ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
    – and –
BRIAN E. COCHRAN (286202)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, on Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> EXTREME NETWORKS, INC., EDWARD B. MEYERCORD III, RÉMI THOMAS, CRISTINA TATE, and KEVIN RHODES, <br><br> Defendants. | Case No.   5:24-cv-05102 <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

1    Plaintiff Steamfitters Local 449 Pension & Retirement Security Funds ("plaintiff"), on

2    behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's

3    complaint against defendants, alleges the following based upon personal knowledge as to plaintiff

4    and plaintiff's own acts, and upon information and belief as to all other matters based on the

5    investigation conducted by and through plaintiff's attorneys, which included, among other things,

6    a review of U.S. Securities and Exchange Commission ("SEC") filings of Extreme Networks, Inc.

7    ("Extreme" or the "Company"), the Company's press releases, and analyst reports, media reports,

8    and other publicly disclosed reports and information about the Company.  Plaintiff believes that

9    substantial additional evidentiary support will exist for the allegations set forth herein after a

10   reasonable opportunity for discovery.

## NATURE OF THE ACTION

12   1.    This is a federal securities class action on behalf of all persons who purchased

13   Extreme common stock between July 27, 2022 and January 30, 2024, inclusive (the "Class

14   Period"), against Extreme and certain of its officers and directors for violations of the Securities

15   Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

17   2.    Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.  The claims

18   asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a),

19   and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

20   3.    Venue is proper here pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b)

21   because certain defendants reside in this District, the Company has offices in this District, and the

22   events and omissions giving rise to the claims asserted herein occurred in substantial part in this

23   District, including the dissemination of false and misleading statements in this District.

24   4.    In connection with the acts alleged herein, defendants, directly or indirectly, used

25   the means and instrumentalities of interstate commerce, including, but not limited to, the mails,

26   interstate telephone communications, and the facilities of the national securities markets.

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                    - 1 -

**PARTIES**

5.      Plaintiff Steamfitters Local 449 Pension & Retirement Security Funds, as set forth in the accompanying certification, which is incorporated by reference herein, purchased Extreme common stock during the Class Period and was damaged thereby.

6.      Defendant Extreme is a provider of computer networking solutions and related services and support.  Extreme common stock trades on the Nasdaq Global Select Market ("Nasdaq") under ticker symbol "EXTR."

7.      Defendant Edward B. Meyercord III ("Meyercord") served as President and Chief Executive Officer ("CEO") of Extreme as well as a director of the Company throughout the Class Period.

8.      Defendant Rémi Thomas ("Thomas") served as Chief Financial Officer ("CFO") of Extreme from November 2018 to February 2023.

9.      Defendant Cristina Tate ("Tate") served as Interim CFO of Extreme from February 2023 to May 2023.  During the remainder of the Class Period, she served as Senior Vice President of Financial Planning & Analysis.

10.      Defendant Kevin Rhodes ("Rhodes") served as CFO of Extreme from May 2023 through the end of the Class Period.

11.      Defendants Meyercord, Thomas, Tate, and Rhodes are collectively referred to herein as the "Individual Defendants."  Extreme and the Individual Defendants are collectively referred to herein as "defendants."

12.      Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, markets, competition, sales, demand, backlog, and present and future business prospects.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

13.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate truthful, accurate, and complete information with respect to the Company's business, operations, services, markets, competition, sales, demand, backlog, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14.     The Individual Defendants, because of their positions of control and authority as officers and directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be false and misleading before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## BACKGROUND

**The Company**

15.     Extreme is a global provider of cloud-based computer networking equipment and related services and support.  Among other products, Extreme designs, develops, and manufactures wired, wireless, and software-defined wide area-network ("SD-WAN") infrastructure equipment. In or around August 2019, Extreme shifted its focus to cloud-based networking.  Extreme's transition to cloud-based networking solutions appeared to begin successfully, with analyst firm Omdia naming Extreme the fastest-growing vendor in Omdia's 2020 Cloud-Managed Networking Market Report.

**Sales, Marketing, and Distribution**

16.     Extreme's sales and distribution channels consist of the following: (i) original equipment manufacturers ("OEM") and strategic relationships: (ii) distributors; (iii) resellers; and (iv) field sales.

17.     First, Extreme has OEM and strategic relationships with a number of large businesses. After testing and validation, the Company's enterprise solutions are marketed and sold by OEMs and strategic partners as part of their end products and services.

18.     Second, Extreme has established several key relationships with leading distributors in the electronics and computer networking industries. Each of the Company's distributors primarily resells Extreme's products to resellers. The distributors enhance Extreme's ability to sell and provide support to resellers who may benefit from the broad service and product fulfillment capabilities offered by these distributors. Distributors are generally given the right to return a portion of inventory to the Company for the purpose of stock rotation, to claim rebates for competitive discounts, and to participate in promotional programs.

19.     Third, Extreme relies on many resellers worldwide that sell directly to the end-user customer. Extreme's relationships with resellers are on a non-exclusive basis. Unlike distributors, Extreme's resellers are not given rights to return inventory and do not automatically participate in any cooperative marketing programs.

20.     Fourth, Extreme utilizes its own field sales organization to support the Company's channel partners and to sell directly to certain end-user customers, including certain large enterprises and service provider global accounts.

**Revenue Recognition**

21.     Extreme derives the majority of its revenue from sales of the Company's networking equipment, with the remaining revenue generated from software as a service ("SaaS") and service fees relating to maintenance contracts, professional services, and training for the Company's products. Products and services may be sold separately or in bundled packages.

22.     Extreme recognizes revenue differently between products and services and subscriptions. For products, revenue is recognized at a point in time, generally when the product

is received.  For services and subscription contracts, revenue is recognized over time as the service is consumed.  For products and services that have multiple performance obligations, the Company allocates the contract's transaction price to each performance obligation based on its relative standalone selling price.

**Backlog**

23.     Backlog is a key Company metric that indicates client demand and future anticipated revenue.  Extreme defines its backlog as confirmed orders with a purchase order for products to be fulfilled and billed to customers with approved credit status.  Actual shipments of products depend on Extreme's manufacturing capabilities and supply chain.  Although the orders included in the backlog are purportedly firm, all orders are subject to possible rescheduling or cancellations by customers, which Extreme may elect to allow on a case-by-case basis.

**The COVID-19 Pandemic Caused Supply Chain**
**Problems Throughout the Networking Industry**

24.     Extreme's products rely on several key components, such as merchant silicon, integrated circuits, and power supplies.  The onset of the coronavirus ("COVID-19") pandemic in early 2020 caused numerous challenges to global supply chains, creating disruptions and bottlenecks that led to a global semiconductor shortage, which in turn led to a shortage of networking equipment.  As a consequence, networking companies like Extreme faced component shortages, increased component and freight costs, and higher order backlogs.  Extreme's backlog rose from $31.7 million as of June 30, 2020 to a high of $555 million as of September 30, 2022.[1]

25.     Because backlog had become increasingly important to the Company's business, by the start of the Class Period Extreme reported its backlog to investors on a quarterly basis. Extreme also reported the related metrics of "Product Book to Bill Ratio" and "Service Book to Bill Ratio" (collectively, "Book to Bill Ratios").  In contrast to backlog, the Book to Bill Ratios refer to the flow of orders for a specified period, *i.e.*, the dollar value of orders received divided by the dollar value of orders shipped and billed during the quarter.  A book-to-bill ratio of above

---

[1]     Extreme's fiscal year ends June 30th of each calendar year.  For example, the Company's 2023 fiscal year ended June 30, 2023 ("FY23").

one implies more orders were received than filled during the period, indicating strong demand, whereas a ratio below one implies less orders were received than filled and thus weaker demand. As reported at the outset of the Class Period, as of June 30, 2022 (the end of the Company's fiscal year 2022 ("FY22")) Extreme's Product Book to Bill Ratio and its Service Book to Bill Ratio were 1.29x.

**During the Class Period, Defendants Engaged
in a Fraudulent Scheme to Conceal Declining
Client Demand**

26.     When Extreme reported its FY22 results on July 27, 2022, the Company stated that it expected improvement in Extreme's supply chain environment during FY23.  Given the significant increase in Company backlog in the wake of the COVID-19 pandemic, investors and analysts questioned how soon the Company would work through its backlog and what impact that process would have on the Company's revenue, growth, and organic demand trends.

27.     To assure investors that the fulfillment of the Company's backlog would add to – and not be at the expense of – the Company's organic revenue, profitability, and prospects, defendants began the Class Period by highlighting Extreme's "unprecedented" and "'unabated market demand'" and "'record backlog,'" which defendants claimed to have "complete visibility into."  Defendants stated that Extreme's backlog would continue to increase to at least $600 million over "the next several quarters" and that it would only "***begin*** to shrink" in the fourth quarter of FY23 ("4Q23").[2]  According to defendants, these factors would lead to "accelerated growth over the next several years" on top of double-digit revenue growth in FY23.  Defendants further told investors that backlog was not expected to normalize to a range of between $50 million to $100 million until fiscal year 2026 ("FY26").

28.     Unbeknownst to investors, however, during the Class Period Extreme was suffering from adverse client demand trends as its clients had ordered more product from Extreme than needed in the wake of the COVID-19 pandemic to avoid supply shortages and because of a lack of alternative sourcing options and thereby cannibalized their Class Period purchasing needs.

---

[2]     Emphasis added here and throughout unless otherwise noted.

Rather than fully and accurately disclosing this fact, as the Company's supply chain constraints eased Extreme began fulfilling its back orders sooner and in larger quantities than defendants had represented in order to create the illusion of continuing organic growth and robust client demand. Essentially, defendants backstopped the loss of organic client demand that Extreme suffered during the Class Period with the fulfillment of back orders. To hide the fact that Extreme's backlog was actually decreasing and "normalizing" faster than defendants had stated (thereby masking declining organic demand and revenue growth), defendants made materially false and misleading statements regarding the Company's organic demand trends. Defendants aided their deception by ending the quarterly reporting of key metrics such as Extreme's backlog and its Book to Bill Ratios, thereby obscuring the true source of the Company's revenues during the Class Period.

29. Rather than come clean about what was happening, defendants repeatedly revised the timeline for drawing down Extreme's backlog in a series of piecemeal disclosures while simultaneously portraying the Company's organic demand as strong and on track. When analysts questioned defendants in ways intended to ascertain the amount of the Company's backlog and the interplay between its normalization and Company demand and revenues, defendants repeatedly misdirected analysts and investors. For example, defendants stated that they did not want to get into "dissecting backlog" and that investors should focus instead on the Company's reported revenues – regardless of whether those revenues were being generated by old orders or new ones.

30. Defendants' Class Period statements, when read in context and in combination, created the false and misleading impression that Extreme was experiencing strong organic customer demand, a sustained backlog, and market share gains that would result in record revenues over the next several years. As a result of these statements, the price of Extreme stock reached a Class Period high of over $32 per share. Ultimately, the true facts concerning these matters emerged in a series of partial corrective disclosures, causing the price of Extreme stock to fall to less than $13 per share and plaintiff and other Class members (defined below) to suffer hundreds of millions of dollars in financial losses and damages under the federal securities laws.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
AND OMISSIONS DURING THE CLASS PERIOD**

31.     The Class Period begins on July 27, 2022.  On that day, Extreme reported its financial results for the fourth quarter and fiscal year ended June 30, 2022 ("4Q22" and "FY22," respectively).  Extreme reported these year-end results in three parts:  (i) Extreme issued a press release (the "FY22 PR"); (ii) Extreme held a conference call with investors and analysts to discuss the Company's financial results (the "FY22 Call"); and (iii) Extreme made a PowerPoint presentation available for the FY22 Call that provided certain additional financial information (the "FY22 PPT").

32.     The FY22 PR, which was subtitled "*Record Bookings and Double-Digit Revenue Growth in FY22 Reiterates FY23 Revenue Growth of 10-15%*," reported that Extreme's revenues for the quarter were "$278.2 million, flat year-over-year, and down 3% quarter-over-quarter"; and Extreme's revenues for FY22 were "$1.1 billion, up 10% from $1.0 billion in fiscal 2021."  The FY22 PR quoted defendants Meyercord and Thomas who highlighted Extreme's purported "'unabated market demand'" and "'record backlog,'" stating in relevant part:

> "*Our teams continue to see <u>unabated market demand</u>, as networking projects remain a priority for our global customers.  This is evidenced by our FY23 funnel of new projects, which is up double-digits from last year*.  Our differentiated Cloud and Fabric solutions are driving more competitive wins today than ever before.  Our new ExtremeCloud SD-WAN and AIOps solutions provide us new ways to drive long-term subscription growth," concluded Meyercord.

> Extreme's Chief Financial Officer Remi Thomas, added, "After another quarter of solid execution, we achieved double-digit growth for the year and improved operating margins, even in the current supply chain environment.  We crossed the $100 million mark in SaaS ARR driven by the strength of our Cloud offerings.  Finally, our strong cash flow performance during the quarter allowed us to return another $20 million to shareholders in the form of share buybacks."

> "*As we enter FY23, our <u>record backlog</u>, combined with the expected improvement in the supply chain environment through the course of the year gives us further confidence that we can grow the topline between 10-15%*, improve our gross margin to exit the year above 60%, and deliver an operating margin between 10-15%," concluded Thomas.

33.     In his prepared remarks on the FY22 Call, defendant Meyercord claimed that Extreme was experiencing "unprecedented demand" and that the Company's backlog would

continue growing for "the next several quarters" and only "begin to shrink" in 4Q23, stating in relevant part:

> *Our results for fiscal '22 highlight <u>unprecedented demand</u> for Extreme's solutions and a very vibrant and healthy market for networking*.
>
> *We reported record bookings growth of 24%, which is a clear indication that we're taking share and winning in the market.  And our forward-looking funnel for fiscal '23 is up double digits year over year.  This is a leading indicator of future bookings growth.  The differentiation of our fabric and cloud solutions for enterprise customers and our targeted solutions for very large service provider customers, combined with the high performance of our global sales and channel teams gives us the confidence in our outlook for continued growth and demand.* Our technology solutions are critical to infrastructure initiatives underpinning digital transformation for all of our customers around the world.  We believe these important projects will continue to remain a priority, irrespective of a changing macroeconomic environment.
>
> *For the year, our double-digit revenue growth led to an all-time high revenue of $1.1 billion, <u>yet it was understated by the $400 million of incremental backlog we built during the year</u>.  Our total Q4 ending backlog was $513 million, thanks to the current supply chain environment*.
>
> *       *       *
>
> *As we noted during our Investor Day in May, <u>we expect to continue to build backlog for the next several quarters</u>, given our outlook for continued bookings growth and the gradual recovery in supply chain.  For the guidance we provided, we expect sequential improvements in our ability to deliver product to customers throughout fiscal '23.  Based on the lead times and commitments, <u>we expect backlog will begin to shrink by Q4 of fiscal '23.  We have complete visibility into our product backlog</u> and have received negligible cancellations to date of less than 1% of bookings*.  Our backlog primarily consists of our latest-generation universal products.  So when we begin to ship product, we will also see an improvement in subscription and services bookings that are attached to our wired and wireless products.

34.     Later in the call, when asked by an analyst about the Company's bookings and pipeline, defendant Meyercord responded that Extreme was still experiencing exceptional demand trends, stating in relevant part:

> *And so Alex, you're rightfully pointing out kind of this – how we're looking at bookings, which is really our measure of true demand, and then versus revenue, and our revenue outlook is really a function of supply chain and product that we are able to release, given the massive backlog that we've built up and the continued strength of bookings*.  So I'll just start off with supply chain.  You've asked about that.
>
> *What we see is a gradual improvement throughout the year.  So think of a step function where we will be stepping our revenue, quarter by quarter, throughout the year, based on our outlook of supply chain.* . . .

*So our teams, as I mentioned in my comments, are more confident today than they have been in our ability to step function our supply of product to our customers' partners.  So what does that mean?  That is how we built the revenue forecast for fiscal '23, which is that step function, with sharper improvement in the second half of the fiscal*.

*As it relates to demand, our demand has been strong, as we talked about it for the year, 24% for us.  That's record-breaking performance*. . . .

In terms of our internal plans, we hit our internal target, which is why we continue to grow bookings.  But relative to where we were in the March quarter with the pricing action, it was different.  *As we look out at the first half of fiscal '23, we see bookings growth continue, and that is a function of several factors*.  First of all, we rely on our teams and our bottoms-up roll-up from direct sellers in the field rolling up geographically.  *There's a lot of confidence from our field teams in the numbers that they're actually calling, I'd say stronger than in years past.  The second thing, we look at that funnel, and we run our own metrics and look at the commit levels and the confidence levels with our algorithms and our formulas there.  And they're up*.  As we mentioned, if you look at our funnel year over year, we are up over double digits in terms of the opportunities.  And over the course of last year, with competitiveness at Extreme, our conversion rates on that funnel have improved, so we're more confident about the quality of the funnel and our ability to win, and we still see growth there.

Finally, we have an AI tool, [recall] the number based on all the CRM activity and looking at the opportunities.  That's up, and now our partners, channel partners and our distributors, they have an outlook and a view, and they're calling a number.  *So when we look at all those different data points, it points to increase in demand*.  What I would tell you is that for the first quarter, we definitely expect to be over a book-to-bill of 1 and that the normal seasonal trends in bookings and comparisons will likely be different because of the pricing actions.

35.     Later on the call, when pressed about the Company's backlog by an analyst, defendant Meyercord confirmed that Extreme expected its backlog to grow to at least $600 million before it would *start* normalizing in 4Q23, stating in relevant part:

*Oh, the backlog, yes.  So, we would expect to see backlog decline.  We would – what we mentioned is that it would level out and start chipping away at that in our Q4.  We're not expecting a meaningful impact, but it's really in the second half of calendar '23 that you'll start to see us take more meaningful chunks out of that backlog*.  And again, it will all be based on supply of components and the increased volume.  *So I think through our fiscal year, the second half of our fiscal year, you'll see a step up, and then throughout fiscal '24 and probably into fiscal '25, you'll see us right-size our backlog*.

\*       \*       \*

*I'm not sure we provided guidance on that, but I think that [$600 million] would be a – I think that's a fairly – I think that's a fairly conservative number. I would say that's a safe number, <u>based on the strength of bookings that we've got relative to supply</u>, especially if you look at the trend over the last several quarters*.

36.     On August 29, 2022, Extreme filed with the SEC its 2022 annual report on Form 10-K ("FY22 10-K"), which was signed by defendants Meyercord and Thomas, who also certified as to the report's accuracy and completeness.  The FY22 10-K included the FY22 financial results provided in the FY22 PR detailed above.

37.     Around the time Extreme filed its FY22 10-K, Extreme made available to shareholders on its website a letter wherein defendant Meyercord highlighted the Company's robust backlog and strong demand, which he claimed positioned the Company for "accelerated growth over the next several years," stating in relevant part:

> ***We are pleased to report record results, unprecedented economic growth and continued business momentum at Extreme as we closed fiscal 2022***. . . .
>
> Revenue exceeded $1.1 billion for the first time in Extreme's history despite unprecedented supply chain constraints.  ***And we exited the year with a record $513 million in product backlog, up 5x from last year, setting the stage for <u>accelerated growth over the next several years</u>.  The continued strength of bookings demand, the re-leveling of our book-to-bill ratio and the high quality of our order backlog gives us greater visibility into the next several years and increased confidence of the returns from our investments in new products, people, and innovations***.

38.     On October 27, 2022, Extreme reported its financial results for the first quarter of FY23 ended September 30, 2022 ("1Q23").  Extreme reported its 1Q23 results in three parts:  (i) Extreme issued a press release (the "1Q23 PR"), a copy of which the Company also filed with the SEC as an exhibit to a Form 8-K signed by defendant Thomas; (ii) Extreme held a conference call with investors and analysts to discuss the Company's financial results (the "1Q23 Call"); and (iii) Extreme made a PowerPoint presentation available for the 1Q23 Call that provided certain additional financial information (the "1Q23 PPT").

39.     The 1Q23 PR, which was subtitled "*Double-Digit Growth Fueled by Cloud Subscription Results in Record Revenue*," reported that Extreme's revenues for the quarter were "$297.7 million, up 11% year-over-year, and up 7% quarter-over-quarter."  The 1Q23 PR quoted defendant Thomas as stating that Extreme was on track to achieve FY23 revenue growth of 10%-15%.  The 1Q23 PR also stated that Extreme was on track to achieve quarterly revenue in the range of $299 to $309 million for its second fiscal quarter of 2023 ("2Q23").

40.     In the prepared portion of defendant Meyercord's remarks on the 1Q23 Call, he highlighted the Company's "record" demand, revenues, and backlog (which he represented would increase through the end of FY23), stating in relevant part:

> *We had a record quarter as demand for cloud-driven networking and for Extreme Solutions has never been stronger.  Again, our share gains are evident by double-digit revenue growth, record revenue and continued growth of backlog, which now sits at $555 million*.

> *                    *          *          *

> *With a strong outlook for bookings growth and the gradual improvement in supply, we expect to build backlog through the end of the fiscal year.  We anticipate neutral book-to-bill or release of backlog in our fiscal Q1 of '24.  Once backlog begins to release, it will unlock an accelerated wave of product shipments and revenue growth over multiple quarters.  We have complete visibility into our product backlog, the vast majority of which is comprised of orders with current delivery request dates*.

41.     In response to an analyst question, defendant Meyercord reiterated that the Company's backlog would increase in FY23, stating in relevant part:

> [W]e're expecting to grow backlog during the year.  So in terms of how we get to our fiscal year growth, the expectation is that we are not reducing backlog, but we're growing backlog.  I just want to clarify that.

42.     Later in the call, defendant Thomas represented that backlog would not normalize to an amount between $50 million and $100 million until FY26, stating in relevant part:

> *Christian, I'll let Ed chime in as well because we're both very close to the topic, but we believe it's going to be fiscal '26 when it really goes back to normal.  And we'd expect our backlog to be anywhere between $50 million to $100 million at that point in time*.

43.     On October 28, 2022, Extreme filed with the SEC its 1Q23 quarterly report on Form 10-Q ("1Q23 10-Q"), which was signed by defendant Thomas and also certified by defendants Meyercord and Thomas as to the report's accuracy and completeness.  The 1Q23 10-Q included the financial results provided in the 1Q23 PR.

44.     The statements referenced in ¶¶32-37 and 39-43 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to Extreme's business, operations, and financial condition, which were known to or recklessly disregarded by defendants as follows:

(a)     that Extreme was suffering from adverse client demand trends as its clients had ordered more product from Extreme than needed in the wake of the COVID-19 pandemic to avoid supply shortages and because of a lack of alternative sourcing options and thereby had cannibalized their Class Period purchasing needs;

(b)     that Extreme was increasingly offsetting these adverse organic demand trends with the fulfillment of backlog orders in a manner that materially exceeded the proportion represented to investors;

(c)     that, as a result of (a)-(b), Extreme was drawing down its backlog at a much faster rate than represented to investors;

(d)     that, as a result of (a)-(c), Extreme's backlog was already decreasing and at a much quicker pace than defendants' statements to investors that backlog would only "begin to shrink" in 4Q23 and it would be not until "fiscal '26 when it really goes back to normal";

(e)     that, as a result of (a)-(d), Extreme's backlog was not on track to continue increasing to $600 million; and

(f)     that, as a result of (a)-(e) above, defendants had materially misrepresented Extreme's organic demand, revenue growth, and market share gains as the fulfillment of Extreme's backlog masked a decline in organic demand and attendant revenues.

45.     Then, on January 25, 2023, Extreme issued a press release announcing the resignation – effective February 16, 2023 – of defendant Thomas, the Company's CFO.  The Form 8-K also stated that defendant Tate would be appointed the Company's Principal Financial and Accounting Officer.  Defendant Tate was to assume these roles while the Company conducted a search for a new CFO.

46.     Also on January 25, 2023, Extreme reported its financial results for its 2Q23 ended December 31, 2022.  In connection with reporting its 2Q23 results, Extreme revealed that, compared to 1Q23, the Company's backlog had *fallen* to $542 million, its Product Book to Bill Ratio had *fallen* from 1.3x to 0.9x and its Service Book to Bill Ratio had fallen from 1.4x to 1.2x. On a related earnings call, Extreme executives also shortened the timeline for backlog normalization.

47.     As a result of this news, the price of Extreme stock dropped from $19.31 per share when the market closed on January 24, 2023 to $16.50 per share on January 25, 2023, a nearly 15% decline on abnormally heavy volume of over 9 million shares traded.  However, because defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, as detailed herein, the price of Extreme stock remained artificially inflated.

48.     On January 25, 2023, Extreme reported its 2Q23 results in three parts:  (i) Extreme issued a press release (the "2Q23 PR"); (ii) Extreme held a conference call with investors and analysts to discuss the Company's financial results (the "2Q23 Call"); and (iii) Extreme made a PowerPoint presentation available for the 2Q23 Call that provided certain additional financial information (the "2Q23 PPT").

49.     The 2Q23 PR, which was subtitled "*Delivers Consistent Double-Digit Growth and Raises FY23 Revenue Outlook*," reported that Extreme's revenues for the quarter were "$318.3 million, up 13% year-over-year, and up 7% quarter-over-quarter."  The 2Q23 PR quoted defendant Meyercord who highlighted "'end customer demand'" and claimed the Company's improving supply chain environment enabled its management to raise the Company's FY23 revenue growth outlook, stating in relevant part:

> President and CEO Ed Meyercord stated: "Extreme delivered another quarter of great results.  ***The continued strength of subscription and accelerated product deliveries drove another quarter of double-digit year-over-year revenue growth.  We are raising our FY23 revenue growth outlook to the high-end of our 10-15% range and expect this momentum to continue into FY24, as the supply chain environment continues to improve***."

> "***We feel confident in end customer demand***.  The majority of our bookings are with government, education, and healthcare sectors, where spending is more resilient.  Our enhanced fabric and cloud subscription offerings are gaining traction in the marketplace.  ***Finally, we have good visibility for the second half of the year based on the strength of our sales funnel," continued Meyercord***.

50.     The 2Q23 PPT included a slide titled "FQ2'23 HIGHLIGHTS" that indicated among the items "DRIVING GROWTH" was "Backlog" of "$542M," which represented a decline from the $555 million reported the prior quarter.  That same slide also noted that the Company's

Product Book to Bill Ratio declined from the prior quarter's 1.3x to 0.9x and the Company's Service Book to Bill Ratio declined from 1.4x to 1.2x.

51.     In defendant Meyercord's prepared remarks on the 2Q23 Call, he highlighted "exceptionally strong" customer demand, the Company's market share gains, and the size of its backlog in raising Extreme's FY23 revenue guidance, stating in relevant part:

> **We had another record quarter, as _demand_ for cloud-driven networking and for Extreme Solutions _remains exceptionally strong with good visibility through fiscal year end '23_, leading us to raise our full year revenue outlook to the high end of our range**.
>
> **Our share gains are evident by a second consecutive quarter of double-digit revenue growth, 17% growth in product revenue**, record free cash flow **and a sizable backlog**.

52.     Later on the call, defendant Meyercord represented that Extreme's backlog would "**remain relatively stable for the next _several_ quarters**" in light of the Company's "strong outlook for bookings growth" and the "gradual improvement of supply," stating in relevant part:

> **On the supply chain side, our ability to pull in components enabled us to achieve revenue upside, which we believe is sustainable into the second half of the year. As a result, we are raising our revenue outlook to the high-end of our prior 10% to 15% guidance range.** We continue to be laser-focused on tactical execution to meet our customer's needs.
>
> This quarter alone, we qualified an additional 37 component suppliers and significantly reduced our parts shortages. **Based on all the actions we've taken with our supply chain over the past year, we now have visibility and confidence that the ramp of our product deliveries will continue to improve and reduce lead times**.
>
> **With a strong outlook for bookings growth and the gradual improvement of supply, we expect backlogs to remain relatively stable for the next several quarters.** We're in the beginning stages of an accelerated wave of product shipments and revenue growth over multiple quarters.

53.     Also during the call, defendant Meyercord stated that customer demand should hold the Company's backlog "very, very stable" through the second half of FY23, stating in pertinent part:

> But our supply chain teams have done a great job. We talked about all the work that's going on behind the scenes. So we are seeing it loosen. So we've seen an acceleration of the release of products. And at the end of the day, we want to take care of our customers with some of that older aged backlog that's out there. . . .
>
> **The second half for us, as you know, we see a lot of demand, and we're really confident and our teams are very confident of that demand. So we have**

*booking strength we see in the second half of the year, and that should hold that backlog – that should hold the backlog very, very stable through the second half of the year.*

54.     During the call, defendant Meyercord revised the Company's timeline for the normalization of its backlog to the last quarter of FY25 ("4Q25") – *i.e.*, the quarter ended June 30, 2025 – based on the "strength of demand" and its expected release of backlog, stating in relevant part:

*We still have the same outlook and the way we've guided that is, that we see backlog returning to normal by the last quarter of fiscal '25.  And then sort of being normal as we enter '26.  And so, that's how we model it.  And that's how we've seen it.  And it's a combination of strength of demand, because we continue to see strong bookings.  And then also just this – the release of backlog in terms of how we forecast supply chain.*

55.     On January 27, 2023, Extreme filed with the SEC its 2Q23 quarterly report on Form 10-Q ("2Q23 10-Q"), which was signed by defendant Thomas and also certified by defendants Meyercord and Thomas as to the report's accuracy and completeness.  The 2Q23 10-Q included the financial results provided in the 2Q23 PR detailed above.

56.     On April 24, 2023, Extreme announced that defendant Rhodes would be the Company's new CFO, effective May 30, 2023.

57.     On April 26, 2023, Extreme reported its financial results for its third fiscal quarter of FY23 ended March 31, 2023 ("3Q23").  Extreme reported its 3Q23 results in three parts:  (i) Extreme issued a press release (the "3Q23 PR"), a copy of which the Company also filed with the SEC on a Form 8-K signed by defendant Tate; (ii) Extreme held a conference call with investors and analysts to discuss the Company's financial results (the "3Q23 Call"); and (iii) Extreme made a PowerPoint presentation available for the 3Q23 Call that provided certain additional financial information (the "3Q23 PPT").

58.     The 3Q23 PR, which was subtitled "*Delivers Record Revenue, Operating Margin, and EPS and Raises FY23 Outlook,*" reported that Extreme's revenues for the quarter were "$332.5 million, up 16% year-over-year, and up 4% quarter-over-quarter."  In the 3Q23 PR, defendant Meyercord highlighted the Company's "'quarter of record results,'" attributing the success to the

Company's improving supply chain, market share gains, and customer demand, stating in relevant part:

> President and CEO Ed Meyercord stated: "***Extreme delivered another quarter of record results punctuated by improving supply chain conditions, the strengthening of our competitive position, and solid execution.  Market share gains were highlighted by 20% growth in bookings from new customers during the quarter, which drove sequential product bookings growth of 6%***.  The combination of our enterprise cloud and fabric networking solutions delivers a simplified experience for customers and provides our team a competitive advantage in the field.  ***Our funnel of opportunities is up double-digits and we expect higher sequential bookings growth as we head into Q4***."

59.    Similar to prior presentations, the 3Q23 PPT included a slide titled "FQ3'23 HIGHLIGHTS" that included a column of items "DRIVING GROWTH."    Unlike prior presentations, however, the slide failed to disclose the Company's backlog amount, the Company's Product Book to Bill Ratio, and the Company's Service Book to Bill Ratio.

60.    In defendant Meyercord's prepared remarks on the 3Q23 Call, he highlighted the quarter's record results, which he attributed to "improvements in our supply chain" and "demand trends."    Defendant Meyercord again revised Extreme's timeline for the normalization of the Company's backlog, this time to the ***first*** quarter of FY25 ("1Q25") (using a revised range of $75 million to $100 million), stating in relevant part:

> ***Extreme delivered another quarter of record results***, driven by solid execution of our teams.  ***Our top line performance was highlighted by improvements in our supply chain that drove 16% total revenue growth and 22% product revenue growth on a year-over-year basis***.  We achieved double-digit growth in 8 of the past 9 quarters.  Our operating margin and EBITDA also achieved quarterly records in Q3.
>
> ***Product orders grew 6% sequentially and orders from new customers grew 20% during this timeframe***.  This is the second consecutive quarter where new logos are playing a substantial role in our growth.  ***We believe demand trends will continue as customers recognize the simplicity of our one network, one cloud solutions relative to the complexity and total cost of ownership of our largest competitors***.
>
> ***Although our Q3 bookings typically decline sequentially in the March quarter, we in fact grew from December, reflecting strong demand***.
>
> *        *        *
>
> This quarter, we were able to bring our lead times down faster than expected in Q3, putting us in a healthier position.  The actions we have taken with our supply chain over the past year give us greater visibility and confidence that the consistently quarter ramp-up of our product deliveries and revenue will continue.

***We expect our backlog will normalize to a range of $75 million to $100 million in our Q1 fiscal '25***.

61.     When pressed by an analyst for more information regarding changes to the Company's backlog, defendants Meyercord and Tate noted the Company's revised normalization parameters, redirected the focus to the Company's revenues, and reaffirmed the Company's mid-teens growth rate through FY25, stating in relevant part:

> [Meyercord:] Yes, Mike, let me jump in and then Cristina, feel free to follow.  Yes, we – ***there's a distributor component of backlog and then there's the customer order component.  And as we said, the customer order component of backlog did not change during the quarter.  But the distributor ordering is driven by lead times and lead times came in faster than we expected this quarter, which that occurrence is good news because it means that the market is getting healthier, and we're able to deliver products to customers sooner***.
>
> ***At the same time, it means that our distributors will adjust their orders accordingly.  And the early ordering that we had experienced earlier would effectively go away and older orders would be adjusted effectively and modified to the shorter lead time.  What we are doing is we're trying to focus people, Mike, on our revenue outlook, and we're confirming the mid-teens revenue growth through our fiscal '25***.
>
> And with a new target point of $75 million to $100 million in ending backlog, we think that distributors going forward are going to have – they'll keep more orders on us and they'll have more inventory on hand so they don't get caught the way they got caught this last cycle.  ***What we want people to do is focus on that $75 million to $100 million, and then that would be a landing point for backlog and then focus on what we're calling is going to be this mid-teens, a mid-teens revenue growth rate through fiscal '25***.  Cristina, I don't know if you want to add anything to that?
>
> [Tate:] Thanks, Ed.  I would just add that the distributor—as we went through this constrained supply chain environment, the days that distributors were on order with us was elevated.  ***And as lead times come down, as Ed mentioned, the whole environment is getting normalized, and so the distributor orders and the backlog is coming to that normalized level of $75 million to $100 million. And we expect to get to that level at around Q1 '25.  And as Ed said, our scenario-based planning gives us commitment and confidence in the guidance that we gave***.

62.     Later in the call, defendant Meyercord stated that Extreme would no longer be providing in its quarterly presentations the backlog and Book to Bill Ratios that Extreme had previously disclosed, stating: "***Yes.  I think what we'll do is just – we'll let you know how we're trending towards that end goal***."

63.     When pressed again for clarification regarding the Company's backlog by an analyst during the call, defendant Meyercord stated that backlog was "about 5x" normal while

highlighting the Company's revenue growth outlook and the normalization of its backlog through 1Q25, stating in relevant part:

> Yes.  Thanks, Christian, for the question.  ***What we've said is that overall backlog is about 5x.  Obviously, distributor behavior is a little more tied to lead times and lead times came down faster.  We're expecting them to come down, so we really don't want to get into sort of dissecting backlog.  Really what we want to do is reinforce our outlook of revenue growth.  And we're doing that out through our fiscal '25, which is out there.  We baked that into our revenue guide, and that's where we're trying to focus everyone***.

64.    On April 27, 2023, Extreme filed with the SEC its 3Q23 quarterly report on Form 10-Q ("3Q23 10-Q"), which was signed by defendant Tate and also certified by defendants Meyercord and Tate as to the report's accuracy and completeness.  The 3Q23 10-Q included the financial results provided in the 3Q23 PR detailed above.

65.    On August 2, 2023, Extreme reported its financial results for 4Q23 and FY23.  Extreme reported these year-end results in three parts: (i) Extreme issued a press release (the "FY23 PR"); (ii) Extreme held a conference call with investors and analysts to discuss the Company's financial results (the "FY23 Call"); and (iii) Extreme made a PowerPoint presentation available for the FY23 Call that provided certain additional financial information (the "FY23 PPT").

66.    In defendant Meyercord's prepared remarks on the FY23 Call, he indicated that "[e]nd customer orders remain firm" and that the normalization of the Company's backlog in 1Q25 remained on track, stating in relevant part:

> ***This quarter, we were able to bring our product lead times down again as our supply chain environment continues to improve.  We have the benefit of a healthy backlog of customer orders with request dates that spread fairly evenly through the end of our fiscal year.  End customer orders remain firm and distributor orders have normalized, giving us confidence in our outlook for this fiscal year***.
>
> ***We continue to expect our backlog to settle in a range of $75 million to $100 million in Q1 '25***.

67.    In defendant Rhodes' prepared remarks on the call, he highlighted Extreme's revenue outlook for fiscal year 2024 ("FY24"), including "continued strong product revenue growth," stating in relevant part:

> To that end, fourth quarter earnings per share were $0.33 at the high end of our guidance entering the quarter.  For the full year, fiscal '23, revenue of $1.3

billion grew 18% from the prior year on product revenue growth of 22%. ***During fiscal year '24, we expect continued strong product revenue growth, given the growing interest in our solution by customers and the ongoing normalization of our backlog***.

68.    When pressed by an analyst for an update on Extreme's backlog, defendant Meyercord refused to quantify the amount of backlog and stated that the Company's backlog would ***start*** to normalize throughout FY24 and into 1Q25, stating in relevant part:

> ***So Mike, we said last quarter that we were not going to give – we were going to move away from giving a specific backlog number each and every quarter.  I think what Ed said in his prepared remarks is that our backlog is now – we feel like it will start to normalize throughout 2024 and into Q1 of 2025.  We feel good about the level of backlog we have.  For instance, it's primarily, I'd say, 90-plus percent is all end customer orders at this point.  And so the distribution orders that we had in the past have basically worked themselves through the system, especially with supply chain getting better.  And so we feel good about those end customer orders and the timing of when those orders need to be shipped to those customers based on their own, I'll call it, like upgrade cycle and whatnot, we feel like it will come down fairly evenly throughout the year and into Q1 of '25.  So feeling good about the level of backlog that we have and the timing of that coming out***.

69.    The statements referenced in ¶¶49-55, 58-64, and 66-68 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to Extreme's business, operations, and financial condition, which were known to or recklessly disregarded by defendants as follows:

(a)    that Extreme was suffering from adverse client demand trends as its clients had ordered more product from Extreme than needed in the wake of the COVID-19 pandemic to avoid supply shortages and because of a lack of alternative sourcing options and thereby had cannibalized their Class Period purchasing needs;

(b)    that Extreme was increasingly offsetting these adverse organic demand trends with the fulfillment of backlog orders in a manner that materially exceeded the proportion represented to investors;

(c)    that, as a result of (a)-(b), Extreme was drawing down its backlog at a much faster rate than represented to investors;

(d)    that, as a result of (a)-(c), Extreme's backlog was not on track to "normalize to a range of $75 million to $100 million in [its] Q1 of fiscal '25" as represented to investors;

(e)     that Extreme's backlog was materially lower than the "about 5x" of the new normal of $75 million to $100 million represented to investors;

(f)     that, as a result of (a)-(e), Extreme's backlog was not on track to "remain relatively stable for the next several quarters" nor "very, very stable through the second half of the year";

(g)     that, as a result of (a)-(f), Extreme could not reasonably achieve "mid-teens revenue growth through [its] fiscal '25" and such representations lacked a reasonably objective factual basis; and

(h)     that, as a result of (a)-(g) above, defendants had materially misrepresented Extreme's organic demand, revenue growth, and market share gains as the fulfillment of Extreme's backlog masked a decline in organic demand and attendant revenues.

70.     Three weeks later, on August 24, 2023, Extreme filed with the SEC its Form 10-K annual report for its FY23 ("FY23 10-K").  The FY23 10-K disclosed the Company's backlog stood at just $267.3 million, revealing a roughly $245 million decline year-over-year and a $275.7 million decline during the prior six months.  The FY23 10-K stated in relevant part:

> ***Our product backlog at June 30, 2023, net of anticipated back-end rebates for distributor sales, was $267.3 million, compared to $513.0 million at June 30, 2022.  The decrease in backlog year over year is primarily due to a combination of a resumption in shipment of orders during fiscal 2023, after experiencing significant delays due to supply chain constraints in prior years, and a reduction in distributor orders due to shorter lead times.***

71.     As a result of this news, the price of Extreme stock dropped from $27.68 per share when the market closed on August 24, 2023 to $25.16 per share on August 25, 2023, a 9% decline on unusually heavy trading volume of over 10 million shares.  However, because defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, as detailed herein, the price of Extreme stock remained artificially inflated.

72.     The FY23 10-K was signed by defendants Meyercord and Rhodes, who also certified as to the report's accuracy and completeness.  The FY23 10-K also included the FY23 financial results in the FY23 PR detailed above.

73.     On November 1, 2023, Extreme reported its financial results for the first quarter of FY24 ended September 30, 2023 ("1Q24").  In connection with reporting its 1Q24 results, Extreme revealed that working through its backlog was resulting in an "air pocket of demand" among end customers that resulted in "more tempered" revenue growth outlook of "mid-to-high single digits" for FY24, and that Extreme was now expecting normalized backlog of between $75 million to $100 million "by the end of Q4 fiscal '24."

74.     As a result of this news, the price of Extreme stock dropped from $20.62 per share when the market closed on October 31, 2023 to $17.86 per share on November 1, 2023, a 13% decline on unusually heavy trading volume of nearly 10 million shares.  However, because defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, as detailed herein, the price of Extreme stock remained artificially inflated.

75.     On November 1, 2023, Extreme reported its 1Q24 results in three parts: (i) Extreme issued a press release (the "1Q24 PR"); (ii) Extreme held a conference call with investors and analysts to discuss the Company's financial results (the "1Q24 Call"); and (iii) Extreme made a PowerPoint presentation available for the 1Q24 Call that provided certain additional financial information (the "1Q24 PPT").

76.     The 1Q24 PR quoted defendant Meyercord who highlighted the Company's increased market share, stating in relevant part:

> "***Extreme delivered another quarter of double-digit growth as we continued to increase both market and mindshare with new customers, while expanding our presence within our existing base***," said Ed Meyercord, President and Chief Executive Officer.

77.     The 1Q24 PR also included financial guidance for Extreme's second quarter of FY24 ending December 31, 2023 ("2Q24"), which stated that the Company was on track to achieve revenues of $312 million to $327 million during the quarter.

78.     In his prepared remarks on the 1Q24 Call, defendant Meyercord maintained a "mid-teens top line growth outlook" for the Company "[o]ver the long term" and reiterated the fourth

fiscal quarter of FY24 ("4Q24") timeline for the normalization of Extreme's backlog, stating in relevant part:

> In light of what we would call an air pocket of demand and decision-making, leading to our revised growth outlook for the year, we took immediate action to realign resources to drive higher productivity and profitability. As a result, we continue to expect high teens operating margin in fiscal '24. That will allow us to grow our EPS by over 25% during the year. Our funnel of opportunities continues to grow up double digits on a year-over-year basis as our underlying business and competitive position remains strong.
>
> ***Over the long term, we expect to return to a mid-teens top line growth outlook*** and a mid-20s operating margin. And here's why.
>
> *       *       *
>
> Our increasing pool of large, high-profile customers and our technology differentiation is why we continue to see the value of deals over $1 million grow each quarter. In Q1, we have more than 30 deals over $1 million. ***We continue to have a healthy customer order backlog with clear visibility to order with specific customer request dates through the balance of our fiscal year***.
>
> This quarter, our product lead times normalize, allowing us to continue working down backlog from product and strengths. ***We continue to expect our backlog to [settle] in a range of $75 million to $100 million by the end of Q4 fiscal '24***.

79.     In the prepared portion of his remarks on the 1Q24 Call, CFO Rhodes lowered FY24 revenue growth expectations to mid- to high single digits and provided 2Q24 revenue guidance in a range of $312 million to $327 million, stating in relevant part:

> Now turning to guidance. ***We remain optimistic about the enterprise networking spending environment and our ability to take share***. However, looking ahead at the balance of fiscal 2024, we are taking a more cautious tone and the current spending environment.
>
> Based on changing customer buying patterns and macroeconomic conditions, we are tempering our revenue outlook for this quarter and the balance of the year. ***We do believe that this is an air pocket as opposed to a more systemic issue within our target markets***.
>
> ***For the second quarter, we expect revenue to be in a range of $312 million to $327 million***; gross margin to be in a range of 60.2% to 62.2%, operating margin to be in a range of 15.4% to 17.3% and earnings to be in a range of $0.26 to $0.31 per diluted share on a share count of 134 million shares.
>
> ***Despite expected near-term market conditions and lower revenue expectations for the full year fiscal '24, <u>we expect mid- to high single digits of revenue growth</u>***, which we believe is above industry growth estimates and implies our share gains will continue.

80.     During the call, defendant Meyercord additionally maintained that backlog would not normalize until the end of 4Q24 even while distributor backlog had already normalized, stating in pertinent part:

> *I think it's fair to say that the – our backlog as it relates to distribution has normalized, but we still have a fair amount of customer backlog that's out there* – and I can give an example of like Kroger.  We had a very large win with Kroger. They're deploying all their stores.  They don't necessarily want all the equipment upfront at once.  They want to time that with their deployment.
>
> So we have customer request dates, very specific customer request dates. That is one of – one example of many.  *And what we've said and what continues to be the case is that we see the normalization of our backlog at the end of fiscal – Q4 of this fiscal year*.

81.     On November 2, 2023, Extreme filed with the SEC its 1Q24 quarterly report on Form 10-Q ("1Q24 10-Q"), which was signed by defendant Rhodes and also certified by defendants Meyercord and Rhodes as to the report's accuracy and completeness.  The 1Q24 10-Q included the financial results provided in the 1Q24 PR detailed above.

82.     The statements referenced in ¶¶76-81 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to Extreme's business, operations, and financial condition, which were known to or recklessly disregarded by defendants as follows:

(a)     that Extreme was suffering from adverse client demand trends as its clients had ordered more product from Extreme than needed in the wake of the COVID-19 pandemic to avoid supply shortages and because of a lack of alternative sourcing options and thereby had cannibalized their Class Period purchasing needs;

(b)     that Extreme was increasingly offsetting these adverse organic demand trends with the fulfillment of backlog orders in a manner that materially exceeded the proportion represented to investors;

(c)     that, as a result of (a)-(b), Extreme was drawing down its backlog at a much faster rate than represented to investors;

(d) that, as a result of (a)-(c), Extreme's backlog was decreasing at a much quicker pace than a normalized range of $75 million to $100 million "by the end of Q4 fiscal '24" as represented to investors;

(e) that, as a result of (a)-(d), Extreme was not on track to achieve 2Q24 revenues of $312 million to $327 million, "mid-to-high single digits" revenue growth for FY24, or "mid-teens top line growth" "[o]ver the long term" as represented to investors and such statements lacked a reasonable objective basis in fact; and

(f) that, as a result of (a)-(e) above, defendants had materially misrepresented Extreme's organic demand, revenue growth, and market share gains as the fulfillment of Extreme's backlog masked a decline in organic demand and attendant revenues.

83. On January 8, 2024, Extreme issued a press release that provided a business update lowering the Company's 2Q24 and long-term revenue outlooks, stating in relevant part:

> ***Second quarter revenues are now expected to be approximately $294 to $297 million, compared to the prior outlook of $312 to $327 million***. . . .
>
> "***Our revised second fiscal quarter outlook reflects industry headwinds of channel*** _**digestion**_ ***and elongated sales cycles.  In late Q2, we saw multiple large deals pushing out to future quarters***," stated Ed Meyercord, President and CEO at Extreme.  "***We remain confident in our long-term strategy and our ability to achieve double-digit long-term revenue and EPS growth supported by competitive customer wins and the growth in our opportunity funnel***."

84. As a result of this news, the price of Extreme stock dropped from $17.52 per share when the market closed on January 8, 2024 to $16.23 per share on January 9, 2024, a 7% decline on unusually heavy volume of over 4 million shares.  However, because defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, as detailed herein, the price of Extreme stock remained artificially inflated.

85. Then, on January 31, 2024, Extreme reported disappointing financial results and operational trends for 2Q24.  Extreme disclosed that its revenues for the quarter were $296.4 million, down 7% year-over-year, and that it had generated just $186.6 million in product revenue, a decline of *37%* year-over-year.  Extreme further revealed that its product backlog had already normalized during the quarter and that the Company made the "conscious decision to put channel digestion behind [it] in the March quarter," leading to a "$40 million to $50 million reduction in

channel inventory in the third quarter" that would result in "[d]emand . . . be[ing] masked by inventory flowing out of the channel."  Rather than increasing revenues as previously represented, Extreme provided new guidance that revealed the Company was in fact on track to suffer lower revenues in FY24 and, in a related earnings call, defendant Meyercord acknowledged that Extreme's "baseline business" was on track to achieve only about $1.1 billion in annual revenues.

86.     As a result of this news, the price of Extreme stock dropped from $16.64 per share when the market closed on January 30, 2024 to $12.59 per share on February 2, 2024, a 24% decline over three trading days on unusually heavy volume.  In total, the price of Extreme stock declined from a Class Period high of $32.27 per share to a low of $12.59 per share after the revelation of the truth, a greater than **60%** decline.

87.     Extreme has continued to report a deterioration in its business.  On May 1, 2024, Extreme stated that it had achieved product revenue of just $106.4 million for its third fiscal quarter of FY24 ended March 31, 2024 ("3Q24") – less than half the $241.1 million in product revenue achieved during the comparable prior year period.  In a press release discussing the results, defendant Meyercord stated that "'channel inventory was significantly reduced during the quarter'" and that the Company's customers were still "'working through their prior purchases.'"  Similarly, on August 7, 2024, Extreme stated that it had achieved 4Q24 revenue of just $256.7 million, down 29% year-over-year, and annual revenue of $1.1 billion, down 15% year-over-year.  The Company also stated it was taking an additional provision for excess and obsolete inventory and loss on its supplier commitments of $46.5 million in 4Q24 and $64.5 million during FY24.  These charges contributed to over $54 million in net losses for 4Q24.

88.     As a result of defendants' wrongful acts and omissions, and the declines in the market value of Extreme stock, plaintiff and other Class members have suffered significant losses and damages under the federal securities laws for which they seek redress through this action.

### ADDITIONAL SCIENTER ALLEGATIONS

89.     As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated during the Class Period to the investing public in the name of Extreme, or in their own name, were

1   materially false and misleading.   Defendants knowingly and substantially participated or

2   acquiesced in the issuance or dissemination of such statements and documents as primary

3   violations of the federal securities laws.   Defendants, by virtue of their receipt of information

4   reflecting the true facts regarding Extreme and its backlog, organic demand, revenues, and market

5   share, and their control over and/or receipt and/or modification of Extreme's materially false and

6   misleading statements, were active and culpable participants in the fraudulent scheme alleged

7   herein.

8          90.   Defendants knew and recklessly disregarded the false and misleading nature of the

9   information they caused to be disseminated to the investing public.   The fraudulent scheme

10   described herein could not have been perpetuated during the Class Period without the knowledge

11   and complicity of, or at least the reckless disregard by, personnel at the highest levels of Extreme,

12   including the Individual Defendants.

13          91.   The Individual Defendants, because of their positions with Extreme, controlled the

14   contents of Extreme's public statements during the Class Period and were intimately involved in

15   Extreme's business.   The Individual Defendants were each provided with or had access to the

16   information alleged herein to be false and misleading prior to or shortly after its issuance and had

17   the ability and opportunity to prevent its issuance or cause it to be corrected.   Because of their

18   positions and access to material, non-public information, the Individual Defendants knew or

19   recklessly disregarded that the adverse facts specified herein had not been disclosed to and were

20   being concealed from the public and that the positive representations that were being made were

21   false and misleading.

22          92.   A number of additional facts support plaintiff's allegations that defendants

23   fraudulently concealed negative information concerning Extreme's demand, backlog, revenue

24   growth, and market share before the truth was revealed.

25          93.   First, in their public comments the Individual Defendants held themselves out as

26   the persons most knowledgeable to speak about Extreme's customer demand trends, revenue

27   growth rate, supply chain, backlog, and Book to Bill Ratios.   Defendants' frequent discussion of

28   these topics demonstrates their knowledge of the importance of these topics to investors and their

familiarity with the facts at issue. Defendants also admitted they had detailed knowledge regarding the Company's supply chain issues and backlog. For example, during the 1Q23 Call, defendant Thomas stated: "***We get a weekly reads from my supply chain teams*** as to what they're able to ship this quarter." Also on that call, defendant Meyercord represented that "***[w]e have complete visibility into our product backlog***, the vast majority of which is comprised of orders with current delivery request dates." In other instances, defendants described their visibility into backlog as "***clear***" (on the 1Q24 Call) and "***complete***" (on the FY22 Call). Defendant Thomas has also conceded that he and defendant Meyercord were "***both very close to the topic***" of the Company's backlog. Admissions of this nature by defendants as to their personal knowledge of the information alleged to be concealed from investors during the Class Period provide strong evidence of scienter.

94. Second, during the 2Q24 Call, defendants admitted that they had significant control over how much backlog was processed each quarter, evincing their personal involvement in the misrepresented aspects of Extreme's business. Defendant Meyercord, for instance, stated that "***[w]e've made the <u>conscious decision</u> to put channel digestion behind us in the March quarter***." He further explained:

> ***And we had to <u>make a decision</u> as to whether or not we want to <u>manage this out over time or take it all in one fell swoop</u>. And our view and our perspective is to get it cleaned up and get normalized as we head into Q4 and turn the corner on '25. And that's how <u>we've made the decision</u> that we're making***.

Defendants' representations that, as supply chain constraints eased, they controlled how quickly Extreme would normalize its backlog creates and adds to a strong inference of defendants' scienter. Acknowledgment of this level of control confirms that defendants had access to the information necessary to determine the amount of Extreme's backlog, when backlog could be normalized, and whether the fulfilment of Extreme's backlog was masking a decline in organic demand and growth.

95. Third, starting with the reporting of Extreme's 3Q23 results on April 26, 2023, defendants suspiciously stopped reporting the amount of the Company's backlog (on a quarterly basis) and the Company's Book to Bill Ratios in a manner designed to conceal the true source of the Company's reported revenues. Defendants concealed this information even though they

1  previously deemed it material enough to investors to warrant disclosure and were well aware of

2  investor concerns about how normalization of the Company's backlog would impact the

3  Company's revenues and growth as illustrated by the frequency with which analysts questioned

4  them on these topics.  Notably, when pressed for information about the Company's backlog and

5  organic growth trends, defendants repeatedly misdirected analysts and investors, telling them to

6  focus on the overall amount of Company revenue while obscuring the source of that revenue.  For

7  example, on the 3Q23 Call, defendant Meyercord stated that "we really don't want to get into sort

8  of dissecting backlog.  Really what we want to do is reinforce our outlook of revenue growth."

9  Similarly, on the FY23 Call, defendant Meyercord rebuffed a request for an update on the amount

10  of backlog by saying: "So Mike, we said last quarter we were not going to give – we were going

11  to move away from giving a specific backlog number each and every quarter. . . .  We feel good

12  about the level of backlog we have."  Defendants' failure to provide information that they had

13  previously deemed material, without an adequate explanation of why that information was no

14  longer relevant to investors, provides further evidence that defendants were acting in bad faith and

15  with fraudulent intent.

16        96.    Fourth, defendants stated that they tracked backlog and Book to Bill Ratios

17  internally, thereby confirming both the materiality of these metrics as well as defendants'

18  knowledge of this information.  For example, on the 3Q23 Call, even when stating that they would

19  no longer publicly disclose backlog and Book to Bill Ratios as part of their quarterly presentations,

20  defendants stated they would still track the metrics internally such that they knew how the

21  Company was "trending."  In other instances, defendants provided a range for the Company's

22  current backlog, demonstrating their knowledge.  Moreover, the Company's ultimate disclosure of

23  its backlog amount in its FY23 10-K (and the resultant sharp decline in the price of Extreme stock)

24  provides further evidence of the critical importance of this information to investors and confirms

25  that defendants were tracking it.

26        97.    Fifth, multiple executives departed the Company during the Class Period.

27  Defendant Thomas, the Company's CFO, resigned unexpectedly on January 25, 2023, purportedly

28  to accept a position at an unnamed privately held software company.  Additionally, on January 8,

1   2024, the day that the Company unexpectedly provided a negative business update concerning

2   2Q24, the Company announced Chief Revenue Officer ("CRO") Joe Vitalone had resigned as

3   CRO.  These executive departures bolster an already compelling inference of scienter.

4          98.     Sixth, defendants had the motive and opportunity to commit fraud.  For example,

5   during the Class Period, defendant Meyercord sold over 585,000 shares of Extreme stock for total

6   proceeds of $11.6 million.  These sales were suspicious in timing and amount as they preceded the

7   disclosure of all of the adverse information regarding the Company's demand, backlog, revenue

8   growth, and market share detailed herein.

9   **NO SAFE HARBOR**

10          99.     The "Safe Harbor" warnings accompanying Extreme's reportedly forward-looking

11   statements ("FLS") issued during the Class Period were ineffective to shield those statements from

12   liability.  To the extent that projected revenues and earnings were included in the Company's

13   financial reports prepared in accordance with Generally Accepted Accounting Principles

14   ("GAAP"), they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C.

15   §78u-5(b)(2)(A).

16         100.    Defendants are also liable for any false or misleading FLS pled because, at the time

17   each FLS was made, the speaker knew the FLS was false or misleading, and the FLS was

18   authorized and approved by an executive officer of Extreme who knew the FLS was false.  None

19   of the historic or present tense statements made by defendants was an assumption underlying or

20   relating to any plan, projection, or statement of future economic performance, as they were not

21   stated to be such assumptions underlying or relating to any projection or statement of future

22   economic performance when made; nor were any of the projections or forecasts made by

23   defendants expressly related to or stated to be dependent on those historic or present tense

24   statements when made.

25   **APPLICABILITY OF PRESUMPTION OF RELIANCE**

26         101.    Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute*

27   *Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against

28   defendants are predicated upon omissions of material fact for which there was a duty to disclose.

102.   Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Extreme stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)   Extreme stock met the requirements for listing and was listed and actively traded on the Nasdaq, a highly efficient market;

(b)   Extreme regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)   Extreme was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

103.   As a result of the foregoing, the market for Extreme stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all those who transacted in Extreme stock during the Class Period suffered similar injury through their transactions in Extreme stock at artificially inflated prices, and a presumption of reliance applies.

104.   Without knowledge of the misrepresented or omitted material facts, plaintiff and other Class members purchased or acquired Extreme stock between the time defendants misrepresented and failed to disclose material facts and the time the facts were disclosed. Accordingly, plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Extreme stock and are entitled to a presumption of reliance on defendants' materially false and misleading statements and omissions during the Class Period.

**LOSS CAUSATION/ECONOMIC LOSS**

105.   During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially

1  inflated the price of Extreme stock by misrepresenting the value of the Company's business and

2  prospects by concealing the slowdown in organic demand for Extreme's products.  As defendants'

3  misrepresentations and fraudulent conduct became apparent to the market, the price of the

4  Company's stock fell precipitously as the prior artificial inflation came out of the stock's price.

5  As a result of their purchases of Extreme stock during the Class Period, plaintiff and other members

6  of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

7        106.  The market for Extreme stock was open, well developed, and efficient at all relevant

8  times.  Throughout the Class Period, Extreme stock traded at artificially inflated prices as a direct

9  result of defendants' materially misleading statements and omissions of material fact, which were

10  widely disseminated to the securities market, investment analysts, and the investing public.

11  Plaintiff and other members of the Class purchased or otherwise acquired Extreme stock, relying

12  upon the integrity of the market price for Extreme stock and market information relating to

13  Extreme, and they have been damaged thereby.

14                       **CLASS ACTION ALLEGATIONS**

15        107.  Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the

16  Federal Rules of Civil Procedure on behalf of a Class consisting of all purchasers or acquirers of

17  Extreme stock during the Class Period.  Excluded from the Class are defendants and members of

18  their immediate families; the officers and directors of the Company at all relevant times and

19  members of their immediate families; the legal representatives, heirs, successors, or assigns of any

20  of the foregoing; and any entity in which defendants have or had a controlling interest.

21        108.  The members of the Class are so numerous that joinder of all members is

22  impracticable.  Throughout the Class Period, Extreme stock was actively traded on the Nasdaq.

23  While the exact number of Class members is unknown to plaintiff at this time and can only be

24  ascertained through appropriate discovery, plaintiff believes there are thousands of members in the

25  proposed Class.  Record owners and other members of the Class may be identified from records

26  maintained by Extreme or its transfer agent and may be notified of the pendency of this action by

27  mail, using the form of notice similar to that customarily used in securities class actions.

28

109.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

110.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

111.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the Exchange Act was violated by defendants as alleged herein;

(b)   whether statements made by defendants misrepresented material facts about the business, operations, and management of Extreme; and

(c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

112.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

113.   Plaintiff incorporates all of the preceding paragraphs by reference.

114.   During the Class Period, defendants disseminated or approved the false statements specified above, which they knew were or deliberately disregarded as misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

115.   Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)   employed devices, schemes, and artifices to defraud;

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Extreme stock during the Class Period.

116.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Extreme stock.  Plaintiff and the Class would not have purchased Extreme stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

117.    Plaintiff incorporates all of the preceding paragraphs by reference.

118.    The Individual Defendants acted as controlling persons of Extreme within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause Extreme to engage in the wrongful conduct complained of herein.  Extreme controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

1      C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in

2  this action, including attorneys' fees; and

3      D.      Awarding such equitable and injunctive or other relief as the Court may deem just

4  and proper.

5  **JURY DEMAND**

6      Plaintiff hereby demands a trial by jury.

7  DATED: August 13, 2024          ROBBINS GELLER RUDMAN
                                  & DOWD LLP

8                               SHAWN A. WILLIAMS

9

10                                  s/ Shawn A. Williams
                              SHAWN A. WILLIAMS

11

12                              Post Montgomery Center
                            One Montgomery Street, Suite 1800

13                              San Francisco, CA  94104
                            Telephone:  415/288-4545

14                              415/288-4534 (fax)

15                              ROBBINS GELLER RUDMAN
                              & DOWD LLP

16                              BRIAN E. COCHRAN
                            655 West Broadway, Suite 1900

17                              San Diego, CA  92101-8498
                            Telephone:  619/231-1058

18                              619/231-7423 (fax)

19                              ROBBINS GELLER RUDMAN
                              & DOWD LLP

20                              RICHARD W. GONNELLO
                            420 Lexington Avenue, Suite 1832

21                              New York, NY  10170
                            Telephone:  212/432-5100

22                              Attorneys for Plaintiff

23

24

25

26

27

28

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY
FUNDS ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at
the direction of plaintiff's counsel or in order to participate in this private action or
any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the
class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period
in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a
class action that was filed under the federal securities laws within the three-year
period prior to the date of this Certification except as detailed below:

*Steamfitters Local 449 Pension & Retirement Security Funds v. Sleep Number Corp., No. 0:21-cv-02669 (D. Minn.) (Both)*
*Jaszczyszyn v. SunPower Corporation, No. 3:22-cv-00956 (N.D. Cal.) (Both)*

6.      Plaintiff will not accept any payment for serving as a representative
party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,
except such reasonable costs and expenses (including lost wages) directly relating
to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 13th day of August, 2024.

STEAMFITTERS LOCAL 449 PENSION
& RETIREMENT SECURITY FUNDS

By:   *James A. Harding*
        James A. Harding, Chairman

EXTREME NETWORKS

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 04/18/2023 | 782 | $18.58 |
| 04/18/2023 | 605 | $18.40 |
| 04/19/2023 | 852 | $15.85 |
| 04/19/2023 | 666 | $16.12 |
| 05/18/2023 | 565 | $18.42 |
| 05/19/2023 | 507 | $18.62 |
| 11/06/2023 | 1,342 | $17.09 |
| 11/06/2023 | 885 | $16.99 |
| 11/07/2023 | 471 | $17.13 |
| 11/07/2023 | 457 | $16.95 |
| 11/10/2023 | 406 | $16.59 |
| 11/20/2023 | 504 | $16.56 |
| 11/20/2023 | 419 | $16.56 |
| 11/21/2023 | 506 | $16.24 |
| 11/21/2023 | 421 | $16.27 |
| 11/22/2023 | 509 | $16.40 |
| 11/22/2023 | 423 | $16.38 |

Prices listed are rounded to two decimal places.