**LABATON KELLER SUCHAROW LLP**
Lauren A. Ormsbee (*pro hac vice*)
Lisa M. Strejlau (*pro hac vice*)
David Saldamando (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
lormsbee@labaton.com
lstrejlau@labaton.com
dsaldamando@labaton.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (Bar No. 250893)
Reed R. Kathrein (Bar. No. 139304)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

*Liaison Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, on Behalf of Itself and All Others Similarly Situated,

Plaintiff,

v.

EXTREME NETWORKS, INC., EDWARD B. MEYERCORD III, RÉMI THOMAS, CRISTINA TATE, KEVIN RHODES, NORMAN RICE, JONAS BROWN

Defendants.

Case No. 3:24-cv-05102-TLT

**CLASS ACTION**

**AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I. NATURE OF THE FRAUD ..... 1

II. JURISDICTION AND VENUE ..... 11

III. THE PARTIES ..... 11

A. Lead Plaintiffs ..... 11

B. Defendants ..... 12

C. Relevant Third Parties – Former Employees ..... 14

IV. SUBSTANTIVE ALLEGATIONS ..... 17

A. Overview of Extreme and the Company's Business ..... 17

B. The COVID-19 Pandemic Leads to Supply Chain Constraints, Increasing Extreme's Backlog ..... 19

C. Extreme Reports Revenue Growth Over FY2022 and FY2023 and Attributes Such Growth to "Exceptionally Strong" Demand and Improvement in the Supply Chain ..... 22

D. Unknown to the Market, Defendants Implemented Manipulative Sales and Inventory Tactics to Inflate Demand, Masking The Company's True, Limited Organic Demand ..... 27

1. Defendants' Fraud Was Aided By Their Chosen Revenue Recognition Model ..... 28

2. In Order to Boost Revenues in the Short Term, Extreme Ships Outdated and Unwanted Product to its Distributors ..... 29

3. Defendants Also Used Manipulative Sales and Inventory Tactics With Extreme's Partners to Misleadingly Accelerate Quarterly Revenues ..... 41

4. Defendants Improperly Inflated Revenues and the Pipeline Based on Other Illusory Sales ..... 52

5. Extreme's Extraordinary Decline In Revenues at the End of and Following the Class Period Demonstrates the Impact of Defendants' Undisclosed Conduct ..... 57

E. During the Class Period, Defendants Also Misrepresented the Strength and "Firm" Nature of Extreme's Product Backlog ..... 62

F. Unknown to the Market, Extreme's Backlog Did Not Reflect "Firm" Orders and Was Not Reflective of Assured "Revenue Growth" ........ 65

1. Former Employees Confirm that Extreme's Backlog Orders Did Not Reflect "Firm" Customer Commitment ........ 65

2. The Significant Gap Between Product Backlog and Product Revenues Further Corroborates that Extreme's Backlog Was Not "Firm" ........ 75

V. THE TRUTH EMERGES THROUGH A SERIES OF PARTIAL DISCLOSURES ........ 81

VI. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........ 87

A. 4Q2022 Earnings Press Release (July 27, 2022) ........ 87

B. 4Q2022 Earnings Investor Presentation (July 27, 2022) ........ 88

C. 4Q2022 Earnings Conference Call (July 27, 2022) ........ 89

D. Extreme's Letter to Shareholders for FY2022 (July 27, 2022) ........ 92

E. Interview with CRN Magazine (August 2, 2022) ........ 92

F. FY2022 Form 10-K (August 29, 2022) ........ 93

G. 1Q2023 Earnings Press Release (October 27, 2022) ........ 94

H. 1Q2023 Earnings Conference Call (October 27, 2022) ........ 96

I. 1Q2023 Form 10-Q (October 28, 2022) ........ 99

J. Needham Virtual Security, Networking & Communications Conference (November 15, 2022) ........ 99

K. 2Q2023 Earnings Press Release (January 25, 2023) ........ 100

L. 2Q2023 Earnings Investor Presentation (January 25, 2023) ........ 101

M. 2Q2023 Earnings Conference Call (January 25, 2023) ........ 102

N. 2Q2023 Form 10-Q (January 27, 2023) ........ 104

O. 3Q2023 Earnings Conference Call (April 26, 2023) ........ 105

P. 3Q2023 Form 10-Q (April 27, 2023) ........ 107

Q. Needham Technology & Media Conference (May 17, 2023) ........ 107

R. 4Q2023 Earnings Press Release (August 2, 2023) ........ 110

S. 4Q2023 Earnings Conference Call (August 2, 2023) ........ 111

T. Rosenblatt Securities Technology Summit (August 22, 2023) ... 114

U. FY2023 Form 10-K (August 24, 2023) ... 115

V. 1Q2024 Earnings Conference Call (November 1, 2023) ... 115

W. 1Q2024 Form 10-Q (November 2, 2023) ... 117

X. Interview with CRN Magazine (November 22, 2023) ... 118

VII. ADDITIONAL ALLEGATIONS OF SCIENTER ... 119

A. The Documents Provided by Former Employees Are Definitive Proof of Scienter ... 119

B. Defendants' Own Statements and Admissions Are Strong Evidence of Scienter ... 120

C. Defendants' Internal Reporting is Strongly Supportive of Scienter ... 123

D. Defendants' Participation in Meetings is Further Indicia of Scienter ... 126

E. Given the Facts Alleged Herein, It Would be Absurd to Believe Defendants Did Not Act With Scienter ... 129

F. In the Constrained Supply Chain Environment, Defendants Had Motive and Opportunity to Accelerate Revenues through Channel Stuffing ... 131

G. Extreme's Executive Compensation Program Further Incentivized the Individual Defendants to Accelerate Revenues in the Short Term, through the Channel Stuffing and Manipulative Sales Tactics ... 133

H. The Retaliatory Culture at Extreme, and the Departures and Resignations of High-Level Executives, Also Support an Inference of Scienter ... 135

VIII. LOSS CAUSATION ... 138

IX. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ... 139

X. THE PRESUMPTION OF RELIANCE ... 140

XI. CLASS ACTION ALLEGATIONS ... 141

XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ... 143

COUNT I ... 143

For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against Defendants Extreme, Meyercord, Thomas, Tate, and Rhodes ... 143

COUNT II ..... 145

For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) Against All Defendants ..... 145

COUNT III ..... 147

For Violation of Section 20(a) of the Exchange Act Against Defendants Meyercord, Thomas, Tate, Rhodes, and Rice ..... 147

XIII. PRAYER FOR RELIEF ..... 148

XIV. JURY DEMAND ..... 149

Lead Plaintiffs Oklahoma Firefighters Pension and Retirement System ("Oklahoma Fire"), Oklahoma Police Pension and Retirement System ("Oklahoma Police"), Oakland County Voluntary Employees' Beneficiary Association ("Oakland County VEBA"), and Oakland County Employees' Retirement System ("Oakland County ERS") (collectively, "Lead Plaintiffs") allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the ongoing investigation of their undersigned counsel ("Lead Counsel"). This investigation includes review and analysis of, among other things: (i) public filings made by Defendant Extreme Networks, Inc. ("Extreme" or the "Company") with the SEC; (ii) transcripts of the Company's conference calls with analysts and investors; (iii) the Company's presentations, press releases, and other public statements; (iv) research reports issued by securities and financial analysts; (v) news and media reports and other publicly available information concerning the Company and Defendants (defined below); (vi) economic analyses of the movement and pricing of the Company's publicly traded securities; (vii) consultation with experts; and (viii) interviews of former employees of the Company (referred to herein as "FE-__"). Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE FRAUD

1. This is a federal securities class action brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of Lead Plaintiffs and all other persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Extreme during the period from July 27, 2022 through January 30, 2024, inclusive (the "Class Period"), and were damaged thereby (the "Class").

2. Lead Plaintiffs' claims arise from a series of material misrepresentations and omissions and a scheme to defraud investors orchestrated by Defendant Extreme and numerous of its key officers and high-level executives, including Extreme's (i) Chief Executive Officer ("CEO"),

Defendant Ed Meyercord ("Meyercord"); (ii) Chief Financial Officers ("CFO") Defendants Rémi Thomas ("Thomas") (CFO until February 2023), Christina Tate ("Tate") (CFO from February 2023 to May 2023), and Kevin Rhodes ("Rhodes") (CFO from May 2023 until the end of the Class Period); (iii) Chief Operating Officer ("COO"), Defendant Norman Rice ("Rice"); and (iv) Senior Director of Worldwide Distribution Sales and Strategy, Defendant Jonas Brown ("Brown") (collectively, the "Individual Defendants").

3. On March 11, 2020, the World Health Organization declared COVID-19 a pandemic, which substantially impacted numerous global supply chains. As relevant here, the consequences of the COVID-19 pandemic included significant manufacturing and shipping disruptions and bottlenecks that led to global semiconductor shortages, amongst other shortages of supplies for networking products manufactured by Extreme.

4. Extreme is a provider and manufacturer of wired and wireless networking products, including wired, wireless, and software-defined wide area-network infrastructure equipment. As the Company entered the constrained supply chain environment brought on by COVID-19, Extreme's business faced the dual pressures of limited supply of its most in-demand products and limited demand for its less popular products.

5. By early-to-mid 2021, numerous analysts reported on and were concerned about Extreme's ability to deliver and generate revenue from its products. Indeed, by the time that Extreme held its earnings call announcing its third fiscal quarter results and outlook on April 28, 2021, analysts asked the Company's leaders to "quantify how the supply chain constraints are impacting your [4Q2021] outlook? And how much revenue you think you're leaving on the table or pushed out to later quarters?" Defendants Meyercord and Thomas responded that the supply chain constraints were having a material impact and were creating downward pressure on Extreme's revenues, and that therefore, Extreme expected its "backlog" to be built up. Accordingly, they announced that Extreme would begin reporting quarterly the amount of its orders on backlog.

6. As employed by Extreme, the reported backlog referred to the amount of revenues the Company would recognize based upon the present amount of "confirmed" orders for products. Importantly, the majority of Extreme's revenues—about 70% of Extreme's total revenues during the

Class Period—were "product" revenues, as opposed to revenues derived from its subscription-based business. And of Extreme's product revenues, more than 80% of these revenues were premised on Extreme's ability to ship orders out to its (i) distributors or (ii) partners, who then themselves deliver the product to the final customer in the sales chain, referred to as the "end user." According to Extreme's adopted "Sales In" revenue recognition model, Extreme reported revenue on orders that were shipped at the time of shipment to the distributor or partner, regardless of when the product reached the end user. However, because Extreme could not supply and fulfill its backlog orders due to supply chain constraints, Extreme could not ship those orders to its distributors and partners and therefore could not report them as revenue, but only as backlog.

7. While Defendants did represent that the orders reflected in the backlog would convert to future revenues, the pressure to generate immediately reportable revenues in this challenging environment led Defendants to embark on a fraudulent scheme that allowed Defendants to represent to investors that Extreme was a Company with organic demand and strong growth. These representations, however, were illusory and misleading. Through the consistent and corroborative accounts of several well-placed former employees, the allegations herein demonstrate how, rather than allow Extreme's sales, pipeline, and flow of purchase orders to be generated organically based on actual demand from Extreme's end users, Extreme and the Individual Defendants engaged in the following improper business practices designed to force through end of quarter sales to inflate Extreme's product revenues throughout the Class Period: (i) shipping unwanted and outdated inventory at the distributor/partner level in exchange for incentives such as discounts, monetary rebates, or prioritization in the product backlog line (*i.e.*, "stuffing" the channel); (ii) shipping inventory to partners early, without a confirmed end user purchase order, in order to "pull in" sales for the quarter; (iii) incentivizing distributors to take unwanted and unneeded inventory by encouraging the use of a right to return a portion of the stock in future quarters; (iv) reneging on those same agreements, which forced the distributors to hold the unwanted product; and (v) manipulating the Company's revenue figures and forecasts by including multi-million dollar orders that Extreme knew it had lost out on to competitors or were improperly double counted—without correction—until after the quarter was over.

8. These undisclosed manipulative sales and inventory tactics had the effect of "pulling in" sales from future quarters and "borrowing" customer demand from future quarters, in order to elevate Extreme's current revenue figures for the present quarter. Importantly, these undisclosed manipulative sales and inventory tactics were not reflective of actual demand and masked true reduced organic demand from Extreme's customers as Defendants reported revenues for the quarter.

9. Defendants hid these tactics from investors and misled the market as to the reason for the Company's well-received revenue growth. Throughout the Class Period, Defendants attributed Extreme's impressive revenue growth to "***strong***" and "***unabated market demand***" for the Company's products.

10. On the first day of the Class Period, July 27, 2022, Extreme announced "double-digit" revenue growth for fiscal year 2022, and stated that this growth was achieved "***due to strong demand***," that "***[o]ur teams continue to see unabated market demand***," and that Extreme "***achieved double-digit growth for the year*** and improved operating margins, ***even in the current supply chain environment***." Analysts repeated and relied upon Defendants' misrepresentations, with Lake Street Capital Markets stating in a report issued that day that the "tale of FY2022 was that ***market demand remains strong for Extreme networking products*** . . . We thought Q4 (Jun) might hint at signs of a slowdown . . . ***but that was not the case***." Lake Street Capital Markets further stated, "Extreme maintained its FY23 revenue target of 10%-15% growth, ***driven by strong demand amongst all major verticals and the unlocking of the backlog***." Given this "***robust demand***," Lake Street Capital Markets issued a Buy rating and raised its price target for Extreme stock to $15.

11. Defendants continued their impressive revenue growth story, making false and misleading statements attributing the Company's product revenue growth to organic customer demand—without disclosing that Defendants' own manipulative sales and inventory tactics were the reason that the Company's met or exceeded its revenue targets.

12. For example, in Extreme's 1Q2023 Earnings Call, Defendant Meyercord stated: "[w]e ***had a record quarter as demand for cloud-driven networking and for Extreme Solutions has never been stronger***. Again, ***our share gains are evident by double-digit revenue growth, record revenue and continued growth of backlog, which now sits at $555 million***." Similar representations

continued and were repeated throughout the Class Period. Consequently, analysts continued to rely on Defendants' statements and assurances that organic demand was strong and growing.

13. The reality was that quarterly product revenue numbers were met not by organic demand and growth but by a systemic channel stuffing scheme directed from the top levels of senior management and done, at the direction of each Individual Defendant. Numerous former Extreme employees who were intimately involved with the Company's sales and business operations during the Class Period describe how Extreme's revenue growth story was a fabrication, and that Defendants orchestrated undisclosed manipulative sales and channel stuffing conduct in order to meet quarterly revenue targets that could not be met by organic customer demand and sales. Importantly, these former employees explain that this channel stuffing and manipulative sales conduct occurred on a global scale, touching Extreme's most important distributors and partners, including its top three distributors that together generated more than half of Extreme's product revenues.

14. For example, FE-1[1], a Senior Distribution Account Manager, described a "Buy-In" process that would occur at the end of every fiscal quarter during his tenure. This process was tailored to meet Extreme's financial revenue targets. According to FE-1, through this "Buy-In" process, Extreme would send unwanted and outdated inventory to the Company's distributors through multiple incentives including: (1) the offer of "points" or rebates, *i.e.*, a monetary discount on the inventory in exchange for the distributors' agreement to take inventory by the end of the quarter; (2) the offer of a valued priority position in front of the backlog line for backlogged products—allowing the distributor to cut the line in front of other distributors with earlier-placed orders (and penalizing distributors who refused to play ball by knocking them to the back of the line); and (3) the use of stock rotation agreements whereby distributors were encouraged to return some portion of unneeded inventory in subsequent quarters. FE-1 described the end of quarter "Buy-In" deals as a "structured deal" with each of the distributors that were made in order for Extreme to "sell more inventory to distribution than distribution needs." All of these incentives and tactics resulted in an unsustainable situation whereby Extreme lost total revenue through unnecessary incentives and rebates, and

[1] In order to protect confidentiality, masculine ("he/him") pronouns will be used to describe the former employees ("FE") of Extreme throughout this Complaint, regardless of identity.

distributors built up inventory in an unsustainable manner that would result in reduced future sales once inventory levels grew too large. Ultimately, FE-1 left the Company as a result of the unethical conduct he witnessed.

15. Notably, according to FE-1, this channel stuffing conduct was organized and directed by Defendant Rice, who was a member of Extreme's C-Suite as COO of the Company. Moreover, FE-1 provided documentation to Lead Counsel demonstrating that FE-1 brought these channel stuffing and manipulative sales tactics ***directly*** to the attention of Defendant Thomas—the CFO of the Company—and others. Specifically, FE-1 conveyed his concerns directly to Defendant Thomas, and also forwarded numerous documents to Defendant Thomas attached to a July 20, 2022 email—one week before the beginning of the Class Period—in which FE-1 stated that Defendant Brown (who reported to Defendant Rice), "works with the distributors to buy bad product that is not sellable to make the corporate number and then artificially suppresses them from rotation [of] bad product to order good product." FE-1 specifically recounted how, based upon his recent conversations with distributor leadership who continues to work with Extreme, Extreme remained engaged in similar inappropriate and unethical channel stuffing practices following FE-1's departure, through the end of the Class Period.

16. Several other former employees corroborate that Extreme and the Individual Defendants continued to engage in their undisclosed manipulative sales and inventory tactics during and throughout the Class Period, all while Defendants made repeated false representations attributing the Company's product revenue growth to strong customer demand and organic sales.

17. FE-3 was a senior level manager of pricing at Extreme until the second half of 2023. FE-3 reported into the Finance leadership of Defendant Tate, who herself reported to Defendants Thomas and then Rhodes. FE-3 explained that it was "***well known internally at Extreme***" throughout his tenure that the sales team was "channel stuffing" by pushing distributors to take orders early to meet sales goals and earn commissions. FE-3 explained that this resulted in extra inventory taken by distributors.

18. Notably, Extreme's manipulative conduct was not only directed at its distributors, but was also directed at its partners too.

19. FE-2, a Director of Sales during the Class Period, confirmed that he witnessed and experienced channel stuffing conduct occur with Extreme's partners. FE-2 explained that with respect to Extreme's partner sales, inventory is normally shipped by Extreme to the partner only when there is an end user purchase order placed. In other words, the end user signing a purchase order triggers the sale, and the product ships thereafter and should only then be recognized as revenues. As stated by many former employees, including FE-2, at the end of each fiscal quarter, Extreme would ship product to a partner and recognize revenues, ***knowing that there was no firm end customer order to justify such shipment***. As a result, partners would hold the inventory for months before the end user ever received delivery of that order. Indeed, in some cases, the end customer purchase order was never even issued.

20. Extreme's reported revenues and growth story that Defendants publicly reported and repeated were not attributable to the represented organic demand for Extreme's products, but rather, were only made possible by Defendants' undisclosed, unsustainable, and accelerated sales tactics that robbed from one quarter to prop up another, creating for each period a misleading representation of organic demand and sustainable growth.

21. In addition to the channel stuffing and improper incentives described above, Defendants' fraudulent manipulation of the truth took another form: as Defendants portrayed a false revenue growth story, they simultaneously misrepresented the nature of Extreme's backlog orders, which had ballooned up to $555 million during the Class Period. These misrepresentations, combined with those described above, communicated to investors that not only was Extreme realizing actual increased organic demand for its core products (a lie), but that the "firm" orders on its backlog—totaling over half a billion dollars—ensured continued growth and revenues in the near future (another lie).

22. During and throughout the Class Period, Defendants made numerous assurances concerning Extreme's backlog, stating that it was poised to unleash product revenue growth for the Company, because Extreme's backlog consisted of "***firm***" customer commitments that were simply "***not cancelable***," and that reflected "***end user demand***." Indeed, Defendants led the market to believe that the "***vast majority***" of the orders reflected in the over half billion-dollar backlog were "***real***

***projects***" and that they did not "***see double ordering***" of Extreme's products on the backlog. Moreover, to the extent there was any risk of cancellation, Defendants led the market to believe that it was in the tune of just "1%" of orders.

23. Importantly, the market strongly relied on these assurances because backlog was intrinsically intertwined with product revenues and the financial health of the Company. Defendants themselves routinely stated that Extreme's product revenues were "understated" by the amount of backlog on the pipeline—meaning that their revenues would have been higher had the orders not been on backlog. And analysts believed them. For example, on July 27, 2022, Needham stated in its analyst report that Extreme had "Visibility Down to the Deal Level: ***No Double Ordering*** as Orders are Tailored to Specific Structured Project Deployments. ***Extreme has long had an order cancellation rate that's solidly less than 1% and that is not changing***. Extreme can see these orders ***with high degree of specificity*** down to the details of the deployment architectures. ***They argue they are confident with this visibility . . . the orders are real and sustainable.***" Similarly, Rosenblatt Securities stated in its August 28, 2022 analyst report that Extreme's revenue "***forecast appears particularly safe due to the Company's highly elevated backlog***." And Rosenblatt Securities wrote in its March 29, 2023 analyst report, in reliance on Defendants' misrepresentations, that: "***Backlog risks seem low. We believe Extreme has excellent visibility to its backlog, and we are confident the risk of double ordering is low***. The company has software tools to know what's in backlog and that no projects are duplicates."

24. In reality, the orders reflected in Extreme's increasingly large backlog—which was five times larger than the Company's baseline pre-COVID backlog—were not firm and therefore were not reasonably correlated to future revenues. Specifically, Defendants concealed that: (1) Extreme's backlog orders as communicated to investors during the Class Period, instead of reflecting "firm" customer commitments, could be cancelled at will at any time by Extreme's customers, and did not reflect end user demand; (2) Extreme's backlog orders with its customers ***included contractual language*** that allowed these orders to be cancelled if another manufacturer met the order and not Extreme; (3) it was well known internally that Extreme's customers were "double-booking," meaning that they were placing orders with both Extreme and other competitors simultaneously and

cancelling the orders with Extreme if the other competitor fulfilled the order first; (4) Defendants ***already*** internally hedged that 10% of the backlog would be cancelled and not be converted to product revenue—a rate materially greater than the 1% of backlog cancellation communicated to the market; and (5) Defendants' internal hedge of 10% was itself known to be severely understated, with one former employee who met quarterly with the C-Suite and reported directly to the C-Suite explaining that the more appropriate hedge for backlog cancellations was up to 66%.

25. Moreover, as mentioned above, the questionable sales tactics employed by Defendants to force through sales at the end of each quarter included leveraging distributors' place on the backlog line with their agreement to take early inventory. The logical ramification of this practice was to deprioritize the backlog position of certain distributors who did not cave to channel stuffing demands, increasing the likelihood that those distributors would acquire the product from a competitor and cancel their Extreme orders.

26. The Individual Defendants were strongly focused on the backlog issues, with one internal message ("IM") from Defendant Brown to FE-1 explaining that there were "[l]ots of eyes on this backlog process – ***it's updated all the way up to [Defendant] Ed [Meyercord]***."

27. Thus, throughout the Class Period, Defendants falsely and misleadingly asserted (1) that its strong product revenues were resultant from organic demand from Extreme's customers; and (2) the hundreds of millions of dollars of backlog that Extreme touted represented "firm," present, commitments from customers and were assured product revenues. In truth, Extreme's revenues were inflated by Defendants' concealed channel stuffing and manipulative sales practices of unwanted and undesired products, and its backlog was inflated by double-booked and readily cancellable orders that were highly unlikely to result in revenues.

28. The truth of Extreme's actual financial state was revealed throughout a series of partial corrective disclosures during the Class Period. For example, on August 24, 2023, Extreme filed with the SEC its Form 10-K for FY2023 (fiscal year ended June 30, 2023), which was signed by Defendants Meyercord and Rhodes. The Form 10-K stated that Extreme lost ***$245 million of backlog***, which reflected an extraordinary decline of 48% year-over-year. On this news, the price of Extreme stock dropped 9% on unusually heavy trading volume.

29. Thereafter, on November 1, 2023, Extreme reported its financial results for 1Q2024—reporting sequential total revenue losses from $363.9 million in 4Q2023 to $353.1 million in 1Q2024. Notably, Extreme also stated that it would discontinue disclosure of its current backlog figure on a quarterly basis. On this news, the price of Extreme stock dropped 13% decline in a single day on unusually heavy trading volume, with a total decrease of 18% over the following days.

30. Then, on January 8, 2024, Extreme issued a press release that provided a business update lowering the Company's 2Q2024 and long-term revenue outlook, stating in relevant part that "second quarter revenues are now expected to be approximately $294 to $297 million, compared to the prior outlook of $312 to $327 million." On this news, the price of Extreme stock dropped an additional 7% on unusually heavy volume.

31. Finally, rather than being on a trajectory of increasing revenues for fiscal year 2024—as previously guided for by Defendants—Defendants disclosed on January 31, 2024 that Extreme's revenues had significantly ***declined*** for 2Q2024, falling from $353.1 million of total revenues in 1Q2024 to $296.4 million in 2Q2024. Critically, Defendants revealed that of that total, its product revenues took the largest hit, totaling only $186.6 million for 2Q2024, compared to $253.5 million from the prior quarter. This represented a decline of $66.9 million, or a ***26% decline*** in product revenue losses quarter-over-quarter.

32. Furthermore, Extreme disclosed that: "[o]ur distributors and partners have lowered inventory purchases, which we expect to accelerate in the third quarter." The Company also revealed that its product backlog had already normalized during the quarter, "earlier than we initially anticipated." In sum, the Company stated that it had made the "conscious decision to put channel digestion behind [it] in the March quarter [*i.e.*, 3Q2024]," leading to a "***$40 million to $50 million reduction in channel inventory in the third quarter***" that would result in "[d]emand . . . be[ing] masked by inventory flowing out of the channel."

33. Following this final corrective disclosure, the market understood that Extreme was not, in fact, growing, calling into serious question the revenue growth story that Defendants previously touted. Indeed, UBS Research downgraded Extreme from a "Buy" to a "Neutral" rating on January 31, 2024—and found that "Extreme's double-digit [revenue] growth in FY22 and FY23

was the result of pandemic-related supply chain delays and depressed demand in FY20 / FY21 followed by double-ordering by customers in FY22 / FY23 to protect against the possibility of supply chain issues. Supply and demand are normalizing in FY24 / FY25 and ***it is now apparent that Extreme is not growing at a sustainable double-digit rate***."

34. As a result of this news, the price of Extreme stock collapsed from $16.64 per share when the market closed on January 30, 2024, to $12.59 per share on February 2, 2024, a 24% decline over three trading days on unusually heavy volume. In total, the price of Extreme stock declined from a Class Period high of $32.27 per share to a low of $12.59 per share after the revelation of the truth, a greater than 60% decline, resulting in investor losses.

35. Lead Plaintiffs bring this action to hold Defendants responsible for their fraud and the resultant significant losses suffered by investors.

## II. JURISDICTION AND VENUE

36. The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

37. The Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

38. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act, 15 U.S.C. § 78aa, because Extreme transacts substantial business and has corporate offices in California, including in this District. Extreme's stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "EXTR." In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. THE PARTIES

### A. Lead Plaintiffs

39. Lead Plaintiff Oklahoma Fire is a multiple-employer, cost-sharing public employee retirement plan that covers 473 cities, 28 fire protection districts, and 135 county fire departments as of June 30, 2024. Oklahoma Fire had $3.4 billion in assets under management as of June 30, 2024.

As set forth in the certifications submitted with its motion for appointment of Lead Plaintiff, (*see* ECF No. 23-2), incorporated by reference herein, Oklahoma Fire purchased Extreme common stock during the Class Period.

40.    Lead Plaintiff Oklahoma Police is a benefit pension fund that provides retirement and related benefits for qualified police officers and their beneficiaries in the state of Oklahoma, with more than 5,046 active members, 3,309 retires, 1,001 beneficiaries, and 174 disabled members as of June 30, 2024. Oklahoma Police had over $3.2 billion in assets under management as of June 30, 2024. As set forth in the certifications submitted with its motion for appointment of Lead Plaintiff, (*see* ECF No. 23-2), incorporated by reference herein, Oklahoma Police purchased Extreme common stock during the Class Period.

41.    Lead Plaintiff Oakland County VEBA provides healthcare benefits for retired employees of Oakland County, Michigan and their spouses and eligible dependents. As set forth in the certification submitted with its motion for appointment of Lead Plaintiff, (*see* ECF No. 23-2), incorporated by reference herein, Oakland County VEBA purchased Extreme common stock during the Class Period.

42.    Lead Plaintiff Oakland County ERS provides pension benefits to retired employees of the Oakland County, Michigan retirement system, and their designated beneficiaries. As set forth in the certification submitted with its motion for appointment of Lead Plaintiff, (*see* ECF No. 23-2), incorporated by reference herein, Oakland County ERS purchased Extreme common stock during the Class Period.

**B.    Defendants**

43.    Defendant Extreme is a public corporation incorporated in the state of Delaware. Founded in 1996, Extreme first incorporated in California in May 1996 and shipped its first products in 1997. The Company reincorporated in Delaware in March 1999 and went public in April 1999. Throughout the Class Period, Extreme common stock traded actively on the NASDAQ under the ticker symbol "EXTR." During the Class Period, there were approximately 130 million shares of Extreme common stock outstanding.

44. Defendant Edward B. Meyercord III ("Meyercord") has served as President and Chief Executive Officer ("CEO") of Extreme since April 2015 and throughout the Class Period. Prior to serving as President and CEO, Meyercord joined Extreme's Board as an independent director in October 2009 and served as Chairman of the Board from March 2011 through August 2015.

45. Defendant Rémi Thomas ("Thomas") served as Chief Financial Officer ("CFO") of Extreme from November 2018 to February 2023.

46. Defendant Cristina Tate ("Tate") served as Interim CFO of Extreme from February 16, 2023 to May 30, 2023. During the entirety of the Class Period, Tate served as Senior Vice President and Head of Financial Planning & Analysis ("FP&A").

47. Defendant Kevin Rhodes ("Rhodes") served as Executive Vice President and CFO of Extreme from May 30, 2023 through the end of the Class Period.

48. Defendant Norman Rice ("Rice") was the Chief Operating Officer ("COO") at Extreme from September 2019 to February 2024. Amongst his duties, Defendant Rice led the Company's Global Supply Chain Management and Operations. On January 8, 2024, Extreme announced through a press release that Defendant Rice would be appointed as Chief Commercial Officer ("CCO"), which is his current title.

49. Defendant Jonas Brown ("Brown") is the Senior Director of Worldwide Distribution Sales and Strategy at Extreme (*i.e.*, "Global Distribution"), and was in that position since June 2018 and throughout the Class Period. According to former employees, Defendant Brown reported directly to the C-Suite through Defendant Rice.[2]

50. Defendants Meyercord, Thomas, Tate, Rhodes, Rice, and Brown are collectively referred to herein as the "Individual Defendants." These Individual Defendants participated in the management of Extreme, had direct and supervisory involvement in Extreme's day-to-day operations, and had the ability to control and did control Extreme's statements to investors. They

[2] Separately, Joseph Vitalone was the Chief Revenue Officer ("CRO") at Extreme from June 2020 to January 2024. According to Extreme's website, Vitalone oversaw global sales, services, channel, and sales operations teams, and his primary responsibilities included "driving sales" and growing Extreme's revenues. On January 8, 2024, Extreme announced through a press release that Joe Vitalone resigned from his position as Chief Revenue Officer of Extreme, "but will serve in an advisory role with the company." Vitalone served as a strategic advisor until August 2024.

were involved in drafting, reviewing, publishing, and/or making the Company's statements to investors, including the false and misleading statements and omissions alleged herein. Further, as discussed herein, Defendants Rice and Brown were aware that their undisclosed conduct would lead to false and misleading statements made by Defendants Extreme, Meyercord, Thomas, Tate, and Rhodes.[3]

51. Extreme and the Individual Defendants are collectively referred to herein as "Defendants."

**C. Relevant Third Parties – Former Employees**

52. FE-1 was the Senior Distribution Account Manager at Extreme from May 2016 through August 2022, and has been in the distribution business for over thirty years. FE-1 reported to the Director of Distribution in the Americas, Joseph Uraco, who in turn, reported to Defendant Brown. Throughout FE-1's tenure at the Company, he managed Extreme's relationship with TD Synnex, one of Extreme's largest distributors. FE-1 worked closely with Defendant Brown on a daily basis. FE-1 decided to leave the Company after witnessing numerous instances of unethical and manipulative channel stuffing behavior with distributors (explained more fully below)—committed by Defendant Rice and Defendant Brown. These channel stuffing and manipulative inventory practices were made known to the Individual Defendants. Specifically, FE-1 explained that he knew Defendant Thomas, and that because of their relationship, Defendant Thomas met with FE-1 to discuss FE-1's departure once FE-1's departure was announced. FE-1 met with Defendant Thomas, gave Defendant Thomas documents demonstrating the unethical channel stuffing conduct that he witnessed, and described the unethical practices that he saw.[4]

---

[3] Indeed, during the Class Period, Defendant Rice spoke to investors in investor conferences, including, for example, in Extreme's November 7, 2023 Analyst Investor Day in New York City. Thus, Defendant Rice would have known that his undisclosed fraudulent scheme would render the other Individual Defendants' statements false and misleading. Similarly, because Defendant Brown reported directly to the C-Suite through Defendant Rice (who was the COO of Extreme), he too, was aware that his undisclosed fraudulent scheme would render the other Individual Defendants' statements false and misleading.

[4] According to FE-1, Extreme personnel communicated internally at Extreme through text messages on their personal phones. He explained that he and other colleagues also often spoke with each other on Extreme's video call function, which was either on Microsoft Teams or Zoom.

53. FE-2 was employed by Extreme throughout the Class Period, including as Director of Sales from before the Class Period to mid-2023. Thereafter, he was an Account Executive until the end of his tenure at Extreme. As Director of Sales, FE-2 reported to Vice President of Sales and Senior Director of SLED (State, Local, and Education) Sales David Savage, who in turn reported to Senior Vice President Sales, Americas, Pete Brant, who in turn reported to Defendant Rice. In his capacity as Director of Sales, FE-2 was responsible for collaborating with end users SLED accounts, including universities, and the channel partners that sold to them, as well as working with Extreme's relevant distributors.[5]

54. FE-3 was a Senior-level Manager of pricing at Extreme from before the Class Period to the second half of 2023. FE-3's responsibilities included executing the rollout of pricing and signing off on deals. FE-3 reported into the Finance leadership of Defendant Tate, who reported to the CFO (*i.e.* Defendant Thomas until February 2023, and then Defendant Rhodes beginning in May 2023).[6]

55. FE-4 was employed by Extreme until December 2022, most recently serving as Senior Regional Distribution Manager operating out of Europe. FE-4 worked directly with leading distributor Westcon during his employment with Extreme.

56. FE-5 was formerly employed by Extreme as Senior Channel Account Manager from March 2022 to April 2024. His responsibilities included collaborating with Extreme's two largest nationwide channel partners. FE-5 explained that he reported to Channel Sales Manager – Strategic Partnerships, Matthew Kilianski, and then Director, Global Solution Partnerships – Americas, Amy Bravo, and lastly Director – Strategic Partnerships, Cameron Marchand. According to FE-5, Kilianski, Bravo, and Marchand reported to Vice President, Americas Channel, Jennifer Orr, who ultimately reported to Defendant Meyercord.

[5] According to FE-2, he and his colleagues often communicated internally using the Company's Microsoft Teams chats and instant messaging. FE-2 also recalled receiving some requests via text message directly to his personal phone, specifically "if they [Extreme] did not want something on a corporate account."

[6] Defendant Tate was the interim CFO from February 2023 to May 2023.

57. FE-6 was a Senior Account Manager at Extreme from July 2017 to October 2022. During different points at his tenure at Extreme FE-6 reported to either David Savage or to FE-2. FE-6 worked as part of the SLED department and except for the K-12 segment of SLED, he worked with distributors and partners throughout his tenure.

58. FE-7 was the former President of a company, which was acquired by Extreme in 2021. FE-7 began working for Extreme in July or August 2021, before officially signing on as an Extreme employee in March 2022. FE-7 explained that he was employed as the Senior Vice President, Strategy, Office of the CTO from March 2022 until March 2023. FE-7 reported to current Chief Technology and Product Officer, EVP/GM Subscription Business, Nabil Bukhari. FE-7 was tasked with analyzing several aspects of Extreme's business, including examining the pricing strategy for Extreme's entire product portfolio. FE-7 attended quarterly meetings with C-Suite executives.

59. FE-8 was employed by Extreme as Senior Vice President Global Channel Sales from January 2022 to November 2023. The Distribution teams reported to FE-8. FE-8 attended "Revenue Assurance" calls led by Defendant Rice, where the Company's backlog was discussed.

60. FE-9 was employed by Extreme as a Channel Account Manager starting before the Class Period, until late 2023. According to FE-9, he was part of a team of employees managing the account and relationship with one of Extreme's largest resellers / partners during the Class Period.

61. FE-10 was employed by Extreme as a Senior Account Executive from after July 2023 until April 2024 and was responsible for accounts in North America.

62. FE-11 was formerly employed by Extreme as an Account Manager from Fall 2022 through the end of the Class Period in the EMEA region. As an Account Manager, he was responsible for ensuring that his partner accounts were set up correctly and received the correct discounts from Extreme's distributors. He was also responsible for ensuring there were no conflicts with end users. FE-11 worked closely and spoke with team members in EMEA who worked directly with the partner accounts.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Overview of Extreme and the Company's Business

63. Extreme is a global provider of cloud-based computer networking equipment and related services. Extreme develops, manufactures, and sells wired and wireless network infrastructure equipment (*i.e.*, "product"), such as wireless access points.

64. Extreme conducts business in three major geographic regions: (1) Americas, (2) Europe, Middle East, and Africa ("EMEA"), and (3) Asia Pacific ("APAC").

65. Extreme's fiscal year ends June 30 of each calendar year. For example, the Company's 2023 fiscal year ("FY") ended June 30, 2023. Thus, 1Q refers to the fiscal quarter ended September 30 of each calendar year; 2Q refers to the fiscal quarter ended December 31; 3Q refers to the fiscal quarter ended March 31 (of the following calendar year); and 4Q refers to the fiscal quarter ended June 30. As an example, 1Q2024 refers to calendar fiscal quarter ended September 30, 2023.

66. The Company reported both (1) product revenues and (2) subscription-based revenues, with product revenues accounting for approximately 70% of Extreme's total revenues during and throughout the Class Period.[7]

67. During the Class Period, Extreme's total revenues were also reported by its two major channels: (1) Direct and (2) Distributor.

68. The Direct channel refers to Extreme selling its products directly to its direct end user customers.

69. The Distributor channel refers to Extreme selling its products to end users through (a) its distributors (who sold to partners/resellers) or (b) its partners/resellers (who sold directly to end users). Accordingly, Extreme's flow of product and sales in the Distributor channel can be illustrated through the following two diagrams:

[continued on next page]

---

[7] Specifically, according to Extreme's SEC filings, product revenues accounted for 62.6% of total revenues for FY2024, 71% of total revenues for FY2023, and 68.5% of total revenues for FY2022.

**Diagram A**

Extreme → Distributors → Partners / Resellers → End Users

**Diagram B**

Extreme → Partners / Resellers → End Users

70. Extreme disclosed that revenues through the Distributor channel were 85% of total product revenues for FY2024, 83% of total product revenues for FY2023, and 80% of total product revenues for FY2022.

71. Further, Extreme stated that its three "largest distributors" were TD Synnex Corporation ("TD Synnex"), Jenne Inc. ("Jenne"), and Westcon Group Inc. ("Westcon").[8] Specifically, Extreme disclosed in its yearly filings that these three distributors collectively accounted for ***more than 50%*** of Extreme's revenues during and throughout the Class Period:

| **Distributor** | **FY 2024** | **FY 2023** | **FY 2022** | **FY 2021** |
|---|---|---|---|---|
| TD Synnex | 21% | 18% | 20% | 19% |
| Jenne | 22% | 15% | 16% | 18% |
| Westcon | 16% | 20% | 18% | 16% |
| **Total** | 59% | 53% | 54% | 53% |

72. **Revenue Recognition**. According to its filings with the SEC, Extreme recognized product revenues at the moment when its products were shipped to Extreme's "customers" (*i.e.* its distributors or partners in the Distribution channel, and end users in the Direct channel)—specifically,

[8] *See*, *e.g.*, Extreme 10-K for FY2022 at 8, 61.

when "control of the product is transferred to the customer (*i.e.*, when the Company's performance obligation is satisfied), which typically occurs at ***shipment*** for product sales."[9]

73. **Backlog**. Additionally, Extreme reported product backlog as a key metric during the Class Period, which indicated the amount of revenue to be recognized based on the present amount of "confirmed orders with a purchase order for products to be fulfilled and billed to customers with approved credit status."[10] Importantly, and as discussed further below, orders on backlog represented orders that had not been "fulfilled" or shipped, and thus, could ***not*** be counted as revenue.

74. **Bookings**. Bookings represented the total value of orders that were received that quarter on a total contract value basis.[11]

### B. The COVID-19 Pandemic Leads to Supply Chain Constraints, Increasing Extreme's Backlog

75. Extreme's networking products rely on several key components, such as merchant silicon, microprocessors, integrated circuits, and power supplies. Extreme utilized a global sourcing strategy that obtained procurement of these materials and product manufacturing from third-party suppliers and original design manufacturers ("ODM") such as Foxconn, Alpha Networks, Lite-On Technology Corp., Senao Networks, Sercomm Corp., and Wistron NeWeb Corp. These third-party manufacturers produced and supplied Extreme's key components for its products.

76. Prior to and throughout the Class Period, Extreme emphasized the significance and importance of its supply chain, stating that:

> We currently purchase several key components used in the manufacturing of our products from single or limited sources and are dependent on supply from these sources to meet our needs. At present, semiconductor chips and other components are currently in high demand with limited supply. These shortages have been exacerbated by increased energy, raw material, and transportation costs, which are resulting in higher overall component costs, higher delivery costs for expedited shipments, and significantly longer than usual lead times for these components.[12]

---

[9] *E.g.*, Extreme 10K for FY2022 (year ended June 30, 2022), at 59.

[10] *E.g.*, Extreme 10-K for FY2023 (year ended June 30, 2023) at 10.

[11] *E.g.*, Extreme 2Q2024 Financial Results Presentation (quarter ended January 31, 2024) at 6.

[12] Extreme 10-K for FY2021 (year ended June 30, 2021) at 14.

77. Extreme further stated that its supply chain and component suppliers had been negatively affected by the COVID-19 pandemic.[13]

78. On March 11, 2020, the World Health Organization declared COVID-19 a pandemic.[14] By late-2020, multiple published studies and articles concluded that the COVID-19 pandemic had impacted global supply chains substantially.[15] Specifically as it related to the networking industry, the COVID-19 pandemic created disruptions and bottlenecks that led to a global semiconductor shortage, amongst other shortages of Extreme's supplies for its networking products.[16]

79. As a result, by early-2021, analysts were concerned about Extreme's ability to deliver products and generate revenue during this constrained supply chain environment. Thus, in April 2021 (a year before the Class Period starts), analysts asked Extreme in the 3Q2021 Earnings Call whether Extreme can "quantify how the supply constraints are impacting your 4Q[2021] outlook? And how much revenue you think you're leaving on the table or pushed out to later quarters"?

80. Defendants Meyercord and Thomas responded that the ongoing supply chain constraints had a "material" "revenue impact" to Extreme and stated that there would be a building up of backlog for the upcoming 4Q2021 quarter (ending June 30, 2021) – stating that "from a revenue perspective, you've seen our book-to-bill[17] number greater than 1. And I think you could expect to

---

[13] *Id.* at 15.

[14] https://www.cdc.gov/museum/timeline/covid19.html

[15] *See, e.g.*, Knut Alicke, et al., *Resetting Supply Chains for the Next Normal*, MCKINSEY & CO. (July 21, 2020), available at https://www.mckinsey.com/capabilities/operations/our-insights/resetting-supply-chains-for-the-next-normal; Nitin Joglekar & Shardul Phadnis, *Accelerating Supply Chain Scenario Planning*, MIT SLOAN MGMT. REV. (Nov. 16, 2020), available at https://sloanreview.mit.edu/article/accelerating-supply-chain-scenario-planning/; THE ECONOMIST, *Changing Places* (Oct. 8, 2020), available at https://www.economist.com/special-report/2020/10/08/changing-place; Mike Cherney, *Firms Want to Adjust Supply Chains Post-Pandemic, but Changes Take Time*, WALL ST. J. (Dec. 27, 2020), available at https://www.wsj.com/articles/firms-want-to-adjust-supply-chains-post-pandemic-but-changes-take-time-11609081200.

[16] *See* Bindiya Vakil & Tom Linton, *Why We're in the Midst of a Global Semiconductor Shortage*, HARVARD BUS. REV. (Feb. 26, 2021), available at https://hbr.org/2021/02/why-were-in-the-midst-of-a-global-semiconductor-shortage.

[17] The Book-to-Bill or "B-B" ratio refers to the flow of orders for a specified period, *i.e.*, the dollar value of orders received divided by the dollar value of orders shipped and billed during the quarter.

see that in this [4Q2021] quarter as well. . . . With our forecast, we're expecting to build backlog in this [4Q2021] quarter."

81. The result of these supply chain constraints led to a large and significant increase in Extreme's backlog of orders from otherwise normal baseline levels. Indeed, Extreme began publicly reporting its total cumulative product backlog on a quarterly basis in 4Q2021 (ending June 30, 2021), and Extreme's backlog grew from approximately $100 million in 4Q2021 to a high of $555 million in 1Q2023. As Defendants touted positively to investors, this increase in backlog gave "confidence" to Defendants' assurances of revenue growth, because, as Defendants explained, the backlog represented assured revenues based off current confirmed orders that simply could not be met at the current moment due to supply chain constraints. Notably, Extreme reported backlog on a quarterly basis from 4Q2021 through 4Q2023, after which it stopped reporting backlog on a quarterly basis:

| **Quarter-End** | **Disclosed Cumulative Backlog ($M)[18]** |
|---|---|
| 4Q2021 | >$100M |
| 1Q2022 | >$200M |
| 2Q2022 | ~$300M |
| 3Q2022 | >$425M |
| 4Q2022 | $513M |
| 1Q2023 | $555M |
| 2Q2023 | $542M |
| 3Q2023 | ~$437.5M[19] |
| 4Q2023 | $267M |

[18] Source: Extreme's Investor Relations website and Extreme's SEC filings.

[19] *See* Extreme 3Q2023 Earnings Call. Defendant Meyercord indicated that Extreme's current product backlog for end of 3Q2023 "represented 5x our expected normalized level [$75 to $100 million]," or about $437.5 million at the midpoint of that range.

82. The chart above can also be represented through the following graph:[20]

**C. Extreme Reports Revenue Growth Over FY2022 and FY2023 and Attributes Such Growth to "Exceptionally Strong" Demand and Improvement in the Supply Chain**

83. As Extreme's backlog ballooned up to $513 million from 1Q2022 to 4Q2022 during the constrained supply chain environment initiated by the COVID-19 pandemic, Extreme nonetheless reported strong revenue growth over that same time frame, touting that revenues increased year-over-year ("YoY") at the start of the Class Period (*i.e.*, quarter-end 4Q2022). In other words, even as Extreme increased its backlog to more than half a billion dollars—which could not yet be counted as revenue—Extreme nonetheless was suspiciously able to report increased revenues.

84. Specifically, Extreme's total revenues increased $100 million YoY, and total product revenues increased $62 million YoY.

85. Extreme touted these results as "***double-digit revenue growth for the year . . . even in the current supply chain environment***," and attributed that growth "***due***" to Extreme's "***strong***" and "***unabated market demand***." Specifically, Defendants stated in Extreme's 4Q2022 Earnings press release on July 27, 2022, that "***For FY22 we achieved double-digit growth*** in both bookings and

[20] The Class Period begins at end of 4Q2022 (*i.e.*, July 27, 2022), and ends at the end of 2Q2024 (*i.e.*, January 30, 2024).

***revenue due to strong demand***," that "***[o]ur teams continue to see unabated market demand***," and that they "***achieved double-digit growth for the year*** and improved operating margins, ***even in the current supply chain environment***."

86. Moreover, Defendants indicated in the 4Q2022 Earnings Call on July 27, 2022 that while Extreme's "double-digit revenue growth led to an all-time high revenue of $1.1 billion," it was still "understated by the $400 million of incremental backlog we built during the year."

87. Defendants not only touted Extreme's results and "unabated market demand" during the Earnings Call, but also projected that the revenue growth would continue—based off the strength of its current backlog and the digestion of that "record" backlog into revenue once those orders would ship. Specifically, Defendants told the market that: "[a]s we enter FY23, ***our record backlog, combined with the expected improvement in the supply chain environment through the course of the year gives us further confidence that we can grow the topline between 10-15%***." Indeed, Defendant Meyercord during the 4Q2022 Earnings Call further emphasized that: "***our revenue outlook is really a function of supply chain and product that we are able to release, given the massive backlog that we've built up***."

88. Analysts believed Defendants' misstatements concerning the attribution of revenue growth to the Company's "strong" organic demand. For example, on July 27, 2022 (the first day of the Class Period), in response to Defendants' 4Q2022 Earnings Call, Lake Street Capital Markets issued an analyst report stating that the "tale of FY22 was that market demand remains strong for Extreme networking products . . . and services . . . We thought Q4 (Jun) might hint at signs of a slowdown, especially in Europe, but that was not the case." Lake Street Capital Markets further stated: "Extreme maintained its FY23 revenue target of 10%-15% growth, driven by strong demand amongst all major verticals and the unlocking of the backlog." Given this "robust demand," Lake Street Capital Markets reiterated its Buy rating and raised its price target for Extreme stock to $15.

89. Similarly, in response to Extreme's 4Q2022 Earnings and Defendants' false and misleading misrepresentation, Needham stated in its July 27, 2022 report that "Extreme believes their demand and robust backlog will enable them to produce double-digit Revenue growth across a wide range of potential scenarios and outcomes." Needham also stated that Extreme: "beat our Revenue

and EPS forecast . . . and importantly, noted a strong, robust pipeline with no evidence of erosion or softening[.]" As a result of Defendants' false assurances, Needham gave Extreme a "Buy" rating and increased the price target to $14.50.

90. During FY2023, Defendants continued to report revenue growth. The following graph shows an increase in Extreme's total revenues, including growth primarily in their distributor channel revenues as compared to direct channel revenues. As shown in the graph below, both total revenues and distributor channel revenues reported an increase from 4Q2022 to 4Q2023, followed by a sharp and significant decline throughout FY2024:

Beginning of Class Period
Revenues ($ Millions)
End of Class Period
$400
$350
$300
$250
$200
$150
$100
$50
$0
1Q22
2Q22
3Q22
4Q22
1Q23
2Q23
3Q23
4Q23
1Q24
2Q24
3Q24
Total Revenue
Distribution Revenue
Direct Revenue

[continued on next page]

24

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

91. Similarly, product revenues also demonstrated a significant increase from 4Q2022 to 4Q2023, followed by a significant decline throughout FY2024, as seen from the following graph:

92. Again, as in the 4Q2022 Earnings Call, Defendants throughout FY2023 articulated that the reason for Extreme's ongoing revenue growth was because of "exceptionally strong" demand. Specifically, Defendants asserted:

> "***We had a record quarter as <u>demand</u> for cloud-driven networking and for*** Extreme ***Solutions <u>has never been stronger</u>.*** Again, our share gains are evident by double-digit revenue growth, record revenue and ***continued growth of backlog, which now sits at $555 million***." (1Q2023 Earnings Conference Call)

> "***We had another record quarter, as <u>demand</u> for cloud-driven networking and for Extreme Solutions <u>remains exceptionally strong</u>*** . . . With a strong outlook for bookings growth and the gradual improvement of supply, ***we expect backlogs to remain relatively stable for the next several quarters***. ***We're in the beginning stages of an accelerated wave of product shipments and revenue growth over multiple quarters***." (2Q2023 Earnings Conference Call)

> "***And we're seeing good demand. We're seeing double-digit growth*** in our weighted funnel year over year. And so that gives us confidence that demand is going to continue." (Needham Technology & Media Conference – May 17, 2023)[21]

[21] The May 17, 2023 Needham Technology & Media Conference occurred roughly two to three weeks after the 3Q2023 Earnings Conference Call.

93. As revenues began to decline slightly in 1Q2024, Defendants nonetheless continued to tout their revenue results as positive growth, and continued to assert that their revenues were strong and attributable to improvements in the supply chain environment. For example:

> "***In the first quarter, we again demonstrated strong financial and operational performance. . . First quarter revenue of $353.1 million grew 19% year-over-year, exceeding the high end of our expectations entering the quarter. . . Product revenue of $253.5 million grew 23% year-over-year, reflecting continued improvement in our supply chain environment***." (1Q2024 Earnings Conference Call)

94. During and throughout the Class Period, analysts continued to believe Defendants' misrepresentations concerning the attribution of revenue growth to Extreme's purported strong organic demand—reflecting the market's reliance on those material misrepresentations.

95. For example, Lake Street Capital Markets stated in its October 27, 2022 analyst report in response to Defendants' 1Q2023 Earnings, that: "Extreme maintained its FY23 revenue target of 10%-15% growth, ***driven by strong demand*** amongst all major verticals." Accordingly, Lake Street Capital Markets again reiterated a "Buy" rating for Extreme stock.

96. Similarly, Craig-Hallum Capital Group LLC stated in its October 28, 2022 analyst report that: "Extreme Networks reported another quarter of solid results. Strong demand and bookings continued to outpace supply and the company continued to build its record backlog. . . . With material backlog set to be a multi-year tailwind to already solid demand trends, and margins to expand and drive material leverage at the same time, we remain very encouraged with Extreme's setup from here. We are reiterating our Buy rating and raising our price target to $22[.]"

97. And, again, Craig-Hallum Capital Group LLC stated in its January 26, 2023 analyst report—in reliance on Defendants' false and misleading misrepresentations—that: "management believes demand will remain strong and expect its strong backlog to remain relatively stable through the next several quarters before beginning to be worked down. . . . With revenue growth expectations in FY23 to be near the high end of the company's previous 10%-15% range, management stated they expect FY24 growth to be within the company's long-term targeted range of 13%-17%. . . with an expectation for continued strong multi-year growth we are maintaining our Buy rating and $22 price target."

**D. Unknown to the Market, Defendants Implemented Manipulative Sales and Inventory Tactics to Inflate Demand, Masking The Company's True, Limited Organic Demand**

98. While Defendants were making their statements attributing Extreme's revenue growth to "exceptionally strong" and "unabated market demand," Defendants implemented undisclosed channel stuffing and other manipulative sales and inventory tactics. These concealed business tactics allowed Defendants to generate record-high revenues, but only did so by improperly masking the reality that there was low organic demand and that Defendants were accelerating revenues into the present by pulling in sales from the future. Defendants engaged in this conduct in an effort to quell market concerns about Extreme's ability to generate revenue during the constrained supply chain environment resultant from the COVID-19 pandemic.

99. While there are different ways to stuff a channel, channel stuffing as referred to herein refers to the act of a company sending more products to its distributors and partners than the company's distributors and partners are capable of selling downstream to end users.[22] Thus, as alleged herein and described more fully below, while the Company touted positive revenue results to the market caused by organic consumer demand for Extreme's products, in reality, the revenue results were a byproduct of Extreme's adoption of undisclosed sales practices that, in large part, resulted in channel stuffing. Extreme's products were sold (or "stuffed") to distributors and partners far in excess of organic consumer demand, resulting in sales that were unsustainable because they resulted in undue channel inventory to the distributors and partners.

100. Multiple former employees at Extreme all confirm and corroborate that during the Class Period, Defendants implemented undisclosed channel stuffing and other manipulative sales and inventory tactics that were designed to accelerate revenues for Extreme's products. These tactics included: (i) stuffing outdated and unwanted inventory at the distributor/partner level in exchange for incentives such as discounts, monetary rebates, or prioritization in the product backlog line for products that customers wanted; (ii) shipping inventory to distributors and partners early, and even without a purchase order by the end user customer, in order to "pull in" sales for the quarter; (iii) allowing distributors a right of return and stock rotation of a portion of the unwanted inventory for

[22] *See* https://corporatefinanceinstitute.com/resources/management/channel-stuffing/.

future quarters (to incentivize them to take the unwanted product); (iv) reneging on those same stock distribution rotation agreements (which forced the distributors/partners to hold the product); and (v) manipulation of the Company's revenue figures and forecasts by including million dollar orders that Extreme knew it had lost out on to competitors or were improperly double counted—***without correction***—until the quarter was over.

101. Notably, these former employees and confidential witnesses describe how Defendants' channel stuffing and other manipulative conduct occurred with (1) TD Synnex, Jenne, and Westcon—the three largest distributor customers of Extreme and which accounted for more than 50% of Extreme's revenues during and throughout the Class Period (*see supra* ¶71), and (2) with Extreme's partners and resellers who had warehouse space for extra inventory.

### 1. Defendants' Fraud Was Aided By Their Chosen Revenue Recognition Model

102. First, Defendants' fraud was made possible by their revenue recognition model, in which revenues were recognized at the moment of shipment of the product to the distributor or partner, as opposed to the end user. As noted above, Extreme's backlog consisted of orders that were not shipped, and therefore, Extreme could not count those orders as revenue. Accordingly, in order to generate Wall Street friendly revenue results, Defendants shipped what they had—outdated and unwanted products and inventory—to Extreme's distributors and partners by offering incentives, rebates, promised returns, and pressures. These sales of outdated and unwanted product ballooned up inventory at the distributor and partner level, while Defendants misleadingly attributed these revenue results and growth to "exceptionally strong" organic demand for Extreme's products.

103. FE-1, a former Senior Distribution Account Manager until August 2022, explained that while former Chief Revenue Officer Bob Gault was in office, Extreme changed their revenue recognition model.[23] According to FE-1, the Company's revenue recognition model changed from a "Point-of-Sale" ("POS") model—which FE-1 explained was recognition of revenue ***only*** when the end user bought the product from Extreme's reseller/partners—to a "Sales-In" model. According to

[23] According to Bob Gault's LinkedIn, he was the Chief Revenue Officer at Extreme until October 2020.

FE-1, with the "Sales-In" model, sales and revenue were recognized as soon as the merchandise physically left Extreme and was on its way into a distributor (as opposed to being recognized when the end user actually purchased and received the product). Importantly, FE-1 explained that purchase orders made by Extreme's customers that were on backlog could not be counted as revenue, because they had not been shipped.

104.    FE-1 explained that the eventual if not desired "outcome" from the switch to a Sales-In model was that Extreme was "able to disguise a multitude of sins" and present "the illusion that things were better" than under the POS model.

105.    FE-1 explained that the switch to a Sales-In model gave Extreme leverage with its distributors that it never had with end users, in order to meet the Company's targets. Specifically, FE-1 stated that the implementation of the Sales-In model allowed Extreme to inflate its revenue by pushing distributors to take inventory at the end of the quarter that the distributors did not need so that the Company's sales appeared larger than actual demand and revenue targets were met.

106.    Similarly, FE-3 explained that Extreme's switch to the revenue recognition model that allowed Extreme to recognize revenue when they shipped their inventory to distributors (and not when received by end users), gave Extreme the ability to "stuff the channel" by incentivizing or forcing Extreme's distributors to take early inventory when they did not need it.

107.    In this way, Extreme's revenue recognition model—while not in and of itself improper or illegal—set the stage for Defendants' fraud and channel stuffing conduct discussed herein.

### 2.    In Order to Boost Revenues in the Short Term, Extreme Ships Outdated and Unwanted Product to its Distributors

108.    The supply chain constraints that Extreme faced created pressures on Extreme management in order to generate revenue—which was compounded by the fact that because orders on backlog could not be shipped, those orders could not be counted as revenues. Indeed, FE-1 provided to Lead Counsel personal notes evidencing meetings that he described as "**Ed talks**" or Ed Meyercord talks, including one from March 17, 2022 (*i.e.*, in 3Q2022), which evidenced Defendant Meyercord's involvement and knowledge of the supply chain constraints facing Extreme, and the inability for Extreme to ship the backlog out as revenue due to such constraints. According to these

notes, and FE-1's explanation of these notes, Defendant Meyercord stated in this particular meeting that (i) the supply chain constraints were "not getting better," (ii) the "constraints were creating backlog," and (iii) that as a result, Extreme "can't ship" this backlog out as revenue.

109. Accordingly, Extreme and the Individual Defendants shipped unwanted and outdated products to its distributors, and "stuffed" these distributors with product that was not reflective of organic demand by Extreme's end customers.

110. FE-1 described a "Buy-In" process that would occur at the end of every fiscal quarter during his tenure, tailored to meet Extreme's financial revenue targets. According to FE-1, Extreme would send outdated and unwanted inventory to the Company's distributors through multiple incentives including (1) "points" or rebates, *i.e.*, a monetary discount on the inventory; (2) priority position in front of the backlog line for backlogged products—allowing the distributor to cut the line in front of other distributors with earlier-placed orders; and (3) stock rotation agreements.

111. Specifically, as to the stock rotation agreements, FE-1 explained that Extreme's contracts with its distributors included a clause where once every quarter, the distributor (TD Synnex) could rotate 15% of the inventory, based upon the prior quarter's receipt of Extreme product. As an example, FE-1 explained if TD Synnex agreed to take $10 million of unneeded / un-demanded inventory in one quarter from Extreme, the next quarter, TD Synnex could rotate up to $1.5 million back to Extreme. According to FE-1, the "sentiment" behind all of this was that Extreme would tell distributors that it can stuff this inventory for this quarter, with the understanding that the distributor could return a portion of it the next quarter.

112. According to FE-1, Defendant Brown organized the Buy-In deals at the end of the quarter. FE-1 described these end of quarter "Buy-In" deals as a "structured deal" with each of the distributors, in order for Extreme to "sell more inventory to distribution than distribution needs." Notably, FE-1 stated that Defendant Brown reported to Defendant Rice, and FE-1 explained that Defendant Rice as COO directed and was involved in all of Extreme's improper channel stuffing and manipulative sales conduct – and that "he would know ***100%***" about such conduct as he directed the conduct. FE-1 also described a process of weekly forecast calls and meetings in which the pipeline reports would be discussed, and ***which would indicate how bad and "unclean" the deals were.***

113. FE-1 further explained that because Defendant Rice and Defendant Brown headed Global Distribution, Defendant Rice and Defendant Brown would target distributors within the global channel network where they could "stuff" inventory, especially toward the end of each quarter. FE-1 described that Defendant Rice and Defendant Brown would do all the "dirty work" regarding channel stuffing and then send that data up to the other Individual Defendants, including Thomas and Meyercord, whom Rice reported to.

114. Extreme's CEO (Defendant Meyercord) and CFOs during the Class Period (Defendants Thomas, Tate, and Rhodes) knew about these sales practices and their intended effect. FE-1 advised that he reported to Director of Distribution Sales, Americas Joseph Uraco, who in turn reported to Defendant Brown, who in turn reported to Defendant Rice. According to FE-1, Defendant Rice as COO was a peer of the C-Suite, which included Defendant Thomas, CRO Vitalone, and Defendant Meyercord.

115. As just one example of the undisclosed channel stuffing behavior, FE-1 recalled that at the end of the same quarter in which the model changed to Sales-In, Defendant Brown directed FE-1 to push TD Synnex to take $1 million in hardware equipment inventory that TD Synnex did not need and had no customers for to help Extreme meet its targets—which TD Synnex did. Importantly, according to FE-1, Defendant Brown was not only doing this with FE-1 and TD Synnex, but with other colleagues and other distributors as well, such that the effects of the channel stuffing conduct were cumulative.

116. According to FE-1 and based on his recent conversations with TD Synnex leadership—who FE-1 states he "100% trusts has intimate knowledge" of the relationship between Extreme and TD Synnex—Extreme was still employing the same inappropriate and unethical channel stuffing practices during and into the end of the Class Period (*i.e.*, January 2024). This included Extreme still doing buy-ins, Extreme still channel stuffing inventory to TD Synnex, and still forcing stock rotations to be reduced.

117. FE-1 described this conduct as allowing Extreme to boost sales and revenue during a downturn with the hope that it did not catch up with the Company in the next quarter if distributors refused to take even more inventory, which in turn led to the need to then push distributors to continue

taking extra inventory. According to FE-1, the problem with this method is that while Extreme makes their sales and revenue targets appear larger for the current quarter, Extreme will then have to "worry about fixing the next quarter," such that Extreme would constantly have to push off underlying demand problems into the future.

118. According to FE-1, TD Synnex and Jenne were the top two distributors that were "being stuffed" at the end of each fiscal quarter and fiscal year in large part because of their willingness to take extra inventory to help Extreme meet their fiscal targets in exchange for (i) discounts and/or (ii) a position at the front of the inventory distribution list when backlogged product became available. Furthermore, FE-1 explained that TD Synnex had the largest account base out of Extreme's distributors and could absorb more inventory. FE-1 also explained that Jenne was a privately held company, as opposed to TD Synnex (who was public), and that Extreme accounted for 40% of Jenne's business. FE-1 described Extreme as having more "wiggle room" to push inventory onto Jenne given that they were a private company that did not have to report forecasts to the market and also relied so heavily on Extreme for business.

119. As to discounts, FE-1 explained that these were "incentives" in which the distributor would receive a percentage rebate off of the product, *e.g.*, 1% off the sale of the unwanted inventory. Extreme did this because it needed to incentivize the distributors to take products they did not need based on current demands.[24]

120. As to the Company's tactics that involved incentivizing inorganic sales in exchange for granting a distributor priority in the backlog distribution line, FE-1 explained that Extreme employed a combination of incentivizing, pushing, pressuring, and leveraging Extreme's distributors against each other to take on inventory at the end of each quarter to meet revenue targets. The resultant

---

[24] Corroborating this, FE-6 (who worked at Extreme until October 2022) also similarly explained that the products sitting in inventory were outdated – meaning that they had old code or outdated "firmware." FE-6 recalled "fire sales" where current products with old code that Extreme did not want to "refresh" being moved. According to FE-6, stock with "old code" required upgrades and additional steps which made it "harder" to sell to end users. FE-6 further explained that if the current model is, e.g., #14 and those in inventory are on #11, then those in inventory needed to be updated to #12, then #13, and finally #14. FE-6 explained that customers do not want product that is not ready to use out of the box unless it came with "a great deal."

outcome was that these distributors who accepted the extra inventory would get moved up the backlog line and have priority for those in-demand but less available products.

121. FE-1 provided specific details of this conduct. FE-1 explained that at one point during his tenure, TD Synnex had $150 million to $200 million on backlog purchase order. FE-1 stated that Defendant Brown then said that if TD Synnex bought $20 million of ***another*** product in the quarter, TD Synnex would get to "keep its place in line" in the backlog line. If TD Synnex did not buy that product, Extreme would shift inventory to distributors who would "play ball." According to FE-1, TD Synnex would then buy product it did not need to keep its place in line. According to FE-1, this meant that where TD Synnex inventory of Extreme products that needed to be sold on to end users used to contain roughly 28 days of supply, as a result of these practices, by the time FE-1 left Extreme in October 2022, TD Synnex ***had 100-200 days of supply***.

122. FE-1 also recalled other quarters when Defendant Brown pressured distributors, especially TD Synnex, to take extra inventory by threatening the distributor with losing its place at the front of the distribution line for newer inventory. FE-1 recalled Defendant Brown telling FE-1 that he was always seeking to sign up more distributors to leverage against each other, including threatening to replace one at the top of the inventory distribution or favorability list if they did not take inventory upon Extreme's request. FE-1 specifically recalled Defendant Brown using this tactic against TD Synnex by threatening to put Jenne ahead of TD Synnex if they did not take inventory, and/or replacing this distributor with another new distributor.

123. FE-1 further recalled a specific instance of Defendant Rice and Defendant Brown trying to get a distributor to take old inventory in order to improve the Company's pipeline reports. According to FE-1, it was sometime in the Spring of 2022, when Defendant Rice and Defendant Brown made FE-1 propose to TD Synnex to buy a $40 million package of old inventory nobody wanted, but noting that if TD Synnex accepted this proposal, it would be prioritized for other in-demand product. FE-1 described this old inventory as "terrible inventory" that included, for example, older cables and antennas.

124. Notably, Extreme shipped unwanted and "outdated" inventory to distributors—recognizing it as shipped revenue—with the promise that the distributors would then be able to return

a portion of it in later quarters under a "stock rotation" plan. As just one example, FE-1 stated that the Company tried to offload "Brocade" hardware—even though Brocade's technology could no longer manage streaming requirements—onto TD Synnex, under the pretense that TD Synnex could always just return the product in a stock rotation.

125. Specifically, according to FE-1, Extreme's contracts with its distributors included a clause where once a quarter the distributor could rotate 15% of old or outdated stock out of its inventory back to Extreme in exchange for new stock of equal value for the next quarter. For example, if a distributor purchased $10 million of product in one quarter, then the distributor could rotate $1.5 million of inventory in the next quarter and offset it with a new purchase order.

126. Sometimes, the timing was even larger, much to the distributors' displeasure. Indeed, according to FE-4, the European distributor Westcon (one of Extreme's top three global distributors by revenue) was allowed up to two quarters to return Extreme's "not saleable products." And according to FE-6, distributors took on product and then in *six months* it needed to be returned for a "refresh."

127. This "right of return" and stock rotation clause thus incentivized distributors to take on unwanted product that did not reflect true organic demand from end users, with the intended result of boosting Extreme's revenues for the immediate quarter. From Extreme's perspective, while a portion of the inventory could be returned by the distributors, that would not be done until after Extreme's fiscal quarter results were reported.

128. However, Extreme reneged even on this stock rotation plan. According to FE-1, Extreme often reneged on allowing distributors to return back the unwanted inventory to Extreme, by reneging on the stock rotation agreement clauses in the contracts, which forced the distributors to hold the unwanted inventory.

129. Specifically, FE-1 explained that Defendant Brown often reneged on honoring Extreme's 15% stock rotation agreement stated in the distributors' contracts. According to FE-1, Defendant Brown reneged on that clause by not allowing the distributors to exercise their contractual rights to return the product. This included instead of honoring the 15% rotation, Defendant Brown often only agreed to go as high as rotating 5% of recently purchased inventory, as an example.

FE-1 added that Defendant Brown often also reneged on the 5% and would delay the rotation as long as he could. FE-1 indicated that reneging on the 15% rotating inventory (and even 5%) allowed Extreme to report inflated numbers to shareholders, while it created "continued distrust" in the distributor's relationship with the Company. Based on FE-1's recent conversations with executives at one of Extreme's distributors, FE-1 advised that the rotating inventory clause in their contract with Extreme has been reduced from around 15% to 5%, and Extreme is still refusing to meet that obligation.

130. The named Defendants either directed and/or were aware of these channel stuffing tactics and their goals. FE-1 explained that Defendant Rice as COO directed and was involved in all of Extreme's improper channel stuffing and manipulative sales conduct – and that "he would know ***100%***" about such conduct as he directed the conduct.

131. FE-6 stated that Defendant Rice was Defendant Meyercord's "right hand man" during the final "few years" of FE-6's tenure. FE-6 stated that Defendant Rice is "part of the problem." According to FE-6, Defendant Rice directed the pulling in of sales, based on FE-6's personal experience on a call that included both FE-6's partner and the end customer – attempting to get both the partner and the customer to accept a multi-million dollar deal. According to FE-6, he heard of other scenarios where Defendant Rice would pull-in sales and where partners and customers would take the inventory. According to FE-6, "we all knew where it was coming from," referring to Defendant Rice.

132. FE-1 also stated that Defendant Rice was fully engaged and directed stuffing inventory shipments because Defendant Brown "got his marching orders from Defendant Rice." FE-1 further explained there was a likelihood that Defendant Meyercord had been exposed to the channel stuffing conduct given that Defendant Rice reported the forecasting updates to the CFO position including Defendant Remi Thomas, who in turn had to report them to Defendant Meyercord. According to FE-1, Defendant Thomas would have relied on the information in the updates provided to him by Defendant Rice, which was then passed up to Defendant Meyercord.

133. Additionally, FE-1 provided documentation to Lead Counsel demonstrating that FE-1 brought these channel stuffing and manipulative inventory practices **directly to Defendant Thomas**, on July 20, 2022—just days before the start of the Class Period.

134. Specifically, FE-1 wrote an email to Defendant Thomas on July 20, 2022 and attached a number of contemporaneous documents to that email. In the body of the email FE-1 stated that "I greatly appreciate you wanting to know the truth about what is going on…[d]uring our conversation, I referenced several specific and detailed issues and encounters."

135. One of the attachments in the email to Defendant Thomas was a separate email that was written by Defendant Brown on June 30, 2022 to a group of employees at Extreme—including Defendant Rice.

136. In this attached email, Defendant Brown requested that the following clause be added to Extreme's distribution contracts: "If a Distributor stock rotates a specific product, they are no longer eligible to re-order 'said' product for the next 12 months." In that email, Defendant Brown further stated that he was "not concerned about policing this new policy. ***Having it in there will be a deterrent and drive the behavior we want***."[25]

137. Notably, this email not only evidences that the stock rotation described above was in place, but also shows that Extreme was seeking to renege on allowing its distributors to return the old inventory as previously agreed to. Indeed, this clause was sought to be added in order to "drive the behavior we want" and discourage distributors from seeking to return or rotate old product, such that it would force the distributors to hold on to this inventory.

138. FE-1 forwarded this email to Defendant Thomas on July 20, 2022—just days before the Class Period—and stated that Defendant Brown "***works with the distributors to buy bad product that is not sellable to make the corporate number*** and then artificially suppresses them from rotation [of] bad product to order good product. He basically wants to punish or threaten them that if they return anything, he will not allow them to buy it again for 12 months…. He basically admits having

[25] Unless otherwise noted, emphasis in any quoted excerpts herein is added.

it there will get the behavior he wants and deter them … from managing their own finances and inventory."[26]

139. In the same July 20, 2022 email to Defendant Thomas, FE-1 also attached numerous other documents and emails that support the fact that Extreme engaged in channel stuffing conduct with the distributors—most specifically evidencing the existence of the stock rotation plan and the right of return with distributors. These documents including the following:

> One IM conversation in which Defendant Brown stated "[w]e forecasted $3M for TD [Synnex] to rotate – they submitted $6.8M**.** That is a HUGE problem for all of us. Josh may have tanked our quarter. I need a plan on how we reverse this . . . if not, our conversion rate will spike, and our auditors will be all over us."[27]
>
> Another IM conversation in which Defendant Brown asked FE-1 whether TD Synnex was "willing to part ways with [its stock rotation clause] for 6+ months?" The discussion concerned a stock rotation submission from TD Synnex for 3Q2022, and Defendant Brown commanded FE-1 that "you need to look at what they [TD Synnex] want to rotate and challenge them when it makes sense," stating "we have massive supply challenges . . ."
>
> A screenshot of contemporaneous notes from FE-1's notebook (dated sometime in 3Q2022), indicating that TD Synnex submitted a stock rotation in 2Q2022 and that as a result, Defendant Brown wanted to "punish them" – referring to TD Synnex. Specifically, Defendant Brown wanted to give them a "bloody nose."

140. FE-1 left the Company as a result of the unethical behavior he witnessed. FE-1 found the pressure exerted on Extreme's distributors to be "embarrassing" and "unethical."

141. FE-1 had separate one-on-one exit interview calls in July 2022, respectively with Defendant Thomas, Executive Vice President of Global Human Resources Kimberly Basnight, and Senior Director of Human Resource, Jim Johnson. In these exit calls, FE-1 explained the unethical channel stuffing and manipulative sales and inventory conduct that he witnessed, to each individual. Notably, FE-1 explained that he never heard back from Basnight after Basnight said in the call that she needed to process this feedback. Furthermore, FE-1 stated that Johnson's response was that he was "not shocked" about Defendant Brown's alleged behavior. And, according to FE-1, Defendant

---

[26] Ellipsis in original.
[27] Ellipsis in original.

Thomas asked FE-1 if he was leaving because of a new opportunity or if there was a problem in the Company, to which FE-1 responded "both."

142. Notably, FE-1 explained that he spoke with a former Extreme colleague around twelve months ago (*i.e.*, early 2024), who spoke with Defendant Thomas sometime after Defendant Thomas left the Company (in February 2023). FE-1 explained that the former Extreme colleague had told him that in this particular conversation, Defendant Thomas stated that he thought he should have done something about the information that was presented to him, but Defendant Thomas stated "he was on his way out" anyway.[28]

143. FE-1 additionally explained that every week the distributors were given inventory lists by Extreme. FE-1 also explained that Extreme *receives* weekly inventory demand reports from its distributors and also a pipeline report which shows what is forecasted, and that these reports had visibility into the end user and reseller demand. According to FE-1, from these reports, Extreme could see what the "true real demand" was from the reseller / end user to the distributor. FE-1 explained that nonetheless, Extreme pushed its distributors to buy additional inventory regardless, even when there was no demand downstream. He added that Extreme ignored their distributors actual demand from their own resellers and end users, and what was on order. Extreme continued to push inventory to the distributors that they did not need, and did not allow them to cancel or return the inventory. FE-1 described these practices as "allowing Extreme to own the distributors' business."

144. Multiple other former employees corroborate that these undisclosed channel stuffing and other manipulative sales and inventory practices with distributors were in place during the Class Period and were widespread in nature throughout the Company.

145. FE-3 was a senior level manager of pricing at Extreme from before the Class Period to the second half of 2023. FE-3's responsibilities included executing the rollout of pricing and

[28] Furthermore, Defendant Thomas in that conversation with FE-1's former colleague explained to the colleague that he (Defendant Thomas) had been pressured by Defendant Meyercord to change how certain statements in presentations were worded when he (Defendant Thomas) was preparing to speak on quarterly investors calls, which Defendant Thomas regretted doing so. According to FE-1, Defendant Thomas told FE-1's former colleague that he left Extreme because he "wanted out."

signing off on deals. FE-3 reported into the Finance leadership of Defendant Tate, who reported to the CFO.

146. FE-3 also corroborated and explained that it was "***well known internally at Extreme***" throughout his tenure at Extreme that the sales team was "channel stuffing" by pushing distributors to take orders early in order to meet sales goals and earn commission. FE-3 explained that this resulted in extra inventory taken by distributors.

147. Additionally, according to FE-3, there were a lot of pre-orders that did not have back-to-back purchase orders. FE-3 described a back-to-back purchase order as a mirror image of a purchase order from an end user for the vendor to have and not just the channel partner. He recalled Extreme having "a lot of pre-orders" without back-to-back purchase orders.

148. FE-3 also confirmed that he witnessed products being pushed to distributors ***without end user purchase orders*** during his tenure, during and into mid-2023 as he left Extreme.

149. FE-4 was employed by Extreme until December 2022, most recently serving as Senior Regional Distribution Manager operating out of Europe. FE-4 worked directly with leading distributor Westcon during his employment with Extreme.

150. FE-4 described Extreme's conduct of prioritizing certain distributors in the backlog line in exchange for the distributor stuffing inventory. FE-4 explained that Westcon and Jenne had a "very big backlog" throughout the latter part of his tenure at the Company. When it came to Westcon specifically, FE-4 described a Vendor Business Lead at Westcon that was in charge of Westcon's backlog for EMEA. This Westcon Vendor Business Lead was close friends with Defendant Thomas.

151. According to FE-4, a dinner occurred sometime in Spring 2022. This dinner included very high managers from Westcon and Defendant Thomas, and another high-level executive management member from Extreme. FE-4 spoke with the Westcon Vendor Business Lead at least two times per week and was told about this Spring 2022 dinner from the Westcon Vendor Business Lead, who had heard about the dinner, what had been discussed, and what the individuals had agreed to. According to FE-4, the scheme to prioritize Westcon's orders was discussed at that dinner.

152. FE-4 explained that, based on his discussions with Westcon Vendor Business Lead as well as other resellers, Extreme was relying on Westcon to clear out Extreme's obsolete and/or end

of life products. According to FE-4, Westcon wanted to fill backlog orders but was forced to buy stock of products nobody wanted to order for the same value as the backlog.

153. As FE-4 explained, in exchange for Westcon's agreement to buy Extreme's obsolete and end of life products, Westcon was then allowed to receive orders off the backlog before other customers who had priority on the backlog list. For example, Westcon would buy $50 million of backlogged products and then be willing to also take on another $50 million of "end of sale" products so Extreme could recognize $100 million in sales. These "end of sale" products, FE-4 explained, were "not saleable products" such as cables, fans, switches, brackets, etc. Westcon was then allowed two quarters to return those "not saleable products."

154. FE-4 went on to say that externally, other customers questioned why Westcon had immediate access to Extreme's products, sometimes being able to get products the same day, as opposed to the customers who had been waiting for backlog for months or even years.

155. Notably, all these witnesses, including FE-1, corroborate each other and demonstrate a pattern and practice whereby Extreme would prioritize certain distributors (like TD Synnex and Jenne) over others in receiving backlogged products, if those distributors would "play ball" and accepted Defendants' stuffed inventory (*see supra* ¶¶118; 121-122).

156. FE-11 (formerly employed by Extreme as an Account Manager from Fall 2022 through the end of the Class Period in the EMEA region) also corroborated this conduct, explaining that Westcon was often asked to take early shipments in order to be prioritized in the backlog line, in EMEA. FE-6 also explained that certain Extreme distributors received special treatment and always had backlogged products in stock.

157. FE-6 further confirmed that Extreme stuffed distributors during his time at the Company and that Extreme also leaned on partners to pull in deals. He further explained that instead of letting deals naturally occur in subsequent quarters, Extreme pulled in deals to make their quarterly number. FE-6 described Extreme's method of pulling in sales as "robbing Peter to pay Paul."

158. According to FE-6, Extreme would make calls to its partners and distributors routinely at the end of each fiscal quarter and year to pull in sales – about 15 days or so before the end of each fiscal quarter. Similar to FE-1's account, FE-6 further explained that Extreme's method of pulling in

deals eventually "catches up to you" when it is done every quarter. FE-6 explained that after a certain period of time customers no longer need product the next time the Company wants to pull a deal in—and when "everyone is tapped out" then there is "panic," corroborating FE-1's account (*see supra* ¶117; *infra* ¶244).

159. In short, these witnesses and former employees described in the preceding paragraphs all consistently explained that leading up to, during, and throughout the Class Period, Extreme channel-stuffed its products to its distributors on a regular quarterly basis in order to inflate its product revenues. These witnesses all explained that these poor business practices could only go on for so long before Extreme's distributors would simply not be able to take on more inventory into their warehouses. At that inevitable point, revenues would significantly decline as revenues were propped up not by organic demand from the end customer, but by Extreme's undisclosed sales tactics. Indeed, FE-6 explained that he departed the Company in October 2022 and approximately a year after he departed the Company, in September 2023, the "bottom fell out" (referring to the Company's revenue decline), and he noticed around that time the stock began to significantly decline.

160. The significance of this revenue decline is discussed further *infra* Section IV.D.5.

### 3. Defendants Also Used Manipulative Sales and Inventory Tactics With Extreme's Partners to Misleadingly Accelerate Quarterly Revenues

161. Extreme not only engaged in channel stuffing and other manipulative inventory and sales practices with its distributors, but it did so with its partners/resellers as well. Importantly, because products that shipped to either its distributors or partners/resellers were counted as revenues at the time of shipment (*see supra* ¶72), Extreme's early shipments to its partners also misleadingly accelerated revenues.

162. FE-2 confirmed that what he witnessed was "channel stuffing" throughout his tenure as Director of Sales (*i.e.*, before the Class Period to mid-2023), where he worked in the "largest revenue producing region in the Americas." FE-2 worked mostly with partner accounts, although FE-2 confirmed that he had been told that the channel stuffing conduct was occurring with the Company's distributors. According to FE-2, Extreme recognized revenue when product shipped from Extreme to a distributor or partner.

163. FE-2 explained that with respect to Extreme's partner sales, inventory is normally shipped by Extreme to the partner only when there is an end user purchase order placed. In other words, the end user signing a purchase order triggers the sale, and the product ships thereafter and should only then be recognized as revenues. As FE-5 explained it, no inventory should be moved without a purchase order from the end user.

164. FE-2 confirmed that he witnessed and experienced channel stuffing conduct occur with Extreme's partners. Specifically, FE-2 described a process how, at the end of each fiscal quarter, Extreme would ship inventory to Extreme's partners knowing that those partners did not have a customer purchase order, *i.e.*, a "customer commitment," from the end user. This practice was in conflict with Extreme's policy of shipping to partners only when there was an end user purchase order place. According to FE-2's experience, the described channel stuffing conduct with Extreme's partners was a "regular" practice at Extreme and occurred often during his tenure.

165. Likewise, FE-10—who was a Senior Account Executive at Extreme from after July 2023 until April 2024—recalled hearing from upper management that the practice of distributors taking on product without end customer purchase orders was "common practice."

166. According to FE-2, when he was personally directed to ask partners to take early inventory, it was without a customer order existing or even an expectation that a customer order was coming soon. In some situations, the partner was asked to send their own purchase order, but FE-2 explained that this was a partner purchase order not based on an actual (end) customer order.

167. According to FE-2, distributors and partners were incentivized to take on inventory early to help Extreme meet its quarterly goals. FE-2 explained that the usual incentive offered to the partners to take inventory early was a discount of "one or two points," meaning 1% or 2%, "on margin." This included discounted margins, of usually 1% or 2% as part of Extreme's rebate program. FE-2 explained that backend rebates were offered to partners if they "pulled-in" an order (that is, took early inventory) when Extreme asked them to. FE-2 explained that he was directed to offer partners an additional 2% in rebates on an order if they took at least $1 million worth of inventory

early. With this particular incentive program, Extreme's partners received a monetary incentive to take on the inventory early.[29]

168. FE-2 added that this was done specifically to help meet quarterly goals, recalling that he was told a number of times by David Savage, Vice President of Sales and Senior Director of SLED[30] Sales, that other Extreme departments were not making their numbers so SLED had to make up the difference. He added that these end-of-the-quarter shipments that were not based on customer orders were, based upon his understanding, ***recognized as revenue to make Extreme's quarter look more profitable than it had been in reality***, because the Company cannot recognize revenues until the product ships.

169. FE-2 explained that Savage directed all of the 4 or 5 regions under his purview to make the same end-of-quarter requests that he made to FE-2, and FE-2 explained that it was his understanding that the practice was going on with other Extreme employees who dealt with the distributors.

170. FE-2 recalled that it was around "two of every four quarters" during the fiscal year where he was directed by Savage, to ask partners to take inventory early, in amounts that were always at least $1 million in value. According to FE-2, this occurred throughout FE-2's tenure as Director of Sales at Extreme. FE-2 explained that some of these partners had warehouse space, while others who did not, could rent warehousing space from distributors.

171. Notably, FE-2 also explained that the millions of dollars of inventory that were shipped early were on his orders on his accounts alone, and explained that it was much more in total when extrapolating to include FE-2's colleagues who were also directed by Savage to offer incentives for their own partners and distributors accounts to take early inventory and pull-in sales.

172. FE-2 further explained that this practice "exhausted demand from the future," and that FE-2 complained about it all the time, because it hurt the sales teams that FE-2 worked with—because, according to FE-2, there is "not an infinite amount of deals" out there to close and pull-in.

---

[29] Additionally, FE-2 explained that this practice not only caused partners to buy product they did not need at the time, but it was also to the detriment of Extreme because Extreme gave up revenues that could have later been realized without the 1-2% discount through backend rebates.

[30] Referring to "State, Local, and Education."

FE-2 further described that the quotas and targets for the next quarter did not decrease, so by pulling in the sales into the present quarter, it became difficult to meet the targets for the future quarters.

173. FE-6 also corroborates these allegations regarding Extreme's channel stuffing with its partners. FE-6 was a Senior Account Manager at Extreme from July 2017 to October 2022. During different points of his tenure at Extreme, FE-6 reported to either David Savage or to FE-2. FE-6 also worked as part of the SLED department, and except for the K-12 segment of SLED,[31] he worked with both distributors and partners throughout his tenure.

174. FE-6 explained that, as an example, a deal would be developing organically to close in approximately three months and, before the end of the quarter or before the end of the fiscal year, he was instructed to pull in the sales early. According to FE-6, he was instructed to "offer more points [greater discount percentage]" and to do "whatever you need to do" in order to help Extreme meet their numbers.

175. FE-6 also observed Extreme offering significant incentives to customers to place larger purchase orders. According to FE-6, Extreme was giving partners extra margins on deals to place orders. As one example, FE-6 knew of one partner who stored all the equipment that was shipped by Extreme, and the partner was sitting on several millions of dollars of inventory—***without a purchase order from the end customer***—for about 16 months, before the inventory was finally delivered to the end customer in the first week of October 2022.

176. FE-6's example above demonstrates that Extreme, knowing that there was no firm end customer order, would nonetheless ship the product to the partner and recognize revenues, all while the partners would hold the inventory for up to ***16 months***, before the end user ever received delivery of that order.

177. Similarly, FE-11 recalled an example that occurred around Fall of 2023, where a partner in EMEA was forced to hold inventory for the end customer for at least six months, because the end customer did not close on the deal with a purchase order.

[31] *I.e.*, the K-12 grades of the Education section of SLED.

178. In this manner, similar to the Defendants' conduct with distributors, Extreme's revenue growth story that Defendants portrayed was not indicative of true organic demand, but rather, was indicative of Defendants' unsustainable and accelerated sales tactics that robbed from one quarter to prop up another, creating for that period a misleading representation of organic demand and sustainable growth.

179. FE-2 gave further details as to a particular incident of channel stuffing during the Class Period. According to FE-2, in July 2023, David Savage directed FE-2 to ask channel partner PC Solutions to take around $1.5 million worth of inventory by the end of that month without a confirmed purchase order. FE-2 advised that this was at the end of Extreme's fiscal year for 2023. Indeed, the timing of this incident comports with Extreme's filing of their revenues for FY2023—filed in August 24, 2023 through the Company's Form 10-K—and further corroborates that Extreme was seeking to inflate revenues through channel stuffing conduct at the end of each fiscal quarter and year.

180. FE-2 explained that Savage directed him to ask PC Solutions to take the $1.5 million inventory because that partner had a warehouse in Miami, Florida and was one of the few partners that either had warehousing or a good amount of it.

181. According to FE-2, in the July 2023 instance there was no indication at that time that Extreme was going to be awarded the purchase order, so he refused to do it. FE-2 explained that he did this because (i) he perceived it as unethical and (ii) Extreme had done this to PC Solutions at least once previously and in that previous occurrence, ***the purchase order never came***, and PC Solutions was stuck with the inventory for a ***year***. FE-2 recalled that as a result of refusing Savage's directive in July 2023, he was demoted from his Director position just a short time later to an Account Executive position.

182. Notably, FE-2 explained that Savage called PC Solutions directly and got the deal done himself.

183. According to FE-2, when he refused to ask PC Solutions to take the early inventory in July 2023, he emailed Senior Vice President Sales Strategy, Business Development, and Operations Matt Cleaver and asked if he (Cleaver) could make the request to that partner. FE-2 recalled that Cleaver was Extreme's interim-CFO for a brief period of time, pre-COVID, and FE-2 described

himself as having a close working relationship with Cleaver at that time and felt that he could go to him with this request.

184. FE-2 was surprised when Cleaver did not respond fairly promptly as he usually did, and that instead, FE-2 received an angry call from Savage later that same day in which Savage said that any directives he gave to ship early inventory should be private and not discussed with the rest of the Company. Savage then told FE-2 that he (Savage) would personally call PC Solutions and make the request.

185. FE-2 explained that he was disturbed enough by Savage's directive to ask PC Solutions to take the early inventory at the end of the fiscal year in 2023 that he reported it on a quarterly sales survey. According to FE-2, he received a call from someone in Human Resources who asked him a question or two about it, but nothing ever came of it.

186. Regarding FE-2's demotion, FE-2 stated that Savage told him that he was "making a change" and moving FE-2 out of SLED and into another department where they were creating a position for FE-2. FE-2 was demoted to an Account Executive position at around half of his compensation of his Director of Sales position. According to FE-2, Human Resources never contacted him for being demoted, and Savage never gave a real reason for the demotion. FE-2 recalled that Defendant Rice told him in an exit interview that Savage had wanted to "let go" of FE-2 at that time, but that Defendant Rice told Savage to demote FE-2 instead.

187. FE-2 believes that Extreme, or at least Defendant Rice, understood that FE-2 could have sued the Company if they had fired him for refusing to do something unethical and possibly illegal and that instead a demotion would not lead to a lawsuit.

188. Additionally, FE-2 explained that when Rice became CCO (Chief Commercial Officer) from COO in January 2024, he took over and led the sales function at Extreme. FE-2 also explained that around this time Vitalone resigned from his position as CRO (Chief Revenue Officer). According to FE-2, through Rice's CCO position, Rice was doing the dual functions of both COO and CRO.

189. FE-2 stated that Savage reported to the Senior Vice President of Sales for Americas, and that John Brams held this role at the end of FE-2's tenure.[32] FE-2 also explained that he regularly received calls directly from the various SVPs of Sales for America on "the status of deals."

190. FE-2 recalled that another partner—Step CG, headquartered in Kentucky—was also often asked to take early inventory and had the warehousing to do so. FE-2 recalled an early Step CG deal which occurred sometime around 2021 or 2022, that the value of the deal was for $1 million, and that it happened "more than once, for years." FE-2 further explained that Extreme routinely approached both Step CG and PC Solutions during his tenure because they had the warehousing to store the inventory.

**a. The Company and its Senior Management Monitored End User Sales, So They Knew When Product was Shipped without and End User Order**

191. Notably, Extreme monitored the likelihood that the accounts with its partners would end up with a secured purchase order by the end user. And critically, Extreme willingly shipped and stuffed product and inventory to its partners while having access to reports, information, and databases that demonstrate that those end users had ***not*** placed a confirmed purchase order.

192. As discussed above, FE-2 recalled Savage on weekly calls nearing the end of every quarter, directing FE-2 and the other Directors of Sales reporting to Savage to "find deals," that is, asking partners to pull-in inventory early and accelerate revenues. According to FE-2, weekly calls were held by Savage and his team, including FE-2, and that Savage had a "***pull-in list***" of partners to target that could potentially pull-in orders. FE-2 explained that Savage directed FE-2 and FE-2's colleagues to offer backend rebate deals, margins, and points to their respective partners to place their own purchase order if they did not have an end-user (customer) purchase order being released or soon to be released.

193. FE-2 explained that this "***pull-in list***" would indicate and monitor what deals each partner had with the end customer and the organic timeline for the deal, such that if a deal was to close and the end customer would place the purchase order, in May, for example (which was in 4Q),

---

[32] FE-2 further explained that Brams was preceded in that title, and throughout FE-2's tenure, in reverse chronological order by Pete Brant, Paul Semak, Pete Doolittle, and Stephen Patak.

then Extreme could target that potential partner to seek to "pull-in" the sale into the present, *e.g.*, in March (which had the effect of pulling in the sale for 3Q). According to FE-2, "just based off the timing of the deals" Extreme could see what deals were potentially available to pull-in.

194. According to FE-2, Savage had this "***pull-in list***" in the form of an Excel spreadsheet that he emailed to his team, including FE-2. FE-2 explained this spreadsheet was "sent up the chain of command" because (i) Savage occasionally included a corresponding PowerPoint deck of slides along with the spreadsheet, and that on the title page of the deck were the names of Senior Vice Presidents of Sales for Americas, and (ii) FE-2 recalled these SVPs calling him for updates on deals to be brought in early. FE-2 further explained that these SVPs reported to Defendant Rice.

195. Separately, FE-2 also explained that Extreme account executives received weekly and sometimes daily updates from customers on the likelihood of an end user securing a purchase order with Extreme, and channel sales did the same with their channel accounts. Based on the feedback from their respective counterparts – end user and partner – the order status would be updated based on "three levels of categories" reflecting the likelihood of the end user entering into a purchase order: (i) "Pipeline," which FE-2 described as the "basic" level which indicated there was too little information to decide the likelihood of an end user placing the purchase order; (ii) "Best-Case"; and (iii) "Key Best-Case." When a proposal was actually ***confirmed*** as being accepted by the end user then the category was updated to (iv) "Commit."

196. Notably, FE-8, Senior Vice President Global Channel Sales from January 2022 to November 2023, also corroborates and confirmed the existence of the "Pipeline" / "Best Case" / "Key Best Case" / "Commit" framework at Extreme. FE-8 referred to this framework as the deal lifecycle and the "stages of opportunity funnel" that was located in the Company's Salesforce[33] database system for both the direct and partner channels. According to FE-8, the "Pipeline" / "Best Case" / "Key Best Case" / "Commit" reporting was aimed at trying to understand what deals were going to close from the perspective of an end user and the likelihood that the end user will close on a deal.

[33] Salesforce was the Company's internal customer relationship management software.

197. Similarly, FE-5 also confirms and corroborates the existence of the "Pipeline" / "Best Case" / "Key Best Case" / "Commit" framework. Again, corroborating these other former employees, FE-5 also confirmed that these four categories measured the likelihood of an end user placing a purchase order with Extreme. FE-5 also described the "Commit" category as ***intended to measure only confirmed purchase orders from end users***.

198. Importantly, and according to FE-2, FE-2 was directed by Savage at the end of almost every quarter to ask partners to take early inventory. The partners and sales targeted were from the Key Best-Case and sometimes Best-Case categories (*i.e.*¸ **but not the "Commit" category**). Thus, this further confirms that Extreme shipped inventory to partners who did not have "committed" purchase orders for the product.

199. Notably, these former employees indicated that the Pipeline" / "Best Case" / "Key Best Case" / "Commit" framework would be shown in the Company's Salesforce and "Clari" database systems – and that Defendants had access to these databases.

200. Specifically, FE-2 explained that these weekly and daily updates were entered into Extreme's Salesforce system, and the details would be "pulled" by the Company's "Clari" system[34] – which could be accessed in diverse ways through the Company's various dashboards depending on what type of information the user wanted. FE-2 explained that everyone in sales and operations had at least some level of access to Clari and the dashboards, depending on their level at the Company. Additionally, FE-2 explained that senior level SVP (Senior Vice President) executives at Extreme called him weekly and sometimes daily throughout his entire tenure asking for more detailed information on the status of deals worth $1 million or more – and FE-2 explained that they were referencing orders from Savage's list of orders that could potentially be pulled-in. FE-2 also received occasional calls from Defendant Meyercord checking the status of FE-2's relationship with his customers.

[34] According to Clari's website, Clari is a "revenue orchestration platform" and allows a company "to run all [their] enterprise revenue workflows, end-to-end." *See* https://www.clari.com/?home_cccr=create.

201. FE-9—a Channel Account Manager during the Class Period—gave further detail as to the Salesforce and Clari database systems. Specifically, FE-9 explained that Clari and Salesforce showed information such as account name, opportunity size, and two columns he filled out – (i) where the opportunity was in the sales cycle, and (ii) notes on updates he entered. According to FE-9, Clari pulled data from Salesforce, which was Extreme's CRM (Customer Relationship Management) platform. An Account Executive would create opportunities that show up for that account in Salesforce and it would appear on FE-9's end in Clari. According to FE-9, everybody had had access to Clari, and the higher the rank or level, the more access and information the executive had access to. FE-9 also confirmed that one can pull reports from Clari.

202. Indeed, FE-5 corroborated that everyone at Extreme had access to Clari and Salesforce, including senior level officers and executives—who could access the employees' pipelines or revenue forecasts. According to FE-5, the Clari and Salesforce databases provided the ability to run reports for all sales and purchase orders nationwide and globally. FE-5 further described it as "everyone could pull revenue forecasts," and the "***C-suite could see everything we see***." And FE-5 further corroborated that the "Pipeline / Best Case / Key Best Case / Commit" framework and updates were entered into the Salesforce and Clari systems.

203. Furthermore, FE-5 stated that he "knows for a fact" ***that senior level executives reviewed those updates*** because he recalled being told on a number of bi-weekly calls throughout his tenure that Defendant Meyercord and CRO Vitalone wanted additional details in the updates so that they could better understand them.

204. FE-5 specifically recalled on a bi-weekly call[35] around January 2024 when the Director of Global Solution Partnerships of Americas Amy Bravo and Vice President of Americas Channel Jennifer Orr directed participants on the call to write their updates clearly, detailed, and professionally as possible "***as if Meyercord is reading them, because he is***."

[35] These bi-weekly calls were significant in magnitude. FE-5 explained that they were led by Director – Strategic Partnerships, Cameron Marchand, Amy Bravo, and Senior Director of Strategic Partnerships Paulette Huber. FE-5 explained that these bi-weekly calls were held for employees on the U.S. channel side of the business and was where they discussed forecasting on Named Partners, which FE-5 described as channel partners who did business nationwide and did a minimum of $100 million in sales per year each.

205.    Similarly, FE-5 explained that Extreme regularly received updates from its distributors on their inventory level, at least on a weekly basis, which Extreme in turn shared with each distributor so that they would know what products could be found on hand.

206.    FE-5 explained that there was an "Inventory List" group listserv, which detailed how much product Extreme had on-hand at any given moment. According to FE-5, the Inventory List listserv was a regular group-wide email that attached an Excel spreadsheet. In the Excel spreadsheet, the device, type of device, serial number, model numbers, current demand, availability, and allocation of Extreme's products was shown. FE-5 indicated that the Inventory List spreadsheet would show, *e.g.*, that "1000 items were committed to this deal" with a particular customer, etc. According to FE-5 – "every item, we would have an inventory count on it." FE-5 explained that the Inventory List spreadsheet indicated what Extreme actually had on hand, what it had on order, and what it had on backlog, at any given moment.

207.    According to FE-5, each distributor had their own Distribution Inventory Excel spreadsheet as well. Accordingly, FE-5 explained that Extreme "would always know what TD Synnex had, what Jenne had, etc."

208.    Importantly, FE-5 explained that the CEO (Defendant Meyercord), the CFO (Defendants Thomas / Tate / Rhodes), and "all executive leaders" were "***always***" email recipients on the listservs and would have received the Excel spreadsheets.

209.    Accordingly, Extreme's executive management, based on the "pull-in lists,' spreadsheets, and reports that were regularly circulated to them, including through the use of the Clari and Salesforce database systems, would have always been aware of which deals were being targeted as "pull-in" sales for the current quarter and the organic timeline for the closing of a deal (*i.e.*, the organic timeline for when the end customer would actually place and secure a firm customer purchase order). Furthermore, these reports and spreadsheets also detail to executive management how much inventory was at Extreme at any given moment in time, how much inventory was being shipped to distributors and partners, and how much of the product was on backlog.

**4. Defendants Improperly Inflated Revenues and the Pipeline Based on Other Illusory Sales**

210. Separate and apart from the channel stuffing and manipulative sales conduct described herein, Defendants also improperly inflated revenues by simply—and improperly—double-counting orders into the revenue and pipeline forecast when those orders were knowingly cancelled or non-existent, as well as engaging in other illusory sales tactics.

211. As discussed above, FE-5 was formerly employed by Extreme as Senior Channel Account Manager from March 2022 to April 2024.

212. FE-5 described actions at Extreme that improperly inflated revenues at quarter end based on illusory sales. Specifically, according to FE-5, there were a lot of what he perceived as inappropriate actions of "inflating the pipeline" including "RFPs" (Requests for Proposal) that Extreme knew that it had lost out on to competitors but kept in the revenue forecast or reinserted back into the forecast until the end of a given quarter in order make the forecast or pipeline look better than it was.

213. Specifically, FE-5 recalled bids that had been lost out on and orders cancelled being put back into the revenue forecast until the end of a quarter, which he explained would be done to artificially inflate the forecast. FE-5 explained that whenever he witnessed this being done, he pushed back against it ***but was told that the correction would not be made until after the quarter was over.*** FE-5 recalled this occurring throughout his tenure even though he knew for certain that Extreme had lost out on bids or orders had been cancelled.

214. FE-5 confirmed that he was made aware of similar instances of revenue and pipeline manipulation occurring multiple times at Extreme during his tenure, based upon the calls he was in throughout the course of his tenure.

215. FE-5 recalled other examples of revenue manipulation by Extreme. In one instance that occurred during the Company's second fiscal quarter of 2024 (*i.e.* 2Q2024), Extreme had ordered the wrong hardware for a New Jersey Transit order whose main component was worth around $1.8 million. When Extreme "called back" the order because it was incorrect, instead of using a new order to clear out the incorrect one, Extreme ***put the new order "on top of the old one" and counted it as***

***two orders that were reflected in the forecast or pipeline as two separate orders.*** According to FE-5, these projected revenues from both the "new" and "old" orders were included in the 2Q2024 revenue forecast.

216. According to FE-5, he sent an email up the chain of command questioning this and recalled getting an email response from a Vice President that the decision had ***been made to keep it as two orders until the quarter was over and then correct it.*** FE-5 recalled someone else in the email chain then advising that Vice President to not say anything else in email and to take any further discussion on the topic offline. According to FE-5, having the two orders instead of one on the books inflated the forecast until 2Q2024 was over.

217. Similarly, FE-10, who was employed by Extreme as a Senior Account Executive from after July 2023 until April 2024, described other illusory tactics that inflated revenues and forecasting. Specifically, FE-10 first corroborated that Extreme's forecasting was available through Salesforce. FE-10 explained that quotas were determined by examining the "health" of a territory and then a forecast was put in place based on information collected in Salesforce. FE-10 also explained that Salesforce contained information regarding previous orders made by a customer and then assumptions were made based on when that customer was going to need new equipment, how much additional equipment they will need for their next order, and what revenue that equates to.

218. According to FE-10, during his tenure, Extreme had included data in Salesforce from five or six acquisitions that had occurred over the previous seven to ten years. FE-10 stated that data pertaining to customers of the acquired companies was included in Salesforce and the "old data" continued to remain even after the customers had "evolved" and stopped using Extreme technology. This rendered the information in Salesforce "archaic" for including information on companies that were no longer customers of Extreme. According to FE-10, this "elevated" the supposed number of customers that Extreme had. FE-10 added that this also "inflated" and claimed to show "elevated" revenue opportunities in a territory and therefore impacted revenue forecasting and assessments of territory health. According to FE-10, "why that matters" is because the revenue forecasting was based upon "archaic" information" and thus inflated.

219. FE-10 recalled that these opportunities contained in the forecasts ended up in the "pipeline," which contained the sales opportunities for that particular time period. FE-10 continued to explain that Extreme simply "threw out numbers" and put "random" numbers on the books as a result.

220. Another tactic that this particular former employee referenced which inflated Extreme's revenues and forecasting, and which was manipulative in nature, was the act of Extreme not removing these outdated and archaic deals from the pipeline once Extreme was made aware of the error and old data—but instead, waiting until after the fiscal year numbers were reported to then correct the pipeline and forecasting.

221. Specifically, FE-10 explained that individuals at Extreme had the ability to input comments into Salesforce for opportunities based on conversations with customers without any "back up." FE-10 recalled an instance of a significant opportunity in Salesforce that he could not get "validated" with the customer as being legitimate. According to FE-10, when he attempted to remove this opportunity from Salesforce he was instructed "don't take it out" or "kill it" and instead he was instructed to "move" the opportunity to the end of the year. FE-10 explained that this "inflated" the "health" of his territory and that this practice was "not good." According to FE-10, the revenue forecasting should have been "reflecting reality" – which it did not during his tenure.

222. For example, according to FE-10, there was a deal forecasted in the range of $800,000 that in reality was closer to $30,000 during his tenure. FE-10 sought to clean up the data in order to effectively do his job, but this "triggered" different alerts to Extreme management. FE-10 explained that removing this old data triggered alerts to management that signified he was losing deals. FE-10 stated that the triggers then led to review by upper management to assess the status of the opportunity which resulted in instructions to "***move***" ***deals to the end of the calendar year***. FE-10 noted that by "moving" a deal to the end of the calendar year it would remain in Salesforce for revenue forecasting purposes for the end of the fiscal year at Extreme, ***which rendered the forecasting for that specific time period inflated***. FE-10 stated that the "deals were taken care of" at the end of the year, and not at that particular moment. According to FE-10, the revenue forecasts and figures that are publicly

reported are derived from Salesforce, and Salesforce hosted the Company's pipeline, funnel, and forecasts.

223. Indeed, FE-10 explained that Extreme upper management would review the "numbers" and take it to the "end of the year," and then decided whether to "kill" the deal or not – but ***only after reporting for it and including it in the Company's fiscal year***.

224. FE-10 explained that by cleaning the data he was responsible for, it "skewed" the pipeline and opportunity forecasts "negatively." FE-10 added that the triggers were in place to assist with identifying individuals to be laid off and that by removing old data and therefore reducing the forecasts for his territory that his standing at the Company was negatively impacted.

225. FE-10 further explained that he was individually performing well and did not have an inclination that he may be laid off less than one year after starting. FE-10 explained that he expected to have at least 12 months at the Company to establish himself.

226. According to FE-10, he had had internal conversations about "cleaning up" the forecasts when he joined and noted that there were opportunities in the Salesforce maintained by his predecessors which were not "real" deals. FE-10 recalled that his counterparts on his team were all "older reps" who had been at the Company for at least a year and were not focused on "cleaning" their data. According to FE-10, he was advised by his counterparts "not to focus on that [data cleaning] too much." FE-10 noted that they "all played ball" by leaving old data and opportunities in Salesforce.

227. FE-10 further explained that when he was let go from the Company in April 2024, he was "blindsided" and there was no "heads up." According to FE-10, he was the only one on his team "cleaning up the pipeline" in order to correct the accuracy of the forecasting, but was terminated anyways.

228. Notably, FE-10 also corroborates that Extreme sought to pull-in sales by pushing inventory to distributors and partners even without an end customer purchase order to justify shipment, as discussed *supra* Section IV.D.3, and that nonetheless, FE-10 sought to do things "with integrity." Specifically, FE-10 stated that in typical deals, the end customer "cuts a purchase order" to the distributor, who then cuts a purchase order to Extreme. In one particular incident during his

tenure, FE-10 was asked to see if the distributor would cut[36] a purchase order to Extreme without having received the purchase order from the end customer. FE-10 explained that he was told and directed by upper management to ask the distributor if they could "cut" the purchase order because the customer had not yet, and Extreme was able to recognize revenue once the distributor had done so. FE-10 pushed back against his superiors and obtained the purchase order from the end customer "with integrity." FE-10 recalled that after the deal was done his superiors "weren't grateful" and expressed "negative comments." FE-10 recalled hearing from upper management that the practice of distributors taking on product without end customer purchase orders was "common practice" and had been done before.

229. Indeed, FE-10 stated that it appeared to him that he arrived at Extreme during a period in which the Company was trying to make up for the misleading perception of its performance that had been on display in the lead up to its year-end filings (around the time he arrived after July 2023). According to FE-10, what the Company was asking of him was "impossible." FE-10 explained that he experienced "pressure" at Extreme that was "pushed from the top down." FE-10 further explained that there was "a lot of pressure" to meet quotas that heightened at the end of quarters. FE-10 recalled receiving calls from superiors on Christmas Day, New Year's Eve, New Year's Day, and Good Friday pushing him to get customers to complete deals and that it was suggested to him that his job depended on it.

230. FE-11 was formerly employed by Extreme Networks as Account Manager from Fall 2022 through the end of the Class Period in the EMEA region. As an Account Manager, he was responsible for ensuring that his partner accounts were set up correctly and received the correct discounts from Extreme's distributors. He was also responsible for ensuring there were no conflicts with end users. FE-11 explained that during his tenure as Account Manager, he was informed by a fellow sales Account Manager in the EMEA region, in addition to an Account Manager from an Extreme partner, about sales orders that were "illegal."

[36] Meaning to issue the purchase order.

231. Specifically, FE-11 explained of one instance where the sales orders were marked in Salesforce as "sold," ***but it was never ordered by a "distributor, partner, or end customer,"*** which made it look as though the orders had been on the "books" in Salesforce.

232. Separately, FE-11 explained of another incident, where a number of orders were counted in Salesforce as one large order instead of how it was supposed to be listed—as orders that were to be scheduled over time.

**5. Extreme's Extraordinary Decline In Revenues at the End of and Following the Class Period Demonstrates the Impact of Defendants' Undisclosed Conduct**

233. Experts and commentators have noted that channel stuffing conduct may come to light through observed performance reversals of revenue in future periods.[37] By improperly pulling sales forward and creating artificial demand, a company that has previously engaged in channel stuffing will often inevitably experience revenue shortfalls in future periods when its distributors and partners are unable to sell the excess inventory.

234. The same performance reversals of revenue are indicators of the materiality of the buildup of channel inventory to a company's financial statements.

235. Accordingly, a period of a significant decline in revenue would be highly probative and indicative evidence of prior channel stuffing conduct within the company.

236. Consistent with this economic phenomenon, and as seen in the graph and chart below, Extreme experienced a steep decline in quarterly revenue at the end of and after the Class Period, as

[37] *See, e.g.*, Somnath Das, et al., *Detection of Channel Stuffing*, FORENSICS ACCT. EJ. (May 2011), available at https://care-mendoza.nd.edu/assets/151939/helenzhang.pdf ("Usually, cases of channel stuffing come to light either due to actions of whistle-blowers or through observed performance reversals in future periods in the form of declining revenues . . ."); Jason Zuckerman, *Report Channel Stuffing and Earn an SEC Whistleblower Award*, THE NAT'L. L. REV. (June 5, 2019), available at https://natlawreview.com/article/report-channel-stuffing-and-earn-sec-whistleblower-award (explaining that when a company improperly pulls sales forward, "the company will naturally experience sales and revenue shortfalls in future periods when its distributors are unable to sell the excess inventory"); *see also In re Plantronics, Inc. Sec. Litig.*, Case No. 19-cv-07481-JST, 2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) (Hon. Jon S. Tigar) ("[c]hannel stuffing is the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply.") (citations omitted).

compared to during the Class Period—a strong indication of the presence of channel stuffing conduct during the build-up of accelerated revenues from 4Q2022 to 4Q2023:

| Quarter End | Date End | Total Revenue ($M) | Distributor Revenue | Direct Revenue |
|---|---|---|---|---|
| 1Q2022 | Sep. 30, 2021 | $267.7 | $146.1 | $121.6 |
| 2Q2022 | Dec. 31, 2022 | $280.9 | $146.4 | $134.5 |
| 3Q2022 | Mar. 31, 2022 | $285.5 | $169.2 | $116.3 |
| 4Q2022 | June 30, 2022 | $278.2 | $145.3 | $132.9 |
| 1Q2023 | Sep. 30, 2022 | $297.6 | $167.6 | $130.0 |
| 2Q2023 | Dec. 31, 2023 | $318.3 | $186.3 | $132.0 |
| 3Q2023 | Mar. 31, 2023 | $332.5 | $205.7 | $126.8 |
| 4Q2023 | June 30, 2023 | $363.9 | $217.4 | $146.5 |
| 1Q2024 | Sep. 30, 2023 | $353.1 | $222.7 | $130.4 |
| 2Q2024 | Dec. 31, 2024 | $296.4 | $162.5 | $133.8 |
| 3Q2024 | Mar. 31, 2024 | $211.0 | $75.3 | $135.7 |

237. More specifically, and as seen from the chart and graph above, there was a significant decline in revenues from 1Q2024 through 3Q2024, with ***all*** of the sequential quarterly declines attributable to the Distributor segment, as opposed to the Direct segment (which was growing over those two quarters).

238. The fact that **all** of the revenue decline can be attributed to the Distributor channel of Extreme's business is further evidence of the undisclosed channel stuffing conduct that occurred with Extreme's distributors and partners.

239. Indeed, total revenue loss from 1Q2024 to 2Q2024 equated to a 16% Quarter-over-Quarter ("QoQ") drop—with the Distributor channel of Extreme experiencing a 27% QoQ loss of revenue. Total revenue loss from 2Q2024 to 3Q2024 equated to a 28.7% QoQ loss—with the Distributor channel of Extreme experiencing 57.3% loss in QoQ revenue.

240. Overall, from quarter-end 1Q2024 (*i.e.*, September 30, 2023) to quarter-end 3Q2024 (*i.e.*, March 31, 2024), Extreme suffered a loss of an astounding **$142 million** of total revenues**,** or **40%** of its total revenues, with the Distributor channel experiencing an extraordinary **$147 million** loss, or a **66%** decline.

241. Additionally, a review of Extreme's product revenues (which comprised 70% of the Company's total revenues during the Class Period) tells the same story. Indeed, as seen below in the graph and chart, Extreme experienced a steep decline in quarterly product revenue at the end of and after the Class Period, as compared to during the Class Period, further evidencing prior undisclosed channel stuffing and manipulative inventory tactics with Extreme's products:

[continued on next page]

Product Revenues ($ Millions)
$300
$250
$200
$150
$100
$50
$0
Beginning of Class Period
End of Class Period
1Q22
2Q22
3Q22
4Q22
1Q23
2Q23
3Q23
4Q23
1Q24
2Q24
3Q24

| Quarter | Product Revenues (Millions) |
|---|---|
| 1Q2022 | $185.2 |
| 2Q2022 | $191.1 |
| 3Q2022 | $198.4 |
| 4Q2022 | $187.1 |
| 1Q2023 | $206.3 |
| 2Q2023 | $223.4 |
| 3Q2023 | $241.1 |
| 4Q2023 | $261.7 |
| 1Q2024 | $253.5 |
| 2Q2024 | $186.6 |
| 3Q2024 | $106.4 |

60

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

242. As seen from the chart and graph above, product revenue loss from 1Q2024 to 2Q2024 equated to a 26.4% QoQ drop. Product revenue loss from 2Q2024 to 3Q2024 equated to a 43% QoQ loss. Overall, from quarter-end 1Q2024 (i.e., September 30, 2023) to quarter-end 3Q2024 (*i.e.*, March 31, 2024), Extreme suffered a loss of an astounding **$147 million** in product revenues, *i.e.*, an extraordinary **<u>58% decline in product revenues</u>**.

243. This loss of product revenues—particularly within the Distributor channel—demonstrates that Extreme improperly borrowed demand from the future during the Class Period in its Distributor channel, which led to an extraordinary loss of recognized revenues once the Distributors reached a breaking point and could no longer hold and stuff product inventory at the request of Extreme.

244. Thereafter, revenues declined significantly as revenues stalled, given that the distributors and partners were now shipping out their stuffed inventory to end users. Indeed, as FE-1 explained, the issue with Defendants' channel stuffing and manipulative conduct is that while Extreme makes their sales and revenue targets appear larger for a quarter (*i.e.*, from 4Q2022 to 1Q2024), Extreme will have to "worry about fixing the next quarter," such that Extreme would constantly have to push off underlying demand problems into the future (by continuously having to stuff inventory in order to keep up the charade). At some point, Extreme's distributors and partners could no longer keep accepting inventory and thus generating recognized revenue—and it is at that point that Extreme's revenues began to decline. As reflected in the significant revenue declines in 2Q2024 and 3Q2024, this occurred in 2Q2024 and continued onwards into and through 3Q2024.

245. Indeed, at 8am ET on January 31, 2024, prior to market trading, Defendants spun the narrative and blamed Extreme's distributors and partners in Extreme's 2Q2024 Earnings Call—stating that: "[o]ur distributors and partners have ***lowered inventory purchases***, which we expect to accelerate in the third quarter." Defendants further stated that they expect "***sell-through to be significantly higher than sell-in,"*** *i.e.*, that distributors and partners will be selling off the excess inventory accumulated, and expected a "***$40 million to $50 million reduction in channel inventory*** in the third quarter [*i.e.*, 3Q2024], which will allow us to cover to a more normalized level of revenue in the fourth quarter."

246. As a result, on January 31, 2024, Defendants disclosed that revenues declined by $56.7 million sequentially quarter-over-quarter, and that product revenues declined by a significant $66.9 million sequentially quarter-over-quarter. Defendants also indicated downward total revenue guidance from $296 million in 2Q2024, to a range of $200 million to $210 million for 3Q2024—an extraordinary projected loss of ***nearly $100 million***.

247. The combination of this news confirmed that Extreme was not, in fact, growing, and that there was a surplus of inventory at the distributor level. This final disclosure led Extreme's shares to drop from $16.64 per share on January 30, 2024 to $12.59 per share on February 2, 2024, a 24% decline over three trading days on heavy volume—resulting in investors' losses.

**E. During the Class Period, Defendants Also Misrepresented the Strength and "Firm" Nature of Extreme's Product Backlog**

248. During and throughout the Class Period, Defendants also falsely and misleadingly touted to the market that—based upon Defendants' "***complete visibility***" into the product backlog—the "vast majority" of orders included in their backlog reflected "***firm***" customer commitments, were "***not cancelable***," and reflected "***end user demand***." Specifically, Defendants asserted that:

> "We have complete visibility into our product backlog ***and have received negligible cancellations to date of less than 1% of bookings***. ***Our backlog primarily consists of our latest-generation universal products***." (4Q2022 Earnings Call – July 27, 2022).

> "Once backlog begins to release, it will unlock an accelerated wave of product shipments and revenue growth over multiple quarters. We have complete visibility into our ***product backlog, the vast majority of which is comprised of orders with current delivery request dates***." (1Q2023 Earnings Call – Oct. 27, 2022).

> "***[The backlog] it's not cancelable***. ***These are real projects that we see***. . . . ***the vast majority of our backlog is related to this kind of end user demand project-based business and we don't see double ordering***." (Needham Technology & Media Conference – May 17, 2023).

> "***We have the benefit of a healthy backlog of customer orders with request dates that spread fairly evenly through the end of our fiscal year. End customer orders remain firm*** and distributor orders have normalized, giving us confidence in our outlook for this fiscal year." (FY2023 Earnings Call – August 2, 2023)

249. The above statements left the market with the impression that the orders in Extreme's backlog reflected firm customer commitments, were not cancelable, and that the present-tense "firm" strength of the backlog orders was poised to lead the Company to strong revenue growth.

250. Moreover, Extreme amended its definition of its backlog orders at the start of the Class Period to reflect the firmness of backlog orders, and therefore the certainty that they indicated future recorded revenue. Before the start of the Class Period, Extreme stated in its 10-K for FY2021 (year ended June 30, 2021) that backlog orders are subject to "cancellations by customers which we may elect to allow *without penalty to customers*[.]" However, at the outset of the Class Period, Extreme changed this definition for backlog, stating that in its 10-K for FY2022 (year ended June 30, 2022) that "[a]lthough we believe the orders included in the backlog are ***firm***, all orders are subject to possible rescheduling by customers, and cancellations by customers, ***which we may elect to allow on an exception basis***."[38]

251. Accordingly, this change in the backlog definition from FY2021 to FY2022 further cemented Defendants' portrayal of the strong and "firm" nature of the backlog. Indeed, the change in language asserted that Extreme's backlog orders could only be cancelled on an "***exception basis***" that Extreme "***may***" (or may not) elect to allow a customer to cancel an order, which is a more difficult hurdle for cancellation than the prior representation that any backlog order could be cancelled at will without penalty or cost.

252. Indeed, Defendant Tate strongly confirmed the certainty of Extreme's backlog orders on May 17, 2023, asserting that the backlog orders—on which the Company had "excellent visibility"—were simply "***not cancelable***." Similarly, at the outset of the Class Period, on July 27, 2022, Defendant Meyercord confirmed the very limited nature of any cancellations of the backlog, stating that they received only 1% of "negligible" cancellations of product backlog.

253. The market believed Defendants' misrepresentations. On July 27, 2022, Needham stated in its analyst report—in response to Defendant Meyercord's statements—that Extreme had "Visibility Down to the Deal Level: ***No Double Ordering*** as Orders are Tailored to Specific

[38] Extreme 10K for FY2022 (year ended June 30, 2022).

Structured Project Deployments. ***Extreme has long had an order cancellation rate that's solidly less than 1%*** and that is not changing. Extreme can see these orders with high degree of specificity down to the details of the deployment architectures. ***They argue they are confident with this visibility . . . [the] orders are real and sustainable.***"

254. And similarly, Rosenblatt Securities stated in its March 29, 2023 analyst report, in reliance on Defendants' misrepresentations, that:

> **Backlog risks seem low.** We believe Extreme has excellent visibility to its backlog, and we are confident the risk of double ordering is low. The company has software tools to know what's in backlog and that no projects are duplicates. Backlog includes product for thousands of medium-to-large Enterprises, and includes specifically identifiable projects including stadiums, cruise ships, hotels and casinos, retail spaces, government facilities, hospitals, and factories. We think the risk of backlog cancellations are very low[.]

255. Other analyst commentary and coverage during the Class Period similarly demonstrated that the market believed Defendants' misrepresentations as to the strength and "firm" nature of Extreme's backlog, and the repeated assertions that the present-tense strength of the backlog of orders would lead to strong revenue growth.

256. For example, on August 28, 2022, Rosenblatt Securities stated that Extreme's revenue "*forecast appears particularly safe due to the* ***Company's highly elevated backlog***." On September 23, 2022, Needham & Company stated that Extreme's operations appear to be "substantially better than average resiliency," which was "driven by its ***massive and sticky backlog***." And on October 28, 2022, Craig-Hallum summed up the market expectation based upon Defendants' false and misleading statements, finding that: "The company expects its backlog to continue to build for the next few quarters through FY23, before supply constraints ease to a level the backlog can begin to work down starting in Q1 FY24. Management stated however, they expect the work down of the company's backlog to take multiple years and do not expect the backlog to recede to normalized levels of $50-$100 million until FY26, a full three-years from today. Management reiterated expectations to drive topline growth of 10%-15% in FY23, and for this growth rate to accelerate in FY24 to 15%-175 as the company's backlog begins to work down. . . . With material backlog set to be a multi-year tailwind

to already solid demand trends, and margins to expand and drive material leverage at the same time, *we remain very encouraged with Extreme' setup from here*."

257. This market sentiment in response to Defendants' statements touting "strong" backlog continued throughout the Class Period, with analysts such as Needham stating in its (i) January 25, 2023 analyst report that: "***Extreme believes their demand and robust backlog will enable them to product double-digit Revenue growth across a wide range of potential scenarios and outcomes***," (ii) in its March 6, 2023 analyst report that "***Extreme's strong backlog and pipeline enables the company to even guide to 'accelerated high-teens growth in FY24'*** [quoting the Company]"; and (iii) further stating in its May 18, 2023 analyst report that the "***the company noted project-based-end-customer backlog is still healthy***."

258. And notably, Needham continued to state in its analyst reports throughout the Class Period—in reliance on Defendants' statements—that there was "***No Double Ordering***," that "***the cancellation rate . . . [is] solidly less than 1%***," and that Extreme was "confident with this visibility . . . ***the orders are real and sustainable***."

### F. Unknown to the Market, Extreme's Backlog Did Not Reflect "Firm" Orders and Was Not Reflective of Assured "Revenue Growth"

#### 1. Former Employees Confirm that Extreme's Backlog Orders Did Not Reflect "Firm" Customer Commitment

259. However, in direct contrast to Defendants' false and misleading statements concerning Extreme's backlog, multiple former employees all confirm and corroborate that Extreme's backlog of orders were not "firm." Specifically, Defendants failed to disclose that: (1) the backlog orders, instead of reflecting "firm" customer commitments, could simply be cancelled at any time by Extreme's distributors and partners, and did not reflect end user demand; (2) it was well known internally that the backlog orders consisted of orders that were double or tripled booked by distributors and partners, and that the distributors/partners would cancel such orders depending on which manufacturer met the order first; (3) Defendants already internally hedged that 10% of the backlog would be cancelled and not be converted to product revenue—far greater than the 1% of backlog cancellation that they led the market to believe during the Class Period; and (4) even Defendants' own internal hedge was severely understated, with the more appropriate hedge for

backlog cancellations to be up to 66%, according to one former employee who met quarterly with the C-Suite. Accordingly, Defendants misled the market as to the strength and "firm" nature of the backlog orders during the Class Period.

260. Moreover, as mentioned above, the questionable sales tactics employed by Defendants to force through sales at the end of each quarter included leveraging distributors' place on the backlog line with their agreement to take early inventory. The logical ramification of this practice was to deprioritize the backlog position of certain distributors who did not cave to channel stuffing demands, increasing the likelihood that those distributors would acquire the product from a competitor and cancel their Extreme orders.[39]

261. FE-3 stated that "Definitely, yes," Extreme's reported backlog was overstated because it included a substantial amount of preferred distributor orders that did not have firm end customer commitments. FE-3 stated that Extreme had a lack of visibility into their end customers' needs.

262. FE-3 stated that Extreme's cancellation policy was "***quite flexible***," and FE-3 explained that a distributor could cancel a purchase order after it had been placed. Specifically, according to FE-3, there were many purchase orders to different vendors throughout and after the COVID-19 pandemic due to the longer waiting times in receiving material through the supply chains.

263. According to FE-3, it was "***well known internally at Extreme***" that: (i) distributors were placing an inordinately high number of orders during the COVID-19 pandemic in 2021; and (ii) this ramp-up of orders from distributors was going to negatively impact future orders given the inventory on hand, including the extra inventory from competitors. FE-3 explained that it was well known that distributors were ordering extra inventory from solutions providers***, further adding that these orders were typically cancellable and returnable.***

---

[39] And notably, as illuminated by FE-1, there was an interplay between the backlog and channel stuffing conduct alleged herein, in that one tactic Extreme employed to channel stuff the inventory to distributors or partners was to tell the distributors or partners that they will lose their place at the front of the line on backlog inventory shipments if they did not agree to Extreme's channel stuffing demands for other outdated and unwanted inventory. In this way, not only was Extreme misrepresenting the "firm" nature of the backlog, Extreme was also using the backlog as a tool to aid in their undisclosed channel stuffing and manipulative conduct. *See, e.g.*, *supra* ¶¶121-122.

264. As an example, FE-3 explained that a distributor would make 10 purchase orders (with different vendors) but cancel 5 purchase orders because of either (1) lead times being too long or (2) a competitor like Cisco could provide the product ahead of Extreme.

265. According to FE-3, it was sometime in 2022 when he became aware of an increased spike in the cancellation of a number of big deals, which FE-3 described as a "warning sign." FE-3 recalled that most of these cancellations took place in Extreme's Latin America market, but there was also one cancellation by a major U.S. end customer. FE-3 explained that Extreme was not expecting these cancellations and that the Company had little or no visibility into an end customer's commitment to a project.

266. The allegations from this former employee further make clear that the true status of the Company's backlog was made known to the C-Suite, including the Individual Defendants. Specifically, FE-3 advised that he held a video call regularly every other week with Defendant Thomas where he discussed pricing and the Company's business operations, and that on one of these calls he discussed the high value cancellations that occurred in Latin America and the U.S.

267. FE-3 explained that cancellations were not normally part of the regular calls, but that he mentioned these cancellations to Defendant Thomas because of their high value and that FE-3 felt the Company would have had better visibility into end users' demands if Extreme had "back-to-back" purchase orders, which they did not.

268. FE-3 advised that he began to address this issue with Defendant Thomas in 2022, and offered a possible solution at that time that would give Extreme better visibility into end customers' needs. According to FE-3, he explained the Latin America and U.S. cancellations to Defendant Thomas and proposed that every big deal for Extreme involve a "back-to-back" or "B2B"[40] distribution clause to secure end customer commitment. FE-3 described "back-to-back" as Extreme's paperwork that would essentially mirror the end customer's order. FE-3 explained that this would have given Extreme greater visibility into the end customer's specific needs and when they needed it.

[40] According to FE-3, "B2B" was another industry phrase for "back-to-back."

269. FE-3 advised that many other companies that he worked for throughout his career in the same industry as Extreme required "back-to-back" purchase orders, but Extreme did not, and this limited the Company's visibility into an end user's actual demand. He recalled Extreme having "a lot of pre-orders" without "back-to-back" purchase orders.

270. FE-3 stated that Defendant Thomas's response was that he was hesitant to implement "back-to-back" because it would require getting Extreme's order management and finance teams involved, which Defendant Thomas did not want to do. FE-3 also explained that Defendant Thomas was hesitant to implement "back-to-back" purchase orders because of the logistics involved requiring an internal restructuring to work around internal controls issues. FE-3 advised that his proposed solution ***was never implemented*** by Extreme by the time FE-3's tenure at Extreme ended in the latter-half of 2023.

271. Notably, the rejection of FE-3's proposed "back-to-back" clause solution is further evidence that Extreme executive management knew that its backlog orders were ***not*** firm and based on end user demand.

272. FE-1 also corroborated that the backlog orders placed by partners were not "firm." According to FE-1, partners and end users were placing the same order with multiple vendors for the same deal/end-user. After they received the inventory they needed, the partners and end users then cancelled the outstanding orders they placed with the other vendors.

273. FE-1 further explained that both (1) the reseller's purchase order and (2) the prebought amount by the reseller or end user of that purchase order ***could be cancelled at any time*** if the reseller/end user placed the same order with multiple other manufacturers or vendors and received the products from someone else first. According to FE-1, resellers would double-book purchase orders due to supply chain constraints, and then cancel. Indeed, as FE-1 explained it, there was never "non-cancellable" purchase orders at Extreme.

274. FE-2 was employed by Extreme throughout the Class Period, including as Director of Sales from before the Class Period to mid-2023. Thereafter, he was an Account Executive until the end of his tenure at Extreme. FE-2 also corroborates the above allegations related to backlog. FE-2 explained that it was ***known within the Company*** that there were many backlog orders known to

often be duplicative of orders placed with other manufacturers (besides Extreme) during the supply chain emergencies brought on by the COVID-19 pandemic, and that these orders were ***freely cancellable***. FE-2 was aware this continued in 2022 and 2023.

275.    FE-7 further corroborates that Extreme's backlog was overstated and did not reflect firm customer commitment. FE-7 was the former President of a company, which was acquired by Extreme in 2021. According to FE-7, he began working for Extreme in July or August 2021, before officially signing on as an Extreme employee in March 2022. He was employed as the Senior Vice President, Strategy, of the Office of the CTO from March 2022 until March 2023. He officially separated from the Company in September 2023. FE-7 reported directly to CTO Nabil Bukhari.

276.    During the Class Period, FE-7 was tasked with examining the pricing strategy for Extreme's entire product portfolio.  FE-7 attended quarterly meetings with C-Suite executives as well as a second meeting which occurred every 30 days. FE-7 explained that the quarterly meeting had detailed discussions on the status of the business, including the Company's backlog. FE-7 explained that both meetings, the quarterly meeting and the meeting occurring every 30 days, were with members of the C-Suite, including Defendants Meyercord, Thomas, and Rice. FE-7 further explained that the meetings which occurred approximately every 30 days, took place, on average, every three or four weeks depending on the schedule of Defendant Meyercord.

277.    FE-7 recalled a meeting that occurred between late 2021 and mid-2022, attended by CTO Bukhari, Defendant Meyercord, then-COO Norman Defendant Rice, former CRO Vitalone, and Defendant Thomas. According to FE-7, who reported directly to the CTO, the CTO wanted FE-7 to attend the meetings given that FE-7 was the former President of a newly acquired company that Extreme acquired.

278.    FE-7 explained that at that meeting, he asked how Extreme was talking about its backlog for reporting purposes. FE-7 explained that he had experience in procurement and that it was well understood that end users are going to be "hedging their bets" and placing anywhere from one to four other identical purchase orders with other vendors.

279.    According to FE-7, at these meetings "everyone [referring to Extreme Networks' C-Suite] in the room knew" that customers hedged their procurement and that it was "standard operating

procedure." According to FE-7, ***the C-Suite knew that the double-hedging and triple-hedging practice by Extreme's customers was going on***, especially during the constrained supply chain environment.

280. Importantly, FE-7 described how Extreme **already was assuming that at least 10% of the backlog would be cancelled** – in direct contrast to Extreme's statements that the backlog orders were "firm" and "not cancelable." Indeed, FE-7 stated that the Company had been factoring a "10% cushion" for backlog deals that are estimated will fall through.

281. According to FE-7, he had conversations with CTO Bukhari about why the Company was not taking a more conservative approach to hedging the backlog. FE-7 stated that he was "baffled" by the 10% hedge figure the Company had applied to its backlog, and it "didn't make sense to him" based on his experience.

282. FE-7 explained that the Company should have had "more rigor" in "acid testing" and should have conducted a "comprehensive sweep" of their purchase orders to determine how much of the backlog was "real" and firm. FE-7 added that the need to be more conservative was "so obvious" to him and the figures as the Company had presented them "looked dangerous" to commit to such a high backlog figure.

283. According to FE-7, Extreme should have been working "closely" with their "big" distributors and in turn had their distributors working closely with the big end customers to determine what portion of the backlog was "real." FE-7 explained that Extreme is "very channel centric" and with steps between the Company and end customer it is important to have supporting statements from the distributors and partners and their customers. FE-7 explained that the backlog may have been $500 million,[41] but that the associated revenues were "not in the bank," or confirmed, based upon the nature of the backlog.

284. Indeed, FE-7 further stated that a more realistic figure was as ***much as 66%*** – ***explaining that upwards of two-thirds of those deals may not come to be realized***. FE-7 expressed

[41] Referring to the backlog high of 4Q2022 to 2Q2023, *see infra* at ¶82.

this in a separate meeting with CTO Bukhari, and according to FE-7, FE-7 is "confident" that CTO Bukhari relayed this information to the C-Suite, including Defendants Meyercord and Thomas.

285. FE-7 continued to explain that he expressed in the meetings with the members of the C-Suite that what Extreme does "from a hardware point of view" is "not that special" and that selling generic hardware leaves users with several other vendor options. FE-7 added that in these meetings there was "very low to no reflection" on the generic selling that Extreme participated in and just how easy it was for competitors to replicate.

286. FE-7 recalled that he was thanked for bringing up the point, but the meeting quickly moved to the next topic. FE-7 was "struck" by the fact that not only was more consideration not given to accurately calculating the backlog—but that there was no consideration at all.

287. FE-7 explained that the 10% "cushion" applied to the backlog was "not prudent" and was "not conservative enough." FE-7 stated that the approach was "not acting in accordance with the real world." According to FE-7, he could not understand "why no one was thinking about backlog" and that if the Company says that the backlog number is good then investors will expect a considerable jump in performance once supply chain issues subsided. Accordingly, FE-7 had concerns about the risks of "leading investors down a bad path." FE-7 explained that the numbers were "dressed for the Company to write some checks they couldn't cash."

288. FE-7 also gave specific details as to the form of the contracts for the backlogged purchase orders. FE-7 explained that the language with Extreme customers' contracts was "first come, first serve" and if another supplier was able to provide the product quicker than Extreme, then the contracts were "void." FE-7 further explained that "conditional" purchase orders were an "industry" term that indicated that the purchase orders themselves included specific language in the contract such as "first-come, first-serve" clauses – meaning that the purchase order placed by the customer was conditional on Extreme fulfilling that order first (and not another manufacturer). FE-7 further explained that to effectuate the double-booking and triple-booking practice by Extreme's customers, Extreme's customers would sign "conditional" purchase orders with Extreme, such that it gave them the ability to hedge in case the orders went to backlog. FE-7 explained that if Extreme did not meet an order on backlog, because of the conditional purchase order language, Extreme's

customers could cancel the order and then meet that order from another manufacturer and then proceed with that other manufacturer. As an example, FE-7 stated that a customer would place an order with Cisco, Juniper, and Extreme—with Cisco and Juniper being Extreme's competitors—and then cancel the order with Extreme if Cisco or Juniper met the order first.

289. According to FE-7, there were "open conversations about this" with the C-Suite, and knowledge that if Extreme's competitors fulfill the product order first then Extreme's customers will "void" their order with Extreme. According to FE-7, the Procurement Teams at end customers are "well versed" with terms and conditions of deals and that Extreme's C-Suite "knew this."

290. Further, FE-7 stated that customers did not have to pay up front with their orders, but instead, the payment would be due *e.g.*, 60 days thereafter. According to FE-7, customers' agreements with Extreme were more like a reservation and did not require upfront payment. As FE-7 explained, 80% to 95% of Extreme's customers were "very big" companies and the companies purchasing from Extreme were "too powerful to require upfront payment."

291. FE-7 explained that customers like enterprise, federal, and public entities have a "go live" schedule for projects and need the product on site, staged, and tested on a specific timeline to remain on schedule. FE-7 continued to say that including "first come, first serve" language in a contract was "not a one-off thing" and that "this is how they do it [structure the contracts]."

292. FE-7 also recalled in subsequent conversations with CTO Bukhari that he explained to Bukhari that he had "acid tested" with customers and was aware that some were "double and triple hedging" and that he believed a more conservative approach to the backlog was warranted.

293. Indeed, FE-7 confirmed that if the product backlog had been "good," then it would have been converted into "sustained" product revenue. FE-7 also explained that the decision to calculate backlog in the way that the Company did was "disingenuous," and a "***colossal risk to take***."

294. Notably, FE-7 also explained that it is "standard operating procedure" from a revenue recognition policy and internal controls perspective to require both Sales and Finance leadership to "sign off on revenue certification." FE-7 added that this practice is "customary," and the certification of revenue is done to ensure that revenue is "free" of "special terms" or "undocumented agreements,"

such as discounts, concessions, or certain payment terms. According to FE-7, this practice is done to "adhere" to Company policies and accounting regulations, and is done on a quarterly basis.

295. FE-7 explained that the quarterly revenue certification process was previously and is currently taking place at Extreme Networks to ensure that revenue recognition complies with regulations. FE-7 explained that this process should capture which orders on the backlog were "real and firm" versus those that were "conditional," and thus impacted by the risk of customers hedging and double-booking. FE-7 continued to say that specifically, the quarterly revenue certification process would have exposed how many of the purchase orders on Extreme's backlog were "conditional." FE-7 further explained that if this process is carried out with "discipline" that it should "bring to light" conditional purchase orders in direct sales or with trade partners and in turn have an impact on backlog reporting.

296. FE-5 further corroborates the lack of "firm" orders in the backlog. FE-5 was formerly employed by Extreme as Senior Channel Account Manager from March 2022 to April 2024.

297. According to FE-5, end users placed orders for the same hardware "all the time" with multiple suppliers such as Extreme and would then cancel the outstanding orders after receiving the hardware they needed from whatever supplier gave it to them first. FE-5 added that it was well known by Extreme that customers placed the same orders with multiple suppliers and that Extreme was likely to lose out on a number of these "supplemental orders," or "secondary orders," as FE-5 called them, through cancellations.

298. According to FE-5, because of supply chain constraints, Extreme's customers placed "secondary" orders with Extreme, even though customers were also placing orders with Juniper and Cisco, etc. According to FE-5, these "secondary" orders would nonetheless be included in the pipeline / revenue forecast even though Extreme knew that the orders would likely be cancelled. The majority of these orders would then go to the backlog and be counted as backlog.

299. According to FE-5, it was "widely known" at Extreme that this double-booking was occurring because of the "RMA" process for double-booked orders. Specifically, FE-5 explained that RMA mean "Return Merchandise Authorization," which was effectively the cancellation. According to FE-5, the practice of RMAs "came from the top."

300. FE-8 was the former Senior Vice President of Global Channel Sales from January 2202 until November 2023. FE-8 explained that the Distribution Teams reported to him.

301. FE-8 similarly stated that it was "hard to ever really know" the true value of Extreme's backlog and that the figure was "driven by projects" and the Company had multiple resellers around the world competing for the same projects.

302. Specifically, FE-8 recalled "Revenue Assurance" calls where the backlog was discussed and there were "conversations around the [backlog] hedge" and the algorithm that Extreme used for this calculation.

303. According to FE-8, the "Revenue Assurance Calls" were attended by Defendant Brown, members of the Finance team, Defendant Rice, and Senior Vice President Jack Lyon.[42] FE-8 continued to explain that the "Revenue Assurance" calls were led by Defendant Rice, who then "took the baton" and had subsequent conversations with the CEO (Defendant Meyercord) and CFO (Defendants Thomas/Tate/Rhodes) through "Output" calls.

304. According to FE-8, these "Output" meetings were calls that occurred after the "Revenue Assurance" calls, where Defendant Rice and others relayed the information to the CEO and CFO—indicating "here's what we're looking at" and the level of risk and the upside. Further, FE-8 explained that it was his understanding that the information provided to the CEO and CFO in the "Output" calls was also presented through an Excel summary sheet, which included the range of calculations for potential outcomes, ***including the assumed "yield" from the backlog—referring to the conversion from backlog to product revenue.***

305. According to FE-8, the Revenue Assurance calls were a "quarterly function" with meetings becoming more frequent as the quarter progressed. FE-8 explained that during the first two months of the quarter, meetings occurred during the final week of the month to discuss current trends. FE-8 continued to explain that during the third month of each quarter the call became weekly and "week over week" trends were discussed. FE-8 explained toward the end of each quarter, these calls occurred "almost daily" and "day over day" happenings were discussed on a more "precise" level.

---

[42] FE-8 explained that Lyon was responsible for logistics and the movement of goods from the manufacturers to the distributors, and ultimately to the end customer.

306. FE-8 also explained that it was his understanding that the Output calls between Defendants Rice, Meyercord, and the CFO occurred at the same frequency as the Revenue Assurance Calls, so as the number of Revenue Assurance calls increased throughout the quarter so too did the Output calls—because "ultimately" Defendant Rice, Defendant Meyercord, and the CFO were trying to determine the "earnings story" they were going to tell the market.

307. According to FE-8, information from the Revenue Assurance Calls was provided to Defendant Meyercord and he recalled instances where it was noted that an update needed to get to Meyercord and that there was certain information he wanted to know. FE-8 further stated that it was "openly known that the information was going to get to the CEO." According to FE-8, Meyercord was hands-on and a "very involved leader" and "detailed guy."

308. Indeed, one of the documents provided by FE-1 undoubtedly demonstrates that Defendant Meyercord and the C-Suite knew about the truth of the backlog. Specifically, one of the documents revealed was an IM conversation dated May 27, 2022—just weeks from the beginning of the Class Period—in which Defendant Brown told FE-1, "why didn't we have [the TD call] scheduled for yesterday? . . . **Lots of eyes on this backlog process – it's updated all the way up to Ed [Meyercord]**."

**2. The Significant Gap Between Product Backlog and Product Revenues Further Corroborates that Extreme's Backlog Was Not "Firm"**

309. A review of Extreme's product revenues in comparison to Defendants' backlog digestion demonstrates that—contrary to Defendants' statements—a significant portion of the backlog was not comprised of "firm" and committed orders, but instead, was comprised of cancellable or double-booked orders that would not lead to revenue generation.

310. ***First***, Extreme defined backlog during the Class Period as "***confirmed orders*** with a purchase order for products to be fulfilled and billed to customers with approved credit status."[43]

311. ***Second***, Defendants repeatedly asserted that the large majority (*i.e.*, 99%) of Extreme's backlog orders were compromised of these "firm,"[44] committed, orders—indicating at the

[43] Extreme 10-K for FY2023 (year ended June 30, 2023) at 10.

[44] Extreme 10K for FY2022 (year ended June 30, 2022).

outset of the Class Period that: "[w]e have complete visibility into our product backlog and have received negligible cancellations to date of less than 1% of bookings."[45] Defendants also stated that the backlog "***it's not cancelable***. ***These are real projects that we see***. . . . ***the vast majority*** of our backlog is related to this kind of ***end user demand project-based business and we don't see double ordering***."[46]

312. ***Third***, Defendants characterized backlog as the amount of revenue expected to be recognized based on the present amount of customer orders, such that Extreme's revenue growth would be driven by unleashing the "massive" backlog (given the release of the supply chain constraints) and converting that backlog into recognized revenue. Specifically:

> "[O]ur ***revenue outlook is really a function of supply chain and product that we are able to release, given the massive backlog*** that we've built ***up*** and the continued strength of our bookings. So I'll just start off with supply chain, You've asked about that. What we see is a gradual improvement throughout the year***. So think of a step function where we will be stepping our revenue, quarter by quarter, throughout the year, based on our outlook of supply chain*** . . . " (4Q2022 Earnings Call – July 27, 2022).

> "[W]e built up quite a bit of backlog because of the supply chain scenario, ***but*** it's all ***very high quality*** and ***we are very confident in the backlog***. ***And so in a way, it just gives us a lot of confidence in the revenue growth forecast*** that we've got into the future and for the next couple of years." (Needham Virtual Security, Network & Communications Conference – November 15, 2022).

> "Really what we want to do is reinforce our outlook of revenue growth. And we're doing that out through our fiscal '25 year, which is out there. ***We baked that [backlog] into our revenue guide, and that's where we're trying to focus everyone***." (3Q2023 Earnings Call – April 26, 2023)

> "We ***have*** the benefit of a ***healthy backlog*** of customer orders with request dates that spread fairly evenly through the end of the year***. End customer orders remain firm and distributor orders have normalized, giving us confidence in our outlook for this fiscal year***." . . . Defendants further stated: "***During fiscal year '24, we expect continued strong product revenue growth***, given the growing interest in our solution by customers and ***the ongoing normalization of our backlog***." (FY2023 Earnings Call – August 2, 2023).

---

[45] Extreme's 4Q2022 Earnings Call (Defendant Meyercord's statements); *see also* 1Q2023 Earnings Call (Defendant Thomas' statements) ("And I can tell you right now because of our scrutiny around this, each and every decommit, to the extent there is one, gets a lot of scrutiny from us . . . and they remain at a fraction of 1%.").

[46] Needham Technology & Media Conference (May 17, 2023).

313. ***Fourth***, and consistent with the explanation of former employees, Extreme disclosed that it recognized revenues at the moment when "control of the product is transferred to the customer (*i.e.*, when the Company's performance obligation is satisfied), which typically occurs at shipment for product sales."[47] Based upon this revenue recognition model, if an order in the product backlog was then fulfilled and shipped to a distributor, partner, or end user—and thus taken out of the backlog amount[48]—that order should then be recognized as product revenue at shipment. Given Extreme's repeated assertions that the majority of the backlog orders (*i.e.*, ~99%) were compromised of "firm" and committed, non-cancellable, orders, then the amount of product backlog digested over a quarter should largely be equivalent to the amount of increase in product revenues in the same quarter (over and above any non-backlog purchase orders in the quarter).

314. The following chart illustrates Extreme's disclosed product backlog[49]:

[continued on next page]

[47] Extreme 10K for FY2022 (year ended June 30, 2022), at 59.

[48] Again, as confirmed by former employees, including FE-1, purchase orders made by Extreme's customers that were on backlog could not be counted as revenue, because they had not been shipped.

[49] Defendants stopped reporting backlog on a quarterly basis after 4Q2023.



Reported Product Backlog ($ Millions)
600
500
400
300
200
100
0
$100.0
$200.0
$300.0
$425.0
$513.0
$555.0
$542.0
$437.5
$267.3
4Q21
1Q22
2Q22
3Q22
4Q22
1Q23
2Q23
3Q23
4Q23
1Q24
2Q24
3Q24

315. As shown from the chart, backlog was built up from 4Q2021 until 1Q2023, and then began to decline starting in 2Q2023, with major declines in 3Q2023 and 4Q2023.

316. The following graph, conversely, shows Extreme's product revenues:

Product Revenues ($ Millions)
$300
$250
$200
$150
$100
$50
$0
Beginning of Class Period
End of Class Period
1Q22
2Q22
3Q22
4Q22
1Q23
2Q23
3Q23
4Q23
1Q24
2Q24
3Q24

78

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

317. The change in reported product backlog and product revenues is thus as follows:

| *$ in millions* | **Q4 2022** | **Q1 2023** | **Q2 2023** | **Q3 2023** | **Q4 2023** |
|---|---|---|---|---|---|
| Change in Product Backlog from prior quarter | $88.0 | $42.0 | -$13.0 | -$104.5 | -$170.2 |
| Change in Product Revenue from prior quarter | -$11.3 | $19.2 | $17.2 | $17.6 | $20.6 |
| **Total Order Change** | **$76.7** | **$61.2** | **$4.2** | **-$86.9** | **-$149.6** |

318. As seen in the table above, there was a significant and material gap in backlog decline and recognized product revenues. For example, from 2Q2023 to 3Q2023, backlog decreased by about $104.5 million, but product revenue only increased by $17.6 million—***leaving a $86.9 million gap***.[50] Similarly, from 3Q2023 to 4Q2023, backlog decreased by about $170.2 million, but product revenues only increased by $20.6 million—***leaving a $149.6 million gap***.[51]

319. Consequently, based on the application of established accounting principles, there are three possible explanations for the discrepancy between backlog and revenues: (1) the Company's unaccounted-for backlog of $236.5 million[52] for those two quarters was not firm (*i.e.*, was not converted into product revenue); (2) the Company's new orders (*i.e.*, bookings) had not only stalled, but *regressed* significantly and abnormally, and product revenues were being propped up by the fulfillment of backlog orders;[53] or (3) a combination of these adverse headwinds contributed to the decrease in orders recognizable as revenue.

320. Defendants, however, have excluded the possibility of options (2) and (3) above, explaining during the Class Period that new orders were actually sold. For example, in the 3Q2023

[50] This $86.9 million figure is conservative as it assumes ***0%*** new bookings in the quarter, and assumes that 100% of the product revenues for the quarter were attributable to the release and conversion of product backlog to product revenues—a highly improbable scenario. Consequently, the assumed shortfall of $86.9 million is likely understated.

[51] Similarly, the $149.6 million figure is likewise conservative.

[52] *I.e.*, the sum of the $86.9 million gap in 3Q2023 and the $149.6 million gap in 4Q2023.

[53] In other words, one potential explanation for the negative gaps is that product revenue attributable to new bookings (as opposed to product revenue attributable to backlog orders being shipped out) regressed and declined so significantly from prior quarters that a portion of the backlog must have kicked in and propped up the total product revenue amount for the quarter ($241.1 million and $261.7 million for 3Q24 and 4Q24, respectively).

Earnings Call, Defendant Meyercord stated that: "[a]lthough our Q3 bookings typically decline sequentially in the March quarter [*i.e.*, 3Q2023], we in fact ***grew*** from December." And in the 4Q2023 Earnings Call, Defendant Meyercord again stated that: "[i]n our fourth quarter, bookings ***grew*** mid-single digits sequentially." In other words, because Defendants disclosed that bookings (*i.e.*, new orders) grew in 3Q2023 and 4Q2023—and had not regressed or declined—the only explanation for the dissipation and evaporation of the $236.5 million in unaccounted-for backlog orders was that ***those orders were never firm in the first place***.

321. As Extreme's backlog evaporated at the end of the Class Period, Defendants indicated that they had made a "conscious decision to put channel digestion ***behind us*** in the March quarter [*i.e.*, the 3Q2024 quarter]."[54] But the disappearance of the backlog had a catastrophic impact on Extreme's reported revenue. ***Product revenues decreased significantly from 1Q2024 to 3Q2024*** (not increased or remained flat). Notably, 3Q2024 product revenues fell to an abysmal $106.4 million—less than half of product revenues reported in any quarter from 2Q2023 to 1Q2024:

| ($M) | **1Q23** | **2Q23** | **3Q23** | **4Q23** | **1Q24** | **2Q24** | **3Q24** | **4Q24** |
|---|---|---|---|---|---|---|---|---|
| Backlog | $555.0 | $542.0 | $438.0 | $267.3 | N/A | N/A | N/A | $64.0 |
| Product Revenue | $206.3 | $223.4 | $241.1 | $261.7 | $253.5 | $186.6 | $106.4 | $152.7 |

322. That product revenues declines continued significantly throughout FY2024 further evidences that the previously reported backlog had not reflected "firm" customer commitment and *far more than 1% of backlog was cancellable by Extreme's customers*, in contrast to the misleading assertions and impression made by Defendants.

323. In short, had Extreme's product backlog actually been firm and real, then the product revenues would have grown by a substantial—and comparable—amount, largely equivalent to the amount of declines in the backlog. This would have represented true "digestion" of the backlog into product revenues. But product revenues did not grow by a comparable amount in 3Q2023 and 4Q2023—and in fact—further declined throughout FY2024. As a result, the only logical conclusion

[54] Extreme 2Q2024 Earnings Call (January 31, 2024).

is that the backlog orders had dissipated and did not result in Defendants' promised revenue growth that investors and analysts believed would occur.

324. Indeed, analysts arrived at the same conclusion at the end of the Class Period – finding that customers were "double-ordering," *i.e.*, cancelling orders, at a far higher rate than Defendants had misled the market into believing. For example, UBS Research downgraded Extreme from a "Buy" to a "Neutral" rating on January 31, 2024 – finding that: "Extreme's double-digit growth in FY22 and FY23 was the result of pandemic-related supply chain delays and depressed demand in FY20 / FY21 ***followed by double-ordering by customers in FY22 / FY23*** to protect against the possibility of supply chain issues. Supply and demand are normalizing in FY24 / FY25 and ***<u>it is now apparent that Extreme is not growing at a sustainable double-digit rate</u>***."

## V. THE TRUTH EMERGES THROUGH A SERIES OF PARTIAL DISCLOSURES

325. As set forth below, Defendants' fraud triggered massive, statistically significant declines in the price of Extreme's common stock that were causally connected to the facts that Defendants misrepresented and concealed. The truth concerning Extreme's channel stuffing and manipulative sales and inventory practices and the true nature of the Company's backlog, emerged through a series of partial disclosures from January 25, 2023 through January 31, 2024. Notably, the Defendants continued to make false and misleading statements throughout this time, as referenced in Section VI, which either inflated or maintained the share price at elevated levels until Extreme's final disclosure on January 31, 2024.

326. These series of disclosures involved significant declines and the dissipation of the product backlog, and significant reductions of revenues and downward revenue guidance. Critically, the market understood both backlog and revenues to be a representation of demand for Extreme's products. The combined dissipation of the backlog and the contemporaneous reduction of revenues thus evidenced that: (1) Extreme's revenue growth was not based upon organic demand as the market was previously led to believe; and (2) the backlog was not based on firm customer commitments that would lead to sustainable revenues, as the market was previously led to believe.

327. ***First***, on January 25, 2023, the Company filed a Form 8-K. The Form 8-K announced the resignation of Defendant Thomas as CFO of the Company, effective February 16, 2023. The

Form 8-K also announced that Defendant Tate was appointed as the Company's interim CFO, effective January 24, 2023, and that effective February 16, 2023, Defendant Tate was appointed as the Company's CFO. Defendant Tate was to assume these roles while the Company conducted a search for a new CFO.

328. Also on January 25, 2023, Extreme reported its financial results for its 2Q2023 ended December 31, 2022. In connection with reporting its 2Q2023 results, Extreme revealed for the first time that backlog had fallen—from $553 million to $542 million. On the 2Q2023 Earnings Call, Defendant Meyercord also shortened the timeline for backlog normalization to be complete (from previously stated FY2026),[55] stating that: "we see backlog returning to normal by the last quarter of fiscal '25 [*i.e.*, 4Q2025]."

329. As a result of this news, the price of Extreme dropped from $19.31 per share when the market closed on January 24, 2023 to $16.50 per share on January 25, 2023, a nearly 15% decline on abnormally heavy volume of over 9 million shares traded. However, because Defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, as discussed Section VI, the price of Extreme stock remained artificially inflated throughout the remainder of the Class Period.

330. Indeed, on January 25, 2023, Rosenblatt Securities stated in its analyst report that: "[i]n our view, the stock is down because . . . backlog decreased $13mn sequentially to $542mn. Orders were not bad, and Extreme is still doing slightly better than its industry peers, but expectations were higher. Additionally, the company announced CFO Rémi Thomas is leaving for another job . . . his departure from Extreme was unexpected." Similarly, Craig-Hallum Capital Group LLC stated in its January 26, 2023 analyst report that: "[w]e believe shares of Extreme Networks sold off yesterday with the announced departure of the company's CFO, Remi Thomas. . . That being said, management believes demand will remain strong and expect its strong backlog to remain relatively stable throughout the next several quarters before beginning to be worked down."

[55] *See* 1Q2023 Earnings Call (Defendant Thomas stating on October 27, 2022: "we believe it's going to be fiscal '26 when it [backlog] goes back to normal.").

331. ***Second***, just a few months later, Extreme stated that its product backlog as of June 30, 2023 declined by an astonishing ***$245 million*** over the course of FY2023. This decline represented an enormous **<u>48%</u>** wipe-out of the backlog, YoY.

332. Specifically, on August 24, 2023, Extreme filed with the SEC its Form 10-K for FY2023 (fiscal year ended June 30, 2023), which was signed by Defendants Meyercord and Rhodes. The Form 10-K stated the following:

> ***Our product backlog at June 30, 2023,*** net of anticipated back-end rebates for distributor sales***, was $267.3 million, compared to $513.0 million at June 30, 2022***. The decrease in backlog year over year is primarily due to a combination of a resumption in shipment of orders during fiscal 2023, after experiencing significant delays due to supply chain constraints in prior years, and a reduction in distributor orders due to shorter lead times.

333. As a result of this news, the price of Extreme stock dropped from $27.68 per share when the market closed on August 24, 2023 to $25.16 per share on August 25, 2023, a 9% decline on unusually heavy trading volume of over 10 million shares. However, because defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, as discussed Section VI, the price of Extreme stock remained artificially inflated.

334. The market interpreted the news negatively, but nonetheless continued to rely on Defendants' false and misleading assurances. For example, Rosenblatt stated in its August 28, 2023 analyst report that: "EXTR is down today on its 10-K disclosure that backlog exiting FY23 was $267mn. This means backlog dropped ~$170mn q/q in 4Q, after falling ~$100mn in 3Q. Before the 10-K came out, we have assumed backlog was down ~$100mn so it came in ~$70mn lower than we expected. . . Quarter-to-quarter backlog declines should be smaller from here, and backlog is still expected to normalize in 1Q[2]5, according to our conversation with the company today. The company still sounds confident in its FY24 guidance because the order environment is improving[.]"

335. ***Third***, on November 1, 2023, Extreme reported its financial results for 1Q2024. Notably, Extreme also stated that it would discontinue disclosure of its current backlog figure on a quarterly basis. Accordingly, Extreme did not report its backlog figure as of 1Q2024.

336. The Company reported sequential total revenue losses from $363.9 million in 4Q2023 to $353.1 million in 1Q2024. The Company also reported sequential product revenue losses from $261.7 million in 4Q2023 to $253.5 million in 1Q2024.

337. On November 1, 2023, Extreme also gave downward total revenue guidance of $312 million to $327 million for 2Q2024, which reflected a "more cautious tone," as described by Defendant Rhodes in the 1Q2024 Earnings Call.

338. In connection with reporting its 1Q2024 results, Extreme also revealed that "[b]ased on changing customer buying patterns . . . we are tempering our revenue outlook for this quarter and the balance of the year," which was resultant from an "air pocket" of demand. Despite the "lower[ed] revenue expectations" for FY2024, Extreme guided to a range of "mid-to-high single digits of revenue ***growth***" for FY2024. Extreme also disclosed that it was expecting normalized backlog of between $75 million to $100 million "by the end of Q4 fiscal '24."

339. As a result of this news, the price of Extreme stock dropped from $20.62 per share when the market closed on October 31, 2023 to $17.86 per share on November 1, 2023, a 13% decline on unusually heavy trading volume of nearly 10 million shares. Furthermore, Extreme's stock price continued to decline as the market continued to absorb the news, falling from a $17.86 closing price on November 1, 2023 to a closing price of $17.10 per share on November 2, 2023, and a closing price of $16.80 per share on November 3, 2023. In total, the share price of Extreme' stock over the three trading days declined by $3.82 per share, reflecting a decrease of 18% from market close on October 31, 2023.

340. ***Fourth***, on January 8, 2024, Extreme issued a press release that provided a business update lowering the Company's 2Q2024 and long-term revenue outlook, stating in relevant part that: "[s]econd quarter revenues are now expected to be approximately $294 to $297 million, compared to the prior outlook of $312 to $327 million." The press release confirmed that Extreme's final results for 2Q2024 would be published on January 31, 2024.

341. The press release also stated in relevant part:

> "Our revised second fiscal quarter outlook reflects industry headwinds of ***channel digestion*** and elongated sales cycles. In late Q2, we saw multiple large deals pushing

> out to future quarters," stated Ed Meyercord, President and CEO at Extreme. "We remain confident in our long-term strategy and our ability to achieve double-digit long-term revenue and EPS growth supported by competitive customer wins and the growth in our opportunity funnel."

342. As a result of this news, the price of Extreme stock dropped from $17.52 per share when the market closed on January 8, 2024 to $16.23 per share on January 9, 2024, a 7% decline on unusually heavy volume of over 4 million shares.

343. ***Finally***, on January 31, 2024, Extreme reported drastically disappointing financial results and operational trends for 2Q2024. Extreme disclosed that its total revenues for the quarter were $296.4 million, down $56.7 million from the prior quarter. Extreme's revenues of $296.4 million represented a decline of 16% in total revenue losses QoQ.

344. Similarly, on January 31, 2024, Extreme reported that its product revenues were only $186.6 million for 2Q2024, compared to $253.5 million from the prior quarter. This represented a decline of $66.9 million QoQ, or a 26% decline in product revenue losses QoQ.

345. Furthermore, Extreme in its 2Q2024 Earnings Call stated that the product revenue decline was attributable to "continued channel digestion and elongated sales cycles." Specifically, Extreme disclosed that: "[o]ur distributors and partners have lowered inventory purchases, which we expect to accelerate in the third quarter." The Company also revealed that its product backlog had ***already normalized*** during the quarter, "earlier than we initially anticipated."

346. The Company further stated that it had made the "conscious decision to put channel digestion behind [it] in the March quarter [*i.e.*, 3Q2024]," leading to a "***$40 million to $50 million reduction in channel inventory in the third quarter***" that would result in "[d]emand . . . be[ing] masked by inventory flowing out of the channel."

347. Additionally, rather than being on track for "mid teens" revenue growth for FY2024, as previously represented, Extreme provided new guidance that revealed the Company was in fact on track to suffer lower revenues in FY2024. Specially, the Company stated that looking into 3Q2024, total revenues would be in the range of just $200 million to $210 million – a further decline from the $296.4 million actuals of 2Q2024.

348.    Indeed, the Company disclosed that in 2Q2024, it expected "***sell through to be significantly higher than sell-in***, which we believe will have a meaningful impact on our operating results. To quantify this impact, we expect a $40 million to $50 million reduction in channel inventory in the third quarter, which will allow us to cover to a more normalized level of revenue in the fourth quarter." Extreme thus disclosed that it anticipated that sales from the distributor/partners to the end users (*i.e.*, the "sell-throughs") will be "significantly" higher than sales from Extreme to the distributor/partner (*i.e.*, the "sell-ins") – which would result in drastically less revenue as less product would be shipped to the distributors and partners. Through this disclosure, Extreme indicated that there was as surplus of inventory at the distributor / partner level that needed to be sold off.

349.    As a result of this news, the price of Extreme stock collapsed from $16.64 per share when the market closed on January 30, 2024, to $13.51 per share on January 31, 2024, and falling further to $13.22 per share on February 1, 2024 and $12.59 per share on February 2, 2024, a 24% decline on unusually heavy volume. In total, the price of Extreme stock declined from a Class Period high of $32.27 per share to a low of $12.59 per share after the revelation of the truth, a greater than 60% decline, resulting in investor losses.

350.    Following this final corrective disclosure, the market understood that Extreme was not, in fact, growing at a sustainable rate and that the revenue growth story that Defendants previously touted was fabricated. For example, UBS Research downgraded Extreme from a "Buy" to a "Neutral" rating on January 31, 2024—finding that: "Extreme's double-digit [revenue] growth in FY22 and FY23 was the result of pandemic-related supply chain delays and depressed demand in FY20 / FY21 ***followed by double-ordering by customers in FY22 / FY23*** to protect against the possibility of supply chain issues. Supply and demand are normalizing in FY24 / FY25 and ***it is now apparent that Extreme is not growing at a sustainable double-digit rate***."

351.    Similarly, Oppenheimer stated in its January 31, 2024 analyst report titled "EXTR F2Q24: Weak Quarter and Very Weak Guidance, Lowering Estimates" that the "stock will continue to be under pressure ***until revenue growth reaccelerates***, ***which is unlikely until 2025***."

352.    And Lake Street Capital Markets declared in its January 31, 2024 analyst report titled "High Inventory Level in Channel Results in Massive Guidance Reset," that: "***[w]e initially suspected***

***a typo when we saw Extreme's Q3 midpoint revenue guide of $205M vs the $321M consensus. But no, that is the correct figure***[.]" Accordingly, Lake Street lowered its estimates and price target from $17 to $13 for Extreme's shares.

353. As explained *supra* Sections IV.D.5 and IV.F.2, the significant declines in revenue—including total revenues, distributor revenues, and product revenues—are firm evidence of both (i) the existence of the undisclosed channel stuffing and other manipulative sales tactics, and (ii) the effects of the misrepresentations regarding the firmness of the backlog.

## VI. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS[56]

354. During the Class Period, Defendants falsely and misleadingly told the market that Extreme's revenue growth was attributable to Extreme's "exceptionally strong" demand and the improvement in the supply chain environment, but failed to disclose that Defendants implemented undisclosed channel stuffing and other manipulative sales and inventory tactics, which allowed Defendants to generate record-high revenues, but improperly masked true organic demand and accelerated revenues into the present by pulling in sales from the future.

355. Additionally, during the Class Period, Defendants falsely and misleadingly mispresented the strength and "firm" nature of Extreme's current backlog orders, touting the Company's massive backlog, but omitting to disclose that such backlog orders were not "firm" and did not reflect strong customer commitment and end user demand.

### A. 4Q2022 Earnings Press Release (July 27, 2022)

356. The Class Period begins on July 27, 2022, when the Company issued a press release entitled "Extreme Networks Reports Fiscal Year and Fourth Quarter 2022 Financial Results," and was subtitled "Record Bookings and Double-Digit Revenue Growth in FY22 Reiterates FY23 Revenue Growth of 10-15%." The press release stated in relevant part:

> "***For FY22 we achieved double-digit growth in both bookings and revenue due to strong demand*** for our differentiated enterprise networking and 5G infrastructure solutions. Bookings grew 24%, revenue exceeded $1.1 billion for the first time, and we exited the year with a record product backlog of $513 million . . ." stated Ed Meyercord, President and CEO of Extreme.

[56] In this section, all bold and italicized portions of Defendants' statements reflect the portions of the statements that Lead Plaintiffs are alleging are false and/or misleading.

> "***Our teams continue to see unabated market demand***, as networking projects remain a priority for our global customers. . . ." concluded Meyercord.
>
> Extreme's Chief Financial Officer Remi Thomas, added, "***After another quarter of solid execution, we achieved double-digit growth for the year and improved operating margins, even in the current supply chain environment***."

357. The statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "***strong***" and "***unabated market demand***" from end customers "even in the current supply chain environment," but rather, was a function of Defendants' actions of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) Defendants' other manipulative sales and inventory tactics as described herein Section IV.D.

**B. 4Q2022 Earnings Investor Presentation (July 27, 2022)**

358. On July 27, 2022, Defendants published their 4Q2022 Financial Results Investor Presentation, which included a slide stating "***Double-Digit Growth Fueled by Strong Demand and Execution***," "***Continued Strong Growth***," and "***Record Fiscal Year Revenue on 10% Y/Y Revenue Growth***," as well as a slide titled "***Driving Growth***" indicating that "Product Backlog" of ***$513 million*** was a key driver of that "***Growth***."

359. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "***strong demand and execution***" from end customers, did not reflect "***continued strong growth***," and the Company's product backlog of $513 million was not "***driving growth***" because, in truth, the revenues and backlog were a function of Defendants'

actions of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) Defendants' other manipulative sales and inventory tactics as described herein Section IV.D.

**C. 4Q2022 Earnings Conference Call (July 27, 2022)**

360. On July 27, 2022, Defendant Meyercord stated the following in the Company's Earnings Call for FY2022:

> ***Our results for fiscal '22 highlight unprecedented demand for Extreme's solutions*** and a very vibrant and healthy market for networking. We reported record bookings growth of 24%, which is a clear indication that we're taking share and winning in the market. And our forward-looking funnel for fiscal '23 is up double digits year over year. This is a leading indicator of future bookings growth. The differentiation of our fabric and cloud solutions for enterprise customers and our targeted solutions for very large service provider customers, ***combined with the high performance of our global sales and channel teams gives us the confidence in our outlook for continued growth and demand.*** Our technology solutions are critical to infrastructure initiatives underpinning digital transformation for all of our customers around the world. We believe these important projects will continue to remain a priority, irrespective of a changing macroeconomic environment***. For the year, our double-digit revenue growth led to an all-time high revenue of $1.1 billion, yet it was understated by the $400 million of incremental backlog we built during the year.*** Our total Q4 ending backlog was $513 million, thanks to the current supply chain environment.

361. Defendant Thomas further stated in the Company's Earnings Call:

> As Ed [Meyercord] described, ***we had solid execution in fiscal '22 with record bookings and backlog generation, double-digit revenue growth, and overall improving margins, in spite of the supply chain environment***. ***Strong demand for our portfolio of products, services, and subscription drove year over year*** bookings growth of 24% in fiscal '22 and 8% in Q4. With a product book-to-bill ratio of 1.29 for the year and 1.23 for the quarter, we exited the year with $513 million in backlog, up more than $400 million year over year and close to $90 million sequentially. ***That's nearly 3 full quarters of product revenue.***

362. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not the result of "***unprecedented demand for Extreme's solutions***" and not based on "***strong demand for our portfolio of products***." In reality, the revenue growth was due in large part to Defendants' actions of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) Defendants' other manipulative sales and inventory tactics as described herein Section IV.D.

363. Additionally, these statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate revenue growth for Extreme and did not reflect "nearly 3 full quarters of product revenue" and reported revenues were not "***understated by the $400 million of incremental backlog we built during the year***" because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

364. Additionally, during the July 27, 2022 Earnings Call, analysts questioned Extreme's ability to generate revenue and unlock the large, accumulated backlog that had been built up to $513 million, to which Defendant Meyercord responded:

> ***…our revenue outlook is really a function of supply chain and product that we are able to release, given the massive backlog that we've built up and the continued strength of bookings***. So I'll just start off with supply chain. You've asked about that. What we see is a gradual improvement throughout the year. So think of a step function where we will be stepping our revenue, quarter by quarter, throughout the year, based on our outlook of supply chain. . . . So our teams, as I mentioned in my comments, are more confident today than they have been in our ability to step function our supply of product to our customers' partners. So what does that mean? That is how we built the revenue forecast for fiscal '23, which is that step function, with sharper improvement in the second half of the fiscal. ***As it relates to demand, our demand has been strong, as we talked about it for the year, 24% for us***. ***That's record-breaking performance.***

365. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "demand" that was "strong" from end customers but rather, was a function of Defendants' actions of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) Defendants' other manipulative sales and inventory tactics as described herein Section IV.D.

366. Additionally, these statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate revenue growth for Extreme and did not reflect "nearly 3 full quarters of product revenue," because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%);

and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

**D. Extreme's Letter to Shareholders for FY2022 (July 27, 2022)**

367. Around the time Extreme filed its FY22 10-K, Extreme made available to shareholders on its website a letter wherein Defendant Meyercord highlighted the Company's robust backlog and strong demand, which he claimed positioned the Company for "accelerated growth over the next several years," stating in relevant part:

> We are pleased to report record results, unprecedented economic growth and continued business momentum at Extreme as we closed fiscal 2022. . . .Revenue exceeded $1.1 billion for the first time in Extreme's history despite unprecedented supply chain constraints. ***And we exited the year with a record $513 million in product backlog, up 5x from last year, setting the stage for accelerated growth over the next several years***. The continued strength of bookings demand, the re-leveling of our book-to-bill ratio and the ***high quality of our order backlog gives us greater visibility into the next several years and increased confidence of the returns*** from our investments in new products, people, and innovations.

368. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not "high quality" and did not "set the stage for accelerated [revenue] growth over the next several years," because (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

**E. Interview with CRN Magazine (August 2, 2022)**

369. On August 2, 2022, Defendant Meyercord had an interview with *CRN Magazine*, a computer publication trade newspaper targeted at the industry. The publication was titled "Extreme Networks CEO: Beating Cisco an 'Exclamation Mark' on Fiscal Year 2022." One of the questions

asked was: "[h]ow does Extreme's most recent fiscal quarter highlight how you're winning against the competition?" Defendant Meyercord responded:

> I can tell you that ***growth is spread across all of our geos*** when we look at the strength and performance in the Americans [sic], in EMEA, in Asia-Pacific. When we look at overall industry vertical growth, our solutions have been very successful across the board, across our verticals, ***so, it's just this very evenly spread, organic growth that we're experiencing at Extreme.*** It means that we're taking share.

370. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "organic growth" from end customers that Extreme was "experiencing," but rather, was a function of Defendants' actions of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) Defendants' other manipulative sales and inventory tactics as described herein Section IV.D.

**F. FY2022 Form 10-K (August 29, 2022)**

371. On August 29, 2022, Extreme filed with the SEC its Form 10-K for FY2022 (fiscal year ended June 30, 2022), which was signed by Defendants Meyercord and Thomas, who also certified as to the report's accuracy and completeness. The Form 10-K stated the following:

> ***Product revenues increased $62.3 million or 8.9% for the year ended June 30, 2022, compared to fiscal 2021. The product revenues increase for the year ended June 30, 2022 as compared to fiscal 2021 was primarily due to strong demand for our products*** partially offset by supply chain constraints which impacted our ability to fulfill the demand for our products during fiscal 2022.

372. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements,

Extreme's revenue growth was not based "primarily due to strong demand for [Extreme's] products," but rather, was a function of Defendants' actions of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) Defendants' other manipulative sales and inventory tactics as described herein Section IV.D.

373. Extreme's 2022 Form 10-K also contained signed certifications by Defendants Meyercord and Thomas pursuant to Section 302 of the Sarbanes Oxley Act of 2022 ("SOX"). These SOX certifications attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

374. These sections of the 2022 Form 10-K were materially false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, as Extreme did not disclose: (i) it was engaging in manipulative sales and inventory tactics which masked the level of organic demand and artificially inflated the Company's revenues listed therein as discussed *supra* Section IV.D.; and (ii) that the backlog of $513.0 million stated therein was overstated and inflated as the backlog did not reflect "firm" customer commitments, as discussed *supra* Section IV.F.

**G. 1Q2023 Earnings Press Release (October 27, 2022)**

375. On October 27, 2022, the Company issued a press release entitled "Extreme Networks Reports First Quarter Fiscal Year 2023 Financial Results," and was subtitled "Reiterates FY23 Revenue Growth Outlook of 10-15%." The press release reported that Extreme's revenues for the quarter were "$297.7 million, up 11% year-over-year, and up 7% quarter-over-quarter." This press release also stated:

> "***We delivered record quarterly revenue of $297.7 million***, and SaaS ARR of $111 million. Our customers view networking as a strategic asset, and they choose Extreme because we are the best choice to drive operational efficiencies and create better outcomes for their end users. ***This is evidenced by this quarter's impressive double-digit revenue growth, record revenue, and continued growth of backlog, which now sits at $555 million***," said Ed Meyercord, President and CEO of Extreme.
>
> "Extreme continues to take share in a thriving and competitive market. The flexibility and intelligence of our products like Extreme Fabric, ExtremeCloud IQ, and innovative capabilities such as Digital Twin and AIOps, are gamechangers. We make it simple to deploy and manage networks, which transforms the way our customers drive their businesses. ***The combination of our continued revenue growth and record backlog gives us even greater confidence in our long-term growth outlook***," concluded Meyercord.
>
> Extreme's Chief Financial Officer Remi Thomas added, "In addition to our strong topline results, both gross and operating margins improved sequentially. Our subscription business revenue grew approximately 40% year-over-year driven by the adoption of our cloud solutions. Given another quarter of strong free cash flow, we retired $37 million of our debt, which will be accretive to earnings."
>
> ***"As we look at the remainder of FY23, the continued improvement in the supply chain environment gives us further confidence in our topline growth outlook of 10-15%.*** We expect to cross the 60% gross margin threshold and achieve an operating margin in the mid-teens in the second half of our fiscal year," concluded Thomas.

376. Similarly, on October 27, 2022, Defendants also published their 1Q2023 Financial Results Investor Presentation, which included a slide stating "***Double-Digit Growth Fueled by Strong Demand and Execution***," "***Continued Strong Growth***," and "***Record Revenue on 11% Y/Y Revenue Growth***," as well as a slide titled "***Driving Growth***" indicating that "Product Backlog" of ***$555 million*** was a key driver of that "***Growth***."

377. These statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "***strong demand***" from end customers or reflect "***continued strong growth***" but rather, was a function of Defendants' actions of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues;

(iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) Defendants' other manipulative sales and inventory tactics as described herein Section IV.D.

378. These statements were also false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's "***record backlog***" of $555 million was not poised to generate continued revenue growth for Extreme and was not sufficient to give the Company "***greater confidence in our long-term growth outlook***" because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

**H. 1Q2023 Earnings Conference Call (October 27, 2022)**

379. On October 27, 2022, Defendant Meyercord stated the following in the Company's Earnings Call for 1Q2023:

> ***We had a record quarter as demand for cloud-driven networking and for Extreme Solutions has never been stronger. Again, our share gains are evident by double-digit revenue growth, record revenue and continued growth of backlog, which now sits at $555 million.***
>
> ***
>
> ***On the supply chain side, we continue to be laser-focused on tactical execution to meet our customers' needs. Our distributors give us the highest rank in the networking industry for delivering on our commit dates***, ***and this is driving demand*** and has become a source of new customer logos and partners for Extreme. This quarter alone, we qualified an additional 50 component suppliers and reduced our part shortages. Our success in reengineering products has also helped ease constraints. Based on all the actions we've taken with our supply chain over the past year, we now

> have better visibility and confidence in the ramp of our product deliveries. With a strong outlook for bookings growth and the gradual improvement in supply, we expect to build backlog through the end of the fiscal year. We anticipate neutral book-to-bill or release of backlog in our fiscal Q1 of '24*. **Once backlog begins to release, it will unlock an accelerated wave of product shipments and revenue growth over multiple quarters. We have complete visibility into our product backlog, the vast majority of which is comprised of orders with current delivery request dates.***

380. These statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "demand [that] has never been stronger" from end customers but rather, was a function of Defendants' actions of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) Defendants' other manipulative sales and inventory tactics as described herein Section IV.D.

381. These statements were also false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog of $555 million was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

382. Defendant Thomas further stated in the Company's Earnings Call:

> Now turning to guidance. ***Our confidence in our outlook is further solidified by $555 million worth of product backlog exiting Q1.*** For Q2, we expect revenue to be in the range of $299 million to $309 million. . . . ***So for the year, we expect 10% to 15% revenue growth.***

383. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog of $555 million was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

384. In the same Earnings Call, analysts asked Defendants about "decommits"—*i.e.*, cancellations by customers—and asked: "[t]he other question I had is on the decommits comments you made, it sounded liked decommits are declining, but still happening. Is that accurate? Or have the decommits basically stopped at this point?" Defendant Thomas responded:

> Alex, decommits are just -- it would be a normal part of the business. ***These are one-offs.*** And I can tell you right now because of our scrutiny around this, each and every decommit, to the extent there is one, gets a lot of scrutiny from us. And there's no consistency around it. So the example I might give would be a government agency that has budget. They can't get supply by the end of the year, it's use it or lose it. So they want to reprioritize another spend. ***So they might cancel an order or and maybe that comes into the budget for the following year based on that dynamic. But these are things that are not really supply chain. I guess you could say that supply chain related, but these are more one-offs. And so we're not really seeing a change in the one-offs, and they remain at a fraction of 1%.***

385. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements: (i) it was well known internally that Extreme's customers were double or triple booking orders from

Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; and (iii) Extreme internally had already hedged that Extreme's backlogged orders would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%).

**I. 1Q2023 Form 10-Q (October 28, 2022)**

386. On October 28, 2022, Extreme filed with the SEC its 2023 First Quarter Form 10-Q for the quarterly period ended September 30, 2022 ("1Q2023"), which contained signed certifications by Defendants Meyercord and Thomas pursuant to Section 302 of SOX. These SOX certifications again attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

387. These sections of the 1Q2023 Form 10-Q were materially false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, as Extreme did not disclose that it was engaging in manipulative sales and inventory tactics which masked the level of organic demand and artificially inflated the Company's revenue listed therein as discussed *supra* Section IV.D.

**J. Needham Virtual Security, Networking & Communications Conference (November 15, 2022)**

388. In this conference, analysts asked Defendant Meyercord regarding the "robust results" that Extreme had been experiencing, to which Meyercord responded in relevant part:

> And as you and I've discussed, ***we built up quite a bit of backlog because of the supply chain scenario, but it's all very high quality and we are very confident in the backlog. And so in a way, it just gives us a lot of confidence in the revenue growth forecast that we've got into the future and for the next couple of years.*** So, we are in a different place and we're going to continue to build on this.
>
> ***
>
> ***We're not seeing [decommits], we're not seeing de-books. The number that we've thrown out as a fraction of 1% and we would attribute that more than normal course of business kind of thing. So, yeah to your point, we're feeling a lot of confidence in the backlog number we have.***

389. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements,

Extreme's backlog was not "high quality" and poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

390. Later in the same conference, Defendant Meyercord stated that revenues had actually been underreported, as they've been stored in the Company's backlog:

> There's operating leverage in the model, Alex, what as you know, gets us excited as we look at this, because I say it kind of tongue in cheek, ***but we've been underreporting our earnings, because we haven't been showing our revenue, because we've been putting in backlog.*** Meanwhile, we've been paying for it.

391. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

**K. 2Q2023 Earnings Press Release (January 25, 2023)**

392. On January 25, 2023, Extreme issued a press release entitled "Extreme Networks Reports Second Quarter Fiscal Year 2023 Financial Results," and was subtitled "Delivers Consistent

Double-Digit Growth and Raises FY23 Revenue Outlook." This press release stated that Extreme's revenues for the quarter were "$318.3 million, up 13% year-over-year, and up 7% quarter-over-quarter." The press release also stated in relevant part:

> President and CEO Ed Meyercord stated: "Extreme delivered another quarter of great results. ***The continued strength of subscription and accelerated product deliveries drove another quarter of double-digit year-over-year revenue growth***. ***We are raising our FY23 revenue growth outlook to the high-end of our 10-15% range and expect this momentum to continue into FY24, as the supply chain environment continues to improve***."
>
> "***We feel confident in end customer demand***. The majority of our bookings are with government, education, and healthcare sectors, where spending is more resilient. Our enhanced fabric and cloud subscription offerings are gaining traction in the marketplace. Finally, we have good visibility for the second half of the year based on the strength of our sales funnel," continued Meyercord.

393. These statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "end customer demand," but rather, was a function of Defendants' actions of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) Defendants' other manipulative sales and inventory tactics as described herein Section IV.D.

### L. 2Q2023 Earnings Investor Presentation (January 25, 2023)

394. On January 25, 2023, Defendants published their 2Q2023 Financial Results Investor Presentation, which included a slide stating "***Continued Double-Digit Y/Y Revenue Growth***," "***Continued Strong Growth***," and "***Record Revenue on 13% Y/Y Revenue Growth***," as well as a slide titled "***Driving Growth***" indicating that Product Backlog of ***$542 million*** was a key driver of that "***Growth***."

395. These statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "end customer demand," but rather, was a function of Defendants' actions of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) Defendants' other manipulative sales and inventory tactics as described herein Section IV.D.

396. These statements were also false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate "revenue growth," because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

**M. 2Q2023 Earnings Conference Call (January 25, 2023)**

397. On January 25, 2023, Defendant Meyercord highlighted the Company's "exceptionally strong" customer demand, the Company's market share gains, and the size of its backlog in raising Extreme's guidance, stating:

> ***We had another record quarter, as demand for cloud-driven networking and for Extreme Solutions remains exceptionally strong with good visibility through fiscal year end '23, leading us to raise our full year revenue outlook to the high end of our range.***

> Our share gains are evident by a second consecutive quarter of double-digit revenue growth, 17% growth in product revenue, record free cash flow and a sizable backlog.
>
> . . .
>
> On the supply chain side, our ability to pull in components enabled us to achieve revenue upside, which we believe is sustainable into the second half of the year. As a result, we are raising our revenue outlook to the high-end of our prior 10% to 15% guidance range. We continue to be laser-focused on tactical execution to meet our customer's needs. . . . With a strong outlook for bookings growth and the gradual improvement of supply, we expect backlogs to remain relatively stable for the next several quarters. ***We're in the beginning stages of an accelerated wave of product shipments and revenue growth over multiple quarters. The majority of our backlog consists of the latest generation universal products*** that pull-through subscription and service bookings.

398. The statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "exceptionally strong" demand from Extreme's customers, but rather, was a function of Defendants' actions of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) Defendants' other manipulative sales and inventory tactics as described herein Section IV.D.

399. These statements were also false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate "an accelerated wave of product shipments and revenue growth" for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be

cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

400. Later during the Earnings Call, Defendant Tate stated:

> Now turning to guidance. ***As we enter the second half [of FY2023], our confidence in the revenue outlook is supported by our product backlog of $542 million***, our services and subscription deferred revenue balance of $446 million, as well as a product pipeline that is up double-digits year-over-year. . . . ***Against this backdrop, we expected for Q3 revenue to be in the range of $315 million to $325 million***, gross margin to be in the range of 58% to 60%, operating expenses to be in the range of $140 million to $145 million, and earnings to be in the range of $31.1 million to $38.4 million, or $0.23 to $0.29 per diluted share. We expect to cross the 60% gross margin threshold in Q4. For full fiscal year '23, we expect revenue growth towards the high end of our 10% to 15% outlook**,** with an operating margin in the mid-teens.

401. The statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

### N. 2Q2023 Form 10-Q (January 27, 2023)

402. On January 27, 2023, Extreme filed with the SEC its 2023 Second Quarter Form 10-Q for the quarterly period ended December 31, 2022 ("2Q2023"), which contained signed certifications by Defendants Meyercord and Thomas pursuant to Section 302 of SOX. These SOX

certifications again attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

403. These sections of the 2Q2023 Form 10-Q were materially false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, as Extreme did not disclose that it was engaging in manipulative sales and inventory tactics which masked the level of organic demand and artificially inflated the Company's revenue listed therein as discussed *supra* Section IV.D.

**O.    3Q2023 Earnings Conference Call (April 26, 2023)**

404. On April 26, 2023, Defendants highlighted the quarter's record results, which Defendants attributed to "improvements in our supply chain" and "demand trends." Additionally, Defendants stated their backlog will normalize to a revised range of $75 million to $100 million in 1Q2025. Defendant Meyercord further indicated that their current product backlog for end of 3Q2023 "represented 5x our expected normalized level," or about $437.5 million at the midpoint.

405. In the Earnings Call, Defendant Meyercord stated:

> ***Extreme delivered another quarter of record results, driven by solid execution of our teams. Our top line performance was highlighted by improvements in our supply chain that drove 16% total revenue growth and 22% product revenue growth on a year-over-year basis.*** We achieved double-digit growth in 8 of the past 9 quarters. Our operating margin and EBITDA also achieved quarterly records in Q3. . . .Although our Q3 bookings typically decline sequentially in the March quarter, we in fact grew from December***, reflecting strong demand.***

406. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "strong demand" from Extreme's customers, but rather, was a function of Defendants' actions of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management

of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) Defendants' other manipulative sales and inventory tactics as described herein Section IV.D.

407. In the same Earnings Call, Defendant Tate stated:

> ***Q3 financial results reflect record revenue,*** operating margin, and EBITDA, ***driven by increased product availability***. . . . ***We are confident in our Q4 and FY '23 outlook and reiterate our commitment to mid-teens long-term growth through fiscal year '25. Our third quarter revenue of $332.5 million grew 16% year-over-year and 4% quarter-over-quarter, exceeding the high end of our expectations entering the quarter***. . .
>
> ***Now turning to guidance, we remain confident in the revenue outlook for Q4 as supported by*** our strong funnel of opportunities, ***our product backlog*** and our services and subscription deferred revenue balance. . . . We continue to expect that the reduction in expedite fees and shipping costs, combined with the full impact of our recent pricing actions, will lead to a continued recovery in gross margin in Q4 and into fiscal year '24. ***Against this backdrop, we expect for Q4 revenue to be in the range of $340 million to $350 million***[.]

408. The statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

409. In response to continued analyst concerns about the decrease in backlog and conversion of backlog into revenue, Defendant Meyercord again sought to divert discussion of the backlog decrease and to not "get into sort of dissecting backlog." Specifically, Defendant Meyercord stated:

> What we've said is that overall backlog is about 5x. Obviously, distributor behavior is a little more tied to lead times and lead times came down faster. ***We're expecting them to come down, so we really don't want to get into sort of dissecting backlog. Really what we want to do is reinforce our outlook of revenue growth. And we're doing that out through our fiscal '25, which is out there. We baked that into our revenue guide, and that's where we're trying to focus everyone.***

410. The statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because Extreme's backlog was not poised to generate continued revenue growth for Extreme, because (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

**P. 3Q2023 Form 10-Q (April 27, 2023)**

411. On April 27, 2023, Extreme filed with the SEC its 2023 Third Quarter Form 10-Q for the quarterly period ended March 30, 2022 ("3Q2023"), which contained signed certifications by Defendants Meyercord and Tate pursuant to Section 302 of SOX. These SOX certifications again attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

412. These sections of the 3Q2023 Form 10-Q were materially false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, as Extreme did not disclose that it was engaging in manipulative sales and inventory tactics which masked the level of organic demand and artificially inflated the Company's revenue listed therein as discussed *supra* Section IV.D.

**Q. Needham Technology & Media Conference (May 17, 2023)**

413. On May 17, 2023, Defendant Tate made the following statements in her exchange with an analyst in the Conference:

> ***And we're seeing good demand. We're seeing double-digit growth in our weighted funnel year over year. And so that gives us confidence that demand is going to continue.*** We saw, like you said, new logo growth, 20% bookings growth from new logos. And so we're expanding into different markets, going beyond our installed base. We're seeing larger deals in our funnel than we have in the past. And so we're competing at a higher level. So all of those things contribute.
>
> ***As far as visibility, we have our backlog. We talk a lot about our product backlog, but we also have services and subscription backlog that goes along with that. We've been growing our subscription business, which gives us visibility as far as our deferred revenue balance, our ARR, what we can expect quarter-after-quarter. So between the backlog and the deferred revenue that we will recognize over time, we have really good, probably better than ever visibility into what we're going to achieve through the next fiscal year.***

414. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's "double-digit" revenue growth was not based on "good demand" from Extreme's customers, but rather, was a function of Defendants' actions of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) Defendants' other manipulative sales and inventory tactics as described herein Section IV.D.

415. The statements were also false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because Extreme's backlog was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as

10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

416. Later in the Conference, the analyst asked Defendant Tate to "talk a little bit about where the backlog was, what it did last quarter, why it did what it did last quarter and, to some extent, the difference between the end customer demand and the disties that support the end customers, that stock inventory?" Tate continued to make misleading statements about Extreme's backlog, saying:

> ***The backlog is – consists of both the end user demand, and so orders for specific deals, specific projects; stadiums, hospitals, schools, et cetera. And then we have orders that are from our distributors for get – having product on hand and on order to be able to deliver customers when the demand hits.***
>
> ***
>
> ***Now, we expect to see that continue over the next several quarters. We expect to see both releasing product, being able to ship to customers, enjoying that product revenue growth***, and we also expect to see the distributor orders adjusting as the lead times come down. It may not be linear, we may not see the same level of reduction in backlog in Q4 that we saw in Q3. We think it'll still be kind of gradual over the next several quarters but – four to five quarters until we get to that normalized level, which we said would be around $75 million to $100 million.

417. Defendant Tate's statement above was false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because Extreme's backlog did not "consist[] of . . . end user demand," because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

418. Finally, an analyst pressed for more information about the Company's visibility into backlog, to which Defendant Tate responded:

> So we have excellent visibility into our backlog. If I think about the question of double ordering or triple ordering, to me that means somebody needs some access points for a school, let's call it, and they're going to order access points from us and they're going to order access points from another vendor, or they may order it twice from us just to get the product. That is not happening, that's not a phenomenon we see at all.
>
> Our customers have to go through a deal registration process, it goes through – ***it's not cancelable. These are real projects that we see. And so I would say the vast majority of our backlog is related to this kind of end user demand project-based business and we don't see double ordering***.

419. Defendant's Tate's statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because: (i) Extreme's backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

**R. 4Q2023 Earnings Press Release (August 2, 2023)**

420. On August 2, 2023, the Company issued a press release entitled "Extreme Networks Reports Fourth Quarter and Fiscal Year 2023 Financial Results," which was subtitled "Marks Second Consecutive Year of Double-Digit Revenue Growth; Expect Continued Strong Growth in FY 24." The press release reported that Extreme's revenues for the fourth quarter were "up 31% year-over-year, and up 9% quarter-over-quarter." This press release quoted Defendant Meyercord, who stated:

> ***"Extreme delivered a year of exceptional performance, with revenue growth accelerating to 31% in the fourth quarter and 18% overall for the year***," said Ed Meyercord, President and Chief Executive Officer. "This marks our second consecutive year of double-digit growth. We're outgrowing our competitors, gaining share, and winning new logos, which helped drive more than 30% growth in the value of deals over $1 million. . . . I remain confident in our growth prospects and am excited about the new innovations and opportunities we have in store for FY24 and beyond," concluded Meyercord.

> Kevin Rhodes, Executive Vice President and Chief Financial Officer stated, "the strong topline growth we achieved in Q4 and FY23 resulted in significant operating leverage that drove over 76% growth in GAAP EPS. We doubled our cash generation to $235 million in free cash flow this year, and even after repurchasing another $100 million worth of shares, and paying down $80 million in debt, we improved our year-end balance sheet to achieve a net cash position. ***Extreme has never been in a more robust financial position***, and I am encouraged about our future prospects."

421. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's "revenue growth" was not based on Extreme having "never been in a more robust financial position," but rather, was a function of Defendants' actions of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) Defendants' other manipulative sales and inventory tactics as described herein Section IV.D.

**S. 4Q2023 Earnings Conference Call (August 2, 2023)**

422. On August 2, 2023, Extreme Networks held an Earnings Conference Call to discuss the Company's Fourth Quarter and Fiscal Year 2023 financial results. In Defendant Meyercord's prepared remarks, he indicated that "[e]nd customer orders remain firm" and that the normalization of the Company's backlog in 1Q25 remained on track, stating in relevant part:

> This quarter, we were able to bring our product lead times down again as our supply chain environment continues to improve***. We have the benefit of a healthy backlog of customer orders with request dates that spread fairly evenly through the end of our fiscal year. End customer orders remain firm and distributor orders have normalized, giving us confidence in our outlook for this fiscal year.***
>
> We continue to expect our backlog to settle in a range of $75 million to $100 million in Q1 '25.

423. Defendant Meyercord's statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because: (i) Extreme's backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

424. Defendant Meyercord later stated in the Earnings Call that: "***in EMEA and the rest of the markets, they remain very strong, and the demand in the U.S. market remains very strong***."

425. These statements in the prior paragraph were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's demand was not "strong" bur rather was a function of Defendants' actions of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) Defendants' other manipulative sales and inventory tactics as described herein Section IV.D.

426. On that same conference call, Defendant Rhodes delivered prepared remarks in which he highlighted Extreme's revenue outlook for fiscal year 2024 ("FY24"), saying:

> "[F]ourth quarter earnings per share were $0.33 at the high end of our guidance entering the quarter. For the full year, fiscal '23, revenue of $1.3 billion grew 18% from the prior year on product revenue growth of 22%. ***During fiscal year '24, we***

***expect continued strong product revenue growth, given the growing interest in our solution by customers and the ongoing normalization of our backlog.***"

427. Defendant Rhodes' statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because the backlog was not poised to generate "continued strong product revenue growth," because at the time of the statements: (i) Extreme's backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

428. Later, when pressed by an analyst for an update on Extreme's backlog, Defendant Meyercord refused to quantify the amount of backlog and stated that the Company's backlog would start to normalize throughout FY24 and into 1Q25, stating in relevant part:

> ***So Mike, we said last quarter that we were not going to give – we were going to move away from giving a specific backlog number each and every quarter. I think what Ed said in his prepared remarks is that our backlog is now – we feel like it will start to normalize throughout 2024 and into Q1 of 2025. We feel good about the level of backlog we have. For instance, it's primarily, I'd say, 90-plus percent is all end customer orders at this point. And so the distribution orders that we had in the past have basically worked themselves through the system, especially with supply chain getting better.*** And so we feel good about those end customer orders and the timing of when those orders need to be shipped to those customers based on their own, I'll call it, like upgrade cycle and whatnot, we feel like it will come down fairly evenly throughout the year and into Q1 of '25. So feeling good about the level of backlog that we have and the timing of that coming out.

429. Defendant Meyercord's statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements: (i) Extreme's backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the

orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

**T. Rosenblatt Securities Technology Summit (August 22, 2023)**

430. On August 22, 2023, Defendants participated in the Rosenblatt Securities Technology Summit. During the Question-and-Answer portion of the Summit, Defendant Rhodes indicated that Defendants were very confident in the mid-teens revenue growth guidance that was given:

> ***So, this year, we've got strong visibility into 2024, in particular Q1 and beyond Q2 and et cetera. And I can see it in the pipeline. I can see in our win rates, et cetera. And that gives me confidence in our ability to kind of say what we think is going to happen in 2024.*** In 2025, I'm not changing yet the long-term guidance that the company had. I have no reason to. The reality is I went and looked at what we had as inherent assumptions within that model. We're already hitting some of those numbers that we have in long-term model from a – hey, we think that operating income is going to be closer to the 20% range. Well, geez, we just landed in Q4 at 17%. And then, OpEx, we're going to be in the 43% range. We're hitting that as well. And so, there's a number of different areas within the long-term model, growth rates, et cetera, as well in the 13% to 17% range. ***We're already calling mid-teens growth this year and think in 2025 with the momentum we are building today, we don't see a lot of change for that at this moment***. We will update it again in November at our Analyst Day, and we're excited for that.

431. Defendant Rhodes' statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements: (i) Extreme's backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

432. The statements were also false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because Extreme's backlog was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

**U.   FY2023 Form 10-K (August 24, 2023)**

433. On August 24, 2023, Extreme filed with the SEC its Form 10-K for FY2023 (fiscal year ended June 30, 2022), which was signed by Defendants Meyercord and Rhodes. The Form 10-K contained signed certifications by Defendants Meyercord and Rhodes pursuant to Section 302 of SOX. These SOX certifications attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

434. These sections of the 2023 Form 10-K were materially false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, as Extreme did not disclose that: (i) it was engaging in manipulative sales and inventory tactics which masked the level of organic demand and artificially inflated the Company's revenues listed therein as discussed *supra* Section IV.D; and (ii) that the backlog of $267.3 million stated therein was overstated and inflated as the backlog did not reflect "firm" customer commitments, as discussed *supra* Section IV.F.

**V.   1Q2024 Earnings Conference Call (November 1, 2023)**

435. Specifically, on November 1, 2023, Defendants participated in an Earnings Conference Call to discuss the Company's 1Q2024 financial results. In his prepared remarks on the 1Q24 call, Defendant Meyercord stated:

> Our increasing pool of large, high-profile customers and our technology differentiation is why we continue to see the value of deals over $1 million grow each quarter. In Q1, we have more than 30 deals over $1 million. ***We continue to have a healthy customer order backlog with clear visibility to order with specific customer request dates through the balance of our fiscal year.***
>
> This quarter, our product lead times normalize, allowing us to continue working down backlog from product and strengths. We continue to expect our backlog to [settle] in a range of $75 million to $100 million by the end of Q4 fiscal '24.

436. The statements above were false and misleading because Extreme did not have a "healthy customer order backlog" because: (i) Extreme's backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

437. Defendant Rhodes in the Earnings Call also stated:

> ***In the first quarter, we again demonstrated strong financial and operational performance. . . First quarter revenue of $353.1 million grew 19% year-over-year, exceeding the high end of our expectations entering the quarter. . . Product revenue of $253.5 million grew 23% year-over-year, reflecting continued improvement in our supply chain environment***.

438. These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's product revenue growth was not reflective of "continued improvement in [Extreme's] supply chain environment," but rather, was a function of Defendants' actions of: (i) stuffing outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; (ii) improperly "pulling in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues; (iii) wholly

improper management of deals included in the pipeline and revenue forecasts which included orders that were double-booked or double-counted, without correction into the fiscal quarter or year was over; and (iv) Defendants' other manipulative sales and inventory tactics as described herein Section IV.D.

439. Finally, Defendant Meyercord also sought to quell market concerns about the backlog, indicating that the backlog was still healthy and would lead to revenue generation:

> ***I think it's fair to say that the – our backlog as it relates to distribution has normalized, but we still have a fair amount of customer backlog that's out there –*** and I can give an example of like Kroger. We had a very large win with Kroger. They're deploying all their stores. They don't necessarily want all the equipment upfront at once. They want to time that with their deployment.

440. Defendant Meyercord's statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements: (i) Extreme's backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

**W. 1Q2024 Form 10-Q (November 2, 2023)**

441. On November 2, 2023, Extreme filed with the SEC its 2024 First Quarter Form 10-Q for the quarterly period ended September 30, 2023 ("1Q2024"), which contained signed certifications by Defendants Meyercord and Rhodes pursuant to Section 302 of SOX. These SOX certifications again attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

442. These sections of the 1Q2024 Form 10-Q were materially false and misleading and omitted material facts, as Extreme did not disclose that it was engaging in manipulative sales and

inventory tactics which masked the level of organic demand and artificially inflated the Company's revenue listed therein as discussed *supra* Section IV.D.

**X. Interview with CRN Magazine (November 22, 2023)**

443. On November 2, 2023, Defendant Meyercord had an interview with *CRN Magazine*, a computer publication trade newspaper targeted at the industry. The publication was titled "Extreme Networks CEO: 'These are Boon Times for Our Channel Partners." In this interview, Meyercord stated:

> ***As you know, we put up 19 percent growth [in 1Q2024]. And I think the channel is very healthy because the channel is digesting all this backlog that is being released***. From a project perspective, our channel partners are busy at work implementing our technology and networking solutions. So from that standpoint, these are boon times for our channel partners.

444. Defendant Meyercord's statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's channel was not "very healthy," and the channel was not "digesting all this backlog that is being released," because at the time of the statements: (i) Defendants used Extreme's channels, including through distributors and partners, to stuff outdated and unwanted inventory with distributors, in order to recognize revenues for the present fiscal quarter, which artificially borrowed demand from future fiscal quarters; and (ii) Defendants' used Extreme's channels to improperly "pull in" sales from future fiscal quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order justifying the recognition of revenues. Additionally, these statements were false and misleading with respect to the digestion of the backlog, because: (i) Extreme's backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's contracts with its customers allowed the orders to be cancelled and were cancellable on a "quite flexible" basis; (iii) Extreme internally had already hedged that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers (and the more appropriate number for the hedge was as high as 66%); and (iv) Extreme's

backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period.

## VII. ADDITIONAL ALLEGATIONS OF SCIENTER

445. Lead Plaintiffs incorporate by reference all of the allegations above.

446. All the facts detailed in this Amended Complaint, when viewed holistically, establish a strong inference that each of the Defendants knew, or were severely reckless in not knowing, that each of the misrepresentations and omissions alleged herein would be, and were, false and misleading to investors at the time they were made. As alleged herein, the Defendants had scienter over their undisclosed and fraudulent scheme.

447. Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over their false or misleading statements and omissions. Defendants acted with scienter in that they knew or recklessly disregarded that the public statements, more specifically set forth in Section VI, were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities law.

### A. The Documents Provided by Former Employees Are Definitive Proof of Scienter

448. As revealed above throughout *supra* Section IV, numerous documents provided by former Extreme employees to Lead Counsel make it abundantly clear that Defendants were made aware of (1) the undisclosed channel stuffing and manipulative sales and inventory conduct and (2) the backlog process—thus strongly evidencing Defendants' scienter.

449. For example, Defendant Thomas was forwarded numerous emails from FE-1, on July 20, 2022—just days before the start of the Class Period.

450. In these emails to Defendant Thomas, FE-1 states that Defendant Brown "**works with the distributors to buy bad product that is not sellable to make the corporate number**." Indeed, this document is evidentiary proof that the C-Suite at Extreme was made aware of the channel stuffing conduct alleged herein, just days prior to the start of the Class Period (July 27, 2022).

451. Furthermore, other documents produced by FE-1 indicated other contemporaneous examples of Defendants seeking to cancel the stock inventory rotation clause that Extreme had with its distributors in order to force the distributors to keep and hold the inventory and—according to Defendant Brown's own words—"***drive the behavior we want***."

452. These documents included emails and IM messages in which Defendant Brown stated, for example, that Extreme "forecasted $3M for TD [Synnex] to rotate – they submitted $6.8M. That is a HUGE problem for all of us. Josh may have tanked our quarter. I need a plan on how we reverse this . . . if not, our conversion rate will spike, ***and our auditors will be all over us***."

453. Other documents provided included FE-1 indicating in his notebook that Defendant Brown wanted to "punish" TD Synnex for submitting a stock rotation in 2Q2022, and specifically, give them a "***bloody nose***."

454. Importantly, these documents were provided to the C-Suite through Defendant Thomas, on July 20, 2022.

455. Notably, these emails and IM messages also demonstrate that the backlog discussions were "**updated all the way to Ed [Meyercord]**." Specifically, an email provided by FE-1 contains an IM conversation dated May 27, 2022, in which Defendant Brown told FE-1, "why didn't we have [the TD call] scheduled for yesterday? . . . ***Lots of eyes on this backlog process – it's updated all the way up to Ed [Meyercord].***"

456. Accordingly, these documents provided to Lead Counsel are extraordinarily strong proof of scienter, and are documentary evidence that the (1) channel stuffing and manipulative sales conduct and (2) the discussions concerning the "backlog process," were known by and discussed internally at the C-Suite level – just days before the beginning of the Class Period (*i.e.*, July 27, 2022).

**B.    Defendants' Own Statements and Admissions Are Strong Evidence of Scienter**

457. Throughout the Class Period, Defendant—including each of the Individual Defendants—strongly asserted that they had "complete visibility" into the operations of their business, including the Company's sales pipeline, their backlog, and other metrics tracking Extreme's customer's purchase orders, which Defendants claimed to have personally reviewed.

458. For example, on July 27, 2022, Defendant Meyercord stated in the Company's 4Q2022 Earnings Call that: "***[w]e have complete visibility into our product backlog*** and have received negligible cancellations to date of less than 1% of bookings. Our backlog primarily consists of our latest-generation universal products."

459. Similarly, in response to analyst questions about backlog normalization, Defendant Thomas also personally assured in the 1Q2023 Earnings Call (October 27, 2023) that: "I'll ***let Ed [Meyercord] chime in as well because we're both very close to the topic***, but we believe it's going to be fiscal '26 when [the backlog] really goes back to normal."

460. Defendant Thomas similarly highlighted in the 1Q2023 Earnings Call that "decommits" (*i.e.*, cancellations of purchase orders) were just a "one-off" and that they get a "lot of scrutiny from" Defendants. Specifically, Thomas stated: "Alex, decommits are just -- it would be a normal part of the business. These are one-offs. ***And I can tell you right now because of our scrutiny around this, each and every decommit, to the extent there is one, gets a lot of scrutiny from us***. And there's no consistency around it. So the example I might give would be a government agency that has budget. They can't get supply by the end of the year, it's use it or lose it. So they want to reprioritize another spend. So they might cancel an order or and maybe that comes into the budget for the following year based on that dynamic. But these are things that are not really supply chain. I guess you could say that supply chain related, but these are more one-offs. And so we're not really seeing a change in the one-offs, and they remain at a fraction of 1%."

461. On May 17, 2023, Defendant Tate also personally assured the market in the Needham Technology & Media Conference that the Defendants had reviewed the firmness of Extreme's backlog—asserting that: "***we have excellent visibility into our backlog***. ***If I think about the question of double ordering or triple ordering***, to me it means somebody needs some access points for a school, let's call it, and they're going to order access points from us and they're going to order access points from another vendor, or they may order it twice from us just to get the product. ***That is not happening, that's not a phenomenon we see at all***. . . . the vast majority of our backlog is related to this kind of end user demand project-based business and ***we don't see double ordering***."

462. Defendants also asserted that they personally reviewed the sales pipeline and sales metrics, including for demand. Indeed, Defendant Tate stated in the May 17, 2023 Needham Technology & Media Conference that: "obviously, ***we're very keen on demand and where demand is going. And so, we do a lot of analytics around that.*** We have our pipeline and what we call our funnel. We look at the total funnel of opportunities that are coming down the pike. . . So between the backlog and the deferred revenue that we will recognize over time, we have really good, probably better than ever visibility into what we're going to achieve through the next fiscal year."

463. And similarly, on November 14, 2023, during the Needham & Company Virtual Tech Week Conference, analysts asked Extreme about "where [Extreme is] relative to the backlog issue/boom bust of supply chain. And then, last piece of that is, can you talk about your pipeline?" Defendant Rhodes responded that: "I'm responsible for making sure that we take friction out of the sales process . . . ***So I'm actually pretty close to looking at our sales pipeline, sales pipeline metrics***."

464. Moreover, Defendant Meyercord asserted on January 25, 2023 that this visibility into the operations of the Company was based on ability to run analytics and use artificial intelligence—claiming that: "[i]n terms of the pipeline and our funnel analytics, we've got very good visibility and we're getting much better at calling numbers and we have this AI [Artificial Intelligence] tool that we use that helps us call it [referring to the health of the pipeline]. ***So I'm going to call it across the board***."

465. Indeed, Defendant Meyercord also made similar assertions regarding analytics and artificial intelligence to the market in the 1Q2023 Earnings Call, stating that with respect to "cancellations" or "delays" on customer orders and the effects on the Company's outlook, that: "obviously, is something ***we keep a very close eye on. And we're not seeing it.*** We have a lot of different variables that we look at, specifically as we look forward, we look at opportunities that we have in the funnel that are -- ***and we're scrubbing those regularly. We have feedback from our direct sellers in field and what they're rolling up and calling. And as you're aware, we have an AI tool that sits on top of Salesforce that comes up with a call***. So we kind of have kind of 3 legs to our outlook, and we're just not seeing it."

466. These statements all demonstrate that Defendants were personally "***close to the topic***" regarding the Company's sales pipeline, the backlog, and the status of the Company's purchase orders—and are accordingly highly indicative of Defendants' scienter.

**C. Defendants' Internal Reporting is Strongly Supportive of Scienter**

467. Multiple former employees make clear that the status of Extreme's purchase orders, the amount of inventory at Extreme, Extreme's backlog orders, and other related metrics were accessible and made available to Defendants in the form of (1) "pull-in" lists, (2) weekly inventory demand reports, (3) distribution listservs, (4) spreadsheets, and (5) the Clari and Salesforce databases, which had the capability of generating and pulling reports on the Company's sales and revenues operations.

468. As discussed above *supra* Section IV, Extreme monitored the likelihood that the accounts with its partners would end up with a secured purchase order by the end user. And critically, Extreme willingly shipped and stuffed product and inventory to its partners while having access to reports, information, and databases that demonstrate that those end users had ***not*** placed a confirmed purchase order.

469. **"Pull-In Lists."** Former employees, specifically FE-2, explained of the existence of a "pull-in list" of partners to target that could potentially pull-in orders. FE-2 explained that this "pull-in list" would indicate and monitor what deals each partner had with the end customer and the organic timeline for the deal, such that if a deal was to close and the end customer would place the purchase order, in May, for example (which was in 4Q), then Extreme could target that potential partner to seek to "pull-in" the sale into the present, e.g., in March (which had the effect of pulling in the sale for 3Q). FE-2 explained the "pull-in list" was in the form of a spreadsheet that was "sent up the chain of command."

470. **Weekly Inventory Demand Reports.** Similarly, FE-1 explained that every week the distributors were given inventory lists by Extreme. FE-1 also explained that Extreme *receives* weekly inventory demand reports from its distributors and also a pipeline report which shows what is forecasted, and that these reports had visibility into the end user and reseller demand. According to FE-1, from these reports, Extreme could see what the "true real demand" was from the reseller / end

user to the distributor. FE-1 explained that nonetheless, Extreme pushed its distributors to buy additional inventory regardless, even when there was no demand downstream. He added that Extreme ignored their distributors actual demand from their own resellers and end users, and what was on order. Extreme continued to push inventory to the distributors that they did not need, and did not allow them to cancel or return the inventory. FE-1 described these practices as "allowing Extreme to own the distributors' business."

471. Other former employees speak of other similar spreadsheets and reports with tracked the Company's product inventory, backlog, and revenues – and which were circulated up to the highest levels of executive management, including the Individual Defendants.

472. **Distribution-Listservs and Spreadsheets.** Specifically, FE-5 explained that Extreme maintained an "Inventory List" group listserv, which detailed how much product Extreme had on-hand at any given moment. According to FE-5, the Inventory List listserv was a regular group-wide email that attached an Excel spreadsheet. In the Excel spreadsheet, the device, type of device, serial number, model numbers, current demand, availability, and allocation of Extreme's products was shown. FE-5 indicated that the Inventory List spreadsheet would show, *e.g.,* that "1000 items were committed to this deal" with a particular customer, etc. According to FE-5 – "every item, we would have an inventory count on it."

473. FE-5 explained that the Inventory List spreadsheet indicated what Extreme actually had on hand, what it had on order, and what it had on backlog, at any given moment.

474. According to FE-5, each distributor had their own Distribution Inventory Excel spreadsheet as well. Accordingly, FE-5 explained that Extreme "would always know what TD Synnex had, what Jenne had, etc."

475. Importantly, FE-5, explained that the CEO (Defendant Meyercord), the CFO (Defendants Thomas / Tate / Rhodes), and "all executive leaders" were "***always***" email recipients on the listservs and would have received the Excel spreadsheets.

476. Thus—at any moment in time during the Class Period—Defendants would have known and were made aware how much inventory was at Extreme, how much inventory was being shipped out to distributors and partners, and how much of the product was on backlog.

477. **Clari and Salesforce Databases.** Separately, multiple former employees describe that the Company's Clari (Extreme's revenue orchestration and organization platform) and Salesforce databases (Extreme's enterprise and customer management system) would have revealed the status of Extreme's revenue forecasts, the pipeline of purchase orders, and would have even documented whether Extreme's end users were likely to place a purchase order.

478. These former employees described that the Clari and Salesforce database systems would have revealed Extreme's pipeline and revenue forecast at any given time during the Class Period. These former employees also described that the Clari and Salesforce database systems hosted the "Pipeline" / "Best Case" / "Key Best Case" / "Commit" framework, and that this framework was intended to measure the likelihood that an end user will actually place and secure a purchase order with Extreme.

479. FE-2 also specifically explained that Extreme's weekly and daily updates were entered into Extreme's Salesforce system, and the details would be "pulled" by the Company's "Clari" system – which could be accessed in diverse ways through the Company's various dashboards depending on what type of information the user wanted.

480. Importantly, these former employees, including FE-5, stated that everyone at Extreme had access to Clari and Salesforce, including senior level officers and executives—who could access the employees' pipelines or revenue forecasts. According to FE-5, the Clari and Salesforce databases provided the ability to run reports for all sales and purchase orders nationwide and globally. FE-5 further described it as "everyone could pull revenue forecasts," and the "***C-suite could see everything we see***."

481. Furthermore, FE-5 stated that he "knows for a fact" that senior level executives reviewed those updates because he recalled being told on a number of bi-weekly calls throughout his tenure that Defendant Meyercord and CRO Vitalone wanted additional details in the updates so that they could better understand them.

482. As just one specific example, FE-5 specifically recalled on a bi-weekly call around January 2024 when the Director of Global Solution Partnerships of Americas Amy Bravo and Vice

President of Americas Channel Jennifer Orr directed participants on the call to write their updates clearly, detailed, and professionally as possible "***as if Meyercord is reading them, because he is.***"

**D. Defendants' Participation in Meetings is Further Indicia of Scienter**

483. Defendants' scienter is further evidenced by the number of meetings that Defendants participated in, as described by former employees, in which both (1) the channel stuffing and manipulative sales and inventory conduct was discussed, and (2) in which the true nature of the backlog was discussed. Defendants' presence, participation, and involvement in these meetings thus further raises the inference of scienter.

484. **"Ed Talks."** FE-1 provided to Lead Counsel personal notes evidencing meetings that he described as "Ed talks" or Ed Meyercord talks, which evidenced Defendant Meyercord's involvement and knowledge of the supply chain constraints facing Extreme, and the inability for Extreme to ship the backlog out as revenue due to such constraints. According to these notes, and FE-1's explanation of these notes, Defendant Meyercord stated in this meeting that (i) the supply chain constraints were "not getting better," (ii) the "constraints were creating backlog," and (iii), that as a result, Extreme "can't ship" this backlog out as revenue.

485. **"Buy-In" Meetings.** FE-1 described a "Buy-In" process that would occur at the end of every fiscal quarter during his tenure, in order to meet Extreme's financial revenue targets. According to FE-1, Extreme would send outdated and unwanted inventory to the Company's distributors through multiple incentives including (1) "points" or rebates, i.e., a monetary discount on the inventory; (2) priority position in front of the backlog line for backlogged products—over other distributors; and (3) stock rotation agreements. FE-1 described these "Buy-In" deals as a "structured deal" with each of the distributors, in order for Extreme to "sell more inventory to distribution than distribution needs." According to FE-1, Defendant Brown organized the Buy-In deals at the end of the quarter and was present at the Buy-In meetings. Additionally, FE-1 explained that Defendant Brown received his "marching orders" from Defendant Rice.

486. **Exit Meetings**. Separately, FE-1 had multiple exit meetings in the summer of 2022 with Defendant Thomas, Executive Vice President of Global Human Resources Kimberly Basnight, and FE-1's Human Resources Manager – whereby FE-1 explained the unethical channel stuffing and

manipulative sales and inventory conduct he witnessed. According to FE-1, he left the Company as a result of the unethical behavior and conduct he witnessed. The import of these meetings is significant, as FE-1 did not only meet with one individual, but many, including high-level Human Resource executives such as Kimberly Basnight and the CFO of the Company itself—Defendant Thomas.

487. **Quarterly and Monthly C-Suite Meetings**. During the Class Period, FE-7 was tasked with examining the pricing strategy for Extreme's entire product portfolio. FE-7 was the former President of a company acquired by Extreme. FE-7 attended quarterly meetings with C-Suite executives as well as a second meeting which occurred every 30 days. FE-7 explained that the quarterly meeting had detailed discussions on the status of the business, including the Company's backlog. FE-7 explained that both meetings, the (1) quarterly meeting and (2) the meeting occurring every 30 days, were with members of the C-Suite, including Defendant Meyercord, Defendant Thomas,[57] and Defendant Rice. FE-7 further explained that the meetings which occurred approximately every 30 days on average at times were every three or four weeks depending on the schedule of Defendant Meyercord.

488. According to FE-7, at these meetings "everyone [referring to Extreme Networks' C-Suite] in the room knew" that customers hedged their procurement and that it was "standard operating procedure." According to FE-7, ***the C-Suite knew that the double-hedging and triple-hedging practice by Extreme's customers was going on***, especially during the constrained supply chain environment.

489. **Revenue Assurance and "Output" Calls**. FE-8 recalled "Revenue Assurance" calls where the backlog was discussed and there were "conversations around the [backlog] hedge" and the algorithm that Extreme used for this calculation.

490. According to FE-8, the "Revenue Assurance Calls" were attended by Defendant Brown, members of the Finance team, Defendant Rice, and Senior Vice President Jack Lyon. FE-8

[57] While FE-7 knew of Defendant Thomas' personal participation in these meetings, it is reasonable to assume that Defendants Tate and Rhodes similarly participated in these meetings since they held the CFO title at various points during the Class Period as well.

explained that the "Revenue Assurance" calls were led by Defendant Rice, who then "took the baton" and had subsequent conversations with the CEO (Defendant Meyercord) and CFO (Defendants Thomas/Tate/Rhodes) through "Output" calls.

491. According to FE-8, these "Output" meetings were calls that occurred after the "Revenue Assurance" calls, where Defendant Rice and others relayed the information to the CEO and CFO – indicating "here's what we're looking at" and the level of risk and the upside. Further, FE-8 explained that it was his understanding that the information provided to the CEO and CFO in the "Output" calls was also presented through an Excel summary sheet, which included the range of calculations for potential outcomes, including the assumed "yield" from the ***backlog***—*i.e.*, the conversion from backlog to product revenue.

492. According to FE-8, the Revenue Assurance calls were a "quarterly function" with meetings becoming more frequent as the quarter progressed. FE-8 explained that during the first two months of the quarter, meetings occurred during the final week of the month to discuss current trends. FE-8 continued to explain that during the third month of each quarter the call became weekly and "week over week" trends were discussed. FE-8 explained toward the end of each quarter, these calls occurred "almost daily" and "day over day" happenings were discussed on a more "precise" level.

493. FE-8 also explained that it was his understanding that the Output calls between Defendant Rice, Meyercord, and the CFO occurred at the same frequency as the Revenue Assurance Calls, so as the number of Revenue Assurance calls increased throughout the quarter so too did the Output calls—because "ultimately" Defendant Rice, Defendant Meyercord, and the CFO were trying to determine the "earnings story" they were going to tell the market.

494. According to FE-8, information from the Revenue Assurance Calls was provided to Meyercord and he recalled instances where it was noted that an update needed to get to Meyercord and that there was certain information he wanted to know. FE-8 further stated that it was "openly known that the information was going to get to the CEO."

495. **Weekly Forecast Calls**. Further, FE-1 described a process of weekly forecast calls and meetings in which the pipeline reports would be discussed, and ***which would indicate how bad and "unclean" the deals were.***

**E. Given the Facts Alleged Herein, It Would be Absurd to Believe Defendants Did Not Act With Scienter**

496. Given the facts alleged herein, including the actual access that Defendants had to truth of the Company's business operations, and the critical importance of the Company's revenues, backlog, and other financial indicators and metrics for the Company's overall health, it would be absurd to believe that the Company did not know of (i) the undisclosed channel stuffing and manipulative sales tactics which greatly accelerated revenues, and (ii) the truth regarding the strength and "firmness" of the Company's backlog—a key financial metric.

497. Indeed, as to the channel stuffing and manipulative sales and inventory practices alleged herein, the breadth and the widespread nature of such practices further raises the indicia of scienter. As alleged above, the undisclosed manipulative sales and inventory practices affected and touched Extreme's most important distributors and partners, which included distributors such as TD Synnex, Westcon, and Jenne. These distributors accounted for more than ***50%*** of the Company's overall revenues during the Class Period. Furthermore, the undisclosed manipulative sales and inventory practices was not isolated to just one region, but affected the Americas, EMEA, and multiple large business segments. As one former employee stated, (FE-2), he witnessed "channel stuffing" throughout his tenure as Director of Sales, where he worked in the "largest revenue producing region in the Americas."

498. Furthermore, Defendants had executive oversight of Defendant Brown, who reported directly to the C-Suite through Defendant Rice. Defendants Rice himself was a member of the C-Suite. Additionally, Defendants Meyercord, Thomas, Tate, and Rhodes had direct control over the sales and product revenue reporting for Extreme's fiscal quarters.

499. Given (1) Defendants' executive oversight of Defendant Rice and Brown, who according to former employees orchestrated and were responsible for the channel stuffing and manipulative sales conduct described herein, (2) the fact that Defendant Thomas was made aware of these manipulative sales and inventory tactics on July 20, 2022—just ***days*** before the start of the Class Period, and (3) the numerous numbers of documentary evidence and reports that were available

during the Class Period—it would be absurd to believe that Defendants would have not been made aware of the manipulative channel stuffing, sales, and inventory tactics described herein.

500. Additionally, the extraordinary importance, magnitude, and amount of the backlog also raises the inference of scienter.

501. First, the backlog number itself was highly material to the Company—*i.e.*, a present-tense metric reflecting what anticipated revenues would be based off current purchase orders. The present-tense backlog was thus a reflection of revenues for the Company. Indeed, Defendants spoke about backlog in every single quarterly Earnings Call over the Class Period – and asserted that the backlog they touted poised the Company for strong revenue growth. Moreover, numerous analysts were extremely focused on the level of backlog and the significance of Defendants' backlog to Extreme's product revenues. The inference of scienter is heightened over such a material metric to the Company, and given the importance of backlog to the Company's core operations, the Defendants would know—or were reckless in not knowing—the true nature, strength, and composition of the backlog, and whether the backlog was indeed "firm."

502. Second, the amount of product backlog during the Class Period was of enormous magnitude, reaching upwards of $555 million at one point during the Class Period. In terms of revenues, this reflected ***multiple quarters worth of product revenue***. It would be absurd to think that Defendants would be unaware of the composition and strength of the backlog, especially as they continuously touted to the market during the Class Period that this backlog would be converted to revenues, and that the orders of backlog were "strong" and "healthy."

503. Notably, Defendants stopped reporting backlog during the Class Period as soon as it became clear that the declines in backlog were not converting into product revenue as they previously led the market to believe they would.

504. Indeed, as discussed in detail *supra* Section IV.F.2, backlog declined significantly from 2Q2023 to 3Q2023, reflecting a decline of $104.5 million. Notably, product revenue only increased by $17.6 million during that same period, reflecting that $86.9 million of the backlog was unaccounted for. Thereafter, from 3Q2023 to 4Q2023, backlog declined significantly again, from $437.5 million to $267.3 million—an extraordinary $170.2 million loss in backlog. Again, product

revenue only increased by a paltry $20.6 million over the same period, reflecting that $149.6 million of the backlog was unaccounted for.

505. Thereafter, Defendants stopped reporting backlog to the market on a quarterly basis.

506. Notably, backlog was a material metric to the market, and Defendants offered no explanation for why they stopped reporting backlog besides obfuscating the unexplainable loss of millions of dollars of backlog. Indeed, on 3Q2023, *i.e.*, the first significant decline in backlog, Defendant Meyercord stated in the 3Q2023 Earnings Call:

> What we've said is that overall backlog is about 5x. Obviously, distributor behavior is a little more tied to lead times and lead times came down faster. We're expecting them to come down***, so we really don't want to get into sort of dissecting backlog. Really what we want to do is reinforce our outlook of revenue growth. And we're doing that out through our fiscal '25, which is out there. We baked that into our revenue guide, and that's where we're trying to focus everyone.***

507. And on 4Q2023, *i.e.*, the second consecutive quarter in which backlog decreased significantly but product revenues did not increase at the same rate, Defendant Meyercord stated:

> ***So Mike, we said last quarter that we were not going to give -- we were going to move away from giving a specific backlog number each and every quarter***. I think what Ed said in his prepared remarks is that our backlog is now -- we feel like it will start to normalize throughout 2024 and into Q1 of 2025. We feel good about the level of backlog we have.

508. Notably, whether backlog was firm or not and whether the composition of the backlog was strong and healthy—as Defendants claimed—could be measured and illuminated by comparison of the reduction in product backlog with the limited gain in product revenues.

509. Thus, obfuscating how much backlog there was, beginning in 1Q2024—and as product revenues were materially declining (*see supra* Section IV.F.2)—further elevates the inference of scienter, as it would prevent the market from accurately understanding how firm the prior-reported backlog was and whether such backlog was—in fact—leading to revenue growth as Defendants claimed.

### F. In the Constrained Supply Chain Environment, Defendants Had Motive and Opportunity to Accelerate Revenues through Channel Stuffing

510. Given the constrained supply chain environment, as discussed *supra* Section IV.B, and the downward effect that this constrained supply chain environment had on the Company's total

revenues, distributor revenues, and product revenues, the Company had a strong motive and opportunity to engage in channel stuffing and other manipulative sales tactics in order to prop up revenues during this constrained environment.

511. Specifically, former employees described how Extreme's revenue recognition model during the Class Period allowed Extreme and Defendants the ability to recognize revenues at the moment of shipment to distributors and partners—***not*** when the end user received or actually purchased the product.

512. Furthermore, these former employees described and explained that purchase orders made by Extreme's customers that were on backlog could ***not*** be counted as revenues, because they were orders that had not been fulfilled, and thus, not shipped.

513. Despite Extreme's impressive growth in backlog during the constrained supply chain environment, it nevertheless could not recognize such growth in backlog as revenues. Indeed, Defendant Meyercord stated at the outset of the Class Period that Defendants' revenue growth was nonetheless "understated by the $400 million of incremental backlog we built during the year."

514. Accordingly, Extreme and Defendants had a strong incentive to boost short term revenues at the expense of future demand, in order to quell market and analyst concerns about the ability to generate revenues and be profitable during the constrained supply chain environment.

515. In doing so, Defendants borrowed from future demand by engaging in their manipulative channel stuffing practices and by "pulling in sales," in order to meet current expectations, as explained and described *supra* Section IV.D.

516. Further, the significant revenue declines in 2Q2024 and 3Q2024—that were in sharp contrast to the revenue growth while the channel stuffing took place—are highly indicative of the channel stuffing conduct that occurred during the Class Period, and are demonstrative that the demand for Extreme's products was artificially inflated by Defendants' undisclosed manipulative sales and inventory conduct.

517. Indeed, at the end of the Class Period, Defendants disclosed that for 3Q2024, Extreme expected "***sell through to be significantly higher than sell-in***, which we believe will have a meaningful impact on our operating results. To quantify this impact, ***we expect a $40 million to $50***

***million reduction in channel inventory in the third quarter***, which will allow us to cover to a more normalized level of revenue in the fourth quarter."

518. Extreme thus disclosed that it anticipated that sales from the distributor/partners to the end users (*i.e.,* the "sell-throughs") will be "significantly" higher than sales from Extreme to the distributor/partner (*i.e.,* the "sell-ins") – which would result in drastically less revenue as less product would be shipped to the distributors and partners. Through this disclosure, Extreme indicated that there was as surplus of inventory at the distributor/partner level that needed to be sold off.

### G. Extreme's Executive Compensation Program Further Incentivized the Individual Defendants to Accelerate Revenues in the Short Term, through the Channel Stuffing and Manipulative Sales Tactics

519. The Individual Defendants were also motivated to engage in the channel stuffing and manipulative sales scheme in order to reap financial benefits from Extreme's executive compensation program. The Company disclosed its executive compensation payouts for fiscal year 2023 (July 1, 2022 through June 30, 2023) in its Form DEF14A Proxy Statement ("2023 Proxy") filed with the SEC on September 26, 2023.

520. In the 2023 Proxy, the Company revealed that Defendants Meyercord, Thomas, Tate, and Rhodes were named executive officers, or "NEOs." The Company further explained that it operated an executive compensation plan, referred to as the Extreme Incentive Plan ("EIP"). The EIP applied to its NEOs—including Defendants Meyercord, Thomas, Tate, and Thomas.

521. According to the 2023 Proxy, the EIP was a "short-term cash incentive plan," which was "designed to reward Company performance . . . ***particularly in the short term***."

522. Furthermore, according to this EIP, the executive compensation plan for Defendants Meyercord, Thomas, Tate, and Rhodes was both (1) "***directly linked to*** the performance of the Company and ***to our stock price***," and (2) was based on the achievement of ***<u>pre-established revenue goals</u>***.

523. Specifically, the EIP for FY2023 provided for semi-annual payouts based on the achievement of pre-established revenue goals for the Company, for each of the first and second halves of fiscal year 2023.

524. For the first half of FY2023 (*i.e.*, July 1, 2022 through December 31, 2022), the Company's "threshold" revenue—which would grant the Defendants' additional compensation (*i.e.*, a bonus)— was $505.6 million. And the "target" goal for revenues was $594.8 million. According to the Proxy, Defendants reached and surpassed both, achieving $616.0 million in revenues for the first half of FY2023.

525. For the second half of FY2023 (*i.e.*, January 1, 2023 through June 30, 2023), under the EIP compensation incentive, the Company's threshold revenues goals were $585.1 million, and the target was $688.3 million. And again, according to the Proxy, Defendants reached and surpassed both goals, achieving $696.4 million in revenues for the second half of FY2023.

526. ***As a direct result of Extreme's increased revenues***, Defendants Meyercord, Thomas, Tate, and Rhodes were thus eligible—and did—receive a hefty cash payment bonus for each half ("1H or 2H") of the year:

| **Defendant** | **1H 2023** Base Salary | **1H 2023** EIP Bonus[58] | *Bonus % of Salary* | **2H 2023** Base Salary | **2H 2023** EIP Bonus[59] | *Bonus % of Salary* |
|---|---|---|---|---|---|---|
| Meyercord | $400,000 | $569,920 | 142% | $400,000 | $544,840 | 136% |
| Thomas | $250,000 | $232,900 | 93% | $64,423 | N/A[60] | N/A |
| Tate | $154,005 | $78,519 | 51% | $173,171 | $85,600 | 49% |

527. Notably, as shown above, the EIP cash payments paid out as a result of the increased revenues were significant, and in some cases, ***larger than Defendant's base salary***. Indeed, for FY2023, Defendant Meyercord received ***$1,114,400 million*** in this EIP bonus—a cash payment amount that was only brought about by the increased revenues. And this monetary cash payment was ***139% larger than his base salary*** for the year, which was $800,000.

528. These monetary incentives continued into the Class Period (which ends January 30, 2024). In Extreme's 2024 Proxy Statement, filed with the SEC on September 27, 2024, Extreme

[58] According to the Proxy, this was "paid" out in February 2023.
[59] According to the Proxy, this was "paid" out in August 2023.
[60] Defendant Thomas left the Company in February 2023.

disclosed that from July 1, 2023 to December 31, 2023, Defendant Meyercord received $183,456 in an EIP cash bonus, and that Defendant Rhodes received a $71,400 monetary cash payment.

529. Thus, given that the Individual Defendants' "***short term***" executive compensation was "directly linked" and "directly tied" to the Company's revenues and stock price performance, and with the opportunity to earn substantial cash sums twice in the same fiscal year, these Individual Defendants had a strong personal pecuniary motive to engage in the channel stuffing and manipulative sales and inventory tactics described herein—which artificially inflated Extreme's revenues and Extreme's stock price, and which in turn, allowed the Individual Defendants to obtain millions of dollars of additional compensation.

**H. The Retaliatory Culture at Extreme, and the Departures and Resignations of High-Level Executives, Also Support an Inference of Scienter**

530. The inference of scienter, including with respect to Defendants' undisclosed manipulative sales tactics and channel stuffing conduct, is further strengthened due to the retaliatory culture that existed at Extreme concerning individuals who refused to participate in the illicit tactics and conduct. Furthermore, there was suspicious turnover by Extreme's executives during the Class Period while Defendant Rice—who orchestrated the channel stuffing conduct as alleged herein—was promoted and given a new title of Chief Commercial Officer.

531. An example of retaliatory conduct was demonstrated by the account of FE-2. FE-2, former Director of Sales at Extreme, described an incident that occurred in July 2023 in which David Savage, the Vice President of Sales and Senior Director of SLED (State, Local, and Education) Sales, directed FE-2 to ask channel partner PC Solutions to take approximately $1.5 million worth of inventory by the end of that month without a confirmed end user purchase order. According to FE-2, there was no indication at that time that Extreme was going to be awarded the purchase order, so he refused to do it. FE-2 explained that he did this because (i) he perceived it as unethical and (ii) Extreme had done this to PC Solutions at least once previously and in that previous occurrence, the purchase order never came, and PC Solutions was stuck with the inventory for a year. FE-2 recalled that as a result of refusing Savage's directive in July 2023, he was thereafter demoted from his Director of Sales position to an Account Executive position.

532. According to FE-2, Human Resources never contacted FE-2 for being demoted, and Savage never gave a real reason for the demotion. FE-2 recalled that Defendant Rice told him in an exit interview that Savage had wanted to "let go" of FE-2 at that time, but that Defendant Rice told Savage to demote FE-2 instead. Notably, FE-2 believes that Extreme, or at least Defendant Rice, understood that FE-2 could have sued the Company if they had fired him for refusing to do something unethical and possibly illegal and that instead a demotion would not lead to a lawsuit.

533. Other former employees were retaliated against and fired in response to their efforts to do the right thing, the results of which would have projected a less positive revenue position for the Company. For example, FE-10, a Senior Account Executive who started at Extreme in July 2023, described how he learned that individuals at Extreme had the ability to input comments into Salesforce for opportunities based on conversations with customers without any "back up." FE-10 recalled an instance of a significant opportunity in Salesforce that he could not get "validated" with the customer as being legitimate. According to FE-10, however, when he attempted to remove this opportunity from Salesforce he was instructed "don't take it out" or "kill it" and instead he was instructed to "move" the opportunity to the end of the year. FE-10 explained that this "inflated" the "health" of his territory and that this practice was "not good." According to FE-10, the revenue forecasting should have been "reflecting reality"—which it did not during his tenure. FE-10 explained that by cleaning the data he was responsible for, it "skewed" the pipeline and opportunity forecasts "negatively." FE-10 added that the triggers were in place to assist with identifying individuals to be laid off, and that by removing old data and therefore reducing the forecasts for his territory, his standing at the Company was negatively impacted.

534. FE-10 further explained that he was individually performing well and did not have any inclination that he may be laid off less than one year after starting. According to FE-10, he had had internal conversations about "cleaning up" the forecasts when he joined and noted that there were opportunities in the Salesforce maintained by his predecessors which were not "real" deals. FE-10 recalled that his counterparts on his team were all "older reps" who had been at the Company for at least a year and were not focused on "cleaning" their data. According to FE-10, he was advised by

his counterparts "not to focus on that [data cleaning] too much." FE-10 noted that they "all played ball" by leaving old data and opportunities in Salesforce.

535. Notably, FE-10 also explained of a separate incident in which he tried to act "with integrity" prior to the end of his tenure. FE-10 recounted how he was asked to see if a distributor would cut a purchase order to Extreme without having received the purchase order from the end user. FE-10 explained that he was told and directed by upper management to ask the distributor if they could "cut" (meaning issue) the purchase order because the customer had not yet done so, and Extreme could only recognize revenue once the distributor had a purchase order. FE-10 pushed back against his superiors and obtained the purchase order from the end customer "with integrity."

536. FE-10 further explained that when he was let go from the Company in April 2024, he was "blindsided" and there was no "heads up." According to FE-10, he was the only one on his team "cleaning up the pipeline" in order to correct the accuracy of the forecasting.

537. Similarly, there were employees at Extreme who left Extreme on their own accord, after witnessing the "unethical" channel stuffing conduct performed by Defendants. For example, FE-1 decided to leave the Company after witnessing numerous instances of unethical and manipulative channel stuffing behavior with distributors (as explained thoroughly *supra* Section IV.D.2)—committed by Defendant Rice and Defendant Brown. The other Individual Defendants were also made aware of these practices. As described above, specifically, FE-1 recounted how he met with Defendant Thomas after announcing his resignation, and gave Defendant Thomas documents demonstrating the unethical channel stuffing conduct that he witnessed, and described the unethical practices that he saw.

538. Notably, according to FE-1, Defendant Brown was trying to get FE-1 fired. Furthermore, FE-1 explained that his supervisor, Director of Distribution in the Americas, Joseph Uraco ***was***—in fact—fired by Defendant Brown around 90 days[61] after FE-1 resigned from the Company (in July / August 2022). FE-1 knows this based upon his own conversation with Uraco. And according to FE-1, nothing changed at Extreme even after FE-1's exit interviews in July 2022.

[61] 90 days after the July/August 2022 timeframe is approximately October/November 2022.

539. Furthermore, the indicia of scienter is further strengthened due to the significant turn-over and resignations of high-level Extreme executives in the C-Suite, all while Defendant Rice—who helped orchestrate the channel stuffing conduct—was given a new title and further revenue and sales responsibilities as Chief Commercial Officer.

540. Defendant Thomas's departure from Extreme also raises an inference of scienter. On January 25, 2023, Extreme announced through a press release Defendant Thomas' departure from the Company, effective February 16, 2023. Notably, the press release gave limited clarifying details regarding Defendant Thomas's sudden departure. Analysts such as Rosenblatt Securities considered the departure "unexpected." Furthermore, raising the indicia of scienter, FE-1 explained that a former colleague mentioned to him in a conversation (after FE-1 left the Company) that Defendant Thomas thought he should have done something about the information that was presented to him, but Defendant Thomas stated "he was on his way out" anyway.

541. The frequent turn-over and resignations of many high-level executives in the C-Suite, and the simultaneous promotion and elevation of Defendant Rice—who was a key orchestrator of the channel stuffing conduct alleged herein—thus further raises the inference of scienter. This inference of scienter is further raised due to Extreme's conduct of retaliating against its employees who sought to "act with integrity" and chose not to participate in the "unethical" and illicit undisclosed tactics alleged herein.

## VIII. LOSS CAUSATION

542. The fraud alleged herein was the proximate cause of the economic loss suffered by Lead Plaintiffs and the Class. There was a causal connection between the alleged fraud and the loss (*i.e.*, stock price declines) described herein. *See, e.g., Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018).

543. During the Class Period, Lead Plaintiffs and other Class members purchased or otherwise acquired Extreme common stock at artificially inflated prices, and were damaged thereby when the price of Extreme common stock declined in response to the partial disclosures. Throughout the Class Period, the price of Extreme common stock was artificially inflated and/or maintained as a result of Defendants' materially false and misleading statements and omissions. The price of Extreme

common stock significantly declined, causing investors to suffer losses, in response to a series of partial disclosures concerning or connected to the facts misrepresented or concealed by Defendants, which disclosures are described more fully above in Section V. Throughout the disclosure period, Defendants mitigated Extreme's stock price declines by making additional false assurances concerning the alleged fraud, as described herein.

544.   As the result of the disclosures described herein on January 25, 2023, August 24, 2023, November 1, 2023, January 8, 2024, and January 31, 2024, Extreme common stock declined from a Class Period high of $32.27 per share to a closing price of $12.59 per share on February 2, 2024 after the final corrective disclosure, a decline of over 60%.  Each of these disclosures, made on was associated with a statistically significant "abnormal" decline, meaning that it was not explained by broader market or industry price declines, as described in more detail in Section V, above.

545.   It was entirely foreseeable that Defendants' materially false and misleading statements and omissions and scheme to defraud investors discussed herein would artificially inflate or maintain the existing artificial inflation of the price of Extreme common stock. It was also foreseeable to Defendants that the disclosures described above would cause the price of Company stock to fall as the artificial inflation caused and maintained by Defendants' misstatements and omissions was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.  Alternatively, loss causation can be demonstrated by the materialization of various risks related to Defendants' channel stuffing scheme and the true nature of the backlog (*i.e.*, that the product backlog was not firm and would not lead to sustainable revenues).

## IX.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

546.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

547.   To the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

548. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, the Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the statement was authorized or approved by an executive officer of Extreme who knew that the statement was false when made, and/or the statement omitted material adverse information whose disclosure was necessary to render the statement not misleading.

549. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X. THE PRESUMPTION OF RELIANCE

550. To the extent that Lead Plaintiffs allege that Defendants made affirmative misstatements, Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) Extreme's common stock traded in an efficient market;

(d) the misrepresentations and omissions alleged would tend to induce an investor to misjudge the value of Extreme common stock;

(e) Plaintiffs and other members of the Class purchased Extreme common stock between the time Defendants misrepresented or omitted facts;

(f) Extreme common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(g) Extreme regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(h) Extreme was followed by securities analysts employed by major brokerage firms who wrote reports, which were distributed to those brokerage firms' sales force and certain customers and that were publicly available and entered the public marketplace; and

(i) unexpected material news about Extreme was reflected in and incorporated into the Company's stock price during the Class Period.

551. As a result of the foregoing, the market for Extreme common stock promptly digested current information regarding Extreme from publicly available sources and reflected such information in the price of Extreme common stock. All persons and entities who or which purchased or otherwise acquired Extreme common stock during the Class Period suffered similar injuries through their purchase of Extreme common stock at artificially inflated prices, and thus, the presumption of reliance applies.

552. A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), to the extent the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## XI. CLASS ACTION ALLEGATIONS

553. Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a Class of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Extreme during the period from July 27, 2022 through January 30, 2024, inclusive, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director or control person of Extreme during the Class

Period and their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) the subsidiaries and affiliates of Extreme; (vi) Extreme's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vii) the legal representatives, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

554. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to class members. Throughout the Class Period, Extreme's roughly 130 million outstanding shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Extreme shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Extreme or its transfer agent and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

555. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the federal securities laws were violated by Defendants' acts as alleged herein; (b) whether Defendants omitted and misrepresented material facts; (c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (d) whether the price of Extreme's securities was artificially inflated; (e) whether Defendants' conduct caused the members of the Class to sustain damages; and (f) the extent of damages sustained by Class members and the appropriate measure of damages.

556. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

557. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

558. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against Defendants Extreme, Meyercord, Thomas, Tate, and Rhodes

559. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

560. This Count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Plaintiffs and the Class, against the Defendants.

561. During the Class Period, Defendant Extreme and Defendants Meyercord, Thomas, Tate, and Rhodes made, disseminated or approved the materially false or misleading statements alleged herein, all of which were about Extreme and its common stock, which they knew or, at minimum, were severely reckless in not knowing, were misleading in that they contained misrepresentations and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

562. Defendant Extreme and Defendants Meyercord, Thomas, Tate, and Rhodes violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material fact and/or disseminated and/or approved and/or omitted to state material facts necessary to make the false or misleading statements specified above not misleading.

563. During the Class Period, Defendant Extreme and Defendants Meyercord, Thomas, Tate, and Rhodes individually and in concert, directly and indirectly, by the use, means, or

instrumentalities of interstate commerce and/or of the mails made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and made the above statements and omissions intentionally or with severe recklessness.

564.   Defendant Extreme is liable for all materially false or misleading statements made the Class Period, as alleged above.

565.   Defendants Meyercord, Thomas, Tate, and Rhodes are liable for the false or misleading statements they made and for which they were responsible, as alleged above.

566.   As alleged above, Defendants Extreme, Meyercord, Thomas, Tate, and Rhodes acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with reckless disregard for the truth. The material misrepresentations and omissions of material facts alleged herein, which presented a danger of misleading buyers and sellers of Extreme common stock, were either known to Defendants Extreme, Meyercord, Thomas, Tate, or Rhodes or were so obvious that the Defendants should have been aware of them.

567.   The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at Extreme, establish a strong inference that Defendants Extreme, Meyercord, Thomas, Tate, and Rhodes acted with scienter in making the materially false or misleading statements alleged above during the Class Period.

568.   Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Extreme common stock and were harmed when the truth about Extreme negatively impacted the price of those securities. Lead Plaintiffs and the Class would not have purchased Extreme common stock at the prices they paid, or at all, had they been aware of the truth about Extreme.

569.   As a direct and proximate result of Defendant Extreme's, Meyercord's, Thomas's, Tate's, and Rhode's wrongful conduct, Lead Plaintiffs and other members of the Class suffered harm in connection with their respective purchases of the Company's common stock during the Class Period.

**COUNT II**

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) Against All Defendants**

570. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

571. This Count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5(a) and (c), on behalf of Lead Plaintiffs and the Class, against all Defendants.

572. Defendant Extreme and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) in that they: (1) employed devices, schemes, and artifices to defraud; and (2) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Extreme common stock during the Class Period in an effort to maintain artificially high market prices for Extreme common stock.

573. Defendant Extreme and the Individual Defendants individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, employed devices, schemes, and artifices to defraud and engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class in connection with the purchase and sale of Extreme common stock; which did: (i) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, Extreme's undisclosed channel stuffing and manipulative sales and inventory tactics; (ii) artificially inflate and maintain the market price of Extreme common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase Extreme common stock at artificially inflated prices and suffer losses when the true facts became known.

574. As part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c), the Defendants engaged in the fraudulent scheme to inflate revenues in the short term and for the present fiscal quarter, at the expense of future fiscal quarters, by: (i) stuffing outdated and unwanted inventory at the distributor/partner level in exchange for incentives such as discounts, monetary rebates, or

prioritization in the product backlog line; (ii) shipping inventory to partners early, without a confirmed end user purchase order, in order to "pull in" sales for the quarter; (iii) incentivizing distributors to take unwanted and unneeded inventory by encouraging the use of a right to return and stock distribution rotation agreements for future quarters; (iv) reneging on those same stock distribution rotation agreements, which forced the distributors to hold the unwanted product; (v) manipulating the Company's revenue figures and forecasts by including multi-million dollar orders that Extreme knew it had lost out on to competitors or were improperly double counted—without correction—until the quarter was over; and (v) misrepresenting the nature of Extreme's backlog as "firm" and revenue-generating, when in reality, the backlog did not represent nor reflect firm commitments from Extreme's customers.

575. These deceptive acts were part of a course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Extreme common stock during the Class Period in an effort to maintain artificially high market prices for Extreme common stock.

576. As described above, Defendant Extreme, and the Individual Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. Defendant Extreme and the Individual Defendants engaged in this misconduct to conceal Extreme's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

577. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Extreme common stock, which artificial inflation was removed from the stock when true facts became known. Lead Plaintiffs and the Class would not have purchased Extreme common stock at the prices they paid, or at all, had they been aware that the market prices for Extreme common stock had been artificially inflated by Defendants' fraudulent course of conduct.

578. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their respective purchases of the Company's common stock during the Class Period.

579. By virtue of the foregoing, Extreme violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c), promulgated thereunder.

## COUNT III

### For Violation of Section 20(a) of the Exchange Act Against Defendants Meyercord, Thomas, Tate, Rhodes, and Rice

580. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

581. This Count is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiffs and the Class, against Defendants Meyercord, Thomas, Tate, Rhodes, and Rice (the "Control Person Defendants").

582. As set forth above, each of the Control Person Defendants were controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. The Control Person Defendants acted as controlling persons of Extreme within the meaning of Section 20(a) of the Exchange Act by virtue of their executive positions and their culpable participation, as alleged above. The Control Person Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Plaintiffs contend were false and misleading, as well as the fraudulent course of conduct and scheme alleged herein. The Control Person Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

583. In particular, the Control Person Defendants had direct involvement in and responsibility over the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and had the power and ability to control public statements about Extreme and the actions of Extreme and its employees. The Control Person Defendants were each

directly involved in providing false information and certifying and/or approving the materially false or misleading statements disseminated by Extreme during the Class Period. Moreover, each of the Control Person Defendants were directly involved in or orchestrated the undisclosed fraudulent scheme alleged herein. As a result of the foregoing, the Control Person Defendants each were controlling persons of Extreme within the meaning of Section 20(a) of the Exchange Act.

584.    As alleged above, Extreme violated Section 10(b) of the Exchange Act by its material misrepresentations and omissions, and undisclosed fraudulent scheme, as alleged in this Complaint. By virtue of their positions as controlling persons of Extreme and as a result of their own aforementioned conduct, the Control Person Defendants are each liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act of Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Extreme common stock. Moreover, as alleged above, during the respective times that the Control Person Defendants served as officers or high-level executives of Extreme or spoke directly to Extreme investors during analyst conference calls, each of the Control Person Defendants culpably participated in the material misstatements and omissions made by Extreme, as set forth above.

585.    As a direct and proximate result of the wrongful conduct by the Control Person Defendants, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of Extreme common stock during the Class Period.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

(a)    Determining that this action is a proper class action, certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Plaintiffs' counsel as Lead Counsel for the Class;

(b)    Awarding Lead Plaintiffs and the Class compensatory damages and equitable relief, including all damages and relief provided for under the Exchange Act and the Securities Act, against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## XIV. JURY DEMAND

586. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiffs demand a trial by jury of all issues so triable.

Dated: February 14, 2025

**LABATON KELLER SUCHAROW LLP**

*/s/ Lauren A. Ormsbee*
Lauren A. Ormsbee (*pro hac vice*)
Lisa M. Strejlau (*pro hac vice*)
David Saldamando (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
lormsbee@labaton.com
lstrejlau@labaton.com
dsaldamando@labaton.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (Bar No. 250893)
Reed R. Kathrein (Bar. No. 139304)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

*Liaison Counsel for the Class*