LATHAM & WATKINS LLP
Melanie M. Blunschi (Bar No. 234264)
  *melanie.blunschi@lw.com*
Morgan E. Whitworth (Bar No. 304907)
  *morgan.whitworth@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Daniel R. Gherardi (Bar No. 317771)
  *daniel.gherardi@lw.com*
140 Scott Drive
Menlo Park, CA 94025
Telephone: +1.650.328.4600

*Attorneys for Defendants Extreme Networks, Inc., Edward B. Meyercord III, Rémi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, and Jonas Brown*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EXTREME NETWORKS, INC., EDWARD B. MEYERCORD III, RÉMI THOMAS, CRISTINA TATE, KEVIN RHODES, NORMAN RICE, JONAS BROWN<br><br>Defendants. | Case No. 3:24-cv-05102-TLT<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AMENDED CONSOLIDATED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing: August 12, 2025<br>Time:   2:00 p.m.<br>Location: Courtroom 9—19th Floor<br>Judge: Hon.  Trina L. Thompson |

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on August 12, 2025 at 2:00 p.m., before the Honorable Trina L. Thompson, United States District Court, Courtroom 9, 19th Floor, 450 Golden Gate Ave., San Francisco, California, Defendants Extreme Networks, Inc., ("Extreme" or the "Company"), Edward B. Meyercord III, Rémi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, and Jonas Brown (the "Individual Defendants," and together with Extreme, "Defendants") will and hereby do move for an order dismissing the Amended Consolidated Complaint ("ACC") (Dkt. 59) of Lead Plaintiffs Oklahoma Firefighters Pension and Retirement System, Oklahoma Police Pension and Retirement System, Oakland County Voluntary Employees' Beneficiary Association, and Oakland County Employees' Retirement System (collectively, "Plaintiffs").

This Motion is made pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 *et seq.*, on the grounds that Plaintiffs fail to state a claim on which relief can be granted

Defendants' Motion is based on this Notice of Motion and Motion to Dismiss, the following Memorandum of Points and Authorities, the Request for Judicial Notice and Incorporation by Reference, and Declaration of Morgan E. Whitworth filed concurrently herewith, the complete files and records in this action, and any other material and arguments as may be considered by the Court.  Through this Motion, Defendants seek an order dismissing the Amended Complaint for failure to state a claim.

## STATEMENT OF ISSUE TO BE DECIDED

1.      Whether Plaintiffs' claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5(b) should be dismissed for failure to plead with particularity a material false statement or omission, scienter, or loss causation.

2.      Whether Plaintiffs' claim under Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) should be dismissed for failure to plead with particularity the use or employment of any manipulative or deceptive device or contrivance, scienter, and loss causation.

3.      Whether Plaintiffs' claim under Section 20(a) of the Exchange Act should be dismissed for failure to plead a predicate violation.

Dated: April 15, 2025

Respectfully submitted,

LATHAM & WATKINS LLP

By:  /s/ *Melanie M. Blunschi*
Melanie M. Blunschi (Bar No. 234264)
 *melanie.blunschi@lw.com*
Morgan E. Whitworth (Bar No. 304907)
 *morgan.whitworth@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Daniel R. Gherardi (Bar No. 317771)
 *daniel.gherardi@lw.com*
140 Scott Drive
Menlo Park, CA 94025
Telephone: +1.650.328.4600

*Attorneys for Defendants Extreme Networks, Inc., Edward B. Meyercord III, Rémi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, and Jonas Brown*

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND ................................................................................................. 3

    A.    Extreme's Business ................................................................................. 3

    B.    Extreme Warned About COVID-Era Global Supply Chain
        Meltdown ................................................................................................. 3

    C.    Extreme Experienced Strong Demand Throughout The Class
        Period ...................................................................................................... 5

    D.    Extreme Reported Growing Backlog But Warned It Was Not Set
        In Stone .................................................................................................. 5

III.  LEGAL STANDARD ......................................................................................... 7

IV.  ARGUMENT ...................................................................................................... 8

    A.    Plaintiffs Do Not Allege A Material Misstatement ............................... 8

        1.    The Growth And Demand Statements Were Not
            Misleading ................................................................................... 9

            a.    Plaintiffs Fail to Plead Improper Sales Tactics ............................ 9

            b.    Corporate Optimism Is Not Actionable .................................... 14

            c.    The PSLRA Safe Harbor Protects Growth and
                Demand Statements ................................................................. 14

        2.    The Backlog Statements Were Not Misleading ........................ 15

            a.    The PSLRA Safe Harbor Protects Backlog
                Statements .............................................................................. 17

            b.    The Backlog Statements Are Non-Actionable
                Opinions ................................................................................. 18

        3.    SOX Certifications Are Not Actionable .................................... 19

    B.    Plaintiffs Do Not Allege Scienter ....................................................... 19

        1.    Plaintiffs Do Not Allege Any Motive To Commit Fraud ........ 20

        2.    Plaintiffs Do Not Plead Deliberate Recklessness Or Intent
            To Defraud ................................................................................. 20

    C.    Plaintiffs Do Not Allege Loss Causation ............................................ 23

    D.    Plaintiffs Fail To Plead Scheme Liability Under 10(B) ....................... 25

E.     Plaintiffs' Control Claims Should Be Dismissed.................................................. 25

V.     CONCLUSION........................................................................................................ 25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

DEFS' MOT. TO DISMISS.
AM. COMPLAINT
CASE NO. 3:24-cv-05102-TLT

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Avila v. LifeLock Inc.*,
2016 WL 4157358 (D. Ariz. Aug. 3, 2016) ............................................................................. 10

*Bajjuri v. Raytheon Techs. Corp.*,
2023 WL 3650554 (D. Ariz. May 25, 2023) ........................................................................... 10

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ................................................................................................... 8

*Browning v. Amyris*,
2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ........................................................................ 12

*Bruce v. Suntech Power Holdings Co.*,
2013 WL 6843610 (N.D. Cal. Dec. 26, 2013) ........................................................................ 19

*Carter v. Furniture Brands Int'l, Inc.*,
2015 WL 357076 (E.D. Mo. Jan. 27, 2015) ............................................................................ 11

*City of Birmingham Ret. & Relief Sys. v. A.O. Smith Corp.*,
468 F. Supp. 3d 1048 (E.D. Wis. 2020) .................................................................................. 11

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ............................................................................................. 18, 19

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
2013 WL 2156358 (N.D. Cal. May 17, 2013) ........................................................................ 13

*City of Royal Oak Ret. Sys. v. Jupiter Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ............................................................................ 14, 17

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) ................................................................... 10, 11

*Costanzo v. DXC Tech. Co.*,
2021 WL 5908385 (N.D. Cal. Dec. 14, 2021) ........................................................................ 18

*Desai v. Deutsche Bank Sec. Ltd.*,
573 F.3d 931 (9th Cir. 2009) ................................................................................................... 8

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024) ............................................................................... 8, 22, 23, 24

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016) ..................................................................................... 18

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

iii

DEFS' MOT. TO DISMISS.
AM. COMPLAINT
CASE NO. 3:24-cv-05102-TLT

*In re Accuray, Inc. Sec. Litig.*,
757 F. Supp. 2d 936 (N.D. Cal. 2010) ........................................................ 16, 17, 21

*In re Align Tech., Inc. Sec. Litig.*,
2021 WL 1176642 (N.D. Cal. Mar. 29, 2021) ................................................. 14

*In re Alteryx Sec. Litig.*,
2021 WL 4551201 (C.D. Cal. 2021) ................................................................ 21

*In re Ashworth, Inc. Sec. Litig.*,
2000 WL 33176041 (S.D. Cal. July 18, 2000) ............................................... 10, 13

*In re Connetics Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008) ........................................................... 10

*In re Dothill Sys. Corp. Sec. Litig.*,
2009 WL 734296 (S.D. Cal. Mar. 18, 2009) .................................................. 17

*In re ICN Pharm., Inc., Sec. Litig.*,
299 F. Supp. 2d 1055 (C.D. Cal. 2004) .......................................................... 9, 13

*In re LeapFrog Enters., Inc. Sec. Litig.*,
527 F. Supp. 2d 1033 (N.D. Cal. 2007) .......................................................... 14

*In re Neustar Sec.*,
83 F. Supp. 3d 671 (E.D. Va. 2015) ............................................................... 18

*In re Nvidia Corp. Sec. Litig.*,
2010 WL 4117561 (N.D. Cal. Oct. 19, 2010) ................................................ 20

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ....................................................................... 20, 21

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ......................................................... 7, 20, 21, 25

*In re Silicon Storage Tech., Inc. Sec. Litig.*,
2007 WL 760535 (N.D. Cal. Mar. 9, 2007) ................................................... 19

*In re Solarcity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) ........................................................... 14, 15, 17

*In re SunPower Corp. Sec. Litig.*,
2018 WL 4904904 (N.D. Cal. Oct. 9, 2018) .................................................. 14

*Jaszczyszyn v. SunPower Corp.*,
2025 WL 510431 (N.D. Cal. Feb. 14, 2025), *appeal filed sub nom,*
*Steamfitters Local 449 Pension & Ret. Sec. Funds v. SunPower Corp., et al.*,
No. 25-1831 (9th Cir. Mar. 20, 2025) ............................................................ 19

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

iv

*Kampe v. Volta Inc.*,
    2024 WL 4534732 (N.D. Cal. Oct. 21, 2024)............................................................................. 13

*Kang v. PayPal Holdings, Inc.*,
    620 F. Supp. 3d 884 (N.D. Cal. 2022) ................................................................................... 21

*Lamontagne v. Tesla, Inc.*,
    2024 WL 4353010 (N.D. Cal. Sept. 30, 2024) ...................................................................... 25

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)................................................................................................... 23

*Limantour v. Cray Inc.*,
    432 F. Supp. 2d 1129 (W.D. Wash. 2006).............................................................................. 14

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) .............................................................................................. 15

*Lloyd v. CVB Financial Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ........................................................................................ 23, 24

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ............................................................................................ 8, 23

*Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*,
    39 F.4th 1092 (9th Cir. 2022) ................................................................................................. 7

*Markette v. XOMA Corp.*,
    2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) ...................................................................... 19

*McGovney v. Aerohive Networks, Inc.*,
    367 F. Supp. 3d 1038 (N.D. Cal. 2019) ................................................................................ 17

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .............................................................................................. 19

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ........................................................................................... 20, 21

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*,
    774 F.3d 598 (9th Cir. 2014) ................................................................................................... 8

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
    2024 WL 5399664 (N.D. Cal. Sept. 18, 2024) ......................................................... 21, 22, 23

*Pound v. Stereotaxis, Inc.*,
    8 F. Supp. 3d 1157 (E.D. Mo. 2014)...................................................................................... 16

*Prodanova v. H.C. Wainwright & Co., LLC*,
    993 F.3d 1097 (9th Cir. 2021) ....................................................................................... 19, 20, 21

*Ret. Sys. v. First Solar Inc.*,
2023 WL 155861 (D. Ariz. 2023)...................................................................................... 23

*Robeco Cap. Growth Funds SICAV – Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*,
2024 WL 4362747 (S.D.N.Y. Sept. 30, 2024), *appeal filed sub. nom.*, *City of Hilaleah Emps. Ret. Sys. v. Peloton Interactive, Inc.*, No. 24-2803 (2d Cir. Oct. 23, 2024) ................................................................................................................ 12

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ............................................................................................ 7

*Scheller v. Nutanix, Inc.*,
450 F. Supp. 3d 1024 (N.D. Cal. 2020) ........................................................................... 22

*Simpson v. AOL Time Warner, Inc.*,
452 F.3d 1040 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008) ................................................................................................................... 8, 25

*Tellabs v. Makor Issues & Rts.*,
551 U.S. 308 (2007)........................................................................................................... 7

*Veal v. LendingClub Corp.*,
2021 WL 4281301 (9th Cir. 2021) ................................................................................... 20

*Waterford Twp. Police v. Mattel*,
321 F. Supp. 3d 1133 (C.D. Cal. 2018) ..................................................................... passim

*Welgus v. TriNet Grp.*,
2017 WL 6466264 (N.D. Cal. Dec. 18, 2017)................................................................. 22

*Wietschner v. Monterey Pasta Co.*,
294 F. Supp. 2d 1102 (N.D. Cal. 2003) ........................................................................... 14

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ......................................................................................... 15

*Yaron v. Intersect ENT, Inc.*,
2020 WL 6750568 (N.D. Cal. June 19, 2020)............................................................... 9, 24

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ................................................................................ 7, 10, 20

**STATUTES**

15 U.S.C. § 78u-4(b)(1)(B)................................................................................................... 7

15 U.S.C. § 78u-5(c)(1) ...................................................................................................... 15

15 U.S.C. § 78u-5(c)(1)(A).................................................................................................. 18

LATHAM&WATKINSᴸᴸᶠ
ATTORNEYS AT LAW

DEFS' MOT. TO DISMISS.
AM. COMPLAINT
Case No. 3:24-cv-05102-TLT

**GLOSSARY**

| Term | Definition |
|---|---|
| ¶_: | Citations to the paragraph numbers in Plaintiffs' Amended Consolidated Complaint for Violation of Federal Securities Laws, filed February 14, 2025, Dkt. No. 59 |
| ACC or Amended Complaint: | Plaintiffs' Amended Consolidated Complaint for Violation of Federal Securities Laws, filed February 14, 2025, Dkt. No. 59 |
| CEO: | Chief Executive Officer |
| Challenged Statements: | Statements Plaintiffs allege to be false or misleading.  For the convenience of the Court, the Challenged Statements are reproduced in chart form and appended to this submission as Appendix A. |
| Class Period: | July 27, 2022 through January 30, 2024, inclusive |
| CW: | Confidential Witness |
| Defendant(s): | Extreme Networks, Inc., Edward Meyercord III, Remi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, Jonas Brown, or any of the Defendants individually |
| Ex(s). or Exhibit(s): | Exhibits attached to the Declaration of Morgan E. Whitworth in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Consolidated Complaint filed concurrently herewith, which are public filings and statements that are incorporated into the Complaint and/or subject to judicial notice |
| Extreme or the Company: | Extreme Networks, Inc. |
| FE: | Confidential Former Employees who supposedly made allegations that Plaintiffs included in the ACC |
| FY22, FY23, FY24, FY25: | Extreme's fiscal years, including fiscal year 2022 (July 1, 2021 to June 30, 2022), fiscal year 2023 (July 1, 2022 to June 30, 2023), and fiscal year 2024 (July 1, 2023 to June 30, 2024) |
| Individual Defendants: | Edward Meyercord III, Remi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, Jonas Brown |
| Plaintiffs: | Lead Plaintiffs Oklahoma Firefighters Pension and Retirement System, Oklahoma Police Pension and Retirement System, Oakland County Voluntary Employees' Beneficiary Association, and County Employees' Retirement System |
| PSLRA: | The Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77k, 77l, 77z–1, 77z–2, 78a, 78j–1, 78t, 78u, 78u–4, 78u–5 |
| Section 10(b): | Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| Section 20(a): | Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

viii

DEFS' MOT. TO DISMISS.
AM. COMPLAINT
CASE NO. 3:24-cv-05102-TLT

## I.    INTRODUCTION

Extreme was one of countless technology companies that experienced unprecedented growth during the COVID-19 pandemic, as it provides the networking infrastructure powering remote work and education.  As the pandemic subsided at an unpredictable cadence, Extreme was also one of countless technology companies that experienced disappointing financial results.  Turning a blind eye to the uncertain times Extreme was operating in, Plaintiffs spin a two-part theory of fraud:  that Extreme simultaneously engaged in "channel stuffing" and misled investors about the strength of its backlog of ordered products.  The problem with Plaintiffs' version of the story is that Plaintiffs come nowhere close to satisfying the formidable pleading standards governing securities fraud claims:  Plaintiffs fail to plead specific facts showing that the Challenged Statements are false, that each Defendant acted with intent to deceive, and that the revelation of the alleged fraud—not other factors—caused their loss.  Indeed, none of the typical indicators of fraud are present here:  there has been no financial restatement, no SEC investigation, no media or analyst suspicions of falsified financial reporting, and no suspicious insider trades.  And Plaintiffs' elaborate theory of fraud is far less compelling than the non-fraudulent inference—that Defendants were doing the best they could to keep their customers supplied and investors updated in uncertain times.

**No Material Misstatements or Scheme to Defraud.**  To start, the Challenged Statements are not actionable under the securities laws:  they are generic statements of corporate optimism (or "puffery"), subjective opinions, forward-looking statements protected by the PSLRA's safe harbor, or some combination.

Even if actionable, neither category of Challenged Statements was misleading when made.  As to **channel stuffing,** Plaintiffs fail to allege with *facts*—rather than speculation and accusations—that some secret scheme caused Extreme's revenue growth during the Class Period.  They ignore Extreme's numerous and specific risk warnings about volatile supply chains and inconsistent customer behavior. Instead, Plaintiffs rely on accounts from low-level FEs with no visibility into Extreme's accounting or financial practices, no knowledge of what drove Extreme's revenues in a given quarter, no specific details (transactions, times, dollar amounts), and no

plausible allegations that the alleged sales tactics were even improper under the accounting standards. Indeed, the so-called "scheme" (of which the FEs supply the only accusations) makes no sense: it allegedly started many years before the Class Period, did not cause revenue growth to spike until the Class Period, did not cause a revenue guidance miss until the end of the class period, and always went undetected by Extreme's outside auditors and stock analysts. Additionally, it is simply implausible that Extreme was in an economic position to unilaterally dictate self-serving "channel stuffing" terms to its major distributors, whose revenues vastly exceeded its own.

The **backlog** statements are not fraudulent, either. Plaintiffs do not dispute that Extreme accurately stated the total value of orders in its backlog at each point in time that it reported backlog. Rather, Plaintiffs allege that Extreme should have expressed greater doubt that these orders would convert to additional revenue (rather than replace new orders or be canceled) several quarters in the future. This Monday-morning quarterbacking is an impermissible attempt to plead fraud by hindsight. In reality, Extreme disclosed time and again that its order backlog could fail to convert to actual revenue for any number of reasons, including customer cancellations. And it specifically flagged the uncertainty of the backlog in light of unprecedented pandemic-era supply chain disruptions and changes to customer behavior.

**No Scienter.** Plaintiffs' claims also fail for the independent reason that they have failed to plead scienter as to each (or any) Defendant. Plaintiffs do not plead any plausible motive for the supposed fraud—no Defendant is accused of insider trades, and in fact, Extreme's CEO *increased* his stock holdings in the company by more than 30% during the Class Period. Nor do Plaintiffs adequately allege that any Defendant was aware that channel stuffing overstated revenues or that any Defendant *knew* that Extreme's order backlog was not "firm"—although the Company warned about that possibility in its SEC filings. The more plausible inference is that Defendants accurately reported revenue growth and order backlog for several consecutive quarters, but could not predict the speed and scale of the post-pandemic return to business-as-usual in late 2023.

**No Loss Causation.** Plaintiffs' claims also fail because they cannot allege loss causation with the requisite particularity. Not *one* of the dozens of analyst reports Plaintiffs cite in the ACC ever suggested that Extreme's revenue growth stemmed from channel stuffing, that an end to

channel stuffing caused its lone guidance miss during the Class Period, or that its eventual stock price declines were the result of investors learning that Defendants knowingly overstated order backlog when it was reported. Instead, Extreme's stock price declined as supply chains and customer demand normalized—just as Extreme warned could happen.

**No Control-Person Liability.** Finally, Plaintiffs' failure to plead a primary violation dooms their Section 20(a) control-person claims against the Individual Defendants.

## II.    BACKGROUND

### A.    Extreme's Business

Extreme is a leading provider of end-to-end, cloud-driven networking solutions. It designs, develops, manufactures, and sells wired and wireless network infrastructure equipment as well as a leading cloud networking platform and applications portfolio. Ex. 9 at 3; ¶ 4. During the relevant period, Extreme reported its revenue and revenue guidance quarterly. When supply chain issues made it difficult to fill orders, Extreme began reporting backlog quarterly during COVID, which represented "confirmed orders with a purchase order for products to be fulfilled and billed to customers with approved credit status." Ex. 17 at 10; ¶¶ 73, 81.

### B.    Extreme Warned About COVID-Era Global Supply Chain Meltdown

COVID-19 created a global supply chain crisis while Extreme was receiving a *record number* of orders. *See* Ex. 6 at 4. COVID-19 "had impacted global supply chains substantially" and "created disruptions and bottlenecks that led to a global semiconductor shortage, amongst other shortages of Extreme's supplies for its networking products." ¶ 78 & nn. 15-16.

Extreme continuously updated investors and disclosed the risks that heightened demand amid crumbling global supply chains posed to its business during the unpredictable COVID era:

- "The spread of COVID-19 and new variants continues to have a material negative impact on our business. . . . including "our component suppliers and contract manufacturers . . . , which may result in product delays and changes in pricing and service levels[.]" "[C]losures and slow ramp up of capacity of many factories in China . . . continue to create supply chain disruptions for Extreme" Ex. 9 at 15; *see also* Ex. 4 at 15.

- "We currently purchase several key components used in the manufacturing of our products from single or limited sources and are dependent upon supply from these sources to meet our needs. At present, semiconductor chips and other components are currently in high demand with limited supply. These shortages have been exacerbated

by increased energy, raw material, and transportation costs, which are resulting in higher overall component costs, higher delivery costs for expedited shipments, and significantly longer than usual lead times for these components. . . . [which] could have a material adverse effect on our ability to meet customer orders and will negatively impact our gross margin and results of operations." Ex. 9 at 14; Ex. 17 at 15.

- "We use our forecast of expected demand to determine our material requirements. Lead times for materials and components we order vary significantly, and depend on factors such as the specific supplier, contract terms and demand for a component at a given time. **If forecasts exceed orders, we may have excess and/or obsolete inventory, which could have a material adverse effect on our business, operating results and financial condition. If orders exceed forecasts, we may have inadequate supplies of certain materials and components, which could have a material adverse effect on our ability to meet customer delivery requirements and to recognize revenue**." Ex. 4 at 14; Ex. 9 at 14; Ex. 17 at 16.

- "We are beginning to witness the first signs of improvement in supply chain constraints, however, risks still exist as supply chain logistics continue to evolve and adapt to new expectations and planning around lead times." Ex. 17 at 15.

- "We are subject to changes in general and specific macroeconomic conditions in the economy as a whole as well as in the networking industry, which could affect both revenue and costs. In particular, rising interest rates could decrease demand for our products and services, as the cost and access to capital to fund large projects may be limited for certain customers." *Id.* at 22.

Investors understood these risks, and expressed "concern[] about Extreme's ability to deliver products and generate revenue during this constrained supply chain environment." ¶ 79.

Rising demand combined with limited supplies created sizeable order backlogs, so Extreme repeatedly disclosed the risks of the backlog, including that customers may cancel orders:

- "Although we believe the orders included in the backlog are firm, **all orders are subject to possible rescheduling by customers, and cancellations by customers**, which we may elect to allow on an exception basis. Therefore, **we do not believe our backlog**, as of any particular date **is necessarily indicative of actual revenues** for any future period." Ex. 9 at 9. *See also* Ex. 4 at 9; Ex. 17 at 10.

- "[O]ur revenues and operating results have varied significantly in the past and may vary significantly in the future due to a number of factors, including…**product returns or the cancellation or rescheduling of orders.**" Ex. 4 at 20. *See also* Ex. 9 at 20; Ex. 17 at 21.

- "We may experience challenges or delays in forecasting, generating or recognizing revenue for a number of reasons" including "our dependence on obtaining orders during a quarter and shipping those orders in the same quarter to achieve our revenue objectives; in particular, with current supply chain constraints, our backlog has continued to grow as we are unable to ship all orders obtained during a quarter" and "**orders in our backlog could be cancelled by customers, impacting the accuracy of our revenue forecasting.**" Ex. at 20. *See also* Ex. at 20; Ex. 17 at 21.

- "**When we announce new products** or product enhancements . . . **customers may defer or cancel orders for our existing products**; in addition, ending sales of existing

products may cause customers to cancel or defer orders for our existing products. These actions could have a material adverse effect on our operating results by unexpectedly decreasing sales, increasing inventory levels of older products and exposing us to greater risk of product obsolescence." Ex. 4 at 17; *see also* Ex. 9 at 17; Ex. 17 at 18.

### C.      Extreme Experienced Strong Demand Throughout The Class Period

Extreme grew its revenue year-over-year and met or exceeded its original guidance in six of the seven quarterly earnings reports issued during the putative class period:[1]

| Fiscal Quarter | Guidance | Actual | % Change YoY |
|---|---|---|---|
| 4Q22 | $265 – $275 million | $278.2 million | 0% |
| 1Q23 | $279 – $289 million | $297.7 million | 11% |
| 2Q23 | $299 – $309 million | $318.3 million | 13% |
| 3Q23 | $315 – $325 million | $332.5 million | 16% |
| 4Q23 | $340 – $350 million | $363.9 million | 31% |
| 1Q24 | $342 – $352 million | $353.1 million | 19% |
| 2Q24 | $312 – $327 million (Revised to $294 – $297 million) | $296.4 million | –6.9% |

Even in the quarter Extreme reported a backlog decrease (4Q23), Extreme *exceeded* its guidance range of $340 to $350 million. ¶ 504; Ex. 15; Ex. 16.

### D.      Extreme Reported Growing Backlog But Warned It Was Not Set In Stone

During this period marked by economic uncertainty and supply chain disruptions, Extreme's backlog reached "record" highs. *See, e.g.*, Ex. 6 at 4; Ex. 8 at 5. But Extreme was clear that backlog orders are not guaranteed, because "all orders are subject to possible rescheduling" or "cancellations by customers." Ex. 9 at 9. The Company thus did not "believe [the] backlog, as of any particular date is necessarily indicative of actual revenues for any future period." *Id*. The backlog itself represents orders that are *not* counted as revenue until the order can be filled. *See id*.

Extreme was also clear that it *expected* the backlog to shrink, and that it was continuously releasing the backlog. In July 2022, Extreme stated that "[b]ased on the lead times and

---

[1] *See* Ex. 6; Ex. 8; Ex. 10; Ex. 13; Ex. 15; Ex. 16; Ex. 19; Ex. 21; Ex. 22.

commitments, we expect backlog will begin to shrink by Q4 of fiscal '23." Ex. 7 at 5. It added that Extreme released $20 million of backlog based on "reengineering products to improve lead times for customers." *Id.* Further, Extreme stated it would "take more **meaningful chunks out of that backlog"** in the second half of 2023. *Id.* at 15.

Extreme repeated similar disclosures again and again. In January 2023, Extreme disclosed that the supply chain had "sign[s] of [] improvement" which would "definitely lead to being able to ship more of the backlog," and that the backlog decrease "reflects accelerated product shipments." Ex. 12 at 6, 8, 9, 14. In April 2023, Extreme disclosed that the "supply chain environment is improving significantly, and lead times are coming down faster than we expected"––and that it expected "normalized level of backlog to be in the range of $75 million to $100 million by Q1 fiscal year '25." Ex. 14 at 6. *See also* ¶ 312 (discussing "*ongoing* normalization of our backlog"). In May 2023, Extreme stated again that the supply chain was improving and "distributor orders started to align with the improving lead times." Ex. 11 at 10. Extreme explained that alignment was a "contributing factor to why our backlog went down"–and that it expected "to see that continue over the next several quarters." *Id.*

Consistent with Extreme's statements, the backlog did shrink due to "a combination of a resumption in shipment of orders during fiscal 2023, after experiencing significant delays due to supply chain constraints in prior years, and a reduction in distributor orders due to shorter lead times." Ex. 17 at 10. In November 2023, Extreme reiterated that, consist with expectations and its prior statements, there was "a very high level of backlog release into the channel" and that customers were "digest[ing]" "a lot of product [they put] into the channel." Ex. 18 at 8.

Indeed, Extreme realized that economic conditions were beginning to change for the "whole industry," and promptly disclosed a change in "customer buying patterns and macroeconomic conditions." *Id.* at 7-8. In response to these shifts, Extreme began "tempering [its] revenue outlook." *Id.* at 7. Then, shortly after Q2 of FY 2024 closed, Extreme reduced its guidance range for the just-ended quarter by about 7.5% based on "industry headwinds of channel digestion and elongated sales cycles," including large sales "pushing out to future quarters"—and met this adjusted guidance. Ex. 21 at 4; Ex. 22 at 4.

In sum, Plaintiffs allege that Extreme capitalized on pandemic-era order growth—posting double-digit year-over-year revenue growth for five consecutive quarters—despite supply chain issues that caused an inflated backlog.  Extreme warned investors that backlog would decrease as supply chains normalized, and that industrywide demand would soften as soon as the Company noticed that development.  But rather than acknowledge that Defendants could not have predicted the specific timing of the macroeconomic forces that caused Extreme's performance to flatten, Plaintiffs claim—without particularized support—that "channel-stuffing" and lying to investors about Extreme's backlog propped up its stock price.

## III.    LEGAL STANDARD

To state a claim under Section 10(b), Plaintiffs must plead with particularity that Defendants made a (1) material misrepresentation or omission of fact, (2) with scienter, (3) that caused Plaintiffs' economic losses.  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).  Rule 9(b) and the PSLRA's "heightened pleading requirements... present no small hurdle," *Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1096 (9th Cir. 2022), and these "requirements are not satisfied merely by making a complaint long."  *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001).  The PSLRA acts as "a check against abusive litigation" because securities-fraud actions, "if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law."  *Tellabs v. Makor Issues & Rts.*, 551 U.S. 308, 313 (2007).

To plead falsity, Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and "state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  Plaintiffs must allege particularized facts demonstrating that the statements were materially "false or misleading at the time they were made," not based on hindsight.  *Rigel*, 697 F.3d at 876.

Plaintiffs must also plead facts giving rise to a strong inference of scienter, "a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 319.  That means Defendants "made false or misleading statements either intentionally or with deliberate recklessness."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).

Deliberate recklessness requires more than "mere recklessness or a motive to commit fraud"—it is "an extreme departure from the standards of ordinary care." *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 536 (9th Cir. 2024). Plaintiffs must "allege scienter with respect to each of the individual defendants." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 607 (9th Cir. 2014).

Plaintiffs "must allege with particularity facts 'plausibly suggesting' that 'a corrective disclosure revealed, in whole or in part, the truth concealed by the defendants' misstatements,' and that disclosure 'caused the company's stock price to decline.'" *Espy*, 99 F.4th at 540. Plaintiffs must allege that "the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).

Scheme liability requires Plaintiffs to plead and prove the same elements as a misstatement-based claim: use or employment of a manipulative or deceptive device or contrivance, scienter, and loss causation. *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009). On top of that, Plaintiffs must plead that each Defendant "engaged in conduct that had the principal purpose and effect of creating a false appearance of fact" in furtherance of a scheme to defraud. *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008).

## IV.   ARGUMENT

### A.   Plaintiffs Do Not Allege A Material Misstatement

Plaintiffs allege two categories of misstatement by omission: first, that Extreme accurately reported revenue growth throughout the Class Period, but concealed that the growth was attributable to "channel stuffing and manipulative sales practices," rather than stronger demand; and second, that Extreme accurately reported its sales "backlog," but concealed that a smaller portion of the backlog would convert to revenue than investors were hoping. ¶ 27. Neither theory is supported, but even the existence of undisclosed information, by itself, is not misleading unless the Challenged Statements "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Extreme's did not. In addition, nearly all statements are nonactionable

corporate optimism or protected by the PSLRA's safe harbor for forward-looking statements.

### 1.    The Growth And Demand Statements Were Not Misleading

At least 22 Challenged Statements relate to demand for Extreme's products and its revenue growth amid a global pandemic and resulting global supply chain constraints (¶¶ 75-78).  *See* Statements 1-10, 12-17, 23-25, 28-29, 32, 35-36, 38-39, 41, 44, 47.  Plaintiffs do not dispute that revenue grew substantially for five consecutive quarters during the Class Period, which is inconsistent with channel stuffing.  *See Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at *8 (N.D. Cal. June 19, 2020) (channel-stuffing theory failed where "sales appear to have been growing, as defendants said, and [the company] met its guidance for most of the Class Period").  Instead, Plaintiffs claim Defendants failed to disclose that the *reason* for this growth was channel stuffing, not increased customer demand.  Plaintiffs are wrong.

#### a.    Plaintiffs Fail to Plead Improper Sales Tactics

To allege channel stuffing or other improper sales tactics under the heightened pleading standards of the PSLRA, Plaintiff "must include sufficient corroborating details about the purported scheme." *Waterford Twp. Police v. Mattel*, 321 F. Supp. 3d 1133, 1147 (C.D. Cal. 2018).  "'Specific transactions, specific shipments, specific customers, specific times, or specific dollar amounts,' are the types of corroborating details a plaintiff needs to include to support a 'channel stuffing' theory at the pleading stage." *Id.*; *In re ICN Pharm., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055, 1061–62 (C.D. Cal. 2004).  Even if adequately alleged, Plaintiffs have a "fundamental problem" if the allegations "do not adequately support the inference that Defendants' alleged "channel stuffing" scheme was improper." *Mattel*, 321 F. Supp. 3d at 1147.  Plaintiffs' channel-stuffing allegations fall far below this standard.

**Implausible Timing.**  "[F]or channel stuffing to be improper[,] logically it must be a ***short-lived*** scheme in which the wrongdoer attempts to capitalize on artificially increased sales before the resulting drop in sales." *ICN*, 299 F. Supp. 2d at 1062.  Yet Plaintiffs allege that Extreme was channel stuffing for years—perhaps as far back as 2017, when Extreme changed its revenue recognition to a "Sales-In" model. *See* ¶¶ 103-04; Ex. 4 at 40.  Plaintiffs' theory thus fails on its face:  even Plaintiff's cited authority confirms that "it is physically impossible for firms to engage

in channel stuffing for an extended period of time." *See* Ex. 1 at 24-25 (cited in ¶ 233 n.37).

**FE Allegations Lack Particularity and Do Not Support Channel-Stuffing.** Plaintiffs base their entire channel-stuffing theory on unreliable FE accounts that fail to provide sufficient information, including "specific shipments," times, or "dollar amounts" to plead a channel stuffing scheme. *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1012 (N.D. Cal. 2008). Instead, the FE allegations consist of vague anecdotes and hypotheticals:

- FE-1, FE-4, and FE-6 describe hypothetical deal structures, not actual deals. ¶¶ 111, 125, 126, 174.

- FE-2 and FE-6 describe deals that *never closed*. *See* ¶¶ 179, 131.

- FE-11 and FE-6 describe deals and "pulling in of sales" without regard to timing or amount. ¶¶, 131, 157-158, 177; *cf. In re Ashworth, Inc. Sec. Litig.*, 2000 WL 33176041, at *7 (S.D. Cal. July 18, 2000) (dismissing complaint that alleged single example of "unlimited right of return" but did "not give[] an example discussing when the product was shipped, how much was returned, or whether the amounts returned were material").

- FE-3, FE-5, FE-7, FE-8, FE-9, and FE-10 do not allege any specific instances of channel stuffing. *See* ¶¶ 147-148, 165; *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *14 (N.D. Cal. Dec. 17, 2019) ("Generally alleging wrongdoing during the CW's employment at the Company does not provide the particularity required under the PSLRA.").

- FE-4, FE-10, and FE-11 rely on hearsay. *See* ¶¶ 151-54, 165, 230; *Bajjuri v. Raytheon Techs. Corp.*, 2023 WL 3650554, at *6 (D. Ariz. May 25, 2023) (rejecting "hearsay from low-level employee" as "uncorroborated and unreliable").

The FEs are also unreliable. *Zucco*, 552 F.3d at 996. Plaintiffs' supposed star witness, FE-1, cannot have "personal knowledge" of Extreme's business practices during the Class Period, considering he left the Company in August 2022. *See* ¶ 103; *Avila v. LifeLock Inc.*, 2016 WL 4157358, at *5 (D. Ariz. Aug. 3, 2016) (CWs' information was "necessarily secondhand" because they were not at company during class period). That FE-1 claims channel-stuffing occurred since as early as 2017 (¶¶ 103-04), apparently without any negative effects on Extreme's revenue until January 2024, highlights his unreliability.

**No Allegations that Channel Stuffing Affected Revenue.** Defendants deny that Extreme engaged in any "channel stuffing." But even taking Plaintiffs' allegations as true, they plead no connective tissue between those practices and the supposedly overstated earnings. Indeed, not once in over 150 pages do Plaintiffs allege facts suggesting that channel stuffing was the reason

for the revenue *growth* Extreme experienced during the Class Period. To the contrary, Plaintiffs allege that channel stuffing was necessary to prevent *shortfalls* caused by the precarious supply-chain situation. *E.g.*, ¶ 98 (alleging defendants channel-stuffed to "to quell market concerns about Extreme's ability to generate revenue during the constrained supply chain environment").

That fails, because Defendants kept the public updated about the real reasons for changes in revenue growth. *See supra* § II(B), (D). Indeed, Defendants explained on November 1, 2023 that customers were "digesting a large volume of backlog release and focusing on network deployment, slowing down their current ordering" and that "macroeconomic conditions" were impacting orders. Ex. 18 at 5, 7. Meyercord added that partners were "receiving an unusually high amount of product" due to the "backlog release into the channel," and therefore "paused some of their purchasing." *Id.* at 8. Against this steady beat of warnings, Plaintiffs' channel-stuffing claims are implausible. *See, e.g.*, *Oracle*, 2019 WL 6877195, at *11-12 (no falsity where defendant's financials tracked statements on slowing growth).

In fact, the market understood that Extreme's decline in orders at the end of 2023 and start of 2024 was not unique. *See, e.g.*, Ex. 20 at 17 ("Extreme, like others in the networking industry, are seeing a decline in orders"). Plaintiffs' cited analyst reports (*see* ¶¶ 350-52) highlight that "order digestion" was "prevalent in the networking industry." *See* Ex. 24 at 2; *see also* Ex. 23 at 1 (recognizing "industry-wide weakness will pressure results"). Perhaps that is why Plaintiffs do not mention a *single* analyst report accusing the Company of channel stuffing—though even that evidence would be insufficient to survive dismissal. *See, e.g.*, *City of Birmingham Ret. & Relief Sys. v. A.O. Smith Corp.*, 468 F. Supp. 3d 1048, 1058 (E.D. Wis. 2020) (dismissing channel-stuffing theory despite analyst report stating company was channel-stuffing); *Carter v. Furniture Brands Int'l, Inc.*, 2015 WL 357076, at *13 (E.D. Mo. Jan. 27, 2015) (same).

**Plaintiffs Have Not Established Wrongdoing.** Plaintiffs highlight that Extreme's revenue recognition model was a "Sales-In" model, whereby sales and revenue are recognized once products are on their way to a distributor. *See* ¶ 103. Plaintiffs omit that Extreme changed its model on July 1, 2017—likely because that timing renders their channel-stuffing claim implausible. *See* Ex. 4 at 40. They concede, however, that Extreme disclosed its revenue

recognition model to investors and that it is not "improper or illegal." ¶¶ 102, 107.

The FEs do not show that Defendants' sales and inventory strategies were "improper," either. *See, e.g.*, *Mattel*, 321 F. Supp. 3d at 1147 (rejecting channel stuffing allegations that did not adequately support the inference . . . alleged 'channel stuffing' scheme was improper"). As one example, FEs 1, 4, and 6 all describe a "right of return" and "stock rotation clause" that purportedly "incentivized distributors to take on unwanted product that did not reflect true organic demand[.]" ¶¶ 124-29. But FE-1 adds that Brown would "not allow [distributors] to buy [the same product] again for 12 months" if they returned it. ¶¶ 136-38. Those allegations make no sense—why would Extreme implement rules to discourage returns if that were the lynchpin of the channel stuffing scheme? Distributors would stop cooperating with the "rotation" plan if they were not allowed to repurchase product. *See, e.g.*, *Robeco Cap. Growth Funds SICAV – Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 2024 WL 4362747, at *11 (S.D.N.Y. Sept. 30, 2024) (FEs did not support falsity where they "conflict[ed] with Plaintiffs' own allegations"). In any event, Extreme disclosed that "[d]istributors are generally given the right to return a portion of inventory to us for the purpose of stock rotation." *E.g.*, Ex. 4 at 8, 41.

As another example, FE-2 alleges "distributors and partners were incentivized to take on inventory early" with rebates. ¶¶ 167-68. FE-6 adds that he was "instructed" (by an unknown figure) to offer more discounts to help Extreme meet its sales. ¶ 174. That Extreme offered discounts to its partners was not a secret: Extreme told investors that distributors are given the right "to claim rebates for competitive discounts." *E.g.*, Ex. 4 at 8. Extreme also disclosed that "a disproportionate percentage of [its] sales occur[] in the last month of a quarter." *E.g.*, Ex. 17 at 21. Defendants reiterated that fact during earnings calls. *See, e.g.*, Ex. 18 at 11. *See, e.g.*, *Browning v. Amyris*, 2014 WL 1285175, at *14 (N.D. Cal. Mar. 24, 2014) (dismissing where "SEC filings are precise and directly address the plaintiffs' complaint").

Other FEs offer examples of routine business deals, not wrongdoing. FE-4, a low-level "Senior Regional Distribution Manager" who left Extreme a few months into the Class Period (¶ 149), recounts a secondhand account of a dinner he did not attend where a business deal with partner Westcon "was discussed." *See* ¶¶ 151-53. Besides failing to specify the terms of this

"agreement" (or whether it was even finalized), FE-4 does not provide any details to suggest the Westcon deal was untoward. *See Ashworth*, 2000 WL 33176041, at *7 (plaintiffs "list[ed] some customers" defendants contacted but did not describe "the terms, the amounts involved, whether goods were actually returned, or how the agreements violated accounting standards"). And though FE-11 purports to corroborate this account (¶ 156), there is nothing "inherently improper" about "offer[ing] incentives for wholesalers to buy more product than they otherwise would." *ICN*, 299 F. Supp. 2d at 1061. His claims that "certain" (and unspecified) Extreme "distributors received special treatment" fails for the same reason. ¶¶ 156-58.

Finally, Plaintiffs' claim that Defendants "double-count[ed] orders into the revenue and pipeline forecast" and "engag[ed] in other illusory sales tactics" is unsupported. *See* ¶¶ 210-32. None of these allegations speak to improperly double-counting *revenue*—rather, even taken as true, these allegations claim that Extreme improperly inflated its internal revenue *forecasts*, which Plaintiffs do not challenge. But the allegations also fail because none of the three FEs (FE-5, FE-10, FE-11) on whom Plaintiffs rely worked in Extreme's accounting or finance organizations. ¶¶ 211-14, 217-18, 230-31. None has a basis to know what figures were included in the revenue or pipeline forecast. *Kampe v. Volta Inc.*, 2024 WL 4534732, at *9 (N.D. Cal. Oct. 21, 2024) (discrediting allegations from non-accounting CW concerning company's "accounting practices"); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 2013 WL 2156358, at *5 (N.D. Cal. May 17, 2013) (CW did not support that revenue projections were unattainable where CW did not "play[] any role in [defendant's] revenue forecasting").

The notion that Extreme could dictate self-serving terms to major distributors—and not the other way around—is implausible. FE-1's account, TD Synnex, (¶ 52), had revenues of *40-50 times greater* than Extreme's revenues during the Class Period, and TD Synnex was never more than 21% of Extreme's revenue—meaning that Extreme's sales to TD Synnex were about half a percent of TD Synnex's revenue. *Compare* Ex. 25 at 52, 62 *with* Ex. 27 at 52. According to FE-7, "80% to 95% of Extreme's customers were 'very big' companies" that were "'too powerful'" for Extreme to force into accepting Extreme's preferred terms. ¶ 290. Missing guidance in Q2 of FY 24 because customers were "pushing out [large sales] to future quarters" is another indication

that Extreme could not control when its customers took inventory.  Ex. 21 at 4; Ex. 22 at 4.

At bottom, the allegations in the ACC underscore why "[c]hannel stuffing claims are disfavored in this Circuit." *Mattel*, 321 F. Supp. 3d at 1147 (citing cases).  Plaintiffs' channel-stuffing claims are no more than "speculation made in hindsight" and should be rejected. *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1114 (N.D. Cal. 2003).

<b>b.      Corporate Optimism Is Not Actionable</b>

Every demand-and-growth statement is "vague and opinion-oriented." *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1146 (W.D. Wash. 2006).  These "general statements of optimistic demand are non-actionable puffery" and "fail to rise to more than opinions" about Extreme's business. *In re SunPower Corp. Sec. Litig.*, 2018 WL 4904904, at *4 (N.D. Cal. Oct. 9, 2018).

Take Defendants' statements about "strong demand" for Extreme products. *See, e.g.*, Statements 1-2, 4-7, 10, 16-17, 23-24, 28, 32, 38, 44.  Courts routinely dismiss challenges to nearly identical statements as non-actionable corporate optimism. *See, e.g.*, *In re SunPower Corp.*, 2018 WL 4904904, at *4 ("strong demand" dismissed); *City of Royal Oak Ret. Sys. v. Jupiter Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012); ("[s]trong demand metrics" and "demand indicators are strong" non-actionable puffery); *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1050 (N.D. Cal. 2007) ("[c]onsumer demand for our learning products is more vibrant than ever" non-actionable puffery).

The same is true for Defendants' statements about Extreme's "strong" or "impressive" growth (Statements 4, 9, 12, 14, 16-17, 24, 28, 32, 35, 39, 44, 47). *See, e.g.*, *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 995 (N.D. Cal. 2017) ("optimistic about our growth," "continued strong growth," "amazing quarter," "incredibly strong sales" non-actionable); *Juniper Networks, Inc.*, 880 F. Supp. 2d at 1063 (company's "growth rate," "excellent results," and "significant sales gains" not actionable).  This is particularly true considering "there is no dispute that, at the time [the Challenged Statements] were made," Extreme's business *was* growing. *In re Align Tech., Inc. Sec. Litig.*, 2021 WL 1176642, at *3 (N.D. Cal. Mar. 29, 2021).

<b>c.      The PSLRA Safe Harbor Protects Growth and Demand Statements</b>

Several statements about Extreme's growth and revenue are also "forward-looking on their

face" because they convey Defendants' expectations for demand or were made in the context of issuing guidance. *In re Solarcity*, 274 F. Supp. 3d at 990-92; *see, e.g.*, Statements 2, 5, 13, 15, 17, 23, 25, 29, 32, 39. These statements are protected by the PSLRA's safe harbor, which immunizes from liability forward-looking statements, if they are either (1) accompanied by meaningful cautionary language, *or* (2) made without "actual knowledge" of falsity. 15 U.S.C. § 78u-5(c)(1); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190 (9th Cir. 2021). Both prongs apply, but either one is sufficient to require dismissal.

First, meaningful cautionary language accompanied the statements. Extreme prefaced its press releases and public filings with warnings that they contain "forward-looking statements" upon which investors "should not place undue reliance." *E.g.*, Ex. 9 at 2. And it warned that "[i]mportant factors could cause actual results to differ materially from the expectations reflected in" such forward-looking statements, including factors described in Extreme's SEC filings. *Id.*; *see also, e.g.*, Ex. 28 at 2. Those filings, in turn, detailed company-specific risks relating to its financial results and operations, *supra* § II(B), including that Extreme could "experience challenges or delays in forecasting, generating or recognizing revenue for a number of reasons," like Extreme's "ability to forecast demand for [its] products, which in the case of lower-than-expected sales, may result in excess or obsolete inventory." Ex. 17 at 21. Extreme also warned that "[s]upply chain constraints have exacerbated" risks to sales if suppliers could not meet their needs—and that their "suppliers and contract manufacturers have been negatively affected by changes and downturns in the economy resulting from the COVID-19 pandemic." Ex. 9 at 2, 15.

Second, the statute protects the statements for the independent reason that Plaintiffs have not alleged facts showing Defendants made the statements with scienter (*see infra*), let alone actual knowledge they were false. *See, e.g.*, *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 n.18 (9th Cir. 2002) ("actual knowledge" is "stricter standard" than scienter). Indeed, Plaintiffs say nothing about whether the Individual Defendants' knew Extreme's revenues would increase because of channel stuffing (and not for one of the myriad other reasons revenue can grow).

## 2.    The Backlog Statements Were Not Misleading

Plaintiffs challenge at least 25 of Defendants' statements concerning Extreme's backlog.

*See, e.g.*, Statements 5-8, 12-13, 15, 17-19, 21-22, 24-26, 29-30, 32-34, 37, 39-41, 43, 45, 47. Plaintiffs dispute neither that Extreme's backlog grew during the Class Period, nor that Defendants repeatedly stated that the backlog would "normalize." *See, e.g.*, ¶¶ 404, 416, 428, 507. Plaintiffs instead question Defendants' forward-looking belief that Extreme's backlog would convert to revenue based on "the later removal of contracts from [the] backlog." *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 945 (N.D. Cal. 2010). Yet "[t]he fact that the backlog included later-removed contracts does not make the backlog figures false at the time they were publicly disclosed." *Id.* at 944. Plaintiffs' theory should be rejected as fraud-by-hindsight.

Plaintiffs' four backlog "omissions" should be rejected, too. Plaintiffs allege Defendants' statements were false or misleading: (i) Extreme's backlog was not "firm" because Extreme's customers were double or triple booking then cancelling orders; (ii) Extreme's contracts with its customers were cancellable; (iii) Extreme internally had hedged backlog would be cancelled as much as 10%; and (iv) Extreme's backlog did not reflect true end user commitment. *See, e.g.*, ¶¶ 363, 366, 368, 378, 381, 383, 385, 389, 391, 396, 399, 401, 408, 410, 415, 417, 419, 423, 427, 431, 436, 440, 444. But Plaintiffs do not plead any omission with particularity.

**"Firm" Backlog and Cancellable Contracts.** Plaintiffs allege Extreme's backlog was not "firm" because it included double or triple orders, which were cancellable. Extreme disclosed, however, that with respect to its backlog, Extreme "granted some flexibility in revising orders to compensate" for supply chain constraints. Ex 9 at 9. It further disclosed that "all orders are subject to possible rescheduling by customers" or cancellations permitted on an "exception basis." *Id.*; *see also* ¶ 250.[2] As a result, Defendants repeatedly disclosed that they "do not believe [Extreme's] backlog, as of any particular date is necessarily indicative of actual revenues for any future period." Ex. 9 at 9; Ex. 4 at 9; Ex. 17 at 10. In other words, Extreme "disclosed exactly how [it] defined 'backlog.'" *Pound v. Stereotaxis, Inc.*, 8 F. Supp. 3d 1157, 1167 (E.D. Mo. 2014). Extreme further warned that it did "not have binding purchase commitments" from its channel partners, Ex. 9 at 18, and that orders could be cancelled for various reasons, *id.* at 17, 20. Plaintiffs cannot state a

---

[2] Plaintiffs assert that Extreme "amended its definition of its backlog" between 2021 and 2022, ¶¶ 250-51, but do not allege that Extreme's policy changed (rather than just its description) and ignore that in both descriptions, Extreme stated that it "may" allow customers to cancel.

securities fraud claim when Defendants "disclose[d] exactly what Plaintiffs claim [they] omitted." *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1052 (N.D. Cal. 2019).

These disclosures aside, Plaintiffs do not plead with particularity any instances of double- or triple-booking at the time the Challenged Statements were made. To be sure, Plaintiffs rely on FEs to conclude "resellers would double-book purchase orders due to supply chain constraints, and then cancel." ¶ 273; ¶ 264 (FE-3); ¶ 274 (FE-2); ¶¶ 297-99. Yet Plaintiffs do not allege that any FE had any involvement in deciding "which deals would be included in the backlog." *See In re Accuray*, 757 F. Supp. 2d at 944 (rejecting FE allegations). And even if they had, none names a single distributor that was double-ordering, let alone when, in what quantity, or how the alleged double orders affected backlog. *See, e.g.*, *Juniper Networks, Inc.*, 880 F. Supp. 2d at 1064-65.

**10% Hedge.** Plaintiffs base their entire hedge theory on FE-7, who claims that Extreme assumed at least 10% of backlog would be cancelled (and who personally thought the figure should be higher). ¶¶ 280, 284. Among other things, Plaintiffs have a timing problem: FE-7's 10% figure comes from a single meeting "between late 2021 and mid-2022," ¶¶ 277-80, months *before* the Class Period. *See, e.g.*, *Solarcity*, 274 F. Supp. 3d at 999 (rejecting CWs' estimate that contracts in backlog were cancelled at 50% rate where estimate was "historical"). In any event, FE-7's "opinion on this issue does not prove the falsity of any of Defendants' statements," *In re Accuray*, 757 F. Supp. 2d at 944, because Extreme disclosed that its backlog contained "orders [that] are subject to possible rescheduling" or "cancellations by customers." Ex. 9 at 9.

**"True End User Commitment."** Plaintiffs' end-user theory stems from FE-3's complaint that Extreme never implemented FE-3's proposed "B2B" clause. *E.g.*, ¶ 363(iv). That reveals only Plaintiffs' criticisms of Extreme's management practices, not falsity. *E.g.*, *In re Dothill Sys. Corp. Sec. Litig.*, 2009 WL 734296, at *10 (S.D. Cal. Mar. 18, 2009) ("allegations of mismanagement are not actionable in securities fraud cases").

### a. The PSLRA Safe Harbor Protects Backlog Statements

Plaintiffs challenge many statements relating to Defendants' "confidence" or predictions about backlog that are forward-looking and thus protected by the PSLRA safe harbor. *See, e.g.*, Statements 5, 8, 13, 15, 18, 21, 26, 29-30, 32-33, 37, 39-41. These statements are "related to

[Extreme's] future expectations and performance." *See Mattel*, 321 F. Supp. 3d at 1150 (statements that metric "increases our confidence," "feel pretty confident with regard to [targets]," and "can say with a degree of confidence that we're poised for much more improved growth" all held forward-looking). The PSLRA safe harbor thus applies. *See supra* § IV(A)(1)(c).

Like the demand statements, meaningful cautionary language accompanied the backlog statements, too. 15 U.S.C. § 78u-5(c)(1)(A). Extreme specifically warned that orders in its backlog could be cancelled by customers, which would impact the accuracy of its revenue forecasting. Section II.B. It also warned against other scenarios in which customers may cancel or reschedule orders. *Id.*

As with the demand statements, these statements fail regardless, because Plaintiffs have failed to allege "actual knowledge of falsity." *See supra* § IV(A)(1)(c); *see also infra* § IV(B).

b.    The Backlog Statements Are Non-Actionable Opinions

Finally, Plaintiffs' challenge to Defendants' expressions of confidence about Extreme's outlook and backlog fail because, in addition to being forward-looking, those are opinion statements. *E.g.*, Statements 5, 8, 12-13, 15, 18, 21, 23, 26, 29, 32, 37, 40-41, 45, 47. *See, e.g.*, *In re Neustar Sec.*, 83 F. Supp. 3d 671, 683 (E.D. Va. 2015) ("an expression of confidence is best characterized as an opinion"); *see also, e.g.*, *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 588-590 (S.D.N.Y. 2016) ("confident that MOXDUO [would] receive approval" non-actionable opinion). Plaintiffs must therefore allege (i) "the speaker did not hold the belief she professed and that the belief is objectively untrue"; (ii) "the supporting fact the speaker supplied is untrue"; or (iii) "facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-616 (9th Cir. 2017). They allege none of this.

To start, Plaintiffs allege no facts suggesting any Defendant disbelieved their opinions or that those opinions were objectively false, i.e., that any Defendant did not feel confident about Extreme's future. *See, e.g.*, *Costanzo v. DXC Tech. Co.*, 2021 WL 5908385, at *11 (N.D. Cal. Dec. 14, 2021) (plaintiffs failed to allege facts that "rendered false Defendants' belief"). And

while Plaintiffs try to allege Extreme's backlog was not firm, that fails for the reasons above. *See supra* § IV(A)(2); *see also, e.g.*, *Markette v. XOMA Corp.*, 2017 WL 4310759, at *6 (N.D. Cal. Sept. 28, 2017) (dismissing opinion statements where plaintiffs alleged only that defendants' "optimism turned out to be misplaced"). Finally, Plaintiffs do not allege that any Defendant omitted material facts underlying the basis for those opinions that conflict with what a reasonable investor would take from the statement—and ignore Extreme's robust disclosures about its backlog. *See, e.g.*, *Align Tech.*, 856 F.3d at 618 (omissions theory of opinion failed in light of defendants' public disclosures). In fact, Plaintiffs do not allege any facts at all about what Defendants knew when they made the Challenged Statements. *See generally* ¶¶ 356-443.

### 3.    SOX Certifications Are Not Actionable

Finally, Plaintiffs appear to challenge certain Defendants' SOX certifications attesting to the accuracy of Extreme's financial reporting. *See* Statements 11, 20, 27, 31, 42, 46. These boilerplate statements do not constitute a material misrepresentation. *See, e.g.*, *In re Silicon Storage Tech., Inc. Sec. Litig.*, 2007 WL 760535, at *17 (N.D. Cal. Mar. 9, 2007); *Bruce v. Suntech Power Holdings Co.*, 2013 WL 6843610, at *3 (N.D. Cal. Dec. 26, 2013). Even if actionable, "each SOX Certification contains important language qualifying that the declarants only certified the financial reporting to the extent of his or her knowledge on the date of the certification." *Jaszczyszyn v. SunPower Corp.*, 2025 WL 510431, at *5 (N.D. Cal. Feb. 14, 2025). That means Plaintiffs must allege "facts explaining how or why the declarants knew the reporting of financial controls was false at the time of the report in order to successfully plead falsity." *Id.* Those facts are not in the Amended Complaint, so Plaintiffs' challenge fails.

### B.    Plaintiffs Do Not Allege Scienter

The Amended Complaint should independently be dismissed for Plaintiffs' failure to "state with particularity facts giving rise to a strong inference" that Defendants undertook the alleged misconduct "with an intent to deceive, manipulate, or defraud, or with deliberate recklessness." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021). The inference must be "at least as compelling as any opposing inference of nonfraudulent intent," not just "merely plausible." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1066 (9th Cir.

2008).  And if, as here, the non-fraudulent explanation is "more plausible," the case "cannot go forward."  *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 419 (9th Cir. 2020).

### 1.    Plaintiffs Do Not Allege Any Motive To Commit Fraud

At its core, Plaintiffs' scienter theory—that Defendants schemed to inflate short-term revenues, only to face the "inevitable fallout" of cannibalized future sales, product returns, and backlog cancellations—"does not make a whole lot of sense."  *Nguyen*, 962 F.3d at 415.  Indeed, Plaintiffs do not—and cannot—show that Defendants "sought to profit from this scheme in the interim."  *Id.*  Far from it, they allege no stock sales by any Individual Defendant and in fact, Meyercord *increased* his stock holdings by more than 30% during the Class Period—which supports an "inference of *innocence*," not fraud.  *Veal v. LendingClub Corp.*, 2021 WL 4281301, at *2 (9th Cir. 2021); *compare* Ex. 5 at 46 (1,742,428) *with* Ex. 26 at 35 (2,316,319).

Plaintiffs thus resort to alleging that the Individual Defendants were incentivized to "reap financial benefits" from Extreme's "short-term cash incentive" executive compensation plan. ¶¶ 520-21.  These incentives were linked to the performance of Extreme's stock price and achievement of revenue goals.  ¶ 522.  But "[i]f simple allegations of pecuniary motive were enough to establish scienter, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'"  *Zucco*, 552 F.3d at 1005.  That is why incentives tied to positive performance of the Company do not show a strong inference of scienter.  *Rigel*, 697 F.3d at 884 (no fraudulent intent "merely because a defendant's compensation was based in part on such successes"); *In re Nvidia Corp. Sec. Litig.*, 2010 WL 4117561, at *11 (N.D. Cal. Oct. 19, 2010) (similar).

### 2.    Plaintiffs Do Not Plead Deliberate Recklessness Or Intent To Defraud

Without a proper motive, it is "much less likely that [Plaintiffs] can show a strong inference of scienter."  *Prodanova*, 993 F.3d at 1108.  Plaintiffs must do more than just "plausibly allege knowledge" of undisclosed facts; they need particularized allegations showing that Defendants "intentionally misled investors, or acted with deliberate recklessness" towards a danger of doing so.  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056-57 (9th Cir. 2014).  Plaintiffs offer only allegations common to most corporations and executives—*e.g.*, internal reports, meetings, public

statements, a supposed "retaliatory culture," and executive resignations—but even together, the "more plausible inference" is that Defendants intended to keep the market apprised of changes in an uncertain market following COVID, "not that [they] were intentionally or with deliberate recklessness seeking to mislead the market." *Nguyen*, 962 F.3d at 419; ¶ 530.

**FE Allegations.** As discussed above, Plaintiffs primarily rely on FE allegations lacking sufficient particularity.[3] *See supra* § IV(A)(1)(a)-(2). And given that several of the FEs are lower-level employees who had no direct interactions with any Defendants, *e.g.*, FEs 4-6, 9-11, it is "difficult to surmise how the opinions and observations of [those FEs] could support a reasonable inference about what these [I]ndividual Defendants knew or did not know at the time each of the Challenged Statements was made." *In re Accuray*, 757 F. Supp. 2d at 949. Nor do the FEs' hearsay allegations (*see supra* § IV(A)(1)(a)) support scienter. *Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2024 WL 5399664, at *19 (N.D. Cal. Sept. 18, 2024) (rejecting hearsay allegations as showing scienter). Even if the Court credits the FEs, Defendants' mere knowledge of efforts to close deals near the end of a quarter or of backlog data do not amount to intentional fraud, or even deliberate recklessness. *NVIDIA*, 768 F.3d at 1056-57; *see also Rigel*, 697 F.3d at 884 (defendant's knowledge that reporting was incomplete insufficient to allege that he "believed that [he was] making false or misleading statements").

**Internal Reports.** Plaintiffs point to various internal reporting at Extreme, but fail to allege that any Defendant knew of specific data contradicting any Challenged Statement when made. ¶¶ 467-82. This failure to "bridge the gap between existence of internal reports and [Defendants'] actual knowledge" does not equate to an inference of scienter. *In re Alteryx Sec. Litig.*, 2021 WL 4551201, at *8 (C.D. Cal. 2021); *Prodanova*, LLC, 993 F.3d at 1109 (9th Cir. 2021) (requiring facts showing defendants had "detailed and contemporaneous knowledge" of information contradicting challenged statements).

---

[3] Plaintiffs rely heavily on and purport to quote from FE-provided documents. *See* ¶ 448. The documents are incorporated by reference, and the Court should consider them in their entirety to preclude plaintiffs from "selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *See Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 895 (N.D. Cal. 2022). In any event, no document contradicts the Individual Defendants' public statements.

**Meetings.**  Attendance and "participation in meetings" similarly cannot support a strong inference of scienter.  ¶¶ 483-95.  All-hands style meetings, like "Ed Talks," ¶ 484, cannot show the requisite "direct contact" with any Defendant to support an inference of scienter.  *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1041-42 (N.D. Cal. 2020).  And Plaintiffs provide no timeframe for most alleged meetings and cannot specify what any Individual Defendant knew and when.  *See CareDx*, 2024 WL 5399664, at *22-23 (rejecting unspecific FE allegations about defendant's attendance at meetings with no date for failure to "lead to a strong inference that [defendant] was aware of the misconduct that Plaintiffs allege").  As for FE-1's exit meetings, "in the summer of 2022" with Thomas, those allegations establish only FE-1's opinions about "unethical" and "manipulative" conduct.  ¶ 486.  His colorful criticisms "make for interesting reading but not an actionable securities fraud claim."  *Espy*, 99 F.4th at 533.

**Speaking to Investors.**  Plaintiffs' lack of specificity also dooms their allegations that Defendants' own statements create a strong inference of scienter.  ¶¶ 457-66.  Even if Defendants were "close to the topic[s]," ¶ 466, the allegations do not show that any Defendant knew of the alleged scheme or any specific information that would render any Challenged Statement misleading.  "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter."  *Espy*, 99 F.4th at 539.

**Core Operations.**  Plaintiffs claim it would be "absurd" to believe Defendants did not act with scienter, ¶ 496, but support their conclusion using broad generalizations on the importance of sales and backlog to Extreme.  To rely on a core operations theory, Plaintiffs must "produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of the company's operations," or specific "witness accounts demonstrating that executives had actual involvement in creating false reports."  *Welgus v. TriNet Grp.*, 2017 WL 6466264, at *19 (N.D. Cal. Dec. 18, 2017).  Again, being "close to the topic[s]" of revenues and backlog is not enough.  *See Espy*, 99 F.4th at 539-40 (allegations that executives "received detailed reports," or "were 'obsessed with numbers'" insufficient).  And Plaintiffs allege no particular facts suggesting any Defendant was involved in, let alone acted fraudulently with respect to, the decision to stop reporting backlog.  ¶¶ 503-09.  That group pleading dooms their argument from the start.  *See City*

*of Pontiac Gen. Emps.' Ret. Sys. v. First Solar Inc.*, 2023 WL 155861, at *6 (D. Ariz. 2023).

**Scattershot Assertions.** Plaintiffs' remaining theories hold no weight. Plaintiffs fail to allege that any Defendant participated in the alleged "retaliatory culture." *CareDx*, 2024 WL 5399664, at *23 (no strong inference of scienter where "it is unclear who from management was bullying, intimidating, and coercing employees"). Likewise, Thomas's departure—to pursue a "new opportunity," Ex. 12 at 6—does not raise an inference of scienter, particularly where all other Defendants remained at Extreme. *See CareDx*, 2024 WL 5399664, at *23 ("that some of the executives resigned does not strongly contribute to a finding of scienter").

### C.    Plaintiffs Do Not Allege Loss Causation

The ACC should be dismissed for the additional, independent reason that they allege no facts showing that "[Defendants'] misstatement, as opposed to some other fact, foreseeably caused [Plaintiffs'] loss." *Espy*, 99 F.4th at 540. Plaintiffs allege five partial disclosures from January 25, 2023, through January 31, 2024, but none of these disclosures reveals any "channel stuffing" or "manipulative" practices, nor do any of the market analysts quoted in the ACC even allude to such misconduct. *See, e.g.*, ¶¶ 330, 334, 350-53. And given Defendants' repeated warnings, analysts expected backlog to decrease all along. *See supra* § II(D). Plaintiffs do not allege with particularity "that the market 'learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendants' poor financial health generally." *Loos*, 762 F.3d at 887-88.

**January 25, 2023[4] and August 24, 2023.** Plaintiffs first target Extreme's announcement of 2Q23 (¶ 328) and FY2023 financial results (¶ 332) that backlog had fallen—but they omit that in both instances Extreme's revenues spiked. *See* Ex. 12 at 4; ¶ 90. The increased revenue goes hand-in-hand with the reported decrease in backlog. Even if the decreasing backlog purportedly revealed a lack of "firm customer commitments" (¶ 326), Extreme warned of these exact risks. *See* § IV(B)(1); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (no loss causation where "substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk").

---

[4] Plaintiffs allege that the Company filed an 8-K announcing the resignation of Thomas, ¶ 327, but fail to allege how that "relate[s] back" to any Challenged Statement. *See Lloyd*, 811 F.3d at 1209.

**November 1, 2023, January 8, 2024, and January 31, 2024.** Next, Plaintiffs target Extreme's financial results for the first two quarters of 2024 (¶¶ 336, 340-43). In November, Extreme reported sequential revenue losses[5], but year-over-year growth. ¶ 336; Ex. 18 at 6. The Company announced downward revenue guidance for 2Q24 due to macro-environment trends, including higher interest rates and economic challenges in some of Extreme's larger markets, and "changing customer buying patterns." ¶¶ 337-38; Ex. 18 at 4-5. On January 8, Extreme announced lowered revenue outlook for 2Q2024 and long-term, noting industry headwinds of channel digestion and elongated sales cycles. ¶ 341. And on January 31, 2024, Extreme issued results for 2Q2024 that met updated guidance announced earlier in the month, noting that decreased revenue from the previously reported macro factors were "impacting the networking industry" as a whole. ¶ 345; Ex. 3 at 6.

None of these "disclosures" reveals any information about Extreme's alleged "channel stuffing and manipulative sales and inventory practices" nor the alleged lack of "firm customer commitments" in the Company's backlog. ¶¶ 325-26; *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016). On the contrary, each of these disclosures confirms what Extreme had been saying all along: the supply chain environment was unpredictable and partners were digesting their inventory. *Espy*, 99 F.4th at 541 (corrective disclosure must disclose "new information" to the market). Plaintiffs further fail to allege any particular facts showing that Extreme's expectations for "sell through to be significantly higher than sell-in" confirmed distributors had a surplus of inventory, let alone particular facts showing that any inventory resulted from "manipulative sales and inventory practices," ¶ 325. *See Yaron*, 2020 WL 6750568, at *10 (dismissing because "plaintiff fails to allege that channel stuffing had a material negative impact" on financial performance and thus failed to allege "proximate cause between channel stuffing and the poor performance that led to missed guidance"). And as to backlog, that it normalized "earlier than [] initially anticipated" (¶ 345) did not reveal that any prior statement on backlog was false or misleading when made. *Lloyd*, 811 F.3d at 1209.

---

[5] Plaintiffs highlight Extreme's sequential revenue losses, but weaker Q1 revenues are part of Extreme's historical "normal seasonal pattern." *See* Ex. 2 at 8.

### D.      Plaintiffs Fail To Plead Scheme Liability Under 10(B)

Plaintiffs allege that all Defendants engaged in a scheme to defraud investors in violation of Rule 10b-5(a) and (c), including by "manipulating the Company's revenue figures and forecasts" and "misrepresenting the nature of Extreme's backlog as 'firm' and revenue-generating, when in reality, the backlog did not represent nor reflect firm commitments from Extreme's customers." ¶ 574. In other words, every aspect of Plaintiffs' purported scheme relates to the practices that purportedly made the Rule 10b5-(b) Defendants' statements misleading. *Id.* This is no different from Plaintiffs' statement-based theory of fraud, and fails for the same reasons explained above. *Lamontagne v. Tesla, Inc.*, 2024 WL 4353010, at \*17 (N.D. Cal. Sept. 30, 2024) (dismissing scheme claims where plaintiff did not allege "any false or misleading statements").

Plaintiffs' channel-stuffing scheme claim fails because Plaintiffs cannot show that any Defendant engaged in a "deceptive act" to "create a false appearance of revenues." *Simpson*, 452 F.3d at 1048. Plaintiffs' mischaracterization of Extreme's business tactics no more support a scheme liability than they do a misstatement claim, and the scheme claim fails for the same reasons as above. *See supra* § IV(A); *Mattel*, 321 F.3d at 1147-48.

Plaintiffs' backlog scheme-liability claim fails because they do not plead that any Defendant's conduct had the "principal purpose and effect of creating a false appearance of fact." *Simpson*, 452 F.3d at 1048. Defendants consistently warned about the risks associated with its backlog, including that it was subject to "cancelling by customers" and not "necessarily indicative of actual revenues for any future period." *See supra* § II(D).

Plaintiffs' scheme liability fails in any event because, as discussed above, Plaintiffs fail to plead scienter and loss causation with particularity in connection with the purported scheme. *Simpson*, 452 F.3d at 1047-48; *see supra* §§ VI-VII.

### E.      Plaintiffs' Control Claims Should Be Dismissed

Finally, Plaintiffs' Section 20(a) claim fails because Plaintiffs do not plead a primary 10(b) violation. *Rigel*, 697 F.3d at 886.

## V.      CONCLUSION

Defendants respectfully request dismissal of Plaintiffs' Amended Complaint.

Dated: April 15, 2025

Respectfully submitted,

LATHAM & WATKINS LLP

By /s/ *Melanie M. Blunschi*

    Melanie M. Blunschi (Bar No. 234264)
     *melanie.blunschi@lw.com*
    Morgan E. Whitworth (Bar No. 304907)
     *morgan.whitworth@lw.com*
    505 Montgomery St., Suite 2000
    San Francisco, CA 94111
    Telephone: +1.415.391.0600

    Daniel R. Gherardi (Bar No. 317771)
     *daniel.gherardi@lw.com*
    140 Scott Drive
    Menlo Park, CA 94025
    Tel.: +1.650.328.4600

*Attorneys for Defendants Extreme Networks, Inc., Edward B. Meyercord, III, Rémi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, and Jonas Brown.*