**LABATON KELLER SUCHAROW LLP**
Lauren A. Ormsbee (*pro hac vice*)
David Saldamando (*pro hac vice*)
Alexandra E. Forgione (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
lormsbee@labaton.com
dsaldamando@labaton.com
aforgione@labaton.com

*Counsel for Lead Plaintiffs and*
*Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (Bar No. 250893)
Reed R. Kathrein (Bar. No. 139304)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

*Liaison Counsel for the Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EXTREME NETWORKS, INC., EDWARD B. MEYERCORD III, RÉMI THOMAS, CRISTINA TATE, KEVIN RHODES, NORMAN RICE, JONAS BROWN<br><br>Defendants. | Case No.: 3:24-cv-05102-TLT<br><br>**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>CLASS ACTION<br><br>Date:    August 12, 2025<br>Time    2:00 p.m.<br>Judge:  Hon. Trina L. Thompson<br>Courtroom:    No. 9, 19th Floor |

**TABLE OF CONTENTS**

GLOSSARY OF CERTAIN DEFINED TERMS................................................................vii

I.      INTRODUCTION ...............................................................................................1

II.     SUMMARY OF ALLEGATIONS .....................................................................2

        A.     Extreme Reports Record Revenues Attributed To "Unabated Market Demand" .................................................................................................2

        B.     Extreme's Positive Revenue Results Were Not Due To Organic Demand .................2

        C.     Defendants Misrepresent The "Firm" Nature Of Extreme's Product Backlog............3

        D.     The Truth Is Revealed................................................................................4

III.    ARGUMENT .....................................................................................................4

        A.     Plaintiffs Adequately Allege That Defendants Misleadingly Attributed Revenues To "Unabated Market Demand" And Other Factors ...................................4

               1.     Defendants' Challenges To The Positive Revenue Misstatements Fail...........5

                      a.     Defendants' Attempt To Redefine Plaintiffs' Theory Of Liability Fails (And Is Satisfied In Any Event) ...................................5

                      b.     Defendants' Incorrect Fact-Intensive Challenges To Falsity Fail .......................................................................................7

                      c.     The Statements Are Not Immaterial Puffery Or Corporate Optimism................................................................................10

                      d.     The PSLRA Safe Harbor Provides No Protection ............................10

        B.     Defendants Misstated The "Firm" Nature Of The Company's Backlog ...................12

               1.     Defendants' Challenges To The Backlog Misstatements Fail .......................13

                      a.     Defendants' Incorrect Fact-Intensive Challenges to Falsity Fail .......................................................................................13

                      b.     The Statements Are Not Inactionable Opinion Statements...............15

                      a.     The PSLRA Safe Harbor Provides No Protection Here....................16

        C.     Defendants' SOX Certifications Are False And Misleading ..................................16

        D.     Defendants Made Their Statements With Scienter ...............................................16

1.    Internal Documents Create A Strong Inference of Scienter...........................17

2.    Defendants' Admissions Support A Strong Inference Of Scienter...............18

3.    FE Allegations Support A Strong Inference Of Scienter..............................19

4.    Descriptions Of Meetings Support A Strong Inference Of Scienter.............20

5.    Access To Reports Support A Strong Inference Of Scienter.........................21

6.    Defendants Had A Pecuniary Motive To Commit Fraud..............................21

7.    Core Operations Doctrine Supports Scienter ................................................22

8.    Extreme's Retaliatory Culture Supports A Strong Inference of Scienter.......................................................................................................23

E.    The Complaint Adequately Alleges Loss Causation ...................................................23

F.    The Defendants Are Liable For Scheme Liability ......................................................25

IV.    CONCLUSION.......................................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Accuray, Inc. Sec. Litig.*,
757 F. Supp. 2d 936 (N.D. Cal. 2010) ........................................................................ 15

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021)........................................................................................ 14

*In re Apple Comp. Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989)................................................................................... 14

*In re Ashworth, Inc. Sec. Litig.*,
2000 WL 33176041 (S.D. Cal. July 18, 2000) ............................................................ 7

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008)..............................................................................*passim*

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
302 F. Supp. 3d 1028 (N.D. Cal. 2018) ..................................................................... 25

*In re Connetics Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008) ......................................................................... 5

*In re Dermtech, Inc. Sec. Litig.*,
2025 WL 1618193 (S.D. Cal. June 5, 2025)......................................................... 11, 17

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................................................... 23

*In re Entropin, Inc. Sec. Litig.*,
487 F. Supp. 2d 1141 (C.D. Cal. 2007)...................................................................... 22

*Espy v. J2 Glob., Inc.*
99 F.4th 527 (9th Cir. 2024)................................................................................ 19, 25

*In re Estée Lauder Co., Inc. Sec. Litig.*,
2025 WL 965686 (S.D.N.Y. Mar. 31, 2025) ..................................................... 8, 9, 10

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) ...................................................................... 22

*In re Extreme Networks, Inc. Sec. Litig.*,
2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)........................................................... 20

*In re Fannie Mae 2008 Sec. Litig.*,
2011 WL 13267340 (S.D.N.Y. Apr. 11, 2011)........................................................... 22

*Farrar v. Workhorse Grp., Inc.*,
    2021 WL 5768479 (C.D. Cal. Dec. 2, 2021) ................................................................. 13, 15

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) .................................................................................. 23

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) .................................................................................. 16, 21

*Hatamian v. Advanced Micro Devices, Inc.*,
    87 F. Supp. 3d 1149 (N.D. Cal. 2015) ...................................................................... 20

*In re ICN Pharms., Inc. Sec. Litig.*,
    299 F. Supp. 2d 1055 (C.D. Cal. 2004) ....................................................................... 5, 6

*In re Intuitive Surgical Sec. Litig.*,
    65 F. Supp. 3d 821 (N.D. Cal. 2014) ......................................................................... 17

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ...................................................................................... 9

*Lamartina v. VMware, Inc.*,
    2023 WL 2763541 (N.D. Cal. Mar. 31, 2023) ............................................................ 24

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ...................................................................................... 25

*Markette v. XOMA Corp.*,
    2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) ........................................................... 15

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ..................................................................................................... 4

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ...................................................................................... 23

*Murphy v. Precision Castparts Corp.*,
    2017 WL 3084274 (D. Or. June 27, 2017) ................................................................ 5, 10

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) ............................................................................ 16

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ...................................................................................... 21

*In re Nvidia Corp. Sec. Litig.*,
    2010 WL 4117561 (N.D. Cal. Oct. 19, 2010) ............................................................ 22

*Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*,
  2024 WL 4353049 (N.D. Cal. Sept. 30, 2024) .......................................................................... 18

*Omnicare, Inc v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) .................................................................................................................. 15

*In re Plantronics, Inc. Sec. Litig.*,
  2022 WL 17974627 (N.D. Cal. Nov. 7, 2022)......................................................................... 6, 7

*In re Plantronics, Inc. Sec. Litig.*,
  2022 WL 3653333 (N.D. Cal. Aug. 17, 2022)..................................................................... 4, 5, 10

*In re Plantronics, Inc. Sec. Litig.*,
  2024 WL 4485595 (N.D. Cal. Apr. 12, 2024) ............................................................................. 8

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
  2025 WL 556283 (N.D. Cal. Feb. 18, 2025) (Thompson, J) .................................................. 22, 23

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014).................................................................................................... 22

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996).................................................................................................... 10

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017)...............................................................................................*passim*

*In re QuantumScape Sec. Class Action Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022) ................................................................................. 11, 12

*Rabkin v. Lion Biotechnologies, Inc.*,
  2018 WL 905862 (N.D. Cal. Feb. 15, 2018)............................................................................. 16

*In re Ramp Networks, Inc. Sec.*,
  201 F. Supp. 2d 1051 (N.D. Cal. 2002) ..................................................................................... 25

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012)...................................................................................................... 22

*Roberts v. Zuora, Inc.*,
  2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ........................................................................... 20

*Rodriguez v. Gigamon Inc.*,
  325 F. Supp. 3d 1041 (N.D. Cal. 2018) ..................................................................................... 11

*Scheller v. Nutanix, Inc.*,
  450 F. Supp. 3d 1024 (N.D. Cal. 2020) ..................................................................................... 21

*Schultz v. Tomotherapy Inc.*,
    2009 WL 2032372 (W.D. Wis. July 8, 2009) ............................................................... 12, 13, 14

*In re Scientific Atlanta, Inc. Sec. Litig.*,
    754 F. Supp. 2d 1339 (N.D. Ga. 2010) ............................................................................. 5

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
    742 F. Supp. 3d 1003 (N.D. Cal. 2024) ................................................................. 17, 18, 21

*In re Solarcity Corp. Sec. Litig.*,
    274 F. Supp. 3d 972 (N.D. Cal. 2017) .......................................................................... 13

*In re SolarEdge Tech., Inc. Sec. Litig.*,
    2024 WL 4979296 (S.D.N.Y. Dec. 4, 2024) ................................................................. 5, 8

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ....................................................................................... 4

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) .............................................................................................. 16, 17

*United Ass'n Nat'l Pension Fund v. Carvana Co.*,
    759 F. Supp. 3d 926 (D. Ariz. 2024) ............................................................................. 10

*Waterford Twp. Police v. Mattel*,
    321 F. Supp. 3d 1133 (C.D. Cal. 2018) ....................................................................... 5, 16

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ...................................................................................... 6, 13

*Westley v. Oclaro, Inc.*,
    897 F. Supp. 2d 902 (N.D. Cal. 2012) ........................................................................... 11

*Wochos v. Tesla*,
    985 F.3d 1180 (9th Cir. 2021) ..................................................................................... 11

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
    655 F.3d 1039 (9th Cir. 2011) ..................................................................................... 25

*Yaron v. Intersect ENT, Inc.*,
    2020 WL 6750568 (N.D. Cal. June 19, 2020) ............................................................... 5, 25

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...................................................................................... 19, 22

**GLOSSARY OF CERTAIN DEFINED TERMS**

| Term | Definition |
|---|---|
| AC or "¶__" | The Amended Consolidated Complaint for Violations of the Federal Securities Laws filed on February 14, 2025. ECF No. 59. |
| Backlog | Defined by Extreme as "confirmed orders with a purchase order for products to be fulfilled and billed to customers with approved credit status." ¶73. |
| Brown | Defendant Jonas Brown, Extreme's Senior Director of Worldwide Distribution Sales and Strategy at Extreme (*i.e.*, "Global Distribution") beginning in June 2018 and continuing throughout the Class Period. ¶49. |
| CCO | Chief Commercial Officer. ¶48. |
| CEO | Chief Executive Officer. ¶2. |
| CFO | Chief Financial Officer. ¶2. |
| Clari Database | Extreme's revenue orchestration and organization platform. ¶477. |
| Class Period | The period from July 27, 2022 through January 30, 2024, inclusive. |
| Company or Extreme | Extreme Networks, Inc. |
| COO | Chief Operating Officer. ¶2. |
| Defendants | Extreme and the Individual Defendants. |
| EMEA | Europe, Middle East, and Africa. ¶64. |
| FEs | Extreme's former employees referenced in the AC. |
| FE-1 | FE-1 was a Senior Distribution Account Manager at Extreme from May 2016 through August 2022 and has been in the distribution business for over thirty years. At Extreme, FE-1 managed the Company's relationship with TD Synnex. FE-1 reported to the Director of Distribution in the Americas, Joseph Uraco, who in turn, reported to Defendant Brown. FE-1 worked with Defendant Brown on a daily basis. <br><br> Allegations attributable to FE-1: ¶¶14-15, 26, 52, 103-05, 108, 110-25, 128-31, 132-34, 138-43, 155, 158, 244, 272-73, 308, 449-55, 470, 484-86, 495, 537-40. |
| FE-2 | FE-2 was the Director of Sales from before the Class Period to mid-2023. Thereafter, FE-2 was an Account Executive until the end of his tenure at Extreme. As Director of Sales, FE-2 reported to David Savage, who in turn reported to SVP Sales, Americas, Pete Brant, who in turn reported to Defendant Rice. In his capacity as Director of Sales, FE-2 was responsible for collaborating with end users SLED accounts, including universities, and the channel partners that sold to them, as well as working with Extreme's relevant distributors. |

LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT
CASE NO.: 3:24-CV-05102-TLT

| | |
|---|---|
| | Allegations attributable to FE-2: ¶¶19, 53, 162-64, 166-73, 179-90, 192-95, 198-200, 274, 469, 479, 497, 531-32. |
| FE-3 | FE-3 was a Senior-level Manager of pricing at Extreme from before the Class Period to the second half of 2023. FE-3's responsibilities included executing the rollout of pricing and signing off on deals. FE-3 reported into the Finance leadership of Defendant Tate, who reported to the CFO.<br><br>Allegations attributable to FE-3: ¶¶17, 54, 106, 145-48, 261-71. |
| FE-4 | FE-4 was employed by Extreme until December 2022, most recently serving as Senior Regional Distribution Manager operating out of Europe. FE-4 worked directly with distributor Westcon during his employment with Extreme.<br><br>Allegations attributable to FE-4: ¶¶55, 126, 149-54 |
| FE-5 | FE-5 was formerly employed by Extreme as Senior Channel Account Manager from March 2022 to April 2024. FE-5's responsibilities included collaborating with Extreme's two largest nationwide channel partners. FE-5 reported to Channel Sales Manager – Strategic Partnerships, Matthew Kilianski, and then Director, Global Solution Partnerships – Americas, Amy Bravo, and lastly Director – Strategic Partnerships, Cameron Marchand. According to FE-5, Kilianski, Bravo, and Marchand reported to Vice President, Americas Channel, Jennifer Orr, who ultimately reported to Defendant Meyercord.<br><br>Allegations attributable to FE-5: ¶¶56, 163, 197, 202-08, 211-16, 296-99, 472-75, 480-82. |
| FE-6 | FE-6 was a Senior Account Manager at Extreme from July 2017 to October 2022. During different points during his tenure at Extreme, FE-6 reported to either David Savage or to FE-2. FE-6 worked as part of the SLED department and except for the K-12 segment of SLED, he worked with distributors and partners throughout his tenure.<br><br>Allegations attributable to FE-6: ¶¶57, 119 n.24, 126, 131, 156-59, 173-76. |
| FE-7 | FE-7 was the former President of a company acquired by Extreme in 2021. FE-7 began working for Extreme in July or August 2021, before officially signing on as an Extreme employee in March 2022. FE-7 explained that he was employed as the SVP, Strategy, Office of the CTO from March 2022 until March 2023. FE-7 reported to current Chief Technology and Product Officer, EVP/GM Subscription Business, Nabil Bukhari. FE-7 was tasked with analyzing several aspects of Extreme's business, including examining the pricing strategy for Extreme's entire product portfolio. FE-7 attended quarterly meetings with C-Suite executives.<br><br>Allegations attributable to FE-7: ¶¶58, 275-95, 487-88. |
| FE-8 | FE-8 was employed by Extreme as SVP Global Channel Sales from January 2022 to November 2023. The Distribution teams reported to FE-8. FE-8 attended "Revenue Assurance" calls led by Defendant Rice, where the Company's backlog was discussed.<br><br>Allegations attributable to FE-8: ¶¶59, 196, 300-07, 489-94. |

| | |
|---|---|
| FE-9 | FE-9 was employed by Extreme as a Channel Account Manager starting before the Class Period, until late 2023. According to FE-9, he was part of a team of employees managing the account and relationship with one of Extreme's largest resellers / partners during the Class Period.<br><br>Allegations attributable to FE-9: ¶¶60, 201. |
| FE-10 | FE-10 was employed by Extreme as a Senior Account Executive from after July 2023 until April 2024 and was responsible for accounts in North America.<br><br>Allegations attributable to FE-10: ¶¶61, 165, 217-19, 221-229, 533-36. |
| FE-11 | FE-11 was employed by Extreme as an Account Manager from Fall 2022 through the end of the Class Period in the EMEA region. FE-11 was responsible for ensuring that partner accounts were set up correctly and received the correct discounts from Extreme's distributors, ensuring there were no conflicts with end users, and working closely with team members in EMEA who worked directly with the partner accounts.<br><br>Allegations attributable to FE-11: ¶¶62, 156, 177, 230-32. |
| FY | Fiscal year. Extreme's fiscal year ends on June 30 of each calendar year. Thus, 1Q ends on September 30, 2Q ends on December 31, 3Q ends on March 31 (of the following calendar year), and 4Q ends on June 3. As an example, FY 2023 ended on June 30, 2023 and 1Q2024 ended on September 30, 2023. ¶65. |
| Individual Defendants | Defendants Meyercord, Thomas, Tate, Rhodes, Rice, Brown. |
| Meyercord | Defendant Edward B. Meyercord, III, President and CEO of Extreme since April 2015 and throughout the Class Period. ¶44. |
| MTD | Defendants' Motion to Dismiss the Amended Consolidated Complaint. ECF No. 74. |
| Plaintiffs | Oklahoma Firefighters Pension and Retirement System ("Oklahoma Fire"), Oklahoma Police Pension and Retirement System ("Oklahoma Police"), Oakland County Voluntary Employees' Beneficiary Association ("Oakland County VEBA"), and Oakland County Employees' Retirement System ("Oakland County ERS"). |
| Pull-In | The practice whereby Extreme had distributors and partners take inventory early, thereby pulling forward and exhausting future demand. ¶¶167, 171-72. |
| Pull-In Lists | A list of partners that Extreme could target to pull-in orders. The list tracked each partner's deals with the end customer, along with the timeline for those deals. ¶469. |
| Revenue Assurance Calls | Calls led by Defendant Rice, and attended by Defendant Brown, where backlog and backlog hedge were discussed. These calls were a "quarterly function" that became more frequent as the quarter progressed. ¶¶301-07. |

LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT
CASE NO.: 3:24-CV-05102-TLT

| | |
|---|---|
| Rhodes | Defendant Kevin Rhodes, the Executive VP and CFO of Extreme from May 30, 2023 through the end of the Class Period. ¶47. |
| Rice | Defendant Norman Rice, the COO at Extreme from September 2019 to February 2024. ¶48. |
| Salesforce Database | Extreme's enterprise and customer management system. ¶477. |
| SOX Certifications | Certifications pursuant to the Sarbanes Oxley Act of 2022 which attest to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. ¶373. |
| Stock Rotation Agreements | Contract clause where Extreme's distributors could rotate old or outdated stock out of its inventory back to the Company in exchange for new stock of equal value for the one-two quarters. ¶125-27. |
| Tate | Defendant Cristina Tate, the Interim CFO of Extreme from February 16, 2023 to May 30, 2023, Senior Vice President and Head of Financial Planning & Analysis ("FP&A") throughout the Class Period. ¶46. |
| Thomas | Defendant Rémi Thomas, the CFO of Extreme from November 2018 to February 2023. ¶45. |

LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT
CASE NO.: 3:24-CV-05102-TLT

x

## I.    INTRODUCTION[1]

Extreme is a publicly traded company that sells cloud-based computer networking equipment through a global network of distributors and channel partners, who then sell Extreme's products directly to end users. Faced with a need to sustain Extreme's post-COVID growth and generate immediately reportable revenues as well as report sustainable future sales, Defendants embarked on a two-part fraudulent scheme. On the one hand, Defendants reported strong revenue growth quarter after quarter during the Class Period and attributed that growth to organic and sustainable demand. In reality, the Company achieved its revenue targets through the use of manipulative sales tactics, including channel stuffing and the provision of incentives to customers who agreed to take on more stock than needed with liberal rights of return. Simultaneously, Defendants communicated to investors a steady stream of future revenues by touting the Company's half billion-dollar backlog as "firm" and "not cancelable" while, in reality, Defendants knew that the backlog was inflated with double-booked and easily cancelled orders that were likely to disappear as supply chains opened.

Ultimately, in a series of disclosures, investors learned that Extreme's revenues were not sustainable, and that the Company's relied-upon backlog was illusory and severely diminished, resulting in significant harm to Extreme's investors. Plaintiffs' investigation has revealed, including through the accounts of eleven former well-placed Extreme employees, in addition to multiple references to internal communications, how Extreme's senior executives, including the six Individual Defendants, directed or knew of the Company's manipulative sales practices and uncertain backlog, and made the materially misleading statements described in the AC. These statements were made with actual knowledge of their falsity, or at the very least, reckless disregard for their truth.

The AC adequately alleges that Defendants violated the Exchange Act through numerous material misrepresentations and additionally through their implementation of a fraudulent scheme to deceive investors. In their motion to dismiss (ECF No. 74, "MTD"), Defendants mischaracterize the AC's allegations and the testimonial and documentary support for those allegations, in order to

---

[1] All references to "¶__" are citations to the Complaint ("AC"). All capitalized and defined terms have the meaning ascribed in the **Glossary of Certain Defined Terms**, *supra* at vii-x. Unless otherwise noted, emphasis has been added, and internal citations are omitted.

fashion a scenario that could be subject to dismissal under prevailing law. The problem with this is that Defendants' arguments rest on inapposite caselaw, and rely on a version of the allegations not actually present within the four corners of the AC. As discussed in full below, Defendants' arguments are unpersuasive; the AC should be sustained, and the case should proceed to discovery.

## II.    SUMMARY OF ALLEGATIONS

### A.    Extreme Reports Record Revenues Attributed To "Unabated Market Demand"

During the Class Period, the Company's product revenues accounted for approximately 70% of total revenues and its sales to distributors or partners accounted for between 80-85% of those product revenues. ¶70. The Company reports its financial results on a fiscal-year basis, with its fiscal year ending on June 30. ¶65. Prior to the start of the Class Period, Extreme's business had been negatively impacted by the COVID pandemic and resulting constrained supply chain environment, leading to a growing backlog of orders that could not translate to reported revenues until the orders were confirmed and had actually shipped. ¶¶75-82. Thus, at the start of the Class Period, the dual pressures of (a) limited supply of Extreme's most in-demand products and (b) limited demand for its less popular products posed a material threat to Extreme's finances and share value. ¶¶4, 108-09.

### B.    Extreme's Positive Revenue Results Were Not Due To Organic Demand

Despite these pressures, Extreme flourished and reported steadily rising revenue growth from the start of the Class Period (4Q22) through 1Q24. ¶¶83-93. This revenue story was well-received by investors. ¶¶88-89; 94-97. Defendants claimed that this revenue growth was attributable to "*unabated*" and "*exceptionally strong*" organic demand," as well as other factors, such as improvements in the "*supply chain environment*."[2] However, according to many former employees ("FEs"), some of whom reported directly to Defendants, Defendants engaged in "channel stuffing" (*i.e.*, sending more products to its distributors and partners than the Company's distributors and partners are capable of selling to end users) and other manipulative sales conduct to generate revenues sufficient to meet and often exceed expectations to drive investor confidence. ¶¶98-258. These

---

[2] *See* ¶¶354; 356; 358; 360-61; 369; 371; 373; 375-76; 379; 386; 392; 394; 397; 402; 405; 411; 413; 420; 424; 433; 437; 441.

practices were unsustainable because at some point, customers would no longer be able to receive the unwanted product and sales and revenues would accordingly decline. ¶¶117; 159; 172; 233-47.

The AC describes several means by which unwanted products were shipped out to meet quarterly revenue targets. For example, FE-1 described how at the end of every quarter, Defendant Brown, head of Global Distribution, organized "Buy-In" deals whereby Extreme would ship outdated and unwanted inventory to distributors at a discount in exchange for the promise of: (1) a priority position to secure backlogged in-demand product and (2) an agreement that the customer could rotate out a material portion of the order past quarter-end once Extreme reported the sale for the present quarter. ¶¶110-12, 127. As another example, FE-2 explained that Extreme shipped inventory to its partners without confirmed purchase orders from an end user, which was prohibited, and in return, provided rebates to those partners who played ball. ¶¶164-67. Multiple other FEs (including FEs-3, 4, 5, 6, 10 and 11) similarly explained how these manipulative sales and channel stuffing tactics pushed out unwanted product that did not reflect true demand, with the intended result of boosting Extreme's revenues for the immediate quarter, at the expense of future quarters. ¶¶108-90; 210-47. According to the FEs, this channel stuffing behavior was a "regular" and "common practice," and allowed Extreme to make its revenues for the quarter appear more profitable than it was. *Id.*

**C.    Defendants Misrepresent The "Firm" Nature Of Extreme's Product Backlog**

As Defendants falsely attributed revenues to organic demand as opposed to risky and manipulative sales practices, they also misstated the "firm" nature of Extreme's backlog orders, which had ballooned up to $555 million during the Class Period.[3] Based on Defendants' self-proclaimed "complete visibility" into the backlog, Defendants assured investors that the backlog was poised to generate revenues because the "***vast majority***" of orders included in the backlog were "***not cancelable***" and reflected "***firm***" customer commitments and "***end user demand***." ¶¶248; 312. Indeed, Defendants specifically stated that "***[t]hese are real projects that we see***" and that "***we don't see double ordering***" in connection with the Company's backlog (¶418)—*i.e.*, the practice of customers booking duplicative orders (with multiple manufacturers) with the intention of canceling

---

[3] *See* ¶¶354; 356; 358; 360-61; 369; 371; 373; 375-76; 379; 386; 392; 394; 397; 402; 405; 411; 413; 420; 424; 433; 437; 441.

one. *See* ¶¶264; 273; 279; 297. Defendants' statements concerning the backlog were false and misleading because multiple FEs with knowledge of the backlog explained that (1) the backlog orders could in fact be cancelled at any time by Extreme's customers (¶¶274, 288, 296-97); (2) it was well known internally that the backlog orders consisted of customer orders that were "double" or "triple" booked, such that they did not reflect "firm" customer commitments (¶¶273, 279, 299); and (3) Defendants *internally hedged* that at least 10% of the backlog would, in fact, be cancelled. ¶¶280-84.

### D.     The Truth Is Revealed

The truth about Extreme's illusory revenue growth and firm backlog emerged through a series of partial disclosures whereby, in total, the price of Extreme stock declined from a Class Period high of $32.27 per share to a low of $12.59 per share after the revelation of the relevant truth, reflecting a 60% decline. ¶¶325-53. This resulted in significant investor losses, and led the market to understand that "it is now apparent that Extreme is not growing at a sustainable double-digit rate." ¶324.

## III.    ARGUMENT

Plaintiffs "must show that [Defendants] made a statement [or omission] that was 'misleading as to a material fact,'" meaning that it is likely that the truth would have altered the "total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011). Allegations must be accepted as true: "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

### A.     Plaintiffs Adequately Allege That Defendants Misleadingly Attributed Revenues To "Unabated Market Demand" And Other Factors

Plaintiffs adequately allege that "Defendants misled investors by falsely claiming that the positive revenue results they touted to the market during the Class Period were caused by organic consumer demand for [Extreme's] products . . . even though, in reality, the results were a byproduct of the Company's adoption of an undisclosed sales practice involving channel stuffing that resulted in [unsustainable] sales." *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *8 (N.D. Cal. Aug. 17, 2022). *Plantronics* is instructive. There, Judge Tigar sustained similar claims, holding "that Defendants' failure to disclose the practice to investors while touting positive revenue results misled

investors into believing that the revenue results they touted were caused by other factors, which, in turn, created an inaccurate impression as to the financial health of the Company in the minds of investors." *Id.* at *11 (citing to *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *8-9 (D. Or. June 27, 2017) (statements of "sustainable organic growth" actionable for failure to disclose "the practice of pulling in sales")). Here, the statements at issue—*e.g.*, "The **product revenues increase** for the year ended June 30, 2022 [] was **primarily due to strong demand** . . ." (¶371)—are the types of statements that the *Plantronics* and *Murphy* courts, and others, have found actionable because such statements fail to disclose that the ongoing channel stuffing conduct was a "part" of the revenue growth. *See also In re SolarEdge Tech., Inc. Sec. Litig.*, 2024 WL 4979296, at *7 (S.D.N.Y. Dec. 4, 2024) ("misleading" to "attribute increased revenues in late 2022 to a variety of factors meanwhile omitting that part of the increase in revenues was caused by a practice of channel stuffing" because defendant is obligated "'to tell the whole truth' with respect to the cause of the revenue growth."); *In re Scientific Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1355 (N.D. Ga. 2010) (similar).

### 1.    Defendants' Challenges To The Positive Revenue Misstatements Fail

#### a.    Defendants' Attempt To Redefine Plaintiffs' Theory Of Liability Fails (And Is Satisfied In Any Event)

Defendants' entire challenge to the falsity of these statements is based on the presumption that to succeed, Plaintiffs must describe "[s]pecific transactions, specific shipments, specific customers, specific times, or specific dollar amounts" sufficient to show that "Defendants' alleged 'channel stuffing' scheme was improper." MTD at 9. Not so. Courts, including *Plantronics*, have rejected this very argument because "even **legitimate** types of channel stuffing may be part of a fraudulent scheme when used to hide poor business fundamentals." *Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at *6 (N.D. Cal. June 19, 2020). Thus, "Plaintiffs are not required to identify specific transactions, because [like here] Plaintiffs' theory of liability does not depend on the transactions themselves being fraudulent." *Plantronics*, 2022 WL 3653333, at *10-11; *see Murphy*, 2017 WL 3084274, at *9 n.3 (same). Here, similarly, Plaintiffs do not allege that the channel stuffing conduct was itself illicit.[4]

---

[4] For this reason, Defendants' citations to *Waterford Twp. Police v. Mattel*, 321 F. Supp. 3d 1133 (C.D. Cal. 2018); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996 (N.D. Cal. 2008); and *In re*
Footnote continued on next page

Moreover, even if the Court adopted Defendants' mistaken framework, Plaintiffs have more than adequately alleged the "specific" times, customers, transactions, and dollar amounts of the undisclosed conduct. As to "times," the AC indicates that the undisclosed channel stuffing transactions were a "regular" and "common" practice, occurring at the tail-end of each fiscal quarter, with FE-6 stating they were entered into about 15 days before the end of the quarter. ¶¶110 (FE-1)[5]; 164 (FE-2); 165 (FE-10); 158, 174 (FE-6). As to "customers," Plaintiffs allege that both Extreme's channel partners, and the top three distributors accounting for more than *50%* of Extreme's total revenues—TD Synnex, Jenne, and Westcon (¶71)—were subject to the manipulative sales practices including channel stuffing. ¶118 (FE-1: TD Synnex and Jenne were the top two distributers that were "being stuffed" at the end of each quarter because of their willingness to take extra inventory); ¶153 (FE-4: Westcon would buy millions of dollars' worth of "end of sale products" that were "not saleable" and be given up to two quarters to return those products); ¶156 (FE-11: Westcon); ¶¶179-82, 190 (FE-2: partners PC Solutions and Step CG routinely pulled-in sales for Extreme because they had the warehousing to store the extra inventory). And as to specific "transactions" and "dollar amounts," the FEs also identify numerous specific transactions evidencing the undisclosed conduct. *E.g.*, ¶121 (FE-1: Brown pressured TD Synnex to "play ball" and buy $20 million worth of unneeded inventory in order to "keep its place in [the backlog] line" for needed inventory, resulting in TD Synnex's oversupply of 100-200 days' worth of inventory (when it normally only had 28 days' worth

---

*ICN Pharms., Inc. Sec. Litig.*, 299 F. Supp. 2d 1055 (C.D. Cal. 2004) are inapposite, as they all weigh falsity against the standard of illegitimate channel stuffing—which is inapplicable here. MTD at 9-10. Defendants also argue that some FEs offer examples of "routine business deals," claiming there is nothing "inherently improper" about "offer[ing] incentives for wholesalers to buy more product than they otherwise would." MTD at 12-13. Plaintiffs agree; Plaintiffs' theory is not premised on alleging that the conduct was itself fraudulent, rather, it was the touting of revenue without disclosure of the underlying practices that was improper.

[5] Defendants argue that FE-1, who worked directly with Defendant Brown, would have no "personal knowledge" of the practices during the Class Period because he resigned early in the Class Period. MTD at 10. *First*, FE-1 was employed at the start of the Class Period once the alleged conduct already impacted revenues. *Second*, pre-Class Period accounts of fraud can "confirm what a defendant should have known during the class period." *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 n.1 (9th Cir. 2018). *Third*, FE-1 stated that, based on recent conversations with TD Synnex leadership, Extreme was *employing the same channel stuffing practices during and into the end of the Class Period* (¶116). *See Plantronics*, 2022 WL 17974627, at *7 (crediting "channel stuffing" based on information from "unnamed" source provided to FE). *Fourth*, FE-1's account is corroborated by a multitude of other FEs that worked at the Company at other points during the Class Period, and who all reported the same undisclosed practice of channel stuffing and "pulling-in" sales from future quarters (¶¶144-90).

of supply)); ¶¶179-82 (FE-2: July 2023 transaction whereby Extreme pulled-in about $1.5 million of sales without a confirmed purchase order from PC Solutions, resulting in FE-2's retaliatory demotion when he refused to participate); ¶¶215-16 (FE-5: during 2Q24 (*i.e.*, September-December 2023), Extreme knowingly double-counted $1.8 million worth of a New Jersey Transit order that was not corrected until after quarterly revenues were reported). Indeed, given all these corroborative accounts, it is no surprise that the FEs stated that it was "***well known internally at Extreme***" that the sales team was "channel stuffing" during the Class Period. ¶146 (FE-3).

Defendants' efforts to discredit the allegations fail as they simply do not cite or misleadingly brush over the AC's detailed allegations. *See* MTD at 10 (claiming that FE-2 described a deal "that never closed" but ignoring ¶182 which explains that "[David] Savage called PC Solutions directly and got the deal done himself."); *id.* (ignoring that FE-2 personally was directed by Savage throughout his tenure to pull in sales regularly prior to each quarter, in amounts that "***were always at least $1 million in value***" (¶170)); *id.* (claiming that FE-6 describes deals without regard to "timing or amount" but ignoring ¶175 where FE-6 describes a specific transaction whereby Extreme shipped ***several millions*** of dollars of inventory to a partner without a purchase order and had the partner hold the inventory for 16 months, before the product was finally delivered in the "first week of October 2022."); *id.* (ignoring that FE-11 gave a specific pull-in transaction that occurred around the "Fall of 2023" where a partner in EMEA was forced to hold inventory for at least six months (¶177)).[6]

### b. Defendants' Incorrect Fact-Intensive Challenges To Falsity Fail

***First***, Defendants argue that there are no allegations that the channel stuffing "affected revenue[s]" and was a reason for the "revenue growth" that Extreme experienced. MTD at 10-11. This is incorrect. Even a cursory review of the AC demonstrates countless allegations that show that the undisclosed channel stuffing and manipulative sales tactics were a significant factor that added to Extreme's revenue growth. *See, e.g.*, ¶¶166-72 (FE-2 claiming that the pulling-in of sales and "end-

---

[6] Further, Defendants' own case law is distinguishable in that—unlike here—"the Complaint [did] not detail a single transaction to substantiate" the channel stuffing conduct. *In re Ashworth, Inc. Sec. Litig.*, 2000 WL 33176041, at *7 (S.D. Cal. July 18, 2000). And as to the contention that some of the FEs rely on "hearsay," (MTD at 10, 21) courts routinely credit such allegations as an FE's "reliance on hearsay is not dispositive as to the reliability of his or alleged reports." *See Plantronics*, 2022 WL 17974627, at *7 (crediting FE allegations of "channel stuffing" notwithstanding "hearsay" argument).

of-quarter" shipments for customers who did not have purchase orders were done and "recognized as revenue to make Extreme's quarter look more profitable than it had been in reality, because the Company cannot recognize revenues until the product ships"); ¶139 (internal IM showing that return of shipped stock from distributor back to Extreme could "tank[] our quarter"); ¶¶68-69; 236-41 (charts showing significant increase in distributor/partner and product revenues). Overall, the AC alleges tens of millions of dollars of quarterly revenues generated because of these practices. ¶¶108-90; 210-32.

*Second*, Defendants argue that they "kept the public updated about the real reasons for changes in revenue growth," which purportedly included "digesting a large volume of backlog release" and "macroeconomic conditions." MTD at 11. It is black-letter law that the Court must accept Plaintiffs' alleged facts as true, and courts reject similar invitations "to draw inferences in [Defendants'] favor or to adopt their own interpretation of Plaintiffs' allegations and the documents upon which [they] are based." *Plantronics*, 2024 WL 4485595, at *9.[7] Further, the issue is not whether Defendants may have disclosed certain *other* factors that may have caused revenue growth, but whether they disclosed the channel stuffing and manipulative sales practices at issue here. They did not. *See SolarEdge*, 2024 WL 4979296, at *7 (omission of "channel stuffing" when touting revenue growth misleading because defendant is obligated "to tell the whole truth"); *In re Estée Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686, at *3 (S.D.N.Y. Mar. 31, 2025) ("What matters is that [Extreme] touted the reasons for its success while leaving out the parts of the truth it found inconvenient.").[8]

*Third*, Defendants' argument that the channel stuffing was "implausible" because the scheme was not "short-lived," and began prior to the Class Period, is improperly premised on a factual assertion that channel stuffing cannot occur in a matter of years. MTD at 9-10. This argument is wholly premature at this stage and ignores (1) that Defs. Ex. 1 at 11 demonstrates that 13% of the firms studied "engaged in channel stuffing for over 2 years"—longer than the Class Period here (*see*

---

[7] Defendants' fact-intensive argument that it was "implausible" for Extreme to dictate terms to major distributors should also be dismissed for this reason. MTD at 13. Indeed, in support of their argument, Defendants cite to TD Synnex's annual report and revenues—which is nowhere to be found within the four corners of Plaintiffs' AC and should therefore be stricken. *See* ECF No. 80 ("Opp. to RJN").

[8] Defendants' charge that Plaintiffs failed to "mention a single analyst report accusing the Company of channel stuffing," MTD at 11, is not relevant to an objective *falsity* analysis—especially given that Defendants' channel stuffing practices were omitted from the public during the Class Period.

*also* Opp. to RJN at 9-10); (2) that multiple FEs discuss that the channel stuffing occurred throughout the Class Period; (3) the corroborative allegations that the incredible revenue decline beginning in 1Q24—to both distributor/partner and product revenues (*i.e.*, where the scheme is alleged to have occurred)—is indicia that channel stuffing did in fact occur and reached its breaking point in 1Q24, as the distributors / partners could not accept any more product, leading to revenue loss (¶¶233-43); and (4) that Defendants *did* publicly announce such revenue loss at the end of the Class Period, as "***demand [was] masked by inventory flowing out of the channel***" and "***sell through [would] be significantly higher than sell-in***" (¶346-48)—*i.e.*, evidence of the excess inventory in the stuffed channels. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018) ("courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage.").[9]

*Fourth*, to the extent Defendants argue that Extreme disclosed (1) its "right to return a portion of inventory to us for the purpose of stock rotation;" that (2) "distributors are given the right 'to claim rebates for competitive discounts;'" and that (3) "a disproportionate percentage of [its] sales occur[] in the last month of a quarter;" MTD at 12, such disclosures are insufficient to preclude liability because nowhere in those statements do Defendants indicate that (1) Extreme was sending its *outdated, unwanted, and "not saleable"* inventory to distributors/partners (¶¶110, 119, 124-26, 138); that (2) the "rebates" at the end of the quarter were offered to partners *with no confirmed purchase order* (required for Extreme to properly recognize revenues) and which "exhausted demand from the future" (¶¶163-75); that (3) the distributors/partners could not return the product until *after the quarter ended and after Extreme's financials were already reported* (¶¶125-27); and that (4) even with the stock rotation clause, Defendants would nonetheless force distributors to keep and hold the product and renege on such rotation, in order to "stuff" the distributors with more product and thereby *inflate* Extreme's financial "numbers" for the present[10] (¶¶128-29; 135-39)—*i.e.*, all the reasons why

[9] Additionally, that the undisclosed conduct may have also occurred pre-Class Period is no bar to an actionable claim here. *See Estée Lauder*, 2025 WL 965686, at *4 (this position is a "non-sequitur").

[10] The FEs answer Defendants' rhetorical question at MTD at 12. As shown through internal emails provided by FE-1—and according to Defendant Brown's own words—the reason for reneging of the stock rotation was to "***drive the behavior we want***," meaning that Defendants "work[ed] with the distributors to buy bad product that is not sellable to make the corporate number and then artificially suppress[] them from rotation [of] bad product[.]" ¶¶134-39. Indeed, one of the documents provided

Footnote continued on next page

Plaintiffs alleged the statements are actionable (*e.g.*, ¶¶100; 357). Accordingly, Defendants have not met their "heavy burden" of showing that the purported truth was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by . . . [the] representations." *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996).[11]

### c.    The Statements Are Not Immaterial Puffery Or Corporate Optimism

Defendants also argue that the statements about "demand," and the statements about revenue "growth," are each immaterial statements of "puffery" and "corporate optimism." MTD at 14. But that ignores the full breadth and context of the misstatements. Courts have found that, in this context, the specific statements here (*i.e.* quantified revenue-growth attributable to other factors) are not inactionable puffery or corporate optimism because the undisclosed adverse information, *i.e.*, the "pulling in [of] sales," may be "important information to a reasonable investor," and thus the underlying omission was "material" to the market. *Murphy*, 2017 WL 3084274, at *9; *see also Plantronics*, 2022 WL 3653333, at *16 (rejecting same argument here that statements touting revenue growth but omitting channel stuffing were "mere corporate puffery" or "optimistic statements").[12]

### d.    The PSLRA Safe Harbor Provides No Protection

Defendants also mistakenly argue that some of the statements were uniformly "forward-looking" and thus protected by the PSLRA's safe harbor. MTD at 14-15. They are not. As a threshold matter, the safe harbor applies only to statements that are forward-looking, not statements about the present or the past. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). Here, the vast majority of statements were assertions about the Company's ***present-tense or historical growth***—without disclosing the ongoing manipulative practices. *E.g.*, ¶356 ("For FY22 we ***achieved*** double-digit growth in both bookings and revenue ***due to strong demand*** . . ."); ¶379 ("We ***had*** a

---

by FE-1 shows Defendant Brown stating that TD Synnex submitted "$6.8M" of product to rotate, which "***may have tanked our quarter***"—and thus, they needed "a plan on how we reverse this." *Id.*

[11] Moreover, this argument fails because Defendants are claiming a "truth-on-the-market" defense, but "as the Supreme Court and Ninth Circuit have explained, the truth-on-the-market defense is a method of refuting an alleged misrepresentation's *materiality*," and "[p]roof of that sort is a matter for trial." *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 955 (D. Ariz. 2024).

[12] None of Defendants' cited cases (MTD at 14) speak as to whether *these* particular types of statements, with such attribution, are puffery or corporate optimism, and thus are inapposite.

record quarter as demand . . . *has* never been stronger"); ¶413 ("we're *seeing* good demand"). There is nothing forward-looking about such statements. *E.g., Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 918 (N.D. Cal. 2012) ("statements about past or present demand are not covered by the safe harbor").

Further, even if some of the alleged statements could arguably be connected to Extreme's issuance of "guidance," MTD at 15, "where defendants make mixed statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are *not* protected by the safe harbor of the PSLRA." *Quality Sys.*, 865 F.3d at 1142. Here, taking ¶375 as an example, the totality of Defendants' statements in the press release demonstrate that Extreme was issuing positive revenue guidance for the "remainder of FY23" *because* of the present-tense and historical assertion that Extreme "delivered record quarterly revenue of $297.7 million," which amounted to "double-digit growth" for the past quarter, due to "continued improvement in the supply chain environment" and "record backlog." These assertions about the Company's "present business conditions" are *not* protected from the safe harbor. *E.g., Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1050 (N.D. Cal. 2018) (factual predicate of "healthy product backlog" and "consistent quarterly linearity" underlying "forward-looking prediction about fourth quarter revenue" not protected); *In re Dermtech, Inc. Sec. Litig.*, 2025 WL 1618193, at *6 (S.D. Cal. June 5, 2025) (recorded revenue from "fourth months prior" as part of full-year outlook not protected).

Furthermore, even if forward-looking, the statements would still not be protected by the safe harbor because (1) they were not accompanied by any "meaningful" cautionary language and (2) were made with actual knowledge of their falsity. *Wochos v. Tesla*, 985 F.3d 1180, 1190 (9th Cir. 2021). The second prong is discussed *infra* Sec. III. D. As to the first prong, Defendants simply ignore the statements where no cautionary language was provided (*see* Defs. Ex. 11 (transcript of ¶413)). And as to the other statements, the cautionary language was not "meaningful." For cautionary language to be meaningful and "adequate," the caution must "discredit the [allegedly misleading statements] so obviously that the risk of real deception drops to *nil*." *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 737 (N.D. Cal. 2022). Thus, "it must 'precise[ly]' and 'directly address' the alleged misrepresentations." *Id.* None of Defendants' cited risk disclosures meet this burden and

discuss the alleged omission underlying the revenue-growth statements. *See* MTD at 15. These cited risk disclosures merely only speak of cautions "at a high level of generality" about unrelated problems that Extreme may experience (*e.g.* COVID-19 pandemic), or about Extreme's generalized inability to "forecast demand" and estimate inventory levels (*see* MTD at 15), but do not "adequately warn investors" that Extreme had, "***in fact***," inflated its revenue growth through the undisclosed channel stuffing and manipulative tactics that were employed. *See QuantumScape*, 580 F. Supp. 3d at 738.

**B.      Defendants Misstated The "Firm" Nature Of The Company's Backlog**

Separate from their misstatements regarding the causes of revenue growth, Defendants also misrepresented the strength and "firm" nature of Extreme's backlog. The Ninth Circuit has explained that "once defendants [choose] to tout the company's backlog, they [are] bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). Here, Defendants violated that principle by repeatedly asserting to the market that—based upon their touted "complete visibility" into the backlog—the "***vast majority***" of orders (*i.e.*, 99% (¶¶311, 388)) included in the backlog were "***not cancelable***" and reflected "***firm***" customer commitments and "***end user demand***," and thus, the backlog was "***very high quality***." ¶248. Indeed, Defendants specifically asserted that "***[t]hese are real projects that we see***" and that "***we don't see double ordering***" in connection with the Company's backlog. ¶418.

The effect of Defendants' repeated misrepresentations "created the natural impression the backlog represented orders merely waiting to be filled, essentially money in the bank within the year." *Schultz v. Tomotherapy Inc.*, 2009 WL 2032372, at *14 (W.D. Wis. July 8, 2009). As indicated by multiple analysts, the market believed and relied upon Defendants' Class Period backlog statements, accepting, *e.g.*, that there was "No Double Ordering" (¶253) with respect to backlog orders and that, based on Defendants' representations: the "orders are real and sustainable" (*id.*); that "no projects are duplicates," and that "we are confident the risk of double ordering is low. . . [w]e think the risk of backlog cancellations are very low" (¶254); that Extreme's revenue "forecast appears particularly safe due to the Company's highly elevated backlog" (¶256); and that "Extreme believes their demand and robust backlog will enable them to produce double-digit Revenue growth" (¶89).

Defendants' statements concerning the backlog were false and misleading because multiple well-placed FEs, including FE-7 that reported directly to the C-Suite, explained how (1) the backlog orders could be cancelled at any time by Extreme's customers—indeed, there was a ***contractual provision that allowed for such cancellation, which customers effectuated*** (¶¶274, 288, 296-97); (2) it was well known internally that the backlog orders consisted of "double" or "triple" booked customer orders that did not reflect "firm" customer commitments (¶¶273, 279, 299); and (3) Defendants ***internally hedged*** that at least 10% of the backlog would, in fact, be cancelled (with FE-7 explaining that even this number was not realistic, and a higher 66% cancellation rate was more appropriate (¶¶280-84)).[13] Indeed, FE-5 explained how it was "***widely known***" at Extreme that the double-booking process was occurring because of the underlying contractual process—a practice which "came from the top." ¶299. Multiple courts have concluded that similar omissions render "backlog" statements actionable. *E.g.*, *Berson*, 527 F.3d at 984-86 (backlog statements actionable for failure to disclose that company was counting "stop-work" orders that could be "cancelled altogether"); *Farrar v. Workhorse Grp., Inc.*, 2021 WL 5768479, at *5 (C.D. Cal. Dec. 2, 2021) (statements about backlog were misleading because they "created the illusion of firm customer orders"); *Schultz*, 2009 WL 2032372, at *14-15 (statements that backlog contained "firm" orders were misleading because the orders were at "serious risk of being cancelled" and this "key fact was not disclosed").

### 1. Defendants' Challenges To The Backlog Misstatements Fail

#### a. Defendants' Incorrect Fact-Intensive Challenges to Falsity Fail

Defendants first argue that Defendants "disclose[d] exactly what Plaintiffs claim [was] omitted," citing to certain disclosures and cautionary language in their Form 10-Ks. MTD at 16-17.

---

[13] Defendants argue that FE-7's 10% figure should be discredited because it came from a meeting "between late 2021 and mid-2022." MTD at 17. Notably, Defendants do not dispute, and therefore concede, that (1) Defendants Meyercord, Rice, and Thomas attended this meeting and (2) that, additionally, "everyone . . . in the room knew" that customers were double- or triple-booking their orders during the Class Period (which is supported by other FEs). ¶¶277-80; 259-74; 296-99. Further, a "mid-2022" meeting plausibly falls on or after July 27, 2022 (the beginning of the Class Period). And even if the meeting was pre-Class Period, Defendants' citation to *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 999 (N.D. Cal. 2017) is unavailing in light of the Ninth Circuit's holding in *Solarcity*—whereby the court found it proper to credit pre-Class Period allegations from FEs as it can "confirm what a defendant should have known during the class period." 884 F.3d at 851 n.1; *see also Quality Sys.*, 865 F.3d at 1145 (crediting FE's allegations from pre-Class Period).

But this same argument was rejected in *Berson*, and a closer analysis of Defendants' cited language demonstrates that "[n]othing" in Defendants' proffered language in their filings "alerts the readers that some of these risks may have already come to fruition" or "that what the company refers to as backlog includes work that is . . . at serious risk of being cancelled altogether" (527 F.3d at 985-86):

- That Extreme disclosed that it "granted some flexibility in revising orders to compensate" for supply chain constraints ***says nothing*** about the fact that customers were double- and triple-booking orders and that those orders were at "serious risk of being ***cancelled altogether***" (*id.*), not merely "revis[ed]."

- That Extreme disclosed that "all orders are subject to possible rescheduling by customers" likewise says nothing about cancellation of orders—indeed, "reasonable investors" (*id.*) reading this statement would assume that the order was not cancelled but merely rescheduled to be delivered for a later time.

- That Extreme disclosed that orders "***could*** be cancelled for various reasons," or that Extreme "***may***" allow customers to cancel "on an *exception* basis" (MTD at 4, 16, and Defs. Ex. 9 at 9, 17, 20), is phrased in the hypothetical and is itself misleading, as such language only "speaks entirely of as-yet-unrealized risks and contingencies." *Berson*, 527 F.3d at 986; *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (same). Indeed, at the time of Defendants' statements, ***Defendants knew that orders were already being cancelled and had also internally hedged that at least 10% of their orders would be cancelled, due to the double-booking***. ¶¶264-68; 274-80; 296-308. *See Schultz*, 2009 WL 2032372, at *15 ("statements about the general risk of customers' ability to cancel or modify contracts [in the backlog] do not prevent omissions from being misleading when the omissions involve risks that have already come to fruition").

- Similarly, that Extreme disclosed that they "do not believe [Extreme's] backlog, as of any particular date is necessarily indicative of actual revenues for any future period," or that it did "not have binding purchase commitments," is likewise insufficient because Defendants' contemporary statements affirmatively characterized the backlog orders as "***firm***" (¶422), that "***[t]hese are real projects that we see***" (¶418), and that they've "***baked [the backlog] into our revenue guide***" (¶409), because Extreme's "***revenue outlook is supported by our product backlog***" (¶400)—statements which investors are "justifiably" entitled to "place heavy reliance on." *See In re Apple Comp. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989).

In fact, the risk disclosures Defendants cite to show that Extreme continued to tout that the backlog orders were "firm" in the very same breath that it gave these ineffective warnings. *E.g.*, Defs. Ex. 9 at 9 ("we believe the orders in the backlog are **<u>firm</u>** . . . "); ¶¶250-51. Accordingly, because "Defendants repeatedly referenced their growing backlog as indicating that they were a strong, growing company," the purported cautionary language and disclosures are insufficient to inoculate

such assertions as "Defendants' statements, even taken with the caveats presented, were misleading when made." *Farrar*, 2021 WL 5768479, at *5 (cautionary language that the "backlog orders were subject to conditions and not guaranteed" insufficient); *Berson*, 527 F.3d at 986 (disclosure that "backlog at any particular date is not necessarily representative of actual sales to be expected" insufficient given the other statements). And here, the misleading impression communicated in Defendants' statements is further evidenced by the many analysts who demonstrated that—in reliance on such misstatements—they were, in fact, misled. *See supra* at 12; ¶¶252-58; *Farrar*, 2021 WL 5768479, at *5 (backlog statements affecting "analyst opinions" supporting falsity analysis).[14]

### b.    The Statements Are Not Inactionable Opinion Statements

Defendants also argue that some of the backlog statements contain "expression of confidence about Extreme's outlook" and thus those statements are "opinion" statements. MTD at 18. However, the Supreme Court made clear that these statements are *not* opinion statements because Defendants made embedded factual assertions—*e.g.*, claiming that Extreme's backlog orders "***remain firm***" (¶422) or that Extreme's revenue was "***understated by the . . . backlog***" (¶360)—which are expressions of "certainty about a thing," and thus outside the amphitheater of opinion. *Omnicare, Inc v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183-86 (2015). Here, either the backlog orders were "firm" or not—and they were not (*see* ¶¶259-324).[15]

Furthermore, even if a challenged statement is deemed an "opinion," such "statement of opinion, even if literally accurate, may be rendered misleading by the omission of a material fact," because "a reasonable investor expects that the issuer's opinion 'fairly aligns with the information in

[14] Defendants' citation to *In re Accuray, Inc. Sec. Litig.* (MTD at 17) is inapposite because there, none of the FEs could speak as to any of the "specific contracts" underlying plaintiff's theory of liability that the statements omitted to disclose such contracts. 757 F. Supp. 2d 936, 943-44 (N.D. Cal. 2010). In contrast to Defendants' assertions regarding particularity (MTD at 17), the Ninth Circuit has found that an FE's allegations concerning backlog are particularized if they can testify as to the "***existence***" and "***effect***" of the alleged omission. *Berson*, 527 F.3d at 985. Defendants concede—as they must—that Plaintiffs have met this burden through the allegations of the FEs who undeniably demonstrate that "resellers would double-book" orders and then "cancel," MTD at 17, which had the effect of overstating the strength and "firm" nature of the backlog. *See* ¶¶275-87. And further, Plaintiffs have, in fact, demonstrated the particularized terms of the contracts at issue here: the purchase orders were considered "conditional'" with included specific "***first-come, first-serve***" clauses. ¶288.

[15] *Markette v. XOMA Corp.* (MTD at 19) is inapposite as there—unlike here—the plaintiff made "no allegation as to the falsity of these facts." 2017 WL 4310759, at *6 (N.D. Cal. Sept. 28, 2017). And Defendants' argument that their disclosures alleviate liability fails for the reasons stated *supra* at 14.

the issuer's possession at the time.'" *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023). Here, Defendants' touted "confidence" in the Company's financial "outlook" hinged upon the asserted strength of the backlog. *E.g.*, ¶400 ("***our confidence in the revenue outlook is supported by our product backlog of $542 million***"). It is materially misleading to make such declarations of confidence when Defendants knew—or had access to such "information" in the Company's "possession"—of the aforementioned omissions concerning the backlog. *See supra* at 13.

### a. The PSLRA Safe Harbor Provides No Protection Here

Finally, Defendants also claim that certain of the statements about the backlog are forward-looking and covered by the PSLRA safe harbor. MTD at 17-18. But Defendants' assertions about the backlog communicated ***present-tense information*** about the Company (*e.g.*, "***the backlog . . . consists of [] end user demand***" (¶416)), and thus such "descriptions of the present aren't forward-looking." *Berson*, 527 F.3d at 990 (like here, backlog was "a snapshot of how much work the company has under contract right now," not "a 'projection' of earnings or a 'statement' about 'future economic performance'"); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 531-32 (D.N.J. 2010) ("each statement relating to backlog is a present fact that is not a projection of future economic performance; these statements concern that value of backlog at the time the statements were made to the public"). *Mattel* is distinguishable (MTD at 18) in that there—unlike here—the statements were about "future expectations and performance." 321 F. Supp. 3d at 1150.[16]

### C. Defendants' SOX Certifications Are False And Misleading

Finally, Defendants' SOX certifications (¶¶373; 386; 402; 411; 433; 441) are similarly false and misleading as they attested to the accuracy of financial reporting concerning revenues and backlog. *See Rabkin v. Lion Biotechnologies, Inc.,* 2018 WL 905862, at *10 (N.D. Cal. Feb. 15, 2018).

### D. Defendants Made Their Statements With Scienter

"The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007). A strong inference of

---

[16] Further, even if forward-looking, the safe harbor does not apply to these statements for the same reasons outlined *supra* 10-12 and 14 (cautionary language was not meaningful and actual knowledge).

LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE
AMENDED COMPLAINT
CASE NO.: 3:24-CV-05102-TLT

16

scienter, "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* at 324. Instead, when viewed holistically, plaintiffs' inference of scienter must be "at least as compelling as any opposing inference" and, if the competing inferences are equally plausible, "a tie goes to the plaintiffs." *Dermtech*, 2025 WL 1618193, at *7. Plaintiffs not only surpass a "tie"—they have the "smoking gun." *Tellabs*, 551 U.S. at 324. Because Defendants only challenge control person claims on the basis of their §10(b) arguments, the Court should sustain the §20(a) claims. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 839 (N.D. Cal. 2014).

### 1.    Internal Documents Create A Strong Inference of Scienter

In *SEB Investment Management AB v. Wells Fargo & Co.*, this Court found that where some of the individual defendants "were directly informed of the issues" (through, for example, receiving communications such as complaints or letters) it naturally supports a "strong" inference of scienter. 742 F. Supp. 3d 1003, 1021 (N.D. Cal. 2024) (Thomspon, J). Here, FE-1 furnished such communications, including ones that were transmitted to Defendant Thomas on July 20, 2022 by email—just seven days before the start of the Class Period—and others that were sent to Thomas and other executives at Extreme in connection with FE-1's resignation that was due in large part to Extreme's undisclosed channel stuffing, which FE-1 understood to be "unethical." ¶¶133-42. Defendants fail to meaningfully discuss these documents, relinquishing their argument to a mere inapposite footnote (MTD at 21 n.3). Viewed holistically, these communications support scienter:

- Through email communications, FE-1 directly notified Thomas of the channel stuffing and manipulative sales practices and disclosed that Defendant Brown "***works with the distributors to buy bad product that is not sellable to make the corporate number***." ¶138.

- Instant message ("IM") in which Defendant Brown discusses how TD Synnex submitted "$6.8M" of product to rotate (pursuant to the stock rotation clause), which "is a HUGE problem for all of us [and] ***may have tanked our quarter***," and thus, Extreme needed "a plan on how we reverse this . . . if not [] ***our auditors will be all over us***." ¶139.

- IM dated just weeks before the Class Period where Brown told FE-1: "***Lots of eyes on this backlog process – it's updated all the way to [Defendant] Ed [Meyercord]***." ¶308.

These documents are "smoking-gun" evidence that (1) with respect to the backlog, the Individual Defendants had access to and were made aware of information concerning its true risks, given the "process" of communicating backlog concerns "all the way" up to the CEO; that (2)

LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE    17
AMENDED COMPLAINT
CASE NO.: 3:24-CV-05102-TLT

Defendant Brown directed the channel stuffing conduct and manipulative sales practices alleged in the AC; and that (3) Defendant Thomas had actual knowledge of such conduct just seven days before the start of the Class Period, during which Defendants made misleading statements attributing revenue growth to organic "demand" and "solid execution . . . even in the current supply chain environment," without disclosing the channel stuffing and manipulative sales and inventory conduct. *E.g.*, ¶356.

Notably, the inference of scienter derived from these documents is applicable to "all named Defendants," as—like in *Wells Fargo*—it is "highly likely" that the other Individual Defendants would have been "aware" of such communications "given their roles" in the Company. 742 F. Supp. 3d at 1021. Here, the other Individual Defendants alleged to have made misstatements (Meyercord, Tate, and Rhodes) were each C-Suite executives (*i.e.*, peers with Thomas), were responsible for financial reporting of revenue and the backlog, and had executive oversight of Brown (¶¶112-14).

### 2. Defendants' Admissions Support A Strong Inference Of Scienter

The strong inference of scienter is further strengthened here because the Individual Defendants claimed that they were all personally "very close to the topic" (¶459) concerning Extreme's backlog, sales pipeline, and revenue growth outlook. Courts, including the Ninth Circuit, recognize that such admissions are highly indicative of scienter. *See Quality Sys.*, 865 F.3d at 1145 (inference of scienter where defendants "themselves told investors they had real-time access to, and knowledge of, sales information."); *Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*, 2024 WL 4353049, at *15 (N.D. Cal. Sept. 30, 2024) (Defendants' admissions of "involvement in the subject matter of the misstatements" supported an inference of scienter).

Here, *each* Individual Defendant made such claims. *E.g.*, ¶458 (Meyercord: "[w]e have *complete visibility into our product backlog*"); ¶459 (Thomas: "I'll let Ed [Meyercord] chime in as well because *we're both very close to the topic*" [of the backlog]); ¶460 (Thomas: "I can tell you right now . . . each and every decommit [*i.e.*, cancellation], to the extent there is one, *gets a lot of scrutiny from us*"); ¶461 (Tate: "*we have excellent visibility into our backlog . . . we don't see double ordering*"); ¶462 (Tate: "*we're very keen on demand and where demand is going. And so, we do a lot of analytics around that* . . . We look at the total funnel of opportunities that are coming down the

pike"); ¶463 (Rhodes: "*I'm actually pretty close* to looking at our sales pipeline, sales pipeline metrics"); ¶465 (Meyercord: "*we keep a very close eye on*. And we're not seeing it . . . we look at opportunities that we have in the funnel [] and we're scrubbing those regularly").[17]

### 3.    FE Allegations Support A Strong Inference Of Scienter

Allegations of former employees can also establish a strong inference of scienter by satisfying a two-part test: (1) the FEs "must be described with sufficient particularity to establish their reliability and personal knowledge" and (2) their "statements . . . must themselves be indicative of scienter." *Quality Sys.*, 865 F.3d at 1144-45. The AC easily satisfies both prongs.

**First**, Defendants do not challenge—nor can they—that the AC pleads details about each of the FE's "job descriptions," including their exact titles, roles, duties, tenures and, in most cases, their reporting structure (¶¶52-62), satisfying the first prong. *See Quality Sys.*, 865 F.3d at 1145.[18]

**Second**, the testimony from the FEs is indicative of Defendants' scienter. Defendants argue that "several of the FEs are lower-level employees who had no direct interactions with any Defendants" and thus their accounts should be discarded. MTD at 21. But this is incorrect. *E.g.*, ¶52 (FE-1 worked with and reported directly to Defendant Brown; FE-1 was responsible for managing relationship with one of Extreme's largest distributors, and brought channel stuffing concerns directly to Thomas); ¶¶58, 275-95 (FE-7 reported directly to the C-Suite, attending C-Suite meetings, and discussed that C-Suite knew of backlog double-ordering practice and that at least 10% of backlog would be cancelled); ¶¶145-46 (FE-3 reported directly into the finance leadership of Defendant Tate and explained that it was "*well known internally at Extreme*" that the sales teams were "channel stuffing" during the Class Period); ¶131 (FE-6 detailed that based upon his *personal experience* on a call with Defendant Rice, Rice directed the pulling in of sales); ¶¶300-08 (FE-8, a Senior VP of Global

---

[17] Defendants repeatedly cite to *Espy v. J2 Glob., Inc.* 99 F.4th 527, 538-39 (9th Cir. 2024) (MTD at 22), but there, unlike here, there were no "specific admissions from top executives that they were involved" and the allegations of involvement came only from FEs, not Defendants' own lips.

[18] At most, Defendants claim that, for example, FE-5, FE-10, and FE-11 did not work in "Extreme's accounting or finance organizations." MTD at 13. But the Ninth Circuit only requires that "the confidential witnesses whose statements are introduced . . . must be described with sufficient particularity to establish their reliability and personal knowledge," *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), and has already rejected the argument that certain positions are determinative of knowledge. *See Berson*, 527 F.3d at 985 (rejecting argument that because FEs were "engineers or technical editors" rather than "managers" their testimony should be discredited).

Channel Sales, explained that the distribution teams reported to him and that through regular "Output" meetings, Defendant Rice and others relayed information to the Individual Defendants following quarterly and weekly "Revenue Assurance" calls—where the backlog hedge was discussed).

Moreover, specific allegations from FE-1, FE-2, FE-5, FE-7, FE-8 each substantively demonstrate that Defendants knew that the backlog was not—in fact—"firm," as they led the market to believe, because of, *inter alia*, the practice of customers double- or triple-ordering and then cancelling. *See* ¶¶259-308. And as to the channel stuffing and manipulative practices, FE-1, FE-2, FE-3, FE-4, FE-5, FE-6, FE-10, and FE-11 explain that the Individual Defendants either directed or had actual knowledge that such channel stuffing conduct and manipulative sales practices were occurring and were inflating revenues. *See* ¶¶108-90; 210-32. "[T]aken together," the sheer multitude of allegations described by the FEs here—including from high-level employees, and which all corroborate each other—"contribute to a strong inference of scienter." *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020).

### 4.    Descriptions Of Meetings Support A Strong Inference Of Scienter

Notably, the above FE allegations are further particularized as they evidence the Individual Defendants' participation in regular meetings in which the backlog (including the cancellations) and manipulative sales conduct was discussed. *See* ¶¶483-95 (FEs describing (1) "Ed" Talks, (2) Buy-In Meetings, (3) Exit Meetings, (4) Quarterly and Monthly C-Suite Meetings, (5) Revenue Assurance and "Output" Calls, and (5) Weekly Forecast Calls); *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *28 (N.D. Cal. Mar. 21, 2018) (allegations that the defendant "scheduled quarterly sales force meetings, led sales force calls, [and] led the global sales force conference…" supported a strong inference of scienter); *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015) (finding that "targeted," "daily and weekly meetings" to keep the Company appraised of the conduct underlying the fraud supported a strong inference of scienter).[19]

---

[19] Defendants' claim that "Plaintiffs provide no timeframe for most alleged meetings and cannot specify what any Individual Defendant knew and when" (MTD at 22) is simply not true. *See* ¶¶14, 108, 110-12 276-79, 302-307, 484-85, 487-94 (providing timeframes for the alleged meetings and what was discussed in the meetings). Moreover, FE-1 did not communicate mere "opinions" in his exit interviews. MTD at 22. Instead, FE-1 put Defendant Thomas (and others) on **direct notice** of the

Footnote continued on next page

### 5.    Access To Reports Support A Strong Inference Of Scienter

Additionally, the fact that the status of Extreme's purchase orders, inventory, backlog, and other related sales metrics were accessible and made available to Defendants through (1) "pull-in" lists, (2) weekly inventory demand reports, (3) distribution listservs, (4) spreadsheets, and (5) the Clari and Salesforce databases (¶¶191-209; 467-82) raises the inference of scienter—given Defendants' misstatements concerning the backlog and reasons for revenue growth. *See Glazer*, 63 F.4th at 773 ("Individual Defendants' access to internal reports and Clari support the inference of scienter."); *see also Wells Fargo*, 742 F. Supp. 3d at 1022 (scienter sufficiently pled by demonstrating that defendants "'had access to and used reports documenting' trends in that topic."). Indeed, FE-5 explained that he "***knows for a fact***" that Extreme's senior level executives reviewed updates on the Clari and Salesforce databases—which provided revenue and pipeline forecast reports (for all purchases orders globally)—because he was specifically told by Director of Global Solution Partnerships of Americas Amy Bravo and VP of Americas Channel Jennifer Orr to write all updates "***as if Meyercord is reading them, because he is***" (¶204); *see* ¶201 (FE-9 corroborating this access).

### 6.    Defendants Had A Pecuniary Motive To Commit Fraud

The Individual Defendants also had strong personal motives to increase revenues through the channel stuffing conduct. Specifically, the structure of the Extreme Incentive Plan ("EIP") rewarded Defendants for increasing both the Company's stock price and revenues—in the "***short term***." ¶¶519-529; *see No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) (defendants were motivated to inflate the company's "financial results and stock prices because their eligibility for stock options and executive bonuses were based principally on the company's financial performance."). Here, Plaintiffs provided a table demonstrating that ***as a direct result of Extreme's increased revenues***, Defendants Meyercord, Thomas, Tate, and Rhodes received hefty cash payment bonus during each fiscal half of 2023 (¶526)—*i.e.*, at the same time

---

underlying channel stuffing conduct and provided documentary evidence. ¶¶133-42. Further, Defendants' citation to *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1041 (N.D. Cal. 2020) fails because there, the witness' "*only*" interaction with the defendant was at an "All-hands meeting." Here, as discussed thoroughly, FE-1's interaction with the Individual Defendants goes far beyond just attending the "Ed Talks," and additionally, the AC demonstrates numerous allegations of the other FE's direct contact. *E.g.,* ¶¶54, 115, 122-23, 131, 133-39, 141, 200, 266-70, 267-78, 302-08.

Defendants misstated the specific causes of that revenue growth. ¶¶236-41. Indeed, during the Class Period, *e.g.*, Meyercord received a whopping 142% of his base salary for 1H 2023 and 136% of his base salary for 2H 2023, amounting to over ***$1.1 million in cash***. *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 603 (N.D. Cal. 2019) (inference of scienter where plaintiffs provided "tables alleging precise amounts each executive received in base salary, stock award, and cash awards for each year" and demonstrated that "the executives' compensation from stock and cash awards far outstripped their base salaries").[20] Notably, these Defendants received these cash bonuses only because they met or exceeded the EIP's "pre-established revenue goals." ¶¶519-29.[21]

### 7. Core Operations Doctrine Supports Scienter

The core operations doctrine "relies on the principle that 'corporate officers have knowledge of the critical core operation of their companies.'" *Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2025 WL 556283, at *15 (N.D. Cal. Feb. 18, 2025) (Thompson, J). The Ninth Circuit has articulated that "specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring," is sufficient to establish the core operations doctrine. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). Here, Defendants made such admissions. *Supra* at 18-19. Further, it would be "absurd" (*CareDx*, 2025 WL 556283, at *15) to suggest that Defendants—all high-level C-Suite executives responsible for financial reporting of revenues at Extreme—did not have knowledge of the causes of their own revenue growth, or of the undisclosed channel stuffing and manipulative sales

---

[20] These particularized connecting details distinguishes Defendants' cited cases (MTD at 20). *See Zucco*, 552 F.3d at 1004-05 ("bare assertions" of bonuses with "no allegation indicating how intimately the bonuses were tied to the company's financials"); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012) (mere "allegations of routine corporate objectives"); *In re Nvidia Corp. Sec. Litig.*, 2010 WL 4117561, at *11 (N.D. Cal. Oct. 19, 2010) (failed to allege "how the compensation packages . . .were linked to [the Company's] financial performance or stock price").

[21] Defendants' attempt to undercut Plaintiffs' allegations by arguing that they purchased stock (MTD at 20) should be rejected because (1) Defendants seek to introduce their Exs. 5 and 26—not cited anywhere in the AC—in order to raise a ***factual dispute*** as to Defendants' state of mind, which is wholly improper; *see also* Opp. to RJN at 7-8 (raising issues of fact with these Exs. which demonstrate why they should not be considered at this stage); (2) even if accepted, "there is no *per se* rule that stock purchases negate any inference of scienter, including an inference based on recklessness," *In re Fannie Mae 2008 Sec. Litig.*, 2011 WL 13267340, at *3 (S.D.N.Y. Apr. 11, 2011); and (3) the Court should reject Defendants' argument as "plaintiffs have produced direct evidence of defendants' actual knowledge." *Cf. In re Entropin, Inc. Sec. Litig.*, 487 F. Supp. 2d 1141, 1153 (C.D. Cal. 2007).

conduct, given that those practices: (1) affected and touched Extreme's most important distributors and partners which accounted for more than **50%** of Extreme's total revenues; (2) was vast and not isolated to just one region, but affected the Americas, EMEA, and multiple large business segments; and (3) was orchestrated and directed by a fellow peer in the C-Suite: Defendant Rice. ¶¶496-99. Likewise, it would be "absurd" to suggest that Defendants were not aware that the backlog did not consist of "firm" customers commitments given that: (1) Defendants touted that they monitored and had "*complete visibility*" into the product backlog; (2) the amount of backlog during the Class Period was of *enormous value*—*i.e.*, **$555 million**—reflecting multiple quarters worth of product revenue; and (3) Defendants *knowingly stopped reporting backlog*—a highly material metric—as soon as it became clear that the declines in backlog were not converting into revenue as they previously led the market to believe. ¶¶501-09. *See Berson*, 527 F.3d at 987 ("high-level managers must have known about the [backlog] orders because of their devastating effect on the corporation's revenue").

**8.    Extreme's Retaliatory Culture Supports A Strong Inference of Scienter**

Finally, this Court has endorsed that "a pattern of retaliation against employees who raised concerns about unlawful conduct supports scienter." *CareDx*, 2025 WL 556283, at *14. Here, the AC highlights multiple instances demonstrating that a retaliatory culture existed at Extreme. *See* ¶¶530-41 (demonstrating that both FE-2 and FE-10 experienced retaliation for refusing to participate in unethical and manipulative sales tactics which inflated revenues); *cf.* ¶538 (FE-1 alleging that Defendant Brown, FE-1's direct supervisor, was trying to get FE-1 fired but FE-1 resigned).

**E.    The Complaint Adequately Alleges Loss Causation**

Loss causation is the "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). This Circuit has rejected the "more restrictive test" that plaintiffs must plead "the revelation of the fraud." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). Instead, loss causation involves "no more than the familiar test for proximate cause," which can be met in "an 'infinite variety' of ways." *Id.* "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation . . . dismissal is inappropriate" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

**January 25 and August 24, 2023**. On January 25, 2023, the Company revealed that backlog had fallen, causing a 15% share price decline. ¶¶81-82; 328-34. On August 24, 2023, Extreme confirmed that backlog declined by an astonishing ***$245 million*** over the year (a 48% decline), causing another 9% share price decline. *Id.* The market did not expect backlog to normalize at this sudden pace; as reflected by analysts: "the stock is down ***because*** . . . backlog decreased" and "backlog was down [$70M] ***lower than we expected***" (¶¶330, 334). Such rapid decline in product backlog—without the corresponding equivalent increase in product revenues (¶¶309-24)—plausibly demonstrated that the Company's backlog did not reflect "firm" commitments. *See Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *16 (N.D. Cal. Mar. 31, 2023) (announcement of "shrinking backlog" sufficient as corrective disclosure).

**November 1, 2023, January 8, 2024, and January 31, 2024**. On November 1, 2023, Extreme stated that it would discontinue disclosure of its backlog figure on a quarterly basis, reported sequential total revenue losses, and projected guidance of $312 to $327 million in revenues for the next quarter. ¶¶335-39. As a result, the market reacted negatively with an 18% decline in share price. *Id.* Then, on January 8, 2024, Extreme disclosed that it "expected" to fail to meet that guidance, disclosing that upcoming revenues for the quarter would be "approximately $294 to $297 million," (causing a 7% share price decline); on January 31, 2024, Extreme confirmed that scenario and that its total revenues for the quarter were $296.4 million (causing a 24% decline in share price). ¶¶340-49.

Importantly, in connection with these disclosures of revenue decline, Defendants revealed that product backlog had already normalized (¶345)—demonstrating that the backlog truly was not "firm" as product revenues had contemporaneously declined (¶91)—and attributed the significant revenue declines to "continued channel digestion" and that "[o]ur distributors and partners have lowered inventory purchases." ¶345. As a result, there would be an upcoming "$40 million to $50 million reduction in channel inventory," and that "***demand would be masked by inventory flowing out of the channel***" because it was expected for "***sell through to be significantly higher than sell-in***." ¶¶346, 348. These disclosures specifically signaled to the market that there was a surplus of inventory at the distributor/partner level that needed to be sold off, reflecting the effects of the channel stuffing and

manipulative inventory conduct. *Id.* As a result, the market understood that following these disclosures, "it is now apparent that Extreme is not growing at a sustainable double-digit rate." ¶350.[22] Here, loss causation is met because it is entirely "foreseeable" that implementation of the manipulative business practices would lead to a build-up of inventory at the distributor/partner level such that there would be drastically less future revenues once those distributors/partners could not ingest more inventory, resulting in stock price declines once Defendants were forced to admit such indigestion. ¶¶233-47. *See In re Ramp Networks, Inc. Sec.*, 201 F. Supp. 2d 1051, 1080-81 (N.D. Cal. 2002) (loss causation met where "damage was a foreseeable consequence of the misrepresentation").

### F.    The Defendants Are Liable For Scheme Liability

"Under Rule 10b–5(a) or (c), a defendant who uses a 'device, scheme, or artifice to defraud,' or who engages in 'any act, practice, or course of business which operates or would operate as a fraud or deceit,' may be liable for securities fraud." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011). Defendants' scheme liability challenges repeat their arguments concerning the misstatements claim, *see* MTD at 25, and fail for all the reasons stated herein. Moreover, Defendants also participated in deceptive acts beyond their misrepresentations.[23]

## IV.    CONCLUSION

For the reasons set forth above, Defendants' MTD should be denied in its entirety. Further, if the Court grants any part of the MTD, Plaintiffs respectfully request leave to amend. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

---

[22] Given the specificity of these disclosures, Defendants' citation to *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014) (MTD at 23-24) is inapposite, because there—unlike here—the corrective disclosures were merely only "disappointing earnings results," without more. Similarly, Defendants' other cited cases are distinguishable on the facts. *See Espy*, 99 F.4th at 540 (corrective disclosures were simply short reports "rely[ing] on public information"); *Yaron*, 2020 WL 6750568, at *7, 10 (channel stuffing case; no loss causation because, unlike here, Defendants' statements "did not implicate any causes for the revenue or sales" and thus no "proximate cause"). Finally, Defendants' argument that "macro-environment trends" (or other forces) caused Extreme's downward revenue guidance cannot be credited at this stage. *See City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1046 (N.D. Cal. 2018) (rejecting this same argument in loss causation analysis).

[23] Specifically, the FEs make clear that Defendant Rice as COO **orchestrated**, **directed**, and "***gave the marching orders***" regarding the channel stuffing and manipulative sales and inventory tactics used to inflate Extreme's revenues, and Defendant Brown followed suit as Senior Director of Worldwide Distribution Sales. *See, e.g.*, ¶¶112; 113; 115; 121-23; 129-32; 134-39.

LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT                                                                              25
CASE NO.: 3:24-CV-05102-TLT

DATED:  June 13, 2025

Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

*/s/ Lauren A. Ormsbee*
Lauren A. Ormsbee (*pro hac vice*)
David Saldamando (*pro hac vice*)
Alexandra E. Forgione (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
lormsbee@labaton.com
dsaldamando@labaton.com
aforgione@labaton.com

*Counsel for Lead Plaintiffs and
Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (Bar No. 250893)
Reed R. Kathrein (Bar. No. 139304)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

*Liaison Counsel for the Class*

**VANOVERBEKE MICHAUD & TIMMONY P.C.**
Aaron L. Castle (*pro hac vice*)
79 Alfred Street
Detriot, MI 48201
Tel: (313) 578-1200
Fax: (313) 578-1201
acastle @vmtlaw.com

*Additional Counsel for Oakland County Voluntary
Employees' Beneficiary and Oakland County
Employees' Retirement System*