LATHAM & WATKINS LLP
Melanie M. Blunschi (Bar No. 234264)
  *melanie.blunschi@lw.com*
Morgan E. Whitworth (Bar No. 304907)
  *morgan.whitworth@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Daniel R. Gherardi (Bar No. 317771)
  *daniel.gherardi@lw.com*
140 Scott Drive
Menlo Park, CA 94025
Telephone: +1.650.328.4600

*Attorneys for Defendants Extreme Networks, Inc., Edward B. Meyercord III, Rémi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, and Jonas Brown*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, on Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> EXTREME NETWORKS, INC., EDWARD B. MEYERCORD III, RÉMI THOMAS, CRISTINA TATE, KEVIN RHODES, NORMAN RICE, JONAS BROWN <br><br> Defendants. | Case No. 3:24-cv-05102-TLT <br><br> **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED CONSOLIDATED COMPLAINT** <br><br> Hearing:  August 12, 2025 <br> Time:     2:00 p.m. <br> Location: Courtroom 9—19th Floor <br> Judge:    Hon. Trina L. Thompson |

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | ARGUMENT | 2 |
|  | A. Plaintiffs Still Do Not Plead Facts Indicating Any Challenged Statement Was False Or Misleading When Made | 2 |
|  |    1. The Growth And Demand Statements Were Not Misleading | 2 |
|  |       a. There Is No Shortcut To Pleading Falsity | 2 |
|  |       b. The ACC Does Not Plead Improper Sales Practices | 4 |
|  |       c. Corporate Optimism Is Not Actionable | 6 |
|  |       d. The PSLRA Safe Harbor Applies | 7 |
|  |    2. The Backlog Statements Were Not Misleading | 8 |
|  |       a. Plaintiffs' Backlog Allegations Are Insufficient | 9 |
|  |       b. The PSLRA Safe Harbor Protects Backlog Statements | 10 |
|  |       c. The Backlog Statements Are Non-Actionable Opinions | 10 |
|  |    3. SOX Certifications Are Not Actionable | 10 |
|  | B. Plaintiffs' Opposition Does Not Salvage Their Deficient Scienter Allegations | 11 |
|  |    1. Plaintiffs Do Not Allege a Motive to Commit Fraud | 11 |
|  |    2. Plaintiffs Do Not Allege Intent to Deceive or Deliberate Recklessness | 12 |
|  | C. Plaintiffs Do Not Allege Loss Causation | 14 |
|  | D. Plaintiffs Fail To Plead Scheme Liability Under 10(b) | 15 |
|  | E. Plaintiffs' Control Claims Should Be Dismissed | 15 |
| III. | CONCLUSION | 15 |

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Berson v. Applied Signal Technology, Inc.*,
527 F.3d 982 (9th Cir. 2008) .................................................................................... 9, 10

*Charter Twp. of Clinton Police & Fire Ret. Sys. v. LPL Fin. Holdings*,
2019 WL 13178511 (S.D. Cal. Mar. 29, 2019) ................................................................ 14

*City of Sunrise Firefighters Pension Fund v. Oracle Corp.*,
2019 WL 6877195 (N.D. Cal. Dec. 12, 2019)................................................................... 5

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024) ............................................................................................. 13

*Farrar v. Workhorse Grp., Inc.*,
2021 WL 5768479 (C.D. Cal. Dec. 2, 2021) ..................................................................... 9

*Glazer Cap. Mgmt., L.P v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ............................................................................................. 13

*Hampton v. Aqua Metals, Inc.*,
2020 WL 6710096 (N.D. Cal. Nov. 16, 2020) ................................................................. 10

*Hatamian v. Advanced Micro Devices, Inc.*,
87 F. Supp. 3d 1149 (N.D. Cal. 2015) .............................................................................. 13

*In re Accuray, Inc. Sec. Litig.*,
757 F. Supp. 2d 936 (N.D. Cal. 2010) .............................................................................. 10

*In re Curaleaf Holdings, Inc. Sec. Litig.*,
519 F. Supp. 3d 99 (E.D.N.Y. 2021) .................................................................................. 8

*In re Extreme Networks, Inc. Sec. Litig.*,
2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)................................................................... 13

*In re Nvidia Corp. Sec. Litig.*,
2010 WL 4117561 (N.D. Cal. Oct. 19, 2010).................................................................... 15

*In re Plantronics, Inc. Securities Litigation*,
2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ............................................................ 3, 6, 7

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .......................................................................................... 13

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ............................................................................................ 11

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

iii

DEFS' REPLY ISO MOT. TO DISMISS.
AM. COMPLAINT
CASE NO. 3:24-cv-05102-TLT

*In re Solarcity Corp. Securities Litigation*,
    274 F. Supp. 3d 972 (N.D. Cal. 2017) .................................................................... 7, 11

*In re SolarEdge Tech. Inc. Sec. Litig.*,
    2024 WL 4979296 (S.D.N.Y. Dec. 4, 2024) ........................................................... 5, 7

*Khoja v. Orexigen Therapeutics Inc.*,
    899 F.3d 988 (9th Cir. 2018) ...................................................................................... 6

*Lamartina v. VMware, Inc.*,
    2023 WL 2763541 (N.D. Cal. Mar. 31, 2023)........................................................... 14

*Murphy v. Precision Castparts Corporation*,
    2017 WL 3084274 (D. Or. June 27, 2017) .............................................................. 3, 6

*Nat'l Junior Baseball League v. Pharm. Dev. Grp., Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) ............................................................................. 8

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ..................................................................................... 11

*Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*,
    2024 WL 4353049 (N.D. Cal. Sept. 30, 2024) .......................................................... 13

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ..................................................................................... 11

*Petersen v. Stem, Inc.*,
    2024 WL 4602710 (N.D. Cal. 2024) .......................................................................... 15

*Petersen v. TriplePoint Venture Growth BDC Corp.*,
    2024 WL 5384678 (N.D. Cal. Aug. 7, 2024) ................................................. 12, 14, 15

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
    2025 WL 556283 (N.D. Cal. Feb. 18, 2025) .............................................................. 14

*Plumbers & Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*,
    2024 WL 4251896 (N.D. Cal. Sept. 17, 2024) .......................................................... 15

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ..................................................................................... 8

*Scheller v. Nutanix, Inc.*,
    450 F. Supp. 3d 1024 (N.D. Cal. 2020) ....................................................................... 4

*Schultz v. Tomotherapy Inc.*,
    2009 WL 2032372 (W.D. Wis. July 8, 2009).............................................................. 9

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
    742 F. Supp. 3d 1003 (N.D. Cal. 2024) ............................................................... 12, 13

*See Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ................................................................................................ 4

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998) ............................................................................................. 3

*Sylebra Cap. Partners Master Fund Ltd. v. Everbridge, Inc.*,
   2025 WL 1938359 (9th Cir. July 15, 2025) ....................................................................... 4, 7

*Tellabs Inc. v. Makor Issues & Rts. Ltd.*,
   551 U.S. 308 (2007) .............................................................................................................. 5

*Waterford Twp. Police v. Mattel, Inc.*,
   321 F. Supp. 3d 1133 (C.D. Cal. 2018) ........................................................................ 3, 4, 10

**GLOSSARY**

| Term | Definition |
|---|---|
| ¶_: | Citations to the paragraph numbers in Plaintiffs' Amended Complaint |
| ACC or Amended Complaint: | Plaintiffs' Amended Consolidated Complaint for Violation of Federal Securities Laws, filed February 14, 2025, Dkt. No. 59 |
| CEO: | Chief Executive Officer |
| Challenged Statements: | Statements Plaintiffs allege to be false or misleading. For the convenience of the Court, the Challenged Statements are reproduced in chart form and appended to this submission as Appendix A. |
| Class Period: | July 27, 2022 through January 30, 2024, inclusive |
| CW: | Confidential Witness |
| Defendant(s): | Extreme Networks, Inc., Edward Meyercord III, Remi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, Jonas Brown, or any of the Defendants individually |
| Ex(s). or Exhibit(s): | Exhibits attached to the Declaration of Morgan E. Whitworth in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Consolidated Complaint filed concurrently herewith, which are public filings and statements that are incorporated into the Complaint and/or subject to judicial notice |
| Extreme or the Company: | Extreme Networks, Inc. |
| FE: | Confidential Former Employees who supposedly made allegations that Plaintiffs included in the ACC |
| FY22, FY23, FY24, FY25: | Extreme's fiscal years, including fiscal year 2022 (July 1, 2021 to June 30, 2022), fiscal year 2023 (July 1, 2022 to June 30, 2023), and fiscal year 2024 (July 1, 2023 to June 30, 2024) |
| Individual Defendants: | Edward Meyercord III, Remi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, Jonas Brown |
| Mot. or Motion | Defendants' Motion to Dismiss Amended Consolidated Complaint, filed April 15, 2025, Dkt. No. 74 |
| Opp. or Opposition | Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended Complaint, filed June 13, 2025, Dkt. No. 81 |
| Plaintiffs: | Lead Plaintiffs Oklahoma Firefighters Pension and Retirement System, Oklahoma Police Pension and Retirement System, Oakland County Voluntary Employees' Beneficiary Association, and County Employees' Retirement System |
| PSLRA: | The Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77k, 77l, 77z–1, 77z–2, 78a, 78j–1, 78t, 78u, 78u–4, 78u–5 |
| Section 10(b): | Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| Section 20(a): | Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |

## I.    INTRODUCTION

Plaintiffs' Opposition does nothing to undercut any of Defendants' dismissal arguments, and instead highlights the incongruity of Plaintiffs' securities fraud theory. Extreme achieved spectacular financial results during COVID, with revenues increasing by double-digit percentages in five consecutive quarters in 2022 and 2023. But this unprecedented demand, coupled with industrywide supply-chain issues, made it difficult to meet all of Extreme's orders, leading to growth in Extreme's order backlog. When demand cooled at the end of 2023, Extreme's revenues and order backlog returned to normal, and Extreme missed one quarter's revenue guidance.

Plaintiffs now concede that there was nothing "illicit" or "illegitimate" about Extreme's sales practices, yet still claim fraud because Extreme didn't tell investors that these sales practices—not an unprecedented pandemic—were purportedly the true cause of its $200m+ revenue growth during the Class Period. But Plaintiffs allege no facts supporting their implausible assertion—no facts showing when Extreme implemented the challenged sales practices, when and by how much they improved the company's financial results, or when and why Extreme suddenly abandoned these (supposedly effective) methods to trigger a stock drop. Instead, Plaintiffs rely on vague anecdotes from low-level FEs describing one-off or potential transactions. Even under the "lesser" standard Plaintiffs incorrectly claim applies, these anecdotes do not show that Challenged Statements broadly attributing Extreme's revenue growth to "strong demand" were misleading.

The Opposition also fails to rectify the fatal flaws in the ACC's backlog theory. Plaintiffs concede that Extreme accurately reported its backlog throughout the Class Period and repeatedly warned that its backlog orders (i) could be canceled, (ii) were an unreliable predictor of future revenues, and (iii) likely would shrink in 2023. Plaintiffs claim that Extreme knew its backlog orders were "not firm," but allege no facts to contradict the Challenged Statements, especially in light of Extreme's many contemporaneous risk warnings. Moreover, the backlog statements are non-actionable opinions and forward-looking statements protected by the PSLRA safe harbor, as they convey management's belief that Extreme's backlog would turn into revenue in the future.

Nor have Plaintiffs met their heavy burden of pleading an equally compelling inference of scienter on a Defendant-by-Defendant basis. The Opposition fails to rebut that Defendants lacked

DEFS' REPLY ISO MOT. TO DISMISS.
AM. COMPLAINT
CASE NO. 3:24-cv-05102-TLT

any motive to commit fraud, nor does it explain why Extreme's CEO would substantially *increase* his stock holdings during the Class Period just to suffer the same stock price declines as Plaintiffs. Plaintiffs' remaining arguments—access to information, "core operations," and management turnover—are shop-worn standbys that courts in this Circuit routinely reject as insufficient.

Plaintiffs also fail to plead that the challenged stock price declines were caused by the alleged misstatements. Neither the ACC nor the Opposition identifies a single securities analyst, auditor, journalist, or regulator who attributed Extreme's financial performance to unsustainable sales practices. And while analysts discussed the effect of normalizing customer demand and supply chains on Extreme's order backlog, there is no support for Plaintiffs' claim that the stock price dropped because investors believed the backlog was fraudulently overstated.

Finally, the scheme claim fails because it is the same as the misrepresentation claim, and Plaintiffs now concede there was nothing "illicit" about Extreme's sales practices that might constitute the requisite "manipulative or deceptive act" in furtherance of a scheme.

The ACC fails to plead securities fraud against any Defendant, and it should be dismissed.

## II.    ARGUMENT

### A.    Plaintiffs Still Do Not Plead Facts Indicating Any Challenged Statement Was False Or Misleading When Made

#### 1.    The Growth And Demand Statements Were Not Misleading

The Court should dismiss all of the Challenged Statements relating to demand and revenue growth, *see* Mot. at 9, because Plaintiffs do not allege that Extreme's reported financial results were inaccurate, do not dispute that demand for Extreme's products grew during the Class Period, do not allege particularized facts to support a channel-stuffing theory, and do not identify any portion of Extreme's revenue growth that is attributable to the alleged channel stuffing.

##### a.    There Is No Shortcut To Pleading Falsity

The Opposition admits there was nothing "improper" or "illicit" about Extreme's sales practices, and asserts "Plaintiffs' theory is not premised on alleging that the [alleged] conduct was itself fraudulent." Opp. at 5-6 & n.4. As Plaintiffs concede (Opp. at 6), pleading "illicit" channel-stuffing requires "sufficient corroborating details about the purported scheme," including

"[s]pecific transactions, specific shipments, specific customers, specific times, or specific dollar amounts." *Waterford Twp. Police v. Mattel, Inc.,* 321 F. Supp. 3d 1133, 1147 (C.D. Cal. 2018). Instead, Plaintiffs claim that statements accompanying Extreme's financial reporting (which Plaintiffs concede was accurate) were false because they "misleadingly attributed" the reason for revenue growth to "strong demand" and similar generic reasons, rather than "ongoing channel stuffing conduct." Opp. at 4-5. Plaintiffs claim that they do not have to establish every element of an "illicit" channel-stuffing claim under their theory, but cite only two cases in support. The Ninth Circuit frowns on channel-stuffing claims, describing them as nothing more than "speculation made in hindsight" because it is, at most, "the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998). Even if there is some ambiguous lower standard for Plaintiffs' claim, there is no precedent for securities fraud claims premised on allegations as thin as these.

Plaintiffs rely heavily on two cases (Opp. at 5) featuring undisputed facts showing that the defendants were engaging in improper, unsustainable sales tactics that materially affected the companies' revenues. In *In re Plantronics, Inc. Securities Litigation*, high-level FEs described the CFO commissioning an internal investigation during the class period, which concluded that the company was improperly channel stuffing. 2022 WL 3653333, at *2 (N.D. Cal. Aug. 17, 2022). One FE, a founding member of the investigation team, said that report drafts were circulated to the company's "most senior executives," including the individual defendants. *Id.* at *4. In *Murphy v. Precision Castparts Corporation*, on which *Plantronics* relies, plaintiffs detailed a "pull-in" scheme that depended heavily on Precision's customers agreeing to stock larger amounts of inventory. 2017 WL 3084274, at *3 (D. Or. June 27, 2017). One of Precision's largest customers announced a plan to cut inventory in half, directly impacting Precision's ability to pull in sales from that customer. *Id.* Nonetheless, defendants continued to assure investors that that customer's new inventory policy would not affect Precision's ability to meet guidance. *Id.*

In contrast, Plaintiffs do not allege any internal or external report revealing the existence of widespread channel-stuffing at Extreme. Nor do Plaintiffs allege any specific partner that

refused to accept inventory, or that such refusal directly impacted Extreme's revenue. *See* Mot. at 11-13; *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1040 (N.D. Cal. 2020) ("[N]on-specific allegations that are based almost entirely upon the statements of one confidential witness with limited personal knowledge do not adequately allege a fraudulent pull-in scheme[.]").  Under any standard, the bar for alleging a channel-stuffing claim is high, and Plaintiffs fail to clear it.

> b.   The ACC Does Not Plead Improper Sales Practices

Plaintiffs' allegations, premised solely on untimely, unreliable, hearsay-driven FEs, fail to show Extreme was engaged in unsustainable sales practices.  Mot. at 9-14.  The Opposition underscores the FEs' unreliability.  For instance, FE-1 claims Extreme was "stuffing" TD Synnex and Jenne at the end of each fiscal quarter and year.  Opp. at 6 n.5.  Setting aside the lack of dollar amounts or other details, FE-1 left Extreme a month into the Class Period.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (discrediting FEs not employed during relevant period).  FE-4's description of Westcon's alleged "agreement to buy Extreme's obsolete and end of life products" does not say when (if ever) Extreme and Westcon enforced this deal.  ¶¶ 151-54.  More importantly, FE-4 does not allege Westcon ever *stopped* buying Extreme's products or returned an excessive amount of products thereby affecting Extreme's revenues.

Plaintiffs accuse Defendants of "brush[ing] over the AC's detailed allegations" about FEs 2, 6, and 11.  Opp. at 7.  Not so.  **FE-2** claims Savage asked him to tell a customer to take inventory without a purchase order in July 2023, but because *Savage* completed the deal, FE-2 knows nothing about its terms, including whether a purchase order existed.  ¶¶ 181-82.  **FE-6's** account is notable for its vagueness:  he recalls "one partner" and a deal for "several millions" of inventory.  ¶ 175. And **FE-11** provides neither the partner nor the amount of inventory Extreme allegedly "forced" the partner to hold.  ¶ 177.  *See Mattel*, 321 F. Supp. 3d at 1147 (dismissing "channel stuffing" allegations that lacked corroborating details).[1]

Plaintiffs claim Defendants raise "fact-intensive challenges," Opp. at 7-8, but none of their

---

[1] The lack of specifics also distinguishes this case from Plaintiffs' supplemental authority.  *See* Dkt. 82-1; *Sylebra Cap. Partners Master Fund Ltd. v. Everbridge, Inc.*, 2025 WL 1938359, *1 (9th Cir. July 15, 2025) (publicly stated contribution would be $9-11 million in revenue when internal estimates showed contribution would actually be $20-25 million).

arguments work. ***First***, Plaintiffs assert their FEs support that channel stuffing affected revenues, citing FE-2 and an undated internal IM attached to a pre-Class Period email. *Id.* FE-2's claims of a pull-in scheme, "based upon his understanding," to make the quarter look more profitable than it was (¶ 168) include ***zero*** facts to show "the revenue generated through the allegedly coercive Sales Practices constituted a material portion of [Extreme's] revenue at the time each alleged misstatement was made." *City of Sunrise Firefighters Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *15 (N.D. Cal. Dec. 12, 2019) (rejecting FE allegations where none supported the materiality of alleged sales practices). The same is true for the whole ACC. *See* Mot. at 10-11.

***Second***, Plaintiffs ask the Court to ignore the disclosed reasons for revenue growth. Though the Court accepts Plaintiffs' allegations as true, the Court is also required to "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss," including documents "incorporated by reference" and "matters of which a court may take judicial notice." *Tellabs Inc. v. Makor Issues & Rts. Ltd.*, 551 U.S. 308, 322 (2007). And while Plaintiffs argue Defendants should have disclosed the "channel stuffing and manipulative sales practices at issue here," that only applies if Plaintiffs adequately allege channel stuffing, which they have not. Opp. at 8. For instance, in Plaintiffs' cited case, FEs reported specific times, dollar amounts, and customers seeking to cancel orders because they were saturated with inventory. *In re SolarEdge Tech. Inc. Sec. Litig.*, 2024 WL 4979296, at *3 (S.D.N.Y. Dec. 4, 2024). None of Plaintiffs' FEs allege that any partner canceled because they had too much product. In fact, the FEs report that partners ***agreed*** to take inventory (*e.g.*, ¶¶ 153, 167, 175), which tracks interim CFO Tate's explanation that distributors order product to have it "on hand and on order to be able to deliver customers when the demand hits." ¶ 416.

***Third***, Plaintiffs' theory is implausible: Plaintiffs suggest the channel-stuffing scheme began as early as 2017 and thus lasted some *six years*. *See* Mot. at 9-10; Opp. at 8 (only 13% of channel-stuffing schemes last over two years). As even Plaintiffs' cited case confirms, the Court need not accept "unwarranted deductions of fact or unreasonable inferences." *Khoja v. Orexigen Therapeutics Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (Opp. at 9). That includes Plaintiffs' claim that Extreme's eventual revenue loss was "evidence of the excess inventory in the stuffed channel,"

rather than the reasonable inference that the loss stemmed from the normalizing of a once-in-a-generation pandemic and related supply-chain disruptions.  This is a far cry from *Plantronics*, where defendants admitted that new sales tactics adopted at the start of the class period proved to be unsustainable.  2022 WL 3653333, at *11 (finding "strong inference that Defendants knowingly adopted the undisclosed sales practice as part of" a merger at the start of the class period).

*Fourth*, Plaintiffs try to discount Extreme's robust disclosures, which undercut their "undisclosed sales practices" theory.  Opp. at 9.  But each challenge fails:

- Plaintiffs claim Extreme sent "unwanted" and "not saleable" inventory, yet Extreme disclosed that announcing new products causes "increasing inventory levels of older products and exposing us to risk of product obsolescence." *E.g.*, Ex. 17 at 28.

- Plaintiffs allege Extreme hid that it offered rebates with no confirmed purchase order, but Extreme disclosed that distributors "submit rebate requests for the Company's pre-approval ***prior to*** selling the product to a customer." *Id.* at 45.

- Plaintiffs assert distributors could not return product until after the quarter ended, but they allege no specifics about why, how, or to what magnitude this impacted revenue.

- Plaintiffs argue Defendants would "force distributors to keep and hold the product" to "inflate Extreme's 'financial' numbers," but shed no light on what "financial numbers" were inflated (nor particulars about how rotating stock impacts those "numbers").

c.    Corporate Optimism Is Not Actionable

Another problem with Plaintiffs' narrowed theory is that the Challenged Statements are too generic to be actionable by omission.  The statements attributed Extreme's growth to broad trends (*e.g.*, "strong demand") without pointing to specific factors or revenue sources that could mislead investors.  Mot. at 14-15.  Plaintiffs cite *Murphy* and *Plantronics* to assert Defendants' "strong growth" and "strong demand" statements are actionable because the "undisclosed adverse information" may be important to investors.  Opp. at 10.  But again, both cases are distinguishable.  In *Murphy*, the court found statements that "the demand is there, the contracts are there, the schedules are there," "they are just doing a temporary destocking," and "the destocking goes away" could be objectively evaluated and verified.  2017 WL 3084274, at *10-11.  In *Plantronics*, defendants' statements about the market's "rapid adoption of recently introduced products" and that "solid results" demonstrated "the leverage available in the model that we have" omitted the ERM report's finding that channel stuffing was the true cause of revenue growth.  2022 WL

3653333, at *16. And in *SolarEdge*—also cited repeatedly—the defendants "attributed the record revenues in 2022 to 'the increase in power prices prior to the beginning of the Ukraine-Russia conflict and the accelerated increases ever since, as well as the expansion of [SolarEdge's] portfolio to include inverters, EV chargers, and batteries[.]'" 2024 WL 4979296, at *7.[2]

In contrast, Defendants' cited cases dismissed identical or nearly identical statements in the context of similar allegations. *See* Mot. at 14. For instance, in *In re Solarcity Corp. Securities Litigation*, the plaintiffs likewise alleged that (i) the company employed "overly aggressive and deceptive sales practices" to induce customers into entering contracts they later cancelled and (ii) that the company "would maintain long-inactive and infeasible contracts on the system as long as possible." 274 F. Supp. 3d 972, 980 (N.D. Cal. 2017). Yet the court held statements that "[d]emand remained as strong as ever," "Q2 was an amazing quarter," "incredibly strong sales," and "we [sic] very optimistic about our growth" non-actionable. *Id.* at 995; *see also In re SunPower Corp. Sec. Litig.*, 2018 WL 4904904, at *3-4 (N.D. Cal. Oct. 9, 2018) (holding "very strong demand" was nonactionable puffery despite allegations that defendants failed to disclose cancelled contract negotiations). The same result is warranted here. *See* Mot. at 14.

d.    The PSLRA Safe Harbor Applies

The forward-looking demand Challenged Statements are protected by the statutory safe harbor and should be dismissed. Mot. at 14-15. Yet Plaintiffs argue the Challenged Statements (1) are not forward-looking; (2) are unaccompanied by meaningful cautionary language; and (3) were made with actual knowledge of falsity. Opp. at 10-11. Each challenge fails.

***First***, the Opposition muddles forward-looking statements to seem present-tense. For example, Plaintiffs point to ¶ 356—which Defendants do not claim is protected. *See* Opp. at 10; Mot. at 14 (not citing Challenged Statement 1). Plaintiffs likewise selectively quote from ¶ 379 (Challenged Statement 17), but omit the relevant forward-looking language: "it ***will*** unlock an accelerated wave of product shipments and revenue growth ***over multiple quarters***." Opp. at 10-11; ¶ 379. And Plaintiffs strain to connect a statement about "record quarterly revenue" to a

---

[2] *Everbridge* is similarly distinguishable on the types of statements found actionable, and it also held that the statements "well down the path of rightsizing and integrating that business" and "integration is … going great" were inactionable puffery. 2025 WL 1938359, at *2.

separate, later Challenged Statement about looking at the "remainder of FY23." Opp. at 11. In reality, Thomas stated "the *continued improvement* in the supply chain environment" supported Extreme's "*further* confidence in our topline growth outlook." *See* Challenged Statement 15; *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) ("classic growth and revenue projections" are "forward-looking on their face").

*Second*, Plaintiffs' purported issues with Extreme's warnings lack merit. Plaintiffs' claim that Defendants "ignore" statements "where no cautionary language was provided" (Opp. at 11) overlooks that "not every public statement made by the Company need contain the full roster of disclosures detailed in the Company's security filings." *In re Curaleaf Holdings, Inc. Sec. Litig.*, 519 F. Supp. 3d 99, 108 (E.D.N.Y. 2021). And Plaintiffs' blanket assertion that Extreme's cautionary language was "general" disregards the actual disclosures. *See* Mot. at 3-4, 15 (quoting risk disclosures and cautionary language). As just one example, Extreme's FY23 10-K disclosed multiple reasons across at least eight pages why its revenue could suffer. *See* Ex. 17 at 15-22.

*Third*, Plaintiffs do not allege actual knowledge. *See infra* II.B; Mot. at 15, 18.

## 2. The Backlog Statements Were Not Misleading

The Opposition confirms Plaintiffs' failure to plead that the backlog statements were false or misleading when made. Mot. at 15-17. No facts show that any Defendant admitted to double- or triple-ordering, nor do Plaintiffs allege any distributor announced it had cancelled orders with Extreme. Instead, Plaintiffs point to a few FEs who insist it was "widely known" that Extreme's backlog was not firm—yet not *one* FE names an actual distributor who double-ordered, let alone when or in what quantity. *Id.* at 17. No FE claims to have any insight into or involvement in "reporting or calculating" the Company's backlog, either. *See Nat'l Junior Baseball League v. Pharm. Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 542-43 (D.N.J. 2010) (FEs lacked reliability where neither "had any involvement in the reporting or calculating" of company's backlog) (Opp. at 16).

Plaintiffs' own cases are instructive. In *Berson v. Applied Signal Technology, Inc.*, the backlog statements were misleading because they omitted that the backlog included contracts that had been halted by federal agencies' stop-work orders. 527 F.3d 982, 985 (9th Cir. 2008). The FEs supporting this claim knew about it: the orders "would have had the very obvious effect of

putting numerous employees out of work." *Id.* Similarly, in *Schultz v. Tomotherapy Inc.*, emails between employees and a customer showed the customer's orders hinged on receiving financing, and the employees "promised to return the full deposit" if the customer wanted to cancel. 2009 WL 2032372, at *14-15 (W.D. Wis. July 8, 2009); *Farrar v. Workhorse Grp., Inc.*, 2021 WL 5768479, at *2 (C.D. Cal. Dec. 2, 2021) (defendant misrepresented UPS deal after UPS announced it had placed a larger order with different company).

### a.    Plaintiffs' Backlog Allegations Are Insufficient

Plaintiffs concede Extreme warned investors that orders "could be cancelled for various reasons," that backlog is not "indicative of actual revenues for any future period," and that it did "not have binding purchase agreements." Opp. at 14. They claim that these warnings did not alert investors that some of the backlog included orders at "risk of being cancelled altogether." *Id.* But Plaintiffs have not adequately alleged that the backlog counted any such orders. *Cf. Berson*, 527 F.3d at 985 (defendant admitted to counting stopped work as backlog). Extreme's extensive risk disclosures defeat Plaintiffs' backlog omission claims. *See* Mot. at 5-6, 16-17.

Plaintiffs' claim that every backlog statement was false because "Defendants knew that orders were already being cancelled" fails because Plaintiffs do not plead with particularity that *any* statement was false when made. Opp. at 14. Plaintiffs emphasize Tate's May 17, 2023 statements that "these are real projects that we see" and that "we don't see double ordering." ¶ 418. Plaintiffs have alleged no facts to the contrary. FE-3 claims that "sometime in 2022," he "became aware of an increased spike" in cancellations only in Extreme's Latin America market, with "one cancellation" by an unknown US customer. ¶ 265. FE-7 speaks only in generalities about customers and time. ¶¶ 288-89. And FE-5 alleges that "end users placed orders for the same hardware 'all the time' with multiple suppliers," but does not say whether or when that happened at Extreme. ¶¶ 297-98. While Plaintiffs rely generally on FE-7's claims of a "10% hedge" discussion, the most they can do is guess the alleged discussion *might* have occurred in "mid-2022." Opp. at 13 n.13. Plaintiffs say nothing about whether FE-7 knew how Extreme calculated backlog, much less how FE-7 would know such information in mid-2022 when he was hired in March 2022 and was only then "tasked with examining [Extreme's] pricing strategy." ¶ 276; *see,*

*e.g.*, *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at \*15 (N.D. Cal. Nov. 16, 2020) (disregarding CW claims based on speculation with no "personal knowledge" in support).

### b. The PSLRA Safe Harbor Protects Backlog Statements

Defendants' backlog statements are also protected by the PSLRA safe harbor. Mot. at 17-18. *Berson* (Opp. at 14) supports this conclusion. There, the company defined backlog as "firm" because it "consist[ed] of anticipated revenues from the *uncompleted portions of existing contracts*." 527 F.3d at 985-86 (emphasis in original). Extreme defined its backlog as representing "confirmed purchase orders for products ***to be fulfilled and billed***," noting "[a]ctual shipments of products depend on the then-current capacity of our contract manufacturers and the availability of materials and components[.]" Ex. 17 at 10. Extreme added, "***all*** orders are subject to possible rescheduling by customers, and cancellations by customers, which we may elect to allow." *Id.*; *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 948 (N.D. Cal. 2010) (backlog forward-looking because it included contingent contracts). And Defendants' expressed "confidence" in the backlog is similarly protected by the PSLRA. *See* Mot. at 17-18 (citing *Mattel*, 321 F. Supp. 3d at 1150).

### c. The Backlog Statements Are Non-Actionable Opinions

Plaintiffs do not rebut that they have not alleged any Defendant disbelieved their own opinions. Mot. at 19; Opp. at 15-16. They argue only that Defendants' expressions of confidence in the backlog were either not opinions or actionable because Defendants had access to "omissions concerning the backlog." Opp. at 15-16. Neither assertion is correct. The Challenged Statements reflect Defendants' "feelings" of confidence or are prefaced by "think." *See, e.g.*, Statements 8, 15 ("confidence"); 21, 23 ("feel[ing] confident"); 40 ("feel good"); 45 ("I think"). And Plaintiffs have not alleged any "omission" with particularity. *See* Mot. at 15-17; *supra* II.A.2.a. Just the opposite: the ACC shows that, consistent with Defendants' repeated warnings, backlog grew as the supply chain situation worsened and began to decrease as the situation sorted itself out. *See* Mot. at 5-6. And backlog converted to revenue: revenue grew substantially during the Class Period and Extreme met or exceeded original guidance in six of seven quarterly reports. *Id.* at 5.

### 3. SOX Certifications Are Not Actionable

Plaintiffs' challenge to SOX certification fails because the statements are not material

misrepresentations, and Plaintiffs do not allege facts suggesting they were knowingly false when made. Mot. at 19. The Opposition ignores both arguments and instead challenges the "accuracy of financial reporting concerning revenues and backlog." Opp. at 16. That fails for the reasons above, including that Plaintiffs do not claim any financial reporting was inaccurate.

**B.      Plaintiffs' Opposition Does Not Salvage Their Deficient Scienter Allegations**

Far from providing "smoking-gun" evidence, Opp. at 17, Plaintiffs' Opposition confirms that their allegations do not raise a strong inference of scienter, particularly "with respect to each of the individual defendants." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014). Plaintiffs make broad assertions that the inference of scienter "is applicable to 'all named Defendants'" given their positions at Extreme and behavior common to most executives, *e.g.*, participation in meetings and access to reports. *See* Opp. at 17-23. But even those allegations support the more plausible inference that, in a rapidly changing and uncertain market, Defendants were reacting to the developing conditions and kept investors updated as necessary.

**1.      Plaintiffs Do Not Allege a Motive to Commit Fraud**

Plaintiffs cannot deny that their theory "does not make a whole lot of sense." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). Plaintiffs' theory "depends on the supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout once" Extreme's channel stuffing scheme and backlog cancellations were revealed. *Id.* But Plaintiffs fail to allege any effort to profit that might make such a scheme sensical. *Id.* Plaintiffs concede Defendants did not sell stock and try to distract from the fact that Defendants actually *acquired* stock—both of which negate any inference of scienter. *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012); *Solarcity*, 274 F. Supp. 3d at 1011 (N.D. Cal. 2017). Plaintiffs thus can only rely on "short term" bonuses paid in 2023, Opp. at 21-22 & n.21, yet do not explain how those bonuses would incentivize Defendants to undertake a channel-stuffing scheme many years prior. *See e.g.*, ¶¶ 110-30 (FE-1 allegations based on experience prior to leaving in August 2022). Plaintiffs also ignore that throughout the Class Period, Defendants' stock-based incentive compensation dwarfed any cash bonuses, meaning that stock ownership, or change thereof, would serve a much better indicator of any financial motivations. *Compare* Ex. 5

at 52 *with* Ex. 26 at 40 (CEO pay mix greatly weighted towards performance stock units); *see Petersen v. TriplePoint Venture Growth BDC Corp.*, 2024 WL 5384678, at *12 (N.D. Cal. Aug. 7, 2024) (large stock holdings aligned defendants' incentives with investors).

**2.      Plaintiffs Do Not Allege Intent to Deceive or Deliberate Recklessness**

Plaintiffs' other allegations do not, individually or collectively, show that any Defendant "intentionally misled investors, or acted with deliberate recklessness." Mot. at 20.

**FE Allegations, Internal Reports, Meetings.** Plaintiffs still rely on their "smoking-gun" evidence and FE allegations despite their narrowed theory that "it was the touting of revenue without disclosure of the underlying practices that was improper," not that "the conduct was itself fraudulent." Opp. at 5-6 n.4. The excerpts of FE-1's internal documents (which, curiously, are not attached to the ACC) say *nothing* about revenue impact; worse, they predate the Class Period. *See* ¶¶ 133-42. Plaintiffs do not even try to explain how these documents show that Defendants knew that any Challenged Statements were false or misleading. They instead claim all Defendants "would have been 'aware' of [FE-1's communications to Thomas] 'given their roles' in the Company." Opp. at 18. That theory does not add up, considering Thomas, Tate, and Rhodes were all C-Suite executives *at different times* (and in fact Rhodes and Thomas never overlapped), ¶¶ 45-47, and Rice is not alleged to have been responsible for any financial reporting, ¶ 48.[3]

The Opposition only underscores Plaintiffs' inability to plead scienter given the FEs' unreliability and lack of specificity. *See supra* II.A.1.b., 2.a.; Mot. at 21. Plaintiffs' cited cases are inapposite because those FEs were in positions to know that defendants knew of specific facts that contradicted the challenged statements. *See SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 742 F. Supp. 3d 1003, 1021-22 (N.D. Cal. 2024) (FE submitted complaint to defendants about issues with diversity recruitment); *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *28 (N.D. Cal. Mar. 21, 2018) (CW's conversations with defendant showed he was "personally aware of [] ongoing integration issues"); *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149,

---

[3] Plaintiffs repeatedly cite an IM discussing $3.8M of additional product to rotate, but provide no details about which quarter this allegedly affected. ¶¶ 139, 452; Opp. at 17. Even assuming the conversation related to metrics for 4Q22, $3.8M comprised only 1% of the $278.2M revenues and less than 1% of the $513M backlog reported in that quarter. *See* Mot. at 5; Ex. 6 at 5.

1163 (N.D. Cal. 2015) (finance director confirmed daily and weekly meetings with defendants to discuss ongoing issues). In contrast, the Opposition ignores FEs 4-5, 9-11 and cites only to interactions with Defendants who *did not* make any Challenged Statements. Opp. at 19-20.

**Alleged Admissions and Access to Information.** Plaintiffs claim "each" Individual Defendant admitted they were "close" to backlog and revenue growth and had access to internal reports. Opp. at 18, 21. But "general awareness" of the Company's finances does not help satisfy the PSLRA scienter requirement. *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 538-39 (9th Cir. 2024). In fact, it would be unusual if Defendants did *not* speak or know about something like revenue. Instead, the PSLRA demands "particular allegations which strongly imply Defendants' *contemporaneous* knowledge that the statement was false when made." *Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*, 2024 WL 4353049, *15 (N.D. Cal. Sept. 30, 2024) (Opp. at 18).

Here too, Plaintiffs' allegations fall well short of the cases they cite in support. *See id.* at *7 (defendant's admission of his personal involvement in cross-checks supported that he had contradictory information); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (executives admitted they monitored sales data "maintained in Salesforce databases" and plaintiffs alleged content of that data contradicted public statements); *Glazer Cap. Mgmt., L.P v. Forescout Techs., Inc.*, 63 F.4th 747, 772-74 (9th Cir. 2023) (senior executive CW alleged defendant accessed system and defendant implied the same publicly, and complaint "include[d] particularized details about the data to be reviewed"); *Wells Fargo*, 742 F. Supp. 3d at 1022 (company maintained "extensive records" for its interview process and management received related updates).

While Plaintiffs cite "pull-in" lists, weekly reports, databases, and listservs, they don't allege their content or how they contradicted Defendants' public statements. *See* ¶¶ 192-94 (no allegation Defendants personally accessed "pull-in" lists); ¶¶ 195-99 (no allegation Defendants personally received "weekly reports"); ¶¶ 200-04 (no specific allegation Defendants personally accessed databases); ¶¶ 206-08 (no allegation about what listservs showed). And though Plaintiffs point to Defendants' statements that they had "complete visibility" into backlog, that is "not the same as an admission that they used" any of the foregoing "reports" to "generate the information that formed the basis" of any alleged misstatement. *Charter Twp. of Clinton Police & Fire Ret.*

*Sys. v. LPL Fin. Holdings*, 2019 WL 13178511, at \*6 (S.D. Cal. Mar. 29, 2019).

**Core Operations.**  Plaintiffs' failure to allege either admissions "of detailed involvement in the minutia of the company's operations" or specific witness accounts showing actual knowledge dooms their core-operations theory.  Mot. at 22-23.  The ACC also lacks particularized allegations showing that any alleged "channel stuffing and manipulative sales conduct" primarily drove revenue growth such that it would be "absurd" for Defendants not to know of those practices.  *See supra* II.A.1.b.  The same is true for Plaintiffs' backlog allegations.  *See supra* II.A.2.a.

**Retaliatory Culture.**  Plaintiffs misstate *Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, claiming that this Court "has endorsed that 'a pattern of retaliation against employees who raised concerns about unlawful conduct supports scienter.'"  Opp. at 23 (quoting 2025 WL 556283, at \*14 (N.D. Cal. Feb. 18, 2025)).  But the quoted language summarizes plaintiffs' allegations; the Court concluded that "[t]aken alone, these allegations do not create a strong inference of scienter." 2025 WL 556283, at \*15.  Just as in *CareDx*, Plaintiffs fail to allege that any Defendant "played a role" in Extreme's purported retaliatory culture.  *See id.*; Mot. at 23.

## C.    Plaintiffs Do Not Allege Loss Causation

**January 25 and August 24, 2023.**  The Opposition abandons any connection between these dates and the growth and demand statements and ignores that Extreme's revenues *increased* on both dates.  Mot. at 23.  Instead, Plaintiffs attribute the price declines solely to revelations "that backlog had fallen."  Opp. at 24.  But Defendants warned backlog would decrease.  Mot. at 5-6; *see Petersen*, 2024 WL 5384678, at \*13 (no loss causation where "Defendants did not conceal any risks").  Plaintiffs' authority, *Lamartina v. VMware, Inc.*, is inapt; there, a "trend" of backlog disclosures led to an SEC investigation specifically into defendant's backlog practices.  2023 WL 2763541, at \*5 (N.D. Cal. Mar. 31, 2023).  Plaintiffs have alleged nothing like that here.  The January 25, 2023 disclosure is especially lacking.  *See* Opp. at 24.  Plaintiffs note that Extreme reported a 2% decrease in backlog, ¶ 328, accompanying increased quarterly revenue, ¶¶ 90-91, and a shortened timeline for future backlog normalization.  ¶¶ 327-28.  Plaintiffs do not explain how this information revealed any prior misstatement.  *See In re Nvidia Corp. Sec. Litig.*, 2010 WL 4117561, at \*12 (N.D. Cal. Oct. 19, 2010) ("a *correlation* and not a *causation*" is insufficient).

**November 1, 2023, January 8 and January 31, 2024.** Though Plaintiffs try to link negative financial reports and lowered guidance to their alleged fraud theory, these were not corrective disclosures. *See, e.g.*, *Plumbers & Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*, 2024 WL 4251896, at *11 (N.D. Cal. Sept. 17, 2024) (prediction of future headwinds was not "a viable corrective disclosure" because "[i]t strains credulity to reverse engineer this forward-looking observation into a retrospective analysis"). Nor did these disclosures reveal anything about either channel stuffing or past backlog commitments, Mot. at 24, and neither Defendants nor analysts mentioned the possibility that channel stuffing could have caused the revenue declines. *See* Opp. at 24-25. Analysts instead noted changing trends in Extreme's growth. *See* ¶¶ 350-52.

Plaintiffs argue that the Court cannot credit the impact of "'macro-environment trends' (or other forces)." Opp. at 25 n.22. Yet courts regularly consider "other possible events" that may "contribute[] to the alleged loss or alleged decline in stock value." *Petersen*, 2024 WL 5384678, at *13. And Plaintiffs' failure to "address the far more plausible reason" for Extreme's stock drop equates to a failure to allege loss causation. *Nvidia*, 2010 WL 4117561, at *12.

**D.    Plaintiffs Fail To Plead Scheme Liability Under 10(b)**

Plaintiffs' scheme claim relies on the same alleged practices that underlie their Rule 10b5-(b) claim and thus fails for the same reasons. *See* Mot. at 25. Plaintiffs' Opposition makes only a cursory attempt at differentiating their scheme claim, Opp. at 25, without addressing what "manipulative or deceptive act" Defendants undertook "in furtherance of the scheme." *Petersen v. Stem, Inc.*, 2024 WL 4602710, at *12 (N.D. Cal. 2024). Plaintiffs' admission that Extreme's sales practices were not "illicit," Opp. at 5, confirms that the allegations of "channel stuffing," *id.* at 25 n.23, fail to establish that Defendants engaged in any separate fraudulent scheme. *See Stem*, 2024 WL 4602710, at *12 (allegations "consistent with the defendants' normal course of business" inadequate to allege scheme liability). The scheme liability claim should be dismissed.

**E.    Plaintiffs' Control Claims Should Be Dismissed**

Plaintiffs do not plead a primary violation, so their Section 20(a) claim fails. Mot. at 25.

**III.    CONCLUSION**

Defendants respectfully request dismissal of Plaintiffs' Amended Complaint.

Dated: July 28, 2025

Respectfully submitted,

LATHAM & WATKINS LLP

By /s/ *Melanie M. Blunschi*
    Melanie M. Blunschi (Bar No. 234264)
     *melanie.blunschi@lw.com*
    Morgan E. Whitworth (Bar No. 304907)
     *morgan.whitworth@lw.com*
    505 Montgomery St., Suite 2000
    San Francisco, CA 94111
    Telephone: +1.415.391.0600

    Daniel R. Gherardi (Bar No. 317771)
     *daniel.gherardi@lw.com*
    140 Scott Drive
    Menlo Park, CA 94025
    Tel.: +1.650.328.4600

    *Attorneys for Defendants Extreme Networks, Inc., Edward B. Meyercord, III, Rémi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, and Jonas Brown.*