Pages 1 - 66

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Trina L. Thompson, Judge Presiding

```
STEAMFITTERS LOCAL 449 PENSION )
& RETIREMENT SECURITY FUNDS, on)
Behalf of Itself and All Others)
Similarly Situated,,          )
                              )
          Plaintiff,          )
                              )
  VS.                         )    NO. 3:24-cv-05102-TLT
                              )
EXTREME NETWORKS, INC., EDWARD )
B. MEYERCORD III, RÉMI THOMAS, )
CRISTINA TATE, KEVIN RHODES,   )
NORMAN RICE, JONAS BROWN,      )
                              )
          Defendants.         )
_____)
```

San Francisco, California
Tuesday, August 12, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

LABATON KELLER SUCHAROW LLP
140 Broadway
New York, New York 10005
BY:  **LAUREN A. ORMSBEE, ATTORNEY AT LAW**
**DAVID SALDAMANDO, ATTORNEY AT LAW**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
Official Reporter, CSR No. 12219

**APPEARANCES**:   (CONTINUED)

For Defendants:

LATHAM & WATKINS LLP
505 Montgomery Street - Suite 2000
San Francisco, California  94111
BY:  **MORGAN E. WHITWORTH, ATTORNEY AT LAW**
     **MELANIE M. BLUNSCHI, ATTORNEY AT LAW**

LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, California 94025
BY:  **DANIEL R. GHERARDI, ATTORNEY AT LAW**

Also Present:       **Tom Reynolds, Head of Litigation**
                       **for Extreme Networks, Inc.**

**Tuesday - August 12, 2025**                                **2:04 p.m.**

                    **P R O C E E D I N G S**

                         ---oOo---

THE COURTROOM DEPUTY:  All rise.  Come to order.
Court is now in session.  The Honorable Trina Thompson
presiding.

THE COURT:  Thank you.  You may be seated unless
you're presenting.

THE COURTROOM DEPUTY:  Now calling case Number
24-cv-05102, Steamfitters Local 449 Pension & Retirement
Security Funds vs. Extreme Networks, Inc, et al.

Counsel, will you please come forward to the podium and
state your appearances beginning with the plaintiffs.

MS. ORMSBEE:  Good afternoon.

THE COURT:  Good afternoon.

MS. ORMSBEE:  My name is Lauren Ormsbee.  I'm with
Labaton Keller Sucharow, here on behalf of the plaintiffs The
Oklahoma Police and Fire Pension Funds and the Oakland County
Funds.  With me today is my colleague David Saldamando.

With Your Honor's permission, we will try to split the
argument up a bit.  Mr. Saldamando is a 2020 graduate, so we're
trying to give extra argument, so he'll be talking as to issues
about scienter and anything you would like to hear about the
request for judicial notice, and I'll cover the rest of the
elements.

Thank you.

THE COURT: All right. Thank you.

MR. WHITWORTH: Good afternoon, Your Honor. Morgan Whitworth of Latham & Watkins on behalf of defendants. With me are my colleagues Melanie Blunschi and Daniel Gherardi, and our client Tom Reynolds who is Extreme Networks' head of litigation.

THE COURT: Thank you. Good afternoon.

All right. You may be seated if you're not presenting.

Before the Court is the defendants' motion to dismiss the amended complaint found at ECF 74. There's also a request for judicial notice, and the judicial notice goes to the facts. It may be helpful to start with that portion of the filings.

After review and consideration of the motion, the Court will be reaffirming court dates. And I understand that counsel are requesting that the further case management conference -- that we vacate September 4th and that we move it to September 18th, 2025.

I am further aware that that would place the joint statement to September 11th. And just as a gentle reminder, the class certification motion is due January 12th, 2026.

When you are arguing and when you get to the portion in which there's a request, if the Court were to grant this motion -- and you should cover all your bases -- if the Court were to grant the motion on the amended complaint to dismiss

and counsel felt leave to amend was not futile and both parties will argue in regards to the same, I may set the date of either August 29th or September 4th as the date for an amended complaint should the motion be granted.

Now, then --

MS. ORMSBEE:  Your Honor?

THE COURT:  Yes, Ms. Ormsbee?

MS. ORMSBEE:  If I could just briefly be heard on that.  I mentioned it before.  We'd ask that it not be September 29th.  Mr. Saldamando, who is a chief architect of this, will be on his honeymoon --

THE COURT:  I didn't say September 29th.

MS. ORMSBEE:  I'm sorry.  August 29th.  Mr. Saldamando will be on his honeymoon out of the country and I'll also be out of state on vacation, so we'd ask that it not -- if it comes to the fact that we do need to amend the complaint, and --

THE COURT:  Counsel, I'm letting you know the dates so that you can, when you get to that portion of your argument, address that; and which is the most appropriate date, whether September 4th would be a date in which an amended complaint could be filed if the Court were to grant the motion.

MS. ORMSBEE:  Understood.

THE COURT:  But keep in mind that I'm also looking at your class certification motion date and further case

management date, and so I want you to have a moment of reflection, consult your calendar, and when you get to that portion in your argument, to proffer any suggestions you may have at that time.

**MS. ORMSBEE:**  Thank you, Your Honor.

**THE COURT:**  All right.  You're welcome.

Now, then, this is defendants' motion.  You may begin.  Each side will be given 45 minutes, 30 minutes of presentation and 15 minutes to respond.  That will take us into an hour and a half.

The courtroom deputy will be monitoring your time.  If you know that you do not need the entire amount of time for your initial argument, given the PowerPoints and the answers to your questions in writing, please be mindful and surrender that time so that you can address all the issues, including the motion; the request, if any, for leave to amend; and then, finally, with regards to any future dates only for case management and if the Court were to grant leave to amend, the date by which the parties would be asking that the amended complaint be filed.

All right.  With that having been said, Counsel for the defense.

**MR. WHITWORTH:**  Thank you, Your Honor.

May it please the Court, Your Honor, this case should be dismissed.  It features none of the usual indicia of fraud.

There's no SEC investigation, there's no restatement, no media or analyst suspicions of false statements or financial reports; no insider trading.

Indeed, the financial information that's at the heart of this case, Extreme's revenue growth and order backlog data, are not alleged to be false.  The numbers themselves are not alleged to be false.

I would like to begin with the questions that the Court posed this morning; and I understand that we provided a written submission to the Court, but I do want to add a little bit of color to each of those questions to begin.

Starting with the Court's first question about the standard for pleading channel stuffing, it is defendants' position that there is a clearly established way to plead channel stuffing in the Ninth Circuit.  That requires specific allegations about transactions, shipments, customers, times, dollar amounts, those sort of corroborating details that lay out the channel stuffing scheme.  If plaintiffs can't allege that, then it's not channel stuffing.

The reason the Ninth Circuit has this standard is because the Ninth Circuit in the *Steckman* case has characterized channel stuffing as being -- channel stuffing claims as being susceptible to speculation made in hindsight.

So I understand that the plaintiffs have largely abandoned an attempt to plead this sort of what they call illicit channel

stuffing and that there are two cases, two district court cases, in the Ninth Circuit that have endorsed this approach. But I want to be clear that if the plaintiffs aren't trying to meet the specific pleading requirements that I just set out, which come from the *Mattel* case, among others --

THE COURT: How would you distinguish this case from the ones that, if at all, are the ones cited by the -- by the plaintiffs, keeping in mind that it may be persuasive authority, it's not from the Ninth Circuit or from the Supreme Court, but if it -- if the Court were to entertain it or thought it was persuasive authority, how would you distinguish it, if at all?

MR. WHITWORTH: Certainly, Your Honor. I'll start with *Plantronics* as I think that's the case they rely on the most.

There's four bases to distinguish it. First, the challenged statements in *Plantronics* are far more specific than what we're dealing with here. In this case, the allegedly misleading statements are things like "strong demand"; right? So Extreme reports revenue numbers. Plaintiffs do not dispute that those revenue numbers are accurate. Then Extreme says those revenue numbers are the result of strong demand for our products.

In *Plantronics*, the statements were things like "dividends from a merger and customer adoption of recently introduced

products."  So much more specific bases are being offered for the growth than was offered by Extreme in these cases.

That's part of the reason we argue that many of Extreme's statements are the sort of corporate optimism or puffery that investors do not rely on; and, in fact, we cite cases in our briefing where that exact phrase, "strong demand," has been held to be puffery.

**THE COURT:**  Can I ask one more question?

This was during COVID where things were somewhat different and just going through the grocery store, trying to get items and being concerned about supplies and whether those items would be on the shelf.  Does the fact that this occurred during COVID have any impact on the analysis?

**MR. WHITWORTH:**  Absolutely.  As Your Honor points out, we lived that.  We dealt with those same supply chain -- I remember I was trying to buy a bunch of furniture at that time, and it took months to get a couch.

So, you know, we had that very experience of not being able to forecast when the supply chain situation would resolve, and Extreme had that too.  And Extreme had the additional problem of their customers trying to do that same sort of forecasting for what their customers, the end users, would want to buy and in what quantities and on what timelines.  So I do think that's a very important factor in this case, the COVID -- the post-COVID supply chain issues.

Also, the fact that Extreme Networks is in the digital networking business, that business took off, I mean, across the industry during that time period.

The second, I think, basis I want to focus on with *Plantronics*, and I'll introduce the -- some of the other cases as well here, but the allegations of channel stuffing are much more specific and our focus in *Plantronics* are different in kind not just in degree.

So there's three sort of ways. Number one, in *Plantronics*, the channel stuffing was alleged to be new. It was initiated as part of the merger between Plantronics and the company that it bought.

Now, that's important because in this case, the supposed channel stuffing conduct started years before the class period. According to one of their former employees witnesses, maybe as early as 2017. And plaintiffs say that the channel stuffing conduct didn't affect Extreme's revenues until the class period, until we were in that post-COVID era of supply chain uncertainty that Your Honor pointed out.

The second factor in *Plantronics* is that the company subsequently admitted that the channel stuffing had a significant impact on revenues. They came out and said, "Our channel was oversupplied and we're writing down our channel inventory as a result of this oversupply."

And then the third thing is that the company admitted that

the channel stuffing was unsustainable.  So they got feedback from their customers.  It took about six quarters, and they said, "That's it.  We can't do this anymore."  And then they fired the guy, the VP, who was responsible for putting in that channel stuffing program at *Plantronics*.

Here, again, you've got a six-year or more alleged channel stuffing scheme.  They don't say why it suddenly started to cause this massive uplift in revenues.  I mean, we're not talking about a few million dollars here either.  Extreme's revenues went up by about $200 million from 2021 to 2023.  And there's just nothing in the complaint that would show when, why, or how the channel stuffing that they allege caused that massive revenue increase.

Another, I think, important basis for distinguishing *Plantronics* is on scienter.  In that case, the chief financial officer of *Plantronics* commissioned an internal investigation into channel stuffing.  The investigator provided regular readouts to management and the board of Plantronics, the audit committee of Plantronics; and the investigation confirmed that, yes, there is some channel stuffing going on here.  Again, nothing like that at Extreme.

And then on loss causation, and I think Your Honor got to this with a question later on, I think it was your fourth or fifth question.  In *Plantronics*, the disclosures closely matched the misstatements.  At the end of the class period, the

company admitted that it had migrated to a new sales practice after this merger, and that that new sales practice caused significant channel inventory buildup.  And then two weeks after that disclosure, the company publicly fired the executive that led the channel stuffing scheme.  That's what's drove the stock drop in *Plantronics* as a clear one-to-one match between what caused the stock to drop in *Plantronics* and the challenged statements.

The other case that the plaintiffs rely on quite a bit is *Murphy v. Precision Castparts Corporation*.  *Murphy* is also distinguishable and the timing is important in Murphy too.  So in that case, the company supposedly had a scheme of pulling in sales, so convincing their customers to take product earlier than they wanted to.  That was all rolling along just fine until, in June of 2013, the president of one of the Precision Castparts Company's biggest customers, which was the Rolls Royce Aerospace Division -- you know, they make those big jet engines that go in the Boeing and Airbus planes -- and Rolls Royce said, "Hey, we're going to stop holding inventory. We're just going to get these parts when we need them.  In other words, you can't channel stuff us anymore.  You can't sell us products that we're not ready for."

The executives at Precision Castparts knew that.  They knew that the plan to provide excess inventory was falling apart and, yet, they still went out to the market and they said

that Rolls Royce policy was temporary, that it was modest de-stocking. That's completely different from the facts on the ground as alleged by the plaintiffs in that case.

Again, here, compare temporary inventory policy and modest de-stocking, so those are the representations in Murphy, with strong demand. That is what you have here.

The other -- another factor in *Murphy* that's important, analysts noticed this and they questioned the company extensively about the failure of its pull-in strategy, and the plaintiffs in *Murphy* also alleged significant insider trading by the executives in that case.

THE COURT: As you're making these distinctions, can you talk to how a cloud-based industry delivers their products both to the direct customer, distributors, retailers? How is it that the items are actually distributed in relationship to this lawsuit and their perceptions of channel stuffing?

MR. WHITWORTH: So Extreme does have a hardware and a software business, so they do provide networking equipment solutions. Like, they -- this Court has a wi-fi network that I'm sure is very advanced. That's what -- no, maybe not.

But a lot of Extreme's customers do have very advanced wi-fi networks. So you might set up a network for a university or hospital, something like that. So there is the hardware component and there is the software component as well. So those are the end users.

But Extreme also has these large distributors who are in between who try to keep enough stock on hand to be able to provide that equipment when necessary to those end-user customers.  And so a lot of Extreme's business is driven by, and historically especially, was driven by those end-user customers.

During the COVID area when their supply chains are, frankly, in shambles, those distributors, and I think this was an industry-wide thing, wanted to make sure that they had enough product and those end users also were deploying product at a much greater rate.  Right?

So what -- that, I think -- I'm not sure if I'm answering Your Honor's question, but the supply chain here is complicated here because there's the intermediate customer and the end-user customer and there's also a hardware component and a software component.

One thing I do think is interesting, I'm just thinking about plaintiffs' two theories -- right? -- there's this channel stuffing theory, which is you had all this excess inventory that you were forcing onto your customers that they didn't want and that they were potentially going to return.  Although, I note that there are not really specifics around that.

At the same time, they say that you have this massive order backlog, orders that your customers have asked you to

fulfill that you are unable to fulfill because you don't have enough inventory.

And I think those are intentioned.  I don't really understand how Extreme can be guilty of pushing unwanted inventory and at the same time also having $500 million worth of order backlog.

**THE COURT:**  Thank you.  I think you anticipated why I asked the question.

You may proceed.

**MR. WHITWORTH:**  Thank you, Your Honor.

I do think now is a good time to touch on scienter briefly.  The Court -- one of your questions was about this, and I also think this incorporates some of your questions about the request for judicial notice.

I want to say at the outset, we don't believe that we need the documents that we requested judicial notice of or that are incorporated by reference, we don't think we need those to win this motion.  However, we do think they are properly subject to judicial notice or most of them are incorporated by reference, and the handful that aren't are properly subject to judicial notice.

I want to focus specifically on the stockholding data, and I think this is what Your Honor was getting at in the scienter section of your questions this morning.

There is a nearly unbroken string of Ninth Circuit cases

that take notice of SEC filings that contain stockholding information and that hold that increased stock ownership negates scienter.

It's undisputed that Extreme -- that the executives did not insider trade or, you know, try to profit off of this scheme by selling stock.  However, plaintiffs do allege that Extreme's executives had a financial motive to do this insider trading and backlog reporting scheme, whatever you want to call it.

And so that's why we think it's imperative that the Court do consider the stockholding data and the lack of any trades and the fact that Extreme's CEO increased his stockholdings over the course of the class period.  And we cited a number of cases.  My personal favorite is Your Honor's case, the *TriplePoint Venture* case from last August, just about a year ago, actually.  And in that case, the Court found it persuasive that the defendants -- one of the defendants increased stockholdings.

Jumping around a little bit, I do think it's important to talk about the plaintiffs' backlog theory unless the Court has any further questions on scienter.

THE COURT:  Well, the knowledge issue of whether the company's officers knew of the process, and I haven't heard you mention any of the former employees yet, so I will wait.

MR. WHITWORTH:  I'm happy to do that now.  I think --

I think that's a good -- to stay on scienter.  I think that makes sense.

So the former employees in this case are, for the most part, lower-level folks who do not allege specific information inconsistent with the challenged statements, and that part's important, going to the executives.

We don't dispute that Extreme's leadership had access to information about its order backlog.  We do dispute that Extreme's senior leadership, the folks making those challenged statements had any hint of knowledge that there were going to be order cancellations and backlog decreases several months into the future.

I want to focus on the primary case plaintiffs cite for that argument, which is the *Berson* case.  In *Berson*, that was a backlog case, the company was provided -- had in its possession stop-work orders for key contracts with government customers.  Notwithstanding those stop-work orders, first, the company went out and reported backlog numbers that included revenue from -- anticipated revenue from the stop-work contracts.  So in *Berson*, the actual reported backlog data was falsifiable by the fact that they had received these stop-work orders.

Nothing like that here.  Instead, plaintiffs' backlog theory is that:  Well, you've reported several hundred million dollars of backlog.  We know that it's not revenue yet.  We know that you've advised us not to treat it as revenue, but we

think customers, because we had these FEs, who say that sometimes customers double order.  There's no evidence that that went to the senior executives.

THE COURT:  Was there any indication that there was more supply than was actually being demanded or any evidence based on the complaint that's been filed that there was a declining demand or that global supplies were disrupted during this period and that was known to the officers that this was happening?

MR. WHITWORTH:  There are, and we don't dispute that later in the class period that information became available and Extreme promptly reported it.  So --

THE COURT:  How much later?

MR. WHITWORTH:  In -- I want to say it's in the middle of -- middle of the class period.  I don't have the exact date.

THE COURT:  So middle of 2023?

MR. WHITWORTH:  Middle of 2023, right.

So Extreme in, I believe it was, April or May of 2023, first reported that backlog had decreased significantly.  But in our briefing, there were multiple points where the company -- we note that there were multiple points where the company told investors, number one, not to rely on backlog as a predicter of future revenue, but also said that backlog is going to decrease.

Now, the company thought backlog would start to decrease

or normalize, as they put it.  Because, remember, backlog shot up during the COVID supply chain era, and then the company thought it was going to feather back down to what's normal for Extreme, around a hundred million dollars at a time.  Extreme thought that would happen in 2025.  They were wrong.  It happened at the end of 2023, or end of Extreme's fiscal 2023, so calendar was the middle of 2023.  So that's the part that Extreme got wrong, when backlog was going to normalize, come back to Earth.

I'll note you asked about the former employees.  None of the former employees identify specific orders that were known to Extreme to be infirm or unlikely to convert to revenue. We've put on our Slide 10 a couple of examples of the FE allegations.

These FEs were not involved in reporting or calculating or analyzing Extreme's backlog.  They weren't the ones who were saying, "Hey, CFO, go say this about backlog."

And the claims that they do make that -- you know, things like it's widely known that backlog is going to decrease or that end-users place double orders for the same hardware, quote, all the time, that's not specific to any customer, transaction, period of time, anything like that.

They cite Former Employee 3.  It's I believe paragraph 265.  He said that there were a lot of cancellations in Extreme's Latin America market and also one cancellation by

a major U.S. end customer, but then FE-3 explained that Extreme was not expecting these cancellations.  So even their FEs are inconsistent with the knowledge element that they need to show for the backlog.

And remember, just to frame it a little bit more, the allegation is not that when Extreme reported $550 million of backlog it actually had $250 million of backlog.  Not -- that's the *Berson* allegation.

What we have here is Extreme reported $550 million of backlog.  It had contracts with customers for that amount.  But Extreme should have been more pessimistic about how likely that backlog would be to convert to revenue later on.  And I think that's a different allegation in kind from what's in *Berson* and what's in some of the other backlog cases.

A related point to that, we also believe that the backlog statements are protected by the safe harbor.  Now, backlog can be a present-tense statement, that's what *Berson* held, if you're talking about this -- again, the specific backlog number; right?

But the alleged fraud here is not the specific backlog number; it's how likely is it to convert to revenue down the road.  And so on Slide 11 of our presentation a lot of the backlog numbers -- a lot of the backlog statements are forward-looking and focused on, you know, the remainder of 2023, second half of 2023, talking about the expectation that

the backlog numbers will come down, but not at such a pace that it would endanger Extreme's revenue growth forecast.

And that's the important part here; right?  When Extreme talked about backlog, it was usually in the context of its revenue forecast, which is a quintessential forward-looking statement and saying, "Hey, we think all this backlog is going to convert to revenue that's going to allow us to meet our revenue guidance."  And for five of the six quarters they met their revenue guidance.

So that issue with the backlog is just that they didn't forecast how quickly it was going to come down, and that's -- defendants' submit that's not fraud.

THE COURT:  So if the -- if the projection failed to convert to actual revenue, is your position that it was a risk that was known or that it was a risk that had been somehow conveyed and that this was just a confidence statement?

MR. WHITWORTH:  Definitely.  And Your Honor introduces two -- I think two important points.  Number one, there were extensive disclosures related to backlog.  We summarized some of them on Slides 8 and 9.

Extreme told investors not to assume that backlog at any particular date is going to be indicative of actual results.

Extreme told investors that orders are subject to possible rescheduling or, under certain circumstances, cancellations.

And Extreme told investors that there aren't binding

purchase commitments from its major customers.  So, you know, all of this sort of "I put investors on notice that, you know, you need to watch this space and monitor what Extreme -- what is happening with Extreme's backlog."  And that's why Extreme was reporting backlog and was -- talked about it so much, frankly, because they knew it was important to investors.

And so Extreme -- and, again, Extreme told investors, "Hey, the backlog is going to come down."  As soon as it started to come down, same thing, Extreme kept updating investors.

The opinion piece, and I think Your Honor touched on this just now, many of Extreme's statements related to backlog are couched in opinion language:  So we feel backlog will start to normalize throughout 2024 and into Q1 of 2025.  We feel good about the level of backlog we have.  We think in 2025 we're going to see mid-teens growth, which, again, is related to backlog.  I think it's fair to say that our backlog, as it relates to distribution, has normalized.

So this is all on our Slide 12.  Quintessential opinion language.

They're not saying, "We are dead certain that all of this backlog is going to convert to revenue."  Even if they had said that, I think that would be a forward-looking statement.  But it's even more -- it's couched in opinion language, and there's no allegation that Extreme knew that there were facts

inconsistent with those opinions.  You know, that "We feel good about the level of backlog we have."

And, again, the dispute is not Extreme assured investors backlog would never go down.  The dispute is this happened a little bit faster than Extreme predicted.  And so that is -- that falls under the opinion framework laid out by the Ninth Circuit in the *Align Tech* case.

THE COURT:  All right.  I just want to check your time.

MR. WHITWORTH:  Sure.

(Pause in proceedings.)

THE COURT:  Two and a half minutes.  I have one question, so I'm going to hold your time for a second.

When I think of channel stuffing, I think of situations where the company is inducing purchasers to increase substantially their prior purchases before they would normally do in the normal course of business, and then that the company knows that they can't really service that inducement; that they're getting people to increase demand so it looks like things are moving forward, moving forward in the hopes that they're going to be able to have the services or the items available for the use by the customer, and the customer psychologically starts to want it even more because it's not available.

So when I think of safe harbor provisions, I'm also

looking at former employees, what they had to say about what was going on within the company; what was being shared; what was being shared with your officers; and was there not only actual knowledge of, perhaps, wrongdoing, if the Court were to believe there was channel stuffing -- which merely channel stuffing by itself might not be enough, but juxtaposed to the -- if there were overstated earnings or whether there was some reckless regard -- disregard in that analysis.

So I wanted to be transparent so when we give you your last 15 minutes, I do want you to spend some time talking about the former employees and whether they contribute to this analysis in any form or fashion, or whether it falls short, or whether there's some information that could be considered whereas others not.

I think about -- I think it was Justice Ginsburg who said something to the effect that the facts have to be particular enough to raise a strong inference of conscious or reckless disregard; that I'm looking at these different explanations and are there innocent explanations and are there explanations that kind of point towards wrongdoing and they have equal weight or greater weight on the side of scienter.

So I'm looking at the holistic evaluation, not just any one thing, but the entire set of circumstances and whether, you know, there were people who were doing what they call price gouging where they were elevating prices because they knew

during COVID there was going to be this huge demand and they were getting profit that way.

So I'm thinking about all of what was organically happening at that time, and I want to be real transparent so that you know what I'm thinking about as I'm looking at this case.

All right.  So you have two and a half minutes remaining, and then I'll ask that you surrender the podium to the plaintiff to respond.

**MR. WHITWORTH:**  Thank you, Your Honor.

And I do want to spend my last two minutes touching on the former employees and, of course, I'm sure Ms. Ormsbee is going to have a little bit to say about them.  And on Slide 5 we outline some of the allegations that the former employees make.

Briefly, Former Employee 1 is the star witness.  He's the one who supposedly supplied a letter or e-mail to plaintiffs' counsel that they reference in the complaint.  Former Employee Number 1 left Extreme one month into the class period.  He has no idea what the individual defendants knew or were told during the class period.

**THE COURT:**  Now, Former Employee 1 started with the company when and left in August?

**MR. WHITWORTH:**  Left in August of 2022.

**THE COURT:**  And when did --

**MR. WHITWORTH:**  And he started with the company long

before that.  He's the one who said that the supposed channel stuffing might have started during a prior CFO's tenure, which we believe was sometime in 2017.

THE COURT:  All right.

MR. WHITWORTH:  So he was there for a long time, knew a lot about how the company ran up to when he left.

And it's interesting that he's their primary source on the supposed channel stuffing and that everybody knew that there was channel stuffing, and yet they don't allege that channel stuffing was -- created this massive revenue spike until after he left the company.

And if -- I know my time is short, but if the Court would look at the paragraphs describing the smoking gun e-mail that FE-1 provided, it's paragraphs 133 to 139, he's speaking in generalities.

These aren't, you know, "$20 million of revenue was secured through channel stuffing in the second quarter of 2023."  No.  That's not what we have.  We have high-level generalities.  We have deals and practices that may or may not have come to fruition.

FE-1 doesn't know because he wasn't senior enough and he left the company before the class period -- before the class period really started in earnest.

One other FE point that I think is worth pointing out, they reference an FE Number 8, who was Extreme's senior

vice president of global channel sales.  I believe that's the highest ranking FE they have.  And, of course, as the head of global channel sales, you would think that person would know a thing or two about channel stuffing.  No allegation of channel stuffing from FE Number 8.  And I think that's telling, that someone's willing to talk to the plaintiffs and supply their allegations for this complaint against their former employer but doesn't allege channel stuffing.

With that, Your Honor, I'd like to reserve the balance of my time for rebuttal.

**THE COURT:**  All right.  Thank you.

**MR. WHITWORTH:**  Thank you.

**THE COURT:**  Counsel, you may begin.

**MS. ORMSBEE:**  Thank you, Your Honor.  Good afternoon.

**THE COURT:**  Good afternoon.

**MS. ORMSBEE:**  I hope that we were able to address Your Honor's inquiries in the letter and the slide we presented, but I'm going to go through them in the course of my presentation and highlight what I'm trying to specifically address, then, if Your Honor has any further questions for me.

**THE COURT:**  All right.  And take into consideration the questions that I posed to counsel because that helps you focus on the areas where -- what I call the rub.

**MS. ORMSBEE:**  I fully intend to address the rub to the best of my ability and invite any more questions Your Honor

might have.

I think we just need to level-set to what plaintiffs' theory of liability is and what the allegations are, which are perhaps, not surprisingly, not always exactly as we feel defendants have described them in their briefing and today.

This case is about corporate executives who chose deception over disclosure at the end of some unprecedented times, which was the COVID period.

This class period starts as those supply chains are opening up and the demand should be leveling out with supply. And I'll go into the channel stuffing theme.

Your Honor just raised one point of your understanding of channel stuffing, and I just wanted to provide one clarification of how I think we allege it.

You had indicated that you thought channel stuffing was when they're forcing companies to make larger orders that perhaps the company can't fulfill, and that's not exactly what we're alleging here.  We're alleging that they are strong-arming distributors and other clients to have orders often for unwanted product that they have no supply chain problems for in the hopes that they can make their revenue targets that they've communicated to investors for that quarter.

They're borrowing Peter to pay Paul, as one of the FEs said.  It's not that the company can't fulfill those; it's that

they're on a quarter-by-quarter basis for the five quarters we have here in this complaint after kind of the, you know, hurricane of COVID is dying down and they're going to their distributors and their various manipulative sales practices that multiple FEs have detailed in the complaint, they're getting them to get to that revenue number.

They made that target each quarter by virtue of getting various distributors through various practices and agreements and promises to put those orders in even when the demand was not there for that product at that time so they can make those revenue targets.

And the problem with channel stuffing, as we've seen in *Plantronics* and *Murphy* and other cases, is those kind of manipulative sales practices do have a coming to, you know, the -- coming to a disclosure point, which is what happened here over a series of disclosures -- which I'll get into and Your Honor had a question about -- throughout the class period.

But I just wanted to kind of level-set.  It's not that they're getting them to just make orders that the company's, you know, not able to fulfill.  They're getting them to put in orders that those suppliers don't need at that moment.  And that crescendo of continuing to do that comes to a point where at the ultimate end, in January 2024, of our class period here, the company did need to make adjustments to its channel inventory almost exactly the same type of disclosures that

ended the *Plantronics* period where they took revenue decreases, they lowered their guidance, and they said that the channel is digesting the inventory; there's less sales in than sales out, which means that their distributors just have too much on hand, they need to unload it, and that means they're not going to see the same sales volume that they had predicted.  That is the end of the channel-stuffing scheme.

And one of the points that Your Honor asked about and like Mr. Whitworth talked about was this, you know, COVID impact here.  And I think much like in *Plantronics* where you had a merger of a company, that was kind of the new event where the company hid behind that and then said, "Oh, we're seeing this great organic growth due to the merger of these two companies," when the real reason was their manipulative sales practices that were alleged in the *Plantronics* complaint.

Here, you don't have a six-year fraud like defendants argue.  What we have in the complaint is we acknowledge that in 2018, Extreme changed its revenue model that allowed the channel stuffing to take place because they now just had to report inventory when the sales went out their door, not when an end-user used them.

To be clear, we don't allege that there were false statements and channel stuffing throughout that whole period. We allege that the channel stuffing and the impact that it had on the materiality and the falsity of the statements that were

made in this period was due to these manipulative sales practices that started some period before the class period because the fraud has to build up and has to take place before the false statements are made.

**THE COURT:**  So can I, just because I need a timeline, so are you indicating that some four years later in 2020 -- strike that -- two years later in 2020, things changed and it was in June of 2022 that the impact was felt?

**MS. ORMSBEE:**  The timeline is a little bit different than that.  The revenue model that changed in 2018 we're not saying was fraudulent.  It was allowed.  The GAAP guidance changed.

**THE COURT:**  But you were saying that it has to build.

**MS. ORMSBEE:**  Right.

**THE COURT:**  So that's why I'm asking.

**MS. ORMSBEE:**  And so COVID happened.  We're not making specific allegations what happened during COVID, but we're not alleging that there was channel stuffing when there was this supply chain disruption.  As far as we can tell, there was a huge supply chain disruption that kind of put the whole market into a tailspin.

Sometime after that, maybe in 2021, definitely by early 2022, the company started implementing, from the allegations we have from multiple FEs, these manipulative sales practices to such an extent that it was material to the company and it

was -- also started to be misleading because the company was seeing sales problems in its channel.  It was seeing that after this kind of COVID heyday, where people were just desperate for product, things were leveling out, and for whatever reasons, their products were not getting the kind of sales that they wanted to meet -- beat these revenue targets organically.

So as our 11 former employees corroboratively described, there was, from a top-down, efforts to go to these distributors and to convince them through various different practices that we outline, which loosely can all be termed as channel stuffing, to get them to put these orders in so they can meet those revenue targets each quarter.  And they go to the market and say, "We're having strong demand, exceptional demand.  Our revenue growth is assured.  We have a healthy channel.  We're out of COVID.  Everything's doing great."

And what is misleading about that, exactly as multiple courts have found, not only with regards to channel stuffing this is kind of bedrock securities litigation concepts, which is if you start speaking about something that's material to your investors, have to speak truthfully.  And if you go out to your market and start telling your investors that you have a healthy channel, that you have a strong backlog that's not just firm, not cancelable, it is not subject to double ordering, and it is indicative of future revenue and then you go and talk about your channel, about how healthy it is, and how these

orders are coming in organically, that is misleading.

Because what you're not telling people is you're only making your revenue targets because you're engaging in manipulative, unsustainable sales practices. And it's the sustainability or un-sustainability of these practices that's incredibly material to investors.

That is why channel stuffing is frowned upon. Obviously you look at the *Plantronics* case, you look at the *Murphy* case, it's not unheard of, but it is frowned upon on as a bad business practice if not -- we're not alleging it's an illegal one here, that it violated GAAP, but it's a bad business practice because it's inherently unsustainable and it's inherently projecting to investors a healthy, strong demand for products when that's simply not what occurred here during the class period.

THE COURT: Okay. Let me interrupt for a moment.

MS. ORMSBEE: Of course.

THE COURT: Do you have a Ninth Circuit case that supports this position that you are sharing in *Plantronics* And then the second part of my question, because I've got to jump in there when I can, is whether the *Plantronics* theory that you're propounding gets you beyond Federal Rules of Civil Procedure 8, as well as the particularity requirements for scienter.

MS. ORMSBEE: Sure. The Ninth Circuit law that we're

relying on is the kind of law that you're -- that stands for the proposition --

THE COURT:  Just a case citation --

MS. ORMSBEE:  Sure.

THE COURT:  -- that's in alignment with *Plantronics*.

MS. ORMSBEE:  Factually, for channel stuffing, there's none that exactly parrot the *Plantronics* but it is not the case that *Mattel* is controlling here.

And I believe Judge Tigar in *Plantronics* the Courts in *Murphy* and in *SolarEdge* site the bedrock Ninth Circuit principles that control, which is if you speak about something that is material to investors, you have to speak truthfully.

There's no magic sauce here, whether it's channel stuffing or bad business practices or the kind of practices that the Ninth Circuit sustained recently in *Nvidia*, where *Nvidia* told investors the source -- they didn't misrepresent the actual revenues they were getting in, but they told investors that the source of those revenues were legitimate users of their technology when in reality they were the type of users, gamers, that were unsustainable and unlikely to be repeat users.  And the court in the Ninth Circuit sustained those claims because that was misleading to investors.  You can't project one thing when the real reason behind that is another thing.

So I think the *Plantronics* court and *Murphy* cite the Ninth Circuit law that's important, I think Your Honor has

cited it, both *Glazer Capital Management*, *Alphabet*, *Khoja*, they all stand for this bedrock principle that when you choose to speak, you must speak truthfully.

And there's really no magic here that the manipulative sales practices here, which involve channel stuffing, were misleading to investors because they misrepresented the truth of the demand that the company was touting and that investors were relying on and multiple analysts were talking about and relying on throughout the class period.

The *Mattel* case, I would like to note, though, Your Honor, defendants say we've given up and we have no chance of satisfying it.  It is not the theory of liability we plead, and plaintiffs are entitled to plead the theory of liability they feel is their strongest.

But in pages 6 to 7 of our brief and in our submission to Your Honor this morning, we do satisfy the *Mattel* standards if the Court finds that plaintiffs do need to have those specific indications of transactions, specific sales, specific customers.  We cite all of those paragraphs in our letter, as well as in our brief, and that is what sets us apart and makes us even stronger from the *Plantronics* case.

In the *Plantronics* case, Judge Tigar in the first go-round dismissed the case because it didn't plead those specific types of transactions.  They didn't have that information.  In the second amended complaint, the plaintiffs changed their theory

of liability to be the one that we're espousing here as our strongest, which is that same statements -- Mr. Whitworth said they were different, but the same statements in scienter -- quote, stronger demand for legacy headsets; quote/unquote, solid results -- those statements were misleading because there was indication that these manipulative sales practices were the source, a driving source, of a company making those strong results each quarter.

But here, we do have those specific transactions; and if the Court wants to follow two alternative theories, we represent that we've satisfied both even though the theory of liability that we push as our strongest is the one that was adopted by *Plantronics*.

I did want to briefly -- and I think I already have -- how, you know, the *Plantronics* kind of lynchpin was this new merger which the company hid behind, and said that was driving growth, one of those manipulative sales practices.

Here, the ending of COVID is kind of this lynchpin where the company is saying, "Oh, now we're level-setting and everything's even and we're getting this great demand."  The fact was they weren't getting that great demand for their products even when the supply chains opened up, and that's when their manipulative sales practices kicked in so they could keep projecting strength to the market.

If Your Honor would allow, I'd go next to the backlog

statements, although I know you raised some pointed questions about the channel stuffing, which we did endeavor to answer in our letter and are also addressed in some of our slides, and I'll just briefly touch on them.

You asked if there was nothing improper or illicit about Extreme's sales practices.  Just to be clear, we don't allege that they were illegal, i.e., illicit, but we do clearly allege these tactics were manipulative and unsustainable.

You also asked whether our allegations of false statements were premised on a misattribution of revenues.  I hope I understand this correctly, but I think the proper answer might be not exactly, because we don't dispute that the actual revenue figures that were reported were the revenue figures that they had, but what was false and misleading were the statements that attributed those revenue figures to strong, unabated, exceptional demand for products that is directly contradictory to the picture painted by multiple, mutually corroborative former employees that my colleague David will discuss in a minute when we get to scienter.

Third, you asked whether we contend that consumer demand for Extreme's products did not increase during the class period.  And I think you can clearly infer from the FE allegations that the company faced waning demand for its products during the class period and projected and made certain revenue targets that it simply could not have met without these

manipulative sales practices to get them over that line, and that was very material to investors.

If you look at our presentation, I can't go through it all now, it's probably too many words, but Slide 4 and Slides 5 through 8 detail how, over the five quarters, defendants made multiple misstatements about the sources, reliability, and sustainability of its demand and how those were -- directly revealed the truth of those -- the falsity of those statements were revealed through the five disclosures, and I'm going to get into those in one minute.

If I could have the time.

**THE COURTROOM DEPUTY:**  15 minutes.

**MS. ORMSBEE:**  Okay.  I want to make sure I give time for my colleague.

If I can talk about the backlog, we feel that the FEs that discussed the backlog are very detailed.  Defendants' slide presentation and Mr. Whitworth talked about some perceived infirmities in FE -- I believe -- 2 and FE-5.  I don't agree with those infirmities, but what they did not discuss were the very specific allegations from our FE-7, our FE-3, and our FE -- and our FE-5.

But FE-7, Your Honor, just to take for an example -- and if you look at our slide, I believe it's slide, page 6 -- we list a summary of some of our FE-7's allegations.  He left in March 2023, before the company disclosed its $245 million

evaporation of its backlog, but he details how, for the prior year, through 2022 and until he left in 2023, there were details about meetings involving the C-Suite, which is our defendants here, where the company openly discussed problems with the backlog, at least a 10 percent expectation that that 20-, $30 million of that -- or $50 million of that backlog would have raised, and he personally, given his senior position, hedged that about two-thirds of the backlog would erase and not be real as the defendants were telling investors they were real.  And that, actually, is pretty close to what happened.

But to the cautionary language, Your Honor, and in our presentation and also in Slides 9 through 11, we discuss the cautionary language.

First of all, many of the backlog statements here are simply not forward-looking and they're not couched in the phrase of confidence or opinion or puffery.  They're very exact and they're very affirmative.  So cautionary language really just can't play a role in the Court's analysis there.

But also it can't play -- and if you -- just for one example of those Your Honor, there's a May 27th, 2023, statement from CFO Tate where she says about the backlog, "It's not cancelable.  These are real projects.  We don't see double ordering," and three months later $245 million of the backlog erases.  So those are clear, direct statements.  No cautionary

language.

But the cautionary language that defendants cite to in their exhibits is meaningless both on its own and especially when juxtaposed next to the directly contradictory statements made by the defendants directly to investors in conference calls and releases.

Multiple courts, and we've cited in our briefing, and the *QuantumScape* case is a good example of that, it's not meaningful when you're saying one thing out of one side of your mouth and a directly opposite, more compelling, more direct thing to investors directly.

Additionally, we allege that defendants knew that the backlog was not firm, was cancelable, was subject to double ordering, and that also erases any protection from the bespeaks -- from the safe harbor.

Another statement -- that was paragraph 418 I quoted from. Another statement in paragraph 360, Defendant Meyercord said that revenue was understated by $400 million because it didn't count the backlog. That is a direct statement saying that that backlog was convertible to revenue.

Briefly, Your Honor, I'd like to just touch on loss causation. Defendants talk very much about how it has to reveal the fraud, you have to have some analyst or someone that has an "ah ha" moment that says, "Ah, this was channel stuffing." That's not the law. *Dura* is very clear that loss

causation is the causal connection between the material misrepresentation and the loss.

In our briefing, and also in Slides 4 and 12 of our presentation that we gave to you today, the truth was disclosed on five dates and each disclosure revealed some truth about the prior misrepresentations.  The first disclosure revealed that the backlog was declining, showed cracks in that firmness, and that CFO Thomas unexpectedly resigned, raising questions about internal issues.

The second in August, the company revealed a massive backlog collapse raising questions as to the company's visibility, which it touted was total and complete and the nature of the firmness.

The third revealed a revenue decline and a cessation of backlog reporting, which raised a lot of concern in the market.

And the fourth and the fifth, in January 2024, it revealed guidance cuts of $20 million, warned of channel issues, channel digestion which is what it was called, and then ultimately a revenue collapse with a reduction in channel inventory of 40- to $50 million, which is a direct parallel between the allegations that were alleged in *Plantronics*.

There defendants say there was some admission and there was a huge internal report.  I won't get into all the details now for time, maybe in my rebuttal, but that's not completely consistent with the allegations in that case.  I should note I

wrote that complaint.

But the admission happened weeks after the corrective disclosures, and it wasn't really truly an admission, and there was no internal investigation into channel stuffing.  It was an internal audit enterprise risk management project where people were interviewed, and channel stuffing was raised as a risk to the company.  That's not materially different than the type of allegations we have here with multiple FEs reporting to defendants at various points in time and discussing the channel stuffing and backlog issues we allege.

Unless your Court has a specific question about those, I'd like to turn over the remaining time in this initial presentation to my colleague David Saldamando.

THE COURT:  Thank you.

And time check for...

THE COURTROOM DEPUTY:  Nine minutes.

THE COURT:  Thank you.

Good afternoon, sir.  You have nine minutes.

MR. SALDAMANDO:  Thank you, Your Honor.

I'd like to start with just level-setting here as Your Honor is well aware with respect to the *Tellabs* case on scienter.

Because the inquiry, as Your Honor mentioned earlier today, is that whether all of the facts alleged taken collectively and holistically meets the standard, not whether

any individual allegation scrutinized in isolation meets the standard, and the case law is also very clear that a tie in scienter goes to the plaintiffs.

So I submit to you, Your Honor, that when you take a step back and just look at all the allegations that are listed holistically and in conjunction with each other, you will see how they far surpass a tie here.

I want to focus on the former employee allegations because I understand that Your Honor has questions and wants to discuss those FEs.

Particularly FE-1, defendants mentioned in their presentation that he worked most of the majority of his tenure prior to the class period.  I'd like to point the Court to the Ninth Circuit *Webb vs. Solarcity* court case that we cited in our opposition briefs, as well as the *In re: Quality Systems Securities Litigation* case, also Ninth Circuit, where the Ninth Circuit has found that pre-class period accounts of fraud can, quote, confirm what a defendant should have known during the class period.

Defendants' arguments also completely ignore what the FE-1 actually presented to Defendant Thomas directly by e-mail with documentary evidence.  And I'll read from the complaint here, Your Honor.  This is paragraph 138.  FE-1, who works with the senior director of global distribution, and Defendant Rice, who was the chief operating officer at the company, FE-1

specifically makes known to Defendant Thomas that, quote --
that Defendant Brown, quote, works with the distributors to buy
back product that is not sellable to make the corporate number
and then artificially suppresses them from rotation of bad
product.

That's paragraph 138, Your Honor.

Your Honor that's channel stuffing.  That's direct
knowledge of channel stuffing.

He also attaches to that e-mail communication multiple
documents reflecting the conduct, including one e-mail in which
Defendant Brown was concerned about the possibility that,
quote, our auditors would be all over us.  That's
paragraph 139.

And, again, Your Honor those documents were received by
the C-Suite just seven days before the first false and
misleading in this case.

Additionally, Your Honor, we have -- out of respect to the
backlog, we have documents, the internal text messages, written
by Defendant Brown, again, the senior director of global
distribution, who claims that during this time there were,
quote, Lots of eyes on this backlog process -- it's updated all
the way up to Ed, referring to Defendant Meyercord.

Now, with respect to the other FE allegations, it's not as
if FE-1 was the only former employee discussing the channel
stuffing conduct here, Your Honor.  We have a multitude of

witnesses who all explained that the channel stuffing that was on going during the class period was widespread in nature touching not just upon one region or one department or even one distributor partner, but was global and widespread in nature and, importantly, Your Honor, affected Extreme's three main distributors that collectively accounted for more than 50 percent of Extreme's total revenues, and those were Jenne, Westcon, and TD Synnex.

So, for example, we have FE-4 who places Defendant Thomas in a specific dinner in which the scheme to stuff Westcon's orders with unwanted end-of-sale products was discussed in exchange for the right to return those end-of-sale products in two quarters.

We have FE-3, who reports directly to the finance leadership of the defendant team in the class period, and explains that, quote, It was well known internally at Extreme that the sales teams were channel stuffing by pushing distributors' orders -- to take orders early in order to meet sales goals.

We have FE-6.  FE-6 explains that based upon his personal experience with a call with Defendant Rice, Defendant Rice as chief operating officer directed and orchestrated the channel stuffing conduct here.  So this was C-Suite-directed activity, Your Honor.

We also have FE-2 who gives you a specific example of a

pooling sales transaction with partner PC Solutions in the amount $1.5 million in the middle of the class period, July 2023.  And, notably, Your Honor, FE-2 refused to participate in that conduct and was demoted as a result from his superiors.

Now, I want to move on to the backlog.  I know my colleague Lauren raised the backlog FE allegations, but I really do want to highlight FE-7's allegations because it's particularly important here.

FE-7 is not a low-level employee.  He was a former vice president -- excuse me -- former president of a company that was acquired by Extreme.  He reported directly to the chief technology officer Nabil Bukhari in this case, and he was in the C-Suite-level meetings with the individual defendants in this action.  So he's in the room, Your Honor, with these defendants.

And FE-7 explains that everyone in the room knew three things:  One, the backlog orders could be canceled at any time by Extreme's customers because of the contractual provision which allowed for such cancellations; two, that it was well known internally that Extreme's customers were double and triple booking their orders with Extreme and then cancelling; and, three, based upon that, it was internally expected that at least 10 percent of the backlog would, in fact, be cancelled in complete contradiction to defendants' statements to the market.

And, Your Honor, as my colleague Lauren mentioned, the backlog statements here are particularly strong, especially in light of the *Berson* -- Ninth Circuit case *Berson vs. Applied Signals Technology*, and there the Ninth Circuit held that if a company is going to speak upon the backlog, they cannot mislead investors as to what the backlog consisted of, and that's exactly what we have here.

FE-5 further corroborates this with respect to the backlog.  He claims that it was widely known at Extreme that Extreme's customers were double booking their orders because of the return merchandise authorization contractual process which effectuated the cancellation; and according to FE-5, this process came from the top.

And, again, Your Honor, with respect to the backlog, the statements are very clear.  The statements are:  These orders are simply not cancelable.  We do not see double ordering.

And this also leads into the inference of scienter given their own admissions as to the backlog.  They claim to have complete and excellent visibility into the company's backlog, the sales metrics, and demand forecastings.

Just one example here, Defendants Meyercord and Thomas claimed to the market that they were both personally, quote, "very close to the topic of the backlog and demand forecasting," they had complete and excellent visibility.  And, again, based upon that visibility, they just weren't seeing

double ordering going on, in complete contradiction to what the FEs explained.

**THE COURT:** All right. Let me see if I can summarize where you're going with this.

That basically you're saying the backlog statements were false and misleading because the FEs are saying that they could be canceled at any time, they were hedging and saying that they wouldn't be canceled, and they were doubling and tripling the numbers in terms of the backlog?

**MR. SALDAMANDO:** That's absolutely correct, Your Honor.

Defendants told the market that the backlog orders were simply not cancelable, that they weren't seeing double ordering on it.

And by double ordering, just to explain a little bit further, distributors would place an order with Extreme and then place an order of a competitor to Extreme and then cancel depending on which manufacturer met the order first.

And so the industry at this time was concerned about that for logical reasons because then you would not, you know, receive revenue from those orders. And Extreme told the market: We're not seeing that. That phenomenon is not happening.

And I point Your Honor to the amended complaint where the market, particularly through analysts, were misled by

defendants' statements where they say, "Based upon defendants' statements, we have confidence that we don't see double ordering going on."

And so to answer your question, Your Honor, the FEs -- all the FEs, with respect to the backlog in particular, are saying, "No that's actually what we were seeing internally," which was in direct contradiction to what defendants were telling the market.

THE COURT:  All right.  We're going to take a break now.  Your nine minutes has expired, and so we're right at the point of that.  I need to give my court reporter a little bit of a break.

MR. SALDAMANDO:  Absolutely, Your Honor.

THE COURT:  I'm sure her fingers are smoking right now.  So 15 minutes and then we'll resume, and each of you will have 15 minutes starting with the defense.

Thank you.

(Recess taken at 3:17 p.m.)

(Proceedings resumed at 3:29 p.m.)

THE COURTROOM DEPUTY:  Come to order.  Court is now in session.

THE COURT:  All right.  Counsel, in your last 15 minutes, keep in mind the Court has your PowerPoints, your written responses, and was in hopes that the arguments would just supplement what I've received and that you would take a

look at each other's arguments and just focus on what I call the rub.

And during this portion, please address leave to amend if the Court were to grant the motion and then, finally, future court dates.

Starting with the Defense, and whether leave to amend would be futile and why.

**MR. WHITWORTH:**  Thank you, Your Honor.

I'll start with the last question, which is that we do not believe that the plaintiffs have pled a securities fraud complaint that meets the standards required under Rules 9(b) and the Private Securities Litigation Reform Act or the critical cases interpreting those statutes.

Now, we understand that many cases in this circuit are frequently dismissed with leave to amend, and so we're not suggesting that it would be wrong to do that.  But this was a very long complaint, it reflects a lot of investigation by the plaintiffs and, yet, it does not state a claim.  There are fundamental issues that an additional FE allegation will not be able to solve, and I'll touch on those in a minute.

To address the points brought up by my colleagues on the other side, I think it's most helpful to start with what do successful allegations of this kind look like:  What worked in *Plantronics* what worked in *Murphy*, what worked in *Berson*.

Well, in *Plantronics* and *Murphy*, the two channel stuffing

cases, there was a clear allegation of a sales practice that was instituted that caused revenue to go up and that at an inflection point at which time the sales practice was untenable.

And there was also clear evidence that the defendants in those cases knew exactly what was going on, knew what the sales practices were, and knew when they had stopped working and, yet, continued to represent to the market that revenue was being generated or, in the case of *Murphy*, would be generated because -- notwithstanding the knowledge that they had of what was going on.

In *Berson*, this is the backlog case.  In *Berson*, the statements were the defendants made statements touting the amount of backlog that they had despite knowing that the backlog consisted of contracts that were under stop-work orders and were unlikely to be resumed.  Now, we have to contrast that with the allegations here.

There are no allegations that the revenue or the backlog amounts were misstated.  There is no inflection point.  The plaintiffs' theory is that Extreme's business operated the same or the sales practices were the same going into COVID throughout COVID and following COVID.

None of their FEs alleges a change in Extreme's sales practices.  None of their FEs alleges when or why those sale practices suddenly became more effective, so effective that

they were able to generate an extra $200 million of revenue during the class period.

The good news is that Your Honor is not bound to simply take their theory whole cloth, check your common sense at the door. Under *Tellabs*, you are able to and, in fact, required to compare the inferences, and the inference of fraud has to be at least as compelling as an innocent inference.

I think Your Honor asked several questions during my initial presentation about the effect of COVID on Extreme's revenues and sales and backlog, and it's all there. It's in plaintiffs' complaint. You don't need to go outside of plaintiffs' complaint to see the effects of COVID and the supply chain uncertainty and the defendants' attempts to manage that supply chain -- manage through that supply chain uncertainty.

And it's telling that none of FEs seem to take that into account. They talk about deals that happened before COVID. They talk about structures and ways that the company would interact with its customers before COVID, during COVID, after COVID. It doesn't matter.

What they don't talk about is where the -- is how anything changed during the class period that would have put the defendants on notice that something other than strong demand is causing the successful results that Extreme experienced during that time period.

I wrote this down.  I'm struck by one of the comments that Ms. Ormsbee made, that the end date of COVID is when this should have -- you know, the chickens should have come home to roost.  And I apologize.  I'm sure I'm butchering the second part.

But the end date of COVID, when was the end date of COVID? When should the defendants have foreseen that coming to pass? How could they have predicted it?

I can tell you that they tried.  Extreme disclosed that its backlog would start to drop, and they disclosed that in July of 2022, the first month of the class period.  They said, "We have this large backlog.  It's going to drop.  It's going to normalize."  They thought it would take a little bit longer to normalize than it ultimately did, but they kept investors aware that this is a process that's going to happen; that the air is going to come out of the balloon, we just don't know exactly when and in -- exactly at what pace.

What are the allegations here missing?  Well, they're also missing the specific concrete statements that were found to be misleading in *Plantronics*, *Murphy*, and *Berson*.

Here we've argued that the channel stuffing statements, many of them are puffery because they turn on high-level optimistic factors like strong demand as the basis for revenue growth, which, again, not to beat a dead horse, but the revenue growth, not disputed.

The backlog statements, as Your Honor pointed out, many of them are opinions.  They're couched in opinion language. Ms. Ormsbee said they're not using the confidence language that you would expect to see in opinions, and that's just not true. There are several examples where Extreme expressed their -- where the defendants expressed their confidence that -- that the -- in the backlog, or that they would meet revenue guidance in the future as a result of having this strong backlog.  So those are classic opinion statements.

And in different ways, both the channel stuffing and the backlog statements are forward-looking and should be protected by the safe harbor.

Again, the issue here is not what Extreme said in the moment about its revenue or about its backlog as it existed; it's about what Extreme knew or should have known would happen in the future despite the uncertainty of COVID as the supply chain crunch started to ease.  What could they predict about their customers' behavior?

Those are quintessential forward-looking statements.  And if the only alleged fraud is that they should have foreseen that the backlog would decrease faster than it did, that should be protected by the forward-looking statement.

And the final thing that's missing from the allegations here that's present in successful channel stuffing and backlog claims is a motive.  There's no motive.  Plaintiffs' response

to the motive allegation -- to our motive argument is a technical one, "Please, don't look at the stock price or the stockholding changes."  But Your Honor can look, and we cited several Ninth Circuit cases and a district court case, including one from Your Honor, where that's been appropriate.  So there's no motive to commit fraud, and that's devastating to their scienter argument.

I want to touch for a moment on the specific former employee allegations.  Your Honor raised several questions about that to both sides, and I do think it's important because there are an exceptional number of former employee allegations in this case.  A few high points and then I'll get into specifics.

First, the former employee allegations cannot overcome the deficiencies that I just listed.  Nothing the former employees say can make the statements not puffery, not opinions, not forward-looking.

None of the former allegations -- none of the former employee allegations can create a motive for the individual defendants.

Another common thread running through the former employee allegations is that they do not establish the factual predicate that you find in *Plantronics*, *Murphy*, and *Berson*.  The former employees do not say whether or when Extreme changed its sales practices, whether or to what degree those sales practices

increased or changed Extreme's revenue. They do not identify any specific transactions that were working but then were suddenly deemed to be unsustainable later in the class period.

In fact, just the opposite. The FEs seem to allege a long, unbroken string of aggressive sales practices, but they don't say how much that contributed to revenue, they don't say when it stopped.

Similarly with respect to backlog, the former employees don't say whether or when Extreme's executives learned about cancellations from specific customers. They speak in generalities as to both time and as to customers and as to amounts of backlog; but they don't say, "On this date or in this quarter, Extreme's CFO or CEO learned that revenue that was part of the backlog would not be realized in the future."

Remember, that's the allegation that worked in *Berson*. In *Berson*, the district court initially granted the motion to dismiss, it went up to the Ninth Circuit, and the circuit court said, "Well, wait a minute. There are -- there's this very specific allegation about backlog contracts being put on stop-work orders, and that's going to prevent -- that puts a huge doubt in counting those as backlog and in expressing confidence that those are going to be eventually converted to revenue." None of that is here.

To touch on some of the specifics, FE-1, again, their star witness, he alleges internal communications predating the class

period about what the company might have wanted to do or things they were worried about, transactions that may have come to fruition.  I think there was one example of a distributor telling Extreme that they were going to return $6 million worth of inventory and Extreme was only planning for a $3 million return.

Now, set aside whether that $3 million difference is material in the context of $200 million of revenue growth. FE-1 doesn't even know what happened.  He doesn't even say whether the distributor returned 6 million, 3 million, some amount in between, some entirely different amount; and it's that kind of speculative, secondhand allegation that courts -- that the Court can disregard.

FE-4 is another former employee brought up in the channel-stuffing context.  FE-4 apparently talked about a dinner.  Now, FE-4 does not allege that he was at the dinner between the Extreme executive and the customer.  FE-4 describes a hypothetical deal that might have occurred between Extreme and that customer.  Nothing completed.  No amount.  No customer -- no timing of a particular deal that was actually completed.

The same story continues in the backlog allegations.  So there's --

THE COURT:  You have two minutes remaining.

MR. WHITWORTH:  Thank you, Your Honor.

So there's nothing about how many backlogged contracts were infirm, whether specific customers were cancelling at particularly high rates or not, when Extreme would have learned about these cancellations other than some vague description of cancellation statement in 2022, and whether or why COVID and other supply chain-related issues would have been a driver of that uncertainty and might have also influenced what the executives were saying.

Now, FE-7, for example, they make much about this 10 percent hedge that FE-7 describes.  Well, that's FE-7's personal opinion.  FE-7 doesn't allege that the CEO or CFO said, "Hey, guys, we need a 10 percent hedge in our backlog." Not the allegation.  FE-7's allegations are not ground in time.

And, of course, Extreme knew that its backlog was decreasing because it announced it and it told investors that that was going to happen.

So taking this back, I think it's important to look at the pleading standards and to look at the cases that have been successful and to compare the allegations here to the cases that have been successful.  They are different in kind on multiple axes.

The very last thing I'll frame -- I'll mention, I don't believe we heard anything about the scheme liability claim that's pled as a second count.  It's not.  It's completely indistinguishable from the challenged statement count, so the

Court should not, not that it sounds like the Court is inclined to do this, but should not go find a scheme separate and apart from the misstatements.

With that, I'm happy to answer any questions that the Court may have.

**THE COURT:**  No further questions.  Thank you.

**MR. WHITWORTH:**  Thank you very much, Your Honor.

**THE COURT:**  Thank you.

Counsel for the plaintiff, final word.

**MS. ORMSBEE:**  Thank you, Your Honor.

First, just to start with the logistical questions, while we do firmly believe and I think we've tried to stridently argue that we believe this complaint should be sustained as alleged based on both prevailing Ninth Circuit law and the compelling cases that we've cited and, most importantly, the very strong evidence of both falsity and scienter we've alleged, we welcome the opportunity to leave to amend.

If the Court does find certain infirmities in the allegations, we would take that to heart.  We can contact both our former employees that we've already been in contact with, along with others, and try to fill any gaps or any holes that the Court thinks that the complaint is missing.

We don't believe there's any legal infirmities here.  We think the cases that we've cited and the facts we've alleged outline a clear path to finding that there were violations of

the Section 10(b) and Section 20(a) in both statements and scheme liability, but we respectfully request, and as Mr. Whitworth acknowledged, leave to amend is normally given in these circumstances, and we would obviously welcome and use that opportunity to amend the complaint.

As for dates, I briefly mentioned earlier, Your Honor, but we would ask for September 8th, preferably, for any amended complaint given that Mr. Saldamando will be out of the country on a honeymoon and I also have a vacation that whole end of August through Labor Day, and I also have an argument in Second Circuit on the 4th.  So we would appreciate the 8th, but we could accommodate any expedited briefing Your Honor sees fit. We do fully intend on getting this case in the format to be fully sustained, and we are aware of the class certification hearing date and Your Honor's rules.

Again, I'll just close, again, that we don't think that would be necessary; but if it is, we would ask for that date.

THE COURT:  All right.  Thank you.

MS. ORMSBEE:  Oh, sorry.

THE COURT:  Oh, I'm sorry.  Go ahead.

MS. ORMSBEE:  I just wanted to touch a few things, and Mr. Saldamando just had a few statements that he wanted to touch base with on the scienter points.

But Mr. Whitworth said we're asking them to predict COVID. We certainly are not.  What the complaint alleges, that the

supply chains started opening up, sales channels started normalizing; and as of that time, defendants' faced a choice whether they could come clean to investors, that perhaps the sales demand that they were hoping would pick up after COVID didn't; that the unwanted product that they wished to sell to competitors, they were only able to sell through some of these manipulative sales practices.  And they chose to instead tell investors this very rosy, positive, strong demand, firm backlog when the opposite was true.

You asked for Ninth Circuit cases for channel stuffing. As I said, there's nothing exactly on point in the Ninth Circuit, but Your Honor could look to *Tellabs*, which is a Supreme Court case in which the Court was dealing with scienter there but found similar allegations of channel stuffing very compelling way back when *Tellabs* came out and then was remanded back to the Seventh Circuit.

But I would just reiterate that prevailing Ninth Circuit and Supreme Court law on how you're supposed to look at these allegations holistically, defendants tried to match, "Well, if this was *Plantronics* you have to have that exact allegation here."  We have to have the same type of allegations and we do, but it's not a tit for tat.  I think that many of the allegations we have here in our complaint are far stronger, far more detailed, far more specific, and would even satisfy the *Mattel* standard.

And you could find it on both alternate theories that it both satisfies what Judge Tigar set out in *Plantronics* in the Ninth Circuit.

One thing we haven't talked about was the confidence statements, the opinion statements.  There are some statements that are couched in confidence, but all of those statements are couched as embedded -- with embedded factual assertions.  The defendants have confidence in the backlog because of what they're seeing.  So you have to look at the statements in their whole context, and that's an *Omnicare*, clear Supreme Court precedent there.

I think that's all just in the interest of turning some of the time over to Mr. Saldamando, because I think he had a few more scienter points and wanted to touch upon the negative inference regarding the stock transactions that they claim that Mr. Meyercord may have engaged in during the class period.  So with Your Honor's permission --

**THE COURT:**  Thank you.

**MS. ORMSBEE:**  -- I'll turn it back over.

**THE COURT:**  All right.  While he's making his way up, I just want to put a bookmark for myself -- you can go ahead and be seated -- that you're wanting me to substitute Judge Tigar's analysis of your drafted complaint in *Plantronics* versus *Mattel*, and the Court will be looking at whether channel stuffing was clearly alleged in that complaint and whether it's

distinguishable from this one.  I'll also be looking at the former employees.

So if your colleague can now approach.

And, sir, you only have about two minutes.

**MR. SALDAMANDO:**  Thank you, Your Honor.  I'll be brief then.

I'll focus my inquiry -- my argument here on the question that Your Honor posed earlier today with respect to the purported stock sales that Defendant Meyercord had during the class period.  And I believe defendants phrased this as technicality, but it's not a technicality, Your Honor.  The argument is based on the law.

Under the *Khoja vs. Orexigen Therapeutics -- Khoja*, K-H-O-J-A -- it's black letter law that it is improper to assume the truth of an unpled document if such assumptions only serve to dispute facts stated in a well-pleaded complaint.

And that's exactly where this argument is coming from, Your Honor.  We do not cite those stock sales in our complaint. Instead, defendants raised this with their own Exhibits 5 and 26.

And as Your Honor's well aware given the *CareDX* case, the *Wells Fargo* case, the Court may grant judicial notice as to SEC filings, such as Exhibit 5 and 26, but only as to the existence of those filings, not for the truth of the matters asserted therein.

And so defendants' inference of innocence argument is solely based upon seeking to assert the truth of the matter of those documents in order to raise a factual dispute as to the defendants' state of mind, all highly improper in the Ninth Circuit case and its progeny.

And I'll end with this, Your Honor, with respect to the scienter point:  Even assuming one can look at the truth of the matter of the documents therein, I'll point the Court to our opposition to request for judicial notice at pages 7 to 8, and you'll see a host of factual disputes there.

I think Exhibit 5 showed the holdings of Meyercord as of, you know, 10 months before the start of the class period, and Exhibit 27 purports to show them nine months after the end of the class period.  So there's an open factual dispute there as to when exactly that increase in shares occurred.  And if it did not occur during the class period, it's completely irrelevant as to Defendant Meyercord's scienter.

And, again, those inquiries and that conversation we're having is exactly why the Ninth Circuit precluded looking at these extraneous documents for the truth of the matter asserted therein, Your Honor.

**THE COURT:**  And I may have -- I may have robbed you of some time, so I want to make sure that you covered all the points that you intended.

**MR. SALDAMANDO:**  Absolutely.

And I'll also just touch upon the fact that defendants raised -- sorry -- the argument that defendants raised with respect to no allegations as to the rate of cancellations regarding the backlog, that there was no connection to defendants there.

I'll just briefly point Your Honor, to give a quick example, to FE-8.  FE-8 was a very high-level senior vice president of global channel sales, and he stated that based upon recurring revenue assurance meetings and output meetings, the individual defendants were made specifically aware of what the assumed yield from the backlog would be at any point in time, and that means the actual conversion from backlog to product revenues.  And, Your Honor, importantly, this was documented in an Excel spreadsheet that the individual defendants had access to.

And FE-8 also explains that it was openly known that all this information was going to the CEO, referring to the -- Defendant Meyercord.

So at least with respect to the backlog, Your Honor, we have FE-7, who was in the room with the individual defendants; we have FE-8, who places the defendants as receiving Excel spreadsheets and reports and involvement in meetings; and we have a host of other FEs who explain that the backlog, contrary to defendants' assertions to the market, were not firm; they were easily cancelable and the orders were double booked and

contractually designed to be cancelable.

Thank you, Your Honor.

**THE COURT:**  Thank you.  All right.  Thank you.

I'm going to take the matter under submission.  I've been flagging those areas that I'm most concerned about.

At this time I'm going to vacate the previously set date of September 4th for a case management, further case management, and reset it to September 18th at 2:00 p.m. via video conference.  The case management statement will, therefore, be due on September 11.

If the Court determines that the motion to dismiss should be granted, as part the plaintiffs' amended complaint, I will be ordering plaintiff to organize all challenged statements into an appendix as defendants have done in the motion that was filed here, and I would point your attention to ECF 74-1.

If the Court grants the motion, as you know, all future dates would be vacated.  The class certification motion date, the motion is due on January 12th, 2026.  I invite all parties to revisit ECF 50.

All right.  Thank you.

**THE COURTROOM DEPUTY:**  Thank you.  That concludes the calendar and court is adjourned.

(Proceedings adjourned at 3:55 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Friday, August 15, 2025

_____

Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court