UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS,<br><br>Plaintiffs,<br><br>v.<br><br>EXTREME NETWORKS, INC., et al.,<br><br>Defendants. | Case No. 24-cv-05102-TLT<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: ECF 74 |

On February 14, 2025, Lead Plaintiffs Oklahoma Firefighters Pension and Retirement System ("Oklahoma Fire"), Oklahoma Police Pension and Retirement System ("Oklahoma Police"), Oakland County Voluntary Employees' Beneficiary Association ("Oakland County VEBA"), and Oakland County Employees' Retirement System ("Oakland County ERS") (collectively, "Plaintiffs") filed a federal securities class action against Defendant Extreme Networks, Inc. ("Extreme") and numerous of its key officers and high-level executives (collectively, "Defendants"). ECF 59. Plaintiffs allege that Defendants made false and misleading statements that misrepresented Extreme's product revenues throughout the Class Period. *Id.* ¶ 7.

Before the Court is Defendants' motion to dismiss the amended complaint, ECF 74, and requests for judicial notice, ECF 75. After review and consideration of motion, briefings, attachments and exhibits thereto, the Court **GRANTS** the motion to dismiss as to all claims with leave to amend.

I. **BACKGROUND**

A. **Procedural History**

On August 13, 2024, Plaintiff Steamfitters Local 449 Pension & Retirement Security Funds filed a federal securities class action against Defendants. ECF 1. On December 30, 2025,

United States District Court
Northern District of California

the Court granted unopposed motion to appoint lead plaintiff and lead counsel, appointing

Oklahoma Fire, Oklahoma Police, Oakland County VEBA, and Oakland County ERS as lead

plaintiffs and Labaton Keller Sucharow LLP ("Labaton") as lead counsel and Hagens Berman

Sobol Shapiro LLP ("Hagens Berman") as liaison counsel.  ECF 51.

On February 14, 2025, Plaintiffs filed an amended consolidated complaint against

Defendant Extreme and its key officers and high-level executives: (i) Chief Executive Officer

("CEO") Ed Meyercord; (ii) Chief Financial Officers ("CFO") Rémi Thomas (CFO until February

2023), Christina Tate (CFO from February 2023 to May 2023), and Kevin Rhodes (CFO from

May 2023 until the end of the Class Period); (iii) Chief Operating Officer ("COO") Norman Rice;

and (iv) Senior Director of Worldwide Distribution Sales and Strategy Jonas Brown.  ECF 59.

Plaintiffs allege that Defendants have violated (1) Section 10(b) of the Securities Exchange Act of

1934 (the "Exchange Act") and Rule 10b-5 (b) promulgated thereunder, (2) Section 10(b) of the

Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and (3) Section 20(a) of the

Exchange Act.  *Id.* ¶¶ 559–85.  The Class is asserted on behalf of all persons and entities who or

which purchased or otherwise acquired the publicly traded common stock of Extreme during the

period from July 27, 2022 through January 30, 2024, inclusive (the "Class Period"), and were

damaged thereby (the "Class").  *Id.* ¶ 1.

On April 15, 2025, Defendants filed a motion to dismiss.  ECF 74.  Defendants also seek

judicial notice of 28 exhibits.  ECF 75.  Plaintiffs timely filed an opposition to the motion to

dismiss, ECF 81, and to the requests for judicial notice, ECF 80.  Defendants timely filed a reply

in support of the motion to dismiss, ECF 83, and a reply in support of the requests for judicial

notice, ECF 84.  The Court heard oral argument on August 12, 2025.

### B.    Factual History

For the purpose of resolving the present motion, the Court accepts as true the allegations in

the amended consolidated complaint, ECF 59.

### 1.  Overview of the Parties

Lead Plaintiffs Oklahoma Fire, Oklahoma Police, Oakland County VEBA, and Oakland

County ERS bring this action individually and on behalf of all persons or entities who purchased

United States District Court
Northern District of California

or otherwise acquired securities of Extreme from July 27, 2022 through January 30, 2024, inclusive ("Class Period").  *Id.* ¶ 1.

Defendant Extreme Networks Inc. is a public corporation, *id.*, ¶ 43, and global provider of cloud-based computer networking equipment and related services, *id.* ¶ 63.  Extreme develops, manufactures, and sells wired and wireless network infrastructure equipment.  *Id.*  Extreme reports its revenues by two major channels: (1) the Direct channel refers to Extreme selling its products directly to its direct end user customers; and (2) the Distributor channel refers to Extreme selling its products to end users through (a) its distributors or (b) its partners/resellers.  *Id.* ¶¶ 67–69.  Revenues through the Distributor channel were 85 percent of total product revenues for FY2024, 83 percent of total product revenues for FY2023, and 80 percent of total product revenues for FY2022.  *Id.* ¶ 70.  Its three largest distributors were TD Synnex Corporation ("TD Synnex"), Jenne Inc. ("Jenne"), and Westcon Group Inc. ("Westcon").  *Id.* ¶ 71.

During the Class Period, Extreme reported revenue when its products are shipped to its customers.  *Id.* ¶ 72.  It also reported backlog as a key metric, which indicated the amount of revenue to be recognized based on the present amount of confirmed orders with a purchase order for products to be fulfilled and billed to customers with approved credit status.  *Id.* ¶ 73.  Finally, it reported bookings, which represented the total value of orders that were received that quarter on a total contract value basis.  *Id.* ¶ 74.

The remaining Defendants are key officers and high-level executives of Extreme during the Class Period.  *Id.* ¶¶ 44–50.  These Defendants "participated in the management of Extreme, had direct and supervisory involvement in Extreme's day-to-day operations, and had the ability to control and did control Extreme's statements to investors."  *Id.* ¶ 50.

**2.  Extreme's Revenues Grew Despite COVID-19's Impact on Backlog**

Extreme's products rely on several key components, such as merchant silicon, microprocessors, integrated circuits, and power supplies.  *Id.* ¶ 75.  Extreme utilized a global sourcing strategy that obtained procurement of these materials and product manufacturing from third-party suppliers and original design manufacturers ("ODM") such as Foxconn, Alpha Networks, Lite-On Technology Corp., Senao Networks, Sercomm Corp., and Wistron NeWeb

United States District Court
Northern District of California

Corp. *Id.* Beginning in March 2020, the COVID-19 pandemic substantially impacted global supply chains. *Id.* ¶ 78. As it related to the networking industry, the COVID-19 pandemic created disruptions and bottlenecks that led to a global semiconductor shortage. *Id.*

Extreme admitted that its supply chain and component suppliers had been negatively affected by the COVID-19 pandemic. *Id.* ¶ 77. Analysts began to grow concerned about Extreme's ability to deliver products and generate revenue during this constrained supply chain environment. *Id.* ¶ 79. These supply chain constraints led to a large and significant increase in Extreme's backlog of orders. *Id.* ¶ 81. Extreme's backlog grew from approximately $100 million in 4Q2021 to a high of $555 million in 1Q2023. *Id.*

During the same time frame, Extreme nonetheless reported strong revenue growth. *Id.* ¶¶ 83–84. Extreme attributed its revenue growth to strong organic demand. *Id.* ¶ 94. Revenues peaked in 4Q2023 but were followed by significant declines in 2Q2024. *Id.* ¶ 91.

### 3. Channel Stuffing and Other Manipulative Sales and Inventory Tactics

During the Class Period, Extreme attributed is revenue growth to strong organic demand when in fact it was due to Defendants' implementation of undisclosed channel stuffing and other manipulative sales and inventory tactics. *Id.* ¶ 98. Channel stuffing refers to the act of a company sending more products to its distributors and partners than the company's distributors and partners are capable of selling downstream to end users. *Id.* ¶ 99.

Multiple former employee ("FE") confidential witnesses corroborate undisclosed channel stuffing and other manipulative sales and inventory tactics. *Id.* ¶ 100. These tactics include "(i) stuffing outdated and unwanted inventory at the distributor/partner level in exchange for incentives such as discounts, monetary rebates, or prioritization in the product backlog line for products that customers wanted; (ii) shipping inventory to distributors and partners early, and even without a purchase order by the end user customer, in order to "pull in" sales for the quarter; (iii) allowing distributors a right of return and stock rotation of a portion of the unwanted inventory for future quarters (to incentivize them to take the unwanted product); (iv) reneging on those same stock distribution rotation agreements (which forced the distributors/partners to hold the product); and (v) manipulation of the Company's revenue figures and forecasts by including million dollar

*United States District Court*
*Northern District of California*

4

orders that Extreme knew it had lost out on to competitors or were improperly double counted—without correction—until the quarter was over." *Id.*; *see id.* ¶¶ 102–232. As a result of these practices, Defendants' reported revenues were improperly inflated. *Id.* ¶ 100.

### 4. Nature of Product Backlog

During the Class Period, Defendants also misrepresented the strength and firm nature of the product backlog. *Id.* ¶ 248. Defendants asserted that based upon "complete visibility" into the product backlog, the "vast majority" of orders included in their backlog reflected "firm" customer commitments, were "not cancelable," and reflected "end user demand." *Id.*

Defendants' statements about the backlog were misleading because multiple FEs explained that (1) the backlog orders could in fact be cancelled at any time by Extreme's customers, *id.* ¶¶ 274, 288, 296–97; (2) it was well known internally that the backlog orders consisted of customer orders that were "double" or "triple" booked, such that they did not reflect "firm" customer commitments, *id.* ¶¶ 273, 279, 299; and (3) Defendants internally hedged that at least 10 percent of the backlog would, in fact, be cancelled, *id.* ¶¶ 280–84.

The backlog grew significantly from 4Q2021 until 1Q2023, and then began to decline starting in 2Q2023, with major declines in 3Q2023 and 4Q2023. *Id.* ¶ 315. As product backlog declined, the gap in backlog decline and recognized product revenue grew. *Id.* ¶ 317. From 2Q2023 to 3Q2023, backlog decreased by about $104.5 million, but product revenue only increased by $17.6 million—leaving a $86.9 million gap. *Id.* ¶ 318. Similarly, from 3Q2023 to 4Q2023, backlog decreased by about $170.2 million, but product revenues only increased by $20.6 million—leaving a $149.6 million gap. *Id.*

### 5. Confidential Witnesses

Plaintiffs rely on eleven confidential witnesses to corroborate their allegations. Each confidential witness with a former employee ("FE") of Extreme.

Former Employee 1 ("FE-1") was a Senior Distribution Account Manager at Extreme from May 2016 through August 2022 and has been in the distribution business for over thirty years. *Id.* ¶ 52. At Extreme, FE-1 managed the Company's relationship with TD Synnex. *Id.* FE-1 reported

5

to the Director of Distribution in the Americas, Joseph Uraco, who in turn, reported to Defendant Brown. *Id.* FE-1 worked with Defendant Brown on a daily basis. *Id.*

Former Employee 2 ("FE-2") was the Director of Sales from before the Class Period to mid-2023. *Id.* ¶ 53. Thereafter, FE-2 was an Account Executive until the end of his tenure at Extreme. *Id.* As Director of Sales, FE-2 reported to David Savage, who in turn reported to SVP Sales, Americas, Pete Brant, who in turn reported to Defendant Rice. *Id.* In his capacity as Director of Sales, FE-2 was responsible for collaborating with end users State, Local and Education ("SLED") accounts, including universities, and the channel partners that sold to them, as well as working with Extreme's relevant distributors. *Id.*

Former Employee 3 ("FE-3") was a Senior-level Manager of pricing at Extreme from before the Class Period to the second half of 2023. *Id.* ¶ 54. FE-3's responsibilities included executing the rollout of pricing and signing off on deals. *Id.* FE-3 reported into the Finance leadership of Defendant Tate, who reported to the CFO. *Id.*

Former Employee 4 ("FE-4") was employed by Extreme until December 2022, most recently serving as Senior Regional Distribution Manager operating out of Europe. *Id.* ¶ 55. FE-4 worked directly with distributor Westcon during his employment with Extreme. *Id.*

Former Employee 5 ("FE-5") was formerly employed by Extreme as Senior Channel Account Manager from March 2022 to April 2024. *Id.* ¶ 56. FE-5's responsibilities included collaborating with Extreme's two largest nationwide channel partners. *Id.* FE-5 reported to Channel Sales Manager – Strategic Partnerships, Matthew Kilianski, and then Director, Global Solution Partnerships – Americas, Amy Bravo, and lastly Director – Strategic Partnerships, Cameron Marchand. *Id.* According to FE-5, Kilianski, Bravo, and Marchand reported to Vice President, Americas Channel, Jennifer Orr, who ultimately reported to Defendant Meyercord. *Id.*

Former Employee 6 ("FE-6") was a Senior Account Manager at Extreme from July 2017 to October 2022. *Id.* ¶ 57. During different points during his tenure at Extreme, FE-6 reported to either David Savage or to FE-2. *Id.* FE-6 worked as part of the SLED department and except for the K-12 segment of SLED, he worked with distributors and partners throughout his tenure. *Id.*

Former Employee 7 ("FE-7") was the former President of a company acquired by Extreme in 2021. *Id.* ¶ 58. FE-7 began working for Extreme in July or August 2021, before officially signing on as an Extreme employee in March 2022. *Id.* FE-7 explained that he was employed as the SVP, Strategy, Office of the CTO from March 2022 until March 2023. *Id.* FE-7 reported to current Chief Technology and Product Officer, EVP/GM Subscription Business, Nabil Bukhari. *Id.* FE-7 was tasked with analyzing several aspects of Extreme's business, including examining the pricing strategy for Extreme's entire product portfolio. *Id.* FE-7 attended quarterly meetings with C-Suite executives. *Id.*

Former Employee 8 ("FE-8") was employed by Extreme as SVP Global Channel Sales from January 2022 to November 2023. *Id.* ¶ 59. The Distribution teams reported to FE-8. *Id.* FE-8 attended "Revenue Assurance" calls led by Defendant Rice, where the Company's backlog was discussed. *Id.*

Former Employee 9 ("FE-9") was employed by Extreme as a Channel Account Manager starting before the Class Period, until late 2023. *Id.* ¶ 60. According to FE-9, he was part of a team of employees managing the account and relationship with one of Extreme's largest resellers / partners during the Class Period. *Id.*

Former Employee 10 ("FE-10") was employed by Extreme as a Senior Account Executive from after July 2023 until April 2024 and was responsible for accounts in North America. *Id.* ¶ 61.

Former Employee 11 ("FE-11") was employed by Extreme as an Account Manager from Fall 2022 through the end of the Class Period in the Europe, Middle East, and Africa ("EMEA") region. *Id.* ¶ 62. FE-11 was responsible for ensuring that partner accounts were set up correctly and received the correct discounts from Extreme's distributors, ensuring there were no conflicts with end users, and working closely with team members in EMEA who worked directly with the partner accounts. *Id.*

United States District Court
Northern District of California

7

## II.    LEGAL STANDARD

### A.    Rule 12(b)(6)

Under Rule 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To overcome a motion to dismiss, a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009) (citations omitted).

### B.    Rule 9(b) and PSLRA

"Securities fraud class actions must meet the higher, more exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Plaintiffs alleging securities fraud must plead all the elements of a securities fraud action with particularity, including "circumstances constituting fraud or mistake." *Id.* at 605; Fed. R. Civ. P. 9(b).

In addition, under the PSLRA, plaintiffs are required to "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (citations omitted). To properly plead falsity, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). To properly plead scienter, the complaint must also "state with particularity facts giving

United States District Court
Northern District of California

8

United States District Court
Northern District of California

rise to a strong inference that the defendant acted with the required state of mind." *Id*. § 78u–4(b)(2). Regarding the "strong inference" standard, a complaint will survive a motion to dismiss, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007).

### C.     Leave to Amend

Pursuant to Rule 15(a)(2), a party may amend its pleadings with the opposing party's written consent or the court's leave. Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id*. This policy is applied with "extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1051 (9th Cir. 2003) (internal citation omitted). The nonmovant bears the burden of demonstrating why leave to amend should not be granted. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987). The Supreme Court has outlined five factors to consider in deciding whether leave to amend is warranted: (1) bad faith on the part of the movant, (2) undue delay by the movant, (3) repeated amendments by the movant, (4) undue prejudice to the nonmovant, and (5) futility of the proposed amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

### III.     REQUESTS FOR JUDICIAL NOTICE OR INCORPORATION BY REFERENCE

"The [C]ourt may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Alternatively, the Court may "consider materials that are submitted with and attached to the Complaint. [The Court] may also consider unattached evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011). The Ninth Circuit has cautioned against the "unscrupulous use of extrinsic documents" under these exceptions, which "risks premature dismissals of plausible claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99 (9th Cir. 2018).

Defendants request judicial notice or incorporation by reference of 28 exhibits, spanning approximately 1,700 pages. ECF 75. Defendants assert that Exhibits 1–4, 6–25, and 28 are incorporated by reference or alternatively, appropriate for judicial notice. *Id.* at 4–7. Defendants also argue the Exhibits 5, 26, and 27, are publicly available SEC filings that are appropriate for judicial notice. *Id.* at 7. Defendants contend that "[t]hese Exhibits provide necessary context to Plaintiffs' allegations of purported corrective disclosures, what the public supposedly understood, and Extreme's alleged revenue losses." ECF 84, at 4.

Plaintiffs oppose every single one of Defendants' requests. ECF 80. Plaintiffs provide three arguments: (1) Exhibits 5–6, 15, and 26–27 are not cited in the complaint and should not be considered for incorporation by reference or judicial notice; (2) Exhibits 1–3 and 23–25 are not necessarily relied on and should not be incorporated by reference or judicial notice; and (3) Exhibits 4, 7–14, 16–18, 20–22, and 28 are relied on in the complaint but should not be incorporated by reference or judicially notice for the truth of the matters asserted. *Id.* at 6–13.

For the reasons that follow, Exhibits 1, 20, 23, and 24 are incorporated by reference for their existence and not for their truth of the matters asserted therein. Exhibits 2–19, 21–22, and 25–28 are judicially noticed for their existence and not for their truth of the matters asserted therein.

### A.    Exhibits 2–19, 21–22, and 25–28

As an initial matter, Exhibits 4–6, 8–10, 13, 15–17, 19, 21–22, and 25–28 are public SEC filings and Exhibits 2, 3, 7, 11, 12, 14, and 18 are publicly available transcripts of earnings calls or investor conferences where Defendants made public statements about Extreme's business.

Plaintiffs concede that "courts typically take judicial notice of SEC filings." ECF 80, at 12. Plaintiffs are primarily concerned that these SEC filings and public statements will be used by Defendants to create a counternarrative. However, the Court is capable of differentiating between factual assertions and attorney argument. Plaintiffs do not dispute that these Exhibits are "not subject to reasonable dispute" and "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Ev. 201.

Courts routinely take judicial notice of public SEC filings and publicly available transcripts of earnings calls or investor conferences—not to accept the entire contents of the documents as true, but to show what information was available to the market. *See Pirani v. Netflix, Inc.*, 710 F. Supp. 3d 756, 767 (N.D. Cal. 2024) ("courts routinely take judicial notice of . . . documents filed with the SEC for the purpose of determining what information was available to the market"); *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 929–30 (N.D. Cal. 2022) (taking judicial notice of transcripts of calls with and presentations to analysts and investors); *Cement Masons & Plasterers Joint Pension Tr. v. Equinix, Inc.*, No. 11-01016 SC, 2012 WL 685344, at *8 n.5 (N.D. Cal. Mar. 2, 2012) (taking judicial notice of the fact that a defendant actually sold more shares during the "six months preceding the class period"). Accordingly, the Court **GRANTS** judicial notice as to the existence of Exhibits 2–19, 21–22, and 25–28 for the purpose of determining what information was available to the market.

### B.    Exhibits 1, 20, 23–24

Exhibit 1 is an article by S. Das, et al. entitled "Detection of Channel Stuffing," dated May 2011. ECF 74-3. Exhibit 23 is an Oppenheimer analyst report issued on January 31, 2024. ECF 74-25. Exhibit 24 is a UBS Global Research and Evidence Lab analyst report issued on January 31, 2024. ECF 74-26.

Plaintiff concedes that Exhibit 1, 23, and 24 are referenced in the complaint but argues that that the Exhibits are not necessarily relied upon for the purpose of incorporation by reference. ECF 80, at 10. Plaintiffs cite Exhibit 1 to provide information relating to "channel stuffing," the sales process Plaintiffs claim Extreme engaged in and that purportedly made false or misleading most of the statements Plaintiffs challenge. ECF 59, ¶ 233 n.37. Thus, Exhibit 1 provides background information that informs the allegations. Additionally, Exhibit 23 and 24 are used to illustrate what the market understood about Extreme's final disclosure. *See* ECF 59, ¶¶ 33, 324, 350, 351.

Here, the Court finds that these Exhibits are relied upon to form the basis of the allegations. The Court **GRANTS** finding that Exhibit 1 is incorporated by reference as it is relied upon to provide background information that informs the allegations. The Court further

**GRANTS** finding that Exhibits 23 and 24 are incorporated by reference as they are used to illustrate what the market understood about Extreme's final disclosure. The Court will consider these Exhibits for only their existence and not for the truth of the matter asserted.

Finally, Exhibit 20 is a CRN article entitled, "Extreme Networks CEO: 'These Are Boon Times for our Channel Partners,' " dated November 22, 2023. ECF 74-22. Plaintiffs concede that its complaint relies on this Exhibit. *See* ECF 59, ¶¶ 369, 443. Accordingly, the Court **GRANTS** finding that Exhibit 20 is incorporated by reference. The Court will consider it for only its existence and not for the truth of the matter asserted.

## IV.    DISCUSSION

Plaintiffs allege that Defendants violated (1) Section 10(b) of the Exchange Act and Rule 10b-5 (b) promulgated thereunder, (2) Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and (3) Section 20(a) of the Exchange Act. ECF 59, ¶¶ 559–85. Defendants move to dismiss each claim. ECF 74.

### A.    Section 10(b) and Rule 10b-5

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2407 (2014)).

In their motion to dismiss, Defendants assert that Plaintiffs are unable to satisfy falsity, scienter, and loss causation. ECF 74, at 8–24.

### 1.  Falsity

To plead falsity, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Statements and omissions are actionably false if they "directly contradict what the defendant knew at that time" or "create an

United States District Court
Northern District of California

12

impression of a state of affairs that differs in a material way from the one that actually exists." *Khoja*, 899 F.3d at 1008; *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false," does not meet the falsity standard. *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

Plaintiffs challenge 47 statements made by Defendants. *See* ECF 59, ¶¶ 356–443; *see also* ECF 74-1 (organizing each statement in an appendix). These statements relate to three categories with some overlap: (1) at least 22 statements relate to demand for Extreme's products and its revenue growth; (2) at least 25 statements concern Extreme's backlog; and (3) at least 6 statements related to Defendants' standard certifications under the Sarbanes-Oxley Act of 2002 ("SOX certifications") attesting to the accuracy of Extreme's financial reporting.

### a.  Growth and Demand Statements

Defendants assert several challenges to Plaintiffs' channel-stuffing theory. ECF 74, at 9–15. Defendants contend that (1) Plaintiffs have failed to plead any improper sales tactics; (2) each growth-and-demand statement is non-actionable corporate optimism; and (3) the PSLRA safe harbor protects several of the growth-and-demand statements. *Id.* Plaintiffs provide counterarguments to each. ECF 81, at 4–10.

### i.  Plaintiffs have failed to allege manipulative sales tactics including channel stuffing.

"Channel stuffing is the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998). The Supreme Court has recognized that channel stuffing may be of "the illegitimate kind (e.g., writing orders for products customers had not requested) or the legitimate kind (e.g., offering customers discounts as an incentive to buy)." *Tellabs*, 551 U.S. at 325.

"To meet the heightened pleading standards of the PSLRA for allegations of channel stuffing, a plaintiff must include sufficient corroborating details about the purported scheme." *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1147 (C.D. Cal. 2018), *aff'd sub*

United States District Court
Northern District of California

*nom. Castro v. Mattel, Inc.*, 794 F. App'x 669 (9th Cir. 2020) (citing *In re ICN Pharm., Inc., Sec. Litig.*, 299 F.Supp.2d 1055, 1061 (C.D. Cal. 2004)). "Specific transactions, specific shipments, specific customers, specific times, or specific dollar amounts, are the types of corroborating details a plaintiff needs to include to support a channel stuffing theory at the pleading stage." *Id.* (internal quotations and citations omitted).

As an initial matter, the parties dispute the specificity in which Plaintiffs need to allege manipulative sales practices as Plaintiffs do not contend that these practices were illegitimate. ECF 81, at 5. Plaintiffs argue that their theory of liability is not based on whether the practices were fraudulent. *Id.* "Plaintiffs do not allege that the channel stuffing conduct was itself illicit." *Id.* Both parties agree that there is nothing inherently improper about offering incentives for wholesalers to buy more product that they otherwise would. *Id.* at 5–6 n.4; ECF 74, at 12–13. Rather, Plaintiffs allege that the touting of revenue without disclosure of the underlying practices that was improper. *Id.*

Plaintiffs rely on two cases. In *In re Plantronics, Inc. Securities Litigation*, defendant company initiated an internal Enterprise Risk Management ("ERM") project. No. 19-CV-07481-JST, 2022 WL 3653333, at *2 (N.D. Cal. Aug. 17, 2022). The ERM project reviewed defendant company's "sales activities with its channel partners over the prior two years and interviewed more than 100 employees." *Id.* From its review, the ERM project team discovered that channel stuffing was occurring at the company. *Id.* The founding member of the ERM project recounted how widespread the practice was. *Id.* at *3. Plaintiffs did not assert that the channel stuffing was itself fraudulent or illicit. *Id.* at *8. Rather, plaintiffs alleged that statements about the company's positive revenue results were misleading because defendants failed to disclose that such results were the byproduct of the undisclosed sales practice of stuffing distributors with excess inventory. *Id.* The court held the statements actionable because plaintiffs had sufficiently alleged that widespread channel stuffing was occurring, defendants were aware of the practice, and defendants failed to mention the practice while attributing positive revenue results to organic consumer demand and other factors. *Id.* at *13.

Similarly, in *Murphy v. Precision Castparts Corporation*, plaintiffs alleged that the defendants misled investors by making statements touting the company's ability to "generate sustainable organic growth" based on demand for the company's products without simultaneously disclosing that the company was engaging in "the practice of pulling in sales to pursue its quarterly goals[.]"  No. 3:16-CV-00521-SB, 2017 WL 3084274, at *8–*9 (D. Or. June 27, 2017), *report and recommendation adopted*, No. 3:16-CV-00521-SB, 2017 WL 3610523 (D. Or. Aug. 22, 2017).  The pull-in sales involved "persuading customers to accept early delivery of product that would ordinarily ship in a future quarter."  *Id.* at *2.  Because the undisclosed pull-in strategy depended on customers holding more inventory than needed at the time, it was unsustainable in the long term.  *Id.* at *9.  The court held that these allegations raised the inference that the defendants' statements were misleading for failure to disclose the pull-in practice.  *Id.*

In both *Plantronics* and *Murphy*, the courts held that plaintiff did not have to allege specific transactions to support their falsity allegations.  However, in both cases, undisputed facts showed that defendants were engaged in unsustainable channel stuffing that materially affected the companies' revenues.  *See Plantronics*, 2022 WL 3653333, at *12 (internal ERM project found channel stuffing based on an interview of over 100 employees and regularly informed defendants of its findings); *Murphy*, 2017 WL 3084274, at *3 (defendants had an established pull-in sales policy that impacted revenues when one of defendant's largest customers cutting inventory in half).  In contrast, here, there are no undisputed facts such as an internal report or internal policy that show that channel stuffing was occurring.  Thus, to get to the *Plantronics* and *Murphy* analysis, as a baseline, Plaintiffs must at least establish with particularized facts that channel stuffing and other manipulative sales practices were occurring.  Thus, the Court next looks to Plaintiffs' allegations of manipulative sales practices.

Plaintiffs contend that they have more than adequately alleged the "specific" times, customers, transactions, and dollar amounts of the undisclosed conduct.  ECF 81, at 6.  At the outset, the timeline of the alleged practice is murky.  Plaintiffs allege that channel stuffing was possible due to Extreme's change in revenue recognition to a "Sales-In" model in 2017.  ECF 59, ¶¶ 103–04.  Defendants contend that such a timeline is not possible because even Plaintiff's cited

United States District Court
Northern District of California

authority confirms that "it is physically impossible for firms to engage in channel stuffing for an extended period of time." *See* ECF 74-3, Ex. 1 at 24–25; *see also* ECF 59, ¶ 233 n.37. In oral argument, Plaintiffs state that they believe the channel stuffing began in 2021—further muddying the timeline.

Plaintiffs largely rely on FEs to allege the manipulative sales practices. ECF 59, ¶¶ 102–232. FE-1 explained that when the Company's revenue recognition model changed from a "Point-of-Sale" ("POS") model to a "Sales-In" model, Defendants were able to make its manipulative practices possible by giving Extreme leverage with its distributors that it never had with end users. *Id.* ¶¶ 103–05. FE-1 described a "Buy-In" process that occurred at the end of each fiscal quarter during which Extreme would send outdated and unwanted inventory to the Company's distributors through multiple incentives. *Id.* ¶ 110. One of these incentives was stock rotation agreements in which Extreme would permit distributors to rotate 15 percent of the inventory, based upon the prior quarter's receipt of Extreme product.[1] *Id.* ¶ 111. Defendant Brown and Defendant Rice would work together on these "Buy-In" deals. *Id.* ¶ 112–13.

FE-1 provides an example of channel stuffing. *Id.* ¶¶ 115–16. At the end of the same quarter in which the model changed to Sales-In, Defendant Brown directed FE-1 to push TD Synnex to take $1 million in hardware equipment inventory that TD Synnex did not need and had no customers for to help Extreme meet its targets. *Id.* ¶ 115. TD Synnex agreed. *Id.* FE-1 states that based on his recent conversations with TD Synnex leadership, this same practice occurred during and into the end of the Class Period. *Id.* ¶ 116.

In another example, FE-1 recounts that during his tenure, TD Synnex had $150 million to $200 million on backlog purchase order. *Id.* ¶ 121. Defendant Brown said that if TD Synnex bought $20 million of another product in the quarter, TD Synnex would get to "keep its place in line" in the backlog line. *Id.* If TD Synnex did not buy that product, Extreme would shift inventory to distributors who would "play ball." *Id.* TD Synnex obliged. *Id.* Similarly, in spring

---

[1] However, FE-1 later explains that Defendant Brown often reneged on honoring Extreme's 15 percent stock rotation agreement stated in the distributors' contracts. ECF 59, ¶ 129. Defendant Brown often only agreed to go as high as rotating 5 percent of recently purchased inventory. *Id.*

United States District Court
Northern District of California

2022, Defendant Rice and Defendant Brown made FE-1 propose to TD Synnex to buy a $40 million package of old inventory nobody wanted, but noting that if TD Synnex accepted this proposal, it would be prioritized for other in demand product. *Id.* ¶ 123.

FE-1 brought these allegations of channel stuffing and manipulative inventory practices in an email directly to Defendant Thomas, on July 20, 2022. *Id.* ¶ 133. He provided an email from Defendant Brown, requesting to a deterrent be added to prevent distributors from stock rotating specific products. *Id.* ¶ 136.

Defendants argue that FE-1's allegations are unreliable. ECF 74, at 10. Specifically, FE-1 cannot have "personal knowledge" of Extreme's business practices during the Class Period, considering he left the Company in August 2022. *Id.* Further, FE-1 alleges that channel stuffing was occurring as early as 2017 without any negative impacts on Extreme's revenue until January 2024. *Id.* Such an assertion is implausible given that channel stuffing cannot be sustained for a such period of time. *Id.*

Here, the Court finds that while FE-1's testimony regarding practices during the Class Period are heavily reliant on hearsay, parts of his testimony prior to his departure are reliable. However, the timeline of FE-1's allegations is unclear. FE-1 allegations of channel stuffing could span from 2017 to 2024—an unusually long period for an "unsustainable" practice. FE-1 alleges Extreme was stuffing TD Synnex and Jenne at the end of each fiscal quarter and year. However, FE-1 can only provide three examples of when he was directed by Defendant Thomas to provide incentives to TD Synnex to purchase product at the end of a quarter. FE-1 must provide more specific and particularized allegations of channel stuffing including clearer timeline and communications with Defendants. While *Plantronics* and *Murphy* courts did not require such specificity from plaintiffs, in those cases, the practice of channel stuffing was undisputed. Here, Plaintiffs must provide more details regarding the examples alleged.

Similarly, FE-3 and FE-6 do not describe any specific examples of channel stuffing—only citing to general allegations of manipulative sales practices. *See* ECF 59, ¶¶ 145–48 (FE-3), 157–58 (FE-6). FE-4 provides one example of Defendant Thomas pressuring Westcon to clear out Extreme's obsolete and end of life products in spring 2022. *Id.* ¶ 153. "[I]n exchange for

17

Westcon's agreement to buy Extreme's obsolete and end of life products, Westcon was then allowed to receive orders off the backlog before other customers who had priority on the backlog list." *Id.* FE-11 also testifies that Westcon was often asked to take early shipments in order to be prioritized in the backlog line. *Id.* ¶ 156. However, FE-4's allegations are based on hearsay and discuss hypothetical terms between that Westcon and Extreme could have agreed to. These allegations need more details such as clearer timeline and specific communications.

Plaintiffs next rely on FE-2. FE-2 described how he was personally directed to ask Extreme's partners to take early inventory at the end of around "two of every four quarters" even when no customer purchase order existed. *Id.* ¶¶ 164–70. Extreme's partners received a monetary incentive to take on the inventory early. *Id.* ¶ 167. FE-6 corroborates this practice but does not provide any specific examples of these transactions. *Id.* ¶¶ 173–76. Similarly, FE-11 recalls of an example of this practice in Fall 2023 but does not provide any additional details of the transaction. *Id.* ¶ 177.

FE-2 provides two examples of channel stuffing. *Id.* ¶¶ 179–90. In July 2023, David Savage, Vice President of Sales and Senior Director of SLED, directed FE-2 to ask channel partner PC Solutions to take around $1.5 million worth of inventory by the end of that month without a confirmed purchase order. *Id.* ¶ 179. This was at the end of Extreme's fiscal year for 2023. *Id.* After FE-2 refused, Savage "called PC Solutions directly and got the deal done himself." *Id.* ¶ 182. FE-2 was later demoted without a reason provided. *Id.* ¶ 186. Finally, FE-2 recalls that another partner, Step CG, was asked to take early inventory sometime around 2021 or 2022 for a value of $1 million. *Id.* ¶ 190.

The Court finds FE-2's allegations regarding the PC Solutions transactions to be sufficiently particularized. However, FE-2's allegations only describe one particular transaction with specific details. Such allegations alone are not sufficient to support allegations of widespread manipulative sales practices.

Similarly, the Court finds FE-5's allegations regarding revenue manipulation during the second fiscal quarter of 2024, *id.* ¶ 215, and FE-10's allegations regarding correcting deal

forecasts, *id.* ¶ 222, to be sufficiently particularized. However, these examples alone are not sufficient to support allegations of widespread manipulative sales practices.

Plaintiffs' allegations regarding manipulative sales practices are close to sufficient as each FE provides corroborating details of such practices including specific distributors and specific dollar amounts. In particular, the Court finds FE-2's allegations regarding to PC Solutions transaction to be sufficiently particularized. However, Plaintiffs' allegations from other FEs are stated largely in general terms. More particularized allegations regarding specific dates, specific communications, and specific transactions are required. Moreover, the timeline of allegations needs to be stated clearer. Additional corroborating details from FEs of distributors would also strengthen the allegations.

Defendants argue that Plaintiffs have not alleged that the practice of channel stuffing affected revenue. ECF 74, at 10–11. However, Plaintiffs' allegations are centered around Defendants' largest distributors. *See* ECF 59, ¶¶ 71 (TD Synnex, Jenne, and Westcon Group Inc. collectively accounted for more than 50 percent of Extreme's revenues during and throughout the Class Period). If Plaintiffs are able to provide more particularized allegations regarding manipulative sales practices toward Defendants' largest distributors, then their allegations will be sufficient to allege that these practices affected revenue.

For the reasons stated above, the Court finds that Plaintiffs have failed to allege falsity as to the manipulative sales practices including channel stuffing. Plaintiffs are provided leave to amend to provide more particularized allegations of manipulative sales practices.

Because the Court finds that Plaintiffs have not alleged the requisite manipulative sales practices with particularity, the Court need not address at this time whether the challenged statements are non-actionable corporate optimism or whether the PSLRA safe harbor applies.

### b. Statements Based on "Firm" Backlog

Defendants contend that Plaintiffs have failed to allege falsity as to the backlog statements because (1) the alleged omissions were not misleading; (2) the PSLRA protects the backlog statements; and (3) the backlog statements are non-actionable opinions. ECF 74, at 15–19.

United States District Court
Northern District of California

19

Plaintiffs counter each argument, asserting that Defendants misstated the "firm" nature of the company's backlog.  ECF 81, at 12–16.

### i.     Plaintiffs' backlog allegations are insufficient.

Plaintiffs allege that Defendants' backlog statements were false and misleading because Defendants failed to disclose that: (1) the backlog orders could be canceled at any time by Extreme's distributors and partners and did not reflect end use demand; (2) backlog orders consisted of orders that were double or triple booked by distributors and partners; (3) Defendants internally hedged that 10 percent of the backlog would be cancelled, far greater than the 1 percent backlog cancellation they led the market to believe; and (4) the actual hedge for backlog cancellations was up to 66 percent.  ECF 59, ¶ 259.

Like its allegations for manipulative sales practices, Plaintiffs rely on FEs to corroborate the backlog order allegations.  *Id.* ¶¶ 261–308.  In 2022, FE-3 cites to a "spike" in cancellations in Extreme's Latin America market with "one cancellation" by an unidentified US customer.  *Id.* ¶ 265.  FE-3 proposed a back-to-back purchase order approach so Extreme could gain greater visibility into the end customer's specific needs, but this solution was never implemented.  *Id.* ¶¶ 267–71.  FE-1, FE-2, FE-5 corroborate that orders were double booked and could be cancelled at any time.  *Id.* ¶¶ 272–75, 296–99.  FE-7 further corroborates that the C-Suite knew of the double-booking and triple-booking by Extreme's customers.  *Id.* ¶ 279.

While FE-3, FE-1, FE-2, FE-5, and FE-7's allegations are reliable, they must be particularized.  These allegations are largely in generalized terms, missing details such as specific examples of customers' double or triple booking and the timing of when these cancellations were occurring.  Like the prior allegations, Plaintiffs' allegations are close to sufficient but need more specific details to corroborate the practices that were omitted.

FE-7 explained that in a meeting he attended between late 2021 and mid-2022, he learned that Extreme assumed that at least 10 percent of the backlog would be cancelled.  *Id.* ¶¶ 277–80.  FE-7 felt that this hedge was not a prudent or conservative enough figure—stating that up to 66 percent was a more realistic figure.  *Id.* ¶¶ 284–87.  Similar to the prior allegations, the timeline of

United States District Court
Northern District of California

20

FE-7's meeting is murky. FE-7's pre-Class Period allegations are reliable to provide what Defendants knew during the Class Period but must be stated with greater particularity.

For the reasons stated above, the Court finds that Plaintiffs have failed to allege falsity as to the "firm" backlog. Plaintiffs are provided leave to amend to provide more particularized allegations of the backlog practices.

Because the Court finds that Plaintiffs have not alleged the requisite backlog allegations with particularity, the Court need not address at this time whether the challenged statements are non-actionable corporate optimism or whether the PSLRA safe harbor applies.

### c. Plaintiffs' SOX certification allegations as tied to the manipulative sales practices and backlog are unactionable.

Finally, Plaintiffs allege that Defendants' SOX certifications, ECF 59, ¶¶ 373, 386, 402, 411, 433, 441, are false and misleading as they attested to the accuracy of financial reporting concerning revenues and backlog. ECF 81, at 16. Defendants counter that SOX certifications are boilerplate statements that are inactionable unless Plaintiff can allege how Defendants knew the reporting of financial controls was false at the time of the report. ECF 74, at 19. Defendants assert that Plaintiffs have not done so here. *Id.*

In *Jaszczyszyn v. SunPower Corp.*, the court determined whether falsity was alleged regarding defendant's SOX certification. No. 22-CV-00956-AMO, 2025 WL 510431, at *5 (N.D. Cal. Feb. 14, 2025). The court noted that "each SOX Certification contains important language qualifying that the declarants only certified the financial reporting to the extent of his or her knowledge on the date of the certification." *Id.* Because of this language, plaintiff had to allege facts "explaining how or why the declarants knew the reporting of financial controls was false at the time of the report in order to successfully plead falsity." *Id.* Because plaintiff had not done so, the court found that plaintiff had failed to allege falsity as to the SOX certification. *Id.*

In *Rabkin v. Lion Biotechnologies, Inc.*, the court found defendants' SOX certification to be actionable because "[d]efendants were, at the time of the certification, engaged in pay for promotion scheme designed to inflate their common stock and mislead investors." No. 17-CV-02086-SI, 2018 WL 905862, at *10 (N.D. Cal. Feb. 15, 2018).

21

Here, the actionability of the SOX certifications is tied to whether Plaintiffs have sufficiently alleged falsity as to manipulative sales practices allegations and backlog allegations. Because Plaintiffs have not sufficiently alleged falsity as to manipulative sales practices allegations and backlog allegations, Plaintiff's allegations as to SOX certifications also fail. Plaintiffs may reassert these allegations in their amended complaint with further particularized manipulative sales practices and backlog allegations

### 2. Scienter and Loss Causation

Defendants also challenge scienter and loss causation. However, because the Court finds that Plaintiffs have failed to allege falsity, the Court need not reach these elements. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) ("[W]e find the issue of falsity to be dispositive, and we therefore do not reach the issues of scienter or loss causation with respect to that complaint.").

The Court finds that Plaintiffs have failed to allege falsity. Accordingly, the Court **GRANTS** the motion to dismiss as to the Section 10(b) and Rule 10b-5(b) claims.

### B.    Scheme Liability

In order "to state a claim for securities fraud based on scheme liability, a plaintiff must allege: (1) the defendant committed a deceptive or manipulative act in furtherance of the alleged scheme; (2) scienter; (3) a connection between the alleged deceptive or manipulative act and the purchase or sale of a security; (4) reliance upon the deceptive or manipulative act; (5) economic loss; and (6) loss causation." *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1206 (N.D. Cal. 2024) (quoting *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1193 (D. Or. 2015)). To be individually liable, each defendant must have committed a deceptive or manipulative act in furtherance of the scheme. *Id.* Rule 9(b) requires plaintiffs to allege the "nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *Id.*

Here, Plaintiffs' scheme liability claim is premised on the same conduct as its Section 10(b) and Rule 10b-5(b) claims. *See* ECF 59, ¶¶ 574. Because the Court has found that Plaintiffs'

United States District Court
Northern District of California

22

allegations regarding manipulative sales practices and backlog are insufficient, the Court **GRANTS** the motion to dismiss as to the scheme liability claim.

### C.    Section 20(a)

"In order to prove a prima facie case under [Section] 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . .; and (2) that the defendant exercised actual power or control over the primary violator . . . ." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (citation omitted). "Section 20(a) provides derivative liability for those who control others found to be primarily liable under the Act." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012) (citation omitted). "Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same." *Id.* (citation omitted).

Because the Court finds that Plaintiffs have failed to properly allege a Section 10(b) and Rule 10b-5 claim, Plaintiffs have likewise failed to allege a Section 20(a) claim. Accordingly, the Court **GRANTS** the motion to dismiss as to the Section 20(a) claim.

## V.    CONCLUSION

For the reasons stated above, the Court **GRANTS** the motion to dismiss as to all claims with leave to amend.

Plaintiffs may file a second amended consolidated complaint by **September 9, 2025**. As part of Plaintiffs' amended complaint, Plaintiffs are ordered to organize all challenged statements into an appendix. *See* ECF 74-1. Additionally, Plaintiffs are ordered to provide as an exhibit a timeline of the allegations.

Plaintiffs may not plead new claims. Should the scope of any amendment exceed the leave to amend granted by this order, the Court will strike the offending portions of the pleading under Rule 12(f). *See* Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act: (1) on its own; or (2) on motion made by a party either before

responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading").

Further Case Management Conference set for September 18, 2025, at 2:00 p.m. via videoconference.  Joint Case Management Statement due by September 11, 2025.  ECF 69.  The Court notes that the Class Certification Motion is due by January 12, 2026.  *See* ECF 50 (case management order).

This Order resolves ECF 74.

**IT IS SO ORDERED.**

Dated: August 15, 2025

_____
TRINA L. THOMPSON
United States District Judge

United States District Court
Northern District of California

24