**LABATON KELLER SUCHAROW LLP**
Lauren A. Ormsbee (*pro hac vice*)
David Saldamando (*pro hac vice*)
Danielle S. Lazarus (*pro hac vice*)
Alexandra E. Forgione (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
lormsbee@labaton.com
dsaldamando@labaton.com
dlazarus@labaton.com
aforgione@labaton.com

*Counsel for Lead Plaintiffs and*
*Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (Bar No. 250893)
Reed R. Kathrein (Bar. No. 139304)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

*Liaison Counsel for the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, on Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> EXTREME NETWORKS, INC., EDWARD B. MEYERCORD III, RÉMI THOMAS, CRISTINA TATE, KEVIN RHODES, NORMAN RICE, JONAS BROWN <br><br> Defendants. | Case No. 3:24-cv-05102-TLT <br><br> **CLASS ACTION** <br><br> **SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

# **TABLE OF CONTENTS**

Page

GLOSSARY OF CERTAIN DEFINED TERMS ......................................................................vi

I.     INTRODUCTION ........................................................................................................2

    A.    Overview of the Fraud ....................................................................................2

    B.    The Channel Stuffing Fraud: Manufacturing "Demand"...............................3

    C.    The Backlog Fraud: Hiding Conditional Orders With Significant Cancellation Risk ..............................................................................................................4

    D.    The Collapse of Both Frauds .........................................................................5

    E.    Procedural History Of This Action ................................................................7

II.    JURISDICTION AND VENUE ..................................................................................9

III.   THE PARTIES ............................................................................................................9

    A.    Lead Plaintiffs ...............................................................................................9

    B.    Defendants....................................................................................................10

    C.    Relevant Third Parties .................................................................................11

IV.   BACKGROUND AND NATURE OF THE FRAUD ................................................14

    A.    Overview Of Extreme's Business ...............................................................14

    B.    Defendants' Class Period Statements Paint a Picture Of Incredible Product Demand, Both Of Orders On Backlog And Shippable Product.................................17

        1.    Extreme's Half Billion Dollar "Firm" and "Not Cancelable" Backlog Increases To Record Highs During The Class Period....................................17

        2.    Extreme's Product Revenues Also Grow Exponentially During The Class Period, Which Defendants Attribute To "Exceptionally Strong" Demand ........................................................................................................22

    C.    In Reality, Defendants Could Not Meet Extreme's Quarterly Revenue Targets And Implemented A Scheme To Leverage Backlog To Stuff The Channel, Close Revenue Gaps, And Report "Strong" And "Unabated" Demand ........................................................................................................26

        1.    A March 16, 2022 Distribution Meeting Launches The Channel Stuffing Scheme—"Ed Chose This Path".......................................27

i

2.    Extreme Solicits Its Top Distributors For The Scheme With One, For Example, Buying $52 Million Of Unneeded, Returnable Product In Exchange For A Prioritized $50 Million Delivery Off The Backlog............. 34

3.    Extreme Formalizes The Scheme To Prioritize Backlog For Those Who Stuff Their Channel With Unneeded Product, And The Consequences Are Felt By Distributors And Employees During FY2023 ................................................................................................. 39

4.    Defendants Engage In Efforts To Sustain The Channel Stuffing Scheme By Preventing Distributors From Returning Or Rotating Their Overstuffed And Unneeded Inventory ................................. 43

5.    FE-1 Resigns And Directly Informs Defendant Thomas (And Others) About The Company's Channel Stuffing Practices ....................................... 49

6.    Extreme Engaged In Channel Stuffing With Partners And Resellers During The Class Period, In Addition to Distributors ................................. 51

7.    The Company And Its Senior Management Monitored End User Sales, So They Knew When Product Was Shipped Without An End User Order ............................................................................................. 61

8.    Defendants Improperly Inflated Revenues Based On Other Illusory Sales Tactics During The Class Period ........................................................ 66

D.    Contrary To Defendants' Repeated Misrepresentations, Extreme's Backlog Was Freely Cancelable, Did Not Reflect "Firm" Orders and Was Not Reflective Of Assured "Revenue Growth" .............................................................. 70

1.    Extreme's Ballooning Backlog Orders Were Conditional And Able to Be Freely Cancelled ...................................................................... 72

2.    In Summer 2022, FE-7 Informs The ELT That Extreme's Handling Of The Backlog Is "Misleading".................................................. 73

3.    Former Employees Confirm That Extreme's Backlog Orders Were Not "Firm" Customer Commitments During The Class Period ................... 78

4.    The Significant Gap Between Product Backlog And Product Revenues Further Confirms that Extreme's Backlog Was Not "Firm" ......... 84

E.    Extreme's Distributors Stop Enabling Channel Stuffing By The End of 2023 ......... 90

V.    THE TRUTH EMERGES THROUGH A SERIES OF PARTIAL DISCLOSURES ........... 92

VI.    EXTREME'S ULTIMATE DECLINE IN REVENUES IS CONSISTENT WITH CHANNEL STUFFING ................................................................................................. 98

VII.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........ 101

ii

A.    4Q2022 Earnings Press Release (July 27, 2022) .............................................. 101

B.    4Q2022 Earnings Investor Presentation (July 27, 2022) ................................ 103

C.    4Q2022 Earnings Conference Call (July 27, 2022) ........................................ 103

D.    Extreme's Letter to Shareholders for FY2022 (July 27, 2022)............................ 107

E.    Interview with CRN Magazine (August 2, 2022) ............................................ 108

F.    FY2022 Form 10-K (August 29, 2022) ............................................................ 109

G.    1Q2023 Earnings Press Release (October 27, 2022) ...................................... 110

H.    1Q2023 Earnings Conference Call (October 27, 2022) ................................ 113

I.    1Q2023 Form 10-Q (October 28, 2022) ........................................................ 116

J.    Needham Virtual Security, Networking & Communications Conference
(November 15, 2022) ...................................................................................... 117

K.    2Q2023 Earnings Press Release (January 25, 2023)........................................ 119

L.    2Q2023 Earnings Investor Presentation (January 25, 2023)........................... 121

M.    2Q2023 Earnings Conference Call (January 25, 2023) ................................ 122

N.    2Q2023 Form 10-Q (January 27, 2023)........................................................... 124

O.    3Q2023 Earnings Conference Call (April 26, 2023) ...................................... 125

P.    3Q2023 Form 10-Q (April 27, 2023)............................................................... 128

Q.    Needham Technology & Media Conference (May 17, 2023)................................ 129

R.    4Q2023 Earnings Press Release (August 2, 2023) .................................... 132

S.    4Q2023 Earnings Conference Call (August 2, 2023) ................................ 134

T.    Rosenblatt Securities Technology Summit (August 22, 2023)........................... 137

U.    FY2023 Form 10-K (August 24, 2023) ............................................................ 139

V.    1Q2024 Earnings Conference Call (November 1, 2023)................................. 139

W.    1Q2024 Form 10-Q (November 2, 2023) ...................................................... 142

X.    Interview with CRN Magazine (November 22, 2023)....................................... 143

VIII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................... 144

A.  Defendants Orchestrated The Illicit Channel Stuffing Scheme To "Get Into The Company [The] # The Street Expects" ............................................................. 144

B.  Internal Documents Are Evidentiary Proof That Defendants Knew Of The Undisclosed Channel Stuffing And Manipulative Sales And Inventory Conduct And The True Nature Of The Backlog ...................................................... 146

C.  Defendants' Own Statements and Admissions Are Strong Evidence of Scienter ....................................................................................................................... 148

D.  Defendants' Internal Reporting Is Strongly Supportive of Scienter ...................... 150

E.  Defendants' Participation In Meetings Is Further Indicia Of Scienter ................... 153

F.  Given The Facts Alleged Herein, It Would Be Absurd To Believe Defendants Did Not Act With Scienter .................................................................. 157

G.  In The Constrained Supply Chain Environment, Defendants Had Motive And Opportunity To Accelerate Revenues Through Channel Stuffing .......................... 159

H.  Extreme's Executive Compensation Program Further Incentivized The Individual Defendants To Accelerate Revenues In The Short Term, Through The Channel Stuffing And Manipulative Sales Tactics .......................................... 161

I.  The Retaliatory Culture At Extreme Supports An Inference of Scienter ................ 163

J.  Defendants' Refusal to Document Their Channel Stuffing Conduct Strongly Supports an Inference of Scienter ............................................................. 166

K.  Defendants' Refusal to Heed Warnings Concerning Their Backlog Misrepresentations Strongly Support Scienter ........................................................ 168

L.  The Departures And Resignations Of High-Level Executives Also Supports An Inference Of Scienter .......................................................................... 169

IX.  LOSS CAUSATION ............................................................................................................ 171

X.  THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .............................. 175

XI.  THE PRESUMPTION OF RELIANCE ............................................................................. 177

XII.  CLASS ACTION ALLEGATIONS ................................................................................... 178

XIII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ............................................. 179

COUNT I  For Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(b) Against Defendants Extreme, Meyercord, Thomas, Tate, And Rhodes ............................................ 179

COUNT II  For Violations Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5(a) And (c) Against All Defendants ....................................................................................... 181

iv

COUNT III  For Violation Of Section 20(a) Of The Exchange Act Against Defendants
     Meyercord, Thomas, Tate, Rhodes, And Rice ...................................................... 184

XIV.    PRAYER FOR RELIEF........................................................................................ 185

XV.    JURY DEMAND ................................................................................................. 186

**APPENDIX A**: CHART OF FALSE AND MISLEADING STATEMENTS AND OMISSIONS

**APPENDIX B**: EXTREME NETWORKS SECURITIES FRAUD TIMELINE

# GLOSSARY OF CERTAIN DEFINED TERMS

| | |
|---|---|
| Americas | Extreme's Americas Sales Region. |
| APAC | Extreme's Asia Pacific Sales Region. |
| Backlog | Defined by Extreme as "confirmed orders with a purchase order for products to be fulfilled and billed to customers with approved credit status." |
| Brown or JB | Defendant Jonas Brown, Extreme's Senior Director of Worldwide Distribution Sales and Strategy at Extreme (*i.e.*, "Global Distribution") beginning in June 2018 and continuing throughout the Class Period. |
| Bukhari | Extreme's Chief Technology Officer Nabil Bukhari, direct supervisor of FE-7 and member of the ELT. |
| CCO | Chief Commercial Officer. |
| CEO | Chief Executive Officer. |
| CFO | Chief Financial Officer. |
| CIO | Chief Information Officer. |
| Clari Database | Extreme's revenue orchestration and organization platform. |
| Class Period | The period from July 27, 2022 through January 30, 2024, inclusive. |
| Company or Extreme | Extreme Networks, Inc. |
| COO | Chief Operating Officer. |
| CRO | Chief Revenue Officer. |
| CTO | Chief Technology Officer. |
| Defendants | Extreme and the Individual Defendants. |
| EIP | Extreme Incentive Plan. |
| ELT | Extreme's Executive Leadership Team. Class Period members included Extreme's CEO, Defendant Meyercord; CFOs, Defendants Thomas, Tate and Rhodes during their respective tenures; COO Rice; Vitalone and Bukhari. |
| EMEA | Extreme's Europe, Middle East, and Africa Sales Region. |
| FEs | Extreme's former employees who are referenced and discussed in the Second Amended Complaint. |

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

| FE-1 | FE-1 was a Senior Distribution Account Manager at Extreme from May 2016 through August 2022 and has been in the distribution business for over thirty years. At Extreme, FE-1 managed the Company's relationship with TD Synnex. FE-1 reported to the Director of Distribution in the Americas, Joseph Uraco, who in turn, reported to Defendant Brown. FE-1 worked with Defendant Brown on a daily basis.

Allegations attributable to FE-1: ¶¶1, 45, 99-113, 115-23, 137, 140, 147-56, 164, 165, 168-77, 179-87, 312, 314, 328, 345, 347-50, 492, 498, 504, 516, 519, 533-35, 548, 608-10, 612. |
|---|---|
| FE-2 | FE-2 was the Director of Sales from before the Class Period to mid-2023. Thereafter, FE-2 was an Account Executive until the end of his tenure at Extreme. As Director of Sales, FE-2 reported to David Savage, who in turn reported to SVP Sales, Americas, Pete Brant, who in turn reported to Defendant Rice. In his capacity as Director of Sales, FE-2 was responsible for collaborating with end users SLED accounts, including universities, and the channel partners that sold to them, as well as working with Extreme's relevant distributors.

Allegations attributable to FE-2: ¶¶46, 143, 190-204, 207-25, 230-35, 237, 239, 315, 518, 585-91. |
| FE-3 | FE-3 was a Senior-level Manager of Pricing at Extreme from before the Class Period to the second half of 2023. FE-3's responsibilities included executing the rollout of pricing and signing off on deals. FE-3 reported into the Finance leadership of Defendant Tate, who reported to the CFO.

Allegations attributable to FE-3: ¶¶27, 141-42, 301-11. |
| FE-4 | FE-4 was employed by Extreme until December 2022, most recently serving as Senior Regional Distribution Manager operating out of Europe. FE-4 worked directly with distributor Westcon during his employment with Extreme.

Allegations attributable to FE-4: ¶¶48, 125-36, 138, 157, 158, 166, 494-95. |
| FE-5 | FE-5 was formerly employed by Extreme as Senior Channel Account Manager from March 2022 to April 2024. FE-5's responsibilities included collaborating with Extreme's two largest nationwide channel partners. FE-5 reported to Channel Sales Manager – Strategic Partnerships, Matthew Kilianski, and then Director, Global Solution Partnerships – Americas, Amy Bravo, and lastly Director – Strategic Partnerships, Cameron Marchand. According to FE-5, Kilianski, Bravo, and Marchand reported to Vice President, Americas Channel, Jennifer Orr, who ultimately reported to Defendant Meyercord.

Allegations attributable to FE-5: ¶¶49, 191, 235-36, 241-47, 251-55, 316-19, 521, 524, 529-31. |

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

| | |
|---|---|
| FE-6 | FE-6 was a Senior Account Manager at Extreme from July 2017 to October 2022. During different points during his tenure at Extreme, FE-6 reported to either David Savage or to FE-2. FE-6 worked as part of the SLED department and except for the K-12 segment of SLED, he worked with distributors and partners throughout his tenure. |
| | Allegations attributable to FE-6: ¶¶50, 107, 143-45, 166, 204-06. |
| FE-7 | FE-7 was the former President of a company acquired by Extreme in 2021. FE-7 began working for Extreme in July or August 2021, before officially signing on as an Extreme employee in March 2022. FE-7 was employed as the SVP, Strategy, Office of the CTO from March 2022 until March 2023. FE-7 reported Bukhari. FE-7 was tasked with analyzing several aspects of Extreme's business, including examining the pricing strategy for Extreme's entire product portfolio. From Summer 2021 through his resignation in March 2023, FE-7 attended monthly and quarterly ELT meetings. |
| | Allegations attributable to FE-7: ¶¶51, 73, 159-60, 272-300, 536-41, 601, 603-07. |
| FE-8 | FE-8 was employed by Extreme as SVP Global Channel Sales from January 2022 to November 2023. The Distribution teams reported to FE-8. FE-8 attended "Revenue Assurance" calls led by Defendant Rice, where the Company's backlog was discussed. |
| | Allegations attributable to FE-8: ¶¶52, 235, 320-27, 542-47. |
| FE-9 | FE-9 was employed by Extreme as a Channel Account Manager starting before the Class Period, until late 2023. According to FE-9, he was part of a team of employees managing the account and relationship with one of Extreme's largest resellers / partners during the Class Period. |
| | Allegations attributable to FE-9: ¶¶53, 239-40. |
| FE-10 | FE-10 was employed by Extreme as a Senior Account Executive from after July 2023 until April 2024 and was responsible for accounts in North America. |
| | Allegations attributable to FE-10: ¶¶54, 144, 256-68, 592-95. |
| FE-11 | FE-11 was employed by Extreme as an Account Manager from Fall 2022 through the end of the Class Period in the EMEA region. FE-11 was responsible for ensuring that partner accounts were set up correctly and received the correct discounts from Extreme's distributors, ensuring there were no conflicts with end users, and working closely with team members in EMEA who worked directly with the partner accounts. |
| | Allegations attributable to FE-11: ¶¶55, 138, 226-28. |

| FIFO | First-In, First-Out backlog fulfillment, described by FE-1, whereby prior to the start of the Class Period, backlog orders were fulfilled and shipped in the order in which they were placed. |
|---|---|
| FY | Extreme's fiscal years, including:<br>• FY2022 (July 1, 2021 to June 30, 2022);<br>• FY2023 (July 1, 2022 to June 30, 2023); and<br>• FY2024 (July 1, 2023 to June 30, 2024) |
| Individual Defendants | Defendants Meyercord, Thomas, Tate, Rhodes, Rice, Brown. |
| Jenne | Jenne Inc., one of Extreme's four largest distributors. |
| Lead Plaintiffs or Plaintiffs | Oklahoma Firefighters Pension and Retirement System ("Oklahoma Fire"); Oklahoma Police Pension and Retirement System ("Oklahoma Police"); Oakland County Employees' Retirement System ("Oakland County ERS"); and Oakland County Voluntary Employees' Beneficiary Association ("Oakland County VEBA"). |
| Meyercord | Defendant Edward B. Meyercord III, CEO of Extreme for all relevant times, and member of the ELT. |
| PO | Purchase Order. |
| Revenue Assurance Calls | Calls led by Defendant Rice, and attended by Defendant Brown, where backlog and backlog hedge were discussed. These calls were a "quarterly function" that became more frequent as the quarter progressed. |
| Rhodes | Defendant Kevin Rhodes, the Executive VP and CFO of Extreme from May 30, 2023 through the end of the Class Period, and member of the ELT. |
| Rice | Defendant Norman Rice, the COO at Extreme from September 2019 through the end of the Class Period, and member of the ELT. |
| Salesforce Database | Extreme's enterprise and customer management system. |
| Savage | David Savage, FE-2's supervisor, and Vice President of Sales and Senior Director of State, Local, and Education Sales ("SLED") for the United States. |
| ScanSource | ScanSource, Inc., one of Extreme's four largest distributors. |
| SEC | Securities and Exchange Commission. |
| Section 10(b) | Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a et seq. |
| Section 20(a) | Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. |

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

| SOX Certifications | Certifications pursuant to the Sarbanes Oxley Act of 2002 signed by Extreme's CEO and CFO, and which attest to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. |
| --- | --- |
| Tate | Defendant Christina Tate, the Interim CFO of Extreme from February 16, 2023 to May 30, 2023, and a member of the ELT while CFO, as well as Senior Vice President and Head of Financial Planning & Analysis ("FP&A") throughout the Class Period. |
| TD Synnex | TD Synnex Corporation, one of Extreme's four largest distributors. |
| Thomas | Defendant Rémi Thomas, CFO of Extreme from November 2018 to February 2023, and member of the ELT. |
| Uraco | Joseph Uraco, Director of Distribution Sales Americas, and FE-1's direct supervisor. |
| Vitalone | Joseph Vitalone, Extreme's Chief Revenue Officer from June 2020 to January 2024, and member of the ELT. |
| Westcon | Westcon Group, Inc., one of Extreme's four largest distributors. |

Lead Plaintiffs Oklahoma Firefighters Pension and Retirement System ("Oklahoma Fire"), Oklahoma Police Pension and Retirement System ("Oklahoma Police"), Oakland County Voluntary Employees' Beneficiary Association ("Oakland County VEBA"), and Oakland County Employees' Retirement System ("Oakland County ERS") (collectively, "Lead Plaintiffs"), by their undersigned counsel ("Lead Counsel"), bring this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendant Extreme Networks, Inc. ("Extreme" or the "Company), and numerous of its key officers and high-level executives: Extreme's (i) CEO Defendant Edward B. Meyercord III ("Meyercord"); (ii) CFOs Defendants Rémi Thomas ("Thomas") (CFO until February 2023), Christina Tate ("Tate") (CFO from February 2023 to May 2023), and Kevin Rhodes ("Rhodes") (CFO from May 2023 through the end of the Class Period); (iii) COO Defendant Norman Rice ("Rice"); and (iv) Senior Director of Worldwide Distribution Sales and Strategy, Defendant Jonas Brown ("Brown") (collectively, the "Individual Defendants"). Lead Plaintiffs bring these claims on behalf of themselves and all other persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Extreme during the period from July 27, 2022 through January 30, 2024, inclusive (the "Class Period"), and were damaged thereby (the "Class").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the ongoing investigation of Lead Counsel. This investigation includes review and analysis of, among other things: (i) public filings made by Extreme with the SEC; (ii) transcripts of the Company's conference calls with analysts and investors; (iii) the Company's presentations, press releases, and other public statements; (iv) research reports issued by securities and financial analysts; (v) news and media reports and other publicly available information concerning the Company and Defendants (defined below); (vi) economic analyses of the movement and pricing of the Company's publicly traded securities; (vii) consultation with experts; (viii) interviews of former employees of the

1  Company (referred to herein as "FE-__");[1] and (ix) handwritten notes, e-mails, and messages

2  provided by and described by certain FEs to Lead Counsel. Lead Counsel's investigation into the

3  factual allegations continues, and many of the relevant facts are known only by Defendants or are

4  exclusively within their custody or control. Lead Plaintiffs believe that additional evidentiary support

5  will exist for the allegations set forth herein after a reasonable opportunity for discovery.

6  **I.    INTRODUCTION**

7      **A.    Overview of the Fraud**

8      1.    For approximately a year and a half, Defendants perpetrated a two-pronged fraud that

9  deceived investors about both the source and sustainability of Extreme's revenue growth.

10      2.    First, while telling investors that record revenues reflected "***exceptionally strong***,"

11  "***robust***," and "***unabated***" organic demand for Extreme's networking equipment, Defendants secretly

12  coerced distributors into buying hundreds of millions of dollars in unwanted inventory by leveraging

13  distributors' access to actually needed products, and accelerated revenues from partners by "pulling-

14  in" sales from future quarters in order to achieve their revenue targets.

15      3.    Second, while assuring investors that Extreme's backlog—$555 million at its peak—

16  comprised "***firm***," "***not cancelable***" orders that reflected "***end user demand***" and no "***double***

17  ***ordering***," with "***less than 1% cancellations***," Defendants knew the backlog was contractually

18  designed to be cancelled and was riddled with duplicate and triplicate orders that would assuredly

19  evaporate to a material extent—with internal estimates ranging from 10% to 66% cancellation rates.

20      4.    Together, these deceptions transformed Extreme into a Wall Street success as its stock

21  climbed to a peak of $32 per share during the Class Period, until the revelation of the true state of the

22  backlog, overstuffed channel, and waning demand destroyed over $2 billion in shareholder value

23  when the stock closed at $12.59 per share following the final corrective disclosure.

24      5.    Attached hereto as **Appendix A** is a chart organizing all of the alleged false and

25  misleading statements and omissions. Also attached hereto, as **Appendix B**, is a succinct timeline of

26

27  _____

28      [1] In order to protect confidentiality, masculine ("he/him") pronouns will be used to describe the former employees ("FE") of Extreme throughout this Complaint, regardless of identity.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

1  the alleged fraudulent scheme, which began just prior to the start of 4Q2022 (the period covering

2  April 2022 through June 2022) and was ultimately revealed to the market by the end of January 2024.

3      **B.    The Channel Stuffing Fraud: Manufacturing "Demand"**

4      6.    Throughout the Class Period, Defendants attributed Extreme's revenue growth to

5  organic customer enthusiasm. "Demand for cloud-driven networking and for Extreme Solutions has

6  ***never been stronger***," CEO Meyercord proclaimed, claiming the Company achieved "***double-digit***

7  ***growth***" due to "***strong demand***" even "in the current supply chain environment." Throughout the

8  Class Period, Defendants Thomas, Tate, and Rhodes echoed these assurances of "***unabated***" and

9  "***exceptionally strong***" demand, "***solid execution***" and "***strong funnel of opportunities***."

10     7.    The truth was the opposite. Facing significant revenue shortfalls heading into the

11  fourth fiscal quarter 2022, Meyercord and the Executive Leadership Team ("ELT") which included

12  Defendants Thomas and Rice as members at the time, discussed how to "***get into the company [the]***

13  ***# the street expects.***" Weighing telling the market the truth about struggling demand versus deceit,

14  Defendants chose deceit and, on or about March 16, 2022, authorized a scheme to manufacture

15  demand.

16     8.    According to contemporaneous notes recorded and maintained by FE-1 (the Senior

17  Distribution Manager responsible for the TD Synnex distributor account), Meyercord and the ELT

18  directed Defendant Brown to implement the scheme, and Brown consequently convened a call on the

19  morning of March 16, 2022, where he communicated the plan to senior distributor and supply chain

20  account executives. Brown described to the meeting attendees how Meyercord "***chose this path—***

21  ***lesser of the 2 evils***" to "***blow up***" the Company's "first-in, first-out" ("FIFO") backlog allocation

22  system because the Company was "***running out of tricks in our bag***" to meet quarterly numbers.

23     9.    The new system was effectively extortion: distributors desperate for in-demand

24  backlog products would be forced to buy massive quantities of unneeded and at times obsolete

25  inventory in exchange for priority shipments. If they refused, those distributors would have to watch

26  their competitors who "played ball" jump ahead in line. After TD Synnex at first refused to "play

27  ball" and take on $40 million of unneeded inventory in March 2022, Extreme's other top distributors

28

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

Jenne and Westcon absorbed that inventory to close the revenue gap and receive backlog priority over TD Synnex.

10.    In one specific transaction that closed in 4Q2022, the first quarter of the Class Period that starts with the Company's 4Q2022 earnings release, top-three distributor Westcon was asked to purchase *$52 million* in "end of sale" junk-cables, brackets, and fans that "nobody wanted" in order to receive $50 million in backlogged products that Westcon's customers actually needed.

11.    The scheme's scope was staggering. Extreme's four main distributors—controlling well over 50% of company revenues—were transformed from business partners into unwilling warehouses, with TD Synnex's inventory alone ballooning from 28 days to up to 100–200 days of supply in a matter of months. As the scheme progressed, and these distributors attempted to return unsaleable products, Defendants tried to prevent those returns from hitting Extreme's books.

12.    Extreme's partners (smaller than distributors but integral to Extreme's success) were similarly coerced. For example, at the close of fiscal year 2023, Extreme partner PC Solutions was heavily, and successfully, pressured to take $1.5 million of product for school districts without customer orders. Another Extreme partner, Synergetics, was similarly pushed to take approximately $700,000 of product with no end user order, and an EMEA Extreme partner took receipt of approximately $500,000 in unneeded wireless access points. Defendants never disclosed this coercion, instead telling investors that it was "exceptionally strong" and "unabated" demand driving Extreme's steady drumbeat of increasing product revenues during the Class Period.

**C.    The Backlog Fraud: Hiding Conditional Orders With Significant Cancellation Risk**

13.    While stuffing channels to create misleadingly organic and "robust" revenues, Defendants perpetrated a parallel deception about what this "strong demand" meant for Extreme's assured revenue growth. Defendants portrayed Extreme's ballooning backlog—first reported to investors at the end of fiscal 2021 and which peaked at *$555 million* in 1Q2023—as deferred revenue. Defendants touted Extreme's "complete" and "excellent visibility" into the firmness of the backlog orders. In early 2023, just as the Company reported its first dip in its backlog, Defendant Tate came out and assured investors that the backlog reflected "***real projects that we see***," was "***not cancelable***,"

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

and that Defendants "***don't see double ordering***," flatly characterizing "double ordering" as "***not a phenomenon we see at all*** . . . ." Incredibly, Defendants told investors that backlog cancellation risk was just 1%.

14.     In reality, Defendants knew Extreme's backlog was not secure, and their depictions of it as "not cancelable" and "firm" were illusory.

15.     At a summer 2022 ELT meeting, Senior VP FE-7 (a regularly invited attendee at ELT meetings who reported to ELT member Bukhari), was shocked to learn that Defendants internally hedged that only 10% of its backlog would be cancelled. This 10% hedge alone reveals an intent to deceive investors who were assured repeatedly not to expect more than a 1% cancellation rate. But what alarmed FE-7 was that even a 10% hedge was "misleading" and "just not right." FE-7 expressed his concerns to the ELT immediately.

16.     FE-7 was so bothered by Extreme's paltry 10% cancellation hedge that he went out and immediately conducted an "acid test" survey of industry CIOs who were responsible for ordering the types of products sold by Extreme and its competitors to gauge whether it was standard industry practice to place multiple simultaneous, conditional orders for essentially interchangeable products, especially given supply chain pressures. FE-7's acid test confirmed that customers routinely placed duplicate orders with 2-3 competitors, meaning up to 66% of Extreme's backlog consisted of phantom orders that would vanish once competitors delivered first. The backlog purchase orders themselves contained "first come, first serve" cancellation clauses, meaning that distributors and partners were freely entitled to—and expected to—cancel backlog orders once they were fulfilled by another manufacturer first. FE-7 presented the conclusions from his "acid test" to ELT member Bukhari and asked him to relay his results to the other ELT members, which included Meyercord, Thomas and Rice. Yet, nothing changed, and with respect to the backlog, Meyercord continued assuring investors of "***complete visibility***" with "***negligible cancellations...less than 1% of bookings***."

### D.    The Collapse of Both Frauds

17.     Ultimately, both unsustainable frauds unraveled. Distributors and partners revolted against the extortionate channel stuffing and the impact of their returns of the unneeded product,

5

refusal to take on more unneeded product, and cancellation of backlog orders revealed the truth about Extreme's declining demand and freely cancelable and conditional backlog.

18.     After cracks in the backlog appeared in January 2023, the supposedly "firm" backlog crashed from a peak of $555 million to $267 million—a 48% collapse in August 2023. The math exposed the lie: when backlog fell $170 million in one quarter, revenues grew just $21 million—meaning $149 million simply vanished, proving the orders were never real.

19.     On January 31, 2024, Defendants finally admitted the truth about both frauds. They revealed that "distributors and partners have lowered inventory purchases" (the channel stuffing had stopped) and needed to digest "$40-50 million in channel inventory" (the warehouses were stuffed with unwanted products). They admitted demand would be "masked by inventory flowing out of the channel" (fake revenues were being exposed) and that backlog had "normalized earlier than anticipated" (the phantom orders had evaporated).

20.     As the truth was revealed, Extreme's stock crashed over 60%, from a Class Period high of $32 per share to the end of Class Period low of $12.59 per share.



21.     Accordingly, the pension funds and other investors who purchased Extreme stock in a market that relied on Defendants' twin lies about "strong demand" and "firm backlog" in setting Extreme's stock price were financially devastated, suffering significant harm once the value of their shares collapsed.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

### E.     Procedural History Of This Action

22.     On December 30, 2024, the Court appointed Oklahoma Police, Oklahoma Fire, Oakland County VEBA and Oakland County ERS as Lead Plaintiffs and Labaton Keller Sucharow as Lead Counsel (ECF No. 51). On February 14, 2025, Lead Plaintiffs filed an Amended Consolidated Complaint for Violations of the Federal Securities Laws ("Amended Complaint") (ECF No. 59). On April 15, 2025, Defendants filed a Motion to Dismiss the Amended Complaint (ECF No. 74), which Lead Plaintiffs opposed (ECF No. 81). On August 15, 2025, after oral argument held on August 12, 2025, the Court granted the motion to dismiss with leave to amend by September 9, 2025 (ECF No. 92) (the "Order").

23.     In the Order, the Court addressed whether the Amended Complaint adequately alleged the falsity of the challenged false and misleading statements and omissions. While the Court determined that the Amended Complaint's allegations "regarding manipulative sales practices are close to sufficient" to establish falsity and identified certain allegations it found "to be sufficiently particularized," the Court noted that "[m]ore particularized allegations regarding specific dates, specific communications, and specific transactions are required," "the timeline of allegations needs to be stated clearer," and "[a]dditional corroborating details from FEs of distributors would also strengthen the allegations." *Id.* at 19. The Court also stated: "If Plaintiffs are able to provide more particularized allegations regarding manipulative sales practices toward Defendants' largest distributors, then their allegations will be sufficient to allege that these practices affected revenue." *Id.* With respect to the allegations concerning the falsity of the alleged backlog misrepresentations, the Court indicated that "Plaintiffs' allegations are close to sufficient but need more specific details to corroborate the practices that were omitted." *Id.* at 20. The Court specifically identified the relevance of FE-7's allegations but noted that while "FE-7's pre-Class Period allegations are reliable to provide what Defendants knew during the Class Period [they] must be stated with greater particularity." *Id*.

24.     Lead Plaintiffs respectfully submit that the wealth of additional information contained in the Second Amended Complaint addresses and far exceeds the types of additional allegations the Court discussed in the Order. Specifically, FE-1, FE-2, FE-4, FE-7 and FE-11 provide compelling

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

additional testimony and documentary evidence that provides the "particularized allegations regarding specific dates, specific communications, and specific transactions," including specific channel stuffing transactions rushed in at the end of each fiscal year within the Class Period, one of which was for a whopping $102 million. These allegations "provide more particularized allegations regarding manipulative sales practices toward Defendants' largest distributors," which the Court noted would be "sufficient to allege that these practices affected revenue."

25.     This new information also enables Lead Plaintiffs to present a remarkably precise "timeline of allegations" that (a) pinpoints the launch of the manipulative scheme to stuff the channel, which was initiated, approved, and implemented by the Individual Defendants, to the morning of March 16, 2022; and (b) clarifies that FE-7, a senior level executive with decades of relevant experience and who attended and participated in ELT meetings with Defendants Meyercord, Thomas, and Rice, informed Defendants at the start of the Class Period that Extreme's backlog practices were "misleading" because up to two thirds of the over $500 million reported backlog was at likely risk of cancellation, only to be ignored. The new information also provides "[a]dditional corroborating details" from distributors in the form of  discussions between FE-1 and FE-4, on the one hand, and representatives of distributors, on the other hand, where those distributors recounted how (a) Extreme's manipulative sales practices continued throughout the Class Period (after FE-1 and FE-4 departed) and (b) how distributors stopped acquiescing to Extreme's demands in 2023, leading to the disclosures alleged herein.

26.     The Court also ordered that Lead Plaintiffs "organize all challenged statements into an appendix" and provide "a timeline of the allegations," which are attached hereto as **Appendix A** and **Appendix B**. Order at 23.

27.     The additional allegations contained in the Second Amended Complaint, including specifically those highlighted above, together with the previously alleged facts, unequivocally and overwhelmingly demonstrate, with the requisite particularity, Defendants' violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5(a), (b) and (c), promulgated thereunder.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

## II.    JURISDICTION AND VENUE

28.    The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

29.    The Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

30.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act, 15 U.S.C. § 78aa, because Extreme transacts substantial business and has corporate offices in California, including in this District. Extreme's stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "EXTR." In connection with the acts alleged in this Second Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    THE PARTIES

### A.    Lead Plaintiffs

31.    Lead Plaintiff Oklahoma Fire is a multiple-employer, cost-sharing public employee retirement plan that covers 473 cities, 28 fire protection districts, and 135 county fire departments as of June 30, 2024. Oklahoma Fire had $3.4 billion in assets under management as of June 30, 2024. As set forth in the certifications submitted with its motion for appointment of Lead Plaintiff, (*see* ECF No. 23-2), incorporated by reference herein, Oklahoma Fire purchased Extreme common stock during the Class Period.

32.    Lead Plaintiff Oklahoma Police is a benefit pension fund that provides retirement and related benefits for qualified police officers and their beneficiaries in the state of Oklahoma, with more than 5,046 active members, 3,309 retires, 1,001 beneficiaries, and 174 disabled members as of June 30, 2024. Oklahoma Police had over $3.2 billion in assets under management as of June 30, 2024. As set forth in the certifications submitted with its motion for appointment of Lead Plaintiff, (*see* ECF No. 23-2), incorporated by reference herein, Oklahoma Police purchased Extreme common stock during the Class Period.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

33.   Lead Plaintiff Oakland County VEBA provides healthcare benefits for retired employees of Oakland County, Michigan and their spouses and eligible dependents. As set forth in the certification submitted with its motion for appointment of Lead Plaintiff, (*see* ECF No. 23-2), incorporated by reference herein, Oakland County VEBA purchased Extreme common stock during the Class Period.

34.   Lead Plaintiff Oakland County ERS provides pension benefits to retired employees of the Oakland County, Michigan retirement system, and their designated beneficiaries. As set forth in the certification submitted with its motion for appointment of Lead Plaintiff, (*see* ECF No. 23-2), incorporated by reference herein, Oakland County ERS purchased Extreme common stock during the Class Period.

**B.   Defendants**

35.   Defendant Extreme is a public corporation incorporated in the state of Delaware. Founded in 1996, Extreme first incorporated in California in May 1996 and shipped its first products in 1997. The Company reincorporated in Delaware in March 1999 and went public in April 1999. Throughout the Class Period, Extreme common stock traded actively on the NASDAQ under the ticker symbol "EXTR." During the Class Period, there were approximately 130 million shares of Extreme common stock outstanding.

36.   Defendant Edward B. Meyercord III ("Meyercord") has served as President and Chief Executive Officer ("CEO") of Extreme since April 2015 and throughout the Class Period. Prior to serving as President and CEO, Meyercord joined Extreme's Board as an independent director in October 2009 and served as Chairman of the Board from March 2011 through August 2015.

37.   Defendant Rémi Thomas ("Thomas") served as Chief Financial Officer ("CFO") of Extreme from November 2018 to February 2023.

38.   Defendant Cristina Tate ("Tate") served as Interim CFO of Extreme from February 16, 2023 to May 30, 2023. During the entirety of the Class Period, Tate served as Senior Vice President and Head of Financial Planning & Analysis ("FP&A").

39.   Defendant Kevin Rhodes ("Rhodes") served as Executive Vice President and CFO of Extreme from May 30, 2023 through the end of the Class Period.

40.    Defendant Norman Rice ("Rice") was the Chief Operating Officer ("COO") at Extreme from September 2019 to February 2024. Amongst his duties, Defendant Rice led the Company's Global Supply Chain Management and Operations. On January 8, 2024, Extreme announced through a press release that Defendant Rice would be appointed as Chief Commercial Officer ("CCO"), which is his current title.

41.    Defendant Jonas Brown ("Brown") is the Senior Director of Worldwide Distribution Sales and Strategy at Extreme (*i.e.*, "Global Distribution"), and was in that position since June 2018 and throughout the Class Period. According to former employees, Defendant Brown reported directly to the C-Suite through Defendant Rice.

42.    Defendants Meyercord, Thomas, Tate, Rhodes, Rice, and Brown are collectively referred to herein as the "Individual Defendants." These Individual Defendants participated in the management of Extreme, had direct and supervisory involvement in Extreme's day-to-day operations, and had the ability to control and did control Extreme's statements to investors. They were involved in drafting, reviewing, publishing, and/or making the Company's statements to investors, including the false and misleading statements and omissions alleged herein. Further, as discussed herein, Defendants Rice and Brown were aware that their undisclosed conduct would lead to false and misleading statements made by Defendants Extreme, Meyercord, Thomas, Tate, and Rhodes.[2]

43.    Extreme and the Individual Defendants are collectively referred to herein as "Defendants."

**C.    Relevant Third Parties**

44.    Joe Vitalone ("Vitalone") was Extreme's Chief Revenue Officer ("CRO") from June 2020 to January 2024. According to Extreme's website, Vitalone oversaw global sales, services,

---

[2] Indeed, during the Class Period, Defendant Rice spoke to investors in investor conferences, including, for example, in Extreme's November 7, 2023 Analyst Investor Day in New York City. Thus, Defendant Rice would have known that his undisclosed fraudulent scheme would render the other Individual Defendants' statements false and misleading.  Similarly, because Defendant Brown reported directly to the C-Suite through Defendant Rice (who was the COO of Extreme), he too, was aware that his undisclosed fraudulent scheme would render the other Individual Defendants' statements false and misleading.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

channel, and sales operations teams, and his primary responsibilities included "driving sales" and growing Extreme's revenues. On January 8, 2024, Extreme announced that Vitalone had resigned from his position.

45.    FE-1 was the Senior Distribution Account Manager at Extreme from May 2016 through August 2022, and has been in the distribution business for over thirty years. FE-1 reported to the Director of Distribution in the Americas, Joe Uraco, who in turn, reported to Defendant Brown. Throughout FE-1's tenure at the Company, he managed Extreme's relationship with TD Synnex, one of Extreme's top three largest distributors. FE-1 worked closely with Defendant Brown on a daily basis. FE-1 decided to leave the Company in July 2022 after witnessing numerous instances of unethical and manipulative channel stuffing behavior with distributors (explained more fully below)—committed by Defendant Rice and Defendant Brown. These channel stuffing and manipulative inventory practices were made known to the other Individual Defendants. Specifically, FE-1 explained that prior to his departure, he provided Defendant Thomas documents demonstrating the unethical channel stuffing conduct that he witnessed, and described the unethical practices that he saw.[3]

46.    FE-2 was employed by Extreme throughout the Class Period, including as Director of Sales from before the Class Period to mid-2023. Thereafter, he was an Account Executive until the end of his tenure at Extreme. As Director of Sales, FE-2 reported to Vice President of Sales and Senior Director of SLED (State, Local, and Education) Sales David Savage, who in turn reported to Senior Vice President Sales, Americas, Pete Brant, who in turn reported to Defendant Rice. In his capacity as Director of Sales, FE-2 was responsible for collaborating with end user SLED accounts, including universities, and the channel partners that sold to them, as well as working with Extreme's relevant distributors.[4]

---

[3] According to FE-1, Extreme personnel communicated internally at Extreme through text messages on their personal phones. He explained that he and other colleagues also often spoke with each other on Extreme's video call function, which was either on Microsoft Teams or Zoom.

[4] According to FE-2, he and his colleagues often communicated internally using the Company's Microsoft Teams chats and instant messaging. FE-2 also recalled receiving some requests via text message directly to his personal phone, specifically "if they [Extreme] did not want something on a corporate account."

47.     FE-3 was a Senior-level Manager of Pricing at Extreme from before the Class Period to the second half of 2023. FE-3's responsibilities included executing the rollout of pricing and signing off on deals. FE-3 reported into the Finance leadership of Defendant Tate, who reported to the CFO (*i.e.* Defendant Thomas until February 2023, and then Defendant Rhodes beginning in May 2023).[5]

48.     FE-4 was employed by Extreme until December 2022, most recently serving as Senior Regional Distribution Manager operating out of Europe. FE-4 worked directly with leading distributor Westcon during his employment with Extreme.

49.     FE-5 was formerly employed by Extreme as Senior Channel Account Manager from March 2022 to April 2024. His responsibilities included collaborating with Extreme's two largest nationwide channel partners. FE-5 explained that he reported to Channel Sales Manager – Strategic Partnerships, Matthew Kilianski, and then Director, Global Solution Partnerships – Americas, Amy Bravo, and lastly Director – Strategic Partnerships, Cameron Marchand. According to FE-5, Kilianski, Bravo, and Marchand reported to Vice President, Americas Channel, Jennifer Orr, who ultimately reported to Defendant Meyercord.

50.     FE-6 was a Senior Account Manager at Extreme from July 2017 to October 2022. During different points at his tenure at Extreme FE-6 reported to either David Savage or to FE-2. FE-6 worked as part of the SLED department and except for the K-12 segment of SLED, he worked with distributors and partners throughout his tenure.

51.     FE-7 was the former President of a company (Intovista) that was acquired by Extreme in 2021. FE-7 began working for Extreme in August 2021 as the sale was underway, and formally became an Extreme employee in March 2022. However, FE-7 attended and participated in quarterly and monthly Executive Leadership Team ("ELT") meetings attended by Defendants Meyercord, Thomas, Rice, as well as Joe Vitalone and others, beginning in or around August 2021. FE-7 explained that he was formally employed as the Senior Vice President, Strategy, Office of the CTO from March 2022 until March 2023. FE-7 reported to current Chief Technology and Product Officer,

---

[5] Defendant Tate was the interim CFO from February 2023 to May 2023.

EVP/GM Subscription Business, Nabil Bukhari. FE-7 was tasked with analyzing several aspects of Extreme's business, including examining the pricing strategy for Extreme's entire product portfolio.

52.    FE-8 was employed by Extreme as Senior Vice President Global Channel Sales from January 2022 to November 2023. The Distribution teams reported to FE-8. FE-8 attended "Revenue Assurance" calls led by Defendant Rice, where the Company's backlog was discussed.

53.    FE-9 was employed by Extreme as a Channel Account Manager starting before the Class Period, until late 2023. According to FE-9, he was part of a team of employees managing the account and relationship with one of Extreme's largest resellers/partners during the Class Period.

54.    FE-10 was employed by Extreme as a Senior Account Executive from after July 2023 until April 2024 and was responsible for accounts in North America.

55.    FE-11 was formerly employed by Extreme as an Account Manager from Fall 2022 through the end of the Class Period in the EMEA region. As an Account Manager, he was responsible for ensuring that his partner accounts were set up correctly and received the correct discounts from Extreme's distributors. He was also responsible for ensuring there were no conflicts with end users. FE-11 worked closely and spoke with team members in EMEA who worked directly with the partner accounts.

## IV.    BACKGROUND AND NATURE OF THE FRAUD

### A.    Overview Of Extreme's Business

56.    Extreme is a global provider of cloud-based computer networking equipment and related services. Extreme develops, manufactures, and sells wired and wireless network infrastructure hardware equipment (*i.e.*, "product"), such as wireless access points.

57.    Extreme conducts business in three major geographic regions: (1) Americas, (2) Europe, Middle East, and Africa ("EMEA"), and (3) Asia Pacific ("APAC").

58.    Extreme's fiscal year ends June 30 of each calendar year. For example, the Company's 2023 fiscal year ("FY") ended June 30, 2023. Thus, 1Q refers to the fiscal quarter ending September 30 of each calendar year; 2Q refers to the fiscal quarter ending December 31; 3Q refers to the fiscal quarter ending March 31 (of the following calendar year); and 4Q refers to the fiscal quarter ending June 30. As an example, 1Q2024 refers to calendar fiscal quarter ended September 30, 2023.

14

59.     The Company reported both (1) product revenues and (2) subscription-based revenues, with product revenues accounting for approximately 70% of Extreme's total revenues during and throughout the Class Period.[6]

60.     During the Class Period, Extreme's total revenues were also reported by its two major channels: (1) Direct and (2) Distributor. The Direct channel refers to Extreme selling its products directly to end user customers. The Distributor channel refers to Extreme selling its products to end users through: (a) its distributors (which sell to partners/resellers); or (b) its partners/resellers (which sell directly to end users). Accordingly, Extreme's flow of product and sales in the Distributor channel can be illustrated through the following two diagrams:

**Diagram A**



**Diagram B**



61.     Extreme disclosed that revenues through the Distributor channel were 85% of total product revenues for FY2024, 83% of total product revenues for FY2023, and 80% of total product revenues for FY2022.

62.     Further, Extreme stated that its three "largest distributors" were TD Synnex Corporation ("TD Synnex"), Jenne Inc. ("Jenne"), and Westcon Group Inc. ("Westcon"), with ScanSource right behind them.[7] Specifically, Extreme disclosed in its yearly filings that its three

---

[6] Specifically, according to Extreme's SEC filings, product revenues accounted for 62.6% of total revenues for FY2024, 71% of total revenues for FY2023, and 68.5% of total revenues for FY2022.

[7] *See*, *e.g.*, Extreme 10-K for FY2022 at 8, 61.

15

largest distributors (TD Synnex, Jenne, and Westcon) collectively accounted for **more than 50%** of Extreme's total revenues during and throughout the Class Period:

| Distributor | FY 2024 | FY 2023 | FY 2022 | FY 2021 |
|---|---|---|---|---|
| TD Synnex | 21% | 18% | 20% | 19% |
| Jenne | 22% | 15% | 16% | 18% |
| Westcon | 16% | 20% | 18% | 16% |
| **Total** | **59%** | **53%** | **54%** | **53%** |

63.    In sum, these three distributors accounted for **over 54% of <u>total</u> Extreme revenues in FY2022, 53% of <u>total</u> Extreme revenues in FY2023, and 59% of <u>total</u> Extreme revenues in FY2024**. ScanSource was also an important distributor for Extreme.[8] For fiscal year 2022, ending June 30, 2022, ScanSource accounted for less than 10% of accounts receivable, but jumped to account for 14% of accounts receivable by the end of the first quarter of 2023, and stayed above 10% for the ensuing two years. In fiscal years 2023 and 2024, ScanSource accounted for 10% and 11% of Extreme's accounts receivable.[9]

64.    According to its Class Period filings with the SEC, Extreme recognized product revenues at the moment when its products were shipped to Extreme's "customers" (*i.e.* its distributors or partners in the Distribution channel, and end users in the Direct channel)—specifically, when "control of the product is transferred to the customer (*i.e.*, when the Company's performance obligation is satisfied), which typically occurs at **shipment** for product sales."[10]

---

[8] Although Extreme reports ScanSource's accounts receivable, it does not report revenues attributable to ScanSource

[9] Notably, Jenne became an increasingly large percentage of Extreme's accounts receivable during the Class Period, comprising 28% of accounts receivable in fiscal year 2022, 39% in fiscal year 2023, and 64% in fiscal year 2024. This means that approximately half of Extreme's accounts receivable in fiscal year 2023 (ending June 30, 2023) were attributable to just Jenne and ScanSource, which rose to 75% for fiscal year 2024 (ending June 30, 2024).

[10] *E.g.*, Extreme 10-K for FY2023 at 57. Accounting Standards Update No. 2014-09, Revenue from Contracts with Customers, Topic 606 ("Topic 606") became effective for public companies for annual reporting periods beginning after December 15, 2017, and was adopted by Extreme thereafter. Topic 606 established a framework for recognizing revenue from customer contracts, providing that companies should recognize revenue in the period in which a good or service is transferred from the company to the customer. According to FE-1, in 2018 or 2019, following the effectuation of Topic

Footnote continued on next page

**B.    Defendants' Class Period Statements Paint a Picture Of Incredible Product Demand, Both Of Orders On Backlog And Shippable Product**

    **1.    Extreme's Half Billion Dollar "Firm" and "Not Cancelable" Backlog Increases To Record Highs During The Class Period**

65.    In addition to revenues earned from shipped product, Extreme reported its product backlog as a key metric during the Class Period. As Extreme stated in its reports filed with the SEC, the Company's backlog represented the amount of revenue Extreme expected to be recognized based on the present amount of "confirmed orders with a purchase order for products to be fulfilled and billed to customers with approved credit status." Importantly, and as discussed further below, orders on backlog represented orders that had not been "fulfilled" or shipped, and thus, could ***not*** be counted as revenue. Nonetheless, Defendants impressed upon the market repeatedly throughout the Class Period that the backlog effectively represented near-certain incoming revenue.

66.    Extreme's networking products rely on several key components, such as merchant silicon, microprocessors, integrated circuits, and power supplies, as a part of an expansive supply chain. The COVID-19 pandemic that first emerged during 2020, however, created disruptions and bottlenecks that led to shortages of Extreme's supplies for its networking products for the following few years.

67.    These supply chain disruptions, together with the larger impact of the COVID-19 pandemic, immediately affected Extreme's revenues. For example, while Extreme had reported total revenues of $267.5 million in 2Q2020 (ending December 31, 2019), $190.5 million of which were product revenues, that number crashed to $209.5 million in 3Q2020 (ending March 31, 2020), $136.5 million of which were product revenues, and only $215.5 million in 4Q2020 (ending June 30, 2020), $141.5 million of which were product revenues. Those revenue figures started to improve in fiscal year 2021, but supply chain disruptions still resulted in a scarcity of Extreme's most in-demand products. Indeed, in Extreme's 3Q2021 Earnings Call (for the quarter ending March 31, 2021), which

---

606, Extreme changed its revenue recognition model from a "Point-of-Sale" model—under which, FE-1 explained, Extreme recognized revenue only when an end user purchased the product from Extreme's reseller/partners—to a "Sales-In" model—under which sales and revenue were recognized as soon as the merchandise physically left Extreme for a distributor or partner.

took place on April 28, 2021, Defendant Meyercord noted that "supply chain constraints" continued to be a concern that would carry on at least until the following year.

68.    Specifically, during that call, analysts asked whether Extreme can "quantify how the supply constraints are impacting your 4Q[2021] outlook? And how much revenue you think you're leaving on the table or pushed out to later quarters?" Defendants Meyercord and Thomas responded that the ongoing supply chain constraints had a "material" "revenue impact" to Extreme and stated that there would be a building up of backlog for the upcoming 4Q2021 quarter (ending June 30, 2021)—stating that "from a revenue perspective, you've seen our book-to-bill[11] number greater than 1. And I think you could expect to see that in this [4Q2021] quarter as well. . . . With our forecast, we're expecting to build backlog in this [4Q2021] quarter."

69.    In light of its growing backlog, Extreme began publicly reporting its total cumulative product backlog on a quarterly basis in 4Q2021 (ending June 30, 2021). Extreme's backlog skyrocketed from approximately $33 million in 1Q2021, to $100 million in 4Q2021, to a high of **$555 million** in 1Q2023 (ending March 31, 2023). As Defendants explained to investors, Extreme's rapidly increasing backlog gave "confidence" to Defendants' promises of continued revenue growth, because, as Defendants explained, the backlog represented assured revenues based on current confirmed orders that simply could not be met at the current moment due to supply chain constraints.

70.    Extreme reported backlog on a quarterly basis from 4Q2021 through 4Q2023, after which the Company stopped reporting backlog on a quarterly basis. As shown below, at the start of the Class Period when the Company reported its financial results for 4Q and FY2022, Extreme's backlog was reported to be valued at more than half a billion dollars:

---

[11] The Book-to-Bill or "B-B" ratio refers to the flow of orders for a specified period, *i.e.*, the dollar value of orders received divided by the dollar value of orders shipped and billed during the quarter.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

1
2
3
4
5
6
7
8
9
10



11    71.    Prior to the start of the Class Period, once Extreme began publicly reporting its backlog

12   value, analysts immediately questioned whether the reported backlog could be counted on as

13   indicative of future revenues. For example, an analyst on the July 28, 2021 Q42021 Earnings Call

14   expressed concern over the reliability of the backlog figure, nothing that the "investing community

15   is so worried that there's some degree of perhaps meaningful over-ordering," and pressed Defendant

16   Meyercord, asking: "What is your visibility as to true demand and the risk that there is a . . .

17   meaningful amount of over-ordering going on, and so true demand is far less than what your nominal

18   order book and other demand metrics would indicate?" Meyercord rejected the analyst's concerns

19   about Extreme's customers "over ordering" or "double ordering" (*i.e.*, customers placing multiple

20   orders for substantively identical products with Extreme and other competitors and then cancelling

21   with Extreme if another competitor met the order first), responding that, compared to Extreme's other

22   competitors, Extreme "do[es]n't see it [over-ordering] as much . . . in terms of our backlog, it's a

23   pretty small percentage."

24    72.    As noted in the chart above, one year later, by the close of 4Q2022, first reported on

25   July 27, 2022 (the first day of the Class Period), Extreme reported a whopping ***$513 million of***

26   ***backlog orders,*** a number that would peak at ***$555 million*** the following quarter. Defendants'

27   statements about the surety of that backlog figure had become increasingly strident and assured. For

28

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

example, during and throughout the Class Period, Defendants touted to the market that—based upon Defendants' "*complete visibility*" into the product backlog—the "vast majority" of orders included in Extreme's backlog reflected "*firm*" customer commitments, were "*not cancelable*," and reflected "*end user demand*." Specifically, Defendants told investors that, for example:

> "We have complete visibility into our product backlog *and have received negligible cancellations to date of less than 1% of bookings*. *Our backlog primarily consists of our latest-generation universal products*." (4Q2022 Earnings Call – July 27, 2022, Defendant Meyercord)

> "Once backlog begins to release, *it will unlock an accelerated wave of product shipments and revenue growth over multiple quarters*. *We have complete visibility into our product backlog, the vast majority of which is comprised of orders with current delivery request dates*." (1Q2023 Earnings Call – Oct. 27, 2022, Defendant Meyercord)

> "*[The backlog] it's not cancelable. These are real projects that we see*. . . . the vast majority of our backlog is related to this kind of end user demand project-based business and *we don't see double ordering*." (Needham Technology & Media Conference – May 17, 2023, Defendant Tate)

> "*We have the benefit of a healthy backlog of customer orders with request dates that spread fairly evenly through the end of our fiscal year. End customer orders remain <u>firm</u>* and distributor orders have normalized, giving us confidence in our outlook for this fiscal year." (FY2023 Earnings Call – August 2, 2023, Defendant Meyercord)

73.     The above statements (and other similar statements described in full below in Section VII and in Appendix A, attached hereto) left the market with the impression that the orders in Extreme's backlog reflected "firm" customer commitments, were not cancelable, and that the present value of the backlog would soon contribute to the Company's strong revenue growth. Indeed, on the first day of the Class Period, Defendant Meyercord stated that Extreme's fiscal year 2022 "all time high revenue of $1.1 billion . . . *was understated by the $400 million of incremental backlog we built during the year*," referring to the growth of backlog from approximately $100 million as of the end of fiscal year 2021 to $513 million as of the end of fiscal year 2022.

74.     Bolstering the represented firmness and generally non-cancelable nature of its backlog, Extreme amended its definition of its backlog orders at the start of the Class Period, offering investors greater assurance in the certainty of the Company's explosive backlog figure. Before the

start of the Class Period, Extreme stated in its Form 10-K for FY2021 (year ended June 30, 2021) that backlog orders would be subject to "cancellations by customers which we may elect to allow *without penalty to customers*[.]" However, at the outset of the Class Period, Extreme changed this definition, stating that in its 10-K for FY2022 (year ended June 30, 2022) that "[a]lthough we believe the orders included in the backlog are ***firm***, all orders are subject to possible rescheduling by customers, and cancellations by customers, which we may elect to allow ***on an exception basis***"—omitting the express statement that cancellation, once "elected" by Extreme, would occur "without penalty." This new phrasing stressed that cancellations were not freely given but could occur on "an exception basis" only, and may incur a "penalty" to be imposed by Extreme.

75.     Defendants reinforced the fact that the backlog orders could not be easily or freely cancelled. Indeed, Defendant Tate, as interim CFO, unequivocally confirmed the certainty of Extreme's backlog orders on May 17, 2023, when she stated that Extreme's backlog orders—on which the Company had "***excellent visibility***"—were simply "***not cancelable***."

76.     Although analysts continued to question Defendants about the firmness and reliability of the backlog, they, and the market, believed Defendants reported backlog figures, their representations that the backlog was not rife with double or triple ordering, and their representations that the backlog value would convert to revenues.

77.     For example, on July 27, 2022, Needham stated in its analyst report—in response to Defendant Meyercord's statements—that Extreme had "Visibility Down to the Deal Level: ***No Double Ordering*** as Orders are Tailored to Specific Structured Project Deployments. ***Extreme has long had an order cancellation rate that's solidly less than 1%*** and that is not changing. Extreme can see these orders with high degree of specificity down to the details of the deployment architecture***. They argue they are confident with this visibility . . . [the] orders are real and sustainable.***"

78.     Other analyst commentary and coverage during the Class Period similarly demonstrated that the market believed Defendants' representations as to the strength and "firm" nature of Extreme's backlog, as well as the repeated assertions that the present-tense strength of the backlog of orders would lead to strong revenue growth. For example, on August 28, 2022, Rosenblatt

21

Securities stated that Extreme's revenue "*forecast appears particularly safe due to the [C]ompany's highly elevated backlog.*" On September 23, 2022, Needham stated that Extreme's operations appear to be "substantially better than average resiliency," which was "driven by its *massive and sticky backlog.*" And on October 28, 2022, Craig-Hallum analysts summed up the market expectation based upon Defendants' false and misleading statements, finding that: "The company expects its backlog to continue to build for the next few quarters through FY23, before supply constraints ease to a level the backlog can begin to work down starting in Q1 FY24. . . . . *With material backlog set to be a multi-year tailwind to already solid demand trends*, and margins to expand and drive material leverage at the same time, *we remain very encouraged with Extreme' setup from here*."

79.    Months later, Rosenblatt Securities stated in its March 29, 2023 analyst report, in reliance on Defendants' misrepresentations, that:

> *Backlog risks seem low. We believe Extreme has excellent visibility to its backlog, and we are confident the risk of double ordering is low. The company has software tools to know what's in backlog and that no projects are duplicates. . . . We think the risk of backlog cancellations are very low*[.]

80.    As discussed in vivid detail below, Defendants willfully and knowingly misled investors about the strength, reliability, and "firmness" of Extreme's backlog. Not only was the backlog contractually-designed to be cancelled and was completely subject to double and triple ordering—rendering up to two-thirds of the backlog likely to be cancelled—but Extreme embarked on a scheme during the Class Period that threw out the Company's historical backlog fulfillment practices based on when a distributor placed its purchase order (FIFO), and used the backlog as a tool to force distributors to place hundreds of millions of dollars of orders for shippable, unwanted, and unneeded "end of life" products in order to jump the line and get prioritized backlog shipments. This created chaos for distributors, partners, end-users, and account executives, leading to a slashed backlog by the start of FY2024 that did not and would not convert to revenues.

### 2.    Extreme's Product Revenues Also Grow Exponentially During The Class Period, Which Defendants Attribute To "Exceptionally Strong" Demand

81.    As Extreme's backlog ballooned, reflecting hundreds of millions of dollars of in-demand product unable to be shipped and recorded as revenue, Extreme simultaneously reported

incredibly strong revenue growth throughout the Class Period, especially as compared to the Company's COVID-era product revenues of approximately $140 million, as shown in the below table:

| Fiscal Quarter | Product Revenue | Total Revenue |
|---|---|---|
| 4Q2022 (end 6/30/22) | $187.1M | $278.2M |
| 1Q2023 (end 9/30/22) | $206.3M | $297.7M |
| 2Q2023 (end 12/31/22) | $4M | $318.3M |
| 3Q2023 (end 3/31/23) | $241.1M | $332.5M |
| 4Q2023 (end 6/30/23) | $261.6M | $363.8M |
| 1Q2024 (end 9/30/23) | $253.5M | $353.1M |

82.     Extreme heralded the Company's record Class Period product revenue results as "*double-digit revenue growth for the year . . . even in the current supply chain environment*," and attributed that growth "due" to Extreme's "*strong*," "*exceptionally strong*," and "*unabated market demand*."

83.     At the start of the Class Period, Defendants stated in Extreme's 4Q2022 Earnings press release on July 27, 2022, that "*For FY22 we achieved double-digit growth* in both bookings and *revenue due to strong demand*," that "*[o]ur teams continue to see unabated market demand*," and that they "*achieved double-digit growth for the year* and improved operating margins, *even in the current supply chain environment*." Defendants emphasized to investors how this "double-digit growth" happened while simultaneously growing Extreme's backlog, such that this impressive growth was still "*understated by the $400 million of incremental backlog we built during the year*."

84.     Analysts responded positively to Defendants' attribution of revenue growth to the Company's "strong" organic demand. For example, on July 27, 2022, Lake Street Capital Markets issued an analyst report stating that the "tale of FY22 was that market demand remains strong for Extreme networking products . . . and services . . . We thought Q4 (Jun) might hint at signs of a slowdown, especially in Europe, but that was not the case." Lake Street Capital Markets further stated: "Extreme maintained its FY23 revenue target of 10%-15% growth, driven by strong demand amongst all major verticals and the unlocking of the backlog." Given this "robust demand," Lake Street Capital Markets reiterated its Buy rating and raised its price target for Extreme stock to $15.

85.     Similarly, Needham stated in its July 27, 2022 report that "Extreme believes their demand and robust backlog will enable them to produce double-digit Revenue growth across a wide

range of potential scenarios and outcomes." Needham also stated that Extreme: "beat our Revenue and EPS forecast . . . and importantly, noted a strong, robust pipeline with no evidence of erosion or softening[.]" As a result of Defendants' false assurances, Needham gave Extreme a "Buy" rating and increased the price target to $14.50.

86.    Throughout FY2023 (July1, 2022 through June 30, 2023), Defendants continued to report steadily increasing product revenue growth, peaking at $261.6 million in 4Q2023, up from $187.1 million in 4Q2022.



87.    Again, as in the 4Q2022 Earnings Call, Defendants throughout FY2023 articulated that the reason for Extreme's ongoing revenue growth was because of "*exceptionally strong*" demand. Specifically, Defendants asserted:

"*We had a record quarter as __demand__ for cloud-driven networking and for Extreme Solutions __has never been stronger__.* Again, our share gains are evident by double-digit revenue growth, record revenue and continued growth of backlog, which now sits at $555 million." (1Q2023 Earnings Conference Call, Defendant Meyercord)

"*We had another record quarter, as __demand__ for cloud-driven networking and for Extreme Solutions __remains exceptionally strong__ with good visibility through fiscal year end '23, leading us to raise our full year revenue outlook to the high end of our range*. . . With a strong outlook for bookings growth and the gradual improvement of supply, *we expect backlogs to remain relatively stable for the next several quarters. We're in the beginning stages of an accelerated wave of product shipments and revenue growth over multiple quarters*. The majority of our backlog consists of the latest generation universal products." (2Q2023 Earnings Conference Call, Defendant Meyercord)

"*And we're seeing good demand. We're seeing double-digit growth* in our weighted funnel year over year. And so that gives us confidence that demand is going to continue." (Needham Technology & Media Conference – May 17, 2023, Defendant Tate)

88.     The above statements (and other similar statements described in full below in *infra* Section VII and in Appendix A, attached hereto) painted a picture of a healthy channel and organic demand for Extreme's products, fueling an exponentially increasing product revenues, which contributed to Extreme's similarly increasing stock price. During and throughout the Class Period, analysts accepted Defendants' attribution of revenue growth to Extreme's purported strong organic demand—reflecting the market's reliance on those material misrepresentations.

89.     For example, Lake Street Capital Markets stated in its October 27, 2022 analyst report in response to Defendants' 1Q2023 Earnings, that: "Extreme maintained its FY23 revenue target of 10%-15% growth, *driven by strong demand* amongst all major verticals." Accordingly, Lake Street Capital Markets again reiterated a "Buy" rating for Extreme stock.

90.     Similarly, Craig-Hallum Capital Group LLC stated in its October 28, 2022 analyst report that: "Extreme Networks reported another quarter of solid results. *Strong demand and bookings continued to outpace supply and the company continued to build its record backlog*. . . . With material backlog set to be a multi-year tailwind to already solid demand trends, and margins to expand and drive material leverage at the same time, we remain very encouraged with Extreme's setup from here. We are reiterating our Buy rating and raising our price target to $22[.]"

91.    And, again, Craig-Hallum stated in its January 26, 2023 analyst report—in reliance on Defendants' false and misleading misrepresentations—that: "management believes demand will remain strong and expect its strong backlog to remain relatively stable through the next several quarters before beginning to be worked down. . . . With revenue growth expectations in FY23 to be near the high end of the company's previous 10%-15% range, management stated they expect FY24 growth to be within the company's long-term targeted range of 13%-17%. . . with an expectation for continued strong multi-year growth we are maintaining our Buy rating and $22 price target."

92.    Similarly, on April 27, 2023, Needham reported that "[t]here is a lot to like in Extreme's FY24 and FY25 outlook as *strong demand, improving supply chain dynamics, and an insulating backlog should enable 10%-15%+ Revenue growth* with rapidly expanding Operating and Gross Margins."

93.    As revenues began to decline slightly in 1Q2024 (ending September 30, 2023), Defendants continued to tout their revenue results as positive growth year-over-year and continued to assert that Extreme's revenues were strong and attributable to improvements in the supply chain environment. For example:

> "*In the first quarter, we again demonstrated strong financial and operational performance. . . First quarter revenue of $353.1 million grew 19% year-over-year, exceeding the high end of our expectations entering the quarter. . . Product revenue of $253.5 million grew 23% year-over-year, reflecting continued improvement in our supply chain environment*." (1Q2024 Earnings Conference Call, Defendant Rhodes)

**C.    In Reality, Defendants Could Not Meet Extreme's Quarterly Revenue Targets And Implemented A Scheme To Leverage Backlog To Stuff The Channel, Close Revenue Gaps, And Report "Strong" And "Unabated" Demand**

94.    Extreme's Class Period revenue growth story was a lie. By March 2022, just before the close of 3Q2022 and the start of 4Q2022, Extreme found itself materially short of its forecasted revenue numbers.

95.    Former employees have now disclosed in precise detail how, beginning in mid-March 2022, at the direction of Defendants Meyercord, Thomas, Rice, and Brown, *Extreme initiated a systematic, Company-wide, scheme to "stuff" its top distributors with excessive "end of sale" and unwanted product, untethered from any actual end-user demand, in order to meet the Company's*

26

*revenue targets*. The primary (but not only) means for stuffing the channel and closing the revenue gap was to "blow up" Extreme's backlog's historical and fair "first in, first out" (FIFO) fulfillment order. Rather than reward distributors for placing early purchase orders for backlog product so that they could be first to receive those products when available, in March 2022, Extreme hatched a scheme to "decommit" all existing FIFO priority and would instead wield the backlog—and leverage distributors' desire to receive in-demand product first—and convinced Extreme's top distributors— primarily Westcon in EMEA and Jenne in the Americas, as well as to a lesser degree TD Synnex and ScanSource—to place orders for tens of millions of dollars of unwanted and unneeded shippable product, and in exchange, those distributors who placed the largest orders could jump the line and get prioritized backlog shipments. Customers who did not "play ball" were demoted, and regardless of how long they had been waiting, did not receive shipments off of the backlog. As a result, Extreme was able to not only meet, but exceeded its revenue targets each quarter of the Class Period (until the truth began to come out).

96.    However, this scheme was unsustainable. Those distributors who played along were allowed to return large amounts of the unneeded, unsaleable product they bought under duress, and those returns negatively impacted revenue, creating even larger revenue gaps. In addition, blowing up the FIFO fulfillment reaped chaos, resulting in the predicted "blood in the streets," and ultimately Extreme's distributors refused to submit to Defendants' demands, cratering the backlog and decimating Extreme's revenues for the second and third quarters, and full fiscal year 2024.

### 1.    A March 16, 2022 Distribution Meeting Launches The Channel Stuffing Scheme—"Ed Chose This Path"

97.    In the months leading up to the 4Q2022 earnings release, while there was demand for Extreme's products that were not readily available to ship (*i.e.*, backlogged products), there was insufficient organic demand for shippable product. Defendants did not want to inform Extreme's investors of this reality. Indeed, only months earlier, Defendant Meyercord had told investors during Extreme's 2Q2022 Earnings Call that "[w]e see strong demand as we turn the corner into calendar 2022" and that "[o]n top of the strong demand in the first half of our fiscal year, our business

momentum is increasing," the "funnel of opportunities is strengthening" and "[w]e expect to grow our market share and drive record double-digit organic growth rates into the foreseeable future."

98.     As the close of 3Q2022 approached (end of March 2022), Extreme's executive leadership team (ELT), which included Defendants Meyercord, Thomas, and Rice, discussed how to "***get into the company [the] # the street expects***," and came up with an illicit channel stuffing plan to be widely implemented with full effect by 4Q and the end of the 2022 fiscal year in June.

99.     FE-1 was the Senior Distribution Account Manager at Extreme from May 2016 through July 2022, with over thirty years of experience in the distribution business. FE-1 reported to the Director of Distribution in the Americas, Joseph Uraco, who reported to Defendant Brown, who in turn reported to Defendant Rice. Throughout FE-1's tenure at the Company, he managed Extreme's relationship with TD Synnex, one of Extreme's top three largest distributors. As part of his employment, FE-1 worked closely with Defendant Brown on a daily basis.

100.     According to FE-1, Extreme's distributor sales practices changed dramatically in March 2022. As noted above, sales to distributors were the lifeblood of Extreme's revenues, with just four distributors—Westcon, Jenne, TD Synnex, and ScanSource—contributing well over 50% of Extreme's total revenues each quarter. FE-1 kept contemporaneous notes of many of his meetings and calls while at Extreme. FE-1 referenced those notes that he kept throughout his tenure at Extreme (copies of which were provided to Lead Counsel) and used those notes and his own recollection when recounting Extreme's management-led channel stuffing that precipitated his resignation from the Company.

101.     FE-1 explained that beginning in March 2022 "was when it got ugly," meaning that Extreme was very short of their Q3 2022 revenue targets. FE-1 stated that, at this point, "none of the distributors ***needed*** any more inventory, but Extreme ***needed*** to ship more to make the number." FE-1 recalled that in March 2022, Defendant Brown launched a new initiative that forced distributors waiting for in-demand product on the backlog to buy large amounts of low- or no-demand products in order to maintain their place in the backlog, or to move up their place in the backlog. FE-1 advised that, according to Defendant Brown, those who refused to buy the unwanted and unneeded products

1  would lose their place in the backlog line. In this way, Extreme utilized customers' position on the
2  backlog line as "leverage" for forced sales of products that were not in-demand.

3      102.    This was a marked change in practice, according to FE-1, given that previously
4  customers' place in the backlog was determined by when they placed their order, providing
5  consistency and fairness to the process.

6      103.    FE-1's contemporaneous notes (and his own vivid recollection) of meetings, events
7  and sales figures during this period document the scheme and provide evidence of the scheme's
8  participants and those who were aware of it, providing indisputable proof of a companywide Class
9  Period channel stuffing scheme that materially misled investors.

10      104.    FE-1 explained that just prior to the middle of March—around March 10, 2022—
11  Defendant Brown told FE-1 that he was going to offer Peter Larocque, President of TD Synnex,
12  revenue towards Synnex's marketing spend if that distributor took unneeded inventory. FE-1 added
13  that Defendant Rice knew about this intended offer. FE-1 continued that on the following day, March
14  11, 2022, FE-1 was on a call where Defendant Brown stated that he was targeting TD Synnex, which
15  was FE-1's managed distributor, for a $40 million purchase of inventory that it did not need. FE-1
16  advised that TD Synnex did not wind up agreeing to the $40 million purchase.

17      105.    Faced with this considerable gap and TD Synnex's rejection, sometime in the
18  following days, Defendants came up with a new way to close Extreme's revenue gaps going forward.

19      106.    At 8:30 am on March 16, 2022, FE-1 participated in a call led by Defendant Brown
20  during which Brown stated that he intended to reach the revenue numbers that analysts expected from
21  Extreme for that quarter (*i.e.*, 3Q2022, which would close in two weeks). According to FE-1,
22  attendees on this call included FE-1; Director of Distribution Sales – Americas Uraco; Director,
23  EMEA Distribution John Campbell; Senior Vice President Global Operations Jack Lyon;
24  Distribution Partner Account Manager Sam Flansbaum ("Flansbaum"); Senior Regional Distribution
25  Manager (Europe) Alison Bullen; Vice President Sales Strategy, Business Development and
26  Operations Matt Cleaver; and others.

27      107.    FE-1's notes indicated that at the start of the meeting, Brown referenced an email from
28  Defendant Rice concerning distributors. In that email, Rice demanded that they meet the quarter's

29

numbers that were expected by the street, with FE-1's notes indicating that Brown ("JB") said at the meeting "***how do we get into the company # that the street expects***…" For context, as FE-6 (a Senior Account Manager at Extreme from July 2017 to October 2022) explained, Defendant Rice was Defendant Meyercord's "right hand man" during the final "few years" of FE-6's tenure. FE-6 stated that Defendant Rice is "part of the problem."

108.    Brown explained to the meeting attendees, including FE-1, that Extreme would reach the numbers analysts expected by forcing Extreme's two main distributors ("2 main disty")—Westcon and Jenne—and two or three smaller distributors to purchase inventory from Extreme they did not need. FE-1's notes reflected that Defendant Brown's plan was to "***decommit all.***" FE-1 explained that this meant that the prior practice of fulfilling backlog orders based on the order in which purchase orders were entered—*i.e.*, first in, first out (FIFO)—would end and the FIFO priority would be "decommitted" in place for a new system.



109.    FE-1's meeting notes also indicated: "Opted in – for all of prioritization next qtr if they opt in," and FE-1 explained that this referred to Defendant Brown announcing that all orders were going to be decommitted, and prioritization of inventory for the next quarter would be based on who opted in to purchasing unneeded inventory.

110.    According to FE-1, up until this point, inventory had been shipped to distributors on a first in, first out, known as "FIFO", basis, meaning that Extreme shipped newly available inventory to whomever ordered it first. However, FE-1's notes from this call quoted Defendant Brown saying that "FIFO" "would not work," and FE-1 recalled Brown explaining that he needed to decommit

distributors instead, and leverage the new, wanted products by refusing to ship them until Extreme could get rid of its old, unwanted products.

111.    FE-1 recalled (referencing his notes) that some of the meeting attendees responded that the effect of cancellations on Extreme's relationships with its distributors would result in "***hurt feelings***," "***consternation***," and proverbial "***blood in the streets***." Regardless, FE-1 explained that Brown's decommit strategy was to be the ***new plan going forward***—not just for that quarter—so that Extreme could force the distributors to help Extreme to meet any future quarterly numbers. He also recalled that Senior Vice President Global Operations Jack Lyon reported during the March 16, 2022 meeting that forecasting was down for the following quarter, making the need to leverage the backlog to pull in orders of non-backlog product even more necessary.

112.    Continuing to reference his notes from the March 16, 2022 meeting, FE-1 recalled Defendant Brown acknowledging that Extreme's "challenge" was that the Company was "***running out of tricks in our bag***" to meet quarterly numbers.



113.    FE-1 further recalled that Brown stated that he would start decommitting distributors within the "next 48 hours," which FE-1 explained needed to be done in order to give Extreme time to negotiate with the distributors, reallocate, and ship material to meet the March 31, 2022 shipping deadline for the end of quarter. Per Defendant Brown, orders were being decommitted in the system in 48 hours and the "winners and losers" would be chosen based on who opted in. FE-1 explained that Brown added that from that quarter on, he was picking winners and losers based on whomever would "dance" with him.

114.    Defendant Brown was no rogue agent; ***this decision was authorized from the very top—by Defendant Meyercord***.

115.    FE-1's notes reflect that Defendant Brown stated that this plan was the "***lesser of many evils for ELT***" (the Executive Leadership Team), required to meet the quarterly numbers. FE-1 advised that the ELT at the time consisted of Defendants Meyercord, Thomas and Rice, as well as Chief Revenue Officer Joe Vitalone, and possibly others. FE-1 specifically recalled Brown stating that Meyercord "***chooses blowing up FIFO***." This indicated to FE-1 that the executives above Brown were aware of and approved of this strategy. FE-1's notes of this call end with the damning line: "***Ed chose this path – lesser of the 2 [evils]***." FE-1 also recalled, more specifically, Brown stating on the call that Defendant Meyercord felt that there were two paths (report poor revenues or force through sales) and that Meyercord "chose this path"—the path of "decommits" and ending FIFO—because he felt that it was the "lesser of the two" evils for Extreme.



116.    The following day, March 17, 2022, FE-1's notes memorialized an internal meeting that he described as "**Ed talks**," during which Defendant Meyercord stated that (i) the supply chain constraints were "not getting better," (ii) the "constraints were creating backlog," and (iii) that as a result, Extreme "can't ship" this backlog out as revenue. According to FE-1, Defendant Meyercord's remarks underscored the pressure that the Company faced and the urgent need to meet revenue targets by any means.

117.    FE-1's notes reflect conversations with distributors that happened in the wake of the March 16, 2022 meeting. One set of notes involves a March 23, 2022 call that FE-1 recalled occurring between himself, the Vice President of Vendor Management of TD Synnex, Defendant Brown, and Uraco. FE-1 explained that on this call, Defendant Brown was discussing an earlier effort to get TD Synnex to take $7 million of inventory for a Verizon deal, and told TD Synnex that it will be worth "$70 million next year."

118.    FE-1 also recalled TD Synnex asking Brown whether TD Synnex "was going to get product or not." Defendant Brown responded that TD Synnex "screwed up" by not purchasing $7 million of Extreme's Verizon inventory. FE-1 explained that the VP of Vendor Management of TD Synnex stated that he may be willing to take Extreme's offer to his supervisor at TD Synnex if Defendant Brown would put this deal, and any other potential "side deals," in writing. However, according to FE-1, Brown responded that he would only do a verbal deal and would not put anything into writing. FE-1's notes from this March 23, 2022 call evidenced this conversation, as FE-1 wrote down the phrases "cant put in writing" and "could not put in writing only verbal." FE-1 elaborated that Brown never wanted to put anything into writing or have his name on anything. A screenshot of these meeting notes is pasted below:



119.    FE-1 explained that although TD Synnex did not agree to purchase $7 million of Verizon inventory as a part this particular "side deal," TD Synnex did agree take on other unneeded Verizon inventory from Extreme in March 2022 as a part of another "side deal." Although FE-1 could not recall the exact value of that "side deal," he recalled it being greater than $1 million but less than $7 million.

120.    Extreme's distributors grew frustrated with this abrupt policy shift that stripped them of their place in the backlog until they agreed to play Defendants' game. Indeed, according to FE-1's notes from a meeting that occurred on March 24, 2022, at 11:00am, Matt Money (a ScanSource Account Executive at Extreme) said that "Cody at ScanSource not happy – says Jonas [Brown] is a bully." FE-1 explained that this referred to Defendant Brown bullying distributors, including ScanSource.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

121.    Indeed, according to FE-1, when FIFO was blown up at the end of 3Q2022/start of 4Q2022, it created a difficult relationship between Extreme and their distributors because the distributors had been expecting product at a certain time, they were no longer going to get it at that expected time, and their product was going to someone else. According to FE-1, based on his conversations with TD Synnex principals (including TD Synnex's President of Americas) and other distributors, the distributors were furious. FE-1 advised that he had his own Sales Vice Presidents "blowing up" at him.

122.    However, despite their dissatisfaction, Extreme's distributors were forced to acquiesce to get the product they wanted. FE-1 provided an example of Westcon and Jenne "playing ball" at the end of 3Q2022 (or March 2022). FE-1 explained that, first, as referenced above, in March 2022, Defendants Rice and Brown made FE-1 propose to TD Synnex to buy a $40 million package of unneeded inventory. FE-1 described this old inventory as "terrible inventory" that included, for example, older cables and antennas. FE-1 stated that TD Synnex did not ultimately agree to this purchase.

123.    Indeed, FE-1 reported that after TD Synnex rejected this deal, Westcon and Jenne instead "played along" with Extreme (as the March 16, 2022 notes discussed) and were willing to purchase Extreme's unneeded inventory in order to move up in line for new product and not be "decommitted." Consequently, FE-1 stated that Brown "cut a deal with Jenne and Westcon" and sold them the $40 million of unneeded product at the end of 3Q2022 that TD Synnex would not take on.

**2.      Extreme Solicits Its Top Distributors For The Scheme With One, For Example, Buying $52 Million Of Unneeded, Returnable Product In Exchange For A Prioritized $50 Million Delivery Off The Backlog**

124.    After the March 2022 scheme was devised and authorized by Defendants Meyercord, Thomas, Brown and Rice, Extreme's top distributors Westcon, Jenne, and ScanSource were roped in.

125.    FE-4 corroborates and provides crucial details about the implementation of Defendants' scheme described by FE-1. FE-4 was employed by Extreme until December 2022, most recently serving as Senior Regional Distribution Manager operating out of Europe. FE-4 worked directly with leading distributor Westcon during his employment with Extreme.

34

126.    FE-4 described Extreme's Class Period conduct of prioritizing certain distributors in the backlog line in exchange for the distributor stuffing its channel with unneeded inventory for which the distributor had no purchase orders or commitments. FE-4 described how three of Extreme's primary distributors in 2022 were Jenne and ScanSource (both primarily in the United States) and Westcon in EMEA. FE-4 explained that Westcon, ScanSource and Jenne had a "very big backlog" throughout the latter part of his tenure at the Company in mid to late 2022.

127.    However, according to FE-4, Westcon, ScanSource and Jenne were all part of a "deal" initiated in Spring 2022 to prioritize those distributors' in-demand backlog orders in exchange for their agreement to purchase unneeded or unwanted products. FE-4 provided additional details of this deal that he learned through his relationship with the Westcon Vendor Business Lead. Based on their accounts, this appears to be a deal that was part of the scheme hatched in mid-March 2022.

128.    FE-4's Westcon Vendor Business Lead was in charge of every Westcon order placed with Extreme for EMEA, and as part of FE-4's role at Extreme, FE-4 had a "very good relationship" with the Westcon Vendor Business Lead. They spoke approximately two times per week.

129.    According to FE-4, the Westcon Vendor Business Lead told FE-4 about a dinner that had occurred in March or April 2022 involving Westcon senior management and Extreme senior management, including specifically Extreme's CFO, Defendant Thomas. The Westcon Vendor Business Lead, because he was responsible for placing all Westcon orders from Extreme and managed where Westcon's stock was allocated in Europe, was informed about this dinner, what had been discussed, and what the individuals had agreed to, and told FE-4 about the dinner. According to FE-4, the scheme to prioritize Westcon's backlog orders in exchange for the purchase of unwanted or unneeded inventory was discussed at that dinner.

130.    FE-4 explained that, based on his regular discussions with the Westcon Vendor Business Lead as well as other resellers, Extreme was relying on Westcon to clear out Extreme's obsolete and/or end of life products. According to FE-4, Westcon wanted to fill backlog orders but was forced to buy stock of products nobody wanted to order for the same value as the backlog. As FE-4 explained, in exchange for Westcon's agreement to buy Extreme's obsolete and end of life

1  products, Westcon was then allowed to receive orders off the backlog before other customers who

2  had priority on the backlog list.

3        131.   FE-4 also described one specific, and significant, transaction he could recall with

4  Westcon that occurred as Defendants launched their scheme, shortly after the March/April 2022

5  dinner between Westcon's senior management and Extreme's senior management, and closing

6  sometime between April and end of June 2022 (*i.e.*, 4Q2022).

7        132.   According to FE-4, ***in exchange for Westcon being prioritized and receiving $50***

8  ***million (USD) in products off of the backlog, Westcon agreed to buy unneeded and "end of sale"***

9  ***stock for $52 million (USD), so it was recorded as a $102 million (USD) order for a single quarter***.

10  As part of this deal, Westcon was allowed to do a stock return the following quarter or two of most

11  of the $52 million (USD) order. These "end of sale" products, FE-4 explained, were "not saleable

12  products" such as cables, fans, switches, brackets, etc. Westcon was then allowed two quarters to

13  return those "not saleable products." With respect to the right to return, FE-4 explained that the

14  "general program" at Extreme was that based on how much a distributor purchased, they were

15  allowed to return a certain percentage. FE-4 noted that the percentage of products allowed to be

16  returned was "quite high."

17        133.   FE-4 explained that he was confident the dinner between the management of Westcon

18  and Extreme that he previously referenced definitely took place in March or April 2022, and that the

19  $102 million transaction with Westcon closed shortly thereafter, between April and June 2022 (*i.e.*

20  4Q2022). This is because FE-4 spent the subsequent months following the dinner and the deal telling

21  all of his customers to buy from Westcon because they had the in-demand products off the backlog

22  from Extreme, and he wanted to get sales in before his new commission plan began in the summer.

23        134.   FE-4 also explained what type of unwanted and unneeded product Westcon agreed to

24  buy and try (unsuccessfully) to sell. FE-4 recalled that sometime after the deal was closed, the

25  Westcon Business Leader received a "big, big" Excel spreadsheet that was sent to all of Extreme's

26  European Business Managers. The Excel spreadsheet included the list of the $52 million (USD) stock

27  that largely came from a warehouse in El Paso, Texas, adding that no customers had orders for these

28  products, which were outdated products that "nobody wanted." FE-4 further recalled that the Westcon

36

Vendor Business Lead asked FE-4 to help him get "rid" of the stock acquired in the deal agreed at the dinner because it was "terrible." FE-4 added that he was unable to sell any of that product to his customers.

135.    FE-4 recalled being aware of other similar transactions between Extreme and Jenne and Extreme and ScanSource that occurred at the same time as the Westcon deal. According to FE-4, it was his understanding that Extreme's management had dinners with the management of Jenne and ScanSource during the same week as the dinner with Westcon. FE-4 noted that given that Jenne and ScanSource primarily operated in North America, which was a "much bigger" market for Extreme than Europe, that these agreements were likely significant in value.

136.    FE-4 went on to say that externally, other customers questioned why Westcon had immediate access to Extreme's products, sometimes being able to get products the same day, as opposed to the customers who had been waiting for backlog for months or even years.

137.    FE-1 also reported that Extreme engaged in a similar transaction with Jenne (as well as Westcon) for a similar value of unneeded inventory—approximately $40 or $50 million—at the end of June 2022, in order for Extreme to meet its 4Q2022 and FY2022 revenue targets. According to FE-1, Westcon and Jenne engaged in this deal because Extreme ***needed $145 million in shipments to make 4Q2022's numbers***.

138.    FE-11 (formerly employed by Extreme as an Account Manager from Fall 2022 through the end of the Class Period in the EMEA region) also corroborated Extreme's channel stuffing conduct with Westcon, explaining that Westcon in EMEA was "often" asked to take early shipments, and that Westcon wanted to do this in order to be prioritized in the backlog line.

139.    Multiple former employees at Extreme further confirm and corroborate that during the Class Period, Defendants implemented undisclosed channel stuffing and other manipulative sales and inventory tactics that were designed to accelerate revenues for Extreme's products. These accounts establish definitively that these practices were widespread and systemic during the Class Period.

140.    For example, FE-1 explained that that "everything" was done to make the quarterly numbers, including shipping up to midnight of the final night of a quarter. He explained that Extreme used Freight on Board: Origin as shipping terms, which meant that the sale could be recognized as

soon as the shipment was loaded up on a truck at Extreme (the location the shipment was originating from). He added that the Company was willing to pay the shipping costs to make sure the product departed before midnight. According to FE-1, if the inventory left their docks, Extreme would count it as revenue.

141.    FE-3 was a Senior-level Manager of Pricing at Extreme from before the Class Period to the second half of 2023. FE-3's responsibilities included executing the rollout of pricing and signing off on deals. FE-3 reported into the Finance leadership of Defendant Tate, who reported to the CFO. FE-3 corroborated and explained that it was "***well known internally at Extreme***" throughout his tenure at Extreme that the sales team was "channel stuffing" by pushing distributors to take orders early in order to meet sales goals and earn commission. FE-3 explained that this resulted in extra inventory taken by distributors.

142.    Additionally, according to FE-3, there were "a lot of pre-orders" that did not have back-to-back purchase orders. FE-3 described a back-to-back purchase order as a mirror image of a purchase order from an end user for the vendor to have and not just the channel partner. FE-3 confirmed that he witnessed products being pushed to distributors without end user purchase orders during his tenure, during and into mid-2023 as he left Extreme.

143.    FE-6 also confirmed that Extreme stuffed distributors during his time at the Company (where FE-6 left in October 2022) and that Extreme also leaned on partners to pull in deals. He further explained that instead of letting deals naturally occur in subsequent quarters, Extreme pulled in deals to make their quarterly number. FE-6 described Extreme's method of pulling in sales as "robbing Peter to pay Paul." FE-6 also explained that certain Extreme distributors received special treatment and always had backlogged products in stock.

144.    According to FE-6, Extreme would make calls to its partners and distributors routinely at the end of each fiscal quarter and year to pull in sales – about 15 days or so before the end of each fiscal quarter. Similar to FE-1's account, FE-6 further explained that Extreme's method of pulling in deals eventually "catches up to you" when it is done every quarter. FE-6 explained that after a certain period of time customers no longer need product the next time the Company wants to pull a deal in— and when "everyone is tapped out" then there is "panic," corroborating FE-1's account. Likewise,

38

FE-10—who was a Senior Account Executive at Extreme from after July 2023 until April 2024—recalled hearing from upper management that the practice of distributors taking on product without end customer purchase orders was "common practice."

145.    In short, these witnesses and former employees described in the preceding paragraphs all consistently explained that leading up to, during, and throughout the Class Period, Extreme channel-stuffed its products to its distributors on a regular quarterly basis in order to inflate its product revenues. These witnesses all explained that these poor business practices could only go on for so long before Extreme's distributors would simply not be able to take on more inventory into their warehouses. At that inevitable point, revenues would significantly decline as revenues were propped up not by organic demand from the end customer, but by Extreme's undisclosed sales tactics. Indeed, FE-6 explained that he departed the Company in October 2022 and approximately a year after he departed the Company, in September 2023, the "bottom fell out" (referring to the Company's revenue decline), and he noticed around that time the stock began to significantly decline.

3.    **Extreme Formalizes The Scheme To Prioritize Backlog For Those Who Stuff Their Channel With Unneeded Product, And The Consequences Are Felt By Distributors And Employees During FY2023**

146.    FE-1 described how, from his vantage point, Defendants immediately implemented these new channel stuffing tactics in 4Q2022 (April – June 2022).

147.    Ultimately, FE-1 explained that "there was no way, based on customer demand" that Extreme could "naturally" make their revenue guidance to shareholders without making distributors take inventory they did not need. FE-1 recalled that FE-1 and Uraco, his direct superior, discussed how both hoped that someone at Extreme would step in and stop the plan that was first discussed on March 16, 2022, and that Extreme would "stop blowing up FIFO." But those hopes were quickly dashed, and the new plan was on its way to becoming a regular practice at Extreme.

148.    Referring to his notes, FE-1 recalled that it was on April 7, 2022, when Uraco called and told him that Extreme's plan where it "blew up FIFO" was "get[ting] legs" from Director of Purchasing, Fiona Nolan. According to FE-1, Nolan worked in Ireland and reported to Senior Vice President Global Operations Lyon, who reported to Defendant Rice, and it was Nolan's responsibility to allocate shipments to distributors in Extreme's software programs. Before this date, Nolan's

allocation would be automated to FIFO, where those who first executed purchase orders were first to get shipments off of the backlog.

149.    According to FE-1, on April 7, 2022, Uraco called and described to him an email exchange between Nolan and Defendant Brown in which Nolan agreed with Brown on getting rid of FIFO. According to Uraco, Nolan explained to Brown that she would have a lot of work to do to change priority of orders to distributors because Extreme's supply chain system was automated, and Nolan and her team would have to go in and "manipulate the system" to decommit distributors. According to FE-1, it was important that inventory to Jenne and Westcon shipped by the end of June because it was the end of Fiscal Year and Nolan needed time to change priorities in Extreme's system.

150.    FE-1 went on to recall that, during this same conversation on April 7, 2022, Uraco told him at some point that he spoke with then-CFO, Defendant Thomas, who told Uraco that he did not like how "things" were trending at Extreme and he "wanted to get out of there."

151.    Defendants' new scheme was gaining traction, to the point where Defendant Meyercord acknowledged the new steps the Company was taking during his "Ed Talks." FE-1 advised that, according to his notes, Defendant Meyercord held a quarterly internal "Ed Talk" on April 27, 2022, at 11:00 AM. FE-1 recalled Meyercord saying on this internal company call that Extreme was not going to be able to "unlock backlog" for another year using the Company's normal practices so they were "taking steps we have not before" on Extreme's supply chain.

152.    Those distributors who complied with Defendants' scheme were rewarded. Indeed, referring to his notes, FE-1 pointed out that Extreme's Worldwide Shipping Report showed that as of a particular day, June 6, 2022, Westcon was scheduled to receive $33.62 million of wanted inventory—previously on backlog—shipped that quarter, Jenne was scheduled for $27.33 million, TD Synnex was scheduled for $6.31 million, and ScanSource was scheduled to have $6.15 million. FE-1 reiterated that the disparity between these numbers showed that those distributors (Westcon and Jenne) who agreed to Brown's buy-in from the previous quarter ending in March 2022 were now "rewarded," put at the front of line of inventory shipments for that current quarter ending in June 2022, and received higher amounts of wanted inventory. Conversely, according to FE-1, distributors who had refused to play Defendants' game were penalized with smaller inventory shipments.

153.    On June 10, 2022, FE-1 recalled having another conversation with Senior Channel Executive Matt Money who managed Extreme's ScanSource account. FE-1 and Money discussed the Worldwide Shipping Report. FE-1 stated Money expressed frustration that, because Westcon and Jenne were playing ball with Extreme, taking on unneeded products and moving up in Extreme's priority line for desired product, Money lost approximately $3.2 million for ScanSource. FE-1 advised that Money's previous job just before he was hired by Extreme was with the Company's distributor, ScanSource.

154.    After suffering the consequences of refusing to go along with Defendants' scheme, TD Synnex was forced to change its tune. FE-1, in his contemporaneous notes, recorded TD Synnex's purchase and inventory metrics in his own abbreviations, noting TD Synnex's near-daily: (a) inventory levels (reflected as "on hand"), (b) outstanding purchase orders on backlog (reflected as "on PO"), and (c) amount of product TD Synnex actually needed (*i.e.*, outstanding purchase orders minus orders not actually needed and without current end user commitments) (reflected as "neg avail."). In handwritten notes provided to Lead Counsel, these metrics were recorded by FE-1 regularly and showed the impact of Extreme's scheme to reward the channel stuffing scheme from end of March/3Q2022 to end of June/4Q2022:

|  | **March 31, 2022** | **June 30, 2022** |
|---|---|---|
| **On Hand** | $37.85M | $24.05M |
| **On PO** | $85.93M | $150.6M |
| **Neg Avail.** | -$32.61M | -$45.51M |

155.    FE-1's notes reflect that TD Synnex, although not *as* active a participant as Westcon or Jenne in the Company's efforts to stuff the channel in exchange for priority backlog shipments, nonetheless nearly doubled its orders over the quarter, most of which sat on the backlog, in efforts to secure in-demand products, even though TD Synnex had no demonstrable need for these products. Indeed, of the $150.6 million backlog attributable to TD Synnex alone at the end of Q4 2022 (as

reflected in FE-1's notes), TD Synnex only had need for less than third of that amount and already had over $24 million of inventory sitting on its shelves.

156.    FE-1's notes are consistent with his own recollection of TD Synnex's activity in 4Q2022, prior to his departure from the Company. FE-1 explained that he also recalled that at one point during his tenure, in June 2022, TD Synnex had $150 million to $200 million on backlog purchase order.[12] FE-1 stated that Defendant Brown then said that if TD Synnex bought $20 million of **another** product in the quarter, TD Synnex would get to "keep its place in line" in the backlog line. If TD Synnex did not buy that product, Extreme would shift inventory to distributors who would "play ball." According to FE-1, TD Synnex would then buy product it did not need to keep its place in line. According to FE-1, this meant that where TD Synnex's inventory of Extreme products that needed to be sold on to end users used to contain roughly 28 days of supply, as a result of these practices, by the time FE-1 left Extreme by August 2022, TD Synnex **had 100-200 days of supply**.

157.    While FE-1 left Extreme in August 2022, the leveraging of the backlog to stuff the channel continued. As an example, FE-4 believed, based on conversations with an Extreme customer, that Westcon had participated in Defendants' scheme again. FE-4 explained that after he left Extreme, he attended a summer party in 2024 and spoke with a smaller Nordic distributor, responsible for Sweden, Norway, and Denmark. FE-4 said that he apologized to this distributor, who had not been allocated desirable product off the backlog when FE-4 was at Extreme, and stated that he hoped his time at Extreme did not hurt the distributor because it did not receive any allocation of product. FE-4 continued to explain that he informed that distributor that it was not his decision but the decision of Extreme to not provide product to this particular distributor.

158.    FE-4 further explained that the distributor informed him that this period in 2022 was not the only time that large distributors, such as Westcon, received all of the new and desired product. FE-4 recounted that that distributor explained that customers had continued canceling orders with them because they were able to obtain the desired products, both new and old, from Westcon, who once again had been given priority by Extreme. According to FE-4, this indicated that Westcon had

---

[12] FE-1's notes reflect that TD Synnex's backlog increased up to $156.3 million on June 21, 2022, ending the quarter at $150.6 million on June 30, 2022.

1 participated in an additional similar arrangement or arrangements with Extreme as he had described

2 in 2022 again in 2023 or 2024.

3      159.    FE-7 further corroborates the pervasive nature of Defendants' scheme. FE-7 recalled

4 that the Company ceasing to fulfill product orders on a first in first out basis and allowing customers

5 to jump the line based on their willingness to purchase other products was Extreme's "modus

6 operandi." FE-7 further explained that, through conversations with sales colleagues, it was apparent

7 that this was "clearly" how sales at Extreme worked. FE-7 explained that customers being rewarded

8 for placing early orders and leveraging distributors to make large orders, in light of Extreme having

9 difficulty meeting revenue targets at the end of each quarter, was "exactly what took place" in mid-

10 2022 and throughout his tenure at Extreme (until his exit in 2023). FE-7 added that order fulfillment

11 on a first in first out basis was only done if it "served" Extreme.

12      160.    According to FE-7, at an ELT meeting, "everyone knew what the marching orders

13 were" when it came to these specific sales tactics and he knew that the "orders had to come from

14 somewhere" in the ELT.

15          **4.      Defendants Engage In Efforts To Sustain The Channel Stuffing Scheme
          By Preventing Distributors From Returning Or Rotating Their
16          Overstuffed And Unneeded Inventory**

17      161.    One of the inevitable consequences of Extreme's newly launched channel stuffing

18 practice was that the Company's distributors, while purchasing tens of millions of dollars of

19 unneeded, end of sale products in exchange for backlog prioritization, were contractually allowed to

20 return or rotate out large quantities of that unneeded stock in the quarters following the sale. When

21 returned or rotated, that "contra" revenue would negatively impact Extreme's revenues and accounts

22 receivable and create an even larger revenue gap to be filled in the following quarters. This is a classic

23 hallmark of a channel stuffing regime: the practice accelerates revenue recognition by pulling sales

24 forward and providing a short-term boost to a company's bottom line for the immediate quarter (at

25 the expense of future quarters). While there are different ways to stuff a channel, including by offering

26 lucrative incentives like discounts, rebates, and extended payment and return terms to distributors

27

28

1  and retailers in exchange for the ability to send them unneeded inventory, the result is almost always

2  the same: long-term negative consequences like sales and revenue shortfalls in future periods.[13]

3    162.    Extreme told investors in its annual reports that its distributors were allowed "limited

4  stock rotation rights" whereby they were "given the right to return a portion of inventory to [Extreme]

5  for the purpose of stock rotation, to claim rebates for competitive discounts and participate in various

6  cooperative marketing programs to promote the sale of our products and services."  However, those

7  stock rotations and other product returns were recorded in Extreme's *Allowance for Product Returns*

8  at the end of each fiscal year. Throughout the Class Period, Defendants reported to investors that

9  "[t]here have not been material revisions to the estimated product returns for any periods presented,"

10  despite the new channel stuffing scheme that was pulling in tens of millions of dollars based on sales

11  of unsaleable, unwanted stock that was accompanied by liberal return and rotation rights, as described

12  above. And Extreme certainly did not disclose that Extreme's customers could return or rotate

13  product only until *after* the immediate quarter's fiscal results were reported, which inflated the

14  revenue results therein.

15    163.    As distributors looked to rotate and return unsaleable stock in the quarters following

16  the scheme's 4Q2022 implementation, Defendants likely realized that a stark increase in product

17  returns would invite considerable scrutiny that would threaten unveiling the scheme. Former

18  employees describe how Extreme, at Brown's direction, attempted to stop or slow distributors from

19  returning or exchanging Extreme product in a given quarter—even though they were contractually

20  allowed to rotate this product—so that the return or rotation did not hit that quarter's revenue

21  numbers.

22    164.    Specifically, as to the stock rotation agreements, FE-1 explained that Extreme's

23  contracts with its distributors included a clause where once every quarter, the distributor (*e.g.*, TD

24

25  _____

    [13] Although channel stuffing schemes, by their nature, cannot be sustained forever, there is no

26  prescribed bright-line rule governing their duration given that companies may engage in a host of
    tactics to sustain and conceal the channel stuffing. A 2011 study looked at 90 companies that had

27  engaged in channel stuffing over eleven years, and noted that 63% of those stuffing practices were
    active for 5 quarters or less, the remaining 30% continued for 6 to 12 quarters (1.5 – 3 years), and 7%

28  continued for over three years. Somnath Das, et al., *Detection of Channel Stuffing*, FORENSICS ACCT.
    J., at 34 (May 2011), *available at* https://care-mendoza.nd.edu/assets/151939/helenzhang.pdf.

Synnex) could rotate 15% of the inventory, based upon the prior quarter's receipt of Extreme product. As an example, FE-1 explained if TD Synnex agreed to take $10 million of unneeded / un-demanded inventory in one quarter from Extreme, the next quarter, TD Synnex could rotate up to $1.5 million back to Extreme. According to FE-1, the "sentiment" behind all of this was that Extreme would tell distributors that it can stuff its channel with this inventory for this quarter, with the understanding that the distributor could return a portion of it the next quarter. In the example of the $102 million Westcon transaction in 4Q2022, assuming the same 15% rotation allowance, Westcon would be allowed to rotate out $15.3 million of the unwanted stock the next quarter.

165.    Notably, Extreme shipped unwanted and "outdated" inventory to distributors—recognizing it as shipped revenue—with the promise that the distributors would then be able to return a portion of it in later quarters under a "stock rotation" plan. As just one example, FE-1 stated that the Company tried to offload "Brocade" hardware—even though Brocade's technology could no longer manage streaming requirements—onto TD Synnex, under the pretense that TD Synnex could always just return the product in a stock rotation.

166.    Sometimes, distributors were allowed more than one quarter for returns and were not limited to rotating just 15% of a sale. Indeed, according to FE-4, the European distributor Westcon (one of Extreme's top three global distributors by revenue) was allowed up to two quarters to return Extreme's "not saleable products." And according to FE-6, distributors took on product and then in *six months* it needed to be returned for a "refresh."

167.    This "right of return" and stock rotation clause thus incentivized distributors to take on unwanted product that did not reflect true organic demand from end users, with the intended result of boosting Extreme's revenues for the immediate quarter. While a portion of the inventory could be returned by the distributors, that would not be done until after Extreme's fiscal quarter results were reported.

168.    However, to maximize revenues and avoid detection, Extreme reneged even on this stock rotation plan during the Class Period. According to FE-1, Defendant Brown often reneged on honoring Extreme's 15% stock rotation agreement stated in the distributors' contracts. According to FE-1, Defendant Brown reneged on that clause by not allowing the distributors to exercise their

1  contractual rights to return the product. This included, instead of honoring the 15% rotation amount,

2  Defendant Brown often only agreed to go as high as rotating 5% of recently purchased inventory, as

3  an example. FE-1 added that Defendant Brown often also reneged on the 5% and would delay the

4  rotation as long as he could.

5      169.    FE-1 indicated that reneging on the 15% rotating inventory (and even 5%) allowed

6  Extreme to report inflated numbers to shareholders, while it created "continued distrust" in the

7  distributor's relationship with the Company. Based on FE-1's recent conversations with executives

8  at one of Extreme's distributors, FE-1 advised that the rotating inventory clause in their contract with

9  Extreme has been reduced from around 15% to 5%, and as of early 2025, Extreme was still refusing

10  to meet that obligation.

11      170.    FE-1 additionally explained that every week the distributors were given inventory lists

12  by Extreme. FE-1 also explained that Extreme *receives* weekly inventory demand reports from its

13  distributors and also a pipeline report which shows what is forecasted, and that these reports had

14  visibility into the end user and reseller demand.  According to FE-1, from these reports, Extreme

15  could see what the "true real demand" was from the reseller / end user to the distributor. FE-1

16  explained that nonetheless, Extreme pushed its distributors to buy additional inventory regardless,

17  even when there was no demand downstream. He added that Extreme ignored their distributors'

18  actual demand from their own resellers and end users, and what was on order. Extreme continued to

19  push inventory to the distributors that they did not need, and did not allow them to cancel or return

20  the inventory. FE-1 described these practices as "allowing Extreme to own the distributors' business."

21      171.    Defendant Brown's efforts to stall or eliminate product returns as a policy matter at

22  the end of 4Q2022 were memorialized in a set of June 2022 emails and IM chats sent or copied to

23  FE-1. As referenced below, *infra* Section IV.C.5, FE-1 forwarded these emails on to Defendant

24  Thomas as part of his Company exit interview in July 2022.

25      172.    One email with the subject "Policy add to our Program Guide" was written by

26  Defendant Brown on June 30, 2022, and addressed to a group of employees at Extreme—including

27  Defendant Rice; FE-1's boss Uraco; Senior Vice President Sales Strategy, Business Development,

28  and Operations Cleaver; Director of Purchasing Nolan and Director, EMEA Distribution John

Campbell. In this email, according to FE-1, Brown proposed a new Company-wide policy intended to prevent distributors from returning unwanted product, which was their contractual right. In the email, Defendant Brown proposed that the following policy be added to Extreme's distribution program guidance, which provided a framework for the language used in Extreme's distribution contracts: "If a Distributor stock rotates a specific product, they are no longer eligible to re-order 'said' product for the next 12 months." In that email, Defendant Brown further stated that he was "not concerned about policing this new policy. ***Having it in there will be a deterrent and drive the behavior we want***."

173.    FE-1 explained that this policy would make it so that if a distributor returned product, then it would not be able to buy it—or the product's newer versions—again for 12 months even if, for example, demand for the product increased and the distributor needed to restock.

174.    FE-1 recalled Extreme's "legal person" Inger Laws[14] telling Jonas Brown this practice was "not legitimate." FE-1 recalled that while Brown was rebuffed in making it written policy, he still attempted to enforce it with distributors. FE-1 reiterated that Brown was "running out of tricks" to the point where he was suppressing the ability of his distributors, some of which are publicly traded companies, to return products based on their agreements.

175.    FE-1 also explained that by not allowing or at least making it difficult for distributors to rotate their inventory once a quarter, Extreme inflated their revenue numbers. According to FE-1, the reason for this change was that if the distributor returned product, it was a "hit" against Extreme's revenue. FE-1 explained that vendors often wanted to ship back inventory that had been in their warehouses for months because it was depreciating in value and negatively affected the distributor's own profitability.

176.    FE-1 forwarded Brown's June 30, 2022 "Policy add to our Program Guide" email to Defendant Thomas on July 20, 2022—just days before the Class Period—and directly informed Defendant Thomas that Defendant Brown "***works with the distributors to buy bad product that is***

[14] Inger Laws served as Extreme's Director, Associate General Counsel from May 2019 to June 2023. Before that, she served as Senior Director, Corporate Counsel at TD Synnex (September 2017 to April 2019) and Associate General Counsel of Westcon (December 2011 to September 2017).

47

1    _not sellable to make the corporate number_ and then artificially suppresses them from rotation *[of]*

2    *bad product to order good product*. He basically wants to punish or threaten them that if they return

3    anything, he will not allow them to buy it again for 12 months…. He basically admits having it there

4    will get the behavior he wants and deter them … from managing their own finances and inventory."[15]

5        177.    In the same July 20, 2022 email to Defendant Thomas, FE-1 also attached numerous

6    other documents and emails that support the fact that Extreme engaged in channel stuffing conduct

7    with the distributors—most specifically evidencing the existence of the stock rotation plan and the

8    right of return with distributors. These documents included the following:

- One IM conversation in which Defendant Brown stated "[w]e forecasted $3M for TD [Synnex] to rotate – they submitted $6.8M**.** That is a HUGE problem for all of us. Josh may have tanked our quarter. I need a plan on how we reverse this . . . if not, our conversion rate will spike, and our auditors will be all over us."[16]

- Another IM conversation in which Defendant Brown asked FE-1 whether TD Synnex was "willing to part ways with [its stock rotation clause] for 6+ months?" The discussion concerned a stock rotation submission from TD Synnex for 3Q2022, and Defendant Brown commanded FE-1 that "you need to look at what they [TD Synnex] want to rotate and challenge them when it makes sense," stating "we have massive supply challenges . . ."

- A screenshot of contemporaneous notes from FE-1's notebook (dated sometime in 3Q2022), indicating that TD Synnex submitted a stock rotation in 2Q2022 and that as a result, Defendant Brown wanted to "punish them"— referring to TD Synnex. Specifically, Defendant Brown wanted to give them a "bloody nose."

178.    Extreme was ultimately successful in stalling for at least a few quarters at least some

of the contractually promised stock rotations and returns for the newly stuffed product.  For fiscal

years 2022 and 2023, Extreme reported product return deductions of $64,745,000 and $88,936,000,

respectively. However, for fiscal year 2024, after the end of the Class Period, Extreme reported an

incredible $131,950,000 in product returns, nearly 20% of the Company entire product revenues for

the entire year.

---

[15] Ellipsis in original.
[16] Ellipsis in original.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

**5.**    **FE-1 Resigns And Directly Informs Defendant Thomas (And Others) About The Company's Channel Stuffing Practices**

179.    FE-1 resigned from Extreme as a result of the unethical behavior he witnessed. FE-1 found the pressure exerted on Extreme's distributors to be "embarrassing" and "unethical."

180.    On or around July 11, 2022, FE-1 handed in his two weeks' notice, which he sent to his direct superior, Uraco. FE-1 recalls that date because it was on or about the same day that Defendants Meyercord and Brown (and others) were meeting with ScanSource executives in Greenville, South Carolina. FE-1 recalled that this ScanSource meeting took place after ScanSource did not agree to a "big deal" with Extreme because they had previously done a handful of large different deals where they held onto inventory at the request of Brown to "only get screwed" by Brown in refusing to allow them to return the inventory. FE-1 believed that Defendant Meyercord, Scott Peterson, Defendant Brown, and Matt Cleaver were present at this in-person meeting, along with Matt Money, who was in charge of the ScanSource account. FE-1 recalled that Joe Uraco was supposed to have attended this meeting but could not because he was ill.

181.    FE-1 recalled that Brown had wanted to fire him immediately after he gave notice, saying that Brown thought FE-1 may say negative things about Extreme to the distributors as retaliation. According to FE-1, his Human Resources Manager told FE-1 that he was not fired and could finish out his last weeks.

182.    FE-1 recalled that shortly after he gave notice (but before the Company's earnings release on July 27, 2022), he had an exit interview with then-CFO, Defendant Thomas, Executive Vice President of Global Human Resources Kimberly Basnight, and FE-1's Human Resources Manager.

183.    As noted above, during that exit interview, FE-1 discussed with Thomas specific examples of channel stuffing and manipulative practices, and followed up on July 20, 2022 by sending Thomas emails and documents supporting that discussion. Of course, given that FE-4 identified Defendant Thomas as having directly participated in the earlier dinner with Westcon's senior management (and possibly with Jenne's and ScanSource's senior management) during which the plan to stuff the channel in exchange for prioritization off of the backlog was implemented (*supra*

49

Section IV.C.2), none of what FE-1 reported to him was likely new information to Defendant Thomas.

184.    Specifically, FE-1, in one email to Thomas, wrote: "I greatly appreciate you wanting to know the truth about what is going on…[d]uring our conversation, I referenced several specific and detailed issues and encounters." In that email, FE-1 also stated that Defendant Brown, through his effort to alter the distributor return policy, "***works with the distributors to buy bad product that is not sellable to make the corporate number** and then artificially suppresses them from rotation [of] bad product to order good product*. He basically wants to punish or threaten them that if they return anything, he will not allow them to buy it again for 12 months…. He basically admits having it there will get the behavior he wants and deter them … from managing their own finances and inventory."[17]

185.    FE-1 had separate one-on-one exit interview calls in July 2022, respectively with Defendant Thomas, Executive Vice President of Global Human Resources Kimberly Basnight, and Senior Director of Human Resource, Jim Johnson. In these exit calls, FE-1 explained the unethical channel stuffing and manipulative sales and inventory conduct that he witnessed, to each individual. Notably, FE-1 explained that he never heard back from Basnight after Basnight said in the call that she needed to process this feedback. Furthermore, FE-1 stated that Johnson's response was that he was "not shocked" about Defendant Brown's alleged behavior. And, according to FE-1, Defendant Thomas asked FE-1 if he was leaving because of a new opportunity or if there was a problem in the Company, to which FE-1 responded "both."

186.    Notably, FE-1 explained that he spoke with a former Extreme colleague in early 2024. That former colleague had spoken with Defendant Thomas sometime after Defendant Thomas left the Company (in February 2023). FE-1 explained that the former Extreme colleague had told him that in this particular conversation, Defendant Thomas stated that he thought he should have done something about the information that was presented to him, but Defendant Thomas stated "he was on his way out" anyway.

---

[17] Ellipsis in original.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

187.    Furthermore, Defendant Thomas, in that conversation with FE-1's former colleague, explained to the colleague that he (Defendant Thomas) had been pressured by Defendant Meyercord to change how certain statements in presentations were worded when he (Defendant Thomas) was preparing to speak on quarterly investors calls, which Defendant Thomas regretted doing so. According to FE-1, Defendant Thomas told FE-1's former colleague that he left Extreme because he "wanted out."

### 6.    Extreme Engaged In Channel Stuffing With Partners And Resellers During The Class Period, In Addition to Distributors

188.    Extreme not only engaged in channel stuffing and other manipulative inventory and sales practices with its distributors, but it did so with its partners/resellers as well. Importantly, because products that shipped to either its distributors or partners/resellers were counted as revenues at the time of shipment, Extreme's early shipments to its partners also misleadingly accelerated and therefore inflated revenues.

189.    In this manner, similar to the Defendants' conduct with distributors, Extreme's revenue growth story that Defendants portrayed was not indicative of true organic demand, but rather was indicative of Defendants' unsustainable and accelerated sales tactics that robbed from one quarter to prop up another, creating for that period a misleading representation of organic demand and sustainable growth.

190.    FE-2 confirmed that he witnessed and experienced "channel stuffing" conduct occur with Extreme's partners in fiscal year 2023, which was during his tenure as Director of Sales, where he worked in the "largest revenue producing region in the Americas." FE-2 worked mostly with partner accounts, although FE-2 confirmed that he had been told that the channel stuffing conduct was occurring with the Company's distributors. According to FE-2, Extreme recognized revenue when product shipped from Extreme to a distributor or partner.

191.    FE-2 explained that with respect to Extreme's partner sales, inventory is normally shipped by Extreme to the partner only when there is an end user purchase order placed. In other words, the end user signing a purchase order triggers the sale, and the product ships thereafter and

1  should only then be recognized as revenues. Indeed, as FE-5 explained it, no inventory should be

2  moved without a purchase order from the end user.

3      192.    Specifically, FE-2 described witnessing how, at the end of each fiscal quarter, Extreme

4  would ship inventory to Extreme's partners knowing that those partners did not have a customer

5  purchase order, *i.e.*, a "customer commitment," from the end user. This practice conflicted with

6  Extreme's policy of shipping to partners only when there was an end user purchase order in place.

7  According to FE-2's experience, the described channel stuffing conduct with Extreme's partners was

8  a "regular" practice at Extreme and occurred often during his tenure. While there were times prior to

9  fiscal year 2022 that Extreme engaged in this practice, in FE-2's experience, this practice worsened

10  in fiscal years 2022 and 2023.

11      193.    According to FE-2, when he was personally directed to ask partners to take early

12  inventory, it was without a customer order existing or even an expectation that a customer order was

13  coming soon. In some situations, the partner was asked to send their own purchase order, but FE-2

14  explained that this was a partner purchase order not based on an actual (end) customer order.

15      194.    According to FE-2, distributors and partners were incentivized to take on inventory

16  early to help Extreme meet its quarterly goals. FE-2 explained that the usual incentive offered to the

17  partners to take inventory early was a discount of "one or two points," meaning 1% or 2%, "on

18  margin." This included discounted margins, of usually 1% or 2% as part of Extreme's rebate program.

19  FE-2 explained that backend rebates were offered to partners if they "pulled-in" an order (that is,

20  took early inventory) when Extreme asked them to. FE-2 explained that he was directed to offer

21  partners an additional 2% in rebates on an order if they took at least $1 million worth of inventory

22  early. With this particular incentive program, Extreme's partners received a monetary incentive to

23  take on the inventory early. Additionally, FE-2 explained that this practice not only caused partners

24  to buy product they did not need at the time, but it was also to the detriment of Extreme because

25  Extreme gave up revenues that could have later been realized without the 1-2% discount through

26  backend rebates.

27      195.    FE-2 added that this was done specifically to help meet quarterly goals, recalling that

28  he was told a number of times by David Savage, Vice President of Sales and Senior Director of

SLED[18] Sales for all of the United States, that other Extreme departments were not making their numbers so SLED had to make up the difference. He added that these end-of-the-quarter shipments that were not based on customer orders were, based upon his understanding, ***recognized as revenue to make Extreme's quarter look more profitable than it had been in reality***, because the Company cannot recognize revenues until the product ships.

196.    FE-2 explained that Savage directed all of the 4 or 5 regions under his purview (which encompassed the entire United States) to make the same end-of-quarter requests that he made to FE-2, and FE-2 explained that it was his understanding that the practice was going on with other Extreme employees who dealt with the distributors. FE-2 recalled Savage on calls directing him and the other directors who reported to Savage to "go find deals" at the end of each quarter, meaning to have partners pull in early inventory. Indeed, FE-2 was able to locate a June 6, 2022 email that exemplifies this normal communication (not always in writing), which he shared with Lead Counsel, where Savage asked FE-2, "***What else can you pull in from next fy [fiscal year] to cover some or all of this?***" As the Extreme fiscal year closed at the end of that June, Savage was asking about what sales FE-2 could "pull in" from FY2024 that began on July 1, 2023.

197.    FE-2 described the push on channel partners to take extra inventory as a "regular occurrence," and recalled that it was around every other quarter ("two of every four quarters") where he and other SLED Sales Directors were directed by Savage and Extreme "management" to ask partners to take inventory early and "pull in everything you can to help us make the numbers" in amounts that were always at least $1 million in value. FE-2 explained that some of Extreme's partners had warehouse space, while others who did not could rent warehousing space from distributors.

198.    FE-2 explained that management's requests to "pull in everything" really started picking up after 2022. As evidence of this, FE-2 referenced a June 29, 2023, email from David Savage, where Savage directed FE-2 to "get creative" in trying to pull in as much as he can before the quarter ended.

---

[18] Referring to "State, Local, and Education."

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

199.    According to FE-2, the directives were to make some deals and ask partners what incentives Extreme could offer to pull in order ***without*** customer / end user purchase orders ("POs"). FE-2 explained that with many of the pull ins, Extreme was requesting and accepting POs on inventory from the partner, like PC Solutions, without the partner having a corresponding PO or written commitment from the end user on the parts.

200.    FE-2 recounted how he did not feel comfortable pushing extra inventory on a partner without a purchase order but that this practice was happening often and at the direction of Savage and "management."

201.    FE-2 recalled that the magnitude of the push to take on inventory worsened when, around early or mid-2022, Savage was "making promises to customers he could not keep" on inventory, which he had no control over, in order to secure orders. He specifically recalled Savage making promises on a school district deal where he guaranteed the delivery dates in order to secure the order. FE further recalled that Savage wound up "stealing stock" from another order that was ahead of the school district in order to fulfill that order, adding that he believed this "came back to haunt" Savage.

202.    Notably, FE-2 estimated that he was directed to incentivize partners to take around $2 million to $3 million worth of early inventory each year. FE-2 also explained that the millions of dollars of inventory that were shipped early were on his orders on his accounts alone, and explained that it was much more in total when extrapolating to include FE-2's colleagues who were also directed by Savage to offer incentives for their own partners and distributors accounts to take early inventory and pull-in sales.

203.    FE-2 further explained that this practice "exhausted demand from the future," and that FE-2 complained about it all the time, because it hurt the sales teams that FE-2 worked with— because, according to FE-2, there is "not an infinite amount of deals" out there to close and pull-in. FE-2 further described that the quotas and targets for the next quarter did not decrease, so by pulling in the sales into the present quarter, it became difficult to meet the targets for the future quarters.

204.    FE-6 also corroborates these allegations regarding Extreme's channel stuffing with its partners. FE-6 was a Senior Account Manager at Extreme from July 2017 to October 2022. During

different points of his tenure at Extreme, FE-6 reported to either David Savage or to FE-2. FE-6 also worked as part of the SLED department, and except for the K-12 segment of SLED,[19] he worked with both distributors and partners throughout his tenure.

205. FE-6 explained that, as an example, a deal would be developing organically to close in approximately three months and, before the end of the quarter or before the end of the fiscal year, he was instructed to pull in the sales early. According to FE-6, he was instructed to "offer more points [greater discount percentage]" and to do "whatever you need to do" in order to help Extreme meet their numbers.

206. According to FE-6, Defendant Rice directed the pulling in of sales, based on FE-6's personal experience on a call that included both FE-6's partner and the end customer—attempting to get both the partner and the customer to accept a multi-million dollar deal. According to FE-6, he heard of other scenarios where Defendant Rice would pull-in sales and where partners and customers would take the inventory. According to FE-6, "we all knew where it was coming from," referring to Defendant Rice.

207. FE-2 provided specific channel stuffing transactions that occurred during June 2023, at the end of FY2023, with partners PC Solutions and Synergetics, and also described similar deals with Step CG.

208. First, FE-2 recalled a channel stuffing transaction in June 2023 involving Synergetics. Synergetics was a reseller for school districts mainly in Alabama and Mississippi and has since merged into Endeavor Communications, which purchased Synergetics in 2020. FE-2 recalled Savage directing on a conference call that they make the Synergetics deal happen, meaning to get the partner to take inventory they did not need. FE-2 described Synergetics as willing to pull in early orders for incentives even though they did not have customer purchase orders. FE-2 believes that the Synergetics deal was for some amount over $700,000,[20] as reflected in emails and document FE-2 sent to Lead Counsel.

---

[19] *I.e.*, the K-12 grades of the Education section of SLED.

[20] FE-2 advised that whenever an opportunity in Salesforce closes, it normally says "Deal Booked."

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

209.    Second, FE-2 described in great detail a specific incident of channel stuffing during the Class Period that involved channel partner PC Solutions. According to FE-2, in June 2023, Savage directed FE-2 to ask channel partner PC Solutions to take around $1.5 million worth of inventory by the end of that month without a confirmed customer (or end user) purchase order or written customer commitment to meet revenue targets for Q4 2023/FY2023.

210.    FE-2 explained that Savage directed him to ask PC Solutions to take the $1.5 million inventory in June 2023 because that partner had a warehouse in Miami, Florida and was one of the few partners that either had warehousing or a good amount of it. Ultimately, PC Solutions pulled in approximately $1.5 million worth of products for four of its school customers: Banks, Commerce, Glynn, and Manatee.

211.    According to FE-2, there was no indication at that time that PC Solutions was going to be awarded the end-user purchase order, so he was hesitant to force them to close the deal. FE-2 explained that he refused to pull in these deals because (i) he perceived it as unethical and (ii) Extreme had done this to PC Solutions at least once previously and in that previous occurrence, ***the purchase order never came***, and PC Solutions was stuck with the inventory for a ***year***.

212.    FE-2 explained this transaction to Lead Counsel and corroborated his account with a series of emails documenting these events. The emails provided to Lead Counsel paint a vivid picture of the pressure FE-2 was under to convince PC Solutions to pull in inventory that was not currently needed to make revenue targets. In an early June 2023 email exchange between FE-2 and Savage that was prompted by a June 2, 2023 call between the two, they are discussing opportunities for sales by PC Solutions to "pull in early for June." In the initial emails on June 2, 2023 – June 5, 2023, with the subject line "Opps requesting PCS of FL to pull into June," FE-2 told Savage that the PC Solutions contact was hesitant as "he's already maxed out on his rebates for the period" and was "probably[] waiting for us to come back to him with some sort of extra incentive" in exchange for the order.[21]

_____

[21] Regarding "maxed out on rebates," FE-2 explained that the rebate program is a partner program. There are at least three partner tiers—Silver, Gold, Diamond—and each one gets a certain amount in rebates back based on how much the partner sold that quarter. For example, Diamond tier is for maybe making $5 million or above in sales for the quarter and Gold is $1 million or above. If you reach the Diamond tier then you can get $20,000 back in rebates as an example, and $10,000

Footnote continued on next page

56

FE-2 further explained that "the customers I believe are OK with just placing these orders once their funding comes out in July/August. Obviously that doesn't help us/Extreme. That's why [PC Solutions contact] doesn't really care about placing these orders now, unless he has a financial incentive, because I don't believe the customers are in desperate need."

213.    FE-2 sent a later email to David Savage on June 6, 2023, forwarding an email about these two deals he sent to two individuals who reported to FE-2 and covered SLED sales in Georgia and Northern Florida, indicating the two individuals agreed that PC Solutions does not have a "compelling reason," outside of financial incentives, to pull in these deals early because one end user customer did not even have its budget "until after July 1st and they don't need the gear for several months" and another won't even "get their internal funding until sometime next FY but does not know when that will be yet." As a result, the PC Solutions agent "isn't in desperate need to get the equipment right now." In response to that email, that same day, Savage asked FE-2 to see "***What else can you pull in from next fy to cover some or all of this?***"

214.    According to FE-2, Savage had been "riding me hard," had become increasingly "belligerent" behind the scenes, and was "making my life miserable."

215.    Savage did not let up, and the efforts to get PC Solutions to "pull in" over $1.5 million of unneeded inventory without a purchase order continued at the end of June 2023. In a series of emails in the last week of June, other senior Extreme executives became involved in efforts to close a deal with PC Solutions—Laura Buttimer ("Buttimer"), Senior Channel Account Executive and Flansbaum, Distribution Partner Account Manager.

216.    In emails titled "PC Solutions Order Update," FE-2, Savage, Buttimer, and Flansbaum emailed about discussions with the PC Solutions account contact, and what type of incentives and discounts could be offered in order for PC Solutions to take ***between $1.4 million and $1.6 million*** in deals for different schools and school districts.  In this email exchange, FE-2 wrote on June 26, 2023, that he felt that the "***increased discount levels on these deals***" were "***too excessive.***"

---

back if you reach Gold. In the situation described above, PC Solutions had already maxed out their rebate for that quarter and wanted additional incentives to take the inventory from Extreme they did not need. PC Solutions wanted Extreme to either lift the rebate cap for that quarter or hold it and apply it to the next quarter, which was going to be Q1 of the new FY.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

217.     According to FE-2, he felt the increased discounts were "too excessive" because they set a bad precedent. He recalled how through such previous types of precedents, PC Solutions had learned to wait until the end of a quarter to place their orders because that is when Extreme would get desperate to give them better deals. He added this practice of waiting to the end of a quarter to get extra discounts under pressure hurt "linearity," explaining that ideally a vendor like Extreme does not want 90% of their orders coming in the final month. Instead, Extreme wants around 25% of orders to arrive in the first month of a quarter and 50% by the end of month two, so that there is less burden on Extreme in the final month of the quarter.

218.     On June 29, 2023, the day before the close of 4Q and FY2023, Extreme was still trying to find a way to close a deal with PC Solutions "by end of June" for about "$1.9M all-in." That morning, Savage emailed FE-2 and said "we need as much as we can get in today and tomorrow" and encouraged FE-2 to "***get creative***" with PC Solutions.  FE-2 indicated to Savage that he had "called in some 'reinforcements'". What he meant was that he had, that morning, emailed Senior Vice President Sales Strategy, Business Development, and Operations Matt Cleaver—who FE-2 advised was the head of Global Sales Operations at that time—and asked if he (Cleaver) could make the request to PC Solutions. FE-2 recalled that Cleaver was Extreme's interim-CFO for a brief period of time, pre-COVID, and FE-2 described himself as having a close working relationship with Cleaver at that time and felt that he could go to him with this request.

219.     FE-2 sent an email to Cleaver on June 29th, 2023 at 9:49 am, with the subject line: "FW: PC Solutions Deals Update." In this email, FE-2 told Cleaver that, "we approached [PC Solutions] a couple weeks ago and asked if he could pull in about 4 Product deals by end of June (Glynn, Manatee, Commerce, Banks…~$1.9M all-in). At first, he wasn't interested (said he needed to clean out his warehouse while it's more empty…)." FE-2 explained that PC Solutions had made some demands for discounts and that there had been discussions around that. He continued, "We agreed to meet all those demands, but then he came back with more demands and wanted us to pay him $180K in additional deal discounts plus the $20K SPIFF to do it." FE-2 attached emails documenting these discussions.

220.    Cleaver did not respond to FE-2. FE-2 was surprised when Cleaver did not respond fairly promptly as he usually did, and that instead, FE-2 received an angry call from Savage later that same day in which Savage said that any directives he gave to ship early inventory should be private and not discussed with the rest of the Company. Savage then told FE-2 that he (Savage) would personally call PC Solutions and make the request.

221.    FE-2 explained that Savage called PC Solutions directly and got the deal done himself and that the deal—for $1.5 million—closed by the end of June 2023 and was recorded for 4Q2023/FY2023. FE-2 advised that he absolutely knows this inventory sale to PC Solutions worth $1.5 million was handled by Savage and it was executed and booked because the transaction was (i) reflected in FE's region's 4Q quarterly financials, and (ii) his team made the "Summit Club" as a form of recognition for meeting their quarterly revenue goals, adding that his team would not have done so without that sale to PC. He explained that only the regions who reached 100% of their quarterly revenue goals made the Summit Club. Moreover, FE-2 provided Lead Counsel with an email sent on June 30, 2023 at 1:35 P.M. with the subject line "PC Solutions PO Numbers," listing the orders that PC Solutions pulled in.

222.    FE-2 explained that he was disturbed enough by Savage's directive to ask PC Solutions to take the early inventory at the end of the fiscal year in 2023 that he reported it within the Company. Specifically, FE-2 advised that he reported the June 2023 incident in the Sarbanes-Oxley ("SOX") quarterly questionnaire form that he and his fellow sales directors had to fill out every quarter where they had to report any inappropriate requests. FE recalled that he filled this out probably at the end of July 2023, adding that this was both at the very end of 4Q2023 and FY2023. According to FE-2, he received a call from someone in Human Resources who asked him a question or two about it, but nothing ever came of it. Shortly thereafter, FE-2 was demoted.

223.    FE-2 recalled that as a result of the PC Solutions transaction that Savage ultimately closed, he believed that he was demoted from his Director position just a short time later to an Account Executive position, at around half of his compensation of his Director of Sales position. Regarding FE-2's demotion, FE-2 stated that Savage told him that he was "making a change" and moving FE-2 out of SLED and into another department where they were creating a position for FE-

59

2. According to FE-2, Human Resources never contacted him for being demoted, and Savage never gave a real reason for the demotion. FE-2 recalled that Defendant Rice told him in an exit interview when he departed the Company after the end of the Class Period, that Savage had wanted to "let go" of FE-2 in August 2023, but that Defendant Rice told Savage to demote FE-2 instead.

224.    FE-2 believes that Extreme, or at least Defendant Rice, understood that FE-2 could have sued the Company if they had fired him for refusing to do something unethical and possibly illegal and that instead a demotion would not lead to a lawsuit.

225.    FE-2 recalled that another partner—Step CG, headquartered in Kentucky—was also often asked to take early inventory and had the warehousing to do so. FE-2 recalled an early Step CG deal which occurred sometime around 2021 or 2022, that the value of the deal was for $1 million, and that it happened "***more than once, for years.***" FE-2 further explained that Extreme routinely approached both Step CG and PC Solutions during his tenure because they had the warehousing to store the inventory.

226.    Similarly, FE-11 recalled an example that occurred around Summer 2022, where a partner in EMEA was incentivized by Extreme to order 1,000 extra access points to be delivered to a large end customer in the EMEA region in exchange for discounts on future orders. FE-11 explained the access points were sold to the partner at around $500 each, after discount, meaning that the value of the deal was likely around $500,000.

227.    According to FE-11, the purchase order from the large end customer never materialized, but the Extreme partner was forced to hold the access points inventory for the end customer for at least six months because the end customer did not close on the deal with a purchase order. FE-11 recounted how the Partner had asked to return the product for "a long time" but that the sales manager at Extreme tried to avoid taking the product back.

228.    After months of unsuccessfully trying to return the access points, FE-11 described how the partner, in a meeting in late 2023 (probably December), demanded that Extreme take the product back before New Years Eve 2023 so that it would not be on the partner's books for the upcoming year. FE-11 recalled that the partner threatened to stop doing business with Extreme if Extreme did not process the return.

**7.    The Company And Its Senior Management Monitored End User Sales, So They Knew When Product Was Shipped Without An End User Order**

229.    Notably, Extreme monitored the likelihood that the accounts with its partners would end up with a secured purchase order by the end user. And critically, Extreme willingly shipped and stuffed product and inventory to its partners while having access to reports, information, and databases that demonstrate that those end users had ***not*** placed a confirmed purchase order.

230.    As discussed above, FE-2 recalled Savage on weekly calls nearing the end of every quarter, directing FE-2 and the other Directors of Sales reporting to Savage to "find deals," that is, asking partners to pull-in inventory early and accelerate revenues. According to FE-2, weekly calls were held by Savage and his team, including FE-2, and that Savage had a "***pull-in list***" of partners to target that could potentially pull-in orders. FE-2 explained that Savage directed FE-2 and FE-2's colleagues to offer backend rebate deals, margins, and points to their respective partners to place their own purchase order if they did not have an end-user (customer) purchase order being released or soon to be released.

231.    FE-2 explained that this "***pull-in list***" would indicate and monitor what deals each partner had with the end customer and the organic timeline for the deal, such that if a deal was to close and the end customer would place the purchase order, in May, for example (which was in 4Q), then Extreme could target that potential partner to seek to "pull-in" the sale into the present, *e.g.¸* in March (which had the effect of pulling in the sale for 3Q). According to FE-2, "just based off the timing of the deals" Extreme could see what deals were potentially available to pull-in.

232.    According to FE-2, Savage had this "***pull-in list***" in the form of an Excel spreadsheet that he emailed to his team, including FE-2. FE-2 explained this spreadsheet was "sent up the chain of command" because (i) Savage occasionally included a corresponding PowerPoint deck of slides along with the spreadsheet, and that on the title page of the deck were the names of Senior Vice Presidents of Sales for Americas, and (ii) FE-2 recalled these SVPs calling him for updates on deals to be brought in early. FE-2 further explained that these SVPs reported to Defendant Rice.

233.    Separately, FE-2 also explained that Extreme account executives received weekly and sometimes daily updates from customers on the likelihood of an end user securing a purchase order

with Extreme, and channel sales did the same with their channel accounts. Based on the feedback from their respective counterparts—end user and partner—the order status would be updated based on "three levels of categories" reflecting the likelihood of the end user entering into a purchase order: (i) "Pipeline," which FE-2 described as the "basic" level which indicated there was too little information to decide the likelihood of an end user placing the purchase order; (ii) "Best-Case"; and (iii) "Key Best-Case." When a proposal was actually *confirmed* as being accepted by the end user then the category was updated to (iv) "Commit."

234.    In addition to having visibility into end-user demand, FE-2 also described Extreme as having exceptionally good visibility into the inventory levels of their distributors. According to FE-2, during the COVID-19 pandemic in 2020, Extreme created the Inventory Distributor Exchange (or a similar name for it) specifically so that each of Extreme's distributors could see which distributors had inventory, along with Extreme. He explained that the distributors' inventory levels of specific items were updated automatically by the distributors' systems whenever inventory was received, shipped, or marked reserved for an order, adding that Extreme could access the Inventory Distributor Exchange. FE-2 suggested that he did not access this system directly but recalled that distributor inventory level spreadsheets were regularly circulated, which he reviewed because he was a recipient on the distribution emails.

235.    Notably, FE-8, Senior Vice President Global Channel Sales from January 2022 to November 2023, also corroborates and confirmed the existence of the "Pipeline" / "Best Case" / "Key Best Case" / "Commit" framework at Extreme. FE-8 referred to this framework as the deal lifecycle and the "stages of opportunity funnel" that was located in the Company's Salesforce[22] database system for both the direct and partner channels. According to FE-8, the "Pipeline"/"Best Case"/"Key Best Case"/"Commit" reporting was aimed at trying to understand what deals were going to close from the perspective of an end user and the likelihood that the end user will close on a deal.

236.    Similarly, FE-5 also confirms and corroborates the existence of the "Pipeline"/"Best Case"/"Key Best Case"/"Commit" framework. Again, corroborating these other former employees,

---

[22] Salesforce was the Company's internal customer relationship management software.

FE-5 also confirmed that these four categories measured the likelihood of an end user placing a purchase order with Extreme. FE-5 also described the "Commit" category as **intended to measure only confirmed purchase orders from end users**.

237.    Importantly, and according to FE-2, FE-2 was directed by Savage at the end of almost every quarter to ask partners to take early inventory. The partners and sales targeted were from the Key Best-Case and sometimes Best-Case categories (*i.e.¸ **but not the "Commit" category***). Thus, this further confirms that Extreme shipped inventory to partners who did not have "committed" purchase orders for the product.  FE-2 advised that he was not the only Director of Sales to seek to have orders pulled in early, and that Savage asked each of his directors to do so.

238.    Notably, these former employees indicated that the Pipeline" / "Best Case" / "Key Best Case" / "Commit" framework would be shown in the Company's Salesforce and "Clari" database systems – and that Defendants had access to these databases.

239.    Specifically, FE-2 explained that these weekly and daily updates were entered into Extreme's Salesforce system, and the details would be "pulled" by the Company's "Clari" system[23]—which could be accessed in diverse ways through the Company's various dashboards depending on what type of information the user wanted. FE-2 explained that everyone in sales and operations had at least some level of access to Clari and the dashboards, depending on their level at the Company. Additionally, FE-2 explained that senior level SVP (Senior Vice President) executives at Extreme called him weekly and sometimes daily throughout his entire tenure asking for more detailed information on the status of deals worth $1 million or more—and FE-2 explained that they were referencing orders from Savage's list of orders that could potentially be pulled-in. FE-2 also received occasional calls from Defendant Meyercord checking the status of FE-2's relationship with his customers.

240.    FE-9—a Channel Account Manager during the Class Period—gave further detail as to the Salesforce and Clari database systems. Specifically, FE-9 explained that Clari and Salesforce

---

[23] According to Clari's website, Clari is a "revenue orchestration platform" and allows a company "to run all [their] enterprise revenue workflows, end-to-end." *See* https://www.clari.com/?home_cccr=create.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

showed information such as account name, opportunity size, and two columns he filled out – (i) where the opportunity was in the sales cycle, and (ii) notes on updates he entered. According to FE-9, Clari pulled data from Salesforce, which was Extreme's CRM (Customer Relationship Management) platform. An Account Executive would create opportunities that show up for that account in Salesforce and it would appear on FE-9's end in Clari. According to FE-9, everybody had had access to Clari, and the higher the rank or level, the more access and information the executive had access to. FE-9 also confirmed that one can pull reports from Clari.

241.    Indeed, FE-5 corroborated that everyone at Extreme had access to Clari and Salesforce, including senior level officers and executives—who could access the employees' pipelines or revenue forecasts. According to FE-5, the Clari and Salesforce databases provided the ability to run reports for all sales and purchase orders nationwide and globally. FE-5 further described it as "everyone could pull revenue forecasts," and the "*C-suite could see everything we see*."  And FE-5 further corroborated that the "Pipeline / Best Case / Key Best Case / Commit" framework and updates were entered into the Salesforce and Clari systems.

242.    Furthermore, FE-5 stated that he "knows for a fact" *that senior level executives reviewed those updates* because he recalled being told on a number of bi-weekly calls throughout his tenure that Defendant Meyercord and CRO Vitalone wanted additional details in the updates so that they could better understand them.

243.    FE-5 specifically recalled on a bi-weekly call[24] around January 2024 when the Director of Global Solution Partnerships of Americas Amy Bravo and Vice President of Americas Channel Jennifer Orr directed participants on the call to write their updates clearly, detailed, and professionally as possible "*as if Meyercord is reading them, because he is*."

---

[24] These bi-weekly calls were significant in magnitude. FE-5 explained that they were led by Director—Strategic Partnerships, Cameron Marchand, Amy Bravo, and Senior Director of Strategic Partnerships Paulette Huber. FE-5 explained that these bi-weekly calls were held for employees on the U.S. channel side of the business and was where they discussed forecasting on Named Partners, which FE-5 described as channel partners who did business nationwide and did a minimum of $100 million in sales per year each.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

244.    Similarly, FE-5 explained that Extreme regularly received updates from its distributors on their inventory level, at least on a weekly basis, which Extreme in turn shared with each distributor so that they would know what products could be found on hand.

245.    FE-5 explained that there was an "Inventory List" group listserv, which detailed how much product Extreme had on-hand at any given moment. According to FE-5, the Inventory List listserv was a regular group-wide email that attached an Excel spreadsheet. In the Excel spreadsheet, the device, type of device, serial number, model numbers, current demand, availability, and allocation of Extreme's products was shown. FE-5 indicated that the Inventory List spreadsheet would show, *e.g.*, that "1000 items were committed to this deal" with a particular customer, etc. According to FE-5, "every item, we would have an inventory count on it." FE-5 explained that the Inventory List spreadsheet indicated what Extreme actually had on hand, what it had on order, and what it had on backlog, at any given moment.

246.    According to FE-5, each distributor had their own Distribution Inventory Excel spreadsheet as well. Accordingly, FE-5 explained that Extreme "would always know what TD Synnex had, what Jenne had, etc."

247.    Importantly, FE-5 explained that the CEO (Defendant Meyercord), the CFO (Defendants Thomas / Tate / Rhodes), and "all executive leaders" were "***always***" email recipients on the listservs and would have received the Excel spreadsheets.

248.    Accordingly, Extreme's executive management, based on the "pull-in lists,' spreadsheets, and reports that were regularly circulated to them—including through the use of the Clari and Salesforce database systems—would have always been aware of which deals were being targeted as "pull-in" sales for the current quarter and the organic timeline for the closing of a deal (*i.e.*, the organic timeline for when the end customer would actually place and secure a firm customer purchase order). Furthermore, these reports and spreadsheets also detail to executive management how much inventory was at Extreme at any given moment in time, how much inventory was being shipped to distributors and partners, and how much of the product was on backlog.

**8.    Defendants Improperly Inflated Revenues Based On Other Illusory Sales Tactics During The Class Period**

249.    Defendants also improperly inflated revenues by simply—and improperly—double-counting orders into the revenue and pipeline forecast when those orders were knowingly cancelled or non-existent, as well as engaging in other illusory sales tactics.

250.    As discussed above, FE-5 was formerly employed by Extreme as Senior Channel Account Manager from March 2022 to April 2024.

251.    FE-5 described actions at Extreme that improperly inflated revenues at quarter end based on illusory sales. Specifically, according to FE-5, there were a lot of what he perceived as inappropriate actions of "inflating the pipeline" including "RFPs" (Requests for Proposal) that Extreme knew that it had lost out on to competitors but kept in the revenue forecast or reinserted back into the forecast until the end of a given quarter in order make the forecast or pipeline look better than it was.

252.    Specifically, FE-5 recalled bids that had been lost out on and orders cancelled being put back into the revenue forecast until the end of a quarter, which he explained would be done to artificially inflate the forecast. FE-5 explained that whenever he witnessed this being done, he pushed back against it *but was told that the correction would not be made until after the quarter was over*. FE-5 recalled this occurring throughout his tenure even though he knew for certain that Extreme had lost out on bids or orders had been cancelled.

253.    FE-5 confirmed that he was made aware of similar instances of revenue and pipeline manipulation occurring multiple times at Extreme during his tenure, based upon the calls he was in throughout the course of his tenure.

254.    FE-5 recalled other examples of revenue manipulation by Extreme. In one instance that occurred during the Company's second fiscal quarter of 2024 (*i.e.* 2Q2024), Extreme had ordered the wrong hardware for a New Jersey Transit order whose main component was worth around $1.8 million. When Extreme "called back" the order because it was incorrect, instead of using a new order to clear out the incorrect one, Extreme *put the new order "on top of the old one" and counted it as two orders that were reflected in the forecast or pipeline as two separate orders*. According to FE-

5, these projected revenues from both the "new" and "old" orders were included in the 2Q2024 revenue forecast.

255.    According to FE-5, he sent an email up the chain of command questioning this and recalled getting an email response from a Vice President that the decision had **been made to keep it as two orders until the quarter was over and then correct it**. FE-5 recalled someone else in the email chain then advising that Vice President to not say anything else in email and to take any further discussion on the topic offline. According to FE-5, having the two orders instead of one on the books inflated the forecast until 2Q2024 was over.

256.    Similarly, FE-10, who was employed by Extreme as a Senior Account Executive from after July 2023 until April 2024, described other illusory tactics that inflated revenues and forecasting. Specifically, FE-10 first corroborated that Extreme's forecasting was available through Salesforce. FE-10 explained that quotas were determined by examining the "health" of a territory and then a forecast was put in place based on information collected in Salesforce. FE-10 also explained that Salesforce contained information regarding previous orders made by a customer and then assumptions were made based on when that customer was going to need new equipment, how much additional equipment they will need for their next order, and what revenue that equates to.

257.    According to FE-10, during his tenure, Extreme had included data in Salesforce from five or six acquisitions that had occurred over the previous seven to ten years. FE-10 stated that data pertaining to customers of the acquired companies was included in Salesforce and the "old data" continued to remain even after the customers had "evolved" and stopped using Extreme technology. This rendered the information in Salesforce "archaic" for including information on companies that were no longer customers of Extreme. According to FE-10, this "elevated" the supposed number of customers that Extreme had. FE-10 added that this also "inflated" and claimed to show "elevated" revenue opportunities in a territory and therefore impacted revenue forecasting and assessments of territory health. According to FE-10, "why that matters" is because the revenue forecasting was based upon "archaic" information" and thus inflated.

258.    FE-10 recalled that these opportunities contained in the forecasts ended up in the "pipeline," which contained the sales opportunities for that particular time period. FE-10 continued

to explain that Extreme simply "threw out numbers" and put "random" numbers on the books as a result.

259.    Another tactic that this particular former employee referenced that inflated Extreme's revenues and forecasting, and which was manipulative in nature, was the act of Extreme not removing these outdated and archaic deals from the pipeline once Extreme was made aware of the error and old data—but instead waiting until after the fiscal year numbers were reported to then correct the pipeline and forecasting.

260.    Specifically, FE-10 explained that individuals at Extreme had the ability to input comments into Salesforce for opportunities based on conversations with customers without any "back up." FE-10 recalled an instance of a significant opportunity in Salesforce that he could not get "validated" with the customer as being legitimate. According to FE-10, when he attempted to remove this opportunity from Salesforce he was instructed "don't take it out" or "kill it" and instead he was instructed to "move" the opportunity to the end of the year. FE-10 explained that this "inflated" the "health" of his territory and that this practice was "not good." According to FE-10, the revenue forecasting should have been "reflecting reality"—which it did not during his tenure.

261.    For example, according to FE-10, there was a deal forecasted in the range of $800,000 that in reality was closer to $30,000 during his tenure. FE-10 sought to clean up the data in order to effectively do his job, but removing this old data "triggered" different alerts to Extreme management that signified he was losing deals. FE-10 stated that the triggers then led to review by upper management to assess the status of the opportunity which resulted in instructions to "***move*** ***deals to the end of the calendar year***. FE-10 noted that by "moving" a deal to the end of the calendar year it would remain in Salesforce for revenue forecasting purposes for the end of the fiscal year at Extreme, ***which rendered the forecasting for that specific time period inflated***. FE-10 stated that the "deals were taken care of" at the end of the year, and not at that particular moment. According to FE-10, the revenue forecasts and figures that are publicly reported are derived from Salesforce, and Salesforce hosted the Company's pipeline, funnel, and forecasts.

262.    Indeed, FE-10 explained that Extreme upper management would review the "numbers" and take it to the "end of the year," and then decided whether to "kill" the deal or not—but *only after reporting for it and including it in the Company's fiscal year*.

263.    FE-10 explained that by cleaning the data he was responsible for, it "skewed" the pipeline and opportunity forecasts "negatively." FE-10 added that the triggers were in place to assist with identifying individuals to be laid off and that by removing old data and therefore reducing the forecasts for his territory that his standing at the Company was negatively impacted.

264.    FE-10 further explained that he was individually performing well and did not have an inclination that he may be laid off less than one year after starting. FE-10 explained that he expected to have at least 12 months at the Company to establish himself.

265.    According to FE-10, he had had internal conversations about "cleaning up" the forecasts when he joined and noted that there were opportunities in the Salesforce maintained by his predecessors which were not "real" deals. FE-10 recalled that his counterparts on his team were all "older reps" who had been at the Company for at least a year and were not focused on "cleaning" their data. According to FE-10, he was advised by his counterparts "not to focus on that [data cleaning] too much." FE-10 noted that they "all played ball" by leaving old data and opportunities in Salesforce.

266.    FE-10 further explained that when he was let go from the Company in April 2024, he was "blindsided" and there was no "heads up." According to FE-10, he was the only one on his team "cleaning up the pipeline" in order to correct the accuracy of the forecasting, but he was terminated anyways.

267.    Notably, FE-10 also corroborates that Extreme sought to pull-in sales by pushing inventory to distributors and partners even without an end customer purchase order to justify shipment, as discussed *supra* Section IV.C.6, and that nonetheless, FE-10 sought to do things "with integrity." Specifically, FE-10 stated that in typical deals, the end customer "cuts a purchase order" to the distributor, who then cuts a purchase order to Extreme. In one particular incident during his

tenure, FE-10 was asked to see if the distributor would cut[25] a purchase order to Extreme without having received the purchase order from the end customer. FE-10 explained that he was told and directed by upper management to ask the distributor if they could "cut" the purchase order because the customer had not done so yet, and Extreme was able to recognize revenue once the distributor had done so. FE-10 pushed back against his superiors and obtained the purchase order from the end customer "with integrity." FE-10 recalled that after the deal was done his superiors "weren't grateful" and expressed "negative comments." FE-10 recalled hearing from upper management that the practice of distributors taking on product without end customer purchase orders was "common practice" and had been done before.

268.    Indeed, FE-10 stated that it appeared to him that he arrived at Extreme during a period in which the Company was trying to make up for the misleading perception of its performance that had been on display in the lead up to its year-end filings (around the time he arrived after July 2023). According to FE-10, what the Company was asking of him was "impossible." FE-10 explained that he experienced "pressure" at Extreme that was "pushed from the top down." FE-10 further explained that there was "a lot of pressure" to meet quotas that heightened at the end of quarters. FE-10 recalled receiving calls from superiors on Christmas Day, New Year's Eve, New Year's Day, and Good Friday pushing him to get customers to complete deals and that it was suggested to him that his job depended on it.

**D.    Contrary To Defendants' Repeated Misrepresentations, Extreme's Backlog Was Freely Cancelable, Did Not Reflect "Firm" Orders and Was Not Reflective Of Assured "Revenue Growth"**

269.    Separate from their misstatements regarding the organic causes of revenue growth while omitting the Company's channel stuffing scheme, Defendants also misrepresented the strength and "**firm**" nature of Extreme's backlog. The Ninth Circuit has explained that "once defendants [choose] to tout the company's backlog, they [are] bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). Here, Defendants violated that principle by repeatedly asserting to the market

---

[25] Meaning to issue the purchase order.

1  that—based upon their touted "complete visibility" into the backlog—the "***vast majority***" of orders

2  (*i.e.*, 99%) included in the backlog were "***not cancelable***" and reflected "***firm***" customer

3  commitments and "***end user demand***," and thus, the backlog was "***very high quality***." Indeed,

4  Defendants specifically asserted that "***[t]hese are real projects that we see***" and that "***we don't see***

5  ***double ordering***" in connection with the Company's backlog. Those statements were affirmatively

6  and provably false and misleading.

7        270.    In direct contrast to Defendants' false and misleading statements concerning

8  Extreme's backlog, multiple former employees confirm and corroborate that Extreme's backlog—

9  which peaked at $555 million in 1Q2023—was not "firm." Specifically, Defendants failed to disclose

10  that: (1) the backlog orders, instead of reflecting "firm" customer commitments, could be cancelled

11  at any time by Extreme's distributors and partners, and did not reflect end user demand; (2) it was

12  well known internally that the backlog orders consisted of orders that were double or tripled booked,

13  or hedged, by distributors and partners, and that the distributors and partners would cancel such orders

14  depending on which manufacturer met the order first; (3) Defendants already internally hedged that

15  10% of the backlog would be cancelled and not be converted to product revenue—far greater than

16  the 1% of backlog cancellation that they led the market to believe during the Class Period; and (4)

17  even Defendants' own internal hedge was severely understated, with the more appropriate hedge for

18  backlog cancellations set at 66% to reflect the double and triple ordering. Accordingly, Defendants

19  misled the market as to the strength and "firm" nature of the backlog orders during the Class Period.

20        271.    The Class Period backlog was further weakened and made less firm by virtue of the

21  channel stuffing scheme launched in mid-March 2022 and set in place for the 4Q2022, the first quarter

22  of the Class Period. As discussed at length above, by leveraging the backlog as a tool to force

23  distributors to stuff their channels with unneeded product in order to jump the line and get prioritized

24  backlog shipments, Extreme threw the backlog in turmoil when it threw out FIFO fulfillment. Since

25  waiting in line for backlog orders to be filled was no longer the practice, distributors had little

26  incentive to keep their backlog orders at all; if and when they needed stock off the backlog, they

27  could try to cut a deal with Extreme instead.

28

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

1.    **Extreme's Ballooning Backlog Orders Were Conditional And Able to Be Freely Cancelled**

272.    FE-7 was employed as Extreme's Senior Vice President, Strategy, of the Office of the CTO. FE-7 formally held this title from March 2022 until March 2023. However, FE-7 explained that his employment with Extreme had begun months prior to March 2022—in mid-2021—as a part of a "rolling start" while Extreme progressed in their acquisition of FE-7's prior employer. FE-7 further explained that, throughout his decades-long tenure in the global networking industry, he has worked at companies on both the supply/sell-side and the customer/buy-side, including at a distributor. FE-7 specifically mentioned that at one time he even had a minority stake in a distributor. FE-7 explained that his position sat "one click" below the ELT and he reported directly to Chief Product and Technology Officer Nabil Bukhari. During the Class Period, FE-7 was tasked with examining the pricing strategy for Extreme's entire product portfolio.

273.    FE-7 explained that backlog orders placed with Extreme were conditional in nature and, accordingly, readily cancellable by Extreme's customers. According to FE-7, in the generic hardware industry that Extreme was part of, when there are supply constraints, there is "no such thing as a non-conditional purchase order."

274.    FE-7 gave specific details as to the form of the contracts for the backlogged purchase orders. FE-7 explained that the language with Extreme customers' contracts was "first come, first serve" and if another supplier was able to provide the product quicker than Extreme, then the contracts were "void." FE-7 further explained that "conditional" purchase orders were an "industry" term that indicated that the purchase orders themselves included specific language in the contract such as "first-come, first-serve" clauses—meaning that the purchase order placed by the customer was conditional on Extreme fulfilling that order first (and not another manufacturer). FE-7 further explained that to effectuate the double-booking and triple-booking practice by Extreme's customers, Extreme's customers would sign "conditional" purchase orders with Extreme, such that it gave them the ability to hedge in case the orders went to backlog. FE-7 explained that if Extreme did not meet an order on backlog, because of the conditional purchase order language, Extreme's customers could cancel the order and then meet that order from another manufacturer and then proceed with that other

manufacturer. As an example, FE-7 stated that a customer would place an order with Cisco, Juniper, and Extreme—with Cisco and Juniper being Extreme's competitors—and then cancel the order with Extreme if Cisco or Juniper met the order first.

275.    According to FE-7, there were "open conversations about this" with the C-Suite, and knowledge that if Extreme's competitors fulfill a product order first then Extreme's customers will "void" their order with Extreme. According to FE-7, the Procurement Teams at end customers are "well versed" with terms and conditions of deals and that Extreme's C-Suite "knew this."

276.    Further, FE-7 stated that customers did not have to pay up front with their orders, but instead, the payment would be due *e.g.*, 60 days thereafter. According to FE-7, customers' agreements with Extreme were more like a reservation and did not require upfront payment. As FE-7 explained, 80% to 95% of Extreme's customers were "very big" companies.

277.    FE-7 explained that customers like enterprise, federal, and public entities have a "go live" schedule for projects and need the product on site, staged, and tested on a specific timeline to remain on schedule. FE-7 continued to say that including "first come, first serve" language in a contract was "not a one-off thing" and that "this is how they do it [structure the contracts]."

### 2.    In Summer 2022, FE-7 Informs The ELT That Extreme's Handling Of The Backlog Is "Misleading"

278.    Given his senior executive role and experience, FE-7 attended monthly and quarterly ELT ("Executive Leadership Team") meetings with Defendants Meyercord, Thomas, Rice, and others from Fall 2021 until his departure in March 2023. Specifically, FE-7 recalled that other individuals who attended the ELT meetings included current President and CEO Ed Meyercord, current COO Norman Rice, current Chief Product and Technology Officer Nabil Bukhari, former CRO Joe Vitalone, and the Chief Financial Officer, who was at the start of his time at Extreme was former CFO Remi Thomas. FE-7 added that former SVP/Head of Global Channels Scott Peterson also attended these meetings from "time to time." FE-7 explained that his position sat "one click" below the ELT and he reported directly to Bukhari.

279.    According to FE-7, during the ELT Meetings, there was "always" an element of discussion around the state of the business regarding progress towards sales targets and potential "speed bumps" in achieving those sales targets.

280.    Further, according to FE-7, at these meetings, "everyone [referring to Extreme's ELT] in the room knew" that customers hedged their procurement and that it was "standard operating procedure." According to FE-7, *the C-Suite / ELT knew that the double-hedging and triple-hedging practice by Extreme's customers was going on*, especially during the constrained supply chain environment.

281.    Importantly, FE-7 described how Extreme ***already was assuming that at least 10% of the backlog would be cancelled***—in direct contrast to Extreme's statements that the backlog orders were "firm" and "not cancelable," and that the Company expected no deviation from a historical ***1% cancellation rate***. Indeed, FE-7 stated that the Company had been factoring a "10% cushion" for backlog deals that are estimated will fall through.

282.    In particular, FE-7 recalled a specific ELT meeting he attended between July and September 2022, during which the meeting attendees discussed a "10% hedge" that the Company had placed against its backlog, meaning that the Company was assuming that at least 10% of its backlog orders would be cancelled. He recalled that this meeting took place in Summer or early Fall 2022, particularly between July and September 2022 (*i.e.*, during the Class Period). FE-7 recalled that this meeting was attended by CTO Bukhari, Defendant Meyercord, then-COO Norman Defendant Rice, former CRO Vitalone, and Defendant Thomas.

283.    FE-7 explained that at that meeting, he asked how Extreme was talking about its backlog for reporting purposes. FE-7 recalled being "startled" when he learned at this ELT meeting that the Company was internally applying a 10% hedge to backlog orders. According to FE-7, he was concerned about this figure based upon his decades-long experience in the industry because he knew that Extreme sold "generic" hardware, meaning that other companies sold very similar and interchangeable hardware, and that generic hardware customers will hedge by placing conditional, "first come, first serve" purchase orders with multiple vendors. FE-7 continued to explain that this

1  meant that purchase orders with other vendors will be canceled once the product can be delivered by

2  the vendor who can most quickly fulfill the order.

3       284.    FE-7 explained that he expressed these concerns to Meyercord, Thomas, and others at

4  the ELT meeting. He recalled that their response to his concerns was "thank you for your opinion,"

5  and it was "clear" to FE-7 that his concerns were "inconvenient" and would not be discussed again.

6       285.    FE-7 was "struck" by the fact that not only was more consideration not given to

7  accurately calculating the backlog—but that there was no consideration at all. FE-7 added that in

8  ELT meetings there was "very low to no reflection" on the generic selling that Extreme participated

9  in and just how easy it was for competitors to replicate.

10      286.    In the week following the ELT meeting, FE-7 conducted an "acid test" of industry

11  CIOs in order to go back to Bukhari with a level of confidence to voice his concerns around the

12  Company's internal hedging once again.[26] FE-7 explained that, following the ELT meeting, he

13  immediately began contacting CIOs that he knew and trusted in various sectors including logistics,

14  pharmaceuticals, and financial services in order to perform an "acid test" of his belief that companies

15  that were similar to Extreme customers would double or triple (or more) their orders for in-demand

16  product that was commonly backlogged. FE-7 further explained that these CIOs worked at companies

17  that were the types of companies Extreme would sell to and would find to be "attractive" customers,

18  and that one of the companies was previously a customer of Extreme. FE-7 noted that he ultimately

19  contacted approximately five CIOs.

20      287.    According to FE-7, he spoke to these CIOs about their business practices when it came

21  to placing orders with multiple vendors. FE-7 recalled that he carried out this acid testing exercise

22  within the same week of the ELT meeting at which he learned of the Company's internal 10% hedge

23  (*i.e.*, during the Class Period). FE-7 explained that he asked the CIOs about their policy around

24  placing identical orders with multiple vendors and their normal business practices during periods in

25  which there are supply constraints. According to FE-7, he was informed that the CIOs' companies

26  "never" commit to one vendor and instead placed conditional purchase orders with two or three

27  _____

28  [26] An "acid test" is defined by the Cambridge Dictionary as "something that proves the true
    qualities, value, or success of someone or something."

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

1    vendors depending on the specifications of their particular rollout plans and timelines. FE-7 added

2    that pricing was also compared between vendors. FE-7 noted that this approach was in line with his

3    previous experience in the industry.

4    　　　　288.    FE-7 recalled that shortly after conversing with the CIOs, and also within the same

5    week of the ELT meeting at which he learned of the Company's internal 10% hedge, FE-7 then

6    arranged to speak with Bukhari about his conversations. FE-7 stated that he and Bukhari connected

7    via WhatsApp or Microsoft Teams messenger.[27] According to FE-7, in a conversation that began on

8    the phone and transitioned to video call, he informed Bukhari of the results of his acid test and

9    explained that the companies of all of the CIOs with whom he spoke were hedging by placing orders

10   for products with multiple vendors. FE-7 stated that some CIOs said that their companies were

11   placing orders with two vendors, and most were placing orders with three different vendors (and

12   some more). FE-7 further stated that he was "baffled" by the 10% hedge figure the Company had

13   applied to its backlog, and it "didn't make sense to him" based on his experience. FE-7 recalled that

14   he informed Bukhari that the Company's internal 10% hedge was "just not right" and that he was

15   "***quite certain this is misleading***." FE-7 continued to explain that a more realistic figure was as much

16   as ***66%***—explaining that upwards of two-thirds of those deals may not come to be realized. FE-7

17   recalled that he further told Bukhari that he had previously held the same positions as many of the

18   higher-ups at Extreme—including the same positions as John Morrison (Senior Vice President

19   EMEA Sales and Services) and Joe Vitalone (Chief Revenue Officer)—at his previous companies,

20   and that he wanted to express his concerns to Bukhari because Bukhari "was part of the executive

21   team" and, per FE-7's extensive experience, "this is not how you do things."

22   　　　　289.    According to FE-7, he expressed to Bukhari that Bukhari could "do what you may"

23   with that information and that if FE-7 was "king for a day," this was something the Company would

24   have to talk about. FE-7 explained that there has "never" been a case, based on his extensive industry

25   experience, where 90% of a Company's backlog "has been good" in the history of the generic

26   hardware industry. FE-7 further explained that Extreme's internal 10% hedge was "removed from

27

28   　　　[27] According to FE-7, Extreme regularly used Microsoft Teams and its chat function to communicate internally.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

1  reality" and if the hedge was not addressed that "a lot" of people will find themselves with "egg on

2  their face."

3          290.    FE-7 added it is his understanding that Bukhari went to Meyercord with this

4  information based on the close relationship between Bukhari and Meyercord.

5          291.    According to FE-7, Extreme "damn well knew" how many orders they would be

6  expecting to fill, "the 10% [internal hedge figure] was bullshit because [they] damn well know," the

7  reported 1% figure—as Defendants publicly represented—was "even worse." FE-7 added that

8  Extreme "did not play by the rules" and his perception was that Extreme "tried to sweeten deals

9  downstream" to maintain orders.

10         292.    FE-7 explained that the Company should have had "more rigor" in "acid testing" itself

11 and should have conducted a "comprehensive sweep" of its purchase orders to determine how much

12 of the backlog was "real" and firm. FE-7 added that the need to be more conservative was "so

13 obvious" to him and the figures as the Company had presented them "looked dangerous" to commit

14 to such a high backlog figure.

15         293.    According to FE-7, Extreme also should have been working "closely" with their "big"

16 distributors and in turn had their distributors working closely with the big end customers to determine

17 what portion of the backlog was "real." FE-7 explained that Extreme is "very channel centric" and

18 with steps between the Company and end customer it is important to have supporting statements from

19 the distributors and partners and their customers. FE-7 explained that the backlog may have been

20 $500 million,[28] but that the associated revenues were "not in the bank," or confirmed, based upon the

21 nature of the backlog.

22         294.    FE-7 explained that the 10% "cushion" applied to the backlog was "not prudent" and

23 was "not conservative enough." FE-7 stated that the approach was "not acting in accordance with the

24 real world." According to FE-7, he could not understand "why no one was thinking about backlog"

25 and that if the Company says that the backlog number is good then investors will expect a

26 considerable jump in performance once supply chain issues subsided. Accordingly, FE-7 had

27

28 _____

[28] Referring to the backlog high of 4Q2022 to 2Q2023.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

concerns about the risks of "leading investors down a bad path." FE-7 explained that the numbers were "dressed for the Company to write some checks they couldn't cash."

### 3. Former Employees Confirm That Extreme's Backlog Orders Were Not "Firm" Customer Commitments During The Class Period

295. Notwithstanding the conditional nature of Extreme purchase orders, according to FE-7, sales personnel had a "roadmap to plan," which included "critical transactions" that needed to be wrapped up prior to the quarter close. FE-7 explained that these are the deals that "need to get over the line" and analysis of the progress of these deals begins as early as five-to-seven weeks prior to the end of the quarter. FE-7 added that this is when people "start to get jittery."

296. In fact, FE-7 heard himself, on at least three occasions, Extreme's Regional Sales Directors expressing concern that "important" deals—valued at more than $5 million each—were not going to come through and had been cancelled.

297. FE-7 specifically recalled attending meetings in Zurich, Switzerland; Lisbon, Portugal; and Toronto, Canada, each taking place approximately five-to-seven weeks before the end of Extreme's final two calendar-year quarters of 2022 and the first quarter of 2023 (*i.e.*, the quarters ending October 2022 [Extreme's fiscal 1Q2023], December 2022 [Extreme's fiscal 2Q2023], and March 2023 [Extreme's fiscal 3Q2023]). At each of these meetings, FE-7 recalled being involved in informal discussions or overhearing colleagues discussing "important" deals for those particular quarters that would not come through. FE-7 further explained that it was his understanding that these "important" deals had values north of $5 million. FE-7 added he heard these concerns—that these deals would not be completed—from Extreme's Regional Sales Directors from EMEA and North America. He added that it is "large" deals like these that are discussed in this manner and receive increased scrutiny during the second half of quarters.

298. FE-7 explained that important deals looking like they will not be completed for quarter end will "set the stage for getting creative" due to the pressure on employees to reach targets. FE-7 added discussions about how to get deals done involved employees sitting two or three steps below the ELT and he is aware that the deals discussed during these conversations were "not insignificant."

299.     Notably, FE-7 also explained that it is "standard operating procedure" from a revenue recognition policy and internal controls perspective to require both Sales and Finance leadership to "sign off on revenue certification." FE-7 added that this practice is "customary," and the certification of revenue is done to ensure that revenue is "free" of "special terms" or "undocumented agreements," such as discounts, concessions, or certain payment terms. According to FE-7, this practice is done to "adhere" to Company policies and accounting regulations, and is done on a quarterly basis.

300.     FE-7 explained that the quarterly revenue certification process was previously and is currently taking place at Extreme to ensure that revenue recognition complies with regulations. FE-7 explained that this process should capture which orders on the backlog were "real and firm" versus those that were "conditional," and thus impacted by the risk of customers hedging and double-booking. FE-7 continued to say that specifically, the quarterly revenue certification process would have exposed how many of the purchase orders on Extreme's backlog were "conditional." FE-7 further explained that if this process is carried out with "discipline" that it should "bring to light" conditional purchase orders in direct sales or with trade partners and in turn have an impact on backlog reporting. FE-7 also explained that the decision to calculate backlog in the way that the Company did was "disingenuous," and a "***colossal risk to take***."

301.     Additional former employees further confirmed that Extreme's backlog orders were conditional, cancelable, and did not represent definite customer commitments. FE-3 stated that "[d]efinitely, yes," Extreme's reported backlog was overstated because it included a substantial amount of preferred distributor orders that did not have firm end customer commitments.

302.     FE-3 stated that Extreme's cancellation policy was "quite flexible," and FE-3 explained that a distributor could cancel a purchase order after it had been placed. Specifically, according to FE-3, there were many purchase orders to different vendors throughout and after the COVID-19 pandemic due to the longer waiting times in receiving material through the supply chains.

303.     According to FE-3, it was "***well known internally at Extreme***" that: (i) distributors were placing an inordinately high number of orders during the COVID-19 pandemic in 2021; and (ii) this ramp-up of orders from distributors was going to negatively impact future orders given the inventory on hand, including the extra inventory from competitors. FE-3 explained that it was well

1  known that distributors were ordering extra inventory from solutions providers, *further adding that*

2  *these orders were typically cancellable and returnable.*

3      304.    As an example, FE-3 explained that a distributor would make ten purchase orders (with

4  different vendors) but cancel five purchase orders because of either (1) lead times being too long or

5  (2) a competitor like Cisco could provide the product ahead of Extreme.

6      305.    According to FE-3, it was sometime in 2022 when he became aware of an increased

7  spike in the cancellation of a number of big deals, which FE-3 described as a "warning sign." FE-3

8  recalled that most of these cancellations took place in Extreme's Latin America market, but there was

9  also one cancellation by a major U.S. end customer.

10      306.    The allegations from this former employee further make clear that the true status of

11  the Company's backlog was made known to the C-Suite, including the Individual Defendants.

12  Specifically, FE-3 advised that he held a video call regularly every other week with Defendant

13  Thomas where he discussed pricing and the Company's business operations, and that on one of these

14  calls he discussed the high value cancellations that occurred in Latin America and the U.S.

15      307.    FE-3 explained that cancellations were not normally part of the regular calls, but that

16  he mentioned these cancellations to Defendant Thomas because of their high value and that FE-3 felt

17  the Company would have had better visibility into end users' demands if Extreme had "back-to-back"

18  purchase orders, which they did not.

19      308.    FE-3 advised that he began to address this issue with Defendant Thomas in 2022, and

20  offered a possible solution at that time that would give Extreme better visibility into end customers'

21  needs. According to FE-3, he explained the Latin America and U.S. cancellations to Defendant

22  Thomas and proposed that every big deal for Extreme involve a "back-to-back" or "B2B"[29]

23  distribution clause to secure end customer commitment. FE-3 described "back-to-back" as Extreme's

24  paperwork that would essentially mirror the end customer's order. FE-3 explained that this would

25  have given Extreme greater visibility into the end customer's specific needs and when they needed

26  it.

27  

28      [29] According to FE-3, "B2B" was another industry phrase for "back-to-back."

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

309.    FE-3 advised that many other companies that he worked for throughout his career in the same industry as Extreme required "back-to-back" purchase orders, but Extreme did not, and this limited the Company's visibility into an end user's actual demand. He recalled Extreme having "a lot of pre-orders" without "back-to-back" purchase orders.

310.    FE-3 stated that Defendant Thomas's response was that he was hesitant to implement "back-to-back" because it would require getting Extreme's order management and finance teams involved, which Defendant Thomas did not want to do. FE-3 also explained that Defendant Thomas was hesitant to implement "back-to-back" purchase orders because of the logistics involved requiring an internal restructuring to work around internal controls issues. FE-3 advised that his proposed solution *was never implemented* by Extreme by the time FE-3's tenure at Extreme ended in the latter-half of 2023.

311.    Notably, the rejection of FE-3's proposed "back-to-back" clause solution is further evidence that Extreme executive management knew that its backlog orders were *not* firm and based on end user demand.

312.    FE-1 also corroborated that the backlog orders placed by partners were not "firm." According to FE-1, partners and end users were placing the same order with multiple vendors for the same deal/end-user. After they received the inventory they needed, the partners and end users then cancelled the outstanding orders they placed with the other vendors.

313.    FE-1 further explained that both (1) the reseller's purchase order and (2) the prebought amount by the reseller or end user of that purchase order *could be cancelled at any time* if the reseller/end user placed the same order with multiple other manufacturers or vendors and received the products from someone else first. According to FE-1, resellers would double-book purchase orders due to supply chain constraints and then cancel. Indeed, as FE-1 explained it, there was never "non-cancellable" purchase orders at Extreme.

314.    Even so, when distributors tried to exercise their contractual right to cancel their orders, Defendants would push back. According to FE-1, Defendants Rice and Brown were refusing to cancel backlog orders, which inflated Extreme's backlog. According to FE-1, the outcome of not allowing distributors to cancel backlog was that it allowed Defendant Meyercord to tout the backlog

numbers and to say that it may or may not wind up being revenue, but Extreme can count it on our books. He added that distributors were pushed not to cancel, which allowed Meyercord to say (i) Extreme made their shipment numbers and (ii) they have healthy backlog. FE-1 pointed out that a distributor had to be worried that if they were not allowed to cancel an order and the parts wound up being delivered, that it would be on the distributor's books and they would have to pay for it.

315.     FE-2 also corroborates the above allegations related to backlog. FE-2 explained that it was **_known within the Company_** that there were many backlog orders known to often be duplicative of orders placed with other manufacturers (besides Extreme) during the supply chain emergencies brought on by the COVID-19 pandemic, and that these orders were **_freely cancellable_**. FE-2 recalled customers telling him and others at Extreme that they were double and triple booking orders, adding that it was not a secret. FE-2 stated that this continued in 2022 and 2023. FE-2 recalled that at Extreme actually encouraged partners to order early and before they had end user commitments before prices went up, while knowing that partners were placing the same orders with multiple distributors and that these orders could be cancelled at any time.

316.     FE-5 further corroborated the lack of "firm" orders in the backlog. FE-5 was formerly employed by Extreme as Senior Channel Account Manager from March 2022 to April 2024.

317.     According to FE-5, end users placed orders for the same hardware "all the time" with multiple suppliers such as Extreme and would then cancel the outstanding orders after receiving the hardware they needed from whatever supplier gave it to them first. FE-5 added that it was well known by Extreme that customers placed the same orders with multiple suppliers and that Extreme was likely to lose out on a number of these "supplemental orders," or "secondary orders," as FE-5 called them, through cancellations.

318.     According to FE-5, because of supply chain constraints, Extreme's customers placed "secondary" orders with Extreme, even though customers were also placing orders with Juniper and Cisco, etc. According to FE-5, these "secondary" orders would nonetheless be included in the pipeline/revenue forecast even though Extreme knew that the orders would likely be cancelled. The majority of these orders would then go to the backlog and be counted as backlog.

319.    According to FE-5, it was "widely known" at Extreme that this double-booking was occurring because of the "RMA" process for double-booked orders. Specifically, FE-5 explained that RMA mean "Return Merchandise Authorization," which was effectively the cancellation. According to FE-5, the practice of RMAs "came from the top."

320.    FE-8 was the former Senior Vice President of Global Channel Sales from January 2202 until November 2023. FE-8 explained that the Distribution Teams reported to him.

321.    FE-8 similarly stated that it was "hard to ever really know" the true value of Extreme's backlog and that the figure was "driven by projects" and the Company had multiple resellers around the world competing for the same projects.

322.    Specifically, FE-8 recalled "Revenue Assurance" calls where the backlog was discussed and there were "conversations around the [backlog] hedge" and the algorithm that Extreme used for this calculation.

323.    According to FE-8, the "Revenue Assurance Calls" were attended by Defendant Brown, members of the Finance team, Defendant Rice, and Senior Vice President Jack Lyon.[30] FE-8 continued to explain that the "Revenue Assurance" calls were led by Defendant Rice, who then "took the baton" and had subsequent conversations with the CEO (Defendant Meyercord) and CFO (Defendants Thomas/Tate/Rhodes) through "Output" calls.

324.    According to FE-8, these "Output" meetings were calls that occurred after the "Revenue Assurance" calls, where Defendant Rice and others relayed the information to the CEO and CFO—indicating "here's what we're looking at" and the level of risk and the upside. Further, FE-8 explained that it was his understanding that the information provided to the CEO and CFO in the "Output" calls was also presented through an Excel summary sheet, which included the range of calculations for potential outcomes, ***including the assumed "yield" from the backlog—referring to the conversion from backlog to product revenue.***

325.    According to FE-8, the Revenue Assurance calls were a "quarterly function" with meetings becoming more frequent as the quarter progressed. FE-8 explained that during the first two

---

[30] FE-8 explained that Lyon was responsible for logistics and the movement of goods from the manufacturers to the distributors, and ultimately to the end customer.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

months of the quarter, meetings occurred during the final week of the month to discuss current trends. FE-8 continued to explain that during the third month of each quarter the call became weekly and "week over week" trends were discussed. FE-8 explained toward the end of each quarter, these calls occurred "almost daily" and "day over day" happenings were discussed on a more "precise" level.

326.    FE-8 also explained that it was his understanding that the Output calls between Defendants Rice, Meyercord, and the CFO occurred at the same frequency as the Revenue Assurance Calls, so as the number of Revenue Assurance calls increased throughout the quarter so too did the Output calls—because "ultimately" Defendant Rice, Defendant Meyercord, and the CFO were trying to determine the "earnings story" they were going to tell the market.

327.    According to FE-8, information from the Revenue Assurance Calls was provided to Defendant Meyercord, and he recalled instances where it was noted that an update needed to get to Meyercord and that there was certain information he wanted to know. FE-8 further stated that it was "openly known that the information was going to get to the CEO." According to FE-8, Meyercord was hands-on and a "very involved leader" and "detailed guy."

328.    Indeed, one of the documents provided by FE-1 undoubtedly demonstrates that Defendant Meyercord and the C-Suite knew about the truth of the backlog. Specifically, one of the documents revealed was an instant message conversation dated May 27, 2022—just weeks from the beginning of the Class Period—in which Defendant Brown told FE-1, "why didn't we have [the TD call] scheduled for yesterday? . . . **Lots of eyes on this backlog process – it's updated all the way up to Ed [Meyercord]**."

**4.    The Significant Gap Between Product Backlog And Product Revenues Further Confirms that Extreme's Backlog Was Not "Firm"**

329.    A review of Extreme's product revenues compared to Defendants' backlog digestion also demonstrates the illusory nature of Extreme's backlog. In line with Extreme's repeated public assertions that roughly 99% of its backlog consisted of "firm," committed orders, the amount of backlog fulfilled in a given quarter should have tracked that quarter's increase in product revenues. But it did not.

330.    **First**, Extreme defined backlog during the Class Period as "**confirmed orders** with a purchase order for products to be fulfilled and billed to customers with approved credit status."[31]

331.    **Second**, Defendants repeatedly asserted that the large majority (*i.e.*, 99%) of Extreme's backlog orders comprised these "firm,"[32] committed, orders—indicating at the outset of the Class Period that: "[w]e have complete visibility into our product backlog and have received negligible cancellations to date of less than 1% of bookings."[33] Defendants also stated that the backlog "**it's not cancelable**. **These are real projects that we see**. . . . **the vast majority** of our backlog is related to this kind of **end user demand project-based business and we don't see double ordering**."[34]

332.    **Third**, Defendants characterized backlog as the amount of revenue expected to be recognized based on the present amount of customer orders, such that Extreme's revenue growth would be driven by unleashing the "massive" backlog (given the release of the supply chain constraints) and converting that backlog into recognized revenue. Specifically:

> "[O]ur **revenue outlook is really a function of supply chain and product that we are able to release, given the massive backlog** that we've built **up** and the continued strength of our bookings. So I'll just start off with supply chain, You've asked about that. What we see is a gradual improvement throughout the year**. So think of a step function where we will be stepping our revenue, quarter by quarter, throughout the year, based on our outlook of supply chain** . . ." (4Q2022 Earnings Call – July 27, 2022).

> "[W]e built up quite a bit of backlog because of the supply chain scenario, **but** it's all **very high quality** and **we are very confident in the backlog**. **And so in a way, it just gives us a lot of confidence in the revenue growth forecast** that we've got into the future and for the next couple of years." (Needham Virtual Security, Network & Communications Conference – November 15, 2022).

> "Really what we want to do is reinforce our outlook of revenue growth. And we're doing that out through our fiscal '25 year, which is out there. **We baked that [backlog]**

---

[31] Extreme 10-K for FY2023 (year ended June 30, 2023) at 10.

[32] Extreme 10K for FY2022 (year ended June 30, 2022).

[33] Extreme's 4Q2022 Earnings Call (Defendant Meyercord's statements); *see also* 1Q2023 Earnings Call (Defendant Thomas' statements) ("And I can tell you right now because of our scrutiny around this, each and every decommit, to the extent there is one, gets a lot of scrutiny from us . . . and they remain at a fraction of 1%.").

[34] Needham Technology & Media Conference (May 17, 2023).

*into our revenue guide, and that's where we're trying to focus everyone*." (3Q2023 Earnings Call – April 26, 2023)

"We **have** the benefit of a **healthy backlog** of customer orders with request dates that spread fairly evenly through the end of the year. **End customer orders remain firm and distributor orders have normalized, giving us confidence in our outlook for this fiscal year**." . . . Defendants further stated: "**During fiscal year '24, we expect continued strong product revenue growth**, given the growing interest in our solution by customers and **the ongoing normalization of our backlog**." (FY2023 Earnings Call – August 2, 2023).

333.    **Fourth**, and consistent with the explanation of former employees, Extreme disclosed that it recognized revenues at the moment when "control of the product is transferred to the customer (*i.e.*, when the Company's performance obligation is satisfied), which typically occurs at shipment for product sales."[35] Based upon this revenue recognition model, if an order in the product backlog was then fulfilled and shipped to a distributor, partner, or end user—and thus taken out of the backlog amount[36]—that order should then be recognized as product revenue at shipment. Given Extreme's repeated assertions that the majority of the backlog orders (*i.e.*, ~99%) comprised "firm" and committed, non-cancellable orders, then the amount of product backlog digested over a quarter should largely be equivalent to the amount of increase in product revenues in the same quarter (over and above any non-backlog purchase orders in the quarter).

334.    The following chart illustrates Extreme's disclosed product backlog[37]:

[continued on next page]

---

[35] Extreme 10K for FY2022 (year ended June 30, 2022), at 59.

[36] Again, as confirmed by former employees, including FE-1, purchase orders made by Extreme's customers that were on backlog could not be counted as revenue, because they had not been shipped.

[37] Defendants stopped reporting backlog on a quarterly basis after 4Q2023.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT



335.   As shown from the chart, backlog was built up from 4Q2021 until 1Q2023, and then began to decline starting in 2Q2023, with major declines in 3Q2023 and 4Q2023.

336.   The following graph, conversely, shows Extreme's product revenues:



SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

337.    The change in reported product backlog and product revenues is thus as follows:

| $ in millions | Q4 2022 | Q1 2023 | Q2 2023 | Q3 2023 | Q4 2023 |
|---|---|---|---|---|---|
| Change in Product Backlog from prior quarter | $88.0 | $42.0 | -$13.0 | -$104.5 | -$170.2 |
| Change in Product Revenue from prior quarter | -$11.3 | $19.2 | $17.2 | $17.6 | $20.6 |
| **Total Order Change** | **$76.7** | **$61.2** | **$4.2** | **-$86.9** | **-$149.6** |

338.    As seen in the table above, there was a significant and material gap in backlog decline and recognized product revenues. For example, from 2Q2023 to 3Q2023, product backlog decreased by about $104.5 million, but product revenue only increased by $17.6 million—*leaving a $86.9 million gap*.[38] Similarly, from 3Q2023 to 4Q2023, product backlog decreased by about $170.2 million, but product revenues only increased by $20.6 million—*leaving a $149.6 million gap*.[39]

339.    Consequently, based on the application of established accounting principles, there are three possible explanations for the discrepancy between backlog and revenues: (1) the Company's unaccounted-for backlog of $236.5 million[40] for 2Q2023–3Q2023 and 3Q2023–4Q2023 was not firm (*i.e.*, was not converted into product revenue); (2) the Company's new orders (*i.e.*, new bookings) had not only stalled, but *regressed* significantly and abnormally, and product revenues were being propped up by the fulfillment of backlog orders;[41] or (3) a combination of these adverse headwinds contributed to the decrease in orders recognizable as revenue.

340.    Defendants, however, have excluded the possibility of options (2) and (3) above because, as they explained during the Class Period, Extreme was actually receiving new orders. For

---

[38] This $86.9 million figure is conservative as it assumes *0%* new bookings in the quarter, and assumes that 100% of the product revenues for the quarter were attributable to the release and conversion of product backlog to product revenues—a highly improbable scenario. Consequently, the assumed shortfall of $86.9 million is likely understated.

[39] Similarly, the $149.6 million figure is likewise conservative.

[40] *I.e.*, the sum of the $86.9 million gap in 3Q2023 and the $149.6 million gap in 4Q2023.

[41] In other words, one potential explanation for the negative gaps is that product revenue attributable to new bookings (as opposed to product revenue attributable to backlog orders being shipped out) regressed and declined so significantly from prior quarters that a portion of the backlog must have kicked in and propped up the total product revenue amount for the quarter ($241.1 million and $261.7 million for 3Q24 and 4Q24, respectively).

example, in the 3Q2023 Earnings Call, Defendant Meyercord stated that: "[a]lthough our Q3 bookings typically decline sequentially in the March quarter [*i.e.*, 3Q2023], we in fact *grew* from December." And in the 4Q2023 Earnings Call, Defendant Meyercord again stated that: "[i]n our fourth quarter, bookings *grew* mid-single digits sequentially." In other words, because Defendants disclosed that new bookings (*i.e.*, new orders) grew in 3Q2023 and 4Q2023—and had not regressed or declined—the only explanation for the dissipation and evaporation of the $236.5 million in unaccounted-for backlog orders was that *those orders were never firm in the first place*.

341.    As Extreme's backlog evaporated at the end of the Class Period, Defendants indicated that they had made a "conscious decision to put channel digestion **_behind us_** in the March quarter [*i.e.*, the 3Q2024 quarter]."[42] But the disappearance of the backlog had a catastrophic impact on Extreme's reported revenue. ***Product revenues decreased significantly from 1Q2024 to 3Q2024*** (not increased or remained flat). Notably, 3Q2024 product revenues fell to an abysmal $106.4 million—a 43% decline from the prior quarter and less than half of product revenues reported in any quarter from 2Q2023 to 1Q2024[43]:

| ($M) | 1Q23 | 2Q23 | 3Q23 | 4Q23 | 1Q24 | 2Q24 | 3Q24 | 4Q24 |
|---|---|---|---|---|---|---|---|---|
| Backlog | $555.0 | $542.0 | $438.0 | $267.3 | N/A | N/A | N/A | $64.0 |
| Product Revenue | $206.3 | $223.4 | $241.1 | $261.7 | $253.5 | $186.6 | $106.4 | $152.7 |

342.    That product revenues declines continued significantly throughout FY2024 further evidences that the previously reported backlog had not reflected "firm" customer commitment and ***far more than 1% of backlog was cancellable by Extreme's customers***, in contrast to the misleading assertions and impression made by Defendants.

343.    In short, had Extreme's product backlog actually been firm and real, then the product revenues would have grown by a substantial—and comparable—amount, largely equivalent to the

---

[42] Extreme 2Q2024 Earnings Call (January 31, 2024).

[43] Extreme's total revenues for 3Q2024 were a similarly dismal $211.0 million, down $85.4 million (29%) from the prior quarter.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

amount of declines in the backlog. This would have represented true "digestion" of the backlog into product revenues. But product revenues did not grow by a comparable amount in 3Q2023 and 4Q2023—and in fact further declined throughout FY2024. As a result, the only logical conclusion is that the backlog orders had dissipated and did not result in Defendants' promised revenue growth that investors and analysts believed would occur.

344.    Indeed, analysts arrived at the same conclusion at the end of the Class Period—finding that customers were "double-ordering," *i.e.*, cancelling orders, at a far higher rate than Defendants had misled the market into believing. For example, UBS Research downgraded Extreme from a "Buy" to a "Neutral" rating on January 31, 2024, finding that: "Extreme's double-digit growth in FY22 and FY23 was the result of pandemic-related supply chain delays and depressed demand in FY20/FY21 *followed by double-ordering by customers in FY22/FY23* to protect against the possibility of supply chain issues. Supply and demand are normalizing in FY24/FY25 and *it is now apparent that Extreme is not growing at a sustainable double-digit rate*."

**E.    Extreme's Distributors Stop Enabling Channel Stuffing By The End of 2023**

345.    According to FE-1 and based on his recent conversations with TD Synnex leadership—who FE-1 states he "100% trusts has intimate knowledge" of the relationship between Extreme and TD Synnex—Extreme was still employing the same inappropriate and unethical channel stuffing practices during and into the end of the Class Period (*i.e.*, January 2024). This included Extreme still doing buy-ins, Extreme still channel stuffing inventory to TD Synnex, and still forcing stock rotations to be reduced.

346.    However, by the second half of 2023—and as supply chain constraints abated for Extreme and its competitors—Extreme's customers had had enough and refused to play ball any longer. They began cancelling backlogged orders at a faster clip and refused to order new product from Extreme.

347.    According to FE-1 and based on his conversations with TD Synnex and other distributors, throughout 2023 and into early 2024, these distributors were all thinking of cancelling backlog since Extreme was getting rid of FIFO. He described the distributors as realizing that they

1    did not need to place backlogged orders with Extreme since they could wait to make an order when

2    they needed it and did not have to have exposure on their books.

3         348.    FE-1 stated that, based on his conversations with TD Synnex and other distributors,

4    Extreme missed their revenue numbers in back-to-back quarters because their distributors ultimately

5    backed off on buying from Extreme quarters after FIFO backlog fulfillment was "blown up."

6    According to FE-1, the quarter where "Extreme's numbers cratered," occurred because the

7    distributors simultaneously decided to cancel their backorders with Extreme as a reaction to and push

8    back against being forced by the Company to take on inventory orders they did not need in order to

9    keep their respective places in line for the distribution of parts that they did need. He described it as

10   the distributors likely "quit playing the game" that Extreme was forcing onto them, adding that

11   Extreme was "running out of tricks."  FE-1 further suggested that backlog orders were cancelled

12   because distributors did not need orders on backlog if "they did not gain anything from it." According

13   to FE-1, this explains the major decline in backlog by $245 million, year-over-year, that Extreme

14   reported in its 10-K in August 2023, adding that a larger backlog had previously allowed the

15   Company to tout stronger demand to the market.

16        349.    For example, according to FE-1, he spoke with two contacts at TD Synnex in the

17   months after he left Extreme, and who indicated to him that they wanted to cancel their backlog. FE-

18   1 recalled them telling him that TD Synnex was going to cancel orders with Extreme because staying

19   on the backlog did not help TD Synnex because Extreme was playing games with backlog every

20   quarter. He further recalled that TD Synnex's President Americas said that TD needed to clean up its

21   books and inventory and that if Extreme was going to fire them as a distributor, then Extreme can

22   fire them. FE-1 believes that, based on his conversations with his contacts at TD Synnex, and others,

23   the cancellation of backlog orders happened two or three quarters after he left Extreme, likely in early

24   2023.

25        350.    FE-1 added also that he has had conversations with distributors since Extreme "took a

26   hit" in August 2023, who told him that there was "zero reason" for any distributor to do a buy in

27   except to help Extreme.

28

---

91

1  **V.  THE TRUTH EMERGES THROUGH A SERIES OF PARTIAL DISCLOSURES**

2      351.   As set forth below, Defendants' fraud triggered massive, statistically significant

3  declines in the price of Extreme's common stock that were causally connected to the facts that

4  Defendants misrepresented and concealed. The truth concerning Extreme's channel stuffing and

5  manipulative sales and inventory practices and the true nature of the Company's backlog, emerged

6  through a series of partial disclosures from January 25, 2023 through January 31, 2024. Notably, the

7  Defendants continued to make false and misleading statements throughout this time, as reference

8  *infra* Section VII, which either inflated or maintained the share price at elevated levels until

9  Extreme's final disclosure on January 31, 2024.

10     352.   These series of disclosures involved significant declines and the dissipation of the

11  product backlog, and significant reductions of revenues and downward revenue guidance. Critically,

12  the market understood both backlog and revenues to be a representation of demand for Extreme's

13  products. The combined dissipation of the backlog and the contemporaneous reduction of revenues

14  thus evidenced that: (1) Extreme's revenue growth was not based upon organic demand as the market

15  was previously led to believe; and (2) the backlog was not based on firm customer commitments that

16  would lead to sustainable revenues, as the market was previously led to believe.

17     353.   ***First***, on January 25, 2023, the Company filed a Form 8-K. The Form 8-K announced

18  that Defendant Thomas had tendered his resignation as CFO of the Company on January 24, 2023,

19  effective February 16, 2023. The Form 8-K also announced that Defendant Tate was appointed as the

20  Company's interim CFO, effective January 24, 2023, and that effective February 16, 2023, Defendant

21  Tate was appointed as the Company's Principal Financial and Accounting Officer. Defendant Tate

22  was to assume these roles while the Company conducted a search for a new CFO.

23     354.   Also on January 25, 2023, Extreme reported its financial results for its 2Q2023 ended

24  December 31, 2022. In connection with reporting its 2Q2023 results, Extreme revealed for the first

25  time that backlog had fallen—from $555 million to $542 million. On the 2Q2023 Earnings Call,

26  Defendant Meyercord also shortened the timeline for backlog normalization to be complete (from

27

28

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

1    previously stated FY2026),[44] stating that: "we see backlog returning to normal by the last quarter of

2    fiscal '25 [*i.e.*, 4Q2025]."

3        355.    As a result of this news, the price of Extreme dropped from $19.31 per share when the

4    market closed on January 24, 2023 to $16.50 per share on January 25, 2023, a nearly 15% decline on

5    abnormally heavy volume of over 9 million shares traded. However, because Defendants failed to

6    disclose the full truth and continued to make materially false and misleading statements and

7    omissions, as discussed *infra* Section VII, the price of Extreme stock remained artificially inflated

8    throughout the remainder of the Class Period.

9        356.    Indeed, on January 25, 2023, Rosenblatt Securities stated in its analyst report that:

10   "[i]n our view, the stock is down because . . . backlog decreased $13mn sequentially to $542mn.

11   Orders were not bad, and Extreme is still doing slightly better than its industry peers, but expectations

12   were higher. Additionally, the company announced CFO Rémi Thomas is leaving for another job . .

13   . his departure from Extreme was unexpected." Similarly, Craig-Hallum Capital Group LLC stated

14   in its January 26, 2023 analyst report that: "[w]e believe shares of Extreme Networks sold off

15   yesterday with the announced departure of the company's CFO, Remi Thomas. . . That being said,

16   management believes demand will remain strong and expect its strong backlog to remain relatively

17   stable throughout the next several quarters before beginning to be worked down."

18       357.    ***Second***, just a few months later, Extreme stated that its product backlog as of June 30,

19   2023 declined by an astonishing ***$245 million*** over the course of FY2023. This decline represented

20   an enormous ***48%*** wipe-out of the backlog, year-over-year.

21       358.    Specifically, on August 24, 2023, Extreme filed with the SEC its Form 10-K for

22   FY2023 (fiscal year ended June 30, 2023), which was signed by Defendants Meyercord and Rhodes.

23   The Form 10-K stated the following:

24       ***Our product backlog at June 30, 2023,*** net of anticipated back-end rebates for
         distributor sales***, was $267.3 million, compared to $513.0 million at June 30, 2022***.
25       The decrease in backlog year over year is primarily due to a combination of a
26       resumption in shipment of orders during fiscal 2023, after experiencing significant

27   _____

28   [44] *See* 1Q2023 Earnings Call (Defendant Thomas stating on October 27, 2022: "we believe it's
     going to be fiscal '26 when it [backlog] goes back to normal.").

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

delays due to supply chain constraints in prior years, and a reduction in distributor orders due to shorter lead times.

359.    As a result of this news, the price of Extreme stock dropped from $27.68 per share when the market closed on August 24, 2023 to $25.16 per share on August 25, 2023, a 9% decline on unusually heavy trading volume of over 10 million shares. However, because defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, as discussed *infra* Section VII, the price of Extreme stock remained artificially inflated.

360.    The market interpreted the news negatively, but nonetheless continued to rely on Defendants' false and misleading assurances. For example, Rosenblatt stated in its August 28, 2023 analyst report that: "EXTR is down today on its 10-K disclosure that backlog exiting FY23 was $267mn. This means backlog dropped ~$170mn q/q in 4Q, after falling ~$100mn in 3Q. Before the 10-K came out, we have assumed backlog was down ~$100mn so it came in ~$70mn lower than we expected. . . Quarter-to-quarter backlog declines should be smaller from here, and backlog is still expected to normalize in 1Q[2]5, according to our conversation with the company today. The company still sounds confident in its FY24 guidance because the order environment is improving[.]"

361.    ***Third***, on November 1, 2023, Extreme reported its financial results for 1Q2024. Notably, Extreme also stated that it would discontinue disclosure of its current backlog figure on a quarterly basis. Accordingly, Extreme did not report its backlog figure as of 1Q2024.

362.    The Company reported sequential total revenue losses from $363.9 million in 4Q2023 to $353.1 million in 1Q2024. The Company also reported sequential product revenue losses from $261.7 million in 4Q2023 to $253.5 million in 1Q2024.

363.    On November 1, 2023, Extreme also gave downward total revenue guidance of $312 million to $327 million for 2Q2024, which reflected a "more cautious tone," as described by Defendant Rhodes in the 1Q2024 Earnings Call.

364.    In connection with reporting its 1Q2024 results, Extreme also revealed that "[b]ased on changing customer buying patterns . . . we are tempering our revenue outlook for this quarter and the balance of the year," which was resultant from an "air pocket" of demand. Despite the "lower[ed] revenue expectations" for FY2024, Extreme guided to a range of "mid-to-high single digits of

revenue *growth*" for FY2024. Extreme also disclosed that it was expecting normalized backlog of between $75 million to $100 million "by the end of Q4 fiscal '24."

365.    As a result of this news, the price of Extreme stock dropped from $20.62 per share when the market closed on October 31, 2023 to $17.86 per share on November 1, 2023, a 13% decline on unusually heavy trading volume of nearly 10 million shares. Furthermore, Extreme's stock price continued to decline as the market continued to absorb the news, falling from a $17.86 closing price on November 1, 2023 to a closing price of $17.10 per share on November 2, 2023, and a closing price of $16.80 per share on November 3, 2023. In total, the share price of Extreme' stock over the three trading days declined by $3.82 per share, reflecting a decrease of 18% from market close on October 31, 2023.

366.    *Fourth*, on January 8, 2024, Extreme issued a press release that provided a business update lowering the Company's 2Q2024 and long-term revenue outlook, stating in relevant part that: "[s]econd quarter revenues are now expected to be approximately $294 to $297 million, compared to the prior outlook of $312 to $327 million." The press release confirmed that Extreme's final results for 2Q2024 would be published on January 31, 2024.

367.    The press release also stated in relevant part:

> "Our revised second fiscal quarter outlook reflects industry headwinds of *channel digestion* and elongated sales cycles. In late Q2, we saw multiple large deals pushing out to future quarters," stated Ed Meyercord, President and CEO at Extreme. "We remain confident in our long-term strategy and our ability to achieve double-digit long-term revenue and EPS growth supported by competitive customer wins and the growth in our opportunity funnel."

368.    The press release also reported that the Company's Chief Revenue Officer since 2020, Joe Vitalone, had resigned. Rather than replace his position, Extreme announced that Defendant Rice would be elevated to Chief Commercial Officer, taking over Vitalone's role in addition to his prior responsibilities.

369.    As a result of this news, the price of Extreme stock dropped from $17.52 per share when the market closed on January 8, 2024 to $16.23 per share on January 9, 2024, a 7% decline on unusually heavy volume of over 4 million shares. In a January 9, 2024 analyst report titled "EXTR Pre Release: Late Quarter Push Outs Hit Revs – Mgmt Notes Strong Funnel," Needham echoed

Extreme's explanation that "several large deals slip[ped] out of the quarter late in the month of December." This is consistent with FE-1's account that Extreme's large distributors, after several quarters of acquiescing to Extreme's scheme—devised and implemented at the start of the Class Period in Spring 2022, to force through sales of unwanted product to large distributors like Westcon and Jenne in exchange for backlog priority—finally refused to "play ball" and rejected these efforts at the end of the Class Period.

370.  **Finally**, on January 31, 2024, Extreme reported drastically disappointing financial results and operational trends for 2Q2024. Extreme disclosed that its total revenues for the quarter were $296.4 million, down $56.7 million from the prior quarter. Extreme's revenues of $296.4 million represented a decline of 16% in total revenue losses QoQ.

371.  Similarly, on January 31, 2024, Extreme reported that its product revenues were only $186.6 million for 2Q2024, compared to $253.5 million from the prior quarter. This represented a decline of $66.9 million QoQ, or a 26% decline in product revenue losses QoQ.

372.  Furthermore, Extreme in its 2Q2024 Earnings Call stated that the product revenue decline was attributable to "continued channel digestion and elongated sales cycles." Specifically, Extreme disclosed that: "[o]ur distributors and partners have lowered inventory purchases, which we expect to accelerate in the third quarter." The Company also revealed that its product backlog had *already normalized* during the quarter, "earlier than we initially anticipated."

373.  The Company further stated that it had made the "conscious decision to put channel digestion behind [it] in the March quarter [*i.e.*, 3Q2024]," leading to a "***$40 million to $50 million reduction in channel inventory in the third quarter***" that would result in "[d]emand . . . be[ing] masked by inventory flowing out of the channel."

374.  Additionally, rather than being on track for "mid teens" revenue growth for FY2024, as previously represented, Extreme provided new guidance that revealed the Company was in fact on track to suffer lower revenues in FY2024. Specially, the Company stated that looking into 3Q2024, total revenues would be in the range of just $200 million to $210 million—a further decline from the $296.4 million actuals of 2Q2024.

375.    Indeed, the Company disclosed that in 2Q2024, it expected "***sell through to be significantly higher than sell-in***, which we believe will have a meaningful impact on our operating results. To quantify this impact, we expect a $40 million to $50 million reduction in channel inventory in the third quarter, which will allow us to cover to a more normalized level of revenue in the fourth quarter." Extreme thus disclosed that it anticipated that sales from the distributor/partners to the end users (*i.e.*, the "sell-throughs") will be "significantly" higher than sales from Extreme to the distributor/partner (*i.e.*, the "sell-ins") – which would result in drastically less revenue as less product would be shipped to the distributors and partners. Through this disclosure, Extreme indicated that there was a surplus of inventory at the distributor/partner level that needed to be sold off.

376.    As a result of this news, the price of Extreme stock collapsed from $16.64 per share when the market closed on January 30, 2024, to $13.51 per share on January 31, 2024, and falling further to $13.22 per share on February 1, 2024 and $12.59 per share on February 2, 2024, a 24% decline on unusually heavy volume. In total, the price of Extreme stock declined from a Class Period high of $32.27 per share to a low of $12.59 per share after the revelation of the truth, a greater than 60% decline, resulting in investor losses.

377.    Following this final corrective disclosure, the market understood that Extreme was not, in fact, growing at a sustainable rate and that the revenue growth story that Defendants previously touted was fabricated. For example, UBS Research downgraded Extreme from a "Buy" to a "Neutral" rating on January 31, 2024—finding that: "Extreme's double-digit [revenue] growth in FY22 and FY23 was the result of pandemic-related supply chain delays and depressed demand in FY20/FY21 ***followed by double-ordering by customers in FY22/FY23*** to protect against the possibility of supply chain issues. Supply and demand are normalizing in FY24/FY25 and ***it is now apparent that Extreme is not growing at a sustainable double-digit rate***."

378.    Needham, in a February 1, 2024 report titled "EXTR: Guidance Collapse, Confident Setback, Long Road to Recovery," called out the severe and unexpected hit to Extreme's product revenues, reporting that Extreme's Q3 guidance "Is Well Below Street Estimates and Implies a 60% Decline in Product Sales Yr-Yr and FY4Q/CY2Q is down ~25%." Needham called into question Extreme's prediction of more "normalized" revenues in Q4, noting that even Extreme's own guidance

"Has Product Revenues Below CY2Q [i.e., Extreme's fiscal Q4] 2019 Levels," and forecasting that Extreme's revenues would not return to growth until the end of 2024 and 2025, noting that there was "a large nut to have to make up."  Needham also questioned Extreme management's attribution of the channel digestion to "macro pressures," because "the economy is still growing and Extreme claims it's gaining share."  Ultimately, Needham expressed caution and slashed its target price, remarking that "management has lost a lot of credibility in recent quarters."

379.    Similarly, Oppenheimer stated in its January 31, 2024 analyst report titled "EXTR F2Q24: Weak Quarter and Very Weak Guidance, Lowering Estimates" that the "stock will continue to be under pressure *until revenue growth reaccelerates*, *which is unlikely until 2025*."

380.    And Lake Street Capital Markets declared in its January 31, 2024 analyst report titled "High Inventory Level in Channel Results in Massive Guidance Reset," that: "*[w]e initially suspected a typo when we saw Extreme's Q3 midpoint revenue guide of $205M vs the $321M consensus. But no, that is the correct figure*[.]" Accordingly, Lake Street lowered its estimates and price target from $17 to $13 for Extreme's shares.

381.    These significant declines in revenue—including total revenues, distributor revenues, and product revenues—are firm evidence of both (i) the existence of the undisclosed channel stuffing and other manipulative sales tactics, and (ii) the effects of the misrepresentations regarding the firmness of the backlog.

## VI.    EXTREME'S ULTIMATE DECLINE IN REVENUES IS CONSISTENT WITH CHANNEL STUFFING

382.    Experts and commentators have noted that channel stuffing conduct may be observed through the reversals of revenue in future periods.[45] By improperly pulling sales forward and creating

---

[45] *See, e.g.*, Somnath Das, et al., *Detection of Channel Stuffing*, FORENSICS ACCT. EJ. (May 2011), available at https://care-mendoza.nd.edu/assets/151939/helenzhang.pdf ("Usually, cases of channel stuffing come to light either due to actions of whistle-blowers or through observed performance reversals in future periods in the form of declining revenues . . ."); Jason Zuckerman, *Report Channel Stuffing and Earn an SEC Whistleblower Award*, THE NAT'L. L. REV. (June 5, 2019), available at https://natlawreview.com/article/report-channel-stuffing-and-earn-sec-whistleblower-award (explaining that when a company improperly pulls sales forward, "the company will naturally experience sales and revenue shortfalls in future periods when its distributors are unable to sell the excess inventory"); *see also In re Plantronics, Inc. Sec. Litig.*, Case No. 19-cv-07481-JST, 2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) (Hon. Jon S. Tigar) ("[c]hannel stuffing is the oversupply of

Footnote continued on next page

artificial demand, a company that has previously engaged in channel stuffing will often inevitably experience revenue shortfalls in future periods when its distributors and partners are unable to sell the excess inventory. The same performance reversals of revenue are indicators of the materiality of the buildup of channel inventory to a company's financial statements. Accordingly, a period of a significant decline in revenue would be highly indicative evidence of prior channel stuffing conduct within the company.

383. Consistent with this economic phenomenon, and as seen in the graph below, Extreme experienced a steep decline in quarterly revenue at the end of and after the Class Period, as compared to during the Class Period—a strong indication of the presence of channel stuffing conduct during the build-up of accelerated revenues from 4Q2022 to 4Q2023:



384. More specifically, and as seen from the graph above, there was a significant decline in revenues from 1Q2024 through 3Q2024, with **all** of the sequential quarterly declines attributable to

---

distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply.") (citations omitted).

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

the Distribution/Partner segment, as opposed to the Direct segment (which was growing over those two quarters).The fact that *all* of the revenue decline can be attributed to the Distribution/Partner channel of Extreme's business is further evidence of the undisclosed channel stuffing conduct that occurred with Extreme's distributors and partners.

385.    Additionally, a review of Extreme's product revenues (which comprised 70% of the Company's total revenues during the Class Period) tells the same story. Indeed, as seen below in the graph, Extreme experienced a steep decline in quarterly product revenue at the end of and after the Class Period, as compared to during the Class Period, further evidencing prior undisclosed channel stuffing and manipulative inventory tactics with Extreme's products:



386.    As seen from the graph above, product revenue loss from 1Q2024 to 2Q2024 equated to a 26.4% quarter-over-quarter drop. Product revenue loss from 2Q2024 to 3Q2024 equated to a 43% quarter-over-quarter loss. Overall, from quarter-end 1Q2024 (i.e., September 30, 2023) to quarter-end 3Q2024 (*i.e.*, March 31, 2024), Extreme suffered a loss of an astounding *$147 million* in product revenues, *i.e.*, an extraordinary *58% decline.*

387.    This loss of product revenues demonstrates that Extreme improperly borrowed demand from the future during the Class Period, which led to an extraordinary loss of recognized

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

1  revenues once Extreme's distributors and partners reached a breaking point and could no longer hold
2  and stuff product inventory at the request of Extreme.

3  **VII.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS**[46]

4    388.    During the Class Period, Defendants falsely and misleadingly told the market that
5  Extreme's revenue growth was attributable to organic and exceptionally strong demand for the
6  Company's products, while concealing that demand was neither "strong" nor "unabated," and that
7  Defendants met and exceeded revenue targets by stuffing its channel and pulling in sales from future
8  quarters. *See supra* Section IV.C. Additionally, during the Class Period, Defendants falsely and
9  misleadingly mispresented the strength and "firm" nature of Extreme's backlog, touting the
10  Company's massive backlog as "not cancelable" and not subject to double ordering, while concealing
11  that the Company's backlog was not "firm", did not reflect strong customer commitment and end
12  user demand, and was at a significant risk of high levels of cancellation. *See supra* Section IV.D.

13    **A.    4Q2022 Earnings Press Release (July 27, 2022)**

14    389.    The Class Period begins on July 27, 2022, when the Company issued a press release
15  entitled "Extreme Networks Reports Fiscal Year and Fourth Quarter 2022 Financial Results," and
16  subtitled "***Record Bookings and Double-Digit Revenue Growth in FY22 Reiterates FY23 Revenue***
17  ***Growth of 10-15%.***" In the press release, Extreme reported ***4Q2022 revenues of $278.2 million,***
18  ***$187.1 million of which was attributable to product revenues, and FY2022 revenues of $1.1 billion,***
19  ***$761.7 million of which was attributable to product revenues***. These revenue figures were repeated
20  in Extreme's FY2022 Form 10-K.

21    390.    These statements touting Extreme's "***double digit revenue growth***," "***record***
22  ***bookings***," and ***annual and quarterly total and product revenues*** were false or misleading when
23  made, and omitted material facts necessary to make the statements not misleading, because Extreme's
24  reported revenues were only achieved through Defendants' channel stuffing scheme and other
25  manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of

26  ────────────────

27    [46] In this section, Lead Plaintiffs present the entirety of Defendants' false and misleading
28  statements, omissions, and half-truths in their full context, and highlight the portions of the statements
that are primarily false and/or misleading. Each of these statements is also presented chronologically
in chart form in the attached **Appendix A**.

tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

391.    The press release stated in relevant part:

"***For FY22 we achieved double-digit growth in both bookings and revenue due to strong demand*** for our differentiated enterprise networking and 5G infrastructure solutions. Bookings grew 24%, revenue exceeded ***$1.1 billion*** for the first time, and we exited the year with a record product backlog of ***$513 million*** . . ." stated Ed Meyercord, President and CEO of Extreme.

"***Our teams continue to see unabated market demand***, as networking projects remain a priority for our global customers. . . ." concluded Meyercord.

Extreme's Chief Financial Officer Remi Thomas, added, "***After another quarter of solid execution, we achieved double-digit growth for the year and improved operating margins, even in the current supply chain environment***."

392.    The statements describing Extreme's "***double-digit revenue growth***," "***strong***" and "***unabated market demand***" from end customers "***even in the current supply chain environment***," were false or misleading when made, and omitted material facts necessary to make the statements not misleading, because Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra,* Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

**B.    4Q2022 Earnings Investor Presentation (July 27, 2022)**

393.    On July 27, 2022, Defendants published their 4Q2022 Financial Results Investor Presentation, which included a slide stating "***Double-Digit Growth Fueled by Strong Demand and Execution***," "***Continued Strong Growth***," and "***Record Fiscal Year Revenue on 10% Y/Y Revenue Growth***," as well as a slide titled "***Driving Growth***" indicating that "Product Backlog" of ***$513 million*** was a key driver of that "***Growth***."

394.    These statements touting Extreme's "double-digit growth fueled by strong demand and execution," "***continued strong growth***," and the Company's product backlog of $513 million as "***driving growth***" were false or misleading when made, and omitted material facts necessary to make the statements not misleading, because Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

**C.    4Q2022 Earnings Conference Call (July 27, 2022)**

395.    On July 27, 2022, Defendant Meyercord stated the following about product demand and backlog in the Company's Earnings Call for FY2022:

***Our results for fiscal '22 highlight unprecedented demand for Extreme's solutions*** and a very vibrant and healthy market for networking. We reported record bookings growth of 24%, which is a clear indication that we're taking share and winning in the market. And our forward-looking funnel for fiscal '23 is up double digits year over year. This is a leading indicator of future bookings growth. The differentiation of our fabric and cloud solutions for enterprise customers and our targeted solutions for very large service provider customers, ***combined with the high performance of our global sales and channel teams gives us the confidence in our outlook for continued growth and demand.*** Our technology solutions are critical to infrastructure initiatives underpinning digital transformation for all of our customers around the world. We believe these important projects will continue to remain a priority, irrespective of a changing macroeconomic environment. ***For the year, our double-digit revenue growth led to an all-time high revenue of $1.1 billion, yet it was understated by the $400 million of incremental backlog we built during the year.*** Our total Q4 ending backlog was $513 million, thanks to the current supply chain environment.. . .

As we noted during our Investor Day in May, we expect to continue to build backlog for the next several quarters, given our outlook for continued bookings growth and the gradual recovery in supply chain. For the guidance we provided, we expect sequential improvements in our ability to deliver product to customers throughout fiscal '23. ***Based on the lead times and commitments, we expect backlog will begin to shrink by Q4 of fiscal '23. We have complete visibility into our product backlog and have received negligible cancellations to date of less than 1% of bookings***.[47]

396.    Defendant Thomas further stated in the Company's Earnings Call:

As Ed [Meyercord] described, ***we had solid execution in fiscal '22 with record bookings and backlog generation, double-digit revenue growth, and overall improving margins, in spite of the supply chain environment. Strong demand for our portfolio of products, services, and subscription drove year over year*** bookings growth of 24% in fiscal '22 and 8% in Q4. With a product book-to-bill ratio of 1.29 for the year and 1.23 for the quarter, we exited the year with $513 million in backlog, up more than $400 million year over year and close to $90 million sequentially. ***That's nearly 3 full quarters of product revenue.***

397.    These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, because at the time of the statements, Extreme's revenue growth was not the result of "***unprecedented demand for Extreme's solutions***" and not based on "***strong demand for our portfolio of products.***" In reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters

---

[47] This statement was in the original Amended Complaint but was inadvertently not included in the summary False and Misleading Statements section, which is now corrected.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

398.    Additionally, these statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, because at the time of the statements, Extreme's backlog was not poised to generate revenue growth for Extreme, did not reflect "nearly 3 full quarters of product revenue," reported revenues were not "***understated by the $400 million of incremental backlog we built during the year,***" and the Company's "***complete visibility into our product backlog***" did not indicate a continuation of "***negligible cancellations to date of less than 1% of bookings***" because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

399.    Additionally, during the July 27, 2022 Earnings Call, Defendant Meyercord responded to an analyst's question about Extreme's ability to generate revenue and unlock the large, accumulated backlog that had been built up to $513 million:

105

**Analyst Question:** "Wanted to get a better handle on the bookings in 4Q and the outlook commentary going into the first half of fiscal '23. It sounds like, clearly, you expect to stay supply constrained true most of the fiscal year. But do you, A, see any improvement in supply in your expectations in the first half of the year? And then second, what's going on in that pipeline as you're looking at that first half outlook. And particularly, if you look at the bookings numbers in the fourth quarter, how did that play on geography, and how do you think that looks going into the upcoming quarter, particularly in EMEA."

**Meyercord:** "[Y]ou're rightfully pointing out kind of this—how we're looking at bookings, which is really our measure of true demand, and then versus revenue, and *our revenue outlook is really a function of supply chain and product that we are able to release, given the massive backlog that we've built up and the continued strength of bookings*. So I'll just start off with supply chain. You've asked about that. What we see is a gradual improvement throughout the year. So think of a step function where we will be stepping our revenue, quarter by quarter, throughout the year, based on our outlook of supply chain. . . . So our teams, as I mentioned in my comments, are more confident today than they have been in our ability to step function our supply of product to our customers' partners. So what does that mean? That is how we built the revenue forecast for fiscal '23, which is that step function, with sharper improvement in the second half of the fiscal. *As it relates to demand, our demand has been strong, as we talked about it for the year, 24% for us*. *That's record-breaking performance.*

400.     These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "demand" that was "strong" from end customers, In reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

401.     Additionally, these statements attributing "*our revenue outlook*" to the *"massive backlog that we've built up and the continued strength of bookings"* were false or, at a minimum,

misleading when made and omitted material facts necessary to make the statements not misleading, because because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

### D.    Extreme's Letter to Shareholders for FY2022 (July 27, 2022)

402.    Around the time Extreme filed its FY22 10-K, Extreme made available to shareholders on its website a letter wherein Defendant Meyercord highlighted the Company's robust backlog and strong demand, which he claimed positioned the Company for "accelerated growth over the next several years," stating in relevant part:

> We are pleased to report record results, unprecedented economic growth and continued business momentum at Extreme as we closed fiscal 2022. . . .Revenue exceeded $1.1 billion for the first time in Extreme's history despite unprecedented supply chain constraints. ***And we exited the year with a record $513 million in product backlog, up 5x from last year, setting the stage for accelerated growth over the next several years***. The continued strength of bookings demand, the re-leveling of our book-to-bill ratio and the ***high quality of our order backlog gives us greater visibility into the next several years and increased confidence of the returns*** from our investments in new products, people, and innovations.

403.    These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not "***high quality***," did not provide "***greater visibility into the next several years and increased confidence of the returns***," and did not "***set the stage for accelerated [revenue] growth over the next several years***," because: (i) the backlog did not reflect "firm" customer

commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

### E.     Interview with CRN Magazine (August 2, 2022)

404.    On August 2, 2022, Defendant Meyercord had an interview with *CRN Magazine*, a computer publication trade newspaper targeted at the industry. The publication was titled "Extreme Networks CEO: Beating Cisco an 'Exclamation Mark' on Fiscal Year 2022." One of the questions asked was: "[h]ow does Extreme's most recent fiscal quarter highlight how you're winning against the competition?" Defendant Meyercord responded:

> I can tell you that **growth is spread across all of our geos** when we look at the strength and performance in the Americas [sic], in EMEA, in Asia-Pacific. When we look at overall industry vertical growth, our solutions have been very successful across the board, across our verticals, **so, it's just this very evenly spread, organic growth that we're experiencing at Extreme. It means that we're taking share**.

405.    These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, because at the time of the statements, Extreme's revenue growth was not based on "organic growth" from end customers that Extreme was "experiencing." In reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy

unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

### F.    FY2022 Form 10-K (August 29, 2022)

406.    On August 29, 2022, Extreme filed with the SEC its Form 10-K for FY2022 (fiscal year ended June 30, 2022), which was signed by Defendants Meyercord and Thomas, who also certified as to the report's accuracy and completeness. The Form 10-K stated the following:

> **Product revenues increased $62.3 million or 8.9% for the year ended June 30, 2022, compared to fiscal 2021. The product revenues increase for the year ended June 30, 2022 as compared to fiscal 2021 was primarily due to strong demand for our products** partially offset by supply chain constraints which impacted our ability to fulfill the demand for our products during fiscal 2022.

407.    These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based "***primarily due to strong demand for [Extreme's] products***," but rather, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter;

1    and (iv) preventing customers from making contractual returns or stock rotations in order to inflate

2    revenues. *Id.*

3       408.    Extreme's 2022 Form 10-K also contained signed certifications by Defendants

4    Meyercord and Thomas pursuant to Section 302 of the Sarbanes Oxley Act of 2002 ("SOX"). These

5    SOX certifications attested to the accuracy of the Company's financial reporting, the disclosure of

6    any material changes to the Company's internal control over financial reporting, and the disclosure

7    of all fraud. In particular, Defendants Meyercord and Thomas certified in their official capacities that

8    "*[t]he information contained in the Report fairly presents, in all material respects, the financial*

9    *conditions and results of operations of the Company*."

10      409.    These sections of the 2022 Form 10-K were materially false or, at a minimum,

11   misleading when made and omitted material facts necessary to make the statements not misleading,

12   as Extreme did not disclose: (i) it was engaging in channel stuffing and manipulative sales and

13   inventory tactics which masked the level of organic demand and artificially inflated the Company's

14   revenues listed therein (***$1.1 billion*** of total revenues and ***$761.7 million*** of product revenues), as

15   discussed *supra* Section IV.C; and (ii) that the backlog of $513.0 million stated therein was overstated

16   and inflated as the backlog did not reflect "firm" customer commitments, as discussed *supra* Section

17   IV.D.

18      **G.    1Q2023 Earnings Press Release (October 27, 2022)**

19      410.    On October 27, 2022, the Company issued a press release entitled "Extreme Networks

20   Reports First Quarter Fiscal Year 2023 Financial Results," and was subtitled "Reiterates FY23

21   Revenue Growth Outlook of 10-15%." In the press release, Extreme reported ***1Q2023 revenues of***

22   "***$297.7 million***, up 11% year-over-year, and up 7% quarter-over-quarter," ***with product revenues***

23   ***totaling $206.3 million,*** also up 11% year-over-year. These revenue figures were repeated in

24   Extreme's 1Q2023 Form 10-Q.

25      411.    The statements touting these total and product revenue figures were false and

26   misleading when made because such revenues were only achieved through Defendants' channel

27   stuffing scheme. In reality, Extreme's reported revenues were only achieved through Defendants'

28   channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as

Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

412.    This press release also stated:

"***We delivered record quarterly revenue of $297.7 million***, and SaaS ARR of $111 million. Our customers view networking as a strategic asset, and they choose Extreme because we are the best choice to drive operational efficiencies and create better outcomes for their end users. ***This is evidenced by this quarter's impressive double-digit revenue growth, record revenue, and continued growth of backlog, which now sits at $555 million***," said Ed Meyercord, President and CEO of Extreme.

"Extreme continues to take share in a thriving and competitive market. The flexibility and intelligence of our products like Extreme Fabric, ExtremeCloud IQ, and innovative capabilities such as Digital Twin and AIOps, are gamechangers. We make it simple to deploy and manage networks, which transforms the way our customers drive their businesses. ***The combination of our continued revenue growth and record backlog gives us even greater confidence in our long-term growth outlook***," concluded Meyercord.

Extreme's Chief Financial Officer Remi Thomas added, "In addition to our strong topline results, both gross and operating margins improved sequentially. Our subscription business revenue grew approximately 40% year-over-year driven by the adoption of our cloud solutions. Given another quarter of strong free cash flow, we retired $37 million of our debt, which will be accretive to earnings."

***"As we look at the remainder of FY23, the continued improvement in the supply chain environment gives us further confidence in our topline growth outlook of 10-15%.*** We expect to cross the 60% gross margin threshold and achieve an operating margin in the mid-teens in the second half of our fiscal year," concluded Thomas.

413.    Similarly, on October 27, 2022, Defendants also published their 1Q2023 Financial Results Investor Presentation, which included a slide stating "***Double-Digit Growth Fueled by Strong Demand and Execution***," "***Continued Strong Growth***," and "***Record Revenue on 11% Y/Y***

---

111

1    *Revenue Growth*," as well as a slide titled "***Driving Growth***" indicating that "Product Backlog" of

2    ***$555 million*** was a key driver of that "***Growth***."

3        414.    These statements above were false or, at a minimum, misleading when made and

4    omitted material facts necessary to make the statements not misleading, because at the time of the

5    statements, Extreme's revenue growth was not based on "***strong demand***" from end customers or

6    reflect "***continued strong growth***" but rather, Extreme's reported revenues were only achieved

7    through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the

8    start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the

9    company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing

10   distributors to buy unwanted and unneeded product in order to receive priority for inventory from

11   Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping

12   products to Extreme's partners and resellers—even without a firm end customer purchase order to

13   justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with

14   Extreme's customers to cause such customers to purchase outdated and unwanted product in

15   exchange for a right to return such product in future quarters after revenues were reported for the

16   present quarter; and (iv) preventing customers from making contractual returns or stock rotations in

17   order to inflate revenues. *Id.*

18       415.    These statements were also false or, at a minimum, misleading when made and omitted

19   material facts necessary to make the statements not misleading because at the time of the statements,

20   Extreme's "***record backlog***" of $555 million was not poised to generate continued revenue growth

21   for Extreme and was not sufficient to give the Company "***greater confidence in our long-term growth***

22   ***outlook***" because: (i) the backlog did not reflect "firm" customer commitments as it was well known

23   internally that Extreme's customers were double or triple booking orders from Extreme and then

24   cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually

25   designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the

26   contracts for orders included provisions which provided for and effectuated customers' double-

27   ordering practice; (iii) Extreme internally had already expected that Extreme's backlog would be

28   cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the

1  hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user

2  commitment as proposed solutions such as the "B2B" clause were never implemented during the

3  Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period

4  jeopardized and weakened the backlog because there was no incentive for distributors to place large

5  backlog orders when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

6  **H.    1Q2023 Earnings Conference Call (October 27, 2022)**

7      416.   On October 27, 2022, Defendant Meyercord stated the following in the Company's

8  Earnings Call for 1Q2023:

9      ***We had a record quarter as demand for cloud-driven networking and for Extreme
     Solutions has never been stronger. Again, our share gains are evident by double-***
10     ***digit revenue growth, record revenue and continued growth of backlog, which now***
     ***sits at $555 million.***

11

12                                          ***

13     ***On the supply chain side, we continue to be laser-focused on tactical execution to
     meet our customers' needs. Our distributors give us the highest rank in the***
     ***networking industry for delivering on our commit dates, and this is driving***
14     demand and has become a source of new customer logos and partners for Extreme. This quarter
     alone, we qualified an additional 50 component suppliers and reduced our part
15     shortages. Our success in reengineering products has also helped ease constraints.
     Based on all the actions we've taken with our supply chain over the past year, we now
16     have better visibility and confidence in the ramp of our product deliveries. With a
     strong outlook for bookings growth and the gradual improvement in supply, we expect
17     to build backlog through the end of the fiscal year. We anticipate neutral book-to-bill
     or release of backlog in our fiscal Q1 of '24. ***Once backlog begins to release, it will***
18     ***unlock an accelerated wave of product shipments and revenue growth over multiple***
     ***quarters. We have complete visibility into our product backlog, the vast majority of***
19     ***which is comprised of orders with current delivery request dates.***

20     417.   These statements above were false or, at a minimum, misleading when made and

21  omitted material facts necessary to make the statements not misleading, because at the time of the

22  statements, Extreme's revenue growth was not based on "***demand [that] has never been stronger***"

23  from end customers but rather, Extreme's reported revenues were only achieved through Defendants'

24  channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as

25  Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that

26  the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy

27  unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog;

28  (ii) improperly "pulling in" sales from future quarters into the present by shipping products to

Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

418.    These statements were also false or, at a minimum, misleading when made, and omitted material facts necessary to make the statements not misleading, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers— and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

419.    Defendant Thomas further stated in the Company's Earnings Call:

> Now turning to guidance. ***Our confidence in our outlook is further solidified by $555 million worth of product backlog exiting Q1.*** For Q2, we expect revenue to be in the range of $299 million to $309 million. . . . ***So for the year, we expect 10% to 15% revenue growth.***

420.    These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog of $555 million was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally

that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

421.    In the same Earnings Call, analysts asked Defendants about "decommits"—*i.e.*, cancellations by customers—and one analyst asked: "[t]he other question I had is on the decommits comments you made, it sounded liked decommits are declining, but still happening. Is that accurate? Or have the decommits basically stopped at this point?" Defendant Thomas responded:

> Alex, decommits are just -- it would be a normal part of the business. ***These are one-offs.*** And I can tell you right now because of our scrutiny around this, each and every decommit, to the extent there is one, gets a lot of scrutiny from us. And there's no consistency around it. So the example I might give would be a government agency that has budget. They can't get supply by the end of the year, it's use it or lose it. So they want to reprioritize another spend. ***So they might cancel an order or and maybe that comes into the budget for the following year based on that dynamic. But these are things that are not really supply chain. I guess you could say that supply chain related, but these are more one-offs. And so we're not really seeing a change in the one-offs, and they remain at a fraction of 1%.***

422.    These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already

expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

**I.    1Q2023 Form 10-Q (October 28, 2022)**

423.    On October 28, 2022, Extreme filed with the SEC its 2023 First Quarter Form 10-Q for the quarterly period ended September 30, 2022 ("1Q2023"), which contained signed certifications by Defendants Meyercord and Thomas pursuant to Section 302 of SOX. These SOX certifications again attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. The 1Q2023 Form 10-Q stated total revenues of *$297.7 million* and product revenues of *$206.3* million for the quarter.

424.    These sections of the 1Q2023 Form 10-Q were materially false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, as Extreme did not disclose that it was engaging in channel stuffing and manipulative sales and inventory tactics which masked the level of organic demand and artificially inflated the Company's revenue listed therein (*$297.7 million* of total revenues and *$206.3 million* of product revenues). In reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such

116

customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

### J.     Needham Virtual Security, Networking & Communications Conference (November 15, 2022)

425.     In this conference, Defendant Meyercord responded to a Needham analyst question regarding the "robust results" that Extreme had been experiencing:

**Analyst Question**: And congratulations on unbelievable year that you've been having. So, that's a superb performance in a very challenging environment. So, maybe you could just start-off with a little bit of a background on how you got to where you are from being a $75 million a quarter company 10 years ago that hadn't had any growth for a decade to a company with the kind of robust results you've been prowessed in?

**Meyercord**: . . . *And as you and I've discussed, we built up quite a bit of backlog because of the supply chain scenario, but it's all very high quality and we are very confident in the backlog. And so in a way, it just gives us a lot of confidence in the revenue growth forecast that we've got into the future and for the next couple of years. So, we are in a different place and we're going to continue to build on this. We've got a great team and yeah, we're hitting on all cylinders right now*.

426.     The Needham analyst followed up on Defendant Meyercord's response, expressing that it was "surprising" that Meyercord "made some pretty positive comments about the backlog staying pretty much where it is through the June fiscal year end quarter," to which Meyercord emphasized the strength pf the backlog firmness:

**Analyst Question**: "So just to put that into some context, there [has] obviously been very nice growth over the FY 2022 timeframe. You produced, I think it was 10% top line growth, a nice acceleration from the 6.5%. But that growth rate is understating it by a lot. As you pointed out, the order growth rate was way above that. You have now built up a big backlog. So, you know, if I look at the backlog.

As you pointed out, the order growth rate was way above that there. You've now built up a big backlog. So, you know, if I look at the backlog today, it's running at what 62% of four quarter, you know, product sales. That should give you significant insulation if we go through an economic cycle. So, can you talk about how you see that progressing. [S]urprisingly, it made some pretty positive comments about the backlog staying pretty much where it is through the June fiscal year end quarter.

**Meyercord**: *We're not seeing [decommits], we're not seeing de-books. The number that we've thrown out as a fraction of 1% and we would attribute that more than normal course of business kind of thing. So, yeah to your point, we're feeling a lot of confidence in the backlog number we have.*

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

427.    These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not "***high quality***" and poised to generate continued revenue growth for Extreme, and because of double and triple ordering the risk of "decommits" was not "***a fraction of 1%***" because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

428.    Later in the same conference, Defendant Meyercord stated that revenues had actually been underreported, as they've been stored in the Company's backlog:

> **Analyst Question**: So, let's talk a little bit about the mechanics of what would happen should the supply chain improve, given the parameters that you just described. You're looking at a pretty good growth rate in the fiscal year. But if I were to look out and say, okay, if I were to get modestly more availability instead of the growth rate of, say, 12% in revenues in that timeframe. Could it be 15% to 20% and dig into that backlog a little sooner and we have a lot of leverage?
>
> **Meyercord**: Absolutely. We haven't made the call yet for – a revised call yet in terms of supply chain and the implication for that in terms of unlocking backlog. But the answer is, yes. It absolutely could be. And as you know, as we see that, we also have some interesting investment opportunities that we're looking at to drive bookings growth. There's operating leverage in the model, Alex, what as you know, gets us excited as we look at this, because I say it kind of tongue in cheek, ***but we've been underreporting our earnings, because we haven't been showing our revenue, because we've been putting in backlog.*** Meanwhile, we've been paying for it.

429.    These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, because at the time of the statements,

1  Extreme's backlog was not poised to generate continued revenue growth for Extreme, because: (i)
2  the backlog did not reflect "firm" customer commitments as it was well known internally that
3  Extreme's customers were double or triple booking orders from Extreme and then cancelling those
4  orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be
5  cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for
6  orders included provisions which provided for and effectuated customers' double-ordering practice;
7  (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much
8  as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-
9  7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed
10 solutions such as the "B2B" clause were never implemented during the Class Period; and (v)
11 Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and
12 weakened the backlog because there was no incentive for distributors to place large backlog orders
13 when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

14     **K.**    **2Q2023 Earnings Press Release (January 25, 2023)**

15     430.    On January 25, 2023, Extreme issued a press release entitled "Extreme Networks
16 Reports Second Quarter Fiscal Year 2023 Financial Results," and was subtitled "Delivers Consistent
17 Double-Digit Growth and Raises FY23 Revenue Outlook." In the press release, Extreme reported
18 total revenues for the quarter of ***"$318.3 million,*** up 13% year-over-year, and up 7% quarter-over-
19 quarter, with product revenues of ***$223.4 million***, up 17% year-over-year. These revenue figures were
20 repeated in Extreme's 2Q2023 Form 10-Q.

21     431.    The statements touting these total and product revenue figures were false and
22 misleading when made because in reality, Extreme's reported revenues were only achieved through
23 Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of
24 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company
25 [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to
26 buy unwanted and unneeded product in order to receive priority for inventory from Extreme's
27 backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products
28 to Extreme's partners and resellers—even without a firm end customer purchase order to justify the

recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

432.    The press release also stated in relevant part:

President and CEO Ed Meyercord stated: "Extreme delivered another quarter of great results. ***The continued strength of subscription and accelerated product deliveries drove another quarter of double-digit year-over-year revenue growth. We are raising our FY23 revenue growth outlook to the high-end of our 10-15% range and expect this momentum to continue into FY24, as the supply chain environment continues to improve***."

"***We feel confident in end customer demand***. The majority of our bookings are with government, education, and healthcare sectors, where spending is more resilient. Our enhanced fabric and cloud subscription offerings are gaining traction in the marketplace. Finally, ***we have good visibility for the second half of the year based on the strength of our sales funnel***," continued Meyercord.

433.    These statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "end customer demand." In reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id*

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

**L.      2Q2023 Earnings Investor Presentation (January 25, 2023)**

434.    On January 25, 2023, Defendants published their 2Q2023 Financial Results Investor Presentation, which included a slide stating "***Continued Double-Digit Y/Y Revenue Growth***," "***Continued Strong Growth***," and "***Record Revenue on 13% Y/Y Revenue Growth***," as well as a slide titled "***Driving Growth***" indicating that Product Backlog of ***$542 million*** was a key driver of that "***Growth***."

435.    These statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "end customer demand."  In reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id*.

436.    These statements were also false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, because at the time of the statements, Extreme's backlog was not poised to generate "revenue growth," because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already

expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

**M.    2Q2023 Earnings Conference Call (January 25, 2023)**

437.    On January 25, 2023, Defendant Meyercord highlighted the Company's "exceptionally strong" customer demand, the Company's market share gains, and the size of its backlog in raising Extreme's guidance, stating:

> ***We had another record quarter, as demand for cloud-driven networking and for Extreme Solutions remains exceptionally strong with good visibility through fiscal year end '23, leading us to raise our full year revenue outlook to the high end of our range.***
>
> Our share gains are evident by a second consecutive quarter of double-digit revenue growth, 17% growth in product revenue, record free cash flow and a sizable backlog.
>
> . . .
>
> On the supply chain side, our ability to pull in components enabled us to achieve revenue upside, which we believe is sustainable into the second half of the year. As a result, we are raising our revenue outlook to the high-end of our prior 10% to 15% guidance range. We continue to be laser-focused on tactical execution to meet our customer's needs. . . . With a strong outlook for bookings growth and the gradual improvement of supply, we expect backlogs to remain relatively stable for the next several quarters. ***We're in the beginning stages of an accelerated wave of product shipments and revenue growth over multiple quarters.*** The majority of our backlog consists of the latest generation universal products that pull-through subscription and service bookings.

438.    The statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "exceptionally strong" demand from Extreme's customers. In reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

439.   These statements were also false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate "***an accelerated wave of product shipments and revenue growth***" for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored.  *See supra* Section IV.D.

440.   Later during the Earnings Call, Defendant Tate stated:

Now turning to guidance. ***As we enter the second half [of FY2023], our confidence in the revenue outlook is supported by our product backlog of $542 million***, our services and subscription deferred revenue balance of $446 million, as well as a

product pipeline that is up double-digits year-over-year. . . . ***Against this backdrop, we expected for Q3 revenue to be in the range of $315 million to $325 million***, gross margin to be in the range of 58% to 60%, operating expenses to be in the range of $140 million to $145 million, and earnings to be in the range of $31.1 million to $38.4 million, or $0.23 to $0.29 per diluted share. We expect to cross the 60% gross margin threshold in Q4. For full fiscal year '23, we expect revenue growth towards the high end of our 10% to 15% outlook*,* with an operating margin in the mid-teens.

441.    The statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

**N.    2Q2023 Form 10-Q (January 27, 2023)**

442.    On January 27, 2023, Extreme filed with the SEC its 2023 Second Quarter Form 10-Q for the quarterly period ended December 31, 2022 ("2Q2023"), which contained signed certifications by Defendants Meyercord and Thomas pursuant to Section 302 of SOX. These SOX certifications again attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. The 2Q2023 Form 10-Q stated total revenues of ***$318.3 million*** and product revenues of ***$223.4*** million for the quarter.

443.    These sections of the 2Q2023 Form 10-Q were materially false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, as Extreme did not disclose that it was engaging in channel stuffing and manipulative sales and inventory tactics which masked the level of organic demand and artificially inflated the Company's revenue listed therein (*$318.3 million* of total revenues and *$223.4 million* of product revenues). Indeed, the statements touting these total and product revenue figures were false and misleading when made because in reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

### O.    3Q2023 Earnings Conference Call (April 26, 2023)

444.    On April 26, 2023, Defendants highlighted the quarter's record results, which Defendants attributed to "improvements in our supply chain" and "demand trends." Additionally, Defendants stated their backlog will normalize to a revised range of $75 million to $100 million in 1Q2025.   Defendant Meyercord further indicated that their current product backlog for end of 3Q2023 "represented 5x our expected normalized level," or about $437.5 million at the midpoint.

445.    In the Earnings Call, Defendant Meyercord stated:

> ***Extreme delivered another quarter of record results, driven by solid execution of our teams. Our top line performance was highlighted by improvements in our supply chain that drove 16% total revenue growth and 22% product revenue growth on a year-over-year basis.*** We achieved double-digit growth in 8 of the past 9 quarters. Our operating margin and EBITDA also achieved quarterly records in Q3. . . .Although

125

our Q3 bookings typically decline sequentially in the March quarter, **we in fact grew from December, reflecting strong demand.**

446.    These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's revenue growth was not based on "strong demand" from Extreme's customers. In reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id*.

447.    In the same Earnings Call, Defendant Tate stated:

> **Q3 financial results reflect record revenue,** operating margin, and EBITDA, **driven by increased product availability.** . . . **We are confident in our Q4 and FY '23 outlook and reiterate our commitment to mid-teens long-term growth through fiscal year '25. Our third quarter revenue of $332.5 million grew 16% year-over-year and 4% quarter-over-quarter, exceeding the high end of our expectations entering the quarter.** . . .
>
> **Now turning to guidance, we remain confident in the revenue outlook for Q4 as supported by our strong funnel of opportunities**, **our product backlog** and our services and subscription deferred revenue balance. . . . We continue to expect that the reduction in expedite fees and shipping costs, combined with the full impact of our recent pricing actions, will lead to a continued recovery in gross margin in Q4 and into fiscal year '24. **Against this backdrop, we expect for Q4 revenue to be in the range of $340 million to $350 million**[.]

448.    The statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's backlog was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that

126

Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

449.    In response to continued analyst concerns about the decrease in backlog and conversion of backlog into revenue, Defendant Meyercord again sought to divert discussion of the backlog decrease and to not "get into sort of dissecting backlog:"

> **Analyst Question**: As we look at the backlog, which we discussed looked to be down roughly $100 million due to adjustments in distributor orders, can you tell us what percentage of the backlog that's left is deferred revenue, customer orders or distributors still?
>
> **Meyercord**: What we've said is that overall backlog is about 5x. Obviously, distributor behavior is a little more tied to lead times and lead times came down faster. ***We're expecting them to come down, so we really don't want to get into sort of dissecting backlog. Really what we want to do is reinforce our outlook of revenue growth. And we're doing that out through our fiscal '25, which is out there. We baked that into our revenue guide, and that's where we're trying to focus everyone.***

450.    The statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because Extreme's backlog was not poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already

1    expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—

2    and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's

3    backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause

4    were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme

5    implemented at the start of the Class Period jeopardized and weakened the backlog because there was

6    no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no

7    longer honored. *See supra* Section IV.D.

8         **P.    3Q2023 Form 10-Q (April 27, 2023)**

9         451.    On April 27, 2023, Extreme filed with the SEC its 2023 Third Quarter Form 10-Q for

10   the quarterly period ended March 30, 2022 ("3Q2023"), which contained signed certifications by

11   Defendants Meyercord and Tate pursuant to Section 302 of SOX. These SOX certifications again

12   attested to the accuracy of the Company's financial reporting, the disclosure of any material changes

13   to the Company's internal control over financial reporting, and the disclosure of all fraud. In the

14   3Q2023 Form 10-Q, Extreme reported total revenues of ***$332.5 million*** and product revenues of

15   ***$241.1 million*** for the quarter.

16        452.    These sections of the 3Q2023 Form 10-Q were materially false or, at a minimum,

17   misleading when made and omitted material facts necessary to make the statements not misleading,

18   as Extreme did not disclose that it was engaging in channel stuffing and manipulative sales and

19   inventory tactics which masked the level of organic demand and artificially inflated the Company's

20   revenue listed therein (***$332.5 million*** of total revenues and ***$241.1 million*** of product revenues).

21   Indeed, In reality, Extreme's reported revenues were only achieved through Defendants' channel

22   stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as

23   Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that

24   the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy

25   unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog;

26   (ii) improperly "pulling in" sales from future quarters into the present by shipping products to

27   Extreme's partners and resellers—even without a firm end customer purchase order to justify the

28   recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's

customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

**Q.    Needham Technology & Media Conference (May 17, 2023)**

453.    On May 17, 2023, Defendant Tate made the following statements in her exchange with an analyst in the Conference:

> **Analyst Question**: …you guys have pretty good visibility four, five, six quarters at least, and a pretty strong pipeline. So can you talk a little bit about…the pipeline and visibility that you're seeing in terms of new customer wins, in terms of the aging and weighting of that pipeline?"
>
> **Tate**: So we're always—obviously, we're very keen on demand and where demand is going. And so, we do a lot of analytics around that…***And we're seeing good demand. We're seeing double-digit growth in our weighted funnel year over year. And so that gives us confidence that demand is going to continue.*** We saw, like you said, new logo growth, 20% bookings growth from new logos. And so we're expanding into different markets, going beyond our installed base. We're seeing larger deals in our funnel than we have in the past. And so we're competing at a higher level. So all of those things contribute.
>
> ***As far as visibility, we have our backlog. We talk a lot about our product backlog, but we also have services and subscription backlog that goes along with that.*** We've been growing our subscription business, which gives us visibility as far as our deferred revenue balance, our ARR, what we can expect quarter-after-quarter. ***So between the backlog and the deferred revenue that we will recognize over time, we have really good, probably better than ever visibility into what we're going to achieve through the next fiscal year.***

454.    These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's "***double-digit***" revenue growth was not based on "***good demand***" from Extreme's customers. In reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the

1  recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's

2  customers to cause such customers to purchase outdated and unwanted product in exchange for a

3  right to return such product in future quarters after revenues were reported for the present quarter;

4  and (iv) preventing customers from making contractual returns or stock rotations in order to inflate

5  revenues. *Id.*

6      455.    The statements were also false or, at a minimum, misleading when made and omitted

7  material facts necessary to make the statements not misleading because Extreme's backlog was not

8  poised to generate continued revenue growth for Extreme, because: (i) the backlog did not reflect

9  "firm" customer commitments as it was well known internally that Extreme's customers were double

10 or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog

11 contracts with its customers were contractually designed to be cancelled and were cancellable on a

12 "quite flexible" basis, as the clauses within the contracts for orders included provisions which

13 provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already

14 expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—

15 and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's

16 backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause

17 were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme

18 implemented at the start of the Class Period jeopardized and weakened the backlog because there was

19 no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no

20 longer honored.  *See supra* Section IV.D.

21     456.    Later in the Conference, the analyst asked Defendant Tate to "talk a little bit about

22 where the backlog was, what it did last quarter, why it did what it did last quarter and, to some extent,

23 the difference between the end customer demand and the disties that support the end customers, that

24 stock inventory?" Tate continued to make misleading statements about Extreme's backlog, saying:

25      ***The backlog is – consists of both the end user demand, and so orders for specific
       deals, specific projects; stadiums, hospitals, schools, et cetera. And then we have***
26      ***orders that are from our distributors for get – having product on hand and on order
       to be able to deliver customers when the demand hits.***

27                                              ***

28

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

*Now, we expect to see that continue over the next several quarters. We expect to see both releasing product, being able to ship to customers, enjoying that product revenue growth*, and we also expect to see the distributor orders adjusting as the lead times come down. It may not be linear, we may not see the same level of reduction in backlog in Q4 that we saw in Q3. We think it'll still be kind of gradual over the next several quarters but – four to five quarters until we get to that normalized level, which we said would be around $75 million to $100 million.

457.    Defendant Tate's statement above was false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because Extreme's backlog did not "*consist[] of . . . end user demand*," because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

458.    Finally, an analyst pressed for more information about the Company's visibility into backlog:

**Analyst Question**: So going back to the backlog issue, one of the questions we get most frequently is how visible is the backlog or is it double ordering or triple ordering? Can you address that issue…and maybe split between what you would you would see at the distie level and what you would see at the customer level?

**Defendant Tate**: So *we have excellent visibility into our backlog.* If I think about the question of *double ordering or triple ordering*, to me that means somebody needs some access points for a school, let's call it, and they're going to order access points from us and they're going to order access points from another vendor, or they may order it twice from us just to get the product. *That is not happening, that's not a phenomenon we see at all.*

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

Our customers have to go through a deal registration process, it goes through – ***it's not cancelable. These are real projects that we see. And so I would say the vast majority of our backlog is related to this kind of end user demand project-based business and we don't see double ordering***.

459.    Defendant's Tate's statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because "double ordering or triple ordering" was happening and Defendants did "see double ordering" because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored.  *See supra* Section IV.D.

**R.    4Q2023 Earnings Press Release (August 2, 2023)**

460.    On August 2, 2023, the Company issued a press release entitled "Extreme Networks Reports Fourth Quarter and Fiscal Year 2023 Financial Results," which was subtitled "Marks Second Consecutive Year of Double-Digit Revenue Growth; Expect Continued Strong Growth in FY 24." The press release reported that Extreme's revenues for the fourth quarter were "***$363.9 million, up 31% year-over-year, and up 9% quarter-over-quarter***," and Extreme's revenues for the full year 2023 were "***$1.3 billion, up 18% compared to $1.1 billion in fiscal 2022***." Extreme's product revenues for the fourth quarter 2023 were ***$261.7 million***, and product revenues for the full year 2023 were ***$932.5 million***. These revenue figures were repeated in Extreme's FY2023 Form 10-K.

461.    The statements touting these total and product revenue figures were false and misleading when made because such revenues were only achieved through Defendants' channel stuffing scheme.  In reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

462.    This press release quoted Defendant Meyercord, who stated:

**"Extreme delivered a year of exceptional performance, with revenue growth accelerating to 31% in the fourth quarter and 18% overall for the year,**" said Ed Meyercord, President and Chief Executive Officer. "This marks our second consecutive year of double-digit growth. We're outgrowing our competitors, gaining share, and winning new logos, which helped drive more than 30% growth in the value of deals over $1 million. . . . I remain confident in our growth prospects and am excited about the new innovations and opportunities we have in store for FY24 and beyond," concluded Meyercord.

Kevin Rhodes, Executive Vice President and Chief Financial Officer stated, "the strong topline growth we achieved in Q4 and FY23 resulted in significant operating leverage that drove over 76% growth in GAAP EPS. We doubled our cash generation to $235 million in free cash flow this year, and even after repurchasing another $100 million worth of shares, and paying down $80 million in debt, we improved our year-end balance sheet to achieve a net cash position. **Extreme has never been in a more robust financial position**, and I am encouraged about our future prospects."

463.    These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's "revenue growth" was not based on Extreme having "never been in a more robust financial position." In reality, Extreme's reported revenues were only achieved through Defendants' channel

133

stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

**S.    4Q2023 Earnings Conference Call (August 2, 2023)**

464.    On August 2, 2023, Extreme held an Earnings Conference Call to discuss the Company's Fourth Quarter and Fiscal Year 2023 financial results. In Defendant Meyercord's prepared remarks, he indicated that "[e]nd customer orders remain firm" and that the normalization of the Company's backlog in 1Q25 remained on track, stating in relevant part:

> This quarter, we were able to bring our product lead times down again as our supply chain environment continues to improve. ***We have the benefit of a healthy backlog of customer orders with request dates that spread fairly evenly through the end of our fiscal year. End customer orders remain firm and distributor orders have normalized, giving us confidence in our outlook for this fiscal year.***

> We continue to expect our backlog to settle in a range of $75 million to $100 million in Q1 '25.

465.    Defendant Meyercord's statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice;

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

(iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

466.    Defendant Meyercord later stated in the Earnings Call that: "***in EMEA and the rest of the markets, they remain very strong, and the demand in the U.S. market remains very strong***."

467.    These statements in the prior paragraph were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's demand was not "strong." In reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

468.    On that same conference call, Defendant Rhodes delivered prepared remarks in which he highlighted Extreme's revenue outlook for fiscal year 2024 ("FY24"), saying:

> "[F]ourth quarter earnings per share were $0.33 at the high end of our guidance entering the quarter. For the full year, fiscal '23, revenue of $1.3 billion grew 18% from the prior year on product revenue growth of 22%. ***During fiscal year '24, we expect continued strong product revenue growth, given the growing interest in our solution by customers and the ongoing normalization of our backlog***."

135

469.    Defendant Rhodes' statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because the backlog was not poised to generate "continued strong product revenue growth." In reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

470.    Later, when pressed by an analyst for an update on Extreme's backlog, Defendant Meyercord refused to quantify the amount of backlog and stated that the Company's backlog would start to normalize throughout FY24 and into 1Q25, stating in relevant part:

> **Analyst Question**: Can we get just an update on the backlog. Last quarter, you said 5x normal. Do we have a metric for this quarter?
>
> Meyercord: ***So Mike, we said last quarter that we were not going to give – we were going to move away from giving a specific backlog number each and every quarter. I think what Ed said in his prepared remarks is that our backlog is now – we feel like it will start to normalize throughout 2024 and into Q1 of 2025. We feel good about the level of backlog we have. For instance, it's primarily, I'd say, 90-plus percent is all end customer orders at this point. And so the distribution orders that we had in the past have basically worked themselves through the system, especially with supply chain getting better.*** And so we feel good about those end customer orders and the timing of when those orders need to be shipped to those customers based on their own, I'll call it, like upgrade cycle and whatnot, we feel like it will come down fairly evenly throughout the year and into Q1 of '25. So feeling good about the level of backlog that we have and the timing of that coming out.

471.    Defendant Meyercord's statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that

1  Extreme's customers were double or triple booking orders from Extreme and then cancelling those

2  orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be

3  cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for

4  orders included provisions which provided for and effectuated customers' double-ordering practice;

5  (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much

6  as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-

7  7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed

8  solutions such as the "B2B" clause were never implemented during the Class Period; and (v)

9  Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and

10  weakened the backlog because there was no incentive for distributors to place large backlog orders

11  when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

**T.    Rosenblatt Securities Technology Summit (August 22, 2023)**

13        472.    On August 22, 2023, Defendants participated in the Rosenblatt Securities Technology

14  Summit. During the Question-and-Answer portion of the Summit, Defendant Rhodes indicated that

15  Defendants were very confident in the mid-teens revenue growth guidance that was given:

> Analyst: The company gave guidance and not timid guidance, which is mid- to high-teens revenue growth guidance with margin improvement every year, I think, and pretty aggressively right now. So, you came in basically a year into that where you did nothing, but exceed it, or three quarters of a year into that... [ ] this fiscal year, we saw some order weakness year-over-year in the beginning of the year. I think it started to come back. But, are you nervous about having not just 2024, but 2025 guidance out there?...how are you feeling about the guide?
>
> Rhodes: ***So, this year, we've got strong visibility into 2024, in particular Q1 and beyond Q2 and et cetera. And I can see it in the pipeline. I can see in our win rates, et cetera. And that gives me confidence in our ability to kind of say what we think is going to happen in 2024.*** In 2025, I'm not changing yet the long-term guidance that the company had. I have no reason to. The reality is I went and looked at what we had as inherent assumptions within that model. We're already hitting some of those numbers that we have in long-term model from a – hey, we think that operating income is going to be closer to the 20% range. Well, geez, we just landed in Q4 at 17%. And then, OpEx, we're going to be in the 43% range. We're hitting that as well. And so, there's a number of different areas within the long-term model, growth rates, et cetera, as well in the 13% to 17% range. ***We're already calling mid-teens growth this year and think in 2025 with the momentum we are building today, we don't see a lot of change for that at this moment.*** We will update it again in November at our Analyst Day, and we're excited for that.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

473.    Defendant Rhodes' statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because In reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

474.    The statements were also false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers— and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored.  *See supra* Section IV.D.

**U.      FY2023 Form 10-K (August 24, 2023)**

475.    On August 24, 2023, Extreme filed with the SEC its Form 10-K for FY2023 (fiscal year ended June 30, 2022), which was signed by Defendants Meyercord and Rhodes.

476.    The 2023 Form 10-K stated that total revenues for the year were ***$1.3 billion*** and product revenues for the year were ***$932.5 million***.  The Form 10-K also contained signed certifications by Defendants Meyercord and Rhodes pursuant to Section 302 of SOX. These SOX certifications attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

477.    These statements of $1.3 billion of total revenue and $932.5 million of product revenue achieved during fiscal year 2023, as well as the SOX certifications, were false and misleading when made.  In reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*.

**V.      1Q2024 Earnings Conference Call (November 1, 2023)**

478.    On November 1, 2023, Defendants participated in an Earnings Conference Call to discuss the Company's 1Q2024 financial results. In his prepared remarks on the 1Q24 call, Defendant Meyercord stated:

139

Our increasing pool of large, high-profile customers and our technology differentiation is why we continue to see the value of deals over $1 million grow each quarter. In Q1, we have more than 30 deals over $1 million. ***We continue to have a healthy customer order backlog with clear visibility to order with specific customer request dates through the balance of our fiscal year.***

This quarter, our product lead times normalize, allowing us to continue working down backlog from product and strengths. We continue to expect our backlog to [settle] in a range of $75 million to $100 million by the end of Q4 fiscal '24.

479.    The statements above were false and misleading because Extreme did not have a "healthy customer order backlog" because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

480.    Defendant Rhodes in the Earnings Call also stated:

> ***In the first quarter, we again demonstrated strong financial and operational performance. . . First quarter revenue of $353.1 million grew 19% year-over-year, exceeding the high end of our expectations entering the quarter. . . Product revenue of $253.5 million grew 23% year-over-year, reflecting continued improvement in our supply chain environment.***

481.    These statements were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's product revenue growth was not reflective of "continued improvement in [Extreme's] supply chain environment." In reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of

140

4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.*

482.    Finally, Defendant Meyercord also sought to quell market concerns about the backlog, indicating that the backlog was still healthy and would lead to revenue generation:

> Analyst: So is it safe to assume that backlog is probably almost back to a somewhat normalized level…
>
> Meyercord: ***I think it's fair to say that the – our backlog as it relates to distribution has normalized, but we still have a fair amount of customer backlog that's out there*** – and I can give an example of like Kroger. We had a very large win with Kroger. They're deploying all their stores. They don't necessarily want all the equipment upfront at once. They want to time that with their deployment.

483.    Defendant Meyercord's statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and effectuated customers' double-ordering practice; (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v)

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

1    Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and

2    weakened the backlog because there was no incentive for distributors to place large backlog orders

3    when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

4        **W.    1Q2024 Form 10-Q (November 2, 2023)**

5        484.    On November 2, 2023, Extreme filed with the SEC its 2024 First Quarter Form 10-Q

6    for the quarterly period ended September 30, 2023 ("1Q2024"), which contained signed certifications

7    by Defendants Meyercord and Rhodes pursuant to Section 302 of SOX. These SOX certifications

8    again attested to the accuracy of the Company's financial reporting, the disclosure of any material

9    changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

10   The 1Q2024 Form 10-Q stated total revenues of ***$353.1 million*** and product revenues of ***$235.5***

11   ***million*** for the quarter.

12       485.    These sections of the 1Q2024 Form 10-Q were materially false and misleading and

13   omitted material facts, as Extreme did not disclose that it was engaging in channel stuffing and

14   manipulative sales and inventory tactics which masked the level of organic demand and artificially

15   inflated the Company's revenue listed therein (***$353.1 million*** of total revenues and ***$253.5 million***

16   of product revenues). Indeed, the statements touting these total and product revenue figures were

17   false and misleading when made because in reality, Extreme's reported revenues were only achieved

18   through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the

19   start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the

20   company [the] # that the street expects." *Supra*, Section IV.C This scheme included (i) forcing

21   distributors to buy unwanted and unneeded product in order to receive priority for inventory from

22   Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping

23   products to Extreme's partners and resellers—even without a firm end customer purchase order to

24   justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with

25   Extreme's customers to cause such customers to purchase outdated and unwanted product in

26   exchange for a right to return such product in future quarters after revenues were reported for the

27   present quarter; and (iv) preventing customers from making contractual returns or stock rotations in

28   order to inflate revenues. *Id.*

**X.    Interview with CRN Magazine (November 22, 2023)**

486.    On November 22, 2023, Defendant Meyercord had an interview with *CRN Magazine*, a computer publication trade newspaper targeted at the industry. The publication was titled "Extreme Networks CEO: 'These are Boon Times for Our Channel Partners." In this interview, Meyercord stated:

> *As you know, we put up 19 percent growth [in 1Q2024]. And I think the channel is very healthy because the channel is digesting all this backlog that is being released*. From a project perspective, our channel partners are busy at work implementing our technology and networking solutions. So from that standpoint, these are boon times for our channel partners.

487.    Defendant Meyercord's statements above were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Extreme's channel was not "very healthy," and the channel was not "digesting all this backlog that is being released."  In reality, Extreme's reported revenues were only achieved through Defendants' channel stuffing scheme and other manipulative sales tactics implemented at the start of 4Q2022 as Defendants were "running out of tricks in our bag" and needed to "get into the company [the] # that the street expects." *Supra,* Section IV.C This scheme included (i) forcing distributors to buy unwanted and unneeded product in order to receive priority for inventory from Extreme's backlog; (ii) improperly "pulling in" sales from future quarters into the present by shipping products to Extreme's partners and resellers—even without a firm end customer purchase order to justify the recognition of revenues; (iii) utilizing discounts, rebates, and other incentives with Extreme's customers to cause such customers to purchase outdated and unwanted product in exchange for a right to return such product in future quarters after revenues were reported for the present quarter; and (iv) preventing customers from making contractual returns or stock rotations in order to inflate revenues. *Id.* Additionally, these statements were false and misleading with respect to the digestion of the backlog, because: (i) the backlog did not reflect "firm" customer commitments as it was well known internally that Extreme's customers were double or triple booking orders from Extreme and then cancelling those orders; (ii) Extreme's backlog contracts with its customers were contractually designed to be cancelled and were cancellable on a "quite flexible" basis, as the clauses within the contracts for orders included provisions which provided for and

effectuated customers' double-ordering practice; (iii) Extreme internally had already expected that Extreme's backlog would be cancelled by as much as 10% from Extreme's customers—and the more appropriate number for the hedge according to FE-7 was as high as 66%; (iv) Extreme's backlog did not reflect true end user commitment as proposed solutions such as the "B2B" clause were never implemented during the Class Period; and (v) Extreme's channel stuffing scheme implemented at the start of the Class Period jeopardized and weakened the backlog because there was no incentive for distributors to place large backlog orders when the FIFO fulfillment order was no longer honored. *See supra* Section IV.D.

## VIII.  ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

488.    Numerous facts including those detailed above and summarized below collectively support a strong inference that the Defendants knew, or at a minimum, were deliberately reckless in not knowing, the true and omitted facts. When viewed holistically, these allegations establish a strong inference that each of the Defendants knew, or were severely reckless in not knowing, that each of the misrepresentations and omissions alleged herein would be, and were, false and misleading to investors at the time they were made. Also as alleged herein, the Defendants had scienter over their undisclosed and fraudulent scheme.

### A.  Defendants Orchestrated The Illicit Channel Stuffing Scheme To "Get Into The Company [The] # The Street Expects"

489.    Defendants' scienter rests squarely on the fact that Defendants orchestrated an illicit channel stuffing scheme for the express purpose of getting "***into the company [the] # the street expects***." Indeed, as the close of 3Q2022 approached, instead of revealing to investors the Company's declining demand, Extreme's ELT chose the "path" of deception.

490.    Specifically, ***Defendant Meyercord and the other ELT members including Defendants Thomas and Rice*** engineered the March 2022 scheme to "decommit all" distributors and leverage the need for Extreme's in-demand products to force distributors to buy undesirable products in exchange for a favorable position on the backlog. *Supra* IV.C.1-3.

491.    Evidencing the fact that the March 2022 scheme came from the top, FE-1's notes from a March 16, 2022 meeting reflect that this plan was the "***lesser of many evils for ELT***" required to

meet the quarterly numbers and that "***Ed chose this path – lesser of the 2 [evils]***." FE-1 recalled Defendant Brown stating during this meeting that Meyercord "***chooses blowing up FIFO***."



492.    FE-1's notes from the March 16, 2022 meeting also demonstrate that Defendant Rice and Defendant Brown were adamant about the need to meet the numbers that investors were expecting. Indeed, prior to the March 16, 2022 meeting, Defendant Rice emailed Defendant Brown demanding that Extreme meet the quarter's numbers that were expected by the street, and during the March 16, 2022 meeting, Defendant Brown asked "***how do we get into the company # that the street expects***…" The answer to Defendants Brown's question was that Extreme "decommit all" and reach the numbers investors expected by forcing Extreme's distributors to purchase inventory from Extreme they did not need.

493.    Before the March 16, 2022 meeting, Extreme's supply chain system was automated so that those who executed their purchased orders first would have priority in getting shipments off the backlog. However, in order to accommodate the March 2022 scheme, Extreme had to take the affirmative step to go in and "manipulate the system" to decommit distributors. *Supra* Section IV.C.1-3. Extreme's deliberate overriding of its supply chain system to accommodate the March 2022 scheme demonstrates a conscious and intentional effort to further the scheme. FE-1's notes describe

an April 7, 2022 email exchange in which Extreme's Director of Purchasing, Fiona Nolan—who was responsible for allocating shipments to distributors—agreed with Defendant Brown on getting rid of FIFO with respect to the allocation of shipments to distributors and changing the system to account for the new practice of manually picking "winners and losers."

494.    Defendant Thomas also played a direct role in the implementation of the March 2022 scheme. According to FE-4, during a dinner that occurred in March or April 2022, Westcon senior management and Extreme senior management, including **Extreme's CFO, Defendant Thomas**, discussed the scheme to prioritize Westcon's backlog orders in exchange for the purchase of unwanted or unneeded inventory. FE-4 further explained that Extreme was relying on Westcon to clear out Extreme's obsolete and/or end of life products in exchange for receiving orders off the backlog before other customers who had priority on the backlog list.

495.    Moreover, according to FE-4, during the same week as the dinner with Westcon, Extreme's management had dinners with the management of Jenne and ScanSource. As such, without wasting any time, Defendants set the scheme into motion, forcing distributors into compliance.

496.    Defendants orchestrated and implemented a scheme that rewarded distributors for enabling Extreme's channel stuffing practices and penalized those who refused. Crucially, Defendants enacted this scheme for the express purpose of artificially inflating Extreme's revenue numbers to mislead investors. Defendants' calculated scheme and active manipulation of Extreme's revenues designed to mislead investors is nothing short of smoking-gun evidence of scienter.

**B.    Internal Documents Are Evidentiary Proof That Defendants Knew Of The Undisclosed Channel Stuffing And Manipulative Sales And Inventory Conduct And The True Nature Of The Backlog**

497.    As revealed above throughout *supra* Section IV, numerous documents provided by former Extreme employees to Lead Counsel make it abundantly clear that Defendants were made aware of (1) the undisclosed channel stuffing and manipulative sales and inventory conduct and (2) the backlog process—thus strongly evidencing Defendants' scienter. In addition to the documentary evidence and notes provided in the previous section, former employees provided additional documents revealing Defendants' knowledge and scienter.

498.    For example, Defendant Thomas was forwarded numerous emails from FE-1, on July 20, 2022—just days before the start of the Class Period.

499.    In these emails to Defendant Thomas, FE-1 states that Defendant Brown "***works with the distributors to buy bad product that is not sellable to make the corporate number***." Indeed, this document is evidentiary proof that the ELT at Extreme was made aware of the channel stuffing conduct alleged herein, just days prior to the start of the Class Period (July 27, 2022).

500.    Furthermore, other documents produced by FE-1 indicated other contemporaneous examples of Defendants seeking to cancel the stock inventory rotation clause that Extreme had with its distributors in order to force the distributors to keep and hold the inventory and—according to Defendant Brown's own words—"***drive the behavior we want***."

501.    These documents included emails and IM messages in which Defendant Brown stated, for example, that Extreme "forecasted $3M for TD [Synnex] to rotate – they submitted $6.8M. That is a HUGE problem for all of us. Josh may have tanked our quarter. I need a plan on how we reverse this . . . if not, our conversion rate will spike, ***and our auditors will be all over us***."

502.    Other documents provided included FE-1 indicating in his notebook that Defendant Brown wanted to "punish" TD Synnex for submitting a stock rotation in 2Q2022, and specifically, give them a "***bloody nose***."

503.    Importantly, these documents were provided to the ELT through Defendant Thomas, on July 20, 2022.

504.    Notably, these emails and IM messages also demonstrate that the backlog discussions were "***updated all the way to Ed [Meyercord]***." Specifically, an email provided by FE-1 contains an IM conversation dated May 27, 2022, in which Defendant Brown told FE-1, "why didn't we have [the TD call] scheduled for yesterday? . . . ***Lots of eyes on this backlog process*** – ***it's updated all the way up to Ed [Meyercord]***."

505.    Accordingly, these documents provided to Lead Counsel are extraordinarily strong proof of scienter, and are documentary evidence that the (1) channel stuffing and manipulative sales conduct and (2) the discussions concerning the "backlog process," were known by and discussed internally at the ELT level – just days before the beginning of the Class Period (*i.e.*, July 27, 2022).

**C.    Defendants' Own Statements and Admissions Are Strong Evidence of Scienter**

506.    Throughout the Class Period, Defendant—including each of the Individual Defendants—strongly asserted that they had "complete visibility" into the operations of their business, including the Company's sales pipeline, their backlog, and other metrics tracking Extreme's customer's purchase orders, which Defendants claimed to have personally reviewed.

507.    For example, on July 27, 2022, Defendant Meyercord stated in the Company's 4Q2022 Earnings Call that: "*[w]e have complete visibility into our product backlog* and have received negligible cancellations to date of less than 1% of bookings. Our backlog primarily consists of our latest-generation universal products."

508.    Similarly, in response to analyst questions about backlog normalization, Defendant Thomas also personally assured in the 1Q2023 Earnings Call (October 27, 2022) that: "I'll *let Ed [Meyercord] chime in as well because we're both very close to the topic*, but we believe it's going to be fiscal '26 when [the backlog] really goes back to normal."

509.    Defendant Thomas similarly highlighted in the 1Q2023 Earnings Call that "decommits" (*i.e.*, cancellations of purchase orders) were just a "one-off" and that they get a "lot of scrutiny from" Defendants. Specifically, Thomas stated: "Alex, decommits are just -- it would be a normal part of the business. These are one-offs. ***And I can tell you right now because of our scrutiny around this, each and every decommit, to the extent there is one, gets a lot of scrutiny from us***. And there's no consistency around it. So the example I might give would be a government agency that has budget. They can't get supply by the end of the year, it's use it or lose it. So they want to reprioritize another spend. So they might cancel an order or and maybe that comes into the budget for the following year based on that dynamic. But these are things that are not really supply chain. I guess you could say that supply chain related, but these are more one-offs. And so we're not really seeing a change in the one-offs, and they remain at a fraction of 1%."

510.    On May 17, 2023, Defendant Tate also personally assured the market in the Needham Technology & Media Conference that the Defendants had reviewed the firmness of Extreme's backlog—asserting that: "*we have excellent visibility into our backlog*. *If I think about the question of double ordering or triple ordering*, to me it means somebody needs some access points for a

148

school, let's call it, and they're going to order access points from us and they're going to order access points from another vendor, or they may order it twice from us just to get the product. ***That is not happening, that's not a phenomenon we see at all***. . . . the vast majority of our backlog is related to this kind of end user demand project-based business and ***we don't see double ordering***."

511.    Defendants also asserted that they personally reviewed the sales pipeline and sales metrics, including for demand. Indeed, Defendant Tate stated in the May 17, 2023 Needham Technology & Media Conference that: "obviously, ***we're very keen on demand and where demand is going. And so, we do a lot of analytics around that.*** We have our pipeline and what we call our funnel. We look at the total funnel of opportunities that are coming down the pike. . . So between the backlog and the deferred revenue that we will recognize over time, we have really good, probably better than ever visibility into what we're going to achieve through the next fiscal year."

512.    And similarly, on November 14, 2023, during the Needham & Company Virtual Tech Week Conference, analysts asked Extreme about "where [Extreme is] relative to the backlog issue/boom bust of supply chain. And then, last piece of that is, can you talk about your pipeline?" Defendant Rhodes responded that: "I'm responsible for making sure that we take friction out of the sales process . . . . ***So I'm actually pretty close to looking at our sales pipeline, sales pipeline metrics***."

513.    Moreover, Defendant Meyercord asserted on January 25, 2023 that this visibility into the operations of the Company was based on ability to run analytics and use artificial intelligence—claiming that: "[i]n terms of the pipeline and our funnel analytics, we've got very good visibility and we're getting much better at calling numbers and we have this AI [Artificial Intelligence] tool that we use that helps us call it [referring to the health of the pipeline]. ***So I'm going to call it across the board***."

514.    Indeed, Defendant Meyercord also made similar assertions regarding analytics and artificial intelligence to the market in the 1Q2023 Earnings Call, stating that with respect to "cancellations" or "delays" on customer orders and the effects on the Company's outlook, that: "obviously, is something ***we keep a very close eye on. And we're not seeing it.*** We have a lot of different variables that we look at, specifically as we look forward, we look at opportunities that we have in the funnel that are -- ***and we're scrubbing those regularly. We have feedback from our direct***

149

1    ***sellers in field and what they're rolling up and calling. And as you're aware, we have an AI tool***

2    ***that sits on top of Salesforce that comes up with a call***. So we kind of have kind of 3 legs to our

3    outlook, and we're just not seeing it."

4         515.    These statements all demonstrate that Defendants were personally "***close to the topic***"

5    regarding the Company's sales pipeline, the backlog, and the status of the Company's purchase

6    orders—and are accordingly highly indicative of Defendants' scienter.

7         **D.**     **Defendants' Internal Reporting Is Strongly Supportive of Scienter**

8         516.    Multiple former employees make clear that the status of Extreme's purchase orders,

9    the amount of inventory at Extreme, Extreme's backlog orders, and other related metrics were

10    accessible and made available to Defendants in the form of (1) "pull-in" lists, (2) weekly inventory

11    demand reports, (3) distribution listservs, (4) spreadsheets, and (5) the Clari and Salesforce databases,

12    which had the capability of generating and pulling reports on the Company's sales and revenues

13    operations.

14         517.    As discussed above *supra* Section IV.C.7, Extreme monitored the likelihood that the

15    accounts with its partners would end up with a secured purchase order by the end user. And critically,

16    Extreme willingly shipped and stuffed product and inventory to its partners while having access to

17    reports, information, and databases that demonstrate that those end users had ***not*** placed a confirmed

18    purchase order.

19         518.    **"Pull-In Lists."** Former employees, specifically FE-2, explained of the existence of a

20    "pull-in list" of partners to target that could potentially pull-in orders.  FE-2 explained that this "pull-

21    in list" would indicate and monitor what deals each partner had with the end customer and the organic

22    timeline for the deal, such that if a deal was to close and the end customer would place the purchase

23    order, in May, for example (which was in 4Q), then Extreme could target that potential partner to

24    seek to "pull-in" the sale into the present, *e.g.*, in March (which had the effect of pulling in the sale

25    for 3Q). FE-2 explained the "pull-in list" was in the form of a spreadsheet that was "sent up the chain

26    of command."

27         519.    **Weekly Inventory Demand Reports.** Similarly, FE-1 explained that every week the

28    distributors were given inventory lists by Extreme.  FE-1 also explained that Extreme *receives* weekly

inventory demand reports from its distributors and also a pipeline report which shows what is forecasted, and that these reports had visibility into the end user and reseller demand.  According to FE-1, from these reports, Extreme could see what the "true real demand" was from the reseller/end user to the distributor. FE-1 explained that nonetheless, Extreme pushed its distributors to buy additional inventory regardless, even when there was no demand downstream. He added that Extreme ignored their distributors actual demand from their own resellers and end users, and what was on order. Extreme continued to push inventory to the distributors that they did not need and did not allow them to cancel or return the inventory. FE-1 described these practices as "allowing Extreme to own the distributors' business."

520. Other former employees speak of other similar spreadsheets and reports which tracked the Company's product inventory, backlog, and revenues—and which were circulated up to the highest levels of executive management, including the Individual Defendants.

521. **Distribution-Listservs and Spreadsheets.** Specifically, FE-5 explained that Extreme maintained an "Inventory List" group listserv, which detailed how much product Extreme had on-hand at any given moment. According to FE-5, the Inventory List listserv was a regular group-wide email that attached an Excel spreadsheet. In the Excel spreadsheet, the device, type of device, serial number, model numbers, current demand, availability, and allocation of Extreme's products was shown. FE-5 indicated that the Inventory List spreadsheet would show, *e.g.,* that "1000 items were committed to this deal" with a particular customer, etc. According to FE-5, "every item, we would have an inventory count on it."

522. FE-5 explained that the Inventory List spreadsheet indicated what Extreme actually had on hand, what it had on order, and what it had on backlog, at any given moment.

523. According to FE-5, each distributor had their own Distribution Inventory Excel spreadsheet as well. Accordingly, FE-5 explained that Extreme "would always know what TD Synnex had, what Jenne had, etc."

524. Importantly, FE-5, explained that the CEO (Defendant Meyercord), the CFO (Defendants Thomas/Tate/Rhodes), and "all executive leaders" were "***always***" email recipients on the listservs and would have received the Excel spreadsheets.

525.    Thus—at any moment in time during the Class Period—Defendants would have known and were made aware how much inventory was at Extreme, how much inventory was being shipped out to distributors and partners, and how much of the product was on backlog.

526.    **Clari and Salesforce Databases.**  Separately, multiple former employees describe that the Company's Clari (Extreme's revenue orchestration and organization platform) and Salesforce databases (Extreme's enterprise and customer management system) would have revealed the status of Extreme's revenue forecasts, the pipeline of purchase orders, and would have even documented whether Extreme's end users were likely to place a purchase order.

527.    These former employees described that the Clari and Salesforce database systems would have revealed Extreme's pipeline and revenue forecast at any given time during the Class Period. These former employees also described that the Clari and Salesforce database systems hosted the "Pipeline"/"Best Case"/"Key Best Case"/"Commit" framework, and that this framework was intended to measure the likelihood that an end user will actually place and secure a purchase order with Extreme.

528.    FE-2 also specifically explained that Extreme's weekly and daily updates were entered into Extreme's Salesforce system, and the details would be "pulled" by the Company's "Clari" system – which could be accessed in diverse ways through the Company's various dashboards depending on what type of information the user wanted.

529.    Importantly, these former employees, including FE-5, stated that everyone at Extreme had access to Clari and Salesforce, including senior level officers and executives—who could access the employees' pipelines or revenue forecasts. According to FE-5, the Clari and Salesforce databases provided the ability to run reports for all sales and purchase orders nationwide and globally. FE-5 further described it as "everyone could pull revenue forecasts," and the "***C-suite could see everything we see***."

530.    Furthermore, FE-5 stated that he "knows for a fact" that senior level executives reviewed those updates because he recalled being told on a number of bi-weekly calls throughout his tenure that Defendant Meyercord and CRO Vitalone wanted additional details in the updates so that they could better understand them.

531.   As just one specific example, FE-5 specifically recalled on a bi-weekly call around January 2024 when the Director of Global Solution Partnerships of Americas Amy Bravo and Vice President of Americas Channel Jennifer Orr directed participants on the call to write their updates clearly, detailed, and professionally as possible "*as if Meyercord is reading them, because he is*."

### E.   Defendants' Participation In Meetings Is Further Indicia Of Scienter

532.   Defendants' scienter is further evidenced by the number of meetings that Defendants participated in, as described by former employees, in which both (1) the channel stuffing and manipulative sales and inventory conduct was discussed, and (2) in which the true nature of the backlog was discussed. Defendants' presence, participation, and involvement in these meetings thus further raises the inference of scienter.

533.   **"Ed Talks."** FE-1 provided to Lead Counsel personal notes evidencing meetings that he described as "Ed talks" or Ed Meyercord talks, which evidenced Defendant Meyercord's involvement and knowledge of the supply chain constraints facing Extreme, and the inability for Extreme to ship the backlog out as revenue due to such constraints.   According to these notes, and FE-1's explanation of these notes, Defendant Meyercord stated in this meeting that (i) the supply chain constraints were "not getting better," (ii) the "constraints were creating backlog," and (iii), that as a result, Extreme "can't ship" this backlog out as revenue.

534.   **"Buy-In" Meetings.** FE-1 described—and other FEs corroborated—a "Buy-In" process that would occur at the end of the fiscal quarter and ramped up considerably beginning in the third quarter of fiscal year 2022, in order to meet Extreme's financial revenue targets. According to FE-1, Extreme would send outdated and unwanted inventory to the Company's distributors through multiple incentives including (1) "points" or rebates, *i.e.*, a monetary discount on the inventory; (2) priority position in front of the backlog line for backlogged products—over other distributors; and (3) stock rotation agreements.   FE-1 described these "Buy-In" deals as a "structured deal" with each of the distributors, in order for Extreme to "sell more inventory to distribution than distribution needs." According to FE-1, Defendant Brown organized the Buy-In deals at the end of the quarter and was present at the Buy-In meetings. Additionally, FE-1 explained that Defendant Brown received his "marching orders" from Defendant Rice.

535. **Exit Meetings**. Separately, FE-1 had multiple exit meetings in the summer of 2022 with Defendant Thomas, Executive Vice President of Global Human Resources Kimberly Basnight, and FE-1's Human Resources Manager – whereby FE-1 explained the unethical channel stuffing and manipulative sales and inventory conduct he witnessed. According to FE-1, he left the Company as a result of the unethical behavior and conduct he witnessed. The importance of these meetings is significant, as FE-1 did not only meet with one individual, but many, including high-level Human Resource executives such as Kimberly Basnight and the CFO of the Company itself—Defendant Thomas.

536. **Quarterly and Monthly ELT Meetings**. During the Class Period, FE-7 was tasked with examining the pricing strategy for Extreme's entire product portfolio. FE-7 was the former President of a company acquired by Extreme. FE-7 attended quarterly ELT meetings with C-Suite executives as well as a second ELT meeting which occurred every 30 days. FE-7 explained that the quarterly ELT meeting had detailed discussions on the status of the business, including the Company's backlog. FE-7 explained that both meetings, the (1) quarterly ELT meeting and (2) the ELT meeting occurring every 30 days, were with members of the C-Suite, including Defendant Meyercord, Defendant Thomas,[48] and Defendant Rice. FE-7 recalled that other individuals who attended the ELT meetings included current President and CEO Meyercord, current COO Rice, current Chief Product and Technology Officer Bukhari, former CRO Joe Vitalone, and the Chief Financial Officer, who at the start of his time at Extreme was former CFO Thomas. FE-7 added that former SVP/Head of Global Channels Scott Peterson also attended these meetings from "time to time." FE-7 further explained that the meetings which occurred approximately every 30 days on average at times were every three or four weeks depending on the schedule of Defendant Meyercord.

537. According to FE-7, during the ELT Meetings, there was "always" an element of discussion around the state of the business regarding progress towards sales targets and potential "speed bumps" in achieving those sales targets.

---

[48] While FE-7 knew of Defendant Thomas' personal participation in these meetings, it is reasonable to assume that Defendants Tate and Rhodes similarly participated in these meetings since they held the CFO title at various points during the Class Period as well.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

538.    Moreover, FE-7 stated that at these meetings "everyone [referring to Extreme's ELT] in the room knew" that customers hedged their procurement and that it was "standard operating procedure." According to FE-7, ***the C-Suite / ELT knew that the double-hedging and triple-hedging practice by Extreme's customers was going on***, especially during the constrained supply chain environment.

539.    FE-7 recalled that he was "startled" when he learned at a specific ELT meeting that the Company was internally applying a 10% hedge to backlog orders. FE-7 recalled that this meeting was attended by CTO Bukhari, Defendant Meyercord, then-COO Norman Defendant Rice, former CRO Vitalone, and Defendant Thomas.

540.    FE-7 explained that he expressed these concerns to Meyercord, Thomas, and others at the ELT meeting. He recalled that their response to his concerns was "thank you for your opinion," and it was "clear" to FE-7 that his concerns were "inconvenient" and would not be discussed again.

541.    In the week following the ELT meeting, FE-7 conducted an "acid test" by asking industry CIOs if their customers were double or triple booking orders. Shortly after these conversations, FE-7 told Bukhari that the companies of all of the CIOs with whom he spoke were hedging by placing orders for products with multiple vendors. FE-7 stated that some CIOs said that their companies were placing orders with two vendors, and most were placing orders with three different vendors (and some more). According to FE-7, he is "confident" that CTO Bukhari relayed this information to the C-Suite, including Defendants Meyercord and Thomas. FE-7 added it is his understanding that Bukhari went to Meyercord with this information based on the close relationship between Bukhari and Meyercord.

542.    **Revenue Assurance and "Output" Calls**. FE-8 recalled "Revenue Assurance" calls where the backlog was discussed and there were "conversations around the [backlog] hedge" and the algorithm that Extreme used for this calculation.

543.    According to FE-8, the "Revenue Assurance Calls" were attended by Defendant Brown, members of the Finance team, Defendant Rice, and Senior Vice President Jack Lyon.  FE-8 explained that the "Revenue Assurance" calls were led by Defendant Rice, who then "took the baton"

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

1  and had subsequent conversations with the CEO (Defendant Meyercord) and CFO (Defendants
2  Thomas/Tate/Rhodes) through "Output" calls.

3       544.    According to FE-8, these "Output" meetings were calls that occurred after the
4  "Revenue Assurance" calls, where Defendant Rice and others relayed the information to the CEO
5  and CFO – indicating "here's what we're looking at" and the level of risk and the upside. Further,
6  FE-8 explained that it was his understanding that the information provided to the CEO and CFO in
7  the "Output" calls was also presented through an Excel summary sheet, which included the range of
8  calculations for potential outcomes, including the assumed "yield" from the **backlog**—*i.e.*, the
9  conversion from backlog to product revenue.

10      545.    According to FE-8, the Revenue Assurance calls were a "quarterly function" with
11  meetings becoming more frequent as the quarter progressed. FE-8 explained that during the first two
12  months of the quarter, meetings occurred during the final week of the month to discuss current trends.
13  FE-8 continued to explain that during the third month of each quarter the call became weekly and
14  "week over week" trends were discussed. FE-8 explained toward the end of each quarter, these calls
15  occurred "almost daily" and "day over day" happenings were discussed on a more "precise" level.

16      546.    FE-8 also explained that it was his understanding that the Output calls between
17  Defendant Rice, Meyercord, and the CFO occurred at the same frequency as the Revenue Assurance
18  Calls, so as the number of Revenue Assurance calls increased throughout the quarter so too did the
19  Output calls—because "ultimately" Defendant Rice, Defendant Meyercord, and the CFO were trying
20  to determine the "earnings story" they were going to tell the market.

21      547.    According to FE-8, information from the Revenue Assurance Calls was provided to
22  Meyercord and he recalled instances where it was noted that an update needed to get to Meyercord
23  and that there was certain information he wanted to know. FE-8 further stated that it was "openly
24  known that the information was going to get to the CEO."

25      548.    **Weekly Forecast Calls**. Further, FE-1 described a process of weekly forecast calls
26  and meetings in which the pipeline reports would be discussed, and ***which would indicate how bad***
27  ***and "unclean" the deals were.***

28

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

**F.    Given The Facts Alleged Herein, It Would Be Absurd To Believe Defendants Did Not Act With Scienter**

549.    Given the facts alleged herein, including the actual access that Defendants had to truth of the Company's business operations, and the critical importance of the Company's revenues, backlog, and other financial indicators and metrics for the Company's overall health, it would be absurd to believe that the Company did not know of (i) the undisclosed channel stuffing and manipulative sales tactics which greatly accelerated revenues, and (ii) the truth regarding the strength and "firmness" of the Company's backlog—a key financial metric.

550.    Indeed, as to the channel stuffing and manipulative sales and inventory practices alleged herein, the breadth and the widespread nature of such practices further raise the indicia of scienter. As alleged above, the undisclosed manipulative sales and inventory practices affected and touched Extreme's most important distributors and partners, which included distributors such as TD Synnex, Westcon, Jenne and ScanSource. These distributors accounted for more than **50%** of the Company's overall revenues during the Class Period. Furthermore, the undisclosed manipulative sales and inventory practices were not isolated to just one region, but affected the Americas, EMEA, and multiple large business segments. As one former employee stated, (FE-2), he witnessed "channel stuffing" throughout his tenure as Director of Sales, where he worked in the "largest revenue producing region in the Americas."

551.    Furthermore, Defendants had executive oversight of Defendant Brown, who reported directly to the C-Suite through Defendant Rice. Defendants Rice himself was a member of the ELT. Additionally, Defendants Meyercord, Thomas, Tate, and Rhodes had direct control over the sales and product revenue reporting for Extreme's fiscal quarters.

552.    Given (1) Defendants' executive oversight of Defendant Rice and Brown, who according to former employees orchestrated and were responsible for the channel stuffing and manipulative sales conduct described herein, (2) the fact that Defendant Thomas was made aware of these manipulative sales and inventory tactics on July 20, 2022—just **days** before the start of the Class Period, and (3) the numerous numbers of documentary evidence and reports that were available

1    during the Class Period—it would be absurd to believe that Defendants would have not been made
2    aware of the manipulative channel stuffing, sales, and inventory tactics described herein.

3        553.    Additionally, the extraordinary importance, magnitude, and amount of the backlog
4    also raises the inference of scienter.

5        554.    First, the backlog number itself was highly material to the Company—*i.e.*, a present-
6    tense metric reflecting what anticipated revenues would be based off current purchase orders. The
7    present-tense backlog was thus a reflection of revenues for the Company. Indeed, Defendants spoke
8    about backlog in every single quarterly Earnings Call over the Class Period—and asserted that the
9    backlog they touted poised the Company for strong revenue growth.  Moreover, numerous analysts
10   were extremely focused on the level of backlog and the significance of Defendants' backlog to
11   Extreme's product revenues. The inference of scienter is heightened over such a material metric to
12   the Company, and given the importance of backlog to the Company's core operations, the Defendants
13   would know—or were reckless in not knowing—the true nature, strength, and composition of the
14   backlog, and whether the backlog was indeed "firm."

15       555.    Second, the amount of product backlog during the Class Period was of enormous
16   magnitude, reaching upwards of $555 million at one point during the Class Period. In terms of
17   revenues, this reflected ***multiple quarters worth of product revenue***. It would be absurd to think that
18   Defendants would be unaware of the composition and strength of the backlog, especially as they
19   continuously touted to the market during the Class Period that this backlog would be converted to
20   revenues, and that the orders of backlog were "strong" and "healthy."

21       556.    Notably, Defendants stopped reporting backlog during the Class Period as soon as it
22   became clear that the declines in backlog were not converting into product revenue as they previously
23   led the market to believe they would.

24       557.    Indeed, as discussed in detail *supra* Section IV.D, backlog declined significantly from
25   2Q2023 to 3Q2023, reflecting a decline of $104.5 million. Notably, product revenue only increased
26   by $17.6 million during that same period, reflecting that $86.9 million of the backlog was
27   unaccounted for. Thereafter, from 3Q2023 to 4Q2023, backlog declined significantly again, from
28   $437.5 million to $267.3 million—an extraordinary $170.2 million loss in backlog. Again, product

revenue only increased by a paltry $20.6 million over the same period, reflecting that $149.6 million of the backlog was unaccounted for.

558.    Thereafter, Defendants stopped reporting backlog to the market on a quarterly basis.

559.    Notably, backlog was a material metric to the market, and Defendants offered no explanation for why they stopped reporting backlog besides obfuscating the unexplainable loss of millions of dollars of backlog. Indeed, on 3Q2023, *i.e.*, the first significant decline in backlog, Defendant Meyercord stated in the 3Q2023 Earnings Call:

> What we've said is that overall backlog is about 5x. Obviously, distributor behavior is a little more tied to lead times and lead times came down faster. We're expecting them to come down*, so we really don't want to get into sort of dissecting backlog. Really what we want to do is reinforce our outlook of revenue growth. And we're doing that out through our fiscal '25, which is out there. We baked that into our revenue guide, and that's where we're trying to focus everyone.*

560.    And on 4Q2023, *i.e.*, the second consecutive quarter in which backlog decreased significantly but product revenues did not increase at the same rate, Defendant Meyercord stated:

> *So Mike, we said last quarter that we were not going to give -- we were going to move away from giving a specific backlog number each and every quarter*. I think what Ed said in his prepared remarks is that our backlog is now -- we feel like it will start to normalize throughout 2024 and into Q1 of 2025. We feel good about the level of backlog we have.

561.    Notably, whether backlog was firm or not and whether the composition of the backlog was strong and healthy—as Defendants claimed—could be measured and illuminated by comparison of the reduction in product backlog with the limited gain in product revenues.

562.    Thus, obfuscating how much backlog there was, beginning in 1Q2024—and as product revenues were materially declining (*see supra* Section IV.D.4)—further elevates the inference of scienter, as it would prevent the market from accurately understanding how firm the prior-reported backlog was and whether such backlog was—in fact—leading to revenue growth as Defendants claimed.

**G.    In The Constrained Supply Chain Environment, Defendants Had Motive And Opportunity To Accelerate Revenues Through Channel Stuffing**

563.    Given the constrained supply chain environment, as discussed *supra* Section IV.C, and the downward effect that this constrained supply chain environment had on the Company's total

revenues, distributor revenues, and product revenues, the Company had a strong motive and opportunity to engage in channel stuffing and other manipulative sales tactics in order to prop up revenues during this constrained environment.

564.    Specifically, former employees described how Extreme's revenue recognition model during the Class Period allowed Extreme and Defendants the ability to recognize revenues at the moment of shipment to distributors and partners—*not* when the end user received or actually purchased the product.

565.    Furthermore, these former employees described and explained that purchase orders made by Extreme's customers that were on backlog could *not* be counted as revenues, because they were orders that had not been fulfilled, and thus, not shipped.

566.    Despite Extreme's impressive growth in backlog during the constrained supply chain environment, it nevertheless could not recognize such growth in backlog as revenues. Indeed, Defendant Meyercord stated at the outset of the Class Period that Defendants' revenue growth was nonetheless "understated by the $400 million of incremental backlog we built during the year."

567.    Accordingly, Extreme and Defendants had a strong incentive to boost short term revenues at the expense of future demand in order to quell market and analyst concerns about the ability to generate revenues and be profitable during the constrained supply chain environment. As FE-1 explained, Defendant Meyercord's remarks during the March 17, 2022 Ed Talk underscored the pressure that the Company faced and the urgent need to meet revenue targets by any means.

568.    In doing so, Defendants borrowed from future demand by engaging in their manipulative channel stuffing practices and by "pulling in sales," in order to meet current expectations, as explained and described *supra* Section IV.C.

569.    Further, the significant revenue declines in 2Q2024 and 3Q2024—that were in sharp contrast to the revenue growth while the channel stuffing took place—are highly indicative of the channel stuffing conduct that occurred during the Class Period, and are demonstrative that the demand for Extreme's products was artificially inflated by Defendants' undisclosed manipulative sales and inventory conduct.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

570.    Indeed, at the end of the Class Period, Defendants disclosed that for 3Q2024, Extreme expected "*sell through to be significantly higher than sell-in*, which we believe will have a meaningful impact on our operating results. To quantify this impact, *we expect a $40 million to $50 million reduction in channel inventory in the third quarter*, which will allow us to cover to a more normalized level of revenue in the fourth quarter."

571.    Extreme thus disclosed that it anticipated that sales from the distributor/partners to the end users (*i.e.,* the "sell-throughs") will be "significantly" higher than sales from Extreme to the distributor/partner (*i.e.,* the "sell-ins")—which would result in drastically less revenue as less product would be shipped to the distributors and partners. Through this disclosure, Extreme indicated that there was a surplus of inventory at the distributor/partner level that needed to be sold off.

**H.    Extreme's Executive Compensation Program Further Incentivized The Individual Defendants To Accelerate Revenues In The Short Term, Through The Channel Stuffing And Manipulative Sales Tactics**

572.    The Individual Defendants were also motivated to engage in the channel stuffing and manipulative sales scheme in order to reap financial benefits from Extreme's executive compensation program. The Company disclosed its executive compensation payouts for fiscal year 2023 (July 1, 2022 through June 30, 2023) in its Form DEF14A Proxy Statement ("2023 Proxy") filed with the SEC on September 26, 2023.

573.    In the 2023 Proxy, the Company revealed that Defendants Meyercord, Thomas, Tate, and Rhodes were named executive officers, or "NEOs." The Company further explained that it operated an executive compensation plan, referred to as the Extreme Incentive Plan ("EIP"). The EIP applied to its NEOs—including Defendants Meyercord, Thomas, Tate, and Thomas.

574.    According to the 2023 Proxy, the EIP was a "short-term cash incentive plan," which was "designed to reward Company performance . . . *particularly in the short term*."

575.    Furthermore, according to this EIP, the executive compensation plan for Defendants Meyercord, Thomas, Tate, and Rhodes was both (1) "*directly linked to* the performance of the Company and *to our stock price*," and (2) was based on the achievement of *pre-established revenue goals*.

576.    Specifically, the EIP for FY2023 provided for semi-annual payouts based on the achievement of pre-established revenue goals for the Company, for each of the first and second halves of fiscal year 2023.

577.    For the first half of FY2023 (*i.e.*, July 1, 2022 through December 31, 2022), the Company's "threshold" revenue—which would grant the Defendants' additional compensation (*i.e.*, a bonus)— was $505.6 million. And the "target" goal for revenues was $594.8 million.  According to the Proxy, Defendants reached and surpassed both, achieving $616.0 million in revenues for the first half of FY2023.

578.    For the second half of FY2023 (*i.e.*, January 1, 2023 through June 30, 2023), under the EIP compensation incentive, the Company's threshold revenues goals were $585.1 million, and the target was $688.3 million. And again, according to the Proxy, Defendants reached and surpassed both goals, achieving $696.4 million in revenues for the second half of FY2023.

579.    ***As a direct result of Extreme's achievement of revenues in excess of target***, Defendants Meyercord, Thomas, Tate, and Rhodes were thus eligible—and did—receive a hefty cash EIP payment bonus for each half ("1H or 2H") of the year:

| Defendant | 1H 2023 Base Salary | 1H 2023 EIP Bonus[49] | *Bonus % of Salary* | 2H 2023 Base Salary | 2H 2023 EIP Bonus[50] | *Bonus % of Salary* |
|---|---|---|---|---|---|---|
| Meyercord | $400,000 | $569,920 | 142% | $400,000 | $544,840 | 136% |
| Thomas | $250,000 | $232,900 | 93% | $64,423 | N/A[51] | N/A |
| Tate | $154,005 | $78,519 | 51% | $173,171 | $85,600 | 49% |

580.    Notably, as shown above, the EIP cash payments paid out as a result of the increased revenues were significant, and in some cases, ***larger than Defendant's base salary***. Indeed, for FY2023, Defendant Meyercord received a total of ***$1,114,400 million*** in this EIP bonus—a cash

---

[49] According to the Proxy, this was "paid" out in February 2023.

[50] According to the Proxy, this was "paid" out in August 2023.

[51] Defendant Thomas left the Company in February 2023.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

1   payment amount that was only brought about by the increased revenues. And this monetary cash
2   payment was ***139% larger than his base salary*** for the year, which was $800,000.

3       581.    These monetary incentives continued into the Class Period (which ends January 30,
4   2024). In Extreme's 2024 Proxy Statement, filed with the SEC on September 27, 2024, Extreme
5   disclosed that from July 1, 2023 to December 31, 2023, Defendant Meyercord received $183,456 in
6   an EIP cash bonus, and that Defendant Rhodes received a $71,400 monetary cash payment. Notably,
7   neither Defendants Meyercord nor Rhodes received a dollar of EIP cash bonus for the second half of
8   fiscal year 2024, given the final corrective disclosures and loss of shareholder value.

9       582.    Thus, given that the Individual Defendants' "***short term***" executive compensation was
10  "directly linked" and "directly tied" to the Company's revenues and stock price performance, and
11  with the opportunity to earn substantial cash sums twice in the same fiscal year, these Individual
12  Defendants had a strong personal pecuniary motive to engage in the channel stuffing and
13  manipulative sales and inventory tactics described herein—which artificially inflated Extreme's
14  revenues and Extreme's stock price, and which in turn, allowed the Individual Defendants to obtain
15  millions of dollars of additional compensation.

16      583.    Defendants Meyercord, Thomas, Tate, and Rhodes were also awarded incentive
17  awards in the form of stock and stock options each year. Extreme granted Defendant Meyercord
18  hundreds of thousands of shares each year pursuant to its Extreme Incentive Plan. Specifically,
19  Extreme granted Meyercord 766,660 shares in FY2021, 312,500 shares in FY2022, and 463,845
20  shares in FY2023. Notably, while Defendant Meyercord's holdings in Extreme increased during the
21  Class Period by virtue of these incentive and compensation awards, Meyercord did not purchase a
22  single share of Extreme on the open market during the Class Period based upon review of
23  Meyercord's filed Form 4s. Instead, he acquired shares solely through the exercise or conversion of
24  derivative securities.

25      **I.    The Retaliatory Culture At Extreme Supports An Inference of Scienter**

26      584.    The inference of scienter, including with respect to Defendants' undisclosed
27  manipulative sales tactics and channel stuffing conduct, is further strengthened due to the retaliatory
28  culture that existed at Extreme concerning individuals who refused to participate in the illicit tactics

and conduct. Furthermore, there was suspicious turnover by Extreme's executives during the Class Period while Defendant Rice—who orchestrated the channel stuffing conduct as alleged herein—was promoted and given a new title of Chief Commercial Officer.

585.    An example of retaliatory conduct was demonstrated by the account of FE-2. FE-2, former Director of Sales at Extreme, described an incident that occurred in June 2023 in which David Savage, the Vice President of Sales and Senior Director of SLED (State, Local, and Education) Sales, directed FE-2 to ask channel partner PC Solutions to take approximately $1.5 million worth of inventory by the end of that month without a confirmed end user purchase order.

586.    FE-2 often told Savage that there were no legitimate reasons to pull in this inventory, as corroborated by a series of emails shared with Lead Counsel. For example, on June 6, 2023, FE-2 sent an email to Savage indicating that PC Solutions does not have a "compelling reason" to pull in inventory early because one end user customer did not even have its budget "until after July 1st and they don't need the gear for several months" and another won't even "get their internal funding until sometime next FY but does not know when that will be yet." As a result, the PC Solutions agent "isn't in desperate need to get the equipment right now." In response to that email, Savage asked FE-2 to see "**What else can you pull in from next fy to cover some or all of this**?"

587.    FE-2 explained that in June 2023, Savage had been "riding me hard," had become increasingly "belligerent" behind the scenes, and was "making my life miserable."

588.    On June 29, 2023, the day before the close of Q4 and FY2023, Extreme was still trying to find a way to close a deal with PC Solutions "by end of June" for about "$1.9M all-in." That morning, Savage emailed FE-2 and said "we need as much as we can get in today and tomorrow" and encouraged FE-2 to "get creative" with PC Solutions. However, according to FE-2, there was no indication at that time that Extreme was going to be awarded the purchase order, so he refused to do it. FE-2 explained that he did this because (i) he perceived it as unethical and (ii) Extreme had done this to PC Solutions at least once previously and in that previous occurrence, the purchase order never came, and PC Solutions was stuck with the inventory for a year.

589.    Notably, FE-2 advised that he reported the June 2023 incident in the SOX quarterly questionnaire form that he and his fellow sales directors had to fill out every quarter where they had

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

to report any inappropriate requests. FE recalled that he filled this out probably at the end of July 2023, adding that this was both at the very end of 4Q'23 and FY2023. According to FE-2, he received a call from someone in Human Resources who asked him a question or two about it, but nothing ever came of it.

590.    FE-2 recalled that as a result of the PC Solutions transaction that Savage ultimately closed, he believed that he was demoted from his Director position just a short time later to an Account Executive position, at around half of his compensation of his Director of Sales position. Regarding FE-2's demotion, FE-2 stated that Savage told him that he was "making a change" and moving FE-2 out of SLED and into another department where they were creating a position for FE-2.

591.    According to FE-2, Human Resources never contacted FE-2 for being demoted, and Savage never gave a real reason for the demotion. FE-2 recalled that Defendant Rice told him in an exit interview that Savage had wanted to "let go" of FE-2 at that time, but that Defendant Rice told Savage to demote FE-2 instead. Notably, FE-2 believes that Extreme, or at least Defendant Rice, understood that FE-2 could have sued the Company if they had fired him for refusing to do something unethical and possibly illegal and that instead a demotion would not lead to a lawsuit.

592.    Other former employees were retaliated against and fired in response to their efforts to do the right thing, the results of which would have projected a less positive revenue position for the Company. For example, FE-10, a Senior Account Executive who started at Extreme in July 2023, described how he learned that individuals at Extreme had the ability to input comments into Salesforce for opportunities based on conversations with customers without any "back up." FE-10 recalled an instance of a significant opportunity in Salesforce that he could not get "validated" with the customer as being legitimate. According to FE-10, however, when he attempted to remove this opportunity from Salesforce he was instructed "don't take it out" or "kill it" and instead he was instructed to "move" the opportunity to the end of the year. FE-10 explained that this "inflated" the "health" of his territory and that this practice was "not good." According to FE-10, the revenue forecasting should have been "reflecting reality"—which it did not during his tenure. FE-10 explained that by cleaning the data he was responsible for, it "skewed" the pipeline and opportunity forecasts

"negatively."  FE-10 added that the triggers were in place to assist with identifying individuals to be laid off, and that by removing old data and therefore reducing the forecasts for his territory, his standing at the Company was negatively impacted.

593.    FE-10 further explained that he was individually performing well and did not have any inclination that he may be laid off less than one year after starting. According to FE-10, he had had internal conversations about "cleaning up" the forecasts when he joined and noted that there were opportunities in the Salesforce maintained by his predecessors which were not "real" deals. FE-10 recalled that his counterparts on his team were all "older reps" who had been at the Company for at least a year and were not focused on "cleaning" their data. According to FE-10, he was advised by his counterparts "not to focus on that [data cleaning] too much." FE-10 noted that they "all played ball" by leaving old data and opportunities in Salesforce.

594.    Notably, FE-10 also explained of a separate incident in which he tried to act "with integrity" prior to the end of his tenure. FE-10 recounted how he was asked to see if a distributor would cut a purchase order to Extreme without having received the purchase order from the end user. FE-10 explained that he was told and directed by upper management to ask the distributor if they could "cut" (meaning issue) the purchase order because the customer had not yet done so, and Extreme could only recognize revenue once the distributor had a purchase order. FE-10 pushed back against his superiors and obtained the purchase order from the end customer "with integrity."

595.    FE-10 further explained that when he was let go from the Company in April 2024, he was "blindsided" and there was no "heads up." According to FE-10, he was the only one on his team "cleaning up the pipeline" in order to correct the accuracy of the forecasting.

**J.    Defendants' Refusal to Document Their Channel Stuffing Conduct Strongly Supports an Inference of Scienter**

596.    Former employees describe how Defendants avoided putting the terms of their manipulative sales practices "in writing," evincing an acknowledgement of wrongdoing and a need to hide Extreme's manipulative sales practices.

597.    For example, in late March 2022, just day after the March 16, 2022 meeting that "blew up" FIFO backlog fulfillment and leveraged backlog priority to those who helped Extreme close its

revenue gap with unneeded, shippable product, FE-1 recorded in his notes a call with Defendant Brown, Joe Uraco, and a TD Synnex Vice President of Vendor Management. As FE-1 recalled and his notes reflect, a purpose of the call was to get TD Synnex to accept a "side deal" with respect to a purchase of goods related to a "Verizon deal." FE-1 explained that the VP of Vendor Management of TD Synnex stated that he may be willing to take Extreme's offer to his supervisor at TD Synnex if Defendant Brown would put this deal, and any other potential "side deals," in writing. However, according to FE-1, Brown responded that he would only do a verbal deal and would not put anything into writing, with FE-1's contemporaneous notes from this March 23, 2022 call stating "could not put in writing only verbal." FE-1 elaborated that Brown never wanted to put anything into writing or have his name on anything. A screenshot of these meeting notes is pasted below:



598.    Similarly, FE-2 described how with respect to the PC Solutions July 2023 transaction, he emailed Vice President Sales Strategy, Business Development, and Operations Matt Cleaver on June 29th, 2023 at 9:49 am, with the subject line: "FW: PC Solutions Deals Update." In this email, FE-2 told Cleaver that, "we approached [PC Solutions] a couple weeks ago and asked if he could pull in about 4 Product deals by end of June (Glynn, Manatee, Commerce, Banks…~$1.9M all-in). At first, he wasn't interested (said he needed to clean out his warehouse while it's more empty…)." FE-2 explained that PC Solutions had made some demands for discounts and that there had been discussions around that. He continued, "We agreed to meet all those demands, but then he came back with more demands and wanted us to pay him $180K in additional deal discounts plus the $20K SPIFF to do it." FE-2 attached emails documenting these discussions.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

599.    Cleaver did not respond to FE-2. FE-2 was surprised when Cleaver did not respond fairly promptly as he usually did, and that instead, FE-2 received an angry call from Vice President of Sales and Senior Director of SLED (State, Local, and Education) Sales David Savage later that same day. According to FE-2, Savage was angry and said that any directives he gave to ship early inventory should be private and not discussed with the rest of the Company. Savage then told FE-2 that he (Savage) would personally call PC Solutions and make the request, which he did and was able to close this suspicious transaction.

600.    This culture directed by Defendants—and especially when viewed in conjunction with FE-1's notes that "*Ed chose this path*"—demonstrates that Defendants were **fully aware** that their channel stuffing and backlog scheme was improper, not above-board, and should not documented, strongly supporting scienter in this action.

### K.    Defendants' Refusal to Heed Warnings Concerning Their Backlog Misrepresentations Strongly Support Scienter

601.    A high level executive, FE-7, directly warned Defendants Meyercord, Thomas, and Rice at an ELT meeting that Extreme's reported backlog number was in conflict with established and known industry practice. In response, he was ignored.

602.    Specifically, in the week following Summer 2022 ELT meeting in which FE-7 learned that Extreme expected that only 10% of the backlog would be cancelled (which, of course, was still far greater than the 1% communicated to the market), FE-7 conducted an "acid test" inquiry of approximately five industry CIOs in order to substantiate his concerns. His acid test did just that, validating his understanding that companies that had been or were similar to Extreme customers would double or triple book (or more) their orders for in-demand product that was commonly backlogged.

603.    FE-7 explained that he was "baffled" by the 10% hedge figure the Company had applied to its backlog, and it "didn't make sense to him" based on his experience. FE-7 recalled that he informed Bukhari that the Company's internal 10% hedge was "just not right" and that he was "*quite certain this is misleading*." FE-7 continued to explain that a more realistic figure was as much as **66%**—explaining that upwards of two-thirds of those deals may not come to be realized. FE-7

recalled that he further told Bukhari that he had previously held the same positions as many of the higher-ups at Extreme—including the same positions as John Morrison (Senior Vice President EMEA Sales and Services) and Joe Vitalone (Chief Revenue Officer)—at his previous companies, and that he wanted to express his concerns to Bukhari because Bukhari "was part of the executive team" and, per FE-7's extensive experience, "this is not how you do things."

604.    According to FE-7, he expressed to Bukhari that Bukhari could "do what you may" with that information and that if FE-7 was "king for a day," this was something the Company would have to talk about. FE-7 explained that there has "never" been a case, based on his extensive industry experience, where 90% of a Company's backlog "has been good" in the history of the generic hardware industry. FE-7 further explained that Extreme's internal 10% hedge was "removed from reality" and if the hedge was not addressed that "a lot" of people will find themselves with "egg on their face."

605.    FE-7 added it is his understanding that Bukhari went to Meyercord with this information based on the close relationship between Bukhari and Meyercord.

606.    According to FE-7, Extreme "damn well knew" how many orders they would be expecting to fill, "the 10% [internal hedge figure] was bullshit because [they] damn well know," the reported 1% figure—as Defendants publicly represented—was "even worse."

607.    FE-7's account strongly supports an inference of scienter with respect to Defendants' backlog misrepresentations.

L.    **The Departures And Resignations Of High-Level Executives Also Supports An Inference Of Scienter**

608.    Employees at Extreme left the Company on their own accord after witnessing the "unethical" channel stuffing conduct performed by Defendants. For example, FE-1 decided to leave the Company after witnessing numerous instances of unethical and manipulative channel stuffing behavior with distributors—committed by the Individual Defendants at the specific direction of Defendant Meyercord.

609.    Notably, according to FE-1, Defendant Brown was trying to get FE-1 fired. Specifically, after witnessing "unethical" and "embarrassing" behavior, FE-1 handed in his two

1    weeks' notice. However, FE-1 recalled that Defendant Brown had wanted to fire him ***immediately***

2    after giving notice, fearing that FE-1 may say negative things about Extreme to the distributors.

3         610.    Furthermore, FE-1 explained that his supervisor, Director of Distribution in the

4    Americas, Joe Uraco ***was***—in fact—fired by Defendant Brown around 90 days[52] after FE-1 resigned

5    from the Company (in July/August 2022).  FE-1 knows this based upon his own conversation with

6    Uraco. And according to FE-1, nothing changed at Extreme even after FE-1's exit interviews in July

7    2022.

8         611.    Furthermore, the indicia of scienter is further strengthened due to the significant turn-

9    over and resignations of high-level Extreme executives in the C-Suite, all while Defendant Rice—

10    who helped orchestrate the channel stuffing conduct—was given a new title and further revenue and

11    sales responsibilities as Chief Commercial Officer.

12         612.    Defendant Thomas's departure from Extreme also raises an inference of scienter. On

13    January 25, 2023, Extreme announced through a press release Defendant Thomas' departure from

14    the Company, effective February 16, 2023. Notably, the press release gave limited clarifying details

15    regarding Defendant Thomas's sudden departure. Analysts such as Rosenblatt Securities considered

16    the departure "unexpected." However, FE-1 recalled that Joe Uraco conveyed that he spoke with

17    then-CFO, Defendant Thomas in April 2022, who told Uraco that he did not like how "things" were

18    trending at Extreme and he "wanted to get out of there." Furthermore, raising the indicia of scienter,

19    FE-1 explained that, after FE-1 left the Company, a former colleague mentioned to him in a

20    conversation that Defendant Thomas thought he should have done something about the information

21    that was presented to him, but Defendant Thomas stated "he was on his way out" anyway.

22         613.    Moreover, on January 8, 2024, Chief Revenue Officer and head of sales, Joe Vitalone,

23    who had joined Extreme in June 2020, resigned from his role. In response to this unexpected news,

24    Extreme elevated COO Defendant Rice to Chief Commercial Officer where he would focus on

25    revenue growth as well as sales and supply chain organization.

---

[52] 90 days after the July/August 2022 timeframe is approximately October/November 2022.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

614.    The frequent turn-over and resignations of many high-level executives in the C-Suite, and the simultaneous promotion and elevation of Defendant Rice—who was a key orchestrator of the channel stuffing conduct alleged herein—thus further raises the inference of scienter.  This inference of scienter is further raised due to Extreme's conduct of retaliating against its employees who sought to "act with integrity" and chose not to participate in the "unethical" and illicit undisclosed tactics alleged herein.

IX.    **LOSS CAUSATION**

615.    The fraud alleged herein was the proximate cause of the economic loss suffered by Lead Plaintiffs and the Class. There was a causal connection between the alleged fraud and the loss (*i.e.*, stock price declines) described herein. *See, e.g.*, *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018).

616.    During the Class Period, Lead Plaintiffs and other Class members purchased or otherwise acquired Extreme common stock at artificially inflated prices, and were damaged thereby when the price of Extreme common stock declined in response to the partial disclosures.  Throughout the Class Period, the price of Extreme common stock was artificially inflated and/or maintained as a result of Defendants' materially false and misleading statements and omissions.  The price of Extreme common stock significantly declined, causing investors to suffer losses, in response to a series of partial disclosures concerning or connected to the facts misrepresented or concealed by Defendants, which disclosures are described more fully above in Section V. Throughout the disclosure period, Defendants mitigated Extreme's stock price declines by making additional false assurances concerning the alleged fraud, as described herein.

617.    As the result of the disclosures described herein on January 25, 2023, August 24, 2023, November 1, 2023, January 8, 2024, and January 31, 2024, Extreme common stock declined from a Class Period high of $32.27 per share to a closing price of $12.59 per share on February 2, 2024 after the final corrective disclosure, a decline of over 60%.  Each of these disclosures made were associated with a statistically significant "abnormal" decline, meaning that they were not explained by broader market or industry price declines, as described in more detail in Section V, above.

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

618.   The below chart summarizes Extreme's partial disclosure, the impact of such disclosures on its stock price, as well as that which each statement revealed about Extreme:

| Date of Disclosure(s) | Disclosure(s) | Resultant Decrease in Stock Price | Corrective Disclosure Revelation |
|---|---|---|---|
| January 25, 2023 | • Extreme's financial results for 2Q2023 revealed for the first time that backlog had fallen from $555 million to $542 million. <br> • On Extreme's 2Q2023 Earnings Call, Defendant Meyercord shortened the timeline for backlog normalization from previously stated FY2026 to 4Q2025. <br> • Extreme's Form 8-K announced the resignation of Defendant Thomas as CFO of the Company, effective February 16, 2023. | The price of Extreme's stock decreased from **$19.31** per share at market close on January 24, 2023, to **$16.50** per share at market close on January 25, 2023, a nearly **15% decline** on unusually heavy trading volume of over 9 million shares. | Extreme's decline in backlog indicated that orders were not firm or based on organic end user demand; the resignation of Defendant Thomas concurrently indicated internal Company turmoil and wrongdoing in connection with financial results. |
| August 24, 2023 | • Extreme's FY2023 Form 10-K revealed that backlog had fallen to $267.3 million as of June 30, 2023, compared to $513.0 million at June 30, 2022 (and $542 million at two quarters prior). | The price of Extreme's stock decreased from **$27.68** per share at market close on August 24, 2023, to **$25.16** per share at market close on August 25, 2023, a **9% decline** on unusually heavy trading volume of over 10 million shares. | Extreme's backlog had essentially halved in a very short period of time, indicating that its backlog orders were not firm or based on organic end user demand; this meant that future revenue growth was no longer assured and weaknesses in demand were exposed. |
| November 1, 2023 | • Extreme's financial results for 1Q2024 reported sequential total revenue losses from $363.9 million in 4Q2023 to $353.1 million in 1Q2024, reported sequential product revenue losses from $261.7 million in 4Q2023 to $253.5 million in 1Q2024, and provided downward total revenue guidance of $312 million to $327 million for 2Q2024. | The price of Extreme's stock decreased from **$20.62** per share at market close on October 31, 2023, to **$17.86** per share on November 1, 2023, a **13% decline** on unusually heavy trading volume | Extreme's revenue decline and prediction of downward total revenue for the following quarter indicated softening growth and demand; Extreme impeded transparency into its backlog, to cover up the fact that declines in backlog |

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

| Date of Disclosure(s) | Disclosure(s) | Resultant Decrease in Stock Price | Corrective Disclosure Revelation |
|---|---|---|---|
| | • Extreme stated that it would discontinue disclosure of its current backlog figure on a quarterly basis and did not report its backlog figure as of 1Q2024.<br>• On Extreme's 1Q2024 Earnings Call, Defendant Rhodes: described Extreme's downward revenue guidance as reflecting a "more cautious tone" and stated that, "[b]ased on changing customer buying patterns . . . we are tempering our revenue outlook for this quarter and the balance of the year," which was resultant from an "air pocket" of demand. | of nearly 10 million shares. | were not converting into product revenue as it previously led the market to believe. |
| January 8, 2024 | • Extreme's press release announced lowered revenue guidance for both 2Q2024 and the long term, from $312–$327 million to $294– $297 million. The press release further stated that Extreme's 2Q2024 revised outlook "reflects industry headwinds of channel digestion and elongated sales cycles. In late Q2, we saw multiple large deals pushing out to future quarters."<br>• Extreme announces Chief Revenue Officer Joe Vitalone resigned; Defendant Rice became Chief Commercial Officer. | The price of Extreme's stock decreased from **$17.52** per share at market close on January 8, 2024, to **$16.23** per share at market close on January 9, 2024, a **7% decline** on unusually heavy trading volume of over 4 million shares. | Extreme's press release expressly warned of issues with its channel, and its guidance cut, as well as its disclosure of elongated sales cycles and deals being pushed out, again indicated softening demand. |
| January 31, 2024 | • Extreme revealed that its revenues had significantly declined—particularly its product revenues, totaling only $186.6 million for 2Q2024, compared to $253.5 million from the prior quarter. This represented a decline of $66.9 million, or a 26% decline in | The price of Extreme's stock decreased from **$16.64** per share at market close January 30, 2024, to **$13.51** per share at market | Extreme's guidance revealed that its revenues were in decline and the Company was not experiencing growth, contrary to prior representations. |

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

| Date of Disclosure(s) | Disclosure(s) | Resultant Decrease in Stock Price | Corrective Disclosure Revelation |
|---|---|---|---|
| | product revenue losses quarter-over-quarter. <br>• Extreme issued new guidance for 3Q2024 that revealed that total revenues would be in the range of $200–$210 million—a further decline from the $296.4 million actuals of 2Q2024—and a departure from its previous representations that the Company was on track for mid-teens revenue growth for FY2024. <br>• On Extreme's 2Q2024 Earnings Call, Defendant Meyercord stated that Extreme made a "conscious decision to put channel digestion behind us in the March quarter [*i.e.*, the 3Q2024 quarter]," and further stated that Extreme's "distributors and partners have lowered inventory purchases, which we expect to accelerate in the third quarter," which would result in "[d]emand . . . be[ing] masked by inventory flowing out of the channel." <br>• Also on Extreme's 2Q2024 Earnings Call, Defendant Rhodes stated that the Company's product revenue decline was attributable to "continued channel digestion and elongated sales cycles," and that Extreme's product backlog had already normalized during the quarter, "earlier than we initially anticipated," and that Extreme expected a "$40 million to $50 million reduction in channel inventory in the third quarter" as well as "sell through to be significantly higher than sell-in, which we believe will | close on January 31, 2024, **$13.22** per share at market close on February 1, 2024, and **$12.59** per share on February 2, 2024, a **24% decline** on unusually heavy trading volume. | Defendants also expressly acknowledged "channel digestion" issues and that organic demand had cratered. Extreme also disclosed that it anticipated that sales from its distributor/partners to the end users (*i.e.*, the "sell-throughs") will be "significantly" higher than sales from Extreme to the distributor/partner (*i.e.*, the "sell-ins"), which indicated that there was a surplus of inventory at the distributor/partner level that needed to be sold off, which would in turn result in drastically less revenue for Extreme since less product would be shipped to the distributors and partners. |

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT

| Date of Disclosure(s) | Disclosure(s) | Resultant Decrease in Stock Price | Corrective Disclosure Revelation |
|---|---|---|---|
| | have a meaningful impact on our operating results." | | |

619.    It was entirely foreseeable that Defendants' materially false and misleading statements and omissions and scheme to defraud investors discussed herein would artificially inflate or maintain the existing artificial inflation of the price of Extreme common stock. It was also foreseeable to Defendants that the disclosures described above would cause the price of Company stock to fall as the artificial inflation caused and maintained by Defendants' misstatements and omissions was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions. Alternatively, loss causation can be demonstrated by the materialization of various risks related to Defendants' channel stuffing scheme and the true nature of the backlog (*i.e.*, that the product backlog was not firm and would not lead to sustainable revenues).

## X.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

620.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

621.    For example, the quality of Extreme's backlog was represented in the present-tense, with Defendants claiming, for example, that Extreme's backlog "*consists of both the end user demand, and so orders for specific deals, specific projects; stadiums, hospitals, schools, et cetera.*" Indeed, Defendants claimed that with respect to the backlog, "*[t]hese are real projects that we see. And I would say the vast majority of our backlog is related to this kind of end user demand project-based business and we don't see double ordering,*" and also claimed during the Class Period that "*[w]e have the benefit of a healthy backlog of customer orders with request dates that spread fairly evenly through the end of our fiscal year.*" These assertions about Extreme's backlog concern the present-tense—not the future.

622.    Similarly, Defendants assertions of revenue growth—which they attributed to "exceptionally strong" organic demand during the Class Period—were also phrased in the present-tense. For example, Defendants claimed that for 4Q2022, "*[w]e had another record quarter, as demand for cloud-driven networking and for Extreme Solutions remains exceptionally strong*."

623.    To the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

624.    Indeed, even a cursory review of Defendants' risk disclosures associated with their SEC filings demonstrates that such risk disclosures merely cautioned of risks in vague, hypothetical language. For example, Extreme disclosed that its backlog orders "*could* be cancelled for various reasons," or that Extreme "*may*" allow customers to cancel "on an *exception* basis"—language that only speaks entirely of as-yet-unrealized risks and contingencies when Defendants had contemporaneous knowledge otherwise. *See supra* Section VIII.

625.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, the Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the statement was authorized or approved by an executive officer of Extreme who knew that the statement was false when made, and/or the statement omitted material adverse information whose disclosure was necessary to render the statement not misleading.

626.    None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XI.    THE PRESUMPTION OF RELIANCE

627.    To the extent that Lead Plaintiffs allege that Defendants made affirmative misstatements, Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    Extreme's common stock traded in an efficient market;

(d)    the misrepresentations and omissions alleged would tend to induce an investor to misjudge the value of Extreme common stock;

(e)    Plaintiffs and other members of the Class purchased Extreme common stock between the time Defendants misrepresented or omitted facts;

(f)    Extreme common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(g)    Extreme regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(h)    Extreme was followed by securities analysts employed by major brokerage firms who wrote reports, which were distributed to those brokerage firms' sales force and certain customers and that were publicly available and entered the public marketplace; and

(i)    unexpected material news about Extreme was reflected in and incorporated into the Company's stock price during the Class Period.

628.    As a result of the foregoing, the market for Extreme common stock promptly digested current information regarding Extreme from publicly available sources and reflected such information in the price of Extreme common stock. All persons and entities who or which purchased or otherwise acquired Extreme common stock during the Class Period suffered similar injuries

177

1   through their purchase of Extreme common stock at artificially inflated prices, and thus, the

2   presumption of reliance applies.

3       629.    A class-wide presumption of reliance is also appropriate in this action under the United

4   States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

5   to the extent the claims asserted herein against Defendants are predicated upon omissions of material

6   fact for which there is a duty to disclose.

7   **XII.   CLASS ACTION ALLEGATIONS**

8       630.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the

9   Federal Rules of Civil Procedure on behalf of a Class of all persons and entities who or which

10  purchased or otherwise acquired the publicly traded common stock of Extreme during the period

11  from July 27, 2022 through January 30, 2024, inclusive, and were damaged thereby. Excluded from

12  the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an

13  individual; (iii) any person who was an officer, director or control person of Extreme during the Class

14  Period and their immediate families; (iv) any firm, trust, corporation, or other entity in which any

15  Defendant has or had a controlling or beneficial interest; (v) the subsidiaries and affiliates of Extreme;

16  (vi) Extreme's employee retirement and benefit plan(s), if any, and their participants or beneficiaries,

17  to the extent they made purchases through such plan(s); and (vii) the legal representatives, heirs,

18  successors-in-interest, or assigns of any such excluded person, in their capacities as such.

19      631.    The members of the Class are so numerous that joinder of all members is

20  impracticable. The disposition of their claims in a class action will provide substantial benefits to

21  class members. Throughout the Class Period, Extreme's roughly 130 million outstanding shares

22  actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead

23  Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs

24  believe that there are at least hundreds or thousands of members in the proposed Class. Millions of

25  Extreme shares were traded publicly during the Class Period on the NASDAQ. Record owners and

26  other members of the Class may be identified from records maintained by Extreme or its transfer

27  agent and may be notified of the pendency of this Action by mail, using the form of notice similar to

28  that customarily used in securities class actions.

632.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the federal securities laws were violated by Defendants' acts as alleged herein; (b) whether Defendants omitted and misrepresented material facts; (c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (d) whether the price of Extreme's securities was artificially inflated; (e) whether Defendants' conduct caused the members of the Class to sustain damages; and (f) the extent of damages sustained by Class members and the appropriate measure of damages.

633.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

634.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

635.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violation Of Section 10(b) Of The Exchange Act And
Rule 10b-5(b) Against Defendants Extreme, Meyercord,
Thomas, Tate, And Rhodes**

636.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

637.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Plaintiffs and the Class, against the Defendants.

179

638.     During the Class Period, Defendant Extreme and Defendants Meyercord, Thomas, Tate, and Rhodes made, disseminated or approved the materially false or misleading statements alleged herein, all of which were about Extreme and its common stock, which they knew or, at minimum, were severely reckless in not knowing, were misleading in that they contained misrepresentations and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

639.     Defendant Extreme and Defendants Meyercord, Thomas, Tate, and Rhodes violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material fact and/or disseminated and/or approved and/or omitted to state material facts necessary to make the false or misleading statements specified above not misleading.

640.     During the Class Period, Defendant Extreme and Defendants Meyercord, Thomas, Tate, and Rhodes individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and made the above statements and omissions intentionally or with severe recklessness.

641.     Defendant Extreme is liable for all materially false or misleading statements made during the Class Period, as alleged above.

642.     Defendants Meyercord, Thomas, Tate, and Rhodes are liable for the false or misleading statements they made and for which they were responsible, as alleged above.

643.     As alleged above, Defendants Extreme, Meyercord, Thomas, Tate, and Rhodes acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with reckless disregard for the truth. The material misrepresentations and omissions of material facts alleged herein, which presented a danger of misleading buyers and sellers of Extreme common stock, were either known to Defendants Extreme, Meyercord, Thomas, Tate, or Rhodes or were so obvious that the Defendants should have been aware of them.

644.     The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at Extreme, establish a strong inference that Defendants Extreme, Meyercord,

1  Thomas, Tate, and Rhodes acted with scienter in making the materially false or misleading statements

2  alleged above during the Class Period.

3      645.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity

4  of the market, they purchased Extreme common stock and were harmed when the truth about Extreme

5  negatively impacted the price of those securities. Lead Plaintiffs and the Class would not have

6  purchased Extreme common stock at the prices they paid, or at all, had they been aware of the truth

7  about Extreme.

8      646.    As a direct and proximate result of Defendant Extreme's, Meyercord's, Thomas's,

9  Tate's, and Rhode's wrongful conduct, Lead Plaintiffs and other members of the Class suffered harm

10  in connection with their respective purchases of the Company's common stock during the Class

11  Period.

## COUNT II

### For Violations Of Section 10(b) Of The Exchange Act And
### SEC Rule 10b-5(a) And (c) Against All Defendants

15      647.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if

16  fully set forth herein.

17      648.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §

18  78j(b), and Rule 10b-5(a) and (c) promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5(a) and

19  (c), on behalf of Lead Plaintiffs and the Class, against all Defendants.

20      649.    Defendant Extreme and the Individual Defendants violated Section 10(b) of the

21  Exchange Act and Rule 10b-5(a) and (c) in that they: (1) employed devices, schemes, and artifices to

22  defraud; and (2) engaged in acts, practices, and a course of business that operated as a fraud and

23  deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of

24  Extreme common stock during the Class Period in an effort to maintain artificially high market prices

25  for Extreme common stock.

26      650.    Defendant Extreme and the Individual Defendants individually and in concert, directly

27  and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails,

28  employed devices, schemes, and artifices to defraud and engaged and participated in a continuous

1    course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class in connection

2    with the purchase and sale of Extreme common stock; which did: (i) deceive the investing public,

3    including Lead Plaintiffs and the Class, regarding, among other things, Extreme's undisclosed

4    channel stuffing and manipulative sales and inventory tactics; (ii) artificially inflate and maintain the

5    market price of Extreme common stock; and (iii) cause Lead Plaintiffs and other members of the

6    Class to purchase Extreme common stock at artificially inflated prices and suffer losses when the true

7    facts became known.

8        651.    As part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c), the

9    Defendants engaged in the fraudulent scheme to inflate revenues in the short term and for the present

10   fiscal quarter, at the expense of future fiscal quarters, by: (i) stuffing its product channel with outdated

11   and unwanted product by forcing those distributors to buy such product if they wanted to be

12   prioritized and receive inventory from Extreme's backlog line; (ii) stuffing its product channel with

13   outdated and unwanted inventory at the distributor/partner level in exchange for incentives such as

14   discounts, monetary rebates, with a right to return such unwanted product in future quarters after

15   revenues were already reported for the fiscal quarter/year; (iii) shipping inventory to partners early,

16   without a confirmed end user purchase order, in order to "pull in" sales and revenues for the quarter;

17   (iv) incentivizing distributors to take unwanted and unneeded inventory by encouraging the use of a

18   liberal right to return and stock distribution rotation agreements for future quarters; (v) reneging on

19   those same stock distribution rotation agreements, which forced the distributors to hold the unwanted

20   product; (vi) manipulating the Company's revenue figures and forecasts by including multi-million

21   dollar orders that Extreme knew it had lost out on to competitors or were improperly double

22   counted—without correction—until the quarter was over; and (vii) misrepresenting the nature of

23   Extreme's backlog as "firm" and revenue-generating, when in reality, the backlog did not represent

24   nor reflect firm commitments from Extreme's customers.

25       652.    Indeed, Defendants' specific channel stuffing scheme was a multi-layered and

26   Company-wide enterprise which, as discussed above *supra* Section IV.C, included (but was not

27   limited to) the following key events: (i) on March 16, 2022, Defendant Brown held a meeting

28   whereby Extreme enacted its scheme to "blow up FIFO" prioritization of the backlog—at the

direction of the ELT, including Defendant Meyercord—in order to utilize Extreme's backlog as leverage to force distributors to purchase un-wanted, un-demanded, and outdated product that Extreme had in its inventory, so Defendants can generate immediately reportable product revenues; (ii) on April 7, 2022, Extreme's plan to blow up FIFO got "legs" from Director of Purchasing Fiona Nolan, who was responsible for allocating shipments to distributors, and who agreed with Defendant Brown on getting rid of FIFO with respect to the allocation of shipments to distributors; (iii) sometime in March/April 2022, Extreme made a deal with Westcon whereby Westcon agreed to buy unneeded and "end of sale" stock of $52 million, and the transaction was closed and recorded for the following quarter—*i.e.*, 4Q2022/FY2022; and (iv) Defendants—including, most notably, Defendant Meyercord—made millions of dollars of executive compensation during the Class Period through bonuses which were specifically tied to the amount of product revenues that were generated as a result of the channel stuffing scheme implemented.

653.    These deceptive acts were part of a course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Extreme common stock during the Class Period in an effort to maintain artificially high market prices for Extreme common stock.

654.    As described above, Defendant Extreme, and the Individual Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. Defendant Extreme and the Individual Defendants engaged in this misconduct to conceal Extreme's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

655.    Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Extreme common stock, which artificial inflation was removed from the stock when true facts became known. Lead Plaintiffs and the Class would not have purchased Extreme common stock at the prices they paid, or at all, had they

183

been aware that the market prices for Extreme common stock had been artificially inflated by Defendants' fraudulent course of conduct.

656.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their respective purchases of the Company's common stock during the Class Period.

657.    By virtue of the foregoing, Extreme violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c), promulgated thereunder.

## COUNT III

**For Violation Of Section 20(a) Of The Exchange Act Against
Defendants Meyercord, Thomas, Tate, Rhodes, And Rice**

658.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

659.    This Count is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiffs and the Class, against Defendants Meyercord, Thomas, Tate, Rhodes, and Rice (the "Control Person Defendants").

660.    As set forth above, each of the Control Person Defendants were controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. The Control Person Defendants acted as controlling persons of Extreme within the meaning of Section 20(a) of the Exchange Act by virtue of their executive positions and their culpable participation, as alleged above. The Control Person Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Plaintiffs contend were false and misleading, as well as the fraudulent course of conduct and scheme alleged herein. The Control Person Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

661.    In particular, the Control Person Defendants had direct involvement in and responsibility over the day-to-day operations of the Company, and/or intimate knowledge of the

184

1    Company's actual performance and had the power and ability to control public statements about

2    Extreme and the actions of Extreme and its employees. The Control Person Defendants were each

3    directly involved in providing false information and certifying and/or approving the materially false

4    or misleading statements disseminated by Extreme during the Class Period. Moreover, each of the

5    Control Person Defendants were directly involved in or orchestrated the undisclosed fraudulent

6    scheme alleged herein. As a result of the foregoing, the Control Person Defendants each were

7    controlling persons of Extreme within the meaning of Section 20(a) of the Exchange Act.

8           662.     As alleged above, Extreme violated Section 10(b) of the Exchange Act by its material

9    misrepresentations and omissions, and undisclosed fraudulent scheme, as alleged in this Complaint.

10   By virtue of their positions as controlling persons of Extreme and as a result of their own

11   aforementioned conduct, the Control Person Defendants are each liable pursuant to Section 20(a) of

12   the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under

13   Section 10(b) of the Exchange Act of Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the

14   other members of the Class who purchased or otherwise acquired Extreme common stock. Moreover,

15   as alleged above, during the respective times that the Control Person Defendants served as officers

16   or high-level executives of Extreme or spoke directly to Extreme investors during analyst conference

17   calls, each of the Control Person Defendants culpably participated in the material misstatements and

18   omissions made by Extreme, as set forth above.

19           663.     As a direct and proximate result of the wrongful conduct by the Control Person

20   Defendants, Lead Plaintiffs and the other members of the Class suffered damages in connection with

21   their purchases or acquisitions of Extreme common stock during the Class Period.

22   **XIV.   PRAYER FOR RELIEF**

23   WHEREFORE, Lead Plaintiffs pray for judgment as follows:

24           (a)      Determining that this action is a proper class action, certifying Lead Plaintiffs

25   as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead

26   Plaintiffs' counsel as Lead Counsel for the Class;

27           (b)      Awarding Lead Plaintiffs and the Class compensatory damages and equitable

28   relief, including all damages and relief provided for under the Exchange Act and the Securities Act,

against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including interest thereon;

        (c)    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

        (d)    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## XV.    JURY DEMAND

664.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiffs demand a trial by jury of all issues so triable.

Dated: September 9, 2025

**LABATON KELLER SUCHAROW LLP**

*/s/ Lauren A. Ormsbee*

Lauren A. Ormsbee (*pro hac vice*)
David Saldamando (*pro hac vice*)
Danielle S. Lazarus (*pro hac vice*)
Alexandra E. Forgione (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
lormsbee@labaton.com
dsaldamando@labaton.com
dlazarus@labaton.com
aforgione@labaton.com

*Counsel for Lead Plaintiffs and*
*Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (Bar No. 250893)
Reed R. Kathrein (Bar. No. 139304)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

*Liaison Counsel for the Class*

186

**VANOVERBEKE MICHAUD & TIMMONY P.C.**
Aaron L. Castle (*pro hac vice*)
79 Alfred Street
Detroit, MI 48201
Tel: (313) 578-1200
Fax: (313) 578-1201
acastle@vmtlaw.com

*Additional Counsel for Oakland County Voluntary
Employees' Beneficiary and Oakland County
Employees' Retirement System*

SECOND AMENDED CONS. COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:24-CV-05102-TLT