1  LATHAM & WATKINS LLP
   Melanie M. Blunschi (Bar No. 234264)
2    *melanie.blunschi@lw.com*
   Morgan E. Whitworth (Bar No. 304907)
3    *morgan.whitworth@lw.com*
4  505 Montgomery St., Suite 2000
   San Francisco, CA 94111
5  Telephone: +1.415.391.0600

6
   Daniel R. Gherardi (Bar No. 317771)
7    *daniel.gherardi@lw.com*
   140 Scott Drive
8  Menlo Park, CA 94025
   Telephone: +1.650.328.4600
9

10 *Attorneys for Defendants Extreme Networks,*
   *Inc., Edward B. Meyercord III, Rémi*
11 *Thomas, Cristina Tate, Kevin Rhodes,*
   *Norman Rice, and Jonas Brown*

12

13                **UNITED STATES DISTRICT COURT**

14               **NORTHERN DISTRICT OF CALIFORNIA**

15                  **SAN FRANCISCO DIVISION**

16 | STEAMFITTERS LOCAL 449 PENSION & | Case No. 3:24-cv-05102-TLT
17 | RETIREMENT SECURITY FUNDS, on Behalf |
   | of Itself and All Others Similarly Situated, | **DEFENDANTS' NOTICE OF**
18 | | **MOTION AND MOTION TO**
   |                Plaintiff, | **DISMISS LEAD PLAINTIFFS'**
19 | | **SECOND AMENDED**
   |        v. | **CONSOLIDATED COMPLAINT;**
20 | | **MEMORANDUM OF POINTS AND**
   | EXTREME NETWORKS, INC., EDWARD B. | **AUTHORITIES IN SUPPORT**
21 | MEYERCORD III, RÉMI THOMAS, | **THEREOF**
   | CRISTINA TATE, KEVIN RHODES, |
22 | NORMAN RICE, and JONAS BROWN | Hearing:   March 3, 2026
   | | Time:       2:00 p.m.
23 |                Defendants. | Location:  Courtroom 9 - 19th Floor
   | | Judge:      Hon. Trina L. Thompson
24

25

26

27

28

1

**NOTICE OF MOTION AND MOTION**

2      **PLEASE TAKE NOTICE** that on March 3, 2026 at 2:00 p.m., before the Honorable Trina

3  L. Thompson, United States District Court, Courtroom 9, 19th Floor, 450 Golden Gate Ave., San

4  Francisco, California, Defendants Extreme Networks, Inc., ("Extreme" or the "Company"),

5  Edward B. Meyercord III, Rémi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, and Jonas

6  Brown (the "Individual Defendants," and together with Extreme, "Defendants") will and hereby

7  do move for an order dismissing the Second Amended Consolidated Complaint ("SAC") (Dkt. 95)

8  of Lead Plaintiffs Oklahoma Firefighters Pension and Retirement System, Oklahoma Police

9  Pension and Retirement System, Oakland County Voluntary Employees' Beneficiary Association,

10  and Oakland County Employees' Retirement System (collectively, "Plaintiffs").

11      This Motion is made pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and

12  the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 *et seq.*, on the

13  grounds that Plaintiffs fail to state a claim on which relief can be granted

14      Defendants' Motion is based on this Notice of Motion and Motion to Dismiss, the

15  following Memorandum of Points and Authorities, the Request for Judicial Notice and

16  Incorporation by Reference, and Declaration of Morgan E. Whitworth filed concurrently herewith,

17  the complete files and records in this action, and any other material and arguments as may be

18  considered by the Court.  Through this Motion, Defendants seek an order dismissing the Amended

19  Complaint for failure to state a claim.

20                          **STATEMENT OF ISSUES TO BE DECIDED**

21      1.      Whether Plaintiffs' claim under Section 10(b) of the Securities Exchange Act of

22  1934 (the "Exchange Act") and SEC Rule 10b-5(b) should be dismissed for failure to plead with

23  particularity a material false statement or omission, scienter, or loss causation.

24      2.      Whether Plaintiffs' claim under Section 10(b) of the Exchange Act and Rule 10b-

25  5(a) and (c) should be dismissed for failure to plead with particularity the use or employment of

26  any manipulative or deceptive device or contrivance, scienter, and loss causation.

27      3.      Whether Plaintiffs' claim under Section 20(a) of the Exchange Act should be

28  dismissed for failure to plead a predicate violation.

1    Dated: October 3, 2025                    Respectfully submitted,

2                                              LATHAM & WATKINS LLP

3                                              By: /s/ *Melanie M. Blunschi*
                                               Melanie M. Blunschi (Bar No. 234264)
4                                                *melanie.blunschi@lw.com*
                                               Morgan E. Whitworth (Bar No. 304907)
5                                                *morgan.whitworth@lw.com*
                                               505 Montgomery St., Suite 2000
6                                              San Francisco, CA 94111
                                               Telephone: +1.415.391.0600
7

8                                              Daniel R. Gherardi (Bar No. 317771)
                                                 *daniel.gherardi@lw.com*
9                                              140 Scott Drive
                                               Menlo Park, CA 94025
10                                             Telephone: +1.650.328.4600

11
                                               *Attorneys for Defendants Extreme Networks, Inc.,*
12                                             *Edward B. Meyercord III, Rémi Thomas, Cristina*
                                               *Tate, Kevin Rhodes, Norman Rice, and Jonas*
13                                             *Brown*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

**Page**

3   I.    INTRODUCTION ................................................................................................ 1

4   II.   BACKGROUND ................................................................................................. 3

5         A.    Extreme Warned About The COVID-Era Global Supply Chain
6               Meltdown ................................................................................................. 3

7         B.    Extreme Experienced Strong Demand Throughout The Class
                Period ....................................................................................................... 4

8         C.    Extreme Reported Growing Backlog But Warned It Was Not Set
9               In Stone ................................................................................................... 4

10        D.    Plaintiffs File This Lawsuit, And The Court Dismisses It ...................... 5

11  III.  ARGUMENT ...................................................................................................... 6

12        A.    Plaintiffs Do Not Allege A Material Misstatement ............................... 7

13              1.    The Growth And Demand Statements Were Not
                        Misleading ................................................................................... 7

14                    a.    Plaintiffs Still Fail To Allege Channel Stuffing ............ 7

15                    b.    Extreme's Revenue Numbers Were Not Misleading ..... 11

16                    c.    Corporate Optimism Is Not Actionable ........................ 12

17                    d.    The PSLRA Safe Harbor Protects Growth and
18                          Demand Statements ...................................................... 13

19              2.    The Backlog Statements Were Not Misleading ....................... 14

20                    a.    The SAC Still Fails to Plead Contemporaneous
                              Falsity ........................................................................... 14

21                    b.    The PSLRA Safe Harbor Protects Backlog
22                          Statements .................................................................... 17

23                    c.    The Backlog Statements Are Non-Actionable
                              Opinions ....................................................................... 18

24              3.    SOX Certifications Remain Not Actionable ............................ 19

25        B.    Plaintiffs Do Not Allege Scienter ....................................................... 19

26              1.    Plaintiffs Do Not Allege A Plausible Motive ......................... 19

27              2.    The Remaining FEs Do Not Support A Strong Inference of
28                    Scienter ..................................................................................... 20

1

                     3.      Alleged Knowledge Does Not Support Scienter ..................................... 21

2                      4.      Culture and Departures Do Not Support Scienter.................................. 22

3                      5.      Core-Operations Doctrine Does Not Support Scienter ........................... 23

4        C.      Plaintiffs Do Not Allege Loss Causation............................................................. 24

5        D.      Plaintiffs Fail To Plead Scheme Liability............................................................ 25

6  IV.     CONCLUSION........................................................................................................... 25

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

### CASES

3

*Applestein v. Medivation, Inc.*,
4    861 F. Supp. 2d 1030 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir.
     2014) ................................................................................................................. 9
5

*Avila v. LifeLock Inc.*,
6    2016 WL 4157358 (D. Ariz. Aug. 3, 2016)................................................... 20

7    *Belodoff v. Netlist, Inc.*,
     2008 WL 2356699 (C.D. Cal. May 30, 2008) .............................................. 16
8

*Cai v. Eargo, Inc.*,
9    2025 WL 66041 (9th Cir. Jan. 10, 2025) ...................................................... 19

10
*Charter Twp. Of Clinton Police & Fire Ret. Sys. v. LPL Fin. Holdings Inc.*,
11   2019 WL 13178511 (S.D. Cal. Mar. 29, 2019) ............................................ 22

12   *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
     856 F.3d 605 (9th Cir. 2017) .................................................................. 18, 19
13

*City of Pontiac Gen. Emps.' Ret. Sys. v. First Solar Inc.*,
14   2023 WL 155861 (D. Ariz. 2023)................................................................. 23

15   *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
     880 F. Supp. 2d 1045 (N.D. Cal. 2012) ....................................................... 12
16

17   *Costanzo v. DXC Tech. Co.*,
     2021 WL 5908385 (N.D. Cal. Dec. 14, 2021) .............................................. 18
18

*Das v. Unity Software Inc.*,
19   2024 WL 1141733 (N.D. Cal. Mar. 15, 2024) .............................................. 11

20
*Deason v. Super Micro Comput., Inc.*,
21   2017 WL 4355128 (N.D. Cal. Sept. 29, 2017) ............................................. 12

22   *Dolly v. GitLab Inc.*,
     2025 WL 2372965 (N.D. Cal. Aug. 14, 2025) .............................................. 17
23

24   *Dura Pharms., Inc. v. Broudo*,
     544 U.S. 336 (2005)....................................................................................... 24
25

*Espy v. J2 Glob., Inc.*,
26   99 F.4th 527 (9th Cir. 2024) .......................................................... 6, 22, 25

27   *Hampton v. Aqua Metals, Inc.*,
     2020 WL 6710096 (N.D. Cal. Nov. 16, 2020) ............................................. 15
28

*Hunter v. Elanco Animal Health Inc.*,
  2022 WL 3445173 (S.D. Ind. Aug. 17, 2022) ........................................................... 9

*In re Accuray, Inc. Sec. Litig.*,
  757 F. Supp. 2d 936 (N.D. Cal. 2010) ..................................................................... 17

*In re Align Tech., Inc. Sec. Litig.*,
  2021 WL 1176642 (N.D. Cal. Mar. 29, 2021) ......................................................... 13

*In re Apple Inc. Sec. Litig.*,
  2020 WL 2857397 (N.D. Cal. 2020) ........................................................................ 12

*In re Downey Sec. Litig.*,
  2009 WL 2767670 (Aug. 21, 2009) .......................................................................... 21

*In re Eargo, Inc. Sec. Litig.*,
  2023 WL 5663154 (N.D. Cal. Aug. 31, 2023) ......................................................... 20

*In re Fusion-io, Inc. Sec. Litig.*,
  2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ............................................................ 16

*In re Great Atl. & Pac. Tea Co., Inc., Sec. Litig.*,
  103 F. App'x 465 (3d Cir. 2004) ............................................................................. 20

*In re ICN Pharm., Inc., Sec. Litig.*,
  299 F. Supp. 2d 1055 (C.D. Cal. 2004) ............................................................... 8, 10

*In re Int'l Rectifier Corp. Sec. Litig.*,
  2008 WL 4555794 (C.D. Cal. May 23, 2008) ......................................................... 11

*In re LeapFrog Enters., Inc. Sec. Litig.*,
  527 F. Supp. 2d 1033 (N.D. Cal. 2007) ................................................................... 12

*In re Medicis Pharm. Corp. Sec. Litig.*,
  689 F. Supp. 2d 1192 (D. Ariz. 2009) ..................................................................... 21

*In re Neustar Sec. Litig.*,
  83 F. Supp. 3d 671 (E.D. Va. 2015) ........................................................................ 18

*In re Peritus Software Servs., Inc. Sec. Litig.*,
  52 F. Supp. 2d 211 (D. Mass. 1999) ........................................................................ 12

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ............................................................................... 6, 20

*In re Solarcity Corp. Sec. Litig.*,
  274 F. Supp. 3d 972 (N.D. Cal. 2017) ..................................................... 12, 13, 23, 24

*In re Spectrum Brands, Inc. Sec. Litig.*,
  461 F. Supp. 2d 1297 (N.D. Ga. 2006) ................................................................. 9, 15

*In re SunPower Corp. Sec. Litig.*,
  2018 WL 4904904 (N.D. Cal. Oct. 9, 2018) ........................................................................ 12

*In re Talis Biomed. Corp. Sec. Litig.*,
  2022 WL 17551984 (N.D. Cal. Dec. 9, 2022) ...................................................................... 16

*Lamontagne v. Tesla, Inc.*,
  2024 WL 4353010 (N.D. Cal. Sept. 30, 2024) .................................................................... 25

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) ............................................................................................ 13

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) ........................................................................................ 24, 25

*Markette v. XOMA Corp.*,
  2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) .................................................................... 18

*McGovney v. Aerohive Networks, Inc.*,
  2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) ...................................................................... 17

*Nat'l Junior Baseball League v. Pharm. Dev. Grp., Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) ..................................................................................... 15

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) .............................................................................................. 19

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*,
  774 F.3d 598 (9th Cir. 2014) ................................................................................................ 6

*Petersen v. Triplepoint Venture Growth BDC Corp.*,
  2024 WL 5384678 (N.D. Cal. Aug. 7, 2024) ...................................................................... 24

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
  2024 WL 5399664 (N.D. Cal. Sept. 8, 2024) ................................................................. 22, 23

*Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*,
  556 F. Supp. 3d 772 (N.D. Ohio 2021)......................................................................... 15, 17

*Prodanova v. H.C. Wainright & Co., LLC*,
  993 F.3d 1097 (9th Cir. 2021) ............................................................................................ 21

*Sayce v. Forescout Techs., Inc.*,
  2021 WL 1146031 (N.D. Cal. Mar. 25, 2021)..................................................................... 18

*Simpson v. AOL Time Warner, Inc.*,
  452 F.3d 1040 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041 (9th
  Cir. 2008) ........................................................................................................................ 7, 25

*Smith v. NetApp, Inc.*,
   2021 WL 1233354 (N.D. Cal. Feb. 1, 2021) ....................................................................... 22

*Sneed v. AcelRx Pharms., Inc.*,
   2024 WL 2059121 (N.D. Cal. May 7, 2024) ..................................................................... 21

*Sneed v. Talphera, Inc.*,
   147 F.4th 1123 (9th Cir. 2025) ................................................................................ 20, 22

*Turner v. MagicJack VocalTec, Ltd.*,
   2014 WL 406917 (S.D.N.Y. Feb. 3, 2014)....................................................................... 12

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
   495 F. Supp. 3d 622 (N.D. Ill. 2020), *aff'd sub nom. Nat'l Elevator Indus*
   *Pension Fund v. Conagra Brands*, 2022 WL 1449184 (7th Cir. May 9, 2022) ..................... 10

*Waterford Twp. Police v. Mattel*,
   321 F. Supp. 3d 1133 (C.D. Cal. 2018) ........................................................................ 8, 18

*Webb v. Solarcity Corp.*,
   884 F.3d 844 (9th Cir. 2018) ....................................................................................... 19

*Welgus v. TriNet Grp.*,
   2017 WL 6466264 (N.D. Cal. Dec. 18, 2017)................................................................. 23

*Weston Fam. P'Ship LLLP v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022) ....................................................................................... 14

*Weston v. Docusign, Inc.*,
   Case No. 22-cv-00824-VC (N.D. Cal. Apr. 29, 2025) ......................................................... 6

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ..................................................................................... 13

*Yaron v. Intersect ENT, Inc.*,
   2020 WL 6750568 (N.D. Cal. Jun 19, 2020).................................................................... 25

*Yaron v. Intersect ENT, Inc.*,
   2021 WL 12103005 (N.D. Cal. Jan. 22, 2021)................................................................... 9

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ....................................................................................... 23

**STATUTES**

15 U.S.C. § 78u-4(b)(1)(B)............................................................................................. 6

15 U.S.C. § 78u-5(c)(1) ............................................................................................... 13

15 U.S.C. § 78u-5(c)(1)(A)............................................................................................ 18

1

PSLRA ............................................................................................................... 6, 17

2

**RULES**

3

17 C.F.R. § 240.10b-5(b) ........................................................................................ 25

4

Fed. R. Civ. P. 9(b) .................................................................................................. 6

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

DEFS' MOT. TO DISMISS SAC
CASE NO. 3:24-cv-05102-TLT

## GLOSSARY

| Term | Definition |
|---|---|
| ¶__ | Citations to the paragraphs of the SAC. |
| CEO: | Chief Executive Officer |
| Challenged Statements: | Statements Plaintiffs allege to be false or misleading. |
| Class Period: | July 27, 2022 through January 30, 2024, inclusive |
| CW: | Confidential Witness |
| Defendant(s): | Extreme Networks, Inc., Edward Meyercord III, Remi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, Jonas Brown, or any of the Defendants individually |
| ELT | Extreme Networks' Executive Leadership Team |
| Ex(s). or Exhibit(s): | Exhibits attached to the Declaration of Morgan E. Whitworth in Support of Defendants' Motion to Dismiss Plaintiffs' Second Amended Consolidated Complaint filed concurrently herewith, which are public filings and statements that are incorporated into the Complaint and/or subject to judicial notice |
| Extreme or the Company: | Extreme Networks, Inc. |
| FAC | Plaintiffs' First Amended Consolidated Complaint for Violation of Federal Securities Laws, filed February 14, 2025, Dkt. No. 59 |
| FE: | Confidential Former Employees who supposedly made allegations that Plaintiffs included in the SAC |
| FY22, FY23, FY24, FY25 | Extreme's fiscal years, including fiscal year 2022 (July 1, 2021 to June 30, 2022), fiscal year 2023 (July 1, 2022 to June 30, 2023), and fiscal year 2024 (July 1, 2023 to June 30, 2024) |
| Individual Defendants: | Edward Meyercord III, Remi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, Jonas Brown |
| Order | Order Granting Motion To Dismiss, Dkt. No. 92 |
| Plaintiffs: | Oklahoma Firefighters Pension and Retirement System, Oklahoma Police Pension and Retirement System, Oakland County Voluntary Employees' Beneficiary Association, and County Employees' Retirement System |
| PSLRA: | The Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77k, 77l, 77z–1, 77z–2, 78a, 78j–1, 78t, 78u, 78u–4, 78u–5 |
| SAC: | Plaintiffs' Second Amended Consolidated Complaint for Violation of Federal Securities Laws, filed September 9, 2025, Dkt. No. 95 |
| Section 10(b): | Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| Section 20(a): | Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| Tr. | August 12, 2025 Transcript of Proceedings on Defendants' Motion to Dismiss |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

DEFS' MOT. TO DISMISS SAC
CASE NO. 3:24-cv-05102-TLT

1    **I.    INTRODUCTION**

2        Plaintiffs' allegations are longer than ever, but they crumble under their own weight.  They

3    still do not cure the deficiencies the Court previously identified in dismissing the FAC, and they

4    fail for numerous independent reasons that the Court did not previously need to consider.  The

5    SAC fails to plead securities fraud and should be dismissed with prejudice.

6        **No Material Misstatements.**  Plaintiffs once again fail to plead an actionably false or

7    misleading statement under either of the alleged theories of fraud they assert.

8        *First*, Plaintiffs allege that statements attributing positive revenue results to generic factors

9    like "strong demand" are false because Extreme did not simultaneously disclose that it was

10   prioritizing customer orders for backlogged products based on the customer's total order volume.

11   Plaintiffs alleged Extreme engaged in channel stuffing by forcing distributors to buy "unwanted"

12   products to get higher priority for the "wanted" products in Extreme's backlog, and allowed some

13   undefined portion of the "unwanted" products to *potentially* be returned.  But Plaintiffs do not

14   explain how bundling product sales or allocating priority is "illicit"—because it is not.  It makes

15   good business sense to prioritize customers with large purchase orders in a compressed supply

16   chain environment.  There are no allegations of customers receiving illicit benefits, and Plaintiffs

17   do not explain how prioritizing customers or encouraging them to order more products constitutes

18   channel stuffing.  While the alleged scheme is based on the purported ability to return some

19   "unwanted" products, Plaintiffs do not allege that any "unwanted" products were returned—ever.

20   Instead, Plaintiffs' allegations show that Extreme's distributors had huge backlogs for their own

21   customers before Extreme revised its shipment allocation process, and that distributors were so

22   eager for Extreme's backlogged products that they were allegedly willing to spend millions to buy

23   purportedly "unwanted" products in order to potentially get marginally better shipment priority.

24   These distributors were not helpless pawns—they were significantly larger businesses than

25   Extreme, and Plaintiffs acknowledge repeatedly that there were numerous competing suppliers in

26   addition to Extreme from whom they could order.  The SAC fails to allege channel stuffing.

27       *Second*, Plaintiffs allege that Extreme's statements discussing its order backlog were

28   overconfident because they failed to predict the percentage of orders that would eventually convert

1    to revenue.  Importantly, Plaintiffs still do not allege that Extreme's reported backlog figures were

2    inaccurate—*i.e.*, that Extreme did not actually have the sales contracts that it reported.  Rather,

3    Plaintiffs claim that statements describing the backlog were misleading by omission because they

4    failed to disclose that it was unlikely to convert to revenue on a 1:1 basis.  But the SAC does almost

5    nothing to enhance the allegations that this Court has already dismissed.  The SAC cites the same

6    hearsay innuendo from the same FEs, but there is still not a single allegation that (1) any customer

7    canceled an order on Extreme's backlog or (2) that Extreme was aware of "double" or "triple"

8    ordering by *a customer of Extreme* contemporaneously with the challenged backlog statements.

9          *Third*, no matter how Plaintiffs characterize Extreme's sales processes, nothing about them

10   rendered any statements false or misleading.  The growth and demand statements are generic

11   expressions of corporate optimism (*e.g.*, "strong demand" and "impressive" growth) or forward-

12   looking statements that courts across the country routinely dismiss as non-actionable.  The backlog

13   statements are forward-looking statements and opinions about what might transpire in the future.

14   The standard for pleading falsity of these statements is much more rigorous.  Even were the Court

15   to accept Plaintiffs' channel-stuffing or backlog theories (it should not), each Challenged

16   Statement, considered individually, is not actionable under federal securities laws.

17         **No Scienter.**  In addition to failing to plead falsity, the SAC fails to allege the requisite

18   compelling inference of scienter on a defendant-by-defendant basis for each of the challenged

19   statements.  Plaintiffs still cannot plead any plausible motive for the alleged fraud, and it remains

20   undisputed that no Defendant engaged in suspicious trading.  To the contrary, Extreme's CEO

21   increased his stock holdings by more than 30% during the Class Period.  Plaintiffs still fail to show

22   that any Defendant was aware of "illicit" channel stuffing, let alone conduct sufficient to render

23   the growth and demand statements materially misleading; or order cancellations, double ordering,

24   or other problems that would render the backlog statements materially misleading when made.

25         **No Loss Causation.**  The SAC should also be dismissed because it fails to plead a causal

26   connection between any of the challenged statements and the losses Plaintiffs allegedly suffered.

27   Plaintiffs still cannot cite any analyst, auditor, or journalist who agrees with their theories that

28   Extreme's revenue growth was in any way related to channel stuffing or that Extreme knew its

order backlog was overstated each time it was reported.  Consistent with the rest of the industry, Extreme's stock price declined as supply chains and customer demand normalized after COVID.

**No Scheme or Control-Person Liability.**  Because Plaintiffs fail to plead that any misstatements were false, made with scienter, and/or caused losses, they also fail to plead liability for a fraudulent scheme.  Plaintiffs cannot simply repackage their Section 10(b) allegations, and absent a Section 10(b) violation, individual defendants cannot be liable under a control-person theory.  As the Court held, these secondary theories should be dismissed because Defendants did not make allegedly false or misleading statements about growth and demand or backlog.

## II.    BACKGROUND

### A.    Extreme Warned About The COVID-Era Global Supply Chain Meltdown

Extreme, a leader in cloud-driven networking solutions, is one of countless companies affected by the COVID supply chain crisis.  Ex. 6 at 3-4; ¶¶ 66, 302.  Extreme designs, manufactures, and sells wired and wireless network equipment and a leading cloud networking platform and applications portfolio, supplies for which were impacted when COVID "created disruptions and bottlenecks."  Ex. 6 at 10; ¶¶ 56, 66, 69.  At the same time, Extreme was receiving a *record number* of orders.  *See* Ex. 3 at 5.  Extreme thus continuously updated investors and disclosed the risks that heightened demand amid crumbling global supply chains posed to its business during the unpredictable COVID era.  The following warnings are emblematic:

- Extreme's required components and semiconductor chips are "currently in high demand with limited supply"; "shortages have been exacerbated by increased energy, raw material, and transportation costs," resulting in "higher [] costs" and "significantly longer than usual lead times for these components" which "could have a material adverse effect on [its] ability to meet customer orders."  Ex. 6 at 14; Ex. 14 at 15.

- If Extreme's "forecasts exceed orders" it "may have excess and/or obsolete inventory" and if its "orders exceed forecasts" it "may have inadequate supplies of certain materials and components" either of which "could have a material adverse effect on [its] ability to meet customer delivery requirements and to recognize revenue."  Ex. 2 at 14; Ex. 6 at 14; Ex. 14 at 16.

Investors understood and asked about the risks regarding Extreme's ability to deliver products and generate revenue, and Extreme was clear that the "ongoing supply chain constraints" had a "material" "revenue impact."  Ex. 1 at 13; ¶ 68.

Rising demand combined with limited supplies created sizeable order backlogs, so Extreme

began reporting backlog quarterly.  ¶¶ 66-71.  Its backlog represented "confirmed orders with a purchase order for products to be fulfilled and billed to customers."  ¶¶ 65, 69.  But it was not without its risks; Extreme disclosed its backlog's uncertainty, including potential cancellations:

- The "firm" orders in Extreme's backlog were all "**subject to possible rescheduling" or "cancellations by customers**," that it may allow "on an exception basis," and thus Extreme "**do[es] not believe [its] backlog… is necessarily indicative of actual revenues** for any future period." Ex. 6 at 9.  *See also* Ex. 2 at 9; Ex. 14 at 10.

- Extreme's revenues and results "have varied significantly in the past and may vary significantly in the future" due to "**product returns or the cancellation or rescheduling of orders.**" Ex. 2 at 20.  *See also* Ex. 6 at 20; Ex. 14 at 21.

-  "Current supply chain constraints" Extreme's caused backlog "to grow," though "**orders in our backlog could be cancelled by customers, impacting the accuracy of our revenue forecasting.**" Ex. 6 at 20.  *See also* Ex. 14 at 21.

- When Extreme announces new or enhanced products, "**customers may defer or cancel orders for [its] existing products**" and "ending sales of existing products may cause customers to cancel or defer orders"; this "could have a material adverse effect on [its] operating results by **unexpectedly decreasing sales, increasing inventory levels of older products and exposing us to greater risk of product obsolescence.**" Ex. 2 at 17; *see also* Ex. 6 at 17; Ex. 14 at 18.

**B.    Extreme Experienced Strong Demand Throughout The Class Period**

Extreme's revenue grew year-over-year, and it met or exceeded its original guidance, in six of the seven quarterly earnings reports issued during the Class Period.[1]  Even in the quarter Extreme reported a significant backlog decrease (4Q23), Extreme *exceeded* the guidance range of $340 to $350 million that it had announced several months before.  ¶ 557; Ex. 12; Ex. 13.

**C.    Extreme Reported Growing Backlog But Warned It Was Not Set In Stone**

During this period marked by economic uncertainty and supply chain disruptions, Extreme's backlog reached "record" highs.  *See, e.g.*, Ex. 3 at 5; Ex. 5 at 5.  But because backlog orders were not guaranteed, the Company did not "believe [the] backlog, as of any particular date is necessarily indicative of actual revenues for any future period"; indeed, the backlog represents orders that are *not* counted as revenue until the order can be filled.  *See* Ex. 2 at 9.

Extreme was also clear that it *expected* its backlog to shrink, and that it was continuously releasing the backlog.  In July 2022, Meyercord stated that Extreme "expect[s] backlog will begin to shrink by Q4 of fiscal '23"—and that it would "take more meaningful chunks out of that

---

[1] *See* Ex. 3; Ex. 5; Ex. 7; Ex. 10; Ex. 12; Ex. 13; Ex. 16; Ex. 18; Ex. 19.

1   backlog" in the second half of 2023.  Ex. 4 at 5, 15.  He added that Extreme released $20 million

2   of backlog based on "reengineering products to improve lead times for customers."  *Id.* at 5.

3           Extreme repeated similar disclosures many times.  In January 2023, Extreme disclosed that

4   the supply chain had "sign[s] of [] improvement" which would "definitely lead to being able to

5   ship more of the backlog," and that the backlog decrease "reflects accelerated product shipments."

6   Ex. 9 at 6, 8, 9, 14.  In April 2023, Extreme disclosed that the "supply chain environment is

7   improving significantly, and lead times are coming down faster than we expected"—and that it

8   expected "normalized level of backlog to be in the range of $75 million to $100 million by Q1

9   fiscal year '25."  Ex. 11 at 6.  Although backlog was "releasing at an accelerated pace," Extreme

10  *reiterated* rather than increased its annual guidance.  *Id*.  When asked if backlog reduction could

11  make some revenue "go away," Meyercord suggested it could:  while *end customer* order backlog

12  remained unchanged, "distributor ordering is driven by lead times and lead times came in faster

13  than we expected."  *Id.* at 8.  Thus, Extreme's distributors could "adjust their orders accordingly,"

14  and early ordering would "effectively go away" or older orders could be modified.  *Id.*

15          Consistent with Extreme's statements, the backlog did shrink due to "a combination of a

16  resumption in shipment of orders during fiscal 2023, after experiencing significant delays due to

17  supply chain constraints in prior years, and a reduction in distributor orders due to shorter lead

18  times."  Ex. 14 at 10.  In November 2023, Extreme reiterated that there was "a very high level of

19  backlog release into the channel" and that customers were "digest[ing]" "a lot of product [they]

20  put] into the channel."  Ex. 15 at 8.  Indeed, when Extreme observed impacts for the "whole

21  industry," it promptly disclosed a change in "customer buying patterns and macroeconomic

22  conditions."  *Id.* at 7-8.  In response, Extreme began "tempering [its] revenue outlook."  *Id.* at 7.

23  Extreme reduced its Q2 of FY 2024 guidance range shortly after the quarter ended by about 7.5%

24  based on "industry headwinds of channel digestion and elongated sales cycles," including large

25  sales "pushing out to future quarters"—and met this adjusted guidance.  Ex. 18 at 4; Ex. 19 at 4.

26          **D.     Plaintiffs File This Lawsuit, And The Court Dismisses It**

27          This Court dismissed Plaintiffs' FAC on August 15, 2025.  *See* Order.  The Court held

28  Plaintiffs must "at least establish with particularized facts that channel stuffing and other

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

manipulative sales practices were occurring" (including by alleging "specific transactions" and "specific communications") when there are no "undisputed facts showed that defendants were engaged in unsustainable channel stuffing that materially affected the companies' revenues." *Id.* at 14-15, 17-18. Plaintiffs fell short of this standard because they presented a "murky" timeline and supported their claims with FE allegations that were "implausible," "heavily reliant on hearsay," "discuss hypothetical terms," or were too generalized and described only limited transactions. *Id.* at 15-19. Plaintiffs' backlog allegations failed for similar reasons: the timeline was "murky" and the FE allegations lacked "specific [corroborating] details" like "specific examples of customers' double or triple booking and the timing of when these cancellations were occurring." *Id.* at 20-21. The Court did not reach Defendants' other arguments. *Id.* at 22.

Plaintiffs then filed the SAC. While they added length[2] and moved some sections around (*see* Dkt. 100), the core of Plaintiffs' claims remain the same. The sole additions to the SAC are excerpted "notes" and new allegations from five of their 11 FEs.

## III. ARGUMENT

To survive dismissal, Plaintiffs must meet the "more exacting pleading standards" of Rule 9(b) and the PSLRA. Order at 8. To plead **falsity**, Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Plaintiffs must allege particularized facts showing that the statements were materially "false or misleading at the time they were made," not based on hindsight. *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). "To properly plead **scienter**," the SAC must "state with particularity facts giving rise to a strong inference" (Order at 8-9) that "each [Individual Defendant] acted with the required state of mind." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 607 (9th Cir. 2014). Plaintiffs must also plead **loss causation** "with particularity," meaning facts "plausibly suggesting" that a corrective disclosure revealed the truth "concealed by" alleged misstatements, and that disclosure "caused the company's stock price to decline." *Espy v. J2*

---

[2] Judge Chhabria recently noted that 100 pages is "incredibly [] long" for a securities class action complaint. *See* Order (Dkt. 263), *Weston v. Docusign, Inc.*, Case No. 22-cv-00824-VC (N.D. Cal. Apr. 29, 2025). The SAC is 187 pages.

*Glob., Inc.*, 99 F.4th 527, 540 (9th Cir. 2024).  Finally, Plaintiffs' **scheme liability** claim requires the same elements as a misstatement-based claim, as well as allegations that each Defendant "engaged in conduct that had the principal purpose and effect of creating a false appearance of fact" in furtherance of a "scheme to defraud."  *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008).  Because the SAC fails to plead each of these elements with particularity, it should be dismissed.

### A.    Plaintiffs Do Not Allege A Material Misstatement

#### 1.    The Growth And Demand Statements Were Not Misleading

##### a.    Plaintiffs Still Fail To Allege Channel Stuffing

The Court dismissed the growth and demand statements because Plaintiffs "failed to allege manipulative sales tactics including channel stuffing."  Order at 13; *see also* Statements 1-6, 8-12, 15-19, 27-30, 33-35, 37, 40, 43, 45-46, 48, 51.  Though the Court directed Plaintiffs to "provide more particularized allegations" (Order at 19), the SAC falls short.  Once again, Plaintiffs rely on vague allegations attributed to anonymous FEs to supply support for their claims.  Plaintiffs were unable to track down any new FEs, and six of the original 11 did not supplement their allegations.  ¶ 24.  As for FEs 1, 2, 4, 7, and 11, Plaintiffs' supplemented allegations do not move the needle; if anything, the SAC highlights Plaintiffs' failure to state a claim based on alleged channel-stuffing.  Plaintiffs fail to support their claims of an "illicit" scheme, fail to allege any distributors in fact returned product, and fail to allege any alleged deals with specific facts.

**Plaintiffs do not adequately allege "illicit" sales practices.**  After conceding to the Court that Plaintiffs were *not* alleging Extreme's sales practices "were illegal, i.e., illicit" because that would involve a heavier pleading burden (Tr. at 37), Plaintiffs now claim Defendant Brown "came up with an *illicit* channel stuffing plan" in March 2022, which fell apart when "distributors stopped acquiescing to Extreme's demands in 2023."  ¶¶ 25, 98.  This new theory apparently stems from "contemporaneous notes" FE-1 purportedly took at meetings before the Class Period (¶ 8), which Lead Counsel had at the time of the FAC, *see* FAC ¶ 108, but only now include in their allegations.  According to Plaintiffs, certain screenshotted snippets from these notes—conveniently excerpted from notebook pages not included with the SAC—now show the previously "murky" timeline for

Defendants' "launch of the manipulative scheme to stuff the channel." ¶ 25.

FE-1 claims that in March 2022, Extreme overhauled its "first in, first out" system and began prioritizing distributors who agreed to "buy large amounts of low- or no-demand products." ¶ 101. These distributors bought "unwanted and unneeded products" to "maintain" or "move up their place in the backlog" for "wanted" products, *id.*, in exchange for the option to "return a portion of [the product] the next quarter," ¶ 164. The crux of FE-1's allegation—that Extreme prioritized distributors who would "play ball" to "keep [their] place in line" for inventory during the COVID supply crunch (¶ 156)—has been considered and rejected as inadequate to plead channel stuffing by the Court. *See* Order at 16-17. And the dramatic shift in the *timing* of FE-1's channel stuffing conspiracy theory—which the SAC posits commenced five years later than alleged in the FAC, based on notes that FE-1 supposedly had in his possession the entire time but were not included in the FAC—is puzzling, to say the least, and renders it unreliable.

But even if the Court were inclined to take the remixed version of FE-1's allegations at face value, they fall far short of pleading an "illicit channel stuffing plan," ¶ 98. In the Order, the Court measured Plaintiffs' channel-stuffing allegations against their preferred cases, *Plantronics* and *Murphy*, because Plaintiffs assured the Court that they were *not* alleging "illicit" channel-stuffing. Order at 14-15. But this time, Plaintiffs are embracing their claim that Extreme launched an "illicit" scheme in May 2022. That means their allegations must be held to the stringent pleading standards of *Waterford Twp. Police v. Mattel*, 321 F. Supp. 3d 1133 (C.D. Cal. 2018) and *In re ICN Pharm., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055 (C.D. Cal. 2004).

FE-1's notes claim that Extreme implemented a strategy for allocating scarce supply during an unprecedented supply-chain crisis—not illicit stuffing. Indeed, the supposed scheme benefitted the very same distributors whom FE-1 claims were somehow coerced into buying unwanted product. *See Mattel*, 321 F. Supp. 3d at 1148 (no falsity where plaintiff's "allegations suggest that there was a legitimate business reason" for purported stuffing). Plaintiffs' own allegations confirm that the entire industry, including Extreme's distributors, faced a growing backlog due to "the constrained supply chain environment." ¶ 280; *see also* ¶ 126 ("Westcon, ScanSource and Jenne had a 'very big backlog'" in late 2022); ¶¶ 402, 406, 416 (Defendants disclosing supply-chain

constraints).  And they confirm that there *was* "strong demand" for Extreme's product: distributors were so eager for Extreme's backlogged products that they were willing to spend millions on purportedly "unwanted" products to gain marginal priority for backlog shipments.  *See, e.g.*, ¶ 123 (alleging Westcon and Jenne "were willing to purchase Extreme's unneeded inventory in order to move up in line for new product and not be 'decommitted'"); ¶ 156 (explaining "TD Synnex would [] buy product it did not need to keep its place in line").  Because Plaintiffs' allegations concern "products that customers actually wanted to buy," Defendants' growth and demand statements were not misleading.  *Yaron v. Intersect ENT, Inc.*, 2021 WL 12103005, at *6 (N.D. Cal. Jan. 22, 2021) (dismissing channel-stuffing claims).

**Plaintiffs do not allege any returns.**  To be sure, Plaintiffs will say demand was not "organic" because distributors could return "unwanted" products.  *E.g.*, ¶¶ 130, 132, 161.  But this theory fails on two levels.  *First*, Extreme disclosed these so-called deals, explaining that its distributors had the "right to return a portion of inventory," Ex. 6 at 8; as every FE acknowledged, these were not nefarious or secretive arrangements.  *See Hunter v. Elanco Animal Health Inc.*, 2022 WL 3445173, at *19 (S.D. Ind. Aug. 17, 2022) (that "Defendants repeatedly discussed" sales practices and rebates is the "opposite of an undisclosed scheme to defraud shareholders").

*Second*, as with the deficient FAC, not a single FE alleges that any customer actually returned anything—let alone who, when, or in what quantity.  *See In re Spectrum Brands, Inc. Sec. Litig.*, 461 F. Supp. 2d 1297, 1309 (N.D. Ga. 2006) (dismissing channel-stuffing claim where complaint was missing  "allegations of any specific returns").  To compensate for this glaring omission, FE-1 alleges Brown prevented distributors from exercising their contractual return rights.  *See* ¶ 168.  But he identifies no concrete examples of this occurring; at most, FE-1 claims that in 3Q22 Brown wanted TD Synnex to *get rid of* its stock rotation clause (¶ 177)—even though the FEs' entire theory is that Extreme *offered* these clauses to facilitate the so-called stuffing (¶¶ 132, 164).  *See Applestein v. Medivation, Inc*., 861 F. Supp. 2d 1030, 1038 (N.D. Cal. 2012) (CW statements unreliable where they contradict one another).

Without a single example of either returns or return refusals, Plaintiffs resort to speculating that Extreme was "successful in stalling" its distributors from rotating inventory because it

1    reported a $131,950,000 deduction for product-return allowances at the end of FY2024.  ¶ 178.

2    That figure is a gross distortion: net returns were only $52 million, representing a marginal $17

3    million increase over 2023 and less than 5% of Extreme's total revenues.  *See* Ex. 20 at 63.

4    **The SAC highlights the FEs' lack of specificity.**  Even setting aside Plaintiffs' failure to

5    allege core features of their newly reinstated "illicit" stuffing theory, the SAC still fails to provide

6    the details the Court requires.  Plaintiffs' new FE allegations remain untethered to the Challenged

7    Statements, the relevant time period, and any companywide directive.

8    For example, the Court concluded that FE-4's original allegations about a deal with

9    Westcon were based on hearsay and needed more details—like a clearer timeline and specific

10   communications—to survive the pleading stage.  Order at 17-18.  But FE-4 alleges neither: his

11   "timeline" is "sometime between April and end of June 2022," ¶ 131, and he still admits neither

12   he nor his "source" (a Westcon Vendor Business Lead) were privy to "specific communications"

13   because neither attended the dinner where the deal was discussed.  ¶ 129.  In any event, affixing

14   numbers to this "deal" adds nothing in light of his failure to allege that Westcon enforced its right

15   to return product and whether that return (if it happened) impacted Extreme's revenues and for

16   which quarter.  *See W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F.

17   Supp. 3d 622, 640 (N.D. Ill. 2020) (no falsity where plaintiffs alleged improper promotional

18   pricing but did not "allege any facts about returns").  FE-4's other new allegation—purported

19   awareness of "similar transactions between Extreme and Jenne and Extreme and ScanSource"—

20   is even worse.  ¶ 135.  He claims these deals were likewise discussed at dinners he did not attend

21   but cannot even say how he gained "his understanding" that they occurred—and he provides no

22   specifics about the alleged "similar transactions."  *See ICN*, 299 F. Supp. 2d at 1062 (listing names

23   of "two distributors" insufficient without allegations of "specific transactions, specific shipments,

24   specific customers, specific times, or specific dollar amounts").

25   FE-2 does not add anything that amounts to "widespread manipulative sales practices,"

26   either.  Order at 18.  The Court considered FE-2's original description of a PC Solutions

27   transaction, but noted other allegations were lacking in particulars.  *Id.*  Other than adding details

28   around the alleged PC Solutions deal, FE-2 now claims that for "some amount over $700,000,"

Synergetics was "willing to pull in early orders for incentives even though they did not have customer purchase orders." ¶ 208. FE-2 provides no information about *when* this deal closed (if in fact it did), *what* incentives were offered, *what* the final price was, and *whether (*and *by how much*) the scheme artificially inflated Extreme's earnings—falling well short of the *Mattel* standard. *See In re Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 4555794, at *18 (C.D. Cal. May 23, 2008) (rejecting CW allegations about pull-in scheme where complaint failed to "identify overall volume" and other details about orders). Nor does FE-2 offer new details around his recycled allegation that there was a "Step CG deal which occurred sometime around 2021 or 2022,"— potentially before the Class Period—"that the value of the deal was for $1 million, and that it happened 'more than once, for years.'" ¶ 225; *see also Int'l Rectifier*, 2008 WL 4555794, at *18 (mere allegation that company would "ship like crazy" at end of quarter insufficient).

FE-11's sole new allegation is just as deficient. He asserts that "around Summer 2022," Extreme incentivized an unnamed EMEA partner to order extra access points for future discounts. ¶ 226. But as with FE-11's FAC allegation, there are not "any additional details of the transaction" other than a vague timeline and the quantity (but not price) involved. Order at 18.

Finally, the only "specific" transaction FE-1 offers contradicts his own theory and represents a deal that *did not* occur. He claims that TD Synnex purportedly agreed to "take on other unneeded Verizon inventory," ¶ 115, but then concedes that it "ultimately did not agree to this purchase," ¶ 122—directly contradicting his theory that Extreme could dictate terms to its distributors. Of course, FE-1 cannot offer any other specifics: if they existed, those details would be "heavily reliant on hearsay." Order at 17; *see also Das v. Unity Software Inc.*, 2024 WL 1141733, at *9 (N.D. Cal. Mar. 15, 2024) (pre-class period allegations from CWs "do not establish the falsity of the statements made during the Class Period").

b.    Extreme's Revenue Numbers Were Not Misleading

Plaintiffs challenge portions of statements reporting the amount of Extreme's revenue growth, most of which were unchallenged in the FAC. *See* Statements 1, 6, 12-15, 17, 22, 26, 32-34, 36, 42-43, 49, 51, 53. These challenges fail in the first instance because statements that "accurately describe historical results, without implicating the causes of those results," are "not

1    actionable." *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *11 (N.D. Cal. 2020). Extreme

2    has not restated its financial statements or been accused of any accounting violations. *See Deason*

3    *v. Super Micro Comput., Inc.*, 2017 WL 4355128, at *2 (N.D. Cal. Sept. 29, 2017) (no

4    misrepresentation or omission where no restatement). That is particularly true because Extreme's

5    independent auditor consistently signed off on Extreme's financials. Ex. 2 at 48-49, Ex. 9 at 48,

6    Ex. 14 at 48, Ex. 20 at 48-49; *Turner v. MagicJack VocalTec, Ltd.*, 2014 WL 406917, at *9

7    (S.D.N.Y. Feb. 3, 2014) (no falsity where "auditor issued opinions" that financial statements were

8    prepared consistent with GAAP). On this ground alone, the statements are not actionable. In any

9    event, Plaintiffs' challenge fails because it hinges on their insufficient channel-stuffing allegations.

10                              c.    Corporate Optimism Is Not Actionable

11        Plaintiffs' amendment does not change that Defendants' "general statements of optimistic

12    demand are non-actionable puffery" and "fail to rise to more than opinions" about Extreme's

13    business. *In re SunPower Corp. Sec. Litig.*, 2018 WL 4904904, at *4 (N.D. Cal. Oct. 9, 2018).

14        Take Defendants' statements about "strong demand" for Extreme products. *See, e.g.*,

15    Statements 2-3, 5-6, 8-9, 12, 17-18, 27, 29, 33, 37, 45. Courts routinely dismiss challenges to

16    nearly identical statements as non-actionable corporate optimism that does not affect investment

17    decisions. *See, e.g.*, *In re SunPower Corp.*, 2018 WL 4904904, at *4 ("strong demand" dismissed);

18    *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal.

19    2012); ("Strong demand metrics" and "demand indicators are strong" non-actionable); *In re*

20    *LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1050 (N.D. Cal. 2007) ("Consumer

21    demand … is more vibrant than ever" non-actionable); *In re Peritus Software Servs., Inc. Sec.*

22    *Litig.*, 52 F. Supp. 2d 211, 220 (D. Mass. 1999) ("unprecedented market demand" dismissed).

23        The same is true for Defendants' statements about Extreme's "strong" or "impressive"

24    growth (Statements 1-2, 4-5, 11, 15-17, 19, 28, 33, 37, 43, 46, 48, 51). *See, e.g.*, *In re Solarcity*

25    *Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 995 (N.D. Cal. 2017) ("optimistic about our growth,"

26    "continued strong growth," "amazing quarter," "incredibly strong sales" non-actionable); *Juniper*

27    *Networks*, 880 F. Supp. 2d at 1063 (company's "growth rate," "excellent results," and "significant

28    sales gains" not actionable). This is particularly true considering "there is no dispute that, at the

1    time [the Challenged Statements] were made," Extreme's business *was* growing. *In re Align Tech.,*

2    *Inc. Sec. Litig.*, 2021 WL 1176642, at *3 (N.D. Cal. Mar. 29, 2021).

3                    d.    <u>The PSLRA Safe Harbor Protects Growth and Demand Statements</u>

4            Several statements about Extreme's growth and revenue are also "forward-looking on their

5    face" because they convey Defendants' expectations for demand or were made in the context of

6    issuing guidance. *In re Solarcity*, 274 F. Supp. 3d at 990-92; *see, e.g.*, Statements 1, 3, 6, 9-10,

7    15-16, 19-20, 23, 27, 29-31, 34-35, 37-38, 40, 44, 46, 48. These statements are protected by the

8    PSLRA's safe harbor, which immunizes from liability forward-looking statements if they are

9    either (1) accompanied by meaningful cautionary language, ***or*** (2) made without "actual

10    knowledge" of falsity. 15 U.S.C. § 78u-5(c)(1); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190 (9th

11    Cir. 2021). Both prongs apply, but either one is sufficient to require dismissal.

12            *First*, meaningful cautionary language accompanied the statements. Extreme prefaced its

13    press releases and public filings with warnings that they contain "forward-looking statements"

14    upon which investors "should not place undue reliance." *E.g.*, Ex. 6 at 2. And it warned that

15    "[i]mportant factors could cause actual results to differ materially from the expectations reflected

16    in" such forward-looking statements, including factors described in Extreme's SEC filings. *Id.*;

17    *see also, e.g.*, Ex. 21 at 2. Those filings, in turn, detailed company-specific risks relating to its

18    financial results and operations. *Supra* § II.A, C. Those risks included that Extreme could

19    "experience challenges or delays in forecasting, generating or recognizing revenue for a number

20    of reasons," like Extreme's "ability to forecast demand for [its] products, which in the case of

21    lower-than-expected sales, may result in excess or obsolete inventory." Ex. 14 at 21. Extreme

22    similarly warned "[s]upply chain constraints have exacerbated" the potential to lose sales if

23    suppliers fell short—and that their "suppliers and contract manufacturers have been negatively

24    affected by … the COVID-19 pandemic," Ex. 6 at 2, 15.

25            *Second*, the statute protects the statements for the independent reason that Plaintiffs have

26    not alleged facts showing Defendants made the statements with scienter (*see infra*), let alone actual

27    knowledge they were false. *See, e.g.*, *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 n.18 (9th

28    Cir. 2002) ("actual knowledge" is "stricter standard" than scienter). Indeed, the SAC says nothing

about whether the Individual Defendants knew Extreme's revenues would increase because of channel stuffing (and not for one of the myriad other reasons revenue can grow).

### 2.    The Backlog Statements Were Not Misleading

Plaintiffs once again challenge multiple statements concerning Extreme's backlog.  *See, e.g.*, Statements 2, 5-10, 15, 17-21, 23-25, 27-28, 30-31, 34-35, 38-41, 44, 46-47, 50, 52, 54.  The Court previously dismissed all of Plaintiffs' backlog allegations on the ground that Plaintiffs failed to allege them "with particularity."  Order at 21.  Plaintiffs have done little to update this claim; they still allege that Defendants' statements about the strength of Extreme's backlog were misleading because rather than reflect "end user demand," the backlog comprised of "duplicate and triplicate orders that would assuredly evaporate."  ¶ 3.  In addition to failing to correct the problems previously identified by the Court, the SAC's backlog allegations are at odds with Plaintiffs' modified channel-stuffing theory: if Extreme's distributors were so keen to move up Extreme's backlog list that they would buy excess inventory that they didn't actually want, then Defendants had every reason to believe Extreme's backlog *was* firm and *did* reflect "end user demand."  That is why Plaintiffs' new FE allegations do not bolster their old ones: they still fail to allege contemporaneous falsity, and the statements are not actionable in any event.

#### a.    The SAC Still Fails to Plead Contemporaneous Falsity

In the FAC, Plaintiffs relied on FEs 1, 2, 3, 5, and 7 to support their challenge to the backlog statements.  Order at 20.  But the Court said those FEs' allegations were not sufficiently "particularized" to allege falsity.  *Id.* at 20-21.  The SAC fares no better; in fact, Plaintiffs concede that FE-3 and FE-5's allegations remain insufficient by not updating them.  *See* ¶ 24.  And FEs 1, 2, 7's "new" allegations are likewise irrelevant: Plaintiffs still fail to allege any Challenged Statement "directly contradict[ed] what the defendant[s] knew at that time" or omitted material information.  *Weston Fam. P'Ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022).

**FE-1**—who was not at the Company for the vast majority of the Class Period—supplies new allegations that contradict themselves.  *First*, he claims that "Defendants Rice and Brown were refusing to cancel backlog orders, which inflated Extreme's backlog."  ¶ 314.  He alleges zero details as to how he learned this "fact"—nor could he, considering Plaintiffs do not allege he

had "any involvement in the reporting or calculating" of Extreme's backlog.  *Nat'l Junior Baseball League v. Pharm. Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 542-43 (D.N.J. 2010).  Even if true, this speculative addition *supports* Defendants' statements about the backlog's strength: if backlog orders—which could be cancelled only on an exception basis—were not getting cancelled, then Defendants had every reason to be confident in Extreme's backlog.  *See Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *9 (N.D. Cal. Nov. 16, 2020) (dismissing where "CWs' statements appear to support, rather than contradict, the Company's statements").

But then FE-1 confusingly claims distributors *did* cancel their backlog orders even in 2023 (without explaining how they allegedly overrode Rice and Brown).  ¶ 348.  Since FE-1 left before 2023, he bases this claim on a 2022 conversation with two TD Synnex contacts, "who indicated to him that they *wanted* to cancel their backlog" orders.  ¶ 349.  FE-1 does not say whether these contacts did in fact cancel their orders, in what magnitude, or when.  Nor does he say whether *other* distributors "wanted" to cancel their orders, if they in fact did, in what magnitude, or when.  *See* Order at 20; *see also Spectrum*, 461 F. Supp. 2d at 1313 ("mere allegation" that customer "requested" return, without alleging return was accepted, was insufficient).

**FE-2** adds almost nothing to his backlog allegation: before, he claimed "it was known within the Company that there were many backlog orders known to be duplicative."  FAC ¶ 274.  Now he adds vague hearsay: unnamed "customers" told him "they were double and triple booking orders."  ¶ 315.  He still does not say what customers, in what quantities, when, or whether these customers cancelled their backlog orders.  *See Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772, 788 (N.D. Ohio 2021) (CW who "heard from an unnamed sales director that an unnamed university" wanted to cancel order did not support falsity of backlog statements).

That leaves Plaintiffs with **FE-7**.  The Court said the timeline of his meeting—in which he purportedly learned that Extreme hedged 10% cancellations—was "murky."  Order at 20.  Now FE-7 recalls that the meeting occurred "between July and September 2022."  ¶ 282.  The problem is that, if true, the alleged discussion refers to Defendants' forward-looking hedge: "the Company was assuming that at least 10% of its backlog orders *would be cancelled*."  ¶ 282.  But Plaintiffs' challenges to backlog statements relate to cancellations *as of the statements' date*—and FE-7's

1    story does not contradict those statements.  *See In re Talis Biomed. Corp. Sec. Litig.*, 2022 WL

2    17551984, at *27-28 (N.D. Cal. Dec. 9, 2022) (dismissing where complaint "does not allege any

3    contemporaneous facts showing" statements were "false or misleading when made").

4         For instance, Plaintiffs challenge Defendants' July 2022 statements that Extreme

5    "received negligible cancellations **to date** of less than 1% of bookings" (¶ 395) and that backlog

6    was "high quality" (¶ 402).  Even crediting FE-7's newfound memory, he says nothing about how

7    many orders had been cancelled *as of July 2022* or whether that figure was discussed at the alleged

8    meeting.  *See Belodoff v. Netlist, Inc.*, 2008 WL 2356699, at *11 (C.D. Cal. May 30, 2008)

9    (challenged statements were temporally "disconnected" from alleged omissions).  Plaintiffs'

10   challenge to Meyercord's October 2022 statement that the "vast majority" of backlog "is

11   comprised of orders with current delivery request dates" (¶ 416) fails for the same reason—nothing

12   from FE-7's meeting contradicts that statement.  And the same is true for Thomas's October 2022

13   statement that "we're not really seeing a change in the [one-off cancellations], and *they remain* at

14   a fraction of 1%."  ¶ 421.  FE-7's account is even further afield for statements that post-date the

15   alleged meeting by several months.  ¶ 426 (November 2022: "we're not seeing de-books"); ¶ 437

16   (January 2023: the "majority of our backlog consists of the latest generation universal products");

17   ¶ 458 (May 2023: "the vast majority of our backlog is related to this kind of end user demand

18   project-based business and we don't see double ordering"); ¶ 464 (August 2023: "We have the

19   benefit of a healthy backlog of customer orders with request dates that spread fairly evenly through

20   the end of our fiscal year."); ¶ 470 (August 2023: "90-plus percent [of backlog] is all customer

21   orders").  Plaintiffs fail to allege a "contemporaneous fact" showing the falsity of these statements.

22   *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *18 (N.D. Cal. Feb. 12, 2015) (CW account

23   did not support falsity for statements occurring "at least three months after the meeting").

24        FE-7's so-called "acid test," previously alleged in the FAC, does not cure this deficiency,

25   and the new "details" only highlight its logical fallacies.  ¶ 286.  FE-7 allegedly called

26   "approximately five" CIOs of unspecified companies—none of which were current customers of

27   Extreme—and they allegedly told him that they placed duplicate orders with two or three

28   competitors for unspecified components that may or may not resemble those on Extreme's

1  backlog. ¶¶ 286-87.  From this, Plaintiffs conclude that "up to 66% of Extreme's backlog consisted

2  of phantom orders."  ¶ 16; *see* ¶ 288.  The PSLRA exists to weed out specious allegations like this.

3          FE-7's hearsay recollection of three "important deals" that "would not come through" is

4  deficient for similar reasons.  ¶¶ 296-300.  Aside from failing to identify actual customers, actual

5  cancellations (rather than speculation that deals would be cancelled), or the basis for his

6  "understanding" that the deals were more than $5 million each, FE-7 does not say any *Defendant*

7  knew about these deals (only "employees sitting two or three steps below the [leadership team],"

8  ¶ 298) or that the deals "remained in [Extreme's] backlog."  *ViewRay*, 556 F. Supp. 3d at 788.

9          Nor do FE-7's allegations contradict Defendants' protected forward-looking opinions

10  about their confidence in the backlog or the backlog's value.  In fact, his claim that Defendants

11  rejected his suggestion that Extreme should use a *higher* "hedge" figure (¶ 288) *supports*

12  Defendants' confidence.  *See Dolly v. GitLab Inc.*, 2025 WL 2372965, at *12 (N.D. Cal. Aug. 14,

13  2025) (no falsity where FE statements supported Defendants' statements).

14          Finally, any claim Defendants had a duty to disclose more about the backlog's composition

15  fails because Defendants *did* disclose the backlog's uncertainty.  Defendants repeatedly disclosed

16  that they "do not believe [Extreme's] backlog, as of any particular date is necessarily indicative of

17  actual revenues for any future period."  Ex. 6 at 9; Ex. 2 at 9; Ex. 14 at 10.  Extreme further warned

18  that it did "not have binding purchase commitments" from its channel partners, Ex. 6 at 18, and

19  that orders could be cancelled for various reasons (*id.* at 17, 20)—including that "customers may

20  defer or cancel orders for [its] existing products" when Extreme announces new or better products

21  (Ex. 2 at 17).  *See McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *11 (N.D. Cal.

22  Aug. 7, 2019) (dismissing where defendant "disclosed exactly what" plaintiffs alleged it omitted).

23                    b.      The PSLRA Safe Harbor Protects Backlog Statements

24          Most of the challenged backlog statements are subjective opinions conveying Defendants'

25  "confidence" that at some point, the backlog would convert to revenue.  *See, e.g.*, Statements 6-7,

26  9-10, 15-16, 19-20, 23-24, 27, 29, 31, 34, 35-38, 40, 44, 46, 46-48.  The PSLRA safe harbor thus

27  applies.  *See supra* § III.A.1.d; *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 947 (N.D. Cal.

28  2010) (that defendants were "confident" or "believed" that backlog would convert to revenue held

forward-looking); *Mattel*, 321 F. Supp. 3d at 1150 ("increases our confidence," "feel pretty confident," and "can say with a degree of confidence that we're poised for much more improved growth" held forward-looking).

Like the demand statements, meaningful cautionary language accompanied the backlog statements. 15 U.S.C. § 78u-5(c)(1)(A). Extreme specifically warned that customers could cancel orders its backlog, which would impact the accuracy of its revenue forecasting. Section II.C. It also warned against other scenarios in which customers may cancel or reschedule orders. *Id.* And as with the demand statements, these statements fail regardless, because Plaintiffs have failed to allege "actual knowledge of falsity." *See supra* § III.A.1.c; *see also infra* § III.B.

c.   The Backlog Statements Are Non-Actionable Opinions

Finally, Plaintiffs' challenge to Defendants' expressions of confidence about Extreme's outlook and backlog fail because those are opinion statements. *E.g.*, Statements 6-7, 9-10, 13, 15-16, 20, 23-24, 27, 32, 34, 37-38, 43-44, 47-50, 54. Defendants' statements about the backlog's strength are their "subjective assessments and do not guarantee the closure of every deal on the pipeline." *Sayce v. Forescout Techs., Inc.*, 2021 WL 1146031, at *5 (N.D. Cal. Mar. 25, 2021); *see also In re Neustar Sec. Litig.*, 83 F. Supp. 3d 671, 683 (E.D. Va. 2015) ("an expression of confidence is best characterized as an opinion"). Plaintiffs must therefore allege (i) "the speaker did not hold the belief she professed and that the belief is objectively untrue"; (ii) "the supporting fact the speaker supplied is untrue"; or (iii) "facts going to the basis for the issuer's opinion," whose omission makes the statement at issue misleading to a "reasonable person reading the statement fairly and in context." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-616 (9th Cir. 2017). They allege none of this.

To start, Plaintiffs allege no facts suggesting any Defendants disbelieved their opinions or that those opinions were objectively false, i.e., that any Defendant did not feel confident about Extreme's future. *See, e.g.*, *Costanzo v. DXC Tech. Co.*, 2021 WL 5908385, at *11 (N.D. Cal. Dec. 14, 2021) (plaintiffs failed to allege facts that "rendered false Defendants' belief"). And while Plaintiffs try to allege Extreme's backlog was not firm, that fails for the reasons above. *See supra* § III.A.2; *see also, e.g.*, *Markette v. XOMA Corp.*, 2017 WL 4310759, at *6 (N.D. Cal. Sept.

28, 2017) (dismissing opinion statements where plaintiffs alleged only that defendants' "optimism turned out to be misplaced"). Finally, Plaintiffs do not allege that any Defendant omitted material facts underlying the basis for those opinions that conflict with what a reasonable investor would take from the statement—and ignore Extreme's robust disclosures about its backlog. *See, e.g.*, *Align Tech.*, 856 F.3d at 618-19 (omissions theory of opinion failed in light of defendants' public disclosures). In fact, Plaintiffs do not allege any facts at all about what Defendants knew when they made the Challenged Statements. *See generally* ¶¶ 356-444.

### 3.    SOX Certifications Remain Not Actionable

As before, Plaintiffs challenge Defendants' SOX certifications. *See* Statements 13, 22, 32, 36, 49, 53. The Court held these statements' "actionability" tied to Plaintiffs' success in alleging "falsity as to manipulative sales practices and backlog allegations." Order at 22. Because Plaintiffs still fail to allege falsity, these challenges fail too. Plaintiffs' addition of certain revenue statements also fails because they fail to allege any revenue reporting was false. *Supra* § III.A.1.b.

### B.    Plaintiffs Do Not Allege Scienter

Plaintiffs' claims also fail because the SAC does not state facts "particular enough to raise a strong inference of conscious or reckless disregard." Tr. at 24:15-18. Here, the "innocent alternative explanation"—that Defendants altered their strategy in response to an unprecedented supply chain crisis and tried to keep investors informed the entire time—is "more plausible," so the case "cannot go forward." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 419 (9th Cir. 2020).

### 1.    Plaintiffs Do Not Allege A Plausible Motive

The most important fact for Defendants' state of mind remains unchanged in the SAC: Plaintiffs still have not identified any motive for Defendants to commit fraud. Indeed, Defendants did not benefit from the alleged fraud. Plaintiffs admit that Meyercord, Thomas, and Tate received incentive awards comprising stock and stock options (*id.* ¶ 579) but allege *no* stock sales, which supports an "inference of innocence." *Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018). That Meyercord's holdings *increased* during the Class Period, ¶ 583, only heightens the innocence inference. *See Cai v. Eargo, Inc.*, 2025 WL 66041, at *2 (9th Cir. Jan. 10, 2025) (CEO and CFO *increasing* stock holdings "contradicts the inference of scienter"). Plaintiffs still fail to explain

1    why cash bonuses in 2023 would motivate Defendants to partake in a nefarious scheme in March

2    2022 (or years earlier, as alleged in the FAC).  ¶ 95.

3          While many of Plaintiffs' scienter theories remain unchanged in the SAC, Plaintiffs allege

4    one new theory based solely on FE-1 and the notes he purportedly already gave Lead Counsel

5    (FAC ¶¶ 108, 139): Defendants "orchestrated an illicit channel stuffing scheme" to get "into the

6    company [the] # the street expects."  ¶ 489.  As an initial matter, trying to "meet analyst and market

7    expectations" is a "general corporate motive, and is not sufficient to give rise to a strong inference

8    of scienter."  *In re Great Atl. & Pac. Tea Co., Inc., Sec. Litig.*, 103 F. App'x 465, 469 (3d Cir.

9    2004).  And to that end, because Plaintiffs do not attach the notes to the SAC, the Court is left to

10   assume that Brown's purported question is connected to fraud rather than a "generally applicable"

11   goal.  *In re Eargo, Inc. Sec. Litig.*, 2023 WL 5663154, at *2 (N.D. Cal. Aug. 31, 2023) ("newly

12   added documents" identifying "generally applicable" risks were not "smoking gun evidence of

13   fraud and scienter").  Even accepting this connection, FE-1's notes show, at most, a new strategy

14   to deal with a supply-chain crisis, not an intent to deceive investors.  *See* ¶¶ 491-96; *supra* § III.A.1.

15   Compounding these problems, Plaintiffs claim Rice and Brown drove the alleged scheme (¶ 492),

16   but they fail to allege any concrete motive for either of them to meet market expectations.  Instead,

17   Plaintiffs ask the Court to accept that the Company's CEO and CFOs each risked their jobs and

18   reputations to go along with an "illicit scheme," all so they could secure certain relatively modest

19   (as a percentage of their total compensation) cash bonuses for FY2023.  ¶¶ 572, 582-83; *see also*

20   *Rigel*, 697 F.3d at 884 (it is "common for executive compensation" to be linked to performance).

21          **2.      The Remaining FEs Do Not Support A Strong Inference of Scienter**

22          Several FEs (*e.g.* FEs 3-6 and 8-11) are low-level employees who "never interacted with

23   [Defendants]" and thus lack "personal knowledge of [Defendants'] decision-making to show

24   scienter."  *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1134 (9th Cir. 2025).  The same is true for FEs

25   who did allegedly speak with Defendants.  While Plaintiffs' star witness **FE-1** "worked closely

26   with Defendant Brown," ¶ 99, and claims to have provided evidence (¶¶ 489-505), he cannot speak

27   to any Defendant's "contemporaneous knowledge" "when [the] statements were made."[3]  *Avila v.*

28

---

[3] Defendant Brown did not make any Challenged Statement.

1 *LifeLock Inc.*, 2016 WL 4157358, at \*4-5 (D. Ariz. Aug. 3, 2016) (rejecting CWs who did not

2 discuss relevant issues with defendants during class period).  In any event, FE-1 is inconsistent

3 and lacks credibility.  He claims Brown "never wanted to put anything into writing or have his

4 name on anything."  ¶ 597.  But elsewhere, he describes a June 2022 email "written by Defendant

5 Brown" proposing a "new Company-wide policy" (¶¶ 149, 172).  *See In re Downey Sec. Litig.*,

6 2009 WL 2767670, at \*6 (Aug. 21, 2009) (discrediting CWs where one claimed management

7 refused to put guidelines in writing while others stated guidelines "were available by e-mail").

8     **FE-7** allegedly "expressed [] concerns" about the backlog "hedge" figure Extreme was

9 supposedly budgeting to the ELT (¶ 540), but does not state any facts suggesting that any

10 Defendant knew that any of Extreme's customers were cancelling backlog orders or double or

11 triple ordering when they made the challenged statements.  And "the mere fact that an employee

12 raised concerns absent facts that Defendants ever accepted the views on which those concerns were

13 based is not sufficient to show that Defendants knew their statements were false." *Sneed v. AcelRx*

14 *Pharms., Inc.*, 2024 WL 2059121, at \*12 (N.D. Cal. May 7, 2024).

15     **FE-2**'s allegations similarly say nothing about scienter.  He claims he "received occasional

16 calls from Defendant Meyercord" (¶ 239), but he does not say "when [these] alleged

17 conversations" took place or what they specifically discussed.  *In re Medicis Pharm. Corp. Sec.*

18 *Litig.*, 689 F. Supp. 2d 1192, 1210 (D. Ariz. 2009).  And his exit interview with Rice pertained to

19 FE-2's relationship with his superior, not any Challenged Statement's subject.  *See* ¶ 591.

20     **3.    Alleged Knowledge Does Not Support Scienter**

21     Plaintiffs otherwise resort to boilerplate allegations about public statements, internally

22 circulated documents, and attendance at meetings to support scienter.  ¶¶ 506-48.  None are

23 sufficiently specific to give rise to a strong inference of scienter. *See Prodanova v. H.C. Wainright*

24 *& Co., LLC*, 993 F.3d 1097, 1109 (9th Cir. 2021) (requiring facts showing defendants had "detailed

25 and contemporaneous knowledge" of information contradicting challenged statements).

26     For instance, Plaintiffs assert Defendants' "**admissions**" about their "visibility" into

27 backlog amounts to a strong inference of scienter.  ¶¶ 506-15.  Yet no Defendant admitted they

28 "closely monitored contracts from large customers or that they received specific information about

1    those contracts." *Smith v. NetApp, Inc.*, 2021 WL 1233354, at *8 (N.D. Cal. Feb. 1, 2021). In any

2    event, statements about "visibility" constitute "corporate puffery that lacks detail." *Id.*

3         Plaintiffs further allege that **internal reports**—generic databases, listservs, weekly

4    demand reports—support scienter. ¶¶ 516-31. "Generally, management's 'receipt of unspecified

5    weekly or monthly' reports is an insufficient basis for inferring scienter." *Charter Twp. Of Clinton*

6    *Police & Fire Ret. Sys. v. LPL Fin. Holdings Inc.*, 2019 WL 13178511, at *5 (S.D. Cal. Mar. 29,

7    2019). To prevail, Plaintiffs must identify "specific documents" Defendants relied on *and* their

8    contents. *Id.* Plaintiffs allege neither: they describe what the reports "would have" showed in

9    general, but do not point to a single document that Defendants accessed.

10        For similar reasons, Plaintiffs' allegations about Defendants' **meeting attendance** fail. ¶¶

11   532-48; *see also Espy*, 99 F.4th at 539 ("corporate management's general awareness of the day-

12   to-day workings of the company's business does not establish scienter"). Most of the SAC's

13   allegations are that "Ed Talks," "Buy-In," and "ELT" meetings occurred, without accompanying

14   facts about timing or what was discussed. *See Plumbers & Pipefitters Loc. Union #295 Pension*

15   *Fund v. CareDx, Inc.,* 2024 WL 5399664, at *22-23 (N.D. Cal. Sept. 8, 2024) (rejecting unspecific

16   FE allegations about defendant's attendance at meetings with no date for failure to "lead to a strong

17   inference" of defendants' awareness of alleged misconduct). In fact, Plaintiffs pinpoint only a

18   handful of meetings: FE-1's exit meetings (¶ 535) and FE-7's newly recalled ELT meeting in the

19   "summer of 2022" (¶¶ 535, 539-40, 601-07). Neither is sufficient. FE-1's exit meetings amount

20   to "[d]issatisfaction" with Extreme's strategy and management. *Espy*, 99 F.4th at 533. And FE-

21   7's meeting where Defendants allegedly "ignored" his warnings "speaks more to a good-faith

22   difference of opinion" than scienter. *Sneed*, 147 F.4th at 1134.

23              **4.    Culture and Departures Do Not Support Scienter**

24        Plaintiffs allege that Extreme's "retaliatory culture" against "individuals who refused to

25   participate in the illicit tactics and conduct" strengthens an inference of scienter but fail to connect

26   any Defendant to the purported "retaliatory conduct." ¶ 585. FE-2 speculated that his demotion

27   was driven by David Savage, who is not a Defendant. ¶¶ 590-91. And FE-10 alleges no specific

28   involvement by management in his termination. *See* ¶¶ 592-95. These allegations are insufficient.

1  *CareDx*, 2024 WL 5399664, at *23 (no strong inference of scienter where "it is unclear who from

2  management was bullying, intimidating, and coercing employees").

3      So are Plaintiffs' allegations about executive departures.  Indeed, the SAC fails to "allege

4  sufficient information to differentiate between a suspicious change in personnel and a benign one."

5  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009).  Plaintiffs cast

6  suspicion on Thomas's departure because Extreme "gave limited clarifying details," ¶ 612, but

7  ignore that Thomas left to pursue a "new venture."  Ex. 9 at 5.[4]  This does not support scienter.

8  *CareDx*, 2024 WL 5399664, at *23 ("that some of the executives resigned does not strongly

9  contribute to a finding of scienter.").  Plaintiffs further assume that Joe Vitalone's resignation made

10  way for Rice to become CCO, but absent allegations the move was "uncharacteristic," the

11  inference Plaintiffs ask for "will never be as cogent or as compelling as the inference that [he]

12  resigned or [was] terminated for unrelated personal or business reasons."  *Zucco*, 552 F.3d at 1002.

13           **5.    Core-Operations Doctrine Does Not Support Scienter**

14      Plaintiffs resort to the core-operations doctrine, claiming that it would be "absurd" to

15  believe Defendants did not act with scienter.  ¶ 549.  But to satisfy the core-operations theory,

16  Plaintiffs must "produce either specific admissions by one or more corporate executives of detailed

17  involvement in the minutia of a company's operations," or specific "witness accounts

18  demonstrating that executives had actual involvement in creating false reports."  *Welgus v. TriNet

19  Grp.*, 2017 WL 6466264, at *19 (N.D. Cal. Dec. 18, 2017).  Plaintiffs' group pleading and lack of

20  any "specific" allegations dooms them from the start.  *See City of Pontiac Gen. Emps.' Ret. Sys.

21  v. First Solar Inc.*, 2023 WL 155861, at *6 (D. Ariz. 2023).  No Defendant admitted their "detailed

22  involvement," and FE-1's accounts do not come close to showing involvement in "false reports."

23      As for backlog, Plaintiffs cite the backlog's size and Extreme's decision to stop reporting

24  backlog.  ¶¶ 554-62.  That backlog was large is not a "rare circumstance" in which it would be

25  "absurd" to suggest Defendants knew detailed data about Extreme's backlog.  *In re Solarcity*, 274

26  F. Supp. 3d at 1013.  And that Extreme stopped reporting backlog could be for "many potential

---

[4] Thomas joined Proofpoint, another large technology company, as its CFO.  He remains in that role today.  *See* https://www.proofpoint.com/us/company/leadership.

reasons," none of which equal fraud. *Id.* at 1002. In fact, Plaintiffs' own allegation that backlog could be measured by comparison to reduction in backlog and gain in product revenues—which directly contradicts Extreme's warnings to investors not to equate backlog with revenue (Ex. 6 at 9)—highlights an alternative explanation for stopping reporting: ensuring that investors did not place outsized reliance on backlog in light of rapidly changing industry conditions. *See* ¶ 559.

## C.    Plaintiffs Do Not Allege Loss Causation

The SAC should also be dismissed because it fails to demonstrate "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Plaintiffs allege five partial disclosures from January 25, 2023 to January 31, 2024, but none involve any revelation of "illicit channel stuffing," "manipulative sales and inventory practices," or "the true nature of the Company's backlog." *E.g.*, ¶¶ 98, 351, 618. In fact, none of the analysts quoted in the SAC even speculated that Extreme misrepresented its revenue or backlog or was channel stuffing. *E.g.*, ¶¶ 356, 360, 369, 377-80. Plaintiffs' own allegations belie such a scheme, with analysts commenting that "several large deals slip[ped] out of the quarter late in the month." ¶ 369. These analysts observed that Extreme was impacted by industrywide factors and backlog would be "worked down" over several quarters. *E.g.*, ¶ 356; *supra* § II.A, C. The stock drops show the market "reacting to reports of the defendant's poor financial health generally" and "changing market conditions, changing investor expectations, or other unrelated factors," not any "revelation of fraudulent activity." *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014).

**January 25, 2023 and August 24, 2023**. Plaintiffs allege that these disclosures revealed declines in backlog but fail to show how they called into question any prior challenged statement versus reporting on real-time "changing market conditions." *Id.* Defendants warned all along that backlog would decrease; that backlog decreased faster than originally anticipated does not make any prior statement false or misleading. *See Petersen v. Triplepoint Venture Growth BDC Corp.*, 2024 WL 5384678, at *13 (N.D. Cal. Aug. 7, 2024) (no loss causation where "Defendants did not conceal any risks"). Plaintiffs also point to Defendant Thomas's resignation as a revelation in the January 25, 2023 disclosure. But speculative allegations that his resignation "indicated internal

1   Company turmoil and wrongdoing in connection with financial results," ¶ 618, and third-hand

2   hearsay that Thomas "wanted out" due to disagreement with public statements, ¶¶ 186-87, fail to

3   explain how his departure "relate[s] back" to any misstatement. *Espy*, 99 F.4th at 540.

4          **November 1, 2023, January 8, 2024, and January 31, 2024.**  Plaintiffs' other alleged

5   disclosures relate to Extreme's financial results for the first two quarters of 2024.  ¶ 618.  These

6   disclosures reiterate Extreme's warnings to investors: the supply chain environment was rapidly

7   changing.  ¶¶ 367, 372; *Espy*, 99 F.4th at 541 (corrective disclosure must be "new information"

8   for the market).  Plaintiffs allege that these disclosures evidence "a surplus of inventory," ¶ 618,

9   but do not allege facts showing that the "surplus of inventory" stemmed from channel stuffing.

10  *See Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at *10 (N.D. Cal. Jun 19, 2020) (no loss

11  causation where plaintiff failed to "allege proximate cause between channel stuffing and the poor

12  performance that led to missed guidance").  At bottom, these disclosures reveal only that Extreme

13  "failed to meet its revenue goals," not any fraudulent practices.  *Loos*, 762 F.3d at 888.

14         **D.    Plaintiffs Fail To Plead Scheme Liability**

15         The SAC fails to allege any scheme separate from the alleged practices underlying their

16  Rule 10b5-(b) claim.  ¶ 651.  Plaintiffs try to highlight "specific" "key events," but they use these

17  very events to allege that Defendants' statements were false and misleading.  *Compare* ¶ 652

18  (referencing Section IV.C for "key events") *with* ¶ 388 (citing Section IV.C to allege that

19  Defendants made false and misleading statements).  Plaintiffs' scheme claim thus fails for the same

20  reasons as their statement-based theory.  *Lamontagne v. Tesla, Inc.*, 2024 WL 4353010, at *17

21  (N.D. Cal. Sept. 30, 2024) (dismissing scheme claims where no "false or misleading statements").

22         Regardless, neither Plaintiffs' channel-stuffing theory nor their backlog theory involves

23  any "deceptive act" that Defendants engaged in for the "principal purpose and effect of creating a

24  false appearance of fact."  *Simpson*, 452 F.3d at 1048; *see supra* § III.A.  And Plaintiffs' failure to

25  plead scienter and loss causation is similarly fatal to their scheme liability claim.  *Simpson*, 452

26  F.3d at 1047-48; *see supra* §§ III.A-B.

27  **IV.    CONCLUSION**

28         Defendants respectfully request dismissal of Plaintiffs' SAC with prejudice.

1    Dated: October 3, 2025

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

LATHAM & WATKINS LLP

By /s/ *Melanie M. Blunschi*
  Melanie M. Blunschi (Bar No. 234264)
  *melanie.blunschi@lw.com*
  Morgan E. Whitworth (Bar No. 304907)
  *morgan.whitworth@lw.com*
  505 Montgomery St., Suite 2000
  San Francisco, CA 94111
  Telephone: +1.415.391.0600

  Daniel R. Gherardi (Bar No. 317771)
  *daniel.gherardi@lw.com*
  140 Scott Drive
  Menlo Park, CA 94025
  Tel.: +1.650.328.4600

  *Attorneys for Defendants Extreme Networks,
  Inc., Edward B. Meyercord, III, Rémi
  Thomas, Cristina Tate, Kevin Rhodes,
  Norman Rice, and Jonas Brown.*