**LABATON KELLER SUCHAROW LLP**
Lauren A. Ormsbee (*pro hac vice*)
David Saldamando (*pro hac vice*)
Danielle S. Lazarus (*pro hac vice*)
Alexandra E. Forgione (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
lormsbee@labaton.com
dsaldamando@labaton.com
dlazarus@labaton.com
aforgione@labaton.com

*Counsel for Lead Plaintiffs and*
*Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (Bar No. 250893)
Reed R. Kathrein (Bar. No. 139304)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

*Liaison Counsel for the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, on Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> EXTREME NETWORKS, INC., EDWARD B. MEYERCORD III, RÉMI THOMAS, CRISTINA TATE, KEVIN RHODES, NORMAN RICE, JONAS BROWN <br><br> Defendants. | Case No.: 3:24-cv-05102-TLT <br><br> **LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** <br><br> CLASS ACTION <br><br> Date:     March 3, 2026 <br> Time      2:00 p.m. <br> Judge:   Hon. Trina L. Thompson <br> Courtroom:    No. 9, 19th Floor |

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT.................................................................................................1

II.   ARGUMENT .......................................................................................................................4

    A.    The SAC Adequately Alleges Material Misrepresentations and Omissions ...............4

        1.    The Growth and Demand Statements Were Materially Misleading Because of Extreme's Channel Stuffing and Manipulative Sales Practices .......................................................................................................4

            a.    The Statements Are Not Immaterial "Puffery" or "Optimism".........10

            b.    The Statements Are Not Protected By The PSLRA Safe Harbor ...................................................................................................10

        2.    Defendants Materially Misrepresented Extreme's Backlog Firmness...........12

            a.    The Statements Are Not Protected By The PSLRA Safe Harbor ...................................................................................................14

            b.    The Statements Are Not Inactionable Opinions................................16

    B.    The SAC Adequately Alleges Scienter .......................................................................17

        1.    Direct Evidence of Scienter Is Alleged.............................................................17

        2.    Additional Allegations Support A Strong Inference Of Scienter...................19

    C.    The SAC Adequately Alleges Loss Causation ...........................................................22

    D.    The SAC Adequately Alleges Scheme and Control Person Liability.......................25

III.  CONCLUSION....................................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Apple Comp. Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) ............................................................................................ 16

*Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009) ............................................................................. 18

*Baker v. SeaWorld Ent., Inc.*,
   423 F. Supp. 3d 878 (S.D. Cal. 2019) ............................................................................... 19

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ....................................................................................... *passim*

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020) .............................................................................................. 23

*In re Cell Therapeutics, Inc. Class Action Litig.*,
   2011 WL 444676 (W.D. Wash. Feb. 4, 2011) .................................................................... 18

*Charter Twp. of Clinton Police & Fire Ret. Sys. v. LPL Fin. Holdings Inc.*,
   2019 WL 13178511 (S.D. Cal. Mar. 29, 2019) .................................................................. 20

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
   302 F. Supp. 3d 1028 (N.D. Cal. 2018) ............................................................................. 25

*Cunha v. Hansen Nat. Corp.*,
   2011 WL 8993148 (C.D. Cal. May 12, 2011) .................................................................... 25

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ................................................................................. 18, 20, 21

*In re Dermtech, Inc. Sec. Litig.*,
   2025 WL 1618193 (S.D. Cal. June 5, 2025) ................................................................ 11, 17

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ........................................................................................................... 22

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
   81 F.4th 918 (9th Cir. 2023) ................................................................................................. 4

*Evanston Police Pension Fund v. McKesson Corp.*,
   411 F. Supp. 3d 580 (N.D. Cal. 2019) ............................................................................... 22

*In re Extreme Networks, Inc. Sec. Litig.*,
   2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ................................................................... 20

*Farrar v. Workhorse Grp., Inc.*,
    2021 WL 5768479 (C.D. Cal. Dec. 2, 2021) ........................................................................ 16

*Gimpel v. The Hain Celestial Grp., Inc.*,
    2025 WL 2749562 (2d Cir. Sept. 29, 2025)..................................................................*passim*

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023)..........................................................................................*passim*

*In re Great Atl. & Pac. Tea Co., Inc., Sec. Litig.*,
    103 F. App'x 465 (3d Cir. 2004)........................................................................................... 22

*Hatamian v. Advanced Micro Devices, Inc.*,
    87 F. Supp. 3d 1149 (N.D. Cal. 2015) ................................................................................. 20

*Karinski v. Stamps.com, Inc.*,
    2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ....................................................................... 23

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018)................................................................................................ 13

*Lamartina v. VMware, Inc.*,
    2023 WL 2763541 (N.D. Cal. Mar. 31, 2023) ............................................................... 22, 23

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014)................................................................................................ 24

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024) ............................................................................................................... 4

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018)........................................................................................... 23, 25

*Murphy v. Precision Castparts Corp.*,
    2017 WL 3084274 (D. Or. June 27, 2017) ................................................................. 5, 7, 10

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) ..................................................................................... 15

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003)................................................................................................ 21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ....................................................................................................... 16, 17

*Pardi v. Tricida, Inc.*,
    2022 WL 3018144 (N.D. Cal. July 29, 2022) ..................................................................... 23

*In re Plantronics, Inc Sec. Litig.*,
    2022 WL 17974627 (N.D. Cal. Nov. 7, 2022)..................................................................... 14

*In re Plantronics, Inc. Sec. Litig.*,
    2022 WL 3653333 (N.D. Cal. Aug. 17, 2022)...................................................... 5, 7, 10, 25

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
    2025 WL 556283 (N.D. Cal. Feb. 18, 2025) (Thompson, J) ........................................... 21, 22

*Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*,
    556 F. Supp. 3d 772 (N.D. Ohio 2021)................................................................................. 17

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996)............................................................................................. 17

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017)............................................................................... 10, 11, 19, 21

*In re QuantumScape Sec. Class Action Litig.*,
    580 F. Supp. 3d 714 (N.D. Cal. 2022) ............................................................................ 11, 12

*Rabkin v. Lion Biotechnologies, Inc.*,
    2018 WL 905862 (N.D. Cal. Feb. 15, 2018)........................................................................ 17

*In re Ramp Networks, Inc. Sec.*,
    201 F. Supp. 2d 1051 (N.D. Cal. 2002) ............................................................................... 24

*Rodriguez v. Gigamon Inc.*,
    325 F. Supp. 3d 1041 (N.D. Cal. 2018) ............................................................................... 11

*Schultz v. Tomotherapy, Inc.*,
    2009 WL 2032372 (W.D. Wis. July 9, 2009) ................................................................. 15, 16

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
    742 F. Supp. 3d 1003 (N.D. Cal. 2024) (Thompson, J)....................................................... 19

*In re SolarEdge Tech., Inc. Sec. Litig.*,
    2024 WL 4979296 (S.D.N.Y. Dec. 4, 2024) ................................................................. 5, 7, 9

*State Teachers Ret. Sys. of Ohio v. ZoomInfo Techs. Inc.*,
    2025 WL 3013683 (W.D. Wash. Oct. 28, 2025) ....................................................... 13, 21, 25

*In re STMicroelectronics N.V. Sec. Litig.*,
    2025 WL 2644241 (S.D.N.Y. Sept. 15, 2025).............................................................. 5, 7, 13

*In re Stratosphere Corp. Sec. Litig.*,
    1 F. Supp. 2d 1096 (D. Nev. 1998) .................................................................................... 6, 8

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)....................................................................................................... 3, 8, 17

*In re Tesla, Inc. Sec. Litig.*,
    477 F. Supp. 3d 903 (N.D. Cal. 2020) ................................................................................. 13

*United Assoc. Nat'l Pension Fund v. Carvana Co.*,
    759 F. Supp. 3d 926 (D. Ariz. 2024).............................................................................. 4

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012)..................................................................................... 17

*Waterford Township Police v. Mattel, Inc.*,
    321 F. Supp. 3d 1133 (C.D. Cal. 2018)...................................................................... 5

*Westley v. Oclaro, Inc.*,
    897 F. Supp. 2d 902 (N.D. Cal. 2012) ..................................................................... 11

*Wochos v. Tesla*,
    985 F.3d 1180 (9th Cir. 2021)............................................................................ 11, 15

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
    655 F.3d 1039 (9th Cir. 2011)................................................................................... 25

*Yaron v. Intersect ENT, Inc.*,
    2020 WL 6750568 (N.D. Cal. June 19, 2020) ....................................................... 8, 24

*York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*,
    738 F. Supp. 3d 1182 (N.D. Cal. 2024) .................................................................... 25

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005) ...................................................................... 20

# GLOSSARY OF CERTAIN DEFINED TERMS[1]

| | |
|---|---|
| Americas | Extreme's Americas Sales Region. |
| Backlog | Defined by Extreme as "confirmed orders with a purchase order for products to be fulfilled and billed to customers with approved credit status." ¶330. |
| Brown | Defendant Jonas Brown, Extreme's Senior Director of Worldwide Distribution Sales and Strategy at Extreme (*i.e.*, "Global Distribution") beginning in June 2018 and continuing throughout the Class Period. Brown was referred to as "JB" in certain handwritten notes provided by FE-1. |
| Bukhari | Extreme's Chief Technology Officer Nabil Bukhari, direct supervisor of FE-7 and member of the ELT. |
| CEO | Chief Executive Officer. |
| CFO | Chief Financial Officer. |
| Clari Database | Extreme's revenue orchestration and organization platform. |
| Class Period | The period from July 27, 2022 through January 30, 2024, inclusive. |
| Company or Extreme | Extreme Networks, Inc. |
| COO | Chief Operating Officer. |
| CTO | Chief Technology Officer. |
| Defendants | Extreme and the Individual Defendants. |
| EIP | Extreme Incentive Plan. |
| ELT | Extreme's Executive Leadership Team. Class Period members included Extreme's CEO, Defendant Meyercord; CFOs, Defendants Thomas, Tate and Rhodes during their respective tenures; COO Rice; Vitalone and Bukhari. |
| ELT Meeting | A specific ELT Meeting that occurred sometime between July and September 2022, and whereby, according to FE-7 who was present at the meeting: (1) the ELT internally discussed an expectation that 10% of the backlog would be cancelled and (2) the ELT was informed of the double-ordering phenomenon by FE-7. ¶¶278-84. |
| EMEA | Extreme's Europe, Middle East, and Africa Sales Region. |

---

[1] All references to "¶__" are citations to the SAC. All capitalized and defined terms have the meaning ascribed in the SAC, this Glossary, or herein in this brief. Unless otherwise noted, all emphasis has been added and internal citations are omitted throughout this brief.

| Ex. A or Exhibit A | Exhibit A to the Declaration of Lauren A. Ormsbee, dated November 3, 2025, which is identical to the Complaint's "Appendix A: Chart of Defendants' False and Misleading Statements and Omissions" (ECF No. 95-1) but with an added column identifying Defendants' arguments challenging those statements and omissions (with citations to the MTD) and Plaintiffs' responses to those arguments (with citations to the Opp.). |
|---|---|
| FAC | Plaintiffs' First Amended Complaint (ECF No. 59). |
| FEs | Extreme's former employees who are referenced and discussed in the Second Amended Complaint. |
| FE-1 | FE-1 was a Senior Distribution Account Manager at Extreme from May 2016 through August 2022 and has been in the distribution business for over thirty years. At Extreme, FE-1 managed the Company's relationship with TD Synnex. FE-1 reported to the Director of Distribution in the Americas, Joseph Uraco, who in turn, reported to Defendant Brown. FE-1 worked with Defendant Brown on a daily basis.<br><br>Allegations attributable to FE-1: ¶¶1, 45, 99-113, 115-23, 137, 140, 147-56, 164, 165, 168-77, 179-87, 312, 314, 328, 345, 347-50, 492, 498, 504, 516, 519, 533-35, 548, 608-10, 612. |
| FE-2 | FE-2 was the Director of Sales from before the Class Period to mid-2023. Thereafter, FE-2 was an Account Executive until the end of his tenure at Extreme. As Director of Sales, FE-2 reported to David Savage (Vice President of Sales and Senior Director of State, Local, and Education Sales ("SLED") for the United States), who in turn reported to SVP Sales, Americas, Pete Brant, who in turn reported to Defendant Rice. In his capacity as Director of Sales, FE-2 was responsible for collaborating with end users SLED accounts, including universities, and the channel partners that sold to them, as well as working with Extreme's relevant distributors.<br><br>Allegations attributable to FE-2: ¶¶46, 143, 190-204, 207-25, 230-35, 237, 239, 315, 518, 585-91. |
| FE-3 | FE-3 was a Senior-level Manager of Pricing at Extreme from before the Class Period to the second half of 2023. FE-3's responsibilities included executing the rollout of pricing and signing off on deals. FE-3 reported into the Finance leadership of Defendant Tate, who reported to the CFO.<br><br>Allegations attributable to FE-3: ¶¶27, 141-42, 301-11. |
| FE-4 | FE-4 was employed by Extreme until December 2022, most recently serving as Senior Regional Distribution Manager operating out of Europe. FE-4 worked directly with distributor Westcon during his employment with Extreme.<br><br>Allegations attributable to FE-4: ¶¶48, 125-36, 138, 157, 158, 166, 494-95. |
| FE-5 | FE-5 was formerly employed by Extreme as Senior Channel Account Manager from March 2022 to April 2024. FE-5's responsibilities included collaborating with Extreme's two largest nationwide channel partners. FE-5 reported to Channel Sales Manager – Strategic Partnerships, Matthew Kilianski, and then Director, Global Solution Partnerships – Americas, Amy Bravo, and lastly Director – Strategic Partnerships, Cameron |

| | |
|---|---|
| | Marchand. According to FE-5, Kilianski, Bravo, and Marchand reported to Vice President, Americas Channel, Jennifer Orr, who ultimately reported to Defendant Meyercord.<br><br>Allegations attributable to FE-5: ¶¶49, 191, 235-36, 241-47, 251-55, 316-19, 521, 524, 529-31. |
| FE-6 | FE-6 was a Senior Account Manager at Extreme from July 2017 to October 2022. During different points during his tenure at Extreme, FE-6 reported to either David Savage or to FE-2. FE-6 worked as part of the SLED department and except for the K-12 segment of SLED, he worked with distributors and partners throughout his tenure.<br><br>Allegations attributable to FE-6: ¶¶50, 107, 143-45, 166, 204-06. |
| FE-7 | FE-7 was the former President of a company acquired by Extreme in 2021. FE-7 began working for Extreme in July or August 2021, before officially signing on as an Extreme employee in March 2022. FE-7 was employed as the SVP, Strategy, Office of the CTO from March 2022 until March 2023. FE-7 reported Bukhari. FE-7 was tasked with analyzing several aspects of Extreme's business, including examining the pricing strategy for Extreme's entire product portfolio. From Summer 2021 through his resignation in March 2023, FE-7 attended monthly and quarterly ELT meetings.<br><br>Allegations attributable to FE-7: ¶¶51, 73, 159-60, 272-300, 536-41, 601, 603-07. |
| FE-8 | FE-8 was employed by Extreme as SVP Global Channel Sales from January 2022 to November 2023. The Distribution teams reported to FE-8. FE-8 attended "Revenue Assurance" calls led by Defendant Rice, where the Company's backlog was discussed.<br><br>Allegations attributable to FE-8: ¶¶52, 235, 320-27, 542-47. |
| FE-9 | FE-9 was employed by Extreme as a Channel Account Manager starting before the Class Period, until late 2023. According to FE-9, he was part of a team of employees managing the account and relationship with one of Extreme's largest resellers / partners during the Class Period.<br><br>Allegations attributable to FE-9: ¶¶53, 239-40. |
| FE-10 | FE-10 was employed by Extreme as a Senior Account Executive from after July 2023 until April 2024 and was responsible for accounts in North America.<br><br>Allegations attributable to FE-10: ¶¶54, 144, 256-68, 592-95. |
| FE-11 | FE-11 was employed by Extreme as an Account Manager from Fall 2022 through the end of the Class Period in the EMEA region. FE-11 was responsible for ensuring that partner accounts were set up correctly and received the correct discounts from Extreme's distributors, ensuring there were no conflicts with end users, and working closely with team members in EMEA who worked directly with the partner accounts.<br><br>Allegations attributable to FE-11: ¶¶55, 138, 226-28. |

| FIFO | First-In, First-Out backlog fulfillment, described by FE-1, whereby prior to the start of the Class Period, backlog orders were fulfilled in the order in which they were placed. |
| --- | --- |
| FY | Extreme's fiscal years, including<br>• FY 2022 (July 1, 2021 to June 30, 2022);<br>• FY 2023 (July 1, 2022 to June 30, 2023); and<br>• FY 2024 (July 1, 2023 to June 30, 2024) |
| Individual Defendants | Defendants Meyercord, Thomas, Tate, Rhodes, Rice, Brown. |
| Jenne | Jenne Inc., one of Extreme's four largest distributors. |
| Lead Plaintiffs or Plaintiffs | Oklahoma Firefighters Pension and Retirement System ("Oklahoma Fire"); Oklahoma Police Pension and Retirement System ("Oklahoma Police"); Oakland County Employees' Retirement System ("Oakland County ERS"); and Oakland County Voluntary Employees' Beneficiary Association ("Oakland County VEBA"). |
| Meyercord | Defendant Edward Meyercord III, CEO of Extreme Networks, Inc. for all relevant times, and member of the ELT. |
| MTD | Defendants' Motion to Dismiss the Second Amended Complaint (ECF No. 104). |
| Order | The Court's August 15, 2025 Order granting Defendants' Motion to Dismiss Plaintiffs' FAC (ECF No. 92). |
| Output Calls | Meetings that occurred after the Revenue Assurance Calls, where Defendant Rice and others relayed information to the CEO and CFO (including Defendants Meyercord, Thomas, Tate, and Rhodes) regarding what was discussed in the Revenue Assurance Calls, which included the assumed "yield" from the backlog—*i.e.*, the rate of conversion from backlog to revenue. |
| PSLRA | Private Securities Litigation Reform Act of 1995. |
| P.O. | Purchase Order. |
| Revenue Assurance Calls | Calls led by Defendant Rice, and attended by Defendant Brown, where backlog and backlog hedge were discussed. These calls were a "quarterly function" that became more frequent as the quarter progressed. |
| Rhodes | Defendant Kevin Rhodes, the Executive VP and CFO of Extreme Networks from May 30, 2023 through the end of the Class Period, and member of the ELT. |
| Rice | Defendant Norman Rice, the COO at Extreme from September 2019 through the end of the Class Period, and member of the ELT. |
| SAC | Plaintiffs' Second Amended Complaint (ECF No. 95). |
| Salesforce Database | Extreme's enterprise and customer management system. |

| ScanSource | ScanSource, Inc., one of Extreme's four largest distributors. |
|---|---|
| SEC | Securities and Exchange Commission. |
| Section 10(b) or §10(b) | Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. |
| Section 20(a) or §20(a) | Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. |
| SOX Certifications | Certifications pursuant to the Sarbanes Oxley Act of 2022 signed by Extreme's CEO and CFO, and which attest to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. |
| Tate | Defendant Christina Tate, the Interim CFO of Extreme from February 16, 2023 to May 30, 2023, as well as Senior Vice President and Head of Financial Planning & Analysis ("FP&A") throughout the Class Period. |
| TD Synnex | TD Synnex Corporation, one of Extreme's four largest distributors. |
| Thomas | Defendant Rémi Thomas, CFO of Extreme from November 2018 to February 2023, and member of the ELT. |
| Timeline | Appendix B to Second Amended Complaint: Extreme Networks Securities Fraud Timeline (ECF No. 95-2). |
| Vitalone | Joseph Vitalone, Extreme's Chief Revenue Officer from June 2020 to January 2024, and member of the ELT. |
| Westcon | Westcon Group, Inc., one of Extreme's four largest distributors. |

## I.      PRELIMINARY STATEMENT

Throughout the Class Period, Defendants made a series of misrepresentations and half-truths that repeatedly extolled the "***unabated market demand***" for Extreme's products, resultant "***exceptionally strong***" revenue growth, and "***firm***" and "***non-cancelable***" half billion dollars of backlog that would translate to revenue. These representations assured investors that Extreme's financial position and organic demand for its products were secure. In reality, Defendants' growth and demand statements were misleading because Extreme hit its targets only because of a channel stuffing scheme implemented at the start of the Class Period through which Extreme coerced key distributors into buying hundreds of millions of dollars in unwanted and unneeded junk inventory for the explicit purpose of "***get[ting] into the company [the] # that the street expects***." This was not the action of a rogue employee; notes from a March 16, 2022 meeting demonstrate that CEO and Defendant "***Ed [Meyercord] chose this path***" and numerous FEs describe how the other Defendants personally furthered the scheme. As numerous courts have held, channel stuffing "may give rise to liability under the Exchange Act when a company engages in the practice to deceive investors." *Gimpel v. The Hain Celestial Grp., Inc.*, 2025 WL 2749562, at \*2 (2d Cir. Sept. 29, 2025). With respect to Defendants' backlog statements, Defendants knew that at least 10% and up to 66% of the backlog faced a high cancellation risk due to known double- and triple-ordering by Extreme's customers, meaning that those orders were unlikely to convert to revenue. Defendants told investors the opposite, and kept the fraud going for nearly 18 months, until inventory became unsustainably overloaded, distributors stopped placing new orders, revenues dropped dramatically, and the backlog evaporated without converting to revenue—resulting in a total 60% decline in Extreme's stock price.

In its August 15, 2025 Order, the Court stated that while Plaintiffs' allegations regarding channel stuffing were "close to sufficient," the Court required additional particularity, such as: "more specific and particularized allegations . . . including [a] clearer timeline and communications with Defendants" from FE-1, FE-4 and FE-11; more details about suspicious transactions from FE-2; and additional allegations of "affected revenue" involving "Defendants' largest distributors." Order at 17-19. With respect to the backlog, the Court similarly found "Plaintiffs' allegations are close to sufficient but need more specific details to corroborate the practices that were omitted," noting

specifically the reliability of FE-7 but seeking more particularity as to FE-7's account of a meeting where the cancellation risk of 10% was discussed. *Id.* at 20-21. Plaintiffs followed this guidance, and reached out to the five FEs identified above seeking greater clarity and documentation of their already reliable accounts. Each FE was able to provide additional particularized information and the SAC clarifies the timeline of events such that the start of the new channel stuffing scheme is pinpointed to a specific day, coerced transactions with top distributors are quantified to show a more precise impact on revenues, contemporaneous notes of specific meetings paint a vivid picture of how Defendants devised and implemented the channel stuffing scheme, new correspondence details additional manipulative transactions, and additional details and timing of the ELT meeting where Defendants discussed backlog cancellations and the ongoing practice of double-ordering at the start of the Class Period are added. *See* ECF No. 100 (summarizing primary substantive additions to the SAC). The SAC provides with exacting detail the particularity identified and requested by the Court.

Defendants—who issued the channel stuffing directives, were present at the meetings described in the SAC, and were parties to correspondence reflected in the SAC—do not dispute the legitimacy or accuracy of the SAC's evidence and the FE's accounts, but continue to argue that the allegations are "vague" or fail to describe "specific transactions." MTD 5-8, 18. This is demonstrably false. The SAC provides, for example, the exact date the scheme launched (March 16, 2022); specific transactions (*e.g.*, $102 million Westcon deal, $40 million TD Synnex proposal, $1.5 million PC Solutions deal); documentary evidence detailing meetings and events implementing the fraud company-wide; and distributor corroboration through conversations with former Extreme employees.

Unable to legitimately refute the SAC's factual and legal sufficiency, Defendants simply rewrite it. For example, Defendants recast the alleged channel stuffing scheme as an innocent "revis[ion]" of Extreme's "shipment allocation process." MTD at 1, 8. This characterization is inconsistent with the SAC's account of how Defendants implemented a decision that would leave "blood on the streets" by forcing distributors to purchase hundreds of millions of dollars of junk to fabricate demand, penalized those who would not agree to this scheme, and lied to Extreme's investors about the source and sustainability of the Company's reported demand and revenues. *Infra* at 4-7. Defendants also argue that the channel stuffing scheme depends on proof that the inventory

was returned. MTD at 1, 9-10. While some portion of the unwanted inventory was returned (as described in the SAC and *infra* at 8-9), what made the scheme unsustainable is that not all inventory could be returned, and as inventory levels skyrocketed, distributors revolted and the scheme collapsed at the end of the Class Period. Further, while Defendants previously incorrectly argued that Plaintiffs alleged a five-year channel stuffing scheme that began during the onset of COVID-19, the SAC is clear that the scheme began in March 2022, as the effects of COVID-19 on supply chains decreased. Yet Defendants spend pages discussing pre-Class Period warnings about "the COVID supply chain crisis" that are irrelevant to the misrepresentations and fraud alleged in the SAC. MTD at 3-4. Defendants' tactics are transparent: manipulate the factual allegations by cherry-picking and introducing new theories—ultimately seeking dismissal of a complaint that is substantially different from the one before the Court. In doing so, Defendants flout the legal standard underpinning 12(b)(6) motions to dismiss, which requires the Court to "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

Defendants' red herring arguments fail, and the Court should conclude that the SAC alleges with sufficient particularity at the pleading stage the existence of Company-wide channel stuffing and manipulative sale practices, as well as the undisclosed heightened risks of significant backlog cancellations. Defendants' remaining legal challenges are also defective. With respect to falsity, Defendants argue that the majority of the 54 alleged misrepresentations and half-truths are either immaterial puffery, inactionable opinions, or protected forward-looking statements. MTD at 12-14, 17-19. These arguments fail because Defendants' statements were highly material to investors, and were affirmative statements of verifiable present or historical facts. *Infra* at 10-12, 14-17. Defendants' scienter arguments are equally defective and provide no compelling inference of innocent intent. MTD at 19-24. The SAC provides direct evidence of actual knowledge, as well as a host of circumstantial evidence of scienter, and the most compelling inference is that Defendants orchestrated this fraud with the intent to deceive investors. *Infra* at 17-22. Similarly, loss causation here is more than adequately pled (*infra* at 22-25), and the SAC adequately alleges that Defendants engaged in a litany of deceptive acts satisfying scheme liability (*infra* at 25).

"Requiring more detail than those presently alleged would transform the PSLRA's formidable

pleading requirement into an impossible one." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 769 (9th Cir. 2023). The MTD should be denied and this case should proceed to discovery.

## II.    ARGUMENT

Under §10(b) and Rule 10b-5(b), a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant [("falsity")]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* at 764. The elements of a Rule 10b-5(a) and (c) "scheme" claim "are largely the same as a misrepresentation claim," but replaces the first element with "use or employment of any manipulative or deceptive device or contrivance." *United Assoc. Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 967 (D. Ariz. 2024).

### A.    The SAC Adequately Alleges Material Misrepresentations and Omissions

#### 1.    The Growth and Demand Statements Were Materially Misleading Because of Extreme's Channel Stuffing and Manipulative Sales Practices

Throughout the Class Period, Defendants attributed Extreme's revenue growth to "***unabated market demand***" that "***has never been stronger***," claiming the Company achieved "***double-digit growth***" "***primarily due to strong demand***" even "***in the current supply chain environment***." *See* Ex. A: Statements 1-6, 8-19, 22, 26-30, 32-34, 36-38, 42-43, 45-46, 48-49, 51, 53. Each statement was a material misrepresentation and a "half-truth" that "omit[ed] critical qualifying information" related to the unsustainable and undisclosed sources of Extreme's reported revenue growth and demand. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024); *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 928 (9th Cir. 2023) (finding falsity when statements "give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'"); *Hain*, 2025 WL 2749562, at *11 (finding defendants triggered the half-truth doctrine by attributing financial results to factors such as "strong worldwide demand for [its products]" while failing to disclose the use of "various channel-stuffing tactics").

The SAC provides critical new facts that, when viewed with the prior allegations already found to be credible, allege with particularity an undisputed unsustainable channel stuffing scheme that materially impacted Extreme's reported revenues from 4Q2022 and FY2022 through the end of

the Class Period, as well as related manipulative sales practices, such that the sufficiency of the SAC's allegations of knowingly misleading misrepresentations can no longer be in question. As the Second Circuit recently held in sustaining similar misstatements that failed to disclose "how the channel-stuffing practices artificially inflated sales figures," reasonable "investors would want to know that revenue is not being driven by increased demand but by sales tactics that will likely prove unsustainable once distributors reach maximum inventory and the company can no longer flood them with product." *Hain*, 2025 WL 2749562, at \*4, \*9-11; *see also, e.g.*, *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at \*11 (N.D. Cal. Aug. 17, 2022) (positive revenue results and growth statements misled investors when defendants failed to disclose channel stuffing practices' impact); *In re STMicroelectronics N.V. Sec. Litig.*, 2025 WL 2644241, at \*1-3 (S.D.N.Y. Sept. 15, 2025) (same); *In re SolarEdge Tech., Inc. Sec. Litig.*, 2024 WL 4979296, at \*7 (S.D.N.Y. Dec. 4, 2024) (same); *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at \*8-9 (D. Or. June 27, 2017) (same). In addition, the SAC provides "corroborating details about the purported scheme," including "[s]pecific transactions, specific shipments, specific customers, specific times, or specific dollar amounts." *Waterford Township Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1147 (C.D. Cal. 2018).

The SAC describes with specificity the timeline of events beginning with the precise launch of the scheme through its collapse once distributors refused to play along. *See also* ECF No. 95-2 (the "Timeline"). On the morning of March 16, 2022, facing quarterly targets they could not legitimately meet, Defendants made a fateful decision. In a meeting memorialized by contemporaneous notes, Defendant Brown asked the pivotal question: "***how do we get into the company [the] # that the street expects***" when they were "***running out of tricks in our bag***" to meet Extreme's quarterly numbers. ¶¶107-12. The solution was to "decommit all" distributors from their place in line for scarce inventory (*i.e.*, the "FIFO" system), instead prioritizing shipments off the backlog to those who agreed to buy tens of millions of dollars of unwanted, unneeded, and unsaleable products. ¶¶108-15. This scheme was unsustainable; those distributors could not sell the junk inventory, and either returned the product or warehoused it, leaving no room for future purchases. ¶¶134-35, 161-78. Extreme's CEO, Defendant Meyercord, personally "***chose this path***" of "***blowing up FIFO***," which was described as the "***lesser of two [evils]***"—with the two evils being report actual poor sales or stuff the channel.

¶115. The channel stuffing was implemented immediately, with Defendant Thomas hosting dinners with top distributors to initiate the plan in the weeks after the March 2022 meeting, and Brown working with Extreme's Global Operations in April to "manipulate the system" to decommit distributors who would not "play ball" and prioritize those who did. ¶¶124-37, 146-49.

Defendants' efforts were immediately successful, with top distributors Jenne and Westcon agreeing to purchase $40 million of unwanted inventory by the end of March 2022, and Westcon agreeing to a second $102 million transaction in the following quarter (*i.e.*, 4Q2022), more than half of which was for unsaleable and returnable inventory, representing 28% of that quarter's product revenue. ¶¶122-33. The SAC describes multiple other manipulative channel stuffing transactions, each of which are set forth through FE allegations and highlighted in the Timeline. ¶¶134-228. As Defendants promoted the Company's revenues as reflective of "***exceptionally strong***," "***robust***," and "***unabated***" organic demand for Extreme's products, in reality, each quarter's revenues would have fallen far short without the coerced and unsustainable channel stuffing. ¶¶391-92, 437-38, 462-63.

Evidence of the existence and implementation of this scheme is overwhelming, and far exceeds the evidence of channel stuffing found sufficient in other cases, including:

(a) FE-1's notes from meetings implementing the channel stuffing (¶¶99-123, 146-57, 161-87)[2];

(b) FE-1's emails and text / IM messages, including emails to Defendant Thomas alerting him of the manipulative sales practices (¶¶176-77, 183-84);

(c) FE-1's description of how Jenne and Westcon agreed to purchase ***$40 million*** of "old" and "terrible" inventory to meet 3Q2022 revenues (¶¶122-23);

(d) FE-1's notes demonstrating that TD Synnex and ScanSource were punished for refusing to "play ball" (¶¶152-53);

(e) FE-1's notes and recollection showing that TD Synnex, with its back against the wall, ultimately complied with Defendants' scheme (¶¶154-56);

(f) FE-4's account of Defendant Thomas' Spring 2022 dinner with Westcon management and a subsequent 4Q2022 $102 million deal that included ***$52 million*** of unneeded and "end of sale" product, as well as similar dinners and sales with two other top distributors (¶¶129, 131-35);

(g) FE-1's account that Extreme engaged in a similar transaction with Jenne to purchase

---

[2] Defendants complain that FE-1's notes—newly acquired by Plaintiffs—were "screenshotted" from FE-1's personal notebook (MTD at 7-8). This argument is curious as the images of FE-1's notes prove, conclusively, that they exist dond will provide evidentiary proof of wrongdoing in discovery. Defendants' "summary judgment arguments" must be reserved for the post-discovery period. *See In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1110 (D. Nev. 1998).

unneeded inventory for approximately $40 to $50 million at the end of June 2022 because Extreme needed to make its 4Q2022 numbers (¶137);

(h) FE-11's corroborative account of the $102 million Westcon channel stuffing deal, as well as another suspicious $500,000 deal in Summer 2022 (1Q2023) (¶¶138, 226-28);

(i) FE-7's corroborative account that, based on conversations with sales colleagues, it was "modus operandi" when Extreme ceased FIFO ordering and allowed customers to jump the backlog line based on willingness to purchase other un-demanded products (¶¶159-60);

(j) FE-2's account (a former Director of Sales in the U.S)—backed by emails and documents—that "channel stuffing" was a "regular" practice at Extreme and occurred often during his tenure, providing two clear examples of channel stuffing transactions in his division totaling over $2.2 million (¶¶192-98, 208-224 (*i.e.*, the PC Solutions and Synergetics deals));

(k) FE-3's account, as a Senior-level Manager of Pricing until 2H 2023, who explained that "it was well known internally at Extreme" that the sales team was "channel stuffing" (¶141);

(l) FE-5's explanation of how a $1.8 million New Jersey Transit order was knowingly double counted in Extreme's revenues forecast in 2Q2024 (¶254); and

(m) FE-1's conversations with Extreme distributors confirming how, at the end of the Class Period, they ultimately rejected the scheme and refused to buy junk products (¶¶122-23, 345-50).

Defendants' marked shift in sales policy where sales practices "migrated" from one model to another, resulting—***by design***—in distributors buying unneeded inventory and holding excess product, is exactly the type of undisputed channel stuffing sustained in *Plantronics*, *Murphy*, *Hain*, and other cases. Where in *Plantronics* the court found persuasive evidence of channel stuffing through a general internal audit survey in which employees expressed concerns over *unspecified* channel stuffing practices (2022 WL 3653333 at *3-4, 12), here, Plaintiffs present specific evidence of the changed channel stuffing practices, implementation of the practice, actual transactions, counterparties, and approximate dates of certain channel stuffing transactions, along with additional corroborative accounts from several FEs. In *Murphy*, the court sustained misleading representations rendered false by undisclosed channel stuffing based on the accounts of 4 FEs, none of whom provided specific suspicious transactions or discounts. 2017 WL 3084274, at *9. *See also SolarEdge*, 2024 WL 4979296, at *7 (only two FEs who "describe how SolarEdge supervisors would encourage salespeople to adjust shipping terms so that it would be easier to pull forward revenues, [] and others describe how SolarEdge would prevent customers from cancelling orders in order to hit the targets."); *STMicroelectronics*, 2025 WL 2644241, at *2, *3 (only one FE referencing channel stuffing). Viewed in its totality, the SAC here provides far greater detail and particularized allegations.

Defendants lodge misplaced factual challenges to the channel stuffing allegations, each of which is countered by the SAC's allegations and should be rejected.

*First*, Defendants ask the Court to ignore FE-1's notes and the descriptions by FE-1, FE-4, and others of how Defendants leveraged backlog prioritization to stuff the channels with unwanted inventory, claiming the Court has "considered and rejected as inadequate" the theory "that Extreme prioritized distributors who would 'play ball' to 'keep [their] place in line' for inventory." MTD at 8. To the contrary, the Court found FE-1's allegations concerning this tactic to be "*reliable*," but requested a clear timeline and additional details. Order at 17. The SAC delivers just that. Similarly, Defendants ask the Court to credit their innocent counter-factual narrative that "Extreme implemented a strategy for allocating scarce supply during an unprecedented supply-chain crisis—not illicit stuffing." MTD at 1, 8. This recasting of the SAC is improper and inconsistent with the allegations detailing quintessential channel stuffing conduct designed to "*get into the company [the] # that the street expects*." ¶¶98-123. *See Stratosphere*, 1 F. Supp. 2d at 1109-10 (rejecting defendants' interpretation of the facts); *Tellabs*, 551 U.S. at 322 (Court must accept the alleged facts as true).

*Second*, Defendants argue that since there was demand for backlogged products (that were at high cancellation risk and not part of reported revenue (¶333 n.36)), their statements attributing reported revenue growth to "unabated," "exceptional," and "strong" demand for shippable, non-backlogged products cannot be false or misleading. MTD at 9. This argument, comparing apples to oranges, fails. The SAC contains detailed allegations showing overstuffed channels, falling revenues, and coerced sales of unwanted product to meet targets, all of which is antithetical to strong organic demand. Indeed, the paragraphs cited by Defendants (¶¶123, 156) only evidence falsity, as they demonstrate *forced* demand for "unwanted" products that were shipped as part of the channel stuffing scheme. Defendants' citation to *Yaron v. Intersect ENT, Inc.* (MTD at 9) is inapposite because here, the products that were shipped were not ones that customers organically "actually wanted to buy," outside of the pressures imposed by Defendants. 2021 WL 12103005, at *6 (N.D. Cal. Jan. 22, 2021).

*Third*, Defendants argue that the channel stuffing allegations must be discounted because "Plaintiffs do not allege any returns" of unwanted product. MTD at 9-10. This argument fails on many levels. As an initial matter, the SAC does provide specific examples of customers returning—and

attempting to return—product purchased through the stuffing scheme. *See, e.g.*, ¶177 (TD Synnex submitted a return of "***$6.8M***," resulting in Brown exclaiming that this would "***tank[] our quarter . . . and our auditors will be all over us***."); ¶132 (other FEs indicate that the returns were "quite high"); ¶178 (Extreme reported a $131,950,000 line item for product returns at the end of FY2024, an amount far greater than during the Class Period).[3] Moreover, Plaintiffs do not allege that Defendants misrepresented customers' right to return product. A right to return legitimately purchased inventory in due course is a far cry from a scheme designed to effectuate the purchase of un-demanded product to misleadingly hit quarterly targets by encouraging distributors and partners to return *that* product in the following quarters. *See* ¶¶101-11, 122, 131-37, 164-69, 534. Additionally, there is nothing contradictory about how Defendant Brown tried to slow down distributor returns to continue inflating quarterly revenue results (*see* MTD at 9; ¶¶168-76); indeed, this is entirely consistent with channel stuffing conduct. *See SolarEdge*, 2024 WL 4979296, at *7 (that Company "would prevent customers from cancelling orders in order to hit the targets" was part of channel stuffing conduct).

***Fourth***, Defendants' piecemeal attack on the purported "lack of specificity" of the new details provided by FEs 1, 2, 4, and 11 is unavailing (MTD at 10-11), as the FE accounts are both credible and specific because they "described conversations that they themselves heard" or "practices to which they themselves were subjected" to concerning Defendants' unsustainable channel stuffing and manipulative sales transactions. *Glazer*, 63 F.4th at 768-69; *see supra* at 5-7.

***Finally***, despite Defendants' contention to the contrary (MTD at 11-12), the SAC adequately alleges that Extreme's reported revenue results were misleading. For example, Extreme's stated product revenues figure of $187.1 million for 4Q2022 was actionable because Defendants attributed those revenues to organic "strong demand," ¶¶389-91, but failed to disclose that ***$52 million*** of that figure was inflated through the channel stuffing transaction that closed with Westcon during 4Q2022 (¶¶130-34)—rendering a material 28% of revenues sourced from this one transaction. The details of this specific transaction (and others) shows the existence of the channel stuffing and other

---

[3] Defendants' improper dispute of Extreme's reported returns, a fact that demonstrates the impact of the unsustainable channel stuffing, is factually incorrect. *See* MTD at 10. Defendants try to divert the Court's attention by pointing to the *balance* of the return reserve account of $52 million, which is not the proper measurement of actual returns for the period from an accounting perspective, and is nonetheless still an increase from the prior period.

manipulative sales practices that rendered the revenue results misleading "[b]ecause [when] Defendants touted positive revenue results in the [] statements and indicated that such results were attributable to organic consumer demand for the Company's products . . . Defendants were required, to avoid misleading investors, to disclose adverse information, namely that the positive revenue results were a byproduct of the undisclosed sales practice." *Plantronics*, 2022 WL 3653333, at *13. That Extreme did not issue a "restatement" or that an "independent auditor" signed off on the financials does not change the underlying fact that Defendants failed to omit this critical "adverse" information—rendering their cited cases inapposite. *See* MTD at 11-12.[4]

### a.  The Statements Are Not Immaterial "Puffery" or "Optimism"

Defendants argue that 25 of the 38 growth and demand misstatements are immaterial "puffery" or "corporate optimism." MTD at 12 (Statements 1-6, 8-9, 11-12, 15-19, 27-29, 33, 37, 43, 45-46, 48, 51). They are not. Courts have easily concluded in the channel stuffing context that statements quantifying revenue growth as attributable to "***exceptionally strong***" and "***unabated***" demand for the Company's products are actionable because the undisclosed information may be "important information to a reasonable investor," and thus the underlying omission was "material" to the market. *See Murphy*, 2017 WL 3084274, at *9; *Plantronics*, 2022 WL 3653333, at *16 (rejecting puffery defense because the "allegations raise the inference that Defendants were aware of material adverse facts that cut against the positive representations that Defendants made"); *Hain*, 2025 WL 2749562, at *11 (statements attributing financial results to "strong demand" are material if "channel stuffing" conduct was undisclosed). In stark contrast, Defendants' six cited cases (MTD at 12) are inapposite as none involve statements made in the channel stuffing or manipulative sales context.

### b.  The Statements Are Not Protected By The PSLRA Safe Harbor

Defendants also argue that 22 of the 38 challenged statements were "forward-looking" and thus protected by the PSLRA's safe harbor. MTD at 13-14 (Statements 1, 3, 6, 9-10, 15-16, 19-20, 23, 27, 29-31, 34-35, 37-38, 40, 44, 46, 48). This argument is also easily rejected.

The PSLRA safe harbor applies only to statements that are forward-looking, *In re Quality*

---

[4] Defendants do not argue that Statements 13, 14, 22, 26, 32, 36, 42, 49, and 53 are growth and demand statements that are immaterial puffery or are protected by the safe harbor. *See* Ex. A. If the Court finds them to be adequately alleged as false and misleading, no further analysis required.

*Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017), yet Defendants do not explain how even a single one of these challenged Statements fit that description. Nor could they. *See, e.g.*, Statement 3 ("Our teams *continue to see* unabated market demand"); 9 ("*our demand has been strong* . . . record-breaking performance"); 15 ("our *continued revenue growth and record backlog gives us even greater confidence* in our long-term growth outlook"); 37 ("*we're seeing good demand* . . . double-digit growth").[5] With nothing forward-looking about the challenged Statements, the safe harbor does not apply, and the inquiry ends here. *See Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 918 (N.D. Cal. 2012) ("statements about past or present demand are not covered by the safe harbor"); *Hain*, 2025 WL 2749562, at *12, n.15 (similar demand statements are unprotected statements of present fact).[6]

While the inquiry should stop here, if the Court continues, it next looks to see whether "meaningful" and specific cautionary language accompanied the challenged Statements—and it will find none. *See Wochos v. Tesla*, 985 F.3d 1180, 1190 (9th Cir. 2021) (safe harbor for forward looking statements does not apply if the statements are not accompanied by "meaningful" cautionary language and were made with actual knowledge of their falsity). The cautionary language identified by Defendants (MTD at 13) provided no "meaningful" warning that "discredit[s] the [allegedly misleading statements] so obviously that the risk of real deception drops to *nil*," nor do they "'precise[ly]' and 'directly address' the alleged misrepresentations." *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 736-37 (N.D. Cal. 2022). Extreme's boilerplate statements that "suppliers and contract manufacturers have been negatively affected by … the COVID-19 pandemic" or that Extreme could "experience challenges or delays in forecasting, generating or recognizing revenue for a number of reasons," (MTD at 13) "would [not] inform a reasonable investor" that

---

[5] Only Statements 20 and 31 could arguably be construed as forward looking, but no safe harbor applies because as described below, these statements were accompanied by only meaningless cautionary language and were made with Defendants' actual knowledge.

[6] Further, even if some of the alleged statements could arguably be connected to Extreme's issuance of "guidance," MTD at 13, "where defendants make mixed statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are not protected by the safe harbor of the PSLRA." *Quality Sys.*, 865 F.3d at 1142; *see Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1050 (N.D. Cal. 2018) (factual predicate of "healthy product backlog" and "consistent quarterly linearity" underlying "forward-looking prediction about fourth quarter revenue" not protected); *In re Dermtech, Inc. Sec. Litig.*, 2025 WL 1618193, at *6 (S.D. Cal. June 5, 2025) (same regarding recorded revenue as part of projection).

Extreme's increasing and unsustainable reliance on channel stuffing was the true source of the Company's positive growth and demand. *Hain*, 2025 WL 2749562, at \*12; *see also QuantumScape*, 580 F. Supp. 3d at 738. Defendants also simply ignore the statements where no cautionary language was provided (*see* Defs. Ex. 8 (transcript of ¶453 without any cautionary language)).[7]

### 2. Defendants Materially Misrepresented Extreme's Backlog Firmness

"[O]nce defendants [choose] to tout the company's backlog, they [are] bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). In *Berson*, the Ninth Circuit found that statements concerning the company's backlog were "misleading" because defendants failed to disclose that the backlog included contracts that were subject to "stop-work" orders—*i.e.*, orders issued by the government to temporarily halt the work "for up to 90 days." *Id.* at 984-87. And "because stopped work often is eventually cancelled altogether, a stop-work order signals a ***heightened risk*** that the company never will earn the money" (*id.*); thus, failure to disclose the risky nature of the orders meant that investors were not "alert[ed]" to the fact that part of the backlog was "***at serious risk of being cancelled altogether***," rendering the backlog statements misleading. *Id.*

Here, Defendants made a series of misleading statements concerning Extreme's backlog (*see* Ex. A; Statements 2, 5-10, 13, 15-16, 17-21, 23-25, 27-28, 30-31, 34-35, 37-41, 44, 46-48, 50, 52, 54) but failed to disclose that—like in *Berson*—part of the backlog was comprised of orders that were subject to a heightened undisclosed risk of cancellation. *Id.* While in *Berson* it was the "stop-work" order phenomenon, here it was the double- or triple-ordering phenomenon: *i.e.*, customers placing multiple orders for substantively identical products with Extreme and other competitors and then cancelling with Extreme if another competitor met the order first. ¶71. Indeed, Defendants affirmatively disclaimed the risk, rendering the statements here stronger than in *Berson*. For example, on May 17, 2023, Defendant Tate, in response to a question, emphasized Extreme's "***excellent visibility into our backlog***," stated "***we don't see double ordering***," and then affirmatively claimed that backlog orders were "***not cancelable***." ¶458. As a result, investors were left with the false and misleading impression that the "***vast majority***" of the backlog consisted of "non-cancelable" orders

---

[7] Defendants also had actual knowledge of falsity as discussed *infra* Section II.B.

that represented contractually assured revenues with "*current delivery request dates*." ¶416. To that end, Defendants repeatedly misrepresented the risk of cancellation as just "*a fraction of 1%*" (¶¶421; 426), and told investors that revenues were "*understated*" by an amount equal to backlog (¶395).

The Court previously found that "FE-3, FE-1, FE-2, FE-5, and FE-7's allegations are reliable," and "close to sufficient" but requested "more specific details to corroborate the [backlog] practices that were omitted." Order at 20. The SAC delivers just that. The SAC demonstrates how as early as July-September 2022, Defendants had actual knowledge that more than a "fraction of 1%" of the backlog would be cancelled, instead, expecting that at least **10%** of the massive $555 million backlog would be cancelled based upon the ongoing double-ordering. ¶¶278-84 (FE-7 explaining how he attended an ELT meeting in July-September 2022 (1Q2023) attended by Company leaders including Meyercord, Thomas, and Rice, and where the 10% backlog cancellation hedge was openly discussed, and where FE-7 directly warned Defendants of double-ordering rendering that figure insufficient).[8] *See State Teachers Ret. Sys. of Ohio v. ZoomInfo Techs. Inc.*, 2025 WL 3013683, at *18 (W.D. Wash. Oct. 28, 2025) (crediting allegation that FE informed defendant that growth was "unsustainable"). In the week following this ELT Meeting, FE-7 conducted an "acid test," testing the ELT's internal 10% hedge with five different companies that were target or former customers of Extreme. This confirmed that industry participants "never" commit to one vendor, which solidified FE-7's understanding that up to 66% of Extreme's backlog would vanish when a competitor delivered first. ¶¶286-88. FE-7 then relayed this evidence to the ELT, explaining that the 10% internal backlog cancellation hedge was already "*misleading*." ¶¶288-90.[9] Thereafter, FE-7, on at least three different occasions, heard Extreme Regional Sales Directors expressing concern in meetings that "important" deals—valued at more than **$5 million each**—were not going to come through and had been cancelled. ¶¶296-97.

---

[8] This fact alone renders, at minimum, Defendants' "1%" statements (¶¶421; 426) misleading half-truths. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (falsity is established when statements "directly contradict what the defendant knew at that time"). And to the extent Defendants argue that their statements were literally true, *see* MTD at 15-16, "even a literally true statement 'can be misleading and thus actionable under the securities laws.'" *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 922 (N.D. Cal. 2020).

[9] Defendants dispute FE-7's acid-test, reducing it to "specious allegations." MTD at 17. But there is nothing "specious" about how a senior ELT-level executive had such major concerns that Defendants were misleading the market that he validated those concerns and then delivered them and his test results to the ELT. *See STMicroelectronics*, 2025 WL 2644241, at *3 (crediting allegation that FE "called out" defendants in a meeting because they were "misleading investors").

These particularized allegations are thoroughly corroborated by multiple other FEs. *See* ¶¶318-19 (FE-5: it was "widely known" at Extreme that double-ordering was occurring because of the "Return Merchandise Authorization" process, which "came from the top"); ¶315 (FE-2: Extreme's partners told him and others that they were double- and- triple-booking orders, which continued throughout 2022 and 2023, and FE-2 explained Extreme knowingly encouraged this practice); ¶¶141, 303-11 (FE-3: it was "well known internally at Extreme" that customers were placing orders with multiple vendors and cancelling, which FE-3 discussed directly with Defendant Thomas and whereby Defendants did not implement FE-3's proposed solution of a B2B clause).

Defendants spend pages challenging the particularity of the allegations provided by FE-1, FE-2, and FE-7, citing inapposite case law and claiming they do not support falsity because the FEs do not say "what customers, in what quantities, when, or whether these customers cancelled their backlog orders." MTD at 14-17. But Defendants misstate the law of this Circuit; in *Berson*, the Ninth Circuit rejected defendants' analogous argument that plaintiffs did not plead the falsity of the backlog statements with "particularity," because the complaint "identifies four [FEs] . . . who allegedly will testify to the ***existence*** and effect of the stop-work orders." 527 F.3d at 985. Thus, the Ninth Circuit did not require allegations of ***cancellations*** for the FE allegations to be sufficiently particularized, because the mere existence of the stop-work phenomenon created a heightened risk that cancellations would occur. *Id.* at 986. The same, plus more, was alleged here: the SAC alleges with particularity the heightened, severe risk of backlog cancellations due to double-ordering, in addition to particularized instances of cancellations. ¶¶269-344, 349. Further, as to Defendants' repeated contention that some of the FEs rely on "hearsay," courts routinely credit such allegations because at this stage, an FE's "reliance on hearsay is not dispositive as to the reliability of his or alleged reports." *In re Plantronics, Inc Sec. Litig.,* 2022 WL 17974627, at *7 (N.D. Cal. Nov. 7, 2022); *see Glazer*, 63 F.4th at 771 (similar; crediting allegations of "conversations that [FEs] themselves heard").[10]

### a.    The Statements Are Not Protected By The PSLRA Safe Harbor

Defendants argue that 23 of the 36 backlog misstatements (Statements 6-7, 9-10, 15-16, 19-

---

[10] Defendants do not argue that Statements 2, 5, 8, 17, 18, 21, 25, 28, 30, 39, 41, or 52 are backlog statements that are protected by the safe harbor or are inactionable opinions. *See* Ex. A. If the Court finds them to be adequately plead as false and misleading, no further analysis required.

20, 23-24, 27, 29, 31, 34, 35-38, 40, 44, 46-48) are forward-looking and entitled to immunity by the PSLRA safe harbor. MTD at 17-18. This argument fails. As with the challenged growth and demand statements, many of these Statements are facially not forward-looking. *See, e.g.*, Statement 6 ("our double-digit revenue growth led to an all-time high revenue of $1.1 billion, yet it was ***understated*** by the $400 million of incremental backlog ***we built during the year***."); 19 ("We have complete visibility into our product backlog, the vast majority of which is ***comprised of orders with current*** delivery request dates."); 44 ("***We have the benefit of a healthy backlog of customer orders . . . end customer orders remain firm***."). Moreover, Defendants' touted backlog was—like in *Berson*—a representation of Extreme's ***present-tense*** "contractual entitlement to perform certain work," (*see* ¶65) and thus, is not "forward-looking." *Berson*, 527 F.3d at 990; *see also Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 531-32 (D.N.J. 2010) ("each statement relating to backlog is a present fact that is not a projection of future economic performance; these statements concern that value of backlog at the time the statements were made to the public"); *Schultz v. Tomotherapy, Inc.*, 2009 WL 2032372, at *14 (W.D. Wis. July 9, 2009) (similar). The inquiry ends here.

However, even if forward-looking, the challenged Statements would still not be protected because (1) they were not accompanied by any "meaningful" cautionary language as—contrary to Defendants' claims—they did not "disclose[] exactly what plaintiffs alleged [they] omitted" (MTD at 17); and (2) the statements were made with actual knowledge of falsity. *Tesla*, 985 F.3d at 1190. The second prong is discussed *infra* Section II.B. As to the first prong, none of Defendants' cited risk disclosures or cautionary language warned investors that the half billion dollar backlog was at a heightened or expected risk of being cancelled due to the double-ordering phenomenon, and that Defendants internally expected at least 10% of the backlog to be cancelled. Instead, Defendants' risk disclosures are phrased in unspecific and hypothetical language. *See, e.g.*, MTD at 17 ("customers *may* defer or cancel orders"). Thus, Defendants' cautionary language merely consists of "entirely of as-yet-unrealized risks and contingencies. Nothing alerts the reader that some of these risks may already have come to fruition, and that what the company refers to as backlog includes work that is substantially [double-ordered] and at serious risk of being cancelled altogether." *Berson*, 527 F.3d at 986 (rejecting risk disclosures disclosing customers' right to "modify" or "cancel" the existing

backlog contract because it did not specify government's "right to stop work" those orders); *see Glazer*, 63 F.4th at 780 (disclosure not "meaningful" because it did not "mention the specific risk to which [the defendant] had been alerted" to); *Schultz*, 2009 WL 2032372, at *15 (similar).

More fatal to Defendants' argument is the fact that they neutralized any applicable cautionary language by affirmatively contradicting it during earnings calls. As noted above, Defendants specifically asserted that the backlog orders were "***not cancelable***" (¶458), that they ***didn't see "double ordering"*** (*id.*), and that they've "***baked [the backlog] into our revenue guide***" (¶449), rendering any contrasting risk disclosures meaningless, as investors are "justifiably" entitled to "place [] heavy reliance on" Defendants' repeated misrepresentations. *See In re Apple Comp. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989); *Farrar v. Workhorse Grp., Inc.*, 2021 WL 5768479, at *5 (C.D. Cal. Dec. 2, 2021) (backlog misstatements not cured by other disclosures). Further, the fact that many analysts were, in fact, misled by Defendants' statements demonstrates that these risk disclosures were ineffective to cure the misstatements. *See Farrar*, 2021 WL 5768479, at *5; ¶¶76-79 (*e.g.*, Rosenblatt: "We believe Extreme . . . and we are confident the risk of double ordering is low").

### b.    The Statements Are Not Inactionable Opinions

Defendants argue that 22 of the 36 backlog statements contain "expression of confidence about Extreme's outlook" and thus those statements are inactionable "opinion" statements. MTD at 18 (challenging Statements 6-7, 9-10, 13, 15-16, 20, 23-24, 27, 32, 34, 37-38, 43-44, 47-50, 54). Defendants once again misclassify these Statements, most of which are not opinions. In the securities context, a statement of fact "expresses certainty about a thing, whereas a statement of opinion ... does not." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). These challenged statements largely express certainty and are factual assertions. *See, e.g.*, Statement 6 ("our double-digit revenue growth . . . ***was understated by the $400 million of incremental backlog*** we built during the year"); 9 ("our revenue outlook is really ***a function of supply chain and product that we are able to release, given the massive backlog that we've built up*** and the continued strength of bookings"); 24 ("***we're not seeing [decommits], we're not seeing de-books***"). Moreover, even statements that could arguably be characterized as opinions are not immunized as they contain within them embedded factual assertions, and those too are outside the

realm of opinion. *See Omnicare*, 575 U.S. at 183-86. Here, either the backlog orders were "firm" or not—and they were not. *See ViewRay*, 556 F. Supp. 3d at 789-90 (statements about backlog were not "a matter of opinion" because either the company had the commitments, or "it did not").

Furthermore, even if a statement is deemed an "opinion," such "statement of opinion, even if literally accurate, may be rendered misleading by the omission of a material fact," because "a reasonable investor expects that the issuer's opinion 'fairly aligns with the information in the issuer's possession at the time.'" *Glazer*, 63 F.4th at 764. Here, Defendants' touted "confidence" hinged upon the asserted strength of the backlog. *E.g.*, Statements 20, 31 ("our confidence in the revenue outlook *is supported by our product backlog of $542 million*"). It is materially misleading to make such declarations of confidence when Defendants had actual knowledge that at least 10% of the backlog (and up to 66%) was expected to be cancelled due to the ongoing double-ordering practice.[11]

## B.    The SAC Adequately Alleges Scienter

Scienter is the "mental state embracing intent to deceive, manipulate, or defraud," *Tellabs*, 551 U.S. at 319, and can be established by demonstrating "actual knowledge or recklessness." *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996). "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 310. A strong inference, "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Instead, the inference of scienter must be "at least as compelling as any opposing inference" and, if the inferences are equally plausible, "a tie goes to the plaintiffs." *Dermtech*, 2025 WL 1618193, at *7.

### 1.    Direct Evidence of Scienter Is Alleged

This is not a case where Defendants can credibly claim a "tie." *Id.* Instead, the SAC sets forth overwhelming evidence demonstrating that the Individual Defendants not only had actual knowledge of the alleged statements' falsity—but that they themselves orchestrated and directed the channel stuffing and backlog schemes with the stated intent to deceive the market. *See In re VeriFone*

---

[11] Moreover, Defendants' SOX certifications (¶¶408-09, 423, 442, 451, 476, 484) are false and misleading as they attested to the accuracy of financial reporting concerning both revenues and the backlog. *See Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *10 (N.D. Cal. Feb. 15, 2018).

*Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012) (drawing "overwhelming inference" of scienter where Defendants "encouraged employees to engage in 'aggressive'" tactics to hit financial targets); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1023 (9th Cir. 2005) (scienter firmly established where plaintiffs "have alleged with specificity that the top executives actually directed" improper practices).

Here, the SAC provides irrefutable "smoking gun" inferences of scienter:

**As to channel stuffing**, during the March 16, 2022 meeting, Defendant Brown launched the channel stuffing scheme and he specifically attributed the changed practice to Defendant Meyercord, who "chose this path," and the ELT (run by Defendants Meyercord, Thomas, and Rice). ¶¶107, 115, 122, 206; *see Hain*, 2025 WL 2749562, at *15 (scienter where "Individual Defendants negotiated the concessions and directed Hain employees to push product on distributors"). Brown specifically declared that the channel stuffing's purpose was to get "***into the Company [the] # that the street expects***" (¶¶106-07) because the Company was "***running out of tricks in our bag***" to meet the market's expected quarterly numbers, evidencing scienter. ¶112; *see Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1186 (S.D. Cal. 2009) (that "Novatel regularly shipped product prematurely in order to meet Wall Street expectations," raised a strong inference of scienter). Following the March 16, 2022 meeting, FE-1 learned that Extreme was formalizing the channel stuffing scheme Company-wide (¶493); witnessed the resulting proverbial "***blood in the streets***" (¶111) from distributors furious about the change (¶120); and brought his concerns directly to Defendant Thomas. ¶¶176-77. Of course, Thomas ignored FE-1 because he was also orchestrating the scheme, having personally met with key distributors to implement the channel stuffing scheme. ¶¶124-34. FE-1 resigned amidst this fraud and the "unethical" behavior he witnessed (¶179), also indicative of scienter. *Infra* at 22.

**As to backlog**, FE-7's account of ELT discussions of a 10% backlog cancellation hedge, and his direct and informed warning to Defendants on the ELT that there was ongoing practice of double-ordering and that the true cancellation risk was 66%, based on his decades of experience and "acid test" validating his concerns (*supra* at 13; ¶¶278-94, 421, 496), provides direct evidence of scienter *See In re Cell Therapeutics, Inc. Class Action Litig.*, 2011 WL 444676, at *3, *5 (W.D. Wash. Feb. 4, 2011) (scienter where "Defendants were told" that actions would invalidate agreement, resulting in misstatements). This Court previously found that "FE-7's pre-Class Period allegations are reliable

to provide what Defendants knew during the Class Period[.]" Order at 21. The SAC now clarifies that FE-7's allegations concerning the ELT Meeting occurred *during* the Class Period. ¶282.

The above facts independently allege scienter and show that Defendants "knew or should have known that their statements were false or misleading at the time they were made." *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 944-45 (S.D. Cal. 2019). Indeed, as this Court has explained, when the Individual Defendants are "on direct notice" of and "directly informed of the issues" underlying the allegations, this naturally establishes a "strong" inference of scienter. *See SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 742 F. Supp. 3d 1003, 1021 (N.D. Cal. 2024) (Thompson, J). The Courts' scienter analysis could end here, but the SAC provides additional, compelling facts that, when viewed holistically, further support a strong inference of scienter.

### 2.     Additional Allegations Support A Strong Inference Of Scienter

**Accounts of Former Employees**. Allegations from FEs are integral to the scienter analysis, and the FE accounts should be credited because the FEs are (a) "described with sufficient particularity to establish their reliability and personal knowledge" and (b) their statements are "indicative of scienter." *Quality Sys.*, 865 F.3d at 1144-45 Defendants do not challenge the first prong—nor can they (¶¶45-55)—and the SAC easily clears the second prong. Multiple FEs (FE-1 through FE-7, FE-10, FE-11) described Defendants' involvement in channel-stuffing and manipulative sales practices (¶¶97-123, 125-38, 140-44, 146-60, 164-77, 183-85, 190-228, 251-68) and multiple FEs (FE-1, FE-2, FE-5, FE-7, and FE-8) confirmed that it was internally known that the backlog orders were inflated by double-ordering (¶¶273-94, 296-328). The FE accounts must be credited, and any other dispute "must at least await discovery." *Berson*, 527 F.3d at 985.[12]

**Internal Reports and Meetings**. The allegations in the SAC demonstrate that the ELT (Meyercord, Thomas, Tate, and Rice) was routinely kept apprised of Extreme's internal financial conditions, including the status of the channel stuffing and backlog schemes.[13] Defendant Brown

---

[12] Contrary to Defendants' claim that the FEs were "low-level employees who 'never interacted with [Defendants]'" (MTD at 20), several reported directly to the Individual Defendants or provided first-hand accounts of their involvement. *See e.g.*, ¶¶45, 47, 51-52, 206, 278-84, 320-27.

[13] Defendants argue that FE-1 cannot speak to any Defendants' "contemporaneous knowledge" "when the statements were made." MTD at 20. However, "common sense" dictates that

Footnote continued on next page

himself described how there were "**lots of eyes on this backlog process – it's updated all the way to Ed [Meyercord]**." ¶328. *See Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015) (scienter where individual defendants were "kept apprised" of issues). The Individual Defendants' knowledge is further bolstered by the many internal reports where Extreme's purchase orders, demand levels, inventory, backlog, and other sales metrics were accessible and made available to Defendants—including lists of customers that Defendants wanted to target to "pull-in" sales—and including monitoring of the Clari and Salesforce revenue forecast databases. *See* ¶¶516-31; *Glazer*, 63 F.4th at 773 (finding scienter due to "Individual Defendants' access to internal reports and Clari, a revenue platform used to track deals"). FE-5 even explained that he "**knows for a fact**" that Extreme's senior executives reviewed updates on Clari and Salesforce databases—because he was told to write all updates "**as if Meyercord is reading them, because he is**." ¶¶242-43; *see Daou*, 411 F.3d at 1022 (monitoring "portions of the company's databases" raises scienter).[14]

Separately, the SAC describes repeated meetings attended by the Individual Defendants where the status of the Company's revenues, demand, and backlog—including the assumed "yield" from the backlog (*i.e.*, the rate of conversion from backlog to product revenue) (¶¶320-27)—was discussed. ¶¶532-48 (FEs describing (1) "Ed Talks," (2) Buy-In Meetings, (3) Exit Meetings, (4) Quarterly and Monthly C-Suite Meetings, (5) Revenue Assurance and "Output" Calls, and (5) Weekly Forecast Calls). These repeated, sometimes "weekly[,] meetings" further support a strong inference of scienter. *Hatamian*, 87 F. Supp. 3d at 1163 (meetings discussing "yield" supporting scienter); *see also In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *28 (N.D. Cal. Mar. 21, 2018) (allegations that defendant "personally attended meetings" supporting inference of scienter).[15]

"circumstances preceding the statements … would be among those knowable at the time of the statements." *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 971 (N.D. Cal. 2005).

[14] The SAC identified particular reports and their contents (¶¶230-48, 516-531) and alleged that Defendants received and monitored those reports (¶¶230-32, 238, 241-43, 247, 518, 520, 524-25, 529-31), despite Defendants' claim otherwise (MTD at 22). Defendants' own cited authority supports Plaintiffs' position. *See Charter Twp. of Clinton Police & Fire Ret. Sys. v. LPL Fin. Holdings Inc.*, 2019 WL 13178511, at *6 (S.D. Cal. Mar. 29, 2019) (scienter is supported where "management had a practice of 'continually monitoring' [] reports.").

[15] Defendants' argument that SAC alleged that the "meetings occurred, without accompanying facts about timing or what was discussed" (MTD at 22) is simply not true. *See* ¶¶8-9, 15, 104, 106-120, 129-30, 135, 148-51, 156, 182-85, 243, 278-85, 297, 322-27, 491-95, 532-48, 601 (providing timeframes for the alleged meetings and what was discussed in the meetings).

**Close Monitoring and Core Operations**. Scienter is further strengthened where Defendants "themselves told investors they had real-time access to, and knowledge of" the information that is the subject of the misstatements. *Quality Sys.*, 865 F.3d at 1145; *Daou*, 411 F.3d at 1022 ("specific admissions from top executives that [] are involved in every detail of the company" favors scienter). Here, each Defendant made admissions of detailed, real-time monitoring of the very topic that they misrepresented to investors. *E.g.*, ¶395 ("[w]e have ***complete visibility into our product backlog***"); ¶508 ("***we're both very close to the topic***" of the backlog); ¶509 ("each and every decommit, to the extent there is one, ***gets a lot of scrutiny from us***"); ¶458 ("***we have excellent visibility into our backlog . . . we don't see double ordering***"); ¶453 ("***we're very keen on demand and where demand is going. And so, we do a lot of analytics around that***"); ¶512 ("***I'm actually pretty close*** to looking at our sales pipeline [and] metrics"); 514 ("***we keep a very close eye on***" cancellations).

The core operations doctrine "relies on the principle that 'corporate officers have knowledge of the critical core operation of their companies.'" *Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2025 WL 556283, at *15 (N.D. Cal. Feb. 18, 2025) (Thompson, J). Here, it would be "absurd" (*id.*) to suggest that C-Suite officers responsible for revenue and backlog reporting were unaware of (1) the widespread channel stuffing that ***they instituted*** and that affected Extreme's most important distributors across various global regions (including Jenne, TD Synnex, Westcon, and ScanSource, distributors that collectively accounted for more than 50% of revenues (¶¶62-63)); or (2) the fact that the ***half billion dollar*** backlog they claimed to monitor with "complete visibility" was not in fact "firm." *See Berson*, 527 F.3d at 987 ("high-level managers must have known about the [backlog] orders because of their devastating effect on the corporation's revenue"). "Taken together, the core operations doctrine and the statements by Individual Defendants suggesting they closely monitored company data support an inference of scienter." *ZoomInfo*, 2025 WL 3013683, at *23.

**Pecuniary Motive**. Scienter is supported where defendants are motivated to inflate the company's "financial results and stock prices because their eligibility for stock options and executive bonuses were based principally on the company's financial performance." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003). Here, Extreme's Incentive Plan rewarded Defendants for increasing both the Company's stock price and

revenues, in the "short term." ¶¶572-82. In FY 2023, Defendants Meyercord, Thomas, Tate, and Rhodes received significant bonuses—Meyercord alone earned over $1.1 million in cash, or 142% and 136% of his base salary (for each half of the year) (¶¶579-80). *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 603 (N.D. Cal. 2019) (scienter established where "executives' compensation from stock and cash awards far outstripped their base salaries").

**Resignations, Retaliatory Culture, and Avoidance of Written Records**. This Court has recognized that suspicious resignations, "a pattern of retaliation against employees who raised concerns about unlawful conduct," and a defendant's refusal to put matters in "writing," all support scienter. *CareDx*, 2025 WL 556283, at *14. Here, the SAC details all three forms of suspicious conduct. ¶¶584-600, 608-14; *see also Hain*, 2025 WL 2749562, at *16 (a "company culture of secrecy and fear" contributed to scienter since "[s]uch secrecy insinuates knowledge of wrongdoing.").

**No Opposing Inference Is Equally or More Compelling**. Defendants recast the SAC's allegations as mere "general corporate motive" to "meet analyst and market expectations," in a distortion of both the substance and significance of Plaintiffs' allegations. MTD at 20. In support, Defendants rely on irrelevant, out-of-circuit authority where the court rejected plaintiffs' unsubstantiated claim that defendants acted with scienter based off a speculative general desire to meet market expectations. *See In re Great Atl. & Pac. Tea Co., Inc., Sec. Litig.*, 103 F. App'x 465, 469 (3d Cir. 2004). In stark contrast, the SAC here alleges not a mere general corporate motive, but a scheme that that Defendants knowingly devised in order to inflate revenues and backlog in order to mislead investors. Defendants also seek an innocent inference for Meyercord only by claiming that he increased his stock holdings during the Class Period. MTD at 19. However, Defendants fail to note that Meyercord made no open-market purchases during the Class Period, acquiring shares only through derivative exercises, negating any innocent inference. ¶583. *See Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *15 (N.D. Cal. Mar. 31, 2023) (if defendant's "increase in holdings were the result of compensation awards rather than stock purchases," inference of good faith is not supported).

C.     The SAC Adequately Alleges Loss Causation

Loss causation is the "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The Ninth Circuit has rejected any

requirement that Plaintiffs plead the "revelation of the fraud;" instead, loss causation involves "no more than the familiar test for proximate cause"—whether the "misstatement . . . foreseeably caused the plaintiff's loss"—which can be shown in "an infinite variety of ways." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). "It is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020).

Five disclosures revealed "new facts" that publicly "render[ed] some aspect" of Defendants' statements false or misleading, resulting in a total 60% stock decline as the truth emerged. *See* ¶618.

**January 25 and August 24, 2023 Disclosures**. On January 25, 2023, Extreme revealed that backlog had fallen and Defendant Thomas unexpectedly resigned as CFO, causing a 15% share price decline. ¶¶353-55. On August 24, 2023, Extreme confirmed that backlog had again fallen, now by an astonishing $245 million over the year (a 48% drop), causing a 9% share price decline. ¶¶357-59. The market did not expect backlog to normalize at this sudden pace, and analysts attributed the drop in Extreme's stock price to the unanticipated backlog freefall. *E.g.*, ¶¶356, 360. These disclosures revealed new facts that rendered some aspect of prior statements about backlog strength, health of the channel, and the "strong" and "unabated demand" for Extreme's products false and misleading, causing a precipitous stock decline. That is all that is required. *See BofI*, 977 F.3d at 790; *Lamartina*, 2023 WL 2763541, at *16 (announcement of "shrinking backlog" constituted corrective disclosure).

In response, Defendants raise an improper truth on the market argument, rehashing their claim that boilerplate warnings that "backlog would decrease" neutralized the falsity of their alleged misrepresentations and the magnitude of these disclosures. MTD at 24. Defendants' risk warnings offer no protection here (*supra* at 11-12, 15-16) and, moreover, truth on the market defenses are unsuitable at this stage. *See Pardi v. Tricida, Inc.*, 2022 WL 3018144, at *6 (N.D. Cal. July 29, 2022). Defendants also contend that Thomas' unexpected resignation is not causally connected to prior misrepresentations. MTD at 24-25. However, analysts attributed Extreme's stock drop to Thomas' abrupt exit (¶356), and the SAC directly ties his departure to his concerns over the Company's sales practices (¶¶150, 612). *See Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *18 (C.D. Cal. Jan. 17, 2020) (loss causation where stock fell after "unexpected" executive departure).

**November 1, 2023, January 8, 2024, and January 31, 2024 Disclosures**. On November 1, 2023, Extreme stated that it would discontinue disclosing its backlog on a quarterly basis, reported sequential total revenue losses, and projected lowered guidance attributable to an "air pocket" of demand, and Extreme's share price declined 18%. ¶¶361-65. On January 8, 2024, Extreme revealed that it "expected" to fail to meet that guidance because of "channel digestion" issues, and Extreme's share price declined 7%. ¶¶366-69. On January 31, 2024, Extreme reported a decline in revenues and attributed it to "continued channel digestion and elongated sales cycles," "[o]ur distributors and partners [] lower[ing] inventory purchases," and disclosed that it anticipated a "$40 million to $50 million reduction in channel inventory" with "sell through to be significantly higher than sell-in." ¶¶370-76 (resulting in a 24% stock price decline). In these disclosures, Extreme revealed new facts indicating that its channel was oversaturated, and its product backlog, which had now normalized, had not been "firm" since revenues had not correspondingly increased. ¶372. From these disclosures, the market understood that "*it is now apparent that Extreme is not growing at a sustainable double-digit rate*," and that Extreme's stock had fallen due to "*depressed demand*," including because of "*double-ordering by customers*." ¶377. The SAC adequately alleges loss causation because it was entirely foreseeable that that implementation of Defendants' channel stuffing and manipulative business practices would lead to the buildup of inventory at the distributor/partner level such that there would be drastically less revenue once those distributors/partners could not ingest more inventory. *See In re Ramp Networks, Inc. Sec.*, 201 F. Supp. 2d 1051, 1080-81 (N.D. Cal. 2002) (loss causation where "damage was a foreseeable consequence of the misrepresentation").

Given the specificity of Extreme's disclosures, Defendants' citation to *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014) (MTD at 23-24) is inapposite, because there, unlike here, the corrective disclosures were merely "disappointing earnings results" without more. Defendants' other cited cases are also distinguishable on the facts. *See, e.g.*, *Intersect ENT*, 2020 WL 6750568, at *7, *10 (channel stuffing case; no loss causation because, unlike here, Defendants' statements "did not implicate any causes for the revenue or sales"). Additionally, Defendants' argument that "factors . . . unrelated" to the disclosure of Extreme's fraudulent activity caused Extreme's downward revenues and guidance (MTD at 24) is belied by the facts and cannot be credited at this stage. *See*

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1046 (N.D. Cal. 2018) (rejecting defendants' alternative theory because "[w]hether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial[.]"). Finally, Defendants insistence that their disclosures were unrelated to their channel stuffing (MTD at 25) is untethered to the law; it is well-established that loss causation "may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss," including "upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *First Solar*, 881 F.3d at 753-54; *see also York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1216 (N.D. Cal. 2024) (loss causation adequately pled "even though [channel stuffing] scheme was not known at the time"); *Cunha v. Hansen Nat. Corp.*, 2011 WL 8993148, at *3-*4 (C.D. Cal. May 12, 2011) (loss causation adequately pled where complaint alleged that the effects of channel stuffing scheme "finally began to wear off" in the same quarter company "missed expectations" and faced a "significant stock price drop[]").

### D.    The SAC Adequately Alleges Scheme and Control Person Liability

Defendants "deceptive conduct" related to devising and implementing the channel stuffing scheme and backlog deception support the SAC's claims of scheme liability. *See* ¶¶650-53; *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011). Indeed, courts have found that channel stuffing is evidence of deceptive conduct to support a scheme liability claim. *See ZoomInfo*, 2025 WL 3013683, at *19 (listing examples of scheme conduct, including channel stuffing); *HP*, 738 F. Supp. 3d at 1194 (scheme liability where executive approved discounts to inflate sales numbers). Defendants' scheme liability challenges repeat their arguments concerning the misstatements claim, *see* MTD at 25, and fail for all the reasons stated herein.

Plaintiffs adequately alleged a §10(b) violation, and Defendants do not challenge their control, so the Court should sustain the §20(a) claim. *See Plantronics*, 2022 WL 365333, at *20.

## III.    CONCLUSION

For the reasons set forth above, Defendants' MTD should be denied in its entirety. Alternatively, if the Court grants any part of Defendants' MTD, Plaintiffs respectfully request leave to amend. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

DATED:  November 3, 2025

Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

*/s/ Lauren A. Ormsbee*
Lauren A. Ormsbee (*pro hac vice*)
David Saldamando (*pro hac vice*)
Danielle S. Lazarus (*pro hac vice*)
Alexandra E. Forgione (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
lormsbee@labaton.com
dsaldamando@labaton.com
dlazarus@labaton.com
aforgione@labaton.com

*Counsel for Lead Plaintiffs and
Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (Bar No. 250893)
Reed R. Kathrein (Bar. No. 139304)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

*Liaison Counsel for the Class*

**VANOVERBEKE MICHAUD & TIMMONY P.C.**
Aaron L. Castle (*pro hac vice*)
79 Alfred Street
Detriot, MI 48201
Tel: (313) 578-1200
Fax: (313) 578-1201
acastle @vmtlaw.com

*Additional Counsel for Oakland County Voluntary
Employees' Beneficiary and Oakland County
Employees' Retirement System*