LATHAM & WATKINS LLP
Melanie M. Blunschi (Bar No. 234264)
 *melanie.blunschi@lw.com*
Morgan E. Whitworth (Bar No. 304907)
 *morgan.whitworth@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Daniel R. Gherardi (Bar No. 317771)
 *daniel.gherardi@lw.com*
140 Scott Drive
Menlo Park, CA 94025
Telephone: +1.650.328.4600

*Attorneys for Defendants Extreme Networks, Inc., Edward B. Meyercord III, Rémi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, and Jonas Brown*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EXTREME NETWORKS, INC., EDWARD B. MEYERCORD III, RÉMI THOMAS, CRISTINA TATE, KEVIN RHODES, NORMAN RICE, and JONAS BROWN<br><br>Defendants. | Case No. 3:24-cv-05102-TLT<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS LEAD PLAINTIFFS' SECOND AMENDED CONSOLIDATED COMPLAINT**<br><br>Hearing:   March 3, 2026<br>Time:      2:00 p.m.<br>Location:  Courtroom 9 - 19th Floor<br>Judge:     Hon. Trina L. Thompson |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................................................................. 1

II.    ARGUMENT ................................................................................................................... 2

    A.    Plaintiffs Do Not Adequately Allege A Material Misstatement ........................... 2

        1.    The Growth And Demand Statements Were Not Misleading ................................................................................. 2

            a.    The Opposition Highlights What Plaintiffs' Allegations Lack ....................................................... 2

            b.    Corporate Optimism Is Not Actionable ......................................... 5

            c.    The Statements Are Protected By The PSLRA Safe Harbor ........................................................................... 6

        2.    The Backlog Statements Were Not Misleading ........................................ 7

            a.    Plaintiffs Still Do Not Identify Any Fact Demonstrating the Statements Were False When Made ............................................................... 7

            b.    The PSLRA Safe Harbor Protects Backlog Statements ............................................................... 8

            c.    The Backlog Statements Are Nonactionable Opinions ............................................................................. 9

    B.    Plaintiffs Do Not Allege Scienter .............................................................. 10

        1.    Plaintiffs Do Not Allege a Plausible Motive ......................................... 10

        2.    Other Allegations Do Not Create a Strong Inference of Scienter ............................................................... 10

        3.    The More Compelling Inference Is Good Faith ...................................... 12

    C.    Plaintiffs Do Not Allege Loss Causation ................................................... 13

    D.    Plaintiffs Fail to Plead Scheme Liability ................................................... 15

III.    CONCLUSION ............................................................................................................ 15

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ....................................................................................... 8

*Brown v. Ambow Educ. Holding Ltd.*,
2014 WL 523166 (C.D. Cal. Feb. 6, 2014)................................................................ 15

*Cai v. Eargo, Inc.*,
2025 WL 66041 (9th Cir. Jan. 10, 2025) ................................................................... 10

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2019 WL 6877195 (N.D. Cal. Dec. 17, 2019)....................................................... 5, 10

*DeKalb Cnty. Pension Fund v. Roblox Corp.*,
2025 WL 948124 (N.D. Cal. Mar. 28, 2025)....................................................... 14, 15

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024) ....................................................................................... 11

*Farrar v. Workhorse Grp., Inc.*,
2021 WL 5768479 (C.D. Cal. Dec. 2, 2021) ............................................................... 9

*Garcia v. J2 Glob. Inc.*,
2022 WL 22717936 (C.D. Cal. Aug. 8, 2022)............................................................ 11

*Gimpel v. The Hain Celestial Grp., Inc.*,
156 F.4th 121 (2d Cir. 2025) ....................................................................................... 3

*In re Accuray, Inc. Sec. Litig.*,
757 F. Supp. 2d 936 (N.D. Cal. 2010) ......................................................................... 9

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ..................................................................................... 9

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ..................................................................................... 14

*In re Credit Suisse First Boston Corp.*,
2005 WL 852455 (D. Mass. Mar. 31, 2005)................................................................ 4

*In re Curaleaf Holdings, Inc. Sec. Litig.*,
519 F. Supp. 3d 99 (E.D.N.Y. 2021) ........................................................................... 7

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ............................................................................. 11, 12

*In re ICN Pharm., Inc. Sec. Litig.*,
  299 F. Supp. 2d 1055 (C.D. Cal. 2004) .................................................................................. 3

*In re Intel Corp. Sec. Litig.*,
  2019 WL 1427660 (N.D. Cal. Mar. 29, 2019)...................................................................... 14

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022) .......................................................................................... 13, 15

*In re Plantronics, Inc. Sec. Litig.*,
  2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ...................................................................... 6

*In re Plantronics, Inc. Sec. Litig.*,
  2021 WL 8572663 (N.D. Cal. Mar. 29, 2021) ...................................................................... 4

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) (Opp. ) ................................................................................ 11

*In re Solarcity Corp. Sec. Litig.*,
  274 F. Supp. 3d 972 (N.D. Cal. 2017) .............................................................................. 6, 8

*In re SunPower Corp. Sec. Litig.*,
  2018 WL 4904904 (N.D. Cal. Oct. 9, 2018).......................................................................... 6

*In re Verifone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) .............................................................................................. 12

*Karinski v. Stamps.com, Inc.*,
  2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ....................................................................... 14

*Lamartina v. VMware, Inc.*,
  2023 WL 2763541 (N.D. Cal. Mar. 31, 2023)................................................................ 10, 14

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) ........................................................................................... 7, 9

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014), *as amended* (Sept. 11, 2014)............................................... 15

*Magro v. Freeport-McMoran Inc.*,
  2018 WL 3725781 (D. Ariz. Aug. 3, 2018)......................................................................... 14

*Melot v. JAKKS Pac., Inc.*,
  2015 WL 12743698 (C.D. Cal. Mar. 2, 2015)....................................................................... 9

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) (Opp. ) .................................................................................. 13

*Murphy v. Precision Castparts Corp.*,
  2017 WL 3084274 (D. Or. Jun 27, 2017) ............................................................................. 6

*Ng v. Berkeley Lights, Inc.*,
    2024 WL 695699 (N.D. Cal. Feb. 20, 2024) ........................................................................ 14

*Petersen v. TriplePoint Venture Growth BDC Corp.*,
    2024 WL 5384678 (N.D. Cal. Aug. 7, 2024) ................................................................. 10, 15

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
    2025 WL 556283 (N.D. Cal. Feb. 18, 2025) ....................................................................... 12

*Plumbers & Steamfitters Loc. 60 Pens. Trust v. Meta Platforms, Inc.*,
    2024 WL 4251896 (N.D. Cal. Sept. 17, 2024) .............................................................. 14, 15

*Prodanova v. H.C. Wainright & Co., LLC*,
    993 F.3d 1097 (9th Cir. 2021) ............................................................................................ 11

*Sneed v. AcelRx Pharms., Inc.*,
    2024 WL 2059121 (N.D. Cal. May 7, 2024) ....................................................................... 13

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) .............................................................................................. 15

*Trustees of Welfare & Pension Funds of Local 464A v. Medtronic PLC*,
    2025 WL 2784543 (D. Minn. Sept. 30, 2025) .................................................................... 15

*Waterford Twp. Police v. Mattel, Inc.*,
    321 F. Supp. 3d 1133 (C.D. Cal. 2018), *aff'd sub nom. Castro v. Mattel, Inc.*,
    794 F. App'x 669 (9th Cir. 2020) ................................................................................ 2, 5, 8

*West v. Ehealth, Inc.*,
    2016 WL 948116 (N.D. Cal. Mar. 14, 2016) ...................................................................... 10

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
    655 F.3d 1039 (9th Cir. 2011) ............................................................................................ 15

# GLOSSARY

| Term | Definition |
|---|---|
| ¶__ | Citations to the paragraphs of the SAC. |
| CEO: | Chief Executive Officer |
| Class Period: | July 27, 2022 through January 30, 2024, inclusive |
| CW: | Confidential Witness |
| Defendant(s): | Extreme Networks, Inc., Edward Meyercord III, Remi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, Jonas Brown, or any of the Defendants individually |
| ELT | Extreme Networks' Executive Leadership Team |
| Ex(s). or Exhibit(s): | Exhibits attached to the Declaration of Morgan E. Whitworth in Support of Defendants' Motion to Dismiss Plaintiffs' Second Amended Consolidated Complaint filed concurrently herewith, which are public filings and statements that are incorporated into the Complaint and/or subject to judicial notice |
| Extreme or the Company: | Extreme Networks, Inc. |
| FAC | Plaintiffs' First Amended Consolidated Complaint for Violation of Federal Securities Laws, filed February 14, 2025, Dkt. No. 59 |
| FE: | Confidential Former Employees who supposedly made allegations that Plaintiffs included in the SAC |
| FY22, FY23, FY24, FY25: | Extreme's fiscal years, including fiscal year 2022 (July 1, 2021 to June 30, 2022), fiscal year 2023 (July 1, 2022 to June 30, 2023), and fiscal year 2024 (July 1, 2023 to June 30, 2024) |
| Individual Defendants: | Edward Meyercord III, Remi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, Jonas Brown |
| Order | Order Granting Motion To Dismiss, Dkt. No. 92 |
| Plaintiffs: | Oklahoma Firefighters Pension and Retirement System, Oklahoma Police Pension and Retirement System, Oakland County Voluntary Employees' Beneficiary Association, and County Employees' Retirement System |
| PSLRA: | The Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77k, 77l, 77z–1, 77z–2, 78a, 78j–1, 78t, 78u, 78u–4, 78u–5 |
| SAC: | Plaintiffs' Second Amended Consolidated Complaint for Violation of Federal Securities Laws, filed September 9, 2025, Dkt. No. 95 |
| Section 10(b): | Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| Section 20(a): | Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| Statements: | Statements Plaintiffs allege to be false or misleading. |
| Tr. | August 12, 2025 Transcript of Proceedings on Defendants' Motion to Dismiss |

## I.    INTRODUCTION

Plaintiffs still have not met the PSLRA's exacting standards.  Plaintiffs have now had four chances—two complaints plus two briefs and appendices—to allege a plausible theory of fraud, yet they have not overcome the fundamental flaws in their claims that the Court uncovered in a lengthy hearing and thorough Order dismissing the FAC.  The SAC should be dismissed.

First, the Court previously rejected Plaintiffs' original **channel-stuffing** theory (not included in the initial complaint) as both "implausible" (because Plaintiffs alleged it commenced as early as 2017) and short on specific details.  The SAC does not solve either of these problems.  Though Plaintiffs now claim—based on new FE allegations that were inexplicably left out of the FAC—that channel stuffing only started in March 2022, their new theory is no more plausible than their last.  Nor is it any more detailed.  Plaintiffs elicited additional information from five of their 11 FEs, but none manages to offer specific details of coercion, unwanted sales, or returns.

Second, the Court rejected Plaintiffs' original **backlog** theory as too "generalized" and missing specific details of double- or triple-booking or actual cancellations.  The SAC falls short here, too.  No matter how the Opposition frames Plaintiffs' "new" allegations, it offers no substitute for its lack of any particularized allegations of Extreme's customers actually placing double orders and then cancelling them—and no particularized allegations showing any backlog statement was false or misleading when made.

Like last time, these flaws in Plaintiffs' factual allegations require dismissal.  But should the Court reach Defendants' other arguments on falsity, those too show that the SAC is insufficient.  Virtually all of the Statements are not actionable because they are general statements of corporate optimism, protected forward-looking statements, opinions, or some combination.

In addition to their inability to allege that any Statement was materially false or misleading when made, Plaintiffs' failure to allege a strong inference of **scienter** is an independent ground for the Court to dismiss.  With no suspicious trading or other personal financial motive to lean on, the Opposition resorts to accusing Defendants of engaging in a multi-year fraud all so Extreme could hit the revenue guidance that *Extreme* sets.  But such a generic motive is insufficient to support a compelling inference.  Plaintiffs' other scienter allegations—meetings, access to vague reports,

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW

resignations—are equally lacking in specificity and not indicative of Defendants' mental states.

The SAC's failure to allege **loss causation** is another independent ground for dismissal. Plaintiffs allege no revelation of fraud and still have not found a single auditor, market analyst, or regulator who believes that Extreme was channel stuffing or lied about its backlog.

Finally, the Opposition all but admits that Plaintiffs have failed to allege a **scheme** separate from their misstatement theory. Their scheme claim should be rejected for the same reasons.

Plaintiffs had their chance to add plausible and particularized facts to their complaint. They added length—but no substance sufficient to surpass the PSLRA's pleading prerequisites. The extra words do not provide a plausible explanation for why a thriving business would suddenly implement a channel-stuffing scheme when its revenues had never been stronger, or why it would feel the need to lie about the future prospects for its backlog when, according to Plaintiffs, its customers were willing to buy products they didn't need to improve their priority on the order list during the pandemic-era supply shortages. Instead, the reality is that Extreme—like scores of other companies—was facing a once-in-a-lifetime supply chain disruption and took commercially reasonable actions to deal with it. Nothing more. The SAC should be dismissed with prejudice.

## II.   ARGUMENT

### A.   Plaintiffs Do Not Adequately Allege A Material Misstatement

#### 1.   The Growth And Demand Statements Were Not Misleading

##### a.   The Opposition Highlights What Plaintiffs' Allegations Lack

Plaintiffs have abandoned their previous representation to the Court that Extreme's sales practices were not "illicit" channel stuffing. *See* Order at 14. That means Plaintiffs must allege "corroborating details" like "[s]pecific transactions, specific shipments, specific customers, specific times, or specific dollar amounts." *Id.* (quoting *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1147 (C.D. Cal. 2018), *aff'd sub nom. Castro v. Mattel, Inc.*, 794 F. App'x 669 (9th Cir. 2020)). While the Opposition flip-flops yet again, Opp. at 7, Plaintiffs have not alleged the details required to show that Extreme was engaging in fraudulent sales practices. The Court has already ordered Plaintiffs to plead "undisputed facts, such as an internal report or internal policy that show channel stuffing was occurring." Order at 15. Plaintiffs at most allege that

Extreme changed its order shipment priority system because "supply chain constraints were 'not getting better,'" ¶¶ 116-17. It makes sense that Extreme prioritized large orders and that its distributors—including Westcon, ScanSource, and Jenne—placed large orders to satisfy their own "very big backlog." ¶ 126; *see also* ¶ 138 ("Westcon wanted to do this in order to be prioritized in the backlog line."). But this is not channel-stuffing; it is a "business decision to offer" incentives to "reach [Extreme's] sales targets." *In re ICN Pharm., Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1061 (C.D. Cal. 2004). And it demonstrates the opposite of a channel-stuffing scheme: Extreme's customers had so much demand they wanted to place large orders to try to meet that demand.

Plaintiffs' reliance on the Second Circuit's decision in *Gimpel v. The Hain Celestial Grp., Inc.* (Opp. at 1, 5) illustrates their allegations' shortcomings. In that case, facing stiff competition from other brands and retailers, Hain began offering concessions to distributors to front-load purchases, including "cash incentives as high as $500,000," product discounts, "extended payment terms," "spoils coverage," and "an absolute right to return unsold products." 156 F.4th 121, 130 (2d Cir. 2025). Hain accounted for these sales without disclosing the return rights or other concessions offered. *Id*. When Hain faced a "sales shortfall," defendants pulled forward sales for a quarter—which "raised serious accounting issues" and resulted in delayed and then restated financial statements, an SEC investigation resulting in a consent decree, and remedial measures to fix internal control issues. *Id.* at 130-34. Plaintiffs allege nothing of the sort here. There are no alleged cash incentives or absolute rights-of-return, no "serious accounting issues," no delayed or restated financial statements, no SEC investigation, and no remedial measures. Far from raising a red flag, Extreme's auditors have consistently issued clean opinions on Extreme's financials. Mot at 12. And most notably, nobody but Plaintiffs has ever accused Extreme of channel stuffing.

The Court dismissed Plaintiffs' channel-stuffing claim before, and nothing Plaintiffs add to the SAC or their Opposition changes that result.

***First***, Plaintiffs' zombie theory of "illicit" channel stuffing is no more plausible than before. Ignoring the context of an unprecedented global pandemic, Plaintiffs claim FE-1's "newly acquired" notes provide "specific and particularized allegations of channel stuffing, including [a] clearer timeline and communications with Defendants." Opp. at 6, Order at 17. In reality,

Plaintiffs have recast FE-1's allegations to spin an entirely different (and inconsistent) story from the FAC that still fails to plead channel stuffing. To start, Plaintiffs gloss over that the FAC already alleged that FE-1 "provided to Lead Counsel personal notes evidencing meetings," including one in March 17, 2022. FAC ¶ 108; *see also* ¶ 116 (discussing the same notes). Even if FE-1 for some reason held back the "smoking gun" portions of his notes about the supposedly crucial March 2022 meeting until after the Court's Order, all they provide are dates (suspiciously years later than FE-1 originally claimed, Order at 17) for the onset of a new supply-allocation strategy to deal with a constrained supply chain. But that does not demonstrate an illicit channel-stuffing scheme.

*Second*, Plaintiffs argue the SAC includes "detailed allegations showing overstuffed channels, falling revenues, and coerced sales of unwanted product to meet targets." Opp. at 8. Wrong again. Nowhere in the SAC is there an allegation of an "overstuffed channel"—on the contrary, Defendants' distributors had "very big backlog[s]" that they were struggling to meet given supply chain constraints. ¶ 126; Mot. 8-9. Nor did Extreme face falling revenues; Plaintiffs admit Extreme "reported incredibly strong revenue growth throughout the Class Period," ¶ 81— revenue that met or exceeded the Company's guidance for six of the seven quarterly earnings reports issued during the Class Period. Mot. at 4. And Plaintiffs do not allege a single coerced sale with particularity, instead admitting Extreme's distributors "wanted to" place orders. ¶ 138.

*Third*, Plaintiffs' channel-stuffing theory is based on the idea that distributors were buying unwanted inventory, but Plaintiffs *still do not allege* a single particularized fact suggesting *any* returns of inventory. Plaintiffs resist this conclusion, citing three examples they say represent returns. Opp. at 8-9. But these consist of a relatively small return *request* (¶ 177), a deal that allegedly included a "right to return" "a certain percentage" of the order (but not any *actual* returns) (¶ 132), and mischaracterizations of Extreme's financial results (¶ 178). *See* Mot. at 9-10 (discussing cited allegations). None amounts to particularized allegations of products returns, much less in a material amount. *See In re Credit Suisse First Boston Corp.*, 2005 WL 852455, at *7 (D. Mass. Mar. 31, 2005) (rejecting plaintiff's "wishful misinterpretation of what the document in question actually said"). As Plaintiffs' own authority recognizes, so-called channel-stuffing is "merely good business when the customers want or keep the products they receive." *In re*

*Plantronics, Inc. Sec. Litig.*, 2021 WL 8572663, at *6 (N.D. Cal. Mar. 29, 2021) (citation omitted). And Plaintiffs' theory is even less plausible because it assumes, without any factual basis, that Extreme was able to "force" its three largest distributors—far larger businesses than Extreme and on whom Extreme's revenue greatly depends (¶ 63)—to participate unwillingly in the scheme.

*Fourth*, and relatedly, Plaintiffs insist their new FE allegations are reliable because they describe conversations or practices they observed. Opp. at 9. That misses the point. The problem with Plaintiffs' FEs is they do not provide "sufficient corroborating details about the purported scheme," i.e., illicit channel stuffing. *Mattel*, 321 F. Supp. 3d at 1147. For instance, FE-4 discusses a purported $52 million "deal" for "end of sale" products in exchange for priority products. ¶¶ 131-34. But FE-4 does not say Westcon exercised its alleged right to "do a stock return the following quarter." ¶ 132. The same is true for the other distributors he identifies. ¶ 135. Plaintiffs' reliance on FE-11 is even less convincing: the Opposition claims FE-11 corroborated FE-4's "$102 million Westcon channel stuffing deal." Opp. at 7. He did not; all FE-11 said was that "Westcon *in EMEA* was 'often' asked to take early shipments, and that Westcon wanted to do this in order to be prioritized in the backlog line." ¶ 138 (emphasis added).

*Finally*, Plaintiffs' argument that Extreme's reported revenue results were misleading fails from the start because "allegations of coercive Sales Practices" do not render Extreme's financial reporting "per se false or misleading." *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *12 (N.D. Cal. Dec. 17, 2019). Plaintiffs do not allege Extreme's actual revenue reporting was false, nor could they: "revenue was, in fact, growing throughout the Class Period" and has never been restated. *Id.*[1] And for that reason, Plaintiffs' challenges to Defendants' SOX certifications (Opp. at 17 n. 11) similarly fails. *See* Mot. at 11-12.

> b.    Corporate Optimism Is Not Actionable

The Opposition does not cure the fundamental flaw that many of the growth and demand

---

[1] In two footnotes, Plaintiffs incorrectly state that "no further analysis" is required for certain Statements if the Court finds them to be "adequately alleged as false or misleading." Opp. at 10 n.4, 14 n.10. Plaintiffs' own Exhibit A—which is itself improper extraneous argument that goes far beyond the allotted 25-page limit for the Opposition—belies this assertion. For instance, Plaintiffs identify Statement 13 as one where the Court need not engage in "further analysis," yet Plaintiffs' Exhibit correctly notes that Defendants argue Statement 13 is *also* an inactionable opinion *and* an inactionable SOX certification. *See* Ex. A.

Statements are nonactionable puffery because they attributed growth to non-quantifiable language (*e.g.*, "strong demand") without pointing to specific factors or revenue sources that could mislead investors. Mot. at 12-13 (listing specific nonactionable Statements). Plaintiffs cite *Murphy* and *Plantronics* to assert Defendants' "strong growth" and "strong demand" statements are actionable because the purportedly undisclosed adverse information may be important to investors. Opp. at 10. But again, both cases are distinguishable. In *Murphy*, the court found statements that "the demand is there, the contracts are there, the schedules are there," "they are just doing a temporary destocking," and "the destocking goes away" could be objectively evaluated and verified. 2017 WL 3084274, at *10-11 (D. Or. Jun 27, 2017). In *Plantronics*, defendants' statements about the market's "rapid adoption of recently introduced products" and "solid results" demonstrating "the leverage available in the model that we have" omitted internal reports finding that channel stuffing was the true cause of revenue growth. 2022 WL 3653333, at *16 (N.D. Cal. Aug. 17, 2022).

In contrast, Plaintiffs ignore the numerous cases cited in the Motion in which courts dismissed virtually identical statements as nonactionable puffery, claiming the cases do not involve a "manipulative sales context." Opp. at 10. But they do. *See* Mot. at 12. In *In re Solarcity Corp. Securities Litigation*, the plaintiffs likewise alleged that the company employed "overly aggressive and deceptive sales practices" to induce customers into entering contracts they later cancelled. 274 F. Supp. 3d 972, 980 (N.D. Cal. 2017). Yet the court held statements that "[d]emand remained as strong as ever," "Q2 was an amazing quarter," "incredibly strong sales," and "we very [sic] optimistic about our growth" non-actionable. *Id.* at 995; *see also In re SunPower Corp. Sec. Litig.*, 2018 WL 4904904, at *3-4 (N.D. Cal. Oct. 9, 2018) ("very strong demand" was nonactionable puffery despite allegations that defendants failed to disclose cancelled contract negotiations).

c.    The Statements Are Protected By The PSLRA Safe Harbor

The forward-looking Growth and Demand Statements are also nonactionable as they are protected by the PSLRA safe harbor. Mot. at 13-14. Plaintiffs argue the Statements (1) are not forward-looking; (2) are unaccompanied by meaningful cautionary language; and (3) were made with actual knowledge of falsity. Opp. at 10-11. Each challenge fails.

***First***, the Opposition cherry-picks words in forward-looking statements to make them seem

present-tense.  For instance, Plaintiffs cite Statement 9 but omit Meyercord's discussion of "our revenue *outlook*."  ¶ 399.  Likewise, Plaintiffs cite Statement 15 but insert ellipses for the forward-looking portion: "that gives us confidence that demand *is going to continue*."  ¶ 453.

**Second**, Plaintiffs' complaints about Extreme's warnings lack merit.  Opp. at 11.  Plaintiffs' claim that Defendants "ignore" statements "where no cautionary language was provided" (Opp. at 12) overlooks that "not every public statement made by the Company need contain the full roster of disclosures detailed in the Company's security filings."  *In re Curaleaf Holdings, Inc. Sec. Litig.*, 519 F. Supp. 3d 99, 108 (E.D.N.Y. 2021).  And Plaintiffs' conclusory assertion that Extreme's cautionary language was "general" disregards the actual disclosures.  *See* Mot. at 3, 13 (quoting specific cautionary language directly related to topics at issue).

**Third**, Plaintiffs do not adequately allege scienter, much less the "stricter" "actual knowledge" standard.  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 n.18 (9th Cir. 2002).

### 2. The Backlog Statements Were Not Misleading

#### a. Plaintiffs Still Do Not Identify Any Fact Demonstrating the Statements Were False When Made

Plaintiffs' Opposition ignores the fact that the SAC does not allege any backlog statement was contemporaneously false at the time it was made.  Mot. at 14-17.  Plaintiffs focus on Tate's May 17, 2023 statement that "we don't see double ordering" and say it is inconsistent with FE-7's memory of a meeting almost a year earlier and some armchair survey he supposedly did around the same time, among other FE allegations.  Opp. at 12-13.  But they do not point to a single particularized allegation that Defendants *were* seeing double-ordering at that time: (i) FE-7 did not speak with any Extreme customers, let alone confirm that they were placing double orders *with Extreme*, *see* ¶¶ 288-90; (ii) FE-5's vague account is undated, *see* ¶¶ 318-19; (iii) FE-2 does not identify an actual customer who was double-ordering, much less that any Defendant knew about it, *see* ¶ 315; and (iv) FE-3's conversation with Thomas (alleged in the FAC, *see* FAC ¶¶ 264-71) occurred in 2022, *see* ¶¶ 303-11.  (Notably, the Opposition does not cite FE-1's allegations.)

Rather than identify particularized contradictory facts Defendants knew at the time of the Statements, Plaintiffs rely on a flawed comparison to *Berson*.  Opp. at 14.  But in *Berson*, the

plaintiffs alleged that the backlog included purported sales subject to "stop-work" orders *and* they alleged both *when* those stop-work orders were received and their magnitude, such that defendants had a duty to disclose them when they announced their backlog figures. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 n.1, 5 (9th Cir. 2008) (complaint alleged stop-work order was received in December 2004 and still in effect during January 2005 statement). In contrast, Plaintiffs do not connect any FE account, including FE-7's claim that the ELT discussed in the spring or summer of 2022 a 10% "hedge" for orders that could be cancelled, with any Statement. *See* Mot. at 15-16 (alleged June-September 2022 discussion of forward-looking hedge did not contradict any statements around or after that time). Nor do Plaintiffs' FEs offer any particularized allegations about double-ordering *or* cancellations. *See Solarcity*, 274 F. Supp. 3d at 999-1001 (rejecting CW statements about backlog as insufficient, including where estimate of a 0% cancellation rate "may or may not have been the cancellation rate during the Class Period").

### b.    The PSLRA Safe Harbor Protects Backlog Statements

As with the growth-and-demand Statements, Plaintiffs claim the backlog Statements are not forward-looking (Opp. at 14-16), but Plaintiffs ignore the actual Statements. For instance, Plaintiffs point to Statement 6, but they omit the portion of that statement that referenced Extreme's "confidence in our *outlook for continued growth and demand*." ¶ 395. So too for Statement 44. *See* ¶ 464 ("giving us confidence in our *outlook for this fiscal year*"). These Statements (and the other backlog Statements, *see* Mot. at 18) relate to Extreme's "future expectations and performance" and are thus forward-looking. *Mattel*, 321 F. Supp. 3d at 1150 ("feel pretty confident," "remain broadly on track to deliver on our full-year outlook" forward-looking).

Not only are the backlog Statements forward-looking, they were also accompanied by meaningful cautionary language. Mot. at 4-5, 18. Plaintiffs claim the warnings don't count, because in *Berson*, backlog included double orders and orders "at serious risk of being cancelled altogether." Opp. at 15-16. But the *Berson* court did not discuss whether any cautionary language was meaningful, as the backlog was not forward-looking. On the other hand, Extreme defined its backlog as representing "confirmed purchase orders for products *to be fulfilled and billed*," noting "[a]ctual shipments of products depend on the then-current capacity of our contract manufacturers

and the availability of materials and components[.]" Ex. 6 at 9. And Extreme "repeatedly warned that its results could differ from its forward-looking statements." *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 948 (N.D. Cal. 2010); *see also, e.g.*, Ex. 2 at 2; Ex. 4 at 4; Ex. 9 at 4.

Plaintiffs argue—without any authority—that Defendants "neutralized any applicable cautionary language" by "contradicting it" during earnings calls. Opp. at 16. But this would render the PSLRA safe harbor meaningless. None of Plaintiffs' cited cases (Opp. at 16) even addresses cautionary language, let alone how defendants could possibly "neutralize" that language to nullify the PSLRA's safe harbor. *In re Apple Computer Securities Litigation* (Opp. at 16) merely confirms the basic premise that companies have a duty to disclose material information to investors who rely on that information. 886 F.2d 1109, 1116 (9th Cir. 1989). And *Farrar v. Workhorse Group, Inc.* considered only whether the challenged statements were false or misleading when made—not whether cautionary language was "neutralized." *See* 2021 WL 5768479, at *4-5 (C.D. Cal. Dec. 2, 2021). Plaintiffs then argue that Defendants' statement that certain backlog orders were "not cancelable" somehow renders other statements not forward-looking. Opp. at 16. But Defendants did not argue ¶ 458 was forward-looking, and Plaintiffs offer no support for the idea that the existence of non-forward-looking challenged statements nullifies the safe harbor for forward-looking statements. Plaintiffs make the same argument for ¶ 449 (a forward-looking statement), but that doesn't make sense either. The only requirement for a forward-looking statement is that meaningful cautionary language accompanied it. *See Melot v. JAKKS Pac., Inc.*, 2015 WL 12743698, at *5, 10-12 (C.D. Cal. Mar. 2, 2015). And here, it did. *See* Ex. 11 at 4; Ex. 6 at 9, 15.

Finally, Plaintiffs do not allege actual knowledge of the falsity of any Backlog Statement at the time it was made. *See infra* § II.B; *Lipton*, 284 F.3d at 1039 n.18.

c.   The Backlog Statements Are Nonactionable Opinions

Plaintiffs argue that Defendants' confidence in Extreme's backlog was either (i) not an opinion or (ii) actionable because Defendants had "actual knowledge that at least 10% of the backlog" would be cancelled at some unknown future time. Opp. at 16-17. Neither assertion is correct. First, the Statements reflect Defendants' "feelings" of confidence and/or are prefaced by "I think." *See, e.g.*, Statements 6, 10, 15-16, 27 (confidence); 47 ("feel good"); 47 ("I think").

Plaintiffs allege no facts showing that any such opinion was not objectively true, nor that any Defendant did not subjectively believe it. Mot. at 18-19. And second, Plaintiffs have not alleged with particularity that any Defendant had "actual knowledge" of contemporaneous information contradicting their stated opinions. Indeed, while Plaintiffs highlight statements in October 2022 and January 2023 as purportedly actionable opinions because they are based on the strength of Extreme's backlog, Opp. at 16-17, Extreme ultimately *exceeded* its guidance in those quarters, undermining any assertion that Defendants had contradictory information about Extreme's backlog. *See* Ex. 9 at 6 (Q2 revenue of $318.3 million); Ex. 11 at 6 (Q3 revenue of $332.5 million); *Oracle*, 2019 WL 6877195, at *11-12 (no falsity where company met forecast).

### B. Plaintiffs Do Not Allege Scienter

#### 1. Plaintiffs Do Not Allege a Plausible Motive

Rather than provide an explanation for the alleged "scheme" to defraud investors, the Opposition highlights that Plaintiffs don't have one. Plaintiffs insist the SAC does not rely on a "general corporate motive," but they fail to articulate *any* concrete or personal benefit any Defendant received when they supposedly "knowingly devised" a scheme that would "inevitably" fail. Opp. at 22; *see* ¶ 382 ("channel stuffing will often inevitably experience revenue shortfalls in future periods"). Meeting analysts' expectations is insufficient, as that is the type of "general market pressure" that "is not evidence of scienter." *West v. Ehealth, Inc.*, 2016 WL 948116, at *9 (N.D. Cal. Mar. 14, 2016). Plaintiffs' cash bonus allegations are no help, either. The alleged scheme was hatched a year before Defendants would see those bonuses, and they were dwarfed by stock incentives that aligned Defendants' interests with investors. *See* ¶¶ 579, 583; *Petersen v. TriplePoint Venture Growth BDC Corp.*, 2024 WL 5384678, at *12 (N.D. Cal. Aug. 7, 2024). Nor do Plaintiffs meaningfully respond to Meyercord's increased holdings, which "contradicts the inference of scienter." *Cai v. Eargo, Inc.*, 2025 WL 66041, at *2 (9th Cir. Jan. 10, 2025). They cite *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *15 (N.D. Cal. Mar. 31, 2023), but the plaintiffs in that case alleged suspiciously timed stock sales.

#### 2. Other Allegations Do Not Create a Strong Inference of Scienter

Without motive, Plaintiffs are left to cobble together a hodgepodge of allegations and claim

scienter. But those allegations—whether considered separately or together—are insufficient to show the "malicious inference is at least as compelling as any opposing innocent inference." *Garcia v. J2 Glob. Inc.*, 2022 WL 22717936, at *3 (C.D. Cal. Aug. 8, 2022).

**The FEs and Their Vague Reports of "Meetings" Are Insufficient.** In addition to lacking credibility or contact with Defendants (or, sometimes, both, *see* Mot. at 20-21), Plaintiffs' FEs do not explain how any Defendant "knew or should have known that their statements were false or misleading at the time they were made." Opp. at 19. Vague descriptions of regularly occurring meetings, rather than specific meetings where specific information was discussed with Defendants, do not raise an inference that Defendants had "detailed and contemporaneous knowledge" of information contradicting any challenged statement. *See Prodanova v. H.C. Wainright & Co., LLC*, 993 F.3d 1097, 1109 (9th Cir. 2021). The same is true for access to information. In *In re Quality Sys., Inc. Sec. Litig.,* 865 F.3d 1130, 1145 (9th Cir. 2017) (Opp. at 19), the FEs alleged the content of and defendants' access to internal reports that contradicted defendants' statements. Here, the FE accounts are not contemporaneous with the Statements and do not allege any Defendant's contradictory knowledge. If anything, the FEs support Defendants' Statements about Extreme's growth, *e.g.*, ¶¶ 126, 130 (distributors had "very big backlog" in 2022 and thus bought Extreme's products), and corroborate Defendants' "confiden[ce]" in Extreme's backlog, *e.g.*, ¶ 601 (Defendants "ignored" FE-7's insistence orders would be cancelled).

**Alleged "Monitoring" Is Insufficient**. The Opposition cites certain alleged "admissions of detailed, real-time monitoring" as evidence of scienter. Opp. at 21. Yet the quoted language highlights the generic nature of Defendants' statements: "excellent visibility," being "close to the topic," and keeping "a very close eye" on Extreme's backlog and sales pipeline. *Id*.; *see also Espy v. J2 Glob., Inc*., 99 F.4th 527, 538-39 (9th Cir. 2024) ("general awareness," like reviewing frequent reports and being "obsessed with numbers" did not establish scienter). These "admissions" fall short of the cases they cite in support. *See Quality Sys.*, 865 F.3d at 1145 (executives admitted they monitored sales data "maintained in Salesforce databases" and plaintiffs alleged content of data contradicted public statements); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1023 (9th Cir. 2005) (defendant said he was "knowledgeable about all aspects of the Company's

finances," including revenue recognition, and directed manipulation of revenue recognition).

**Plaintiffs Do Not Satisfy the Core-Operations Theory**.  Plaintiffs claim that it would have been "absurd" to suggest that Defendants "responsible for revenue and backlog reporting" were unaware of "widespread channel stuffing" or that backlog "was not in fact 'firm,'" Opp. at 21.  "Proof under this theory is not easy."  *Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2025 WL 556283, at *15 (N.D. Cal. Feb. 18, 2025) (Opp. at 21).  Plaintiffs have not provided it: there are no specific allegations that any Defendant had the requisite "detailed involvement in the minutia" of specific sales transactions and backlog orders.  *See* Mot. at 23.

**"Culture" Is Not Indicative of Scienter**.  Plaintiffs claim to have alleged (i) suspicious resignations, (ii) a pattern of retaliation, and (iii) Defendants' "refusal to put matters in 'writing.'" Opp. at 22.  The resignations in the SAC are not "suspicious": Thomas left to pursue a new venture (Mot. at 23) and Plaintiffs offer no particularized reason non-Defendant Vitalone resigned (¶ 613). Nor is there a "pattern": neither FE-2 nor FE-10 attributes their demotion and termination to any Defendant.  *See* Mot. at 22.  And Plaintiffs cannot get their story straight on paper trails: FE-1 claims both that Brown "never wanted to put anything into writing" and yet simultaneously documented the alleged channel-stuffing policy in a wide-ranging email.  ¶¶ 118, 172.

### 3.    The More Compelling Inference Is Good Faith

Plaintiffs have not offered a more compelling inference of scienter as to each of the Individual Defendants, let alone "overwhelming evidence" and "irrefutable [] 'smoking gun[s].'" Opp. at 17-18.  Indeed, unlike in their cited cases, Plaintiffs have not alleged any Defendant directed employees to make "baseless adjustments to the company's financial statements" (*In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 709-10 (9th Cir. 2012)), or "directed the practice of automatically recognizing revenue" without regard to "any actual percentage of completion" (*Daou*, 411 F.3d at 1023).  Instead, Plaintiffs ask the Court to make inferential leaps in a vacuum without regard for equally compelling inferences.

As to **channel-stuffing**, Plaintiffs cite FE-1's newly surfaced notes as "smoking gun" evidence that Brown—who is not on the ELT and is not alleged to have any compensation or other incentives tied to Company performance—came up with a master plan to stuff Extreme's channel,

then convinced his superiors to risk their jobs and reputations to lie about it in public statements. Opp. at 18.  Even more implausibly, Plaintiffs claim Extreme risked its relationship with its three largest distributors by forcing them to "play ball," apparently without regard for the fact that the loss of any one of those distributors' business would destroy Extreme's chances at "getting into the Company [the] # that the street expects." ¶ 107; *see also* ¶ 63 (Extreme's three largest distributors accounted for over 50% of Extreme's revenues).

As to **backlog,** Plaintiffs claim FE-7's "account of ELT discussions of a 10% backlog cancellation hedge" in 2022 and his attendant warning is "direct evidence" that Defendants lied in calling the backlog "firm." Opp. at 18.  Discussing a small hedge to unprecedented backlog is not inconsistent with Defendants' belief, and one FE's purported concerns about backlog do not invalidate more optimistic expectations.  *See Sneed v. AcelRx Pharms., Inc.*, 2024 WL 2059121, at *12 (N.D. Cal. May 7, 2024) (employee's concerns insufficient "to show that Defendants knew their statements were false").  Moreover, Plaintiffs ignore their own allegations (and Extreme's public disclosures) that backlog could be cancelled "on an exception basis" (¶ 74)—and they do not allege any Defendant was involved in granting exceptions.

### C.      Plaintiffs Do Not Allege Loss Causation

Plaintiffs do not meet the standard set by their own authority: "trac[e] the loss back to the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (Opp. at 22).  Instead, Plaintiffs' allegations "suggest that relatively disappointing [financial] results, not any revelation of earlier falsehoods, caused [Extreme's] share price to plunge." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022).

**January 25 and August 24, 2023**.  Plaintiffs argue that falling backlog and Thomas's resignation as CFO "revealed new facts that rendered some aspect of prior statements about backlog strength, health of the channel and the 'strong' and 'unabated demand' for Extreme's products false and misleading."  Opp. at 23.  Plaintiffs' disclosures did not "reveal" a fall in backlog—Extreme had consistently informed investors of expected decreases and provided backlog updates throughout the Class Period.  Mot. at 24; *see, e.g.*, Ex. 4 at 5, 15; Ex. 9 at 6, 8-9, 14.  Decreased backlog only "confirmed" what Extreme had "repeatedly warned" about in the

Class Period. *Plumbers & Steamfitters Loc. 60 Pens. Trust v. Meta Platforms, Inc.*, 2024 WL 4251896, at *11-12 (N.D. Cal. Sept. 17, 2024).[2] Plaintiffs' citation to *VMware* is inapposite; there, a "trend" of backlog disclosures "[c]ombined with . . . the disclosure of [a related] SEC investigation" satisfied loss causation. 2023 WL 2763541, at *5, *16.

Thomas's resignation and Plaintiffs' vague allegations that Thomas "thought he should have done something" and "regretted" certain statements in presentations, ¶¶ 186-87, say nothing about what "aspect of the [Defendants'] prior statements" were rendered "false or misleading." Opp. at 23 (citing *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020)). This is nothing like *Karinski v. Stamps.com, Inc.*, where a disclosure relating to the subject of the false statements accompanied the executive's departure. 2020 WL 281716, at *17 (C.D. Cal. Jan. 17, 2020) (Opp. at 23). Thomas's departure is not "an admission of past concealment, but rather [is] a forward-looking statement of changes to the company." *Ng v. Berkeley Lights, Inc.*, 2024 WL 695699, at *18 (N.D. Cal. Feb. 20, 2024); *Magro v. Freeport-McMoran Inc.*, 2018 WL 3725781, at *9 (D. Ariz. Aug. 3, 2018) (rejecting "corrective disclosures manifested through resignations").

**November 1, 2023, January 8, 2024, and January 31, 2024**. Nor do Plaintiffs satisfy loss causation for reported revenue declines due to "channel digestion," "elongated sales cycles," and "lower[ed] inventory purchases," which Plaintiffs claim "revealed new facts indicating that [Extreme's] channel was oversaturated" and its backlog was not "firm." Opp. at 24. The purported "specificity of Extreme's disclosures" does not change the fact that the market reacted to news of "disappointing earnings results" rather than any revelation of fraud. *See* Opp. at 24; *DeKalb Cnty. Pension Fund v. Roblox Corp.*, 2025 WL 948124, at *4 (N.D. Cal. Mar. 28, 2025) (no causation where "market reacted to . . . the slowdown in growth—rather than to disclosure of the alleged fraud itself"). Plaintiffs criticize *Loos* but ignore the court's finding that a "reference to slower than normal collection of accounts receivable" was insufficient to infer premature revenue

---

[2] Highlighting Extreme's prior risk warnings is not "an improper truth on the market" argument. Opp. at 23. *See In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *13 n. 18 (N.D. Cal. Mar. 29, 2019) (recognizing difference between arguments that defendants "disclosed all required information, not that they failed to make required disclosures but should be excused because other sources have already made the same information available").

recognition fraud. *Loos v. Immersion Corp.*, 762 F.3d 880, 888 (9th Cir. 2014), *as amended* (Sept. 11, 2014). Similarly, Plaintiffs try to frame Extreme's general reference to "buildup of inventory" as an admission of "channel stuffing and manipulative business practices," Opp. at 24, but it is not—and no analyst agreed with Plaintiffs' theory. *See Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *9 (C.D. Cal. Feb. 6, 2014) (no loss causation where company "never expressly nor implicitly revealed the alleged impropriety of its [] practices to the market").

Worse still, Plaintiffs ignore the reality that the macro environment was rapidly changing and results reflected "updated" information post-dating the Statements. *Nektar*, 2020 WL 3962004, at *17; Mot. at 24. Courts regularly consider "other possible events" that may contribute to the alleged decline in stock value." *Petersen*, 2024 WL 5384678, at *13; *see Roblox*, 2025 WL 948124, at *4 ("slowdown in growth" caused the stock drop, not "disclosure of the alleged fraud itself"). And lowering guidance in response to these changes provides information *going forward* rather than a "corrective disclosure" of past performance. *Meta*, 2024 WL 4251896, at *11.

### D.    Plaintiffs Fail to Plead Scheme Liability

Plaintiffs' scheme liability claim fails for the same reasons as their Rule 10b5-(b) claim, and it must be dismissed. *See* Order at 22-23. Plaintiffs make no effort to differentiate the conduct underlying their scheme liability claim, and "[a] defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions . . . when the scheme also encompasses conduct beyond those misrepresentations or omissions." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057-58 (9th Cir. 2011) (affirming district court dismissal of scheme liability claim where plaintiff "does not allege any facts that are separate from those already alleged in their Rule 10b5-(b) omission claims"). Moreover, Plaintiffs' vague group allegations (¶¶ 651-53) fall far short of pleading the conduct underlying scheme liability with particularity. *See Trustees of Welfare & Pension Funds of Local 464A v. Medtronic PLC*, 2025 WL 2784543, at *23-24 (D. Minn. Sept. 30, 2025) (rejecting group pleading for scheme claim and relying in part on *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007)).

### III.    CONCLUSION

Defendants respectfully request dismissal of Plaintiffs' SAC with prejudice.

Dated: November 25, 2025

Respectfully submitted,

LATHAM & WATKINS LLP

By /s/ *Melanie M. Blunschi*
   Melanie M. Blunschi (Bar No. 234264)
   *melanie.blunschi@lw.com*
   Morgan E. Whitworth (Bar No. 304907)
   *morgan.whitworth@lw.com*
   505 Montgomery St., Suite 2000
   San Francisco, CA 94111
   Telephone: +1.415.391.0600

   Daniel R. Gherardi (Bar No. 317771)
   *daniel.gherardi@lw.com*
   140 Scott Drive
   Menlo Park, CA 94025
   Tel.: +1.650.328.4600

   *Attorneys for Defendants Extreme Networks, Inc., Edward B. Meyercord, III, Rémi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, and Jonas Brown.*