# Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FAROOQ KHAN,<br><br>        Plaintiff,<br><br>    v.<br><br>CHARGEPOINT HOLDINGS, INC., et al.,<br><br>        Defendants. | Case No. 23-cv-06172-NW<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: ECF No. 132 |

This is a putative class action for securities fraud against Defendants ChargePoint Holdings Inc. ("ChargePoint"), Pasquale Romano, Rex S. Jackson, and Michael Hughes (collectively, "Defendants"). ChargePoint offers networked hardware and subscription charging solutions for electric vehicles. In what is now a consolidated class action, Lead Plaintiffs Shahram Afshani and Paulina Afshani Schwartz filed a second amended class action complaint ("SAC") alleging that Defendants made materially false and misleading statements regarding ChargePoint's supply chain management, revenue growth, and value of inventory, which led to an initial 11% drop in ChargePoint's stock price.[1] SAC, ECF No. 127. Plaintiffs allege violations of Sections

---

[1] Plaintiff Farooq Khan initiated this action on November 29, 2023. Compl., ECF No. 1. On May 16, 2024, the Court consolidated the *Khan* action with a related action, *Smith v. ChargePoint Holdings, Inc.* (24-cv-00363). ECF No. 87. After reviewing the seven motions for lead plaintiff and lead counsel, the Court appointed Shahram Afshani and Paulina Afshani Schwartz as Lead Plaintiffs, finding they have the greatest financial interest. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) (rebuttable presumption in PSLRA cases that the movant with the largest financial interest is the most adequate plaintiff). The Court approved the Lead Plaintiffs' selection of Hagens Berman Sobol Shapiro LLP as lead counsel. The Court ordered that the consolidated class action would proceed under the *Khan* caption and case number going forward. On May 24, 2024, the Court granted the parties' stipulation for the Lead Plaintiffs to file a first amended complaint. ECF No. 92. On July 15, 2025, the parties filed another stipulation asking the Court for leave for Lead Plaintiffs to file the SAC, which the Court granted in part. ECF Nos. 125, 126. Plaintiffs filed their SAC on July 22, 2025. ECF No. 127.

10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5.

On September 17, 2025, Defendants filed a motion to dismiss.  Mot., ECF No. 132.[2] Plaintiff opposed, ECF No. 136, and Defendants filed a reply, ECF No. 139.  For the reasons stated below, the Court GRANTS Defendants' motion to dismiss with leave to amend.

## I.    BACKGROUND[3]

Plaintiffs purchased ChargePoint securities between December 7, 2021, and November 16, 2023, inclusive (the "Class Period").  Plaintiffs allege that Defendants' fraudulent business practices caused class members to suffer significant losses and damage.  Lead Plaintiffs bring securities fraud claims on behalf of all individuals who purchased ChargePoint securities during the Class Period.

ChargePoint is incorporated in Delaware and has its principal executive offices in Campbell, California.  The company "provides networked solutions for [electric vehicles ("EVs")], including the ChargePoint cloud subscription platform and charging hardware."  SAC ¶ 33.  ChargePoint's customers include commercial and individual drivers, and businesses.  The majority of ChargePoint's revenue derives from its sales of charging systems, with a smaller share of revenue from software subscription services.  As of March 1, 2021, when ChargePoint went public, ChargePoint was the "world's first publicly traded global EV charging network."  *Id*. ¶ 35.

Defendants Romano, Jackson, and Hughes ("Executive Defendants") participated in the management and daily operations of ChargePoint.  At all relevant times, Defendant Romano was ChargePoint's President and Chief Executive Officer ("CEO"), Defendant Jackson served as the Chief Financial Officer ("CFO"), and Defendant Hughes served as the Chief Commercial and Revenue Officer.  The Executive Defendants had access to material information about ChargePoint and "authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional

---

[2] Having considered the parties' briefs and the relevant legal authority, the Court concluded oral argument was not required, *see* N.D. Cal. Civ. L.R. 7-1(b).

[3] The factual background is drawn from Plaintiffs' SAC.  *See* ECF No. 127.

United States District Court
Northern District of California

investors (*i.e.*, the market)." *Id*. ¶ 43.

Plaintiffs allege that ChargePoint and the Executive Defendants concealed severe supply chain constraints, which in turn obscured ChargePoint's accurate financial picture. Beginning in February 2020, during the COVID-19 pandemic, ChargePoint experienced "acute supply shortage problems." *Id*. ¶¶ 56, 58. ChargePoint did not have access to parts that were required to complete its charging stations. Certain parts were manufactured in Italy and in Mexico, where there were plant closures and significant delays. ChargePoint's "supply shortage problems" caused it "to lose customers and face contractual penalties based on its failure to deliver the products as promised." *Id*. ¶ 56. The supply chain issues persisted through 2023.

Plaintiffs assert that Defendants materially misled investors by creating the false impression that "ChargePoint was managing COVID-19 supply chain constraints effectively and generating record revenues due to the increased, organic demand for the Company's chargers." *Id*. The Executive Defendants made statements in their quarterly reports and investor statements about "ChargePoint's ability to manage post-COVID-19 supply constraints to deliver extraordinary quarter-after-quarter revenue growth on the back of organic factors such as 'growth in charging demand.'" *Id*. ¶ 57. In addition, to "prop up" the impression that ChargePoint was navigating post-COVID-19 supply constraints, "Defendants directed ChargePoint employees to engage in unsustainable sales and inventory practices to pull in future sales and improperly recognize revenues at the end of each quarter." *Id*.

At the same time Plaintiffs allege ChargePoint was "prop[ing] up" the impression of managing supply chain constraints, Plaintiffs also contend that ChargePoint "had so much extra inventory" of certain products that it "offloaded its excess inventory" to its customers. *Id*. ¶¶ 137, 139. Plaintiffs explain that during the Class Period, ChargePoint shipped products ahead of deadlines, sent products that had not been ordered to customers, and stored palettes of unwanted or returned products with resellers.

Plaintiffs allege that ChargePoint's concealed supply chain issues came to light on September 6, 2023, when ChargePoint reported its fiscal year 2024, second quarter financial results. Although ChargePoint reported a revenue of $150.5 million, which fell within the

previously shared guidance of $148 million to $158 million (and which ChargePoint attempted to "spin" as a "39% year-over-year increase"), ChargePoint also reported a $28 million "inventory impairment charge" that addressed "legacy supply chain-related costs and supply overruns on a particular [direct current] DC product." *Id*. ¶¶ 222-23. "On this news, the Company's share price fell $0.77, or 11%, from a close price of $7.06 per share on September 6, 2023, to close price of $6.29 per share on September 7, 2023, on unusually heavy trading volume." *Id*. ¶ 232. In the days following, Defendants Jackson and Hughes "began selling substantial amounts of their personally held shares." *Id*. ¶ 234. "Losses on ChargePoint shares extended the next trading day as the market continued to digest the Company's disclosures, falling to a close price of $5.72 per share on September 8, 2023." *Id*. ¶ 232.

On November 16, 2023, ChargePoint gave a preview of its fiscal year 2024, third quarter financial results. ChargePoint announced that its revenue fell short of prior guidance, and that they would "take another non-cash impairment charge of $42 million." *Id*. ¶ 238. ChargePoint additionally reported that Defendant Romano and Defendant Jackson would be replaced as CEO and CFO, effective immediately. "On this news, the Company's share price fell $1.11, or 35%, from a close price of $3.13 per share on November 16, 2023, to close at a record low of $2.02 per share on November 17, 2023, on unusually heavy trading volume." *Id*. ¶ 245.

Plaintiffs allege that ChargePoint and the Executive Defendants "engaged in deceptive and manipulative acts in a scheme to defraud investors" including by "engaging in an undisclosed and unsustainable revenue recognition scheme." *Id*. ¶¶ 318, 320. Plaintiffs contend that ChargePoint's materially false and misleading statements about its financial well-being and prospects caused investors to have an inaccurate and unrealistically positive assessment of the company and its financial health, ultimately causing Plaintiffs to incur significant losses.

## II.    LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the [plaintiff]." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

4

However, the tenet that a court must accept a complaint's allegations as true "is inapplicable to . . . [t]hreadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Securities fraud class actions must [also] meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Under Rule 9(b) and the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to the alleged false statements or omissions, and a party must "state with particularity the circumstances constituting fraud or mistake." 15 U.S.C. § 78u-4(b)(2)(A); Fed. R. Civ. P. 9(b). If the complaint does not satisfy the PSLRA's pleading requirements, the Court must grant a motion to dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

### A.      Violations of Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act prohibits any act or omission resulting in fraud or deceit in connection with the purchase or sale of any security. 15 U.S.C. § 78j(b) (declaring it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary."). Rule 10b-5 implements Section 10(b) by specifying three types of proscribed activities: (a) employing "any device, scheme, or artifice to defraud"; (b) making or omitting "any untrue statement of a material fact"; and (c) engaging "in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5.

Courts refer to a first category of proscribed activity brought under subsections (a) and (c) as "scheme liability." *See e.g., In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021). The second category of proscribed activity, brought under subsection (b), concerns liability for statements that are material misrepresentations or omissions ("statement liability").

"'[C]onsiderable overlap' exists among the subsections of Rule 10b-5." *In re Alphabet*, 1 F.4th at 709 (quoting *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 80 (2019)). Both types of

United States District Court
Northern District of California

5

proscribed activity require a plaintiff to allege: (1) scienter; (2) reliance; (3) economic loss; and (4) loss causation. *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1206 (N.D. Cal. 2024), *motion to certify appeal granted on other grounds,* No. 20-CV-07835-JSW, 2024 WL 4831889 (N.D. Cal. June 3, 2024); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017). To state a claim based on scheme liability, a plaintiff must additionally allege (1) that the defendant committed a deceptive or manipulative act in furtherance of the alleged scheme, and (2) a connection between the alleged deceptive or manipulative act and the purchase or sale of a security. *York Cnty.*, 738 F. Supp. 3d at 1206. Similar to scheme liability, a claim for statement liability also requires a plaintiff to allege two additional factors: (1) defendants made a material misrepresentation or omission, and (2) there was a connection between the misrepresentation or omission and the purchase or sale of a security. *City of Dearborn Heights*, 856 F.3d at 613. Both scheme and statement liability claims under Rule 10b-5 are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020).

## III. DISCUSSION

Here, Plaintiffs allege two theories of violations of Section 10(b) and Rule 10b-5: (1) scheme liability against all Defendants for engaging in a course of conduct to deceive the investing public, inflate the price of securities, and encourage the purchase of securities at inflated prices, and (2) statement liability for material misstatements against ChargePoint and Defendants Romano and Jackson. Plaintiffs also bring a claim for "control person" liability against the Executive Defendants pursuant to Section 20(a) of the Exchange Act.

Defendants move to dismiss Plaintiffs' SAC in its entirety.[4] Defendants primarily contend

---

[4] In connection with their motion to dismiss and reply, Defendants ask the Court to take judicial notice of, or incorporate by reference, 18 separate exhibits. Request for Judicial Notice, ECF No. 133 ("RJN"); Declaration of Jamie A. Bartlett, Exs. 1-17, ECF No. 134; Supplemental Request for Judicial Notice, ECF No. 141; Supplemental Declaration of Jamie A. Bartlett, Ex. 18, ECF No. 142. These include documents cited and quoted in the SAC, including transcripts and SEC filings (Exhibits 1-14). Additionally, Defendants ask the Court to take judicial notice of SEC filings that were not referenced in the SAC and a complaint filed in state court (*Larrenaga v. ChargePoint, Inc.*, Case No. 22CV398534) (Exhibits 15-18). Plaintiffs oppose Defendants' request for judicial

United States District Court
Northern District of California

that Plaintiffs fail to adequately plead falsity or deception and scienter for their claims brought under both theories of liability.[5]  As discussed in detail below, the Court grants Defendants' motion to dismiss Plaintiffs' Section 10(b) claims because Plaintiffs have failed to adequately allege that Defendants engaged in a deceptive scheme and that Defendants' statements were false when made.  As a result, the Court does not reach Defendants' arguments regarding scienter.

The Court identifies three foundational issues with the facts as alleged in the complaint. Each issue challenges the sufficiency of Plaintiffs' allegations of falsity or deception.[6]  Plaintiffs failed to adequately allege falsity and deception because Plaintiffs: (a) have not pled facts showing what was false about Defendants' statements or the impressions those statements created; (b) pled facts that are contradictory when viewed together; and (c) primarily rely on facts that occurred outside of the Class Period.

### A.      Failure to Plead Falsity of Statements or Impression

Plaintiffs have failed to plausibly allege the true facts Defendants concealed, or what was

---

notice because "Defendants improperly offer many of these documents to support a counter-narrative and dispute the well-pled allegations of the SAC."  Opp'n to RJN, ECF No. 137 at 1. Plaintiffs correctly note that when assessing the sufficiency of the complaint under Federal Rule of Civil Procedure 12(b)(6), the Court generally cannot consider material outside of the pleadings. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).  Once a document is incorporated by reference or judicially noticed, the Court "may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)," but the Court may not "assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1003.  Accordingly, the Court GRANTS Defendants' motion and incorporates by reference Exhibits 1-14, and takes judicial notice of Exhibits 15-18, subject to *Khoja*'s restrictions.

[5] Defendants challenge loss causation briefly in their motion to dismiss.  The PSLRA requires the plaintiff to prove "that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  "Loss causation" refers to the "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Plaintiffs must show a "'causal connection' between the fraud and the loss . . . by tracing the loss back to 'the very facts about which the defendant lied.'" *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (internal citations omitted).  Although the Court need not and does not address the merits of this issue in this Order, the Court notes that Plaintiffs have not clearly (both substantively and temporally) connected the alleged fraud and the stock price drop.

[6] For each claim, Plaintiffs incorporate by reference all of the preceding allegations in the SAC and recite the bare elements of Rule 10b-5 claims.  The SAC does not provide a clear explanation of which, if any, of the preceding 304 paragraphs are relevant to each claim.

United States District Court
Northern District of California

United States District Court
Northern District of California

false about the impression Defendants created at the time.  To satisfy the exacting requirements under the PSLRA for pleading falsity, "Plaintiffs must plead 'specific facts indicating why' the statements at issue were false when made." *In re Cloudera, Inc.*, No. 19-CV-03221-LHK, 2021 WL 2115303, at *11 (N.D. Cal. May 25, 2021) (quoting *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).  Plaintiffs posit that there were "ongoing supply chain issues occurring throughout the Class Period."  SAC ¶ 65.  However, Plaintiffs do not identify *what* the supply chain issues were.  Plaintiffs point to "plant closures due to COVID-19" in Italy and Mexico as the basis for "supply constraints brought on by the COVID-19 pandemic" and a "deficit of parts that were available to complete the builds on the charging stations," but do not provide further detail.  *Id*. ¶ 58.  Plaintiffs do not specifically describe the supply constraints, articulate what products were affected, explain the impact of constraints in those product lines on ChargePoint's revenue, nor address whether these supply constraints continued into the Class Period.  In order to state a claim for materially misleading statements or omissions, "Plaintiffs must allege 'contemporaneous facts that would establish a contradiction between the alleged materially misleading statements and reality.'"  *In re Cloudera*, 2021 WL 2115303, at *11 (quoting *Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016)).  Here, Plaintiffs have not provided facts to demonstrate "a contradiction" between the alleged concerning statements and reality.

Plaintiffs do stress the negative impact of ChargePoint's decision to outsource manufacturing to Mexico and outsource accounting services to India as part of its allegations of a deceptive scheme.  However, "[c]onduct that is consistent with the defendants' normal course of business" is not "typically be considered to have the purpose and effect of creating a misrepresentation," and therefore, "standing alone, does not suffice to plead scheme liability." *Petersen v. Stem, Inc.*, No. 23-CV-02329-MMC, 2024 WL 4602710, at *12 (N.D. Cal. Aug. 30, 2024) (cleaned up).  It is not clear what was deceptive or manipulative about Defendants' outsourcing decisions (including any potential risks or consequences), whether those decisions were concealed, or why this conduct was not consistent with Defendants' "normal course of business."

### B.    Reliance on Contradictory Facts

Plaintiffs have alleged two categories of facts – supply chain constraints and pushing product shipments – that are at odds with one another.  "'Contradictory allegations such as these are inherently implausible, and fail to comply with Rule 8, *Twombly*, and *Iqbal*,' much less Rule 9(b)'s heightened pleading standard." *Hoang v. ContextLogic, Inc.*, No. 21-CV-03930-BLF, 2023 WL 6536162, at *10 (N.D. Cal. Mar. 10, 2023) (internal citation omitted).  On one hand the SAC alleges serious supply chain limitations that Defendants hid from investors.  On the other hand, the SAC details Defendants' improper sales and accounting practices related to pushing products to customers.  For example, Plaintiffs state that ChargePoint's "unsustainable sales and inventory practices" "created premature bases for recognizing revenue, concealed ChargePoint's true revenues and costs, or *otherwise concealed significant sources of revenue*."  *Id*. ¶ 86 (emphasis added).  According to Plaintiffs, ChargePoint "offloaded its excess inventory" of certain products to its customers.  *Id*. ¶ 139.  These practices necessarily show that ChargePoint had product, and arguably too much product, to meet the demands of its customers.  There is a tension between Plaintiffs' allegations of "offload[ing] its excess inventory" and Plaintiffs' theory that ChargePoint had supply chain constraints that led to an inability to complete and timely ship products.  In the SAC, Plaintiffs have not adequately squared these "contradictory allegations" such that they are not "inherently implausible."  *Hoang*, 2023 WL 6536162, at *10.

### C.    Reliance on Facts from Outside of Class Period

Plaintiffs allege a Class Period from December 7, 2021, to November 16, 2023, inclusive.  Plaintiffs rely heavily on conduct that occurred before the actionable period.  While reliance on facts from before the Class Period is not impermissible, Plaintiffs do not explain how those facts are relevant to Plaintiffs' claims during the Class Period — an important distinction as Defendants may only be held liable for statements made during the Class Period.  *Hodges v. Akeena Solar, Inc.*, No. C 09-02147 JW, 2010 WL 3705345, at *2 (N.D. Cal. May 20, 2010) ("A securities class action defendant is liable only for those statements made during the class period, not statement made before or after the class period.").

In support of their Section 10(b) claims, Plaintiffs point to: "supply constraints brought on

9

by the COVID-19 pandemic" that began in February 2020; the decision to "outsource manufacturing from the United States to Mexico in late 2019 and early 2020"; the decision to outsource accounting to India that employees "learned of . . . in or about June 2020"; and the practice of assigning "software tokens to 'fictitious' customers" beginning "in or about January 2020, right before the start of the pandemic."  Compl. ¶¶ 58, 61, 69, 128, 130.  Yet Plaintiffs' allegations of what occurred during the Class Period paint a different picture of a steady supply of products, sometimes to excess, without supply chain constraints.  For example, in "summer and fall of 2022 (which would have been late July/early August)" ChargePoint told the sales team to "ship all pending orders" and that "all orders that were in the 'queues' in Salesforce were to be released to NetSuite (warehouse) to be shipped."  *Id*. ¶ 89.  Plaintiffs state that, around fall of 2022, ChargePoint "doubled or tripled" their usual number of orders, amounting to "roughly between $1 million and $5 million of product."  *Id*.  Additionally, "from 2021 to 2023, ChargePoint effectively forced resellers to take on more inventory than they needed every quarter."  *Id*. ¶ 102.

Plaintiffs additionally rely on allegations by a former member of ChargePoint's legal team, Rachel Larrenaga, to make the point that ChargePoint would "deeply discount sales to channel partners in order for channel partners to take such sales."  *Id*. ¶ 123.  However, Larrenaga did not work at ChargePoint during the Class Period.  She left the company in June 2021, six months before the Class Period began.  Again, Plaintiffs have not connected the facts surrounding Larrenaga to the alleged material misstatements or deceptive scheme during the Class Period.

* * *

The Court finds that Plaintiffs have failed to adequately plead falsity for all statements Plaintiffs' challenge, and have insufficiently alleged the deceptive actions taken by Defendants in furtherance of an alleged scheme.  Additionally, the SAC does not adequately allege conduct by the Executive Defendants that furthered the deceptive scheme beyond their alleged misstatements.  As such, the current allegations in the SAC does not support individual liability for the Executive Defendants.

Because Plaintiffs fail to adequately plead falsity, the SAC fails to state a claim under

10

Section 10(b) and Rule 10b-5. Accordingly, Court does not reach the question of scienter nor the remaining elements.

### D.    Control Person Liability

Section 20(a) of the Exchange Act makes certain "controlling person[s]" liable for violations of Section 10(b) and Rule 10b-5. 15 U.S.C. § 78t(a). Because Plaintiffs have not adequately alleged a primary violation of Section 10(b) or Rule 10b-5, their control person claims under Section 20(a) necessarily fail. *See Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1113 (9th Cir. 2021).

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss with leave to amend because the Court is not convinced, at this juncture, that amendment would be futile. If Plaintiffs wish to file an amended complaint correcting the deficiencies identified above, they must file within 14 days of the date of this Order.

**IT IS SO ORDERED.**

Dated: February 20, 2026

Noël Wise
United States District Judge

United States District Court
Northern District of California

11