LATHAM & WATKINS LLP
Melanie M. Blunschi (Bar No. 234264)
  melanie.blunschi@lw.com
Morgan E. Whitworth (Bar No. 304907)
  morgan.whitworth@lw.com
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Daniel R. Gherardi (Bar No. 317771)
  daniel.gherardi@lw.com
140 Scott Drive
Menlo Park, CA 94025
Telephone: +1.650.328.4600

*Attorneys for Defendants Extreme
Networks, Inc., Edward B. Meyercord III,
Rémi Thomas, Cristina Tate, Kevin
Rhodes, Norman Rice, and Jonas Brown*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, on Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> EXTREME NETWORKS, INC., EDWARD B. MEYERCORD III, RÉMI THOMAS, CRISTINA TATE, KEVIN RHODES, NORMAN RICE, JONAS BROWN <br><br> Defendants. | Case No. 3:24-cv-05102-TLT <br><br> **DEFENDANTS' RESPONSES TO THE COURT'S SUPPLEMENTAL QUESTIONS REGARDING THE MOTION TO DISMISS AND REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFENCE IN SUPPORT OF MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** <br><br> Judge:    Hon.  Trina L. Thompson |

Defendants Extreme Networks, Inc., Edward B. Meyercord III, Rémi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, and Jonas Brown ("Defendants") respectfully submit the following responses to the Court's Supplemental Questions for Hearing Regarding the Motion to Dismiss and Request for Judicial Notice and Incorporation by Reference in Support of Motion to Dismiss the Second Amended Complaint (Dkt. 121).

### B.    Corporate Optimism

**Question 2**:  Please explain how the Court should view Defendants' statements, including "exceptionally strong" and "unabated" under *Cutera*.

**Defendants' Response**:  Terms like "exceptionally strong" and "unabated" in the context of customer demand are paradigmatic examples of non-actionable corporate optimism under *In re Cutera Securities Litigation*, 610 F.3d 1103 (9th Cir. 2010).  The *Cutera* court held that statements such as, "we expect the second half [] to be stronger than the first half," "new products are coming in a wave, not in a trickle," and "old products are doing very well" are the sort of "puffery" that investors do not rely on. *Id.* at 1111 (citing *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1095 (N.D.Cal.1994), *aff'd*, 95 F.3d 922 (9th Cir.1996)).  Statements like the ones at issue here are regularly dismissed by courts in the Ninth Circuit because "professional investors, and most amateur inventors as well, know how to devalue the optimism of corporate executives." *Cutera*, 610 F.3d at 1111-12.

For example, in *In re Solarcity Corporation Securities Litigation*, cited in Defendants' Motion to Dismiss ("Mot."), Dkt. 104, at 12, the court held that statements like "[d]emand remained as strong as ever," "Q2 was an amazing quarter," "incredibly strong sales," "we very [sic] optimistic about our growth," and we are "extremely bullish for the US markets" were non-actionable under *Cutera*.  274 F. Supp. 3d 972, 995 (N.D. Cal. 2017).  As here, plaintiffs in *Solarcity* had alleged that the company employed "overly aggressive and deceptive sales practices" to induce customers into entering contracts they later cancelled. *Id.* at 980.  The court rejected plaintiffs' argument that the statements could be false because they were based on "key operating metrics," instead dismissing because the *types* of statements were not actionable.   *Id.* at 995.  Similarly, in *In re SunPower Corporation Securities Litigation*, (cited in Mot. at 12), the court

dismissed statements regarding "very, very strong demand" as inactionable puffery despite allegations that defendants failed to disclose a cancelled contract and that the company was "scrambling to close deals," again citing *Cutera* for the proposition that "investors do not rely on vague statements of optimism." 2018 WL 4904904, at *4 (N.D. Cal. Oct. 9, 2018) (citing *Cutera*, 610 F.3d at 1111); *see also City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (citing *Cutera* and holding "strong demand metrics and good momentum" and "product portfolio is robust" inactionable puffery because "no reasonable investor would rely on such statements"); *Shnayder v. Allbirds, Inc.*, 2026 WL 533600, at *8 (N.D. Cal. Feb. 26, 2026) (citing *Cutera* and dismissing "performed really, really well" and "strong" economics and pipeline as inactionable puffery); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 956 (D. Ariz. 2007) (dismissing "[w]e believe that 2004 will present exceptional growth opportunities for [the company][,]" as inactionable puffery); *Kong v. Fluidigm Corp.*, 2023 WL 2134394, at *2  (9th Cir. Feb. 21, 2023) (dismissing defendants' statements that their franchise has "grown extremely strongly[,]" as inactionable puffery); *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *13 (N.D. Cal. Mar 29, 2013) (dismissing defendants' statements that they are "extremely well positioned," and "on fire in terms of our growth[,]" as inactionable puffery). Plaintiffs cannot adequately plead a securities fraud claim based on challenges to vague statements of corporate optimism.

**Question 3:**  If the Court finds that Defendants' statements constitute non-actionable corporate optimism, please explain how this finding affects the remaining issues in this motion, specifically the evaluation of scienter and the holistic review of the SAC.

**Defendants' Response**:  Because corporate optimism statements are "non-actionable," they cannot be a basis for falsity—and that ends the inquiry.  *Cutera*, 610 F.3d at 1111.  For statements to be actionable, Plaintiffs must plead with particularity that they "address *specific aspects* of a company's operation that the speaker *knows* to be performing poorly."  *In re Align Tech., Inc. Sec. Litig.*, 2021 WL 1176642, at *3 (N.D. Cal. Mar. 29, 2021), *aff'd sub nom. Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092 (9th Cir. 2022) (emphasis added) (statement that "we see tremendous growth in APAC, in China" was inactionable).  Plaintiffs

cannot do so in this case because there is "no dispute" that backlog "was growing" and there was substantial demand for Extreme's products. *Id.*; ¶ 9 ("distributors [were] *desperate for* in-demand backlog products") (emphasis added); ¶ 81 ("backlog ballooned, reflecting hundreds of millions of dollars of in-demand product unable to be shipped").[1]

Because corporate optimism statements are not actionable, the Court need not reach the question of whether Plaintiffs have adequately alleged scienter as to those statements. Moreover, nonactionable statements do not contribute in any way to a holistic review of the complaint, including with regard to scienter. On the contrary, as the Ninth Circuit recently held, "[s]howing scienter necessarily becomes harder when the allegedly misleading statements are not flagrantly false." *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1134 (9th Cir. 2025). Even more than not being "flagrantly false," corporate optimism is not actionable at all, meaning Plaintiffs' ability to plead a "strong inference" of an intent to defraud that is "at least as compelling as any opposing inference of nonfraudulent intent" is all the more difficult. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007); *see also In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *15 (S.D.N.Y. Mar. 30, 2021) (granting dismissal on scienter grounds where independently insufficient scienter allegations remained insufficient when considered collectively, *i.e.*, "zero plus zero (plus zero plus zero plus zero) cannot equal one").

### C.    PSLRA Safe Harbor

**Question 4:** Is the *Intuitive Surgical* disclaimer the proper standard for this Court to determine if the alleged misstatements are forward-looking? If yes, identify which statements were immediately preceded or accompanied by such a disclaimer. If no, provide the alternative legal authority that governs the distinction between present facts and "forward-looking" projections.

**Defendants' Response**: Yes, the disclaimer in *Police Retirement System of St. Louis v. Intuitive Surgical, Inc.* is a correct standard for identifying forward-looking statements and providing investors with cautionary language about the risks associated with those statements. The

---

[1] All ¶ citations are to Plaintiffs' Second Amended Complaint ("SAC").

court in *Intuitive Surgical* held the disclaimer that "comments mentioned on today's call may be deemed to contain forward-looking statements," along with the warning that "[a]ctual results may differ materially from those expressed or implied" and that investors should not place "undue reliance" on such statements, and directing them to the "risks and uncertainties [] described in detail in the company's SEC filings" was sufficient to render forward-looking statements nonactionable. *Intuitive Surgical*, 759 F.3d 1051, 1059 (9th Cir. 2014). The court laid out the standard for what might be a forward-looking statement in holding that the PSLRA provides a safe harbor for forward-looking statements that protects any statements concerning "(1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." *Id.* at 1058. Any statement meeting *any* of these criteria is not actionable if accompanied by the disclaimer noted above or functional equivalent. *Id.* at 1059. Importantly, the court in *Intuitive Surgical* also held that even if *unaccompanied* by the cautionary language disclaimer, forward-looking statements are *still* not actionable *unless* Plaintiffs allege with particularity that they were made with "actual knowledge…that the statement was false or misleading." *Id.* at 1058 (quoting 15 U.S.C. § 78u–5(c)(1)); *see also* Mot. at 13, 17-18.

Here, several of the statements Plaintiffs challenge were forward-looking and subject to the Safe Harbor. *See* Statements 1, 3, 6, 7, 9, 10, 15, 16, 19, 20, 23, 24, 27, 29, 30, 31, 34, 35, 36, 37, 38, 40, 44, 46, 47, 48. As an initial matter, Plaintiffs do not allege any fact suggesting any Defendant made these statements with **actual knowledge** of their purported falsity. Mot. at 13-14, 18. That alone ends the analysis.

But the forward-looking statements were also accompanied by meaningful cautionary language. Mot. at 13-14, 17-18. Statements 1, 3, 15, 16, and 27 are from Extreme press releases that include express cautionary language about forward-looking statements, disclose risk factors related to those statements, and point investors to risk factors in the Company's SEC filings. *See* Ex. 5 at 11; Ex. 7 at 10; Ex. 10 at 10-11. Statements 6, 7, 9, 19, 20, 29, 30, 31, 34, 35, 44, 46, and 47 are from Extreme's earnings calls with investors, all of which began with an express warning about the uncertainty surrounding forward-looking statements and directing investors to the

Company's SEC filings for a robust discussion of risk factors. *See, e.g.*, Ex. 4 at 4; Ex. 9 at 4; Ex. 11 at 4.[2] Statement 10 was in a shareholder letter that attached the Company's annual financial report on Form 10-K, which includes numerous risk disclosures, including about forward-looking statements.[3] Statement 36 was made in a quarterly financial statement on SEC Form 10-Q that includes express disclosures about forward-looking statements and points investors to the Company's most recent annual financial report for its robust disclosure of risk factors related to the business.[4]

For the fireside discussions at investor conferences hosted by Needham and Rosenblatt (Statements 23-24, 37-38, 40, and 48), while the transcripts and/or webcasts of the specific portion including Extreme's question-and-answer period do not expressly include statements about cautionary language, Plaintiffs do not allege facts suggesting that language was not displayed or discussed outside of the snippets available publicly years later. And in any event, Plaintiffs allege no fact suggesting that any Defendant made any statement at those conferences, which were all responses to analysts' live questions, with *actual knowledge* that any such statement was false. This satisfies the second prong of the PSLRA's safe harbor.

The PSLRA expressly recognizes that forward-looking statements include the "assumptions underlying or related to" future expectations and projections. *Intuitive Surgical*, 759 F.3d at 1058. And that makes sense. Predictions of the future are often based on assumptions using what is knowable at the time of the statement. That's why forward-looking statements (including the assumptions baked into them) are protected by the safe harbor, because federal

---

[2] The earnings call transcript for the call held October 27, 2022 is publicly available at https://seekingalpha.com/article/4549997-extreme-networks-inc-extr-q1-2023-earnings-call-transcript, among other sources. The earnings call transcript for the call held on August 2, 2023 is publicly available at https://finance.yahoo.com/news/extreme-networks-inc-nasdaq-extr-125521839.html. Defendants did not want to burden the Court with every document referenced in Plaintiffs' 198-page SAC, but are happy to supplement their motion with these materials if the Court would find them helpful.

[3] *See* Extreme Networks, 2022 Annual Report, *https://s205.q4cdn.com/756692490/files/doc_financials/2022/ar/2022-AR-EXTREME-NETWORKS-INC-_10K_2022_V3-PWO-12100-1.pdf.*

[4] *See* Extreme Networks, Quarterly Report on Form 10-Q for the quarter ended March 31, 2023 , *https://www.sec.gov/ix?doc=/Archives/edgar/data/0001078271/000095017023015282/extr-20230331.htm* at 25, 37.

securities laws do not require companies to have a crystal ball and predict the future. *Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *11 (N.D. Cal. Dec. 18, 2017) (explaining that investors do not expect defendants to have "had a crystal ball").

**Question 5:**  Plaintiffs contend that you "neutralized cautionary language by affirmatively [stating] backlog orders were "not cancelable" (¶ 458)" and that you did not see "double ordering." Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss the Second Amended Complaint ("Opposition" or "Opp."), Dkt. 109 at 16.  Explain why these assertions should still be protected by the Safe Harbor.

**Defendants' Response:**   Plaintiffs identify no case law suggesting that accurate descriptions of Extreme's customer contracts and statements concerning what sort of ordering they were seeing—which is not rebutted by any particularized allegation of any customer actually double-ordering—"neutralize[s]" robust risk disclosures. *See* Opp. at 16 (citing one case for the inapposite proposition that repeated misrepresentation may be relied upon by investors).  Nor do Plaintiffs explain how a non-forward-looking statement about whether orders are cancelable has anything to do with whether the PSLRA safe harbor applies to other forward-looking statements. Defendants' Reply In Support of Motion to Dismiss Lead Plaintiffs' Second Amended Consolidated Complaint ("Reply"), Dkt 110 at 9.

In any event, Plaintiffs concede in the SAC that Extreme's orders in the backlog were not cancelable as of right, and instead could only be canceled "on an exception basis."  ¶ 74.  That is, if Extreme agreed there was an exception that would permit a one-off cancellation.  Plaintiffs also concede that Extreme disclosed that it had received "negligible cancellations to date of less than 1%" in 2022.  ¶¶ 395, 421, 426.  And that "exception basis" is exactly what Extreme warned about in its cautionary language.  *See* Mot. at 3-4.  Moreover, Plaintiffs do not allege a *single particularized fact* about any customer order cancellation or instance of double-ordering, or any other facts contradicting the 1% statements.  Plaintiffs' argument, therefore, that statements about the nature of customer contracts and lack of observed double-ordering nullify cautionary language is untenable.  Even if the cautionary language were deemed "neutralized," Plaintiffs' failure to plead any specific instance of double-ordering or cancellations means they also have not alleged

that any Defendant had actual knowledge of the falsity of any forward-looking backlog statements. Thus, they offer no support for the idea that accurate statements about orders should eviscerate the PSLRA's safe harbor protection for unrelated, forward-looking statements.

### D.     Loss Causation

**Question 6:** Under *Espy*, what level of specific detail does the Court need to verify to determine SAC properly pleaded loss causation?  Please include exact citations to the record for any specific language.

**Defendants' Response:** *Espy* teaches that Plaintiffs must allege "with particularity" "facts 'plausibly suggesting' that 'a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements.'" *Espy v. J2 Global, Inc.*, 99 F.4th 527, 540 (9th Cir. 2024) (quoting *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020)).  While "'the disclosure need not precisely mirror the earlier misrepresentation, [] it must at least relate back to the misrepresentation and not to some other negative information about the company.'" *Id.* (quoting *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016)).

*Espy* is instructive as to the specificity of the link between the alleged corrective disclosure(s) and the alleged misrepresentation(s).  In that case, the alleged corrective disclosures were two investor research reports.  The first one, from Citron Research, "detail[ed] the failures of [the defendant's] acquisition model" and "revealed" that the defendant "use[ed] money generated from its legacy eFax business to prop the financials of its other assets," but the Court held that this negative information about the defendant's acquisition model were insufficiently detailed to reveal the allegedly omitted "underperformance of two acquired assets in particular." *Id.* at 540-42 (cleaned up).  The second report, from Hindenburg Research, purportedly revealed that the defendant's "opaque acquisition approach has opened the door to egregious insider self-enrichment," "masked the underperformance of acquisitions by utilizing 'tricky accounting,'" especially relating to" the two specific investments that allegedly underperformed, "and failed to disclose 'decades of intertwined financial interests between board members and executives,' as reflected in" another investment. *Id.* at 542.  But the Court found that it, too, was insufficient because the Hindenburg report merely collated and summarized information that was already

public. *Id.*

Here, the relationship between the alleged corrective disclosures and the challenged statements is impermissibly attenuated, if not completely missing. The information Plaintiffs allege was concealed or misrepresented is that Defendants (1) "coerced distributors into buying hundreds of millions of dollars in unwanted inventory by leveraging distributors' access to actually needed products," ¶ 2; and (2) knew at the time the challenged statements were made that Extreme's order backlog "would assuredly evaporate to a material extent," ¶ 3. At a minimum, the purported corrective disclosure for the first category of challenged statements should have revealed that there was, in fact, channel stuffing or illicit sales practices. But it did not. Instead, the corrective disclosure was simply that Extreme's revenue would be slightly lower (7.5%) than originally forecasted, ¶¶ 366-67, which could be for dozens of reasons that have nothing to do with any alleged channel stuffing. *See* Mot. at 4-5, 24-25; *Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at *10 (N.D. Cal. Jun 19, 2020) (no loss causation where plaintiff failed to "allege proximate cause between channel stuffing and the poor performance that led to missed guidance"). As discussed in response to Question 9, none of the analysts cited in Plaintiffs' SAC (and, as far as Defendants are aware, no analysts whatsoever) thought that Extreme missed guidance because a channel-stuffing scheme fell apart. And for the backlog statements to be fraudulent, the corrective disclosures must have revealed some information suggesting that the backlog weakness was known months earlier, when the challenged statements were made. They do not.

The cases Plaintiffs cite in their Opposition are inapposite. Opp. at 25. *Mineworkers' Pension Scheme v. First Solar Incorporated* is a *per curiam* interlocutory opinion that predates *Espy* and does not address channel stuffing or backlog allegations. 881 F.3d 750, 752-53 (9th Cir. 2018). In *York County. on Behalf of County. of York Retirement Fund v. HP Inc.*, the plaintiff alleged that the defendant admitted that it "completely overhauled its sales model and took a $700 million Supplies inventory reduction" as a result of the challenged sales practices. 738 F. Supp. 3d 1182, 1212, 1216 (N.D. Cal. 2024), motion to certify appeal granted, 2024 WL 4831889 (N.D. Cal. June 3, 2024). And *Cunha v. Hansen Natural Corporation* only included one sentence on loss causation, but credited allegations that the defendant's distributors were holding a year's

worth of defendant's key products because no products were selling "th[r]ough to consumers." 2011 WL 8993148, at *2, 4 (C.D. Cal. May 12, 2011). Here, unlike in those cases, not only was there no disclosure of channel stuffing or improper sales practices at the time of the corrective disclosure, there are *still* no allegations demonstrating that the small guidance miss was actually caused by the deterioration of the channel stuffing scheme—there were no alleged returns of unwanted products, Mot. at 9, no allegations by Extreme's customers, and the star confidential witness for the alleged scheme, FE-1, stopped working at Extreme more than a year before the scheme allegedly fell apart, ¶ 45.

**Question 9:** Regarding your statement in Dkt. 110 at 15 that "no analyst agreed with Plaintiffs' theory" that the inventory buildup was evidence of channel stuffing, please provide the exact citation in your briefing supporting the analyst's position.

**Defendants' Response:** The quoted language from Defendants' Reply at 15 echoes an argument from Defendants' Motion at page 24:

> Plaintiffs allege five partial disclosures from January 25, 2023 to January 31, 2024, but none involve any revelation of "illicit channel stuffing," "manipulative sales and inventory practices," or "the true nature of the Company's backlog." *E.g.*, ¶¶ 98, 351, 618. In fact, none of the analysts quoted in the SAC even speculated that Extreme misrepresented its revenue or backlog or was channel stuffing. *E.g.*, ¶¶ 356, 360, 369, 377-80.

Plaintiffs bear the burden of pleading particularized facts sufficient to meet the heightened pleading standards of Rule 9(b) and the PSLRA to allege the loss causation element of a securities fraud claim under the Exchange Act. *Apollo.* The cited paragraphs from the "Truth Emerges" section of Plaintiffs' SAC, ¶¶ 351-81, quote snippets from various analysts' reports following the alleged corrective disclosures.[5] Not one of these analyst reports mentions channel stuffing, illicit sales practices, or a "scheme" to force customers to order product they did not need, and none expresses any suspicion that Extreme misrepresented or manipulated its order backlog at any point

---

[5] The cited analyst reports are Rosenblatt Securities, Jan. 25, 2023 (¶ 356); Craig-Hallum Capital Group LLC, Jan. 26, 2023 (¶ 356); Rosenblatt Securities, Aug. 28, 2023 (¶ 360); Needham & Co., Jan. 9, 2024 (¶ 369); UBS Research, Jan. 31, 2024 (¶ 377); Needham & Co., Feb. 1, 2024 (¶ 378); Oppenheimer, Jan. 31, 2024 (¶ 379); and Lake Street Capital Markets, Jan. 31, 2024 (¶ 380). Defendants would be happy to submit the full text of these analyst reports if the Court would find them helpful.

during the relevant time period.  Defendants' argument is that Plaintiffs—who bear the pleading burden here—have quoted analyst reports in the SAC purportedly in support of their loss causation allegations, but they have not identified any analyst report expressing suspicion regarding purported channel stuffing or manipulation of order backlogs during the relevant time period. Were analysts to have expressed such suspicion, Plaintiffs surely would have alleged it in their SAC.

### E.    Recent Decisions (Dkt. 118)

**Question 10:**  How does the recent decision in *Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc*, No. 24-4909, 2026 WL 292424 (9th Cir. Feb. 4, 2026) and *Indiana Pub. Ret. Sys. v. Rivian Auto., Inc.*, No. 2:24-CV-4566-CBM-JPR, 2026 WL 199989 (C.D. Cal. Jan. 22, 2026) affect the Court's analysis of whether a company has a duty to disclose internal cancellation hedges, such as those described by FE-7?

**Defendants' Response:**  Neither *Funko* nor *Rivian* supports Plaintiffs' falsity contentions, and indeed, both demonstrate what Plaintiffs' allegations are lacking here.  Moreover, neither case includes any allegations about an internal order cancellation hedge or other internal risk hedging metrics, as discussed in allegations attributed to FE-7 in this case.

In *Funko*, the Ninth Circuit held that statements that Funko's inventory was "generally high quality" and "in a really good healthy position" were "'vague and generalized corporate commitments, aspirations, or puffery that cannot support' Exchange Act liability."  *Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc.*, 166 F.4th 805, 824-29 (9th Cir. 2026) (quoting *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 708 (9th Cir. 2021)).  The Court should reach the same conclusion with respect to Defendants' virtually identical statements that Extreme's backlog was "high quality," ¶¶ 402, 425; and "healthy," ¶¶ 464, 478.  The inventory statements that the *Funko* court found to be actionable were risk disclosures purportedly characterizing Funko's inventory buildup as a hypothetical possibility when the company's warehouses allegedly were at capacity and inventory was piling up in the parking lots.  *Funko*, 166 F.4th at 817, 819. Here, Plaintiffs *do not challenge* Extreme's risk disclosures, and for good reason:  the disclosures

were replete with warnings that Extreme's backlog "could be cancelled" and is not "necessarily indicative of actual revenues for any future period." *See* Mot. at 4.

The recent *Rivian* decision (on a narrow motion for judgment on the pleadings) also demonstrates what is missing here. Plaintiffs' claims in *Rivian* were based on Rivian's "Roadmap for production" and specific related representations that it was "on track to achieve gross margin profits in 2024 by increasing the production and sales of its electric vehicles," and that it was not affected by macroeconomic factors impacting the industry. *Rivian*, 2026 WL 199989, at *3. The court held that Plaintiffs had adequately alleged falsity for these statements based on a confluence of factors, including that a "large number" of Rivian's backlog was based on "preorders" from before Rivian vehicles were ever even first delivered to consumers, that ***all*** of the preorders were "fully cancellable" by consumers, that macroeconomic factors were adversely affecting demand, and that Rivian was having supply chain and production issues that would impact the ability to ramp production. *Id.* at *3. Moreover, the court noted that while Rivian initially reported on its backlog metrics, Rivian suddenly stopped reporting on backlog while continuing to make positive statements about it to the market. *Id.* at *4 & n.4. The court held that Rivian concealed from investors that defendants monitored backlog and cancellations (that any customer could decide to do unilaterally at any time) "daily" and knew of a number of facts contradicting their positive statements about profitability and demand. *Id.* at 3-4 & n.4. Here, Plaintiffs do not allege any similar facts. They concede that customers' orders of Extreme products were only cancellable on an "exception basis," ¶ 74, and they do not allege that any such orders were made years before potential delivery of the products, much less before the products were ever first delivered to consumers. And Plaintiffs allege no similar facts about "daily" monitoring of backlog and cancellations, nor do they allege that Defendants completely stopped reporting on backlog.[6]

In addition to being distinguishable to Plaintiffs' allegations here, *Funko* and *Rivian* do not support the position that Defendants had a duty to disclose any internal hedging metric during the

---

[6] While Plaintiffs allege Extreme stopped reporting backlog on a quarterly basis (¶ 558), they do not allege that Extreme completely stopped reporting backlog for years, like in Rivian, and instead allege elsewhere that backlog could be measured by comparison with other reported metrics (¶ 561).

relevant period. Defendants would only have had a duty to disclose the alleged 10% backlog hedge if Extreme's statements otherwise "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." Dkt 92 at 12-13. Here, the challenged backlog statements were not false or misleading *even if* Extreme had assumed that 10% of its backlog were "hedged" in "Summer or early Fall 2022," ¶ 282, because Defendants repeatedly warned that backlog would "normalize"—*i.e.*, come down—throughout the Class Period, Mot. at 4-5. Extreme also met or exceeded its revenue guidance in six of the seven quarterly earnings reports issued during the Class Period (until the last quarter of 2023), Mot. at 4, meaning that for at least a year after the 10% backlog hedge was allegedly implemented, Extreme's guidance was on-target (if not conservative). And, critically, neither FE-7 nor any other FE alleges that any specific backlog orders were *actually cancelled*—let alone 10% of backlog—during the Class Period. *See Solarcity*, 274 F. Supp. 3d at 999-1001 (rejecting CW statements about backlog as insufficient, including where estimate of a 50% cancellation rate "may or may not have been the cancellation rate during the Class Period").

It is also worth noting that FE-7's objection to the alleged 10% internal backlog hedge is not that it was undisclosed, but rather that it was not conservative enough. *See* ¶ 283. FE-7 claims that he was "startled" when he learned that Extreme was allegedly anticipating that only 10% of backlog would not convert to revenue and "concerned" because he thought Extreme should be assuming a *bigger* hedge: FE-7 believes that "because other companies sold very similar and interchangeable hardware" as Extreme, "generic hardware customers" would place duplicative orders with multiple vendors and then cancel the order(s) that are not delivered first. *Id.* But Extreme's executive team supposedly disregarded FE-7's concern that the backlog hedge was too small (and thus the strength of the backlog would be overstated). ¶ 284. In other words, FE-7 was concerned that Extreme's leadership team was *too confident* in the strength of the backlog. *Id.*; Opp. at 13 (FE-7 "warned Defendants" that the "10% backlog cancellation hedge" was "insufficient"). No facts support FE-7's allegation that a 10% backlog hedge was insufficient— there are no particularized allegations of double ordering or backlog cancellations during the Class Period, and Extreme met its revenue guidance for six of the seven quarters. Mot. at 4, 15-17. But

even if FE-7 were right, the alleged 10% hedge assumption is consistent with Defendants' public statements expressing confidence in Extreme's backlog.  Taken as true, FE-7's allegations directly contradict Plaintiffs' scienter theory because they confirm that Extreme's executive team believed that backlog would convert to revenue at very high rates.

Dated: March 2, 2026                              Respectfully submitted,

                                                  LATHAM & WATKINS LLP


                                          By  /s/ Melanie M. Blunschi
                                              Melanie M. Blunschi (Bar No. 234264)
                                                melanie.blunschi@lw.com
                                              Morgan E. Whitworth (Bar No. 304907)
                                                morgan.whitworth@lw.com
                                              505 Montgomery St., Suite 2000
                                              San Francisco, CA 94111
                                              Telephone: +1.415.391.0600

                                              Daniel R. Gherardi (Bar No. 317771)
                                                daniel.gherardi@lw.com
                                              140 Scott Drive
                                              Menlo Park, CA 94025
                                              Telephone: +1.650.328.4600

                                              *Attorneys for Defendants Extreme
                                              Networks, Inc., Edward B. Meyercord
                                              III, Rémi Thomas, Cristina Tate, Kevin
                                              Rhodes, Norman Rice, and Jonas Brown*