# Exhibit A

2026 WL 657744
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

RYAN BARKER, et al., Plaintiffs,

v.

NEXTRACKER INC., et al., Defendants.

Case No. 24-cv-09467-PCP
|
Filed 03/09/2026

**Attorneys and Law Firms**

Jacob Alexander Goldberg, Pro Hac Vice, Leah Heifetz-Li, Pro Hac Vice, The Rosen Law Firm, P.A., Jenkintown, PA, Laurence Matthew Rosen, The Rosen Law Firm, P.A., Los Angeles, CA, for Plaintiff Ryan Barker.

Jacob Alexander Goldberg, Pro Hac Vice, The Rosen Law Firm, P.A., Jenkintown, PA, for Plaintiff Charles Bennett.

Alexander K. Talarides, James Neil Kramer, Orrick, Herrington & Sutcliffe LLP, San Francisco, CA, Brian Marc Burnovski, Pro Hac Vice, Davis Polk & Wardwell LLP, New York, NY, Neal Alan Potischman, Davis Polk & Wardwell LLP, Redwood City, CA, for Defendants Nextracker Inc., Daniel Shugar, David Bennett, Howard Wenger, Charles Boynton.

James Neil Kramer, Alexander K. Talarides, Orrick, Herrington & Sutcliffe LLP, San Francisco, CA, for Defendant Nicholas "Marco" Miller.

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

P. Casey Pitts United States District Judge

**\*1** In their class action complaint, plaintiffs Ryan Barker and Charles Bennett allege that Nextracker Inc. and its executives Daniel Shugar, David Bennett, Howard Wenger, Charles Boynton, and Nicholas Miller made materially false or misleading statements in 2024 in violation of federal securities laws. Defendants now move to dismiss plaintiffs' lawsuit for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the Court grants Nextracker's motion to dismiss.

**BACKGROUND**

Nextracker sells equipment and software to help solar panels track the sun's movement in the sky.[1] Nextracker is a public company.[2] The individual defendants were all executives or directors of Nextracker for at least some time during plaintiffs' proposed class period of May 14, 2024, to August 1, 2024. Daniel Shugar was CEO throughout the class period and is a co-founder of Nextracker. David Bennett was CFO until May 2024, at which point he became Nextracker's Chief Accounting Officer. Howard Wenger was President and a director of Nextracker throughout the class period. Charles Boynton was CFO after David Bennett and for the remainder of the class period. Nicholas Miller was COO throughout the class period and is a co-founder of Nextracker.

[1] The Court assumes the truth of the allegations in the amended class action complaint for the purposes of defendants' Rule 12(b)(6) motion.

[2] In November 2025, Nextracker changed its name to Nextpower. Nextracker Rebrands as Nextpower to Reflect the Company's Position as an Integrated Power Technology Innovator, Bus. Wire (Nov. 12, 2025 9:15 AM EST), https://www.businesswire.com/news/home/ 20251112663209/en/NextrackerRebrands-as-Nextpower-to-Reflect-the-Companys-Position-as-an-IntegratedPower-Technology-Innovator.

After the passage of the Inflation Reduction Act of 2022, Nextracker's revenues increased sharply. One measure of Nextracker's financial health is its "backlog," or "executed contracts or purchase orders with deposits and specific bills of material for specific projects with indicated start dates." Nextracker's backlog provides a signal of Nextracker's expected future revenue. Throughout 2023, Nextracker reported large backlogs of $2–3 billion, as well as large increases in the size of its backlog year-over-year, reaching quarterly growth in the double and even triple-digit percentages. At the same time, the solar tracking industry generally risks being hurt by delays in solar projects' completion, which stem from complications relating to permits, inputs, regulatory clearances, weather, or construction. Industry risks also include interconnection delays, which are delays in connecting solar power projects to the electrical grid.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 657744

On May 10, 2023, Nextracker announced its quarterly and annual results for the quarter and year that ended on March 31, 2023. Nextracker reported that its backlog of projects had grown, forecasted revenue of $2.1 billion to $2.3 billion for the next year, and made other optimistic financial projections. For three consecutive quarters thereafter, Nextracker raised its guidance for the full year, projecting better financial results in July 2023, October 2023, and January 2024.

**\*2** A few months thereafter, Nextracker made three statements relevant to this action. First, on May 14, 2024, Nextracker issued a press release and held an earnings call touting its financial performance for the quarter and fiscal year that had ended on March 31, 2024. Second, on May 28, 2024, Nextracker's Form 10-K filing reported that project delays "could have a material adverse effect on us." The filing also warned that the company's financial results "may fluctuate from quarter to quarter." The filing stated, "We have experienced seasonal and quarterly fluctuations in the past as a result of fluctuations in our customers' businesses, changes in local and global market trends, as well as seasonal weather-related disruptions." Finally, on June 17, 2024, defendant Boynton said at a conference that Nextracker had been able to withstand delays "because of the size and scale and ab[ility] to meet our customers' demands and really focus on on-time delivery." Boynton was responding to a question as to why Nextracker had been able to weather project delays "relatively less scathed," to which he responded in full:

> To the extent that there are movements, if a customer wants to delay, we will work with that customer to delay. If a customer wants to pull it in, we'll try to pull it in. With that, we probably have been a little more resilient because of the size and scale and able [sic] to meet our customers' demands and really focus on on-time delivery. That's been helpful to us.[3]

[3] Nextracker requests judicial notice of a set of documents including publicly filed financial statements, earnings call transcripts, and a transcript of the Energy, Power & Renewables Conference during which defendant Boynton allegedly made his statements. Dkt. No. 54-10. Plaintiffs have not opposed Nextracker's request for judicial notice. Because all of the documents are incorporated by reference in plaintiffs' complaint or otherwise subject to judicial notice, the Court grants Nextracker's request.

On August 1, 2024, plaintiffs allege, "the truth emerge[d]." On that date, Nextracker announced its results for the quarter

ending on June 30, 2024, and disclosed that, in comparison to the immediately prior quarter, its revenue had fallen from $737 million to $720 million and its gross profits had fallen from $340 million to $237 million. On Nextracker's earnings call that day, Shugar said that "it is taking longer for projects to be fulfilled in real life due to" interconnection and permitting delays. Wenger said that Nextracker's backlog conversion rate—how quickly Nextracker could turn backlog into actual revenue—would be around 80 percent in part because "project life cycles are getting a little bit longer." Nextracker's stock price subsequently fell, as it did again on October 30, 2024, when Nextracker again reported declines in quarterly revenue and profits.

In support of their claim that defendants' earlier statements were false or misleading, plaintiffs' complaint describes testimony from multiple former Nextracker employees. Those employees report that Nextracker and its leadership "tracked and had real time access to all information about projects, including and especially project delays."

Former Employee 1 (FE1) was an Assistant Project Manager from February 2023 through November 2024 who reported to people who reported to Nextracker executives. FE1 explains that Nextracker had Excel spreadsheets to track projects and included information about running progress, including on the delivery of equipment. Senior leaders allegedly reviewed these project spreadsheets and held weekly project meetings to discuss the projects.

Former Employee 2 (FE2) was a project manager from July 2024 through April 2025. FE2 reports that three or four of his eleven projects experienced delays. FE2 also reports that Nextracker maintained revenue recognition forecasts that other project managers could see.

Former Employee 3 (FE 3) was a senior project manager from March 2016 through November 2024 who claims that "approximately 20% of projects faced delays Company-wide." FE3 explains that if a customer asked to delay the delivery of equipment, "project managers quickly reported up the chain, virtually immediately upon receiving delay letters from customers."

**\*3** Former Employee 4 (FE4) was a director of finance from April 2018 to April 2024 who reported directly to then-CFO Bennett. FE4 says that "permitting delays, solar panel supply challenges, and increasingly long wait times for interconnection to the electrical grids were common causes

for project delays" and that Nextracker leadership "constantly discussed project delays and their causes" and held weekly leadership meetings.

Finally, Former Employee 5 (FE5) was a project manager from October 2023 to January 2024. FE5 also says that Nextracker leadership used Excel spreadsheets to track projects.

Lead Plaintiff Ryan Barker and co-plaintiff Charles Bennett seek to represent a class of Nextracker shareholders who bought common stock between May 14, 2024, and August 1, 2024. They allege that they suffered financial losses from Nextracker's misrepresentations or omissions. They contend that Nextracker and Nextracker's executives committed fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act), as applied in Rule 10b-5, and Section 20(a) of the Exchange Act. Plaintiffs seek to represent a class defined as "all persons and entities that purchased Nextracker publicly traded common stock during the Class Period, and who were damaged thereby," except for defendants and other Nextracker leaders and related entities. Plaintiffs seek class certification, damages, fees and costs, and a jury trial.

Defendants now move to dismiss plaintiffs' suit for failure to state a claim.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include a "short and plain statement of the claim showing that the pleader is entitled to relief." If the complaint does not do so, the defendant may move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). Dismissal is required if the plaintiff fails to allege facts allowing the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true and

construe the pleadings in the light most favorable" to the non-moving party. *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009). While legal conclusions "can provide the [complaint's] framework," the Court will not assume they are correct unless adequately "supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

Besides satisfying Rule 12(b)(6), securities fraud plaintiffs must also satisfy "the "dual pleading requirements" Rule 9(b) and the Private Securities Litigation Reform Act, which together require a plaintiff to plead fraud as to each allegedly fraudulent statement with "particularity." *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009); 15 U.S.C. § 78u-4(b)(1). Thus, a plaintiff must plead how each allegedly false or misleading statement is false or misleading, the reasons each is misleading, and, if the allegations are based on information and belief, the facts on which that belief is based. *See Zucco*, 552 F.3d at 990–91.

## DISCUSSION

 **\*4** A plaintiff alleging a claim for securities fraud under Rule 10b-5(b), which implements Section 10(b) of the Exchange Act, must plead "six essential elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017) (cleaned up). Defendants argue that plaintiffs have not plausibly alleged material misrepresentations or omissions or scienter. Because plaintiffs' failure to plead a material misrepresentation or omission is dispositive, the Court declines to consider at this time whether they have adequately pleaded scienter.

### I. Section 10(b)

For the purposes of Section 10(b), a material misrepresentation or omission occurs when a communication "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually

Case 3:24-cv-05102-TLT    Document 131-2    Filed 03/23/26    Page 5 of 8
RYAN BARKER, et al., Plaintiffs, v. NEXTRACKER INC., et al.,..., Slip Copy (2026)

2026 WL 657744

exists.' " *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2006)). The statement must be misleading in the context of the "totality of the statements made within the Class Period." *Retail Wholesale*, 845 F.3d at 1277.

A statement is not a material misrepresentation if it is "transparently aspirational" or "mere corporate puffery." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021). Corporate statements that are merely "vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers" are generally not misrepresentations because investors "know how to devalue the optimism of corporate executives." *Police Ret. Sys. of St. Louis v. Intuitive Surgical*, 759 F.3d 1051, 1060 (9th Cir. 2014) (quoting *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)). Puffery and vague statements of misrepresentations become actionable "only if they provide concrete description of the past and present that affirmatively create a plausibly misleading impression of a state of affairs that differed in a material way from the one that actually existed." *In re Alphabet*, 1 F.4th at 700 (cleaned up). One can create such a "misleading impression of a state of affairs" by warning that risks " 'could' or 'may' occur ... when [one already knows] that those risks had materialized." *Id.* at 700, 704. For example, the president of a pharmaceutical company made material misrepresentations in responding to concerns that the FDA would not approve the company's drug by calling those concerns "scientifically wrong" and "irresponsible" and stating that "everything [was] going fine," when the company allegedly "knew, based on its clinical studies, that [the drug] might not work and would never be approved by the FDA." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 957, 959 (9th Cir. 1996).

Plaintiffs allege that three sets of statements were false or misleading: Nextracker's May 14, 2024, earnings report and the accompanying press release and conference call; Nextracker's May 28, 2024, Form 10-K; and Boynton's June 17, 2024, answer to a question at an energy conference. Considering each in turn, none plausibly includes an actionable falsity, misrepresentation, or omission.

### A. May 14, 2024, Press Release and Earnings Call

In their May 14, 2024, press release and earnings call, Nextracker "reported results that exceeded Nextracker's full year guidance" as measured year-over-year by revenue, net income, earnings per share, and earnings before interest, taxes, depreciation, and amortization. In the release,

defendant CEO Shugar said that 2024 "was a year of strong execution and significant growth for Nextracker, and we reached a record backlog of over $4 billion that more than tripled in 2 years." Shugar also said, "We've accelerated our pace of product innovation, scaled global revenue and supply chain, more than doubled our profits from the prior year, and exceeded all elements of our full year guidance." During Nextracker's earnings call, Shugar responded to concerns about delays by stating: "On prior earnings calls, we've had questions regarding sector headwinds and interconnection permitting and other areas. We noted that these headwinds can be real for any given project or customer, but that the total universe of projects and customers has grown such that in totality the market continued strong growth." Defendant Wenger responded to a question about delays by saying, "We're pleased with the growth of our backlog. Typically, it results in revenue in two to eight quarters and most of that in two to five quarters."

**\*5** Plaintiffs have not adequately pleaded that any of these statements were false or misleading; at most, their statements amount to "vague statements of optimism." *In re Alphabet*, 1 F.4th at 700. Plaintiffs do not contend that the press release and earnings report were materially false or misleading to the extent that they reported on the previous period's financial results. And though optimistic statements about the past might sometimes suggest optimistic forecasts about the future, the alleged misstatements here did not do so. Shugar's comments were statements about the past. Wenger's comments were either statements of subjective assessment, such as saying that the company is "pleased with the growth of our backlog," or reporting of past trends, saying that "[t]ypically [backlogs] result[ ] in revenue in two to eight quarters and most of that in two to five quarters." These statements did not "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006.

Plaintiffs make no allegations that the underlying figures and reporting themselves were false or misleading. Instead, they argue that the above statements were "materially false and misleading" because defendants "knew or recklessly disregarded at the time that they issued this press release that project delays were increasing and lengthening as a result of interconnection queue and permitting delays[ ] and materially impacting Nextracker's results due to its inability to convert material backlog into revenue." In support, plaintiffs point to former employees who purportedly provide "

'particularized facts' showing that [defendants'] answers to analysts' questions were false."

Plaintiffs fail, however, to establish that the defendants "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* A statement can be incomplete without being materially false or misleading. *See id.* The former employee statements do not create a plausible inference of material misrepresentation because they do not establish that project delays were significant enough either in number or magnitude to undermine Shugar's or Wenger's statements. Many of the former employees' statements are vague or anecdotal, such as FE1's explanation that senior leaders actively monitored detailed project spreadsheets or FE2's note that three to four out of eleven projects experienced delays, "last[ing] months to years, including one project that experienced a delay until 2027." The closest plaintiffs come to a broader allegation about Nextracker's statements being materially false is FE3's claim that "approximately 20% of projects faced delays Company-wide." But without more detail, such as an explanation of how this delay rate compared to the delay rates in prior fiscal years, even FE3's statements are insufficiently specific to suggest that Shugar's and Wenger's acknowledgement of project delays was false or misleading.

Plaintiffs also argue that Shugar's and Wenger's comments constituted material misrepresentations because they were made in direct response to analysts' questions. But Shugar and Wenger merely responded generally and did not provide statements of assurance as sweeping as the president in *Warshaw*, who said that "everything [was] going fine." 74 F.3d at 959. Shugar and Wenger acknowledged concerns and presented somewhat bland and general statements about Nextracker but did not present or suggest that "everything [was] going fine." *Id.* The two pointed to specific projections and understandings that guided their thinking. The defendants also pointed to past trends and thus did not "significantly alter[ ] the 'total mix' of information made available' to investors." *In re Palo Alto Networks, Inc. Sec. Litig.*, 2025 WL 1093247, at *6 (N.D. Cal. Apr. 11, 2025) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).

The cases plaintiffs cite in opposition are inapposite. In *In re Quality Systems, Inc. Securities Litigation*, 865 F.3d 1130 (9th Cir. 2017), the plaintiffs alleged that defendant officers had made public statements that were "inconsistent with real-time financial information," *id.* at 1144, and quoted former employees who provided specific testimony regarding

larger trends in the company. *Id.* Here, by contrast, the former employee statements are vague and general and do not specifically contradict anything the executives said.

**\*6** Similarly, in *Glazer Capital Management, L.P. v. Forescout Technologies*, 63 F.4th 747 (9th Cir. 2023), confidential witnesses reported systemic problems with Forescout's business practices, including executives' practice of misleadingly labeling "numerous seven-figure deals as 'committed' when, in fact, the buyers had no interest." *Id.* at 769. Plaintiffs here do not allege similarly misleading practices. Finally, the backlog of orders at issue in *Berson* included "stop-work order[s]" which, in the defendant's business, meant that those orders were "often ... eventually cancelled altogether." 527 F.3d at 984. Here, by contrast, plaintiffs do not contend that Nextracker's backlog of orders was comparably misreported, nor did Nextracker executives obfuscate about the nature of their backlog to the same degree as the defendants in *Berson* did. *See id.* at 986–87.

Accordingly, plaintiffs have not plausibly alleged that defendants' May 14, 2024, statements were materially false or misleading.

### B. May 28, 2024, Form 10-K

Plaintiffs next argue that a statement that project delays "could have a material adverse effect" in Nextracker's May 28, 2024, 10-K filing was materially false because, according to plaintiffs, project delays were *already* having a material adverse effect.

Plaintiffs' argument that this was a material misrepresentation fails in the first instance because Nextracker in fact warned investors of the risk of project delays. According to plaintiffs' own allegations, Nextracker did not merely say that delays "may" occur but instead acknowledged past delays. Nextracker's 2024 Form 10-K warned that the company's financial performance "may fluctuate from quarter to quarter" and stated, "We *have* experienced seasonal and quarterly fluctuations in the past as a result of fluctuations in our customers' businesses, changes in local and global market trends, as well as seasonal weather-related disruptions."

In support of their claim that the 10-K's statement was false or misleading, plaintiffs cite *In re Alphabet*, 1 F.4th 687, which held that risk disclosures that do not mention instances of that risk already having occurred can be plausibly materially misleading. *Id.* at 702. But in that case, Alphabet only described the risk possibilities generally and said that there

had been "no material changes to our risk factors since" its 2017 Form 10-K, when the truth was that certain of those risks had already materialized. *Id.* at 696; *see also id.* at 704 ("[T]he complaint plausibly alleges that Alphabet's warning in each Form 10-Q of risks that 'could' or 'may' occur is misleading to a reasonable investor when Alphabet knew that those risks had materialized."). Unlike Alphabet, Nextracker did "alert" investors "that some of these risks may already have come to fruition" by expressly discussing the existence of delays. *See Glazer,* 63 F.4th at 781 (quoting *Berson,* 527 F.3d at 985–87). And more importantly, none of former employee statements offered by plaintiffs in support of their suit provide any specific allegations that, by the time of the 10-K's issuance, there had been an increase in delays sufficient to have *a materially adverse effect* on Nextracker's earnings. In the absence of particularized allegations supporting the claim that such an effect had already been realized, Nextracker's acknowledgment that delays "could" have a material adverse effect was not false or misleading.

The broader context of defendants' statements also does not render the statements false or misleading. On multiple occasions, in at least May 2023, July 2023, October 2023, January 2024, and March 2024, Nextracker warned that interconnection and permitting delays could adversely affect its business. Given this factual context, it is not plausible that a reasonable investor would think that Nextracker was intimating a false state of affairs—i.e., that its projects would not be affected by potential delays. And plaintiffs have not alleged facts from which the Court could plausibly conclude that defendants were aware, by May 28, 2024, that the number or length of project delays had changed to a degree that would materially affect the company's business.

### C. June 17, 2024, Resiliency Statement

**\*7** Finally, plaintiffs allege that defendant Boynton made a material misrepresentation when he said, on June 17, 2024, that Nextracker "had been resilient in the face of delays 'because of the size and scale and ab[ility] to meet our customers' demands and really focus on on-time delivery.'" Plaintiffs argue that Boynton's comment was false and misleading because "Boynton knew that the project delays as a result of interconnection queue and permitting delays were lengthening." In their request for judicial notice, defendants include a transcript providing Boynton's remarks in full, which shows that he was responding to a question as to why Nextracker had been able to weather project delays "relatively less scathed." Boynton responded, in part,

To the extent that there are movements, if a customer wants to delay, we will work with that customer to delay. If a customer wants to pull it in, we'll try to pull it in. With that, we probably have been a little more resilient because of the size and scale and able to meet our customers' demands and really focus on on-time delivery. That's been helpful to us. *Id.*

In order to "plead[ ] falsity of opinion statements[,] ... the plaintiff must allege both that 'the speaker did not hold the belief [he] professed' and that the belief is objectively untrue." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,* 856 F.3d 605, 615–16 (9th Cir. 2017) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,* 575 U.S. 175, 186 (2015)). Here, plaintiffs have not adequately pleaded that Boynton "did not hold the belief [he] professed" and that his belief was "objectively untrue." *Id.* There is no indication in the complaint that Boynton did not believe what he was saying, even assuming Boynton was aware of the former employees' testimony. Boynton provided his subjective assessment of an explanation for his company's performance. His statement was careful and relative: "[W]e probably have been a little more resilient...." The complaint contains no specific allegation that makes plausible the inference that Boynton's belief was "objectively untrue," because plaintiffs do not allege that a reasonable person would not think that Nextracker is "a little more resilient" than its competitors. *Id.* at 615–16. Therefore, plaintiffs have not plausibly alleged that Boynton's June 17, 2024, statement was materially false or misleading.

Further, "when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that 'the supporting fact [the speaker] supplied [is] untrue.'" *Align,* 856 F.3d at 616 (quoting *Omnicare,* 575 U.S. at 186). Here, the supporting fact—whether Nextracker "probably [has] been a little more resilient"—is too vague and circumlocutory to be untrue. Boynton's statement is careful, comparative, and general. Plaintiffs' allegations from former employees do not plausibly allege that Boynton's opinion was materially misleading because they do not contradict the possibility that Nextracker was "a little more resilient" than its competitors. Therefore, plaintiffs have not plausibly alleged that Boynton's June 17, 2024, statement was materially false or misleading.

2026 WL 657744

* * *

In short, plaintiffs have not plausibly alleged that any of the statements identified in their complaint constituted a material misrepresentation or omission. Defendants' motion to dismiss their Section 10(b) claim is therefore granted with leave to amend.

## II. Section 20(a)

Section 20(a) of the Exchange Act imposes liability on individual who "control[ ] any person" who has violated, among other laws, Section 10(b) and Rule 10b-5. 15 U.S.C. § 78t(a); *Zucco*, 552 F.3d at 990. Section 20(a) requires a "primary violation" of the federal securities laws, on which to base Section 20(a) liability. *See Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1113 (9th Cir. 2021). Because plaintiffs have failed to plead a violation of Section 10(b), they have not pleaded a predicate "primary violation" and their Section 20(a) claim "necessarily fail[s]." *Id.* Nextracker's motion to dismiss that claim is therefore granted with leave to amend.

## CONCLUSION

**\*8** For the reasons set forth above, defendants' motion to dismiss is granted with leave to amend. Plaintiffs must file any amended complaint within 28 days of the filing of this order. Failure to file an amended complaint will result in the dismissal with prejudice of all claims.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2026 WL 657744

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.