UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>EXTREME NETWORKS, INC., EDWARD B. MEYERCORD III, RÉMI THOMAS, CRISTINA TATE, KEVIN RHODES, NORMAN RICE, JONAS BROWN,<br><br>Defendants. | Case No.  24-cv-05102-TLT<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT AND GRANTING-IN-PART REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE**<br><br>Re: Dkt. Nos. 104, 105, 131 |

## I.    INTRODUCTION

Before the Court is Defendants Extreme Networks, Inc. ("Extreme"), Edward B. Meyercord III, Rémi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, and Jonas Brown (collectively, "Defendants")'s motion to dismiss Lead Plaintiffs Oklahoma Firefighters Pension and Retirement System ("Oklahoma Fire"), Oklahoma Police Pension and Retirement System ("Oklahoma Police"), Oakland County Voluntary Employees' Beneficiary Association ("Oakland County VEBA"), and Oakland County Employees' Retirement System ("Oakland County ERS") (collectively, "Plaintiffs")'s SAC.  ECF 104.  Defendants also request judicial notice and incorporation by reference of 21 selected exhibits in support of their motion to dismiss.  ECF 105. This is a federal securities class action brought under the Securities Exchange Act of 1934 ("Exchange Act") and the U.S. Securities and Exchange Commission's rule ("Rule").

In the SAC, Plaintiffs allege that Defendants made false and misleading statements about Extreme's product revenue and backlog between July 27, 2022, and January 30, 2024 (the "Class

Period"). ECF 95. The Class includes all persons and entities who purchased or acquired the publicly traded common stock of Extreme during the Class Period and suffered damages thereby. *Id*. at 1.

After reviewing the parties' briefs, hearings, and the relevant legal authority, and for the reasons below, the Court **DENIES** the motion to dismiss and **GRANTS** judicial notice as to the existence of selected exhibits.

## II.    BACKGROUND

### A.    Procedural background

On August 13, 2024, Plaintiff Steamfitters Local 449 Pension & Retirement Security Funds filed a federal securities class action against Defendants. ECF 1. On December 30, 2025, the Court granted the unopposed motion to appoint lead plaintiff and lead counsel, appointing Oklahoma Fire, Oklahoma Police, Oakland County VEBA, and Oakland County ERS as lead plaintiffs. ECF 51.

On February 14, 2025, Plaintiffs filed the FAC against Defendant Extreme and its key officers and high-level executives: (i) Chief Executive Officer Edward B. Meyercord III; (ii) Chief Financial Officers ("CFO") Rémi Thomas (who was the CFO until February 2023), Christina Tate (who was the CFO from February 2023 to May 2023), and Kevin Rhodes (who was the CFO from May 2023 until the end of the Class Period); (iii) Chief Operating Officer Norman Rice; and (iv) Senior Director of Worldwide Distribution Sales and Strategy Jonas Brown. ECF 59. Plaintiffs allege that Defendants have violated (1) Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, (2) Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and (3) Section 20(a) of the Exchange Act. *Id*. ¶¶ 559–85.

On April 15, 2025, Defendants filed a motion to dismiss the FAC and requested judicial notice of the selected exhibits. ECF 74, 75. After being fully briefed, the Court granted the motion to dismiss the FAC as to all claims, with leave to amend, because Plaintiffs failed to allege the requisite manipulative sales practices and falsity with particularity as to the channel stuffing and backlog schemes. ECF 92 ("Order"). The Court also granted judicial notice of the exhibits for their existence, not for the truth of the matters asserted therein. *Id*.

United States District Court
Northern District of California

On September 9, 2025, Plaintiffs timely filed the SAC.  ECF 95.  On October 3, 2025, Defendants filed a motion to dismiss the SAC and requested judicial notice of 21 exhibits.  ECF 104, 105.  On November 3, 2025, Plaintiffs filed an opposition to the motion to dismiss and a response to the request for judicial notice.  ECF 108, 109.  On November 25, 2025, Defendants filed a reply in support of the motion to dismiss and a response in support of the requests for judicial notice, ECF 110, 111.  The Court heard oral argument on March 3, 2026.

### B.    Factual background

For the purpose of resolving the present motion, the Court accepts the following allegations in the SAC as true.  ECF 95.

#### i.    Overview of the parties

Lead Plaintiffs Oklahoma Fire, Oklahoma Police, Oakland County VEBA, and Oakland County ERS bring this action individually and on behalf of all persons or entities who purchased or otherwise acquired securities of Extreme during the Class Period (i.e., July 27, 2022, through January 30, 2024).  ECF 95 at 1.

Defendant Extreme Networks Inc. is a public corporation and global provider of cloud-based computer networking equipment and related services.  *Id*. ¶¶ 35, 56.  Extreme develops, manufactures, and sells wired and wireless network infrastructure hardware equipment.  *Id*. ¶ 56.  Extreme reports its revenues by two major channels: (1) the direct channel refers to Extreme selling its products directly to end user customers; and (2) the distributor channel refers to Extreme selling its products to end users through (a) its distributors or (b) its partners/resellers.  *Id*. ¶ 60.

Revenues through the distributor channel were 85 percent of total product revenues for FY2024, 83 percent of total product revenues for FY2023, and 80 percent of total product revenues for FY2022.  *Id*. ¶ 61.  Its three largest distributors were TD Synnex Corporation ("TD Synnex"), Jenne Inc. ("Jenne"), and Westcon Group Inc. ("Westcon") with ScanSource, Inc. ("ScanSource"), right behind them.  *Id*. ¶ 62.  The top three distributors accounted for over 54 percent, 53 percent, and 59 percent of total Extreme revenues in FY2022, FY2023, and FY2024, respectively.  *Id*. ¶ 63.

During the Class Period, Extreme recognized product revenue upon shipment to its customers. *Id.* ¶ 64. In addition, Extreme reported backlog as a key metric and projected the revenue based on the present number of "confirmed orders with a purchase order for products to be fulfilled and billed to customers with approved credit status." *Id.* ¶ 65. Defendants repeatedly impressed the market that "the backlog effectively represented near-certain incoming revenue." *Id.*

The individual Defendants are key officers and high-level executives of Extreme during the Class Period. *Id.* ¶¶ 36–42. These Defendants "participated in the management of Extreme, had direct and supervisory involvement in Extreme's day-to-day operations, and had the ability to control and did control Extreme's statements to investors." *Id.* ¶ 42.

###         ii.    Confidential witnesses

Plaintiffs rely on eleven confidential witnesses to corroborate their allegations. Each confidential witness is a former employee ("FE") of Extreme.

FE-1 was a Senior Distribution Account Manager at Extreme from May 2016 through August 2022 and has been in the distribution business for over thirty years. *Id.* ¶ 45. At Extreme, FE-1 managed the Company's relationship with TD Synnex. *Id.* FE-1 reported to the Director of Distribution in the Americas, Joe Uraco, who in turn, reported to Defendant Brown. *Id.* FE-1 worked with Defendant Brown on a daily basis. *Id.*

FE-2 was the Director of Sales from before the Class Period to mid-2023. *Id.* ¶ 46. Thereafter, FE-2 was an Account Executive until the end of his tenure at Extreme. *Id.* As Director of Sales, FE-2 reported to David Savage, who in turn reported to SVP Sales, Americas, Pete Brant, who in turn reported to Defendant Rice. *Id.* In his capacity as Director of Sales, FE-2 was responsible for collaborating with end user State, Local and Education ("SLED") accounts, including universities, and the channel partners that sold to them, as well as working with Extreme's relevant distributors. *Id.*

FE-3 was a Senior-level Manager of pricing at Extreme from before the Class Period to the second half of 2023. *Id.* ¶ 47. FE-3's responsibilities included executing the rollout of pricing and signing off on deals. *Id.* FE-3 reported to the Finance leadership of Defendant Tate, who reported

4

United States District Court
Northern District of California

to the CFO at Extreme. *Id.*

FE-4 was employed by Extreme until December 2022, most recently serving as Senior Regional Distribution Manager operating out of Europe. *Id.* ¶ 48. FE-4 worked directly with distributor Westcon during his employment with Extreme. *Id.*

FE-5 was formerly employed by Extreme as Senior Channel Account Manager from March 2022 to April 2024. *Id.* ¶ 49. FE-5's responsibilities included collaborating with Extreme's two largest nationwide channel partners. *Id.* FE-5 reported to Channel Sales Manager – Strategic Partnerships, Matthew Kilianski, and then Director, Global Solution Partnerships – Americas, Amy Bravo, and lastly Director – Strategic Partnerships, Cameron Marchand. *Id.* According to FE-5, Kilianski, Bravo, and Marchand reported to Vice President, Americas Channel, Jennifer Orr, who ultimately reported to Defendant Meyercord. *Id.*

FE-6 was a Senior Account Manager at Extreme from July 2017 to October 2022. *Id.* ¶ 50. During different points during his tenure at Extreme, FE-6 reported to either David Savage or to FE-2. *Id.* FE-6 worked as part of the SLED department, and except for the K-12 segment of SLED, he worked with distributors and partners throughout his tenure. *Id.*

FE-7 was the former President of a company, Intovista, that was acquired by Extreme in 2021. *Id.* ¶ 51. FE-7 began working for Extreme in August 2021, as the sale was underway, and formally became an Extreme employee in March 2022. *Id.* FE-7 attended and participated in quarterly and monthly Executive Leadership Team meetings in or around August 2021, where Defendants Meyercord, Thomas, Rice, Joe Vitalone, and others attended. *Id.* FE-7 explained that he was formally employed as the SVP, Strategy, Office of the CTO from March 2022 until March 2023. *Id.* FE-7 reported to the current Chief Technology and Product Officer, EVP/GM Subscription Business, Nabil Bukhari. *Id.* FE-7 was tasked with analyzing several aspects of Extreme's business, including examining the pricing strategy for Extreme's entire product portfolio. *Id.*

FE-8 was employed by Extreme as SVP Global Channel Sales from January 2022 to November 2023. *Id.* ¶ 52. The Distribution teams reported to FE-8. *Id.* FE-8 attended "Revenue Assurance" calls led by Defendant Rice, where the Company's backlog was discussed. *Id.*

FE-9 was employed by Extreme as a Channel Account Manager starting before the Class Period, until late 2023. *Id*. ¶ 53. According to FE-9, he was part of a team of employees managing the account and relationship with one of Extreme's largest resellers/partners during the Class Period. *Id*.

FE-10 was employed by Extreme as a Senior Account Executive from July 2023 until April 2024 and was responsible for accounts in North America. *Id*. ¶ 54.

FE-11 was employed by Extreme as an Account Manager from Fall 2022 through the end of the Class Period in the Europe, Middle East, and Africa ("EMEA") region. *Id*. ¶ 55. He was responsible for ensuring that partner accounts were set up correctly and received the correct discounts from Extreme's distributors, resolving any conflicts with end users, and working closely with team members in EMEA who worked directly with the partner accounts. *Id*.

### iii.    Extreme's revenues grew despite COVID-19's impact on backlog.

Extreme's products rely on several key components, such as merchant silicon, microprocessors, integrated circuits, and power supplies. *Id*. ¶ 66. The COVID-19 pandemic, which first emerged in 2020, created disruptions and bottlenecks that led to a shortage of Extreme's supply of networking products in the subsequent years. *Id*. The impact of the pandemic was imminent on Extreme's revenues. *Id*. ¶ 67. Analysts began to grow concerned about Extreme's ability to deliver products and generate revenue during this constrained supply chain environment. *Id*. ¶ 68. These supply chain constraints led to a large and significant increase in Extreme's backlog of orders. *Id*. ¶ 69. Extreme's backlog grew from approximately $100 million in 4Q2021 to a high of $555 million in 1Q2023. *Id*. During the same time frame, Extreme nonetheless reported strong revenue growth. *Id*. ¶ 81. Extreme attributed its revenue growth to "exceptionally strong demand." *Id*. ¶ 87. Revenues peaked in 4Q2023 but then declined significantly in 2Q2024. *Id*. ¶¶ 86, 93.

### iv.    Channel stuffing and other manipulative sales and inventory tactics

In March 2022, facing revenue shortfalls, Defendants initiated a scheme to manufacture demand to meet market expectations. *Id*. ¶ 7. This new system functioned as "extortion," in which distributors or partners desperate for in-demand backlog products were forced to purchase

United States District Court
Northern District of California

massive quantities of unneeded, at times obsolete, inventory in exchange for priority shipments. *Id*. ¶ 9. Defendant Meyercord authorized a plan to "blow up" Extreme's "first-in, first-out" ("FIFO") backlog allocation system because Extreme was "running out of tricks" to meet quarterly numbers. *Id*. ¶ 8. If they refused, competitors who "played ball" would jump ahead in the delivery line. *Id*. ¶ 9. Specific instances of this conduct were identified across Extreme's distributors and partners through Extreme's FEs.

For instance, in March 2022, Jenne and Westcon agreed to purchase $40 million of Extreme's unneeded inventory to move up in line for Extreme's new product. *Id*. ¶ 123. Between April and June 2022, Westcon was coerced into a transaction in which it purchased $52 million in "end of sale" junk cables, brackets, and fans that "nobody wanted" in exchange for $50 million in backlogged products its customers actually needed. *Id*. ¶¶ 10, 125–34. Jenne agreed to a deal similar to WestCon's, valued at $40 to $50 million, to enable Extreme to meet its 4Q2022 and FY2022 revenue targets. *Id*. ¶ 137. In Summer 2022, Extreme's partner was incentivized by Extreme to make a $500,000 deal in exchange for discounts on future orders without any purchase order. *Id*. ¶ 226–27. TD Synnex had its inventory balloon from 28 days to 100-200 days of supply within months because it was forced to buy product it did not need to "keep its place in line" in the backlog. *Id*. ¶ 11, 156. Smaller distributors or partners were similarly coerced. In June 2023, PC Solutions and Synergetics were forced to take $1.5 million and $700,000 worth of product for school districts, respectively, without customer orders, to help Extreme at the close of fiscal year 2023. *Id*. ¶ 12, 207–21. To sustain this scheme, Defendants sought to prevent the return or rotation of the inventory by threatening to bar distributors from re-ordering products for 12 months. *Id*. ¶ 11, 172, 176. Defendants never disclosed this coercion, instead telling investors that it was "exceptionally strong" and "unabated" demand driving Extreme's steady drumbeat of increasing product revenues during the Class Period. *Id*. ¶ 12. As a result of these practices, Defendants' reported revenues were improperly inflated. *Id*. ¶ 249.

Defendants knew the backlog was contractually designed to be cancelled and consisted of phantom orders that would vanish once competitors delivered first. *Id*. ¶¶ 3, 16. The internal investigations by FE-7 confirmed that up to 66% of the backlog consisted of phantom orders

United States District Court
Northern District of California

placed simultaneously by multiple competitors. *Id.* While publicly claiming a one percent cancellation rate, Defendants internally hedged for a 10 percent rate. *Id.* ¶¶ 15, 602. This conduct was exposed in August 2023 when the backlog fell by $170 million in a single quarter, while revenues grew by only $21 million, indicating that $149 million in firm orders had simply vanished. *Id.* ¶ 18, 19

### v.    Challenged growth and demand Statements and backlog Statements

During the Class Period, Defendants allegedly made false and misleading growth and demand statements to the market that "Extreme's revenue growth was attributable to organic and exceptionally strong demand for the Company's products" while masking the implementation of an extensive channel-stuffing scheme. *Id.* ¶¶ 388–487; *see generally* ECF 95-1 statements 1–54 ("Statements"). These tactics allegedly included shipping products to partners without firm purchase orders, forcing distributors to buy unneeded inventory to maintain backlog priority, and preventing contractual returns to hide the true state of customer demand. ECF 95 ¶ 390.

Moreover, Defendants assured investors that Extreme's ballooning backlog, which peaked at $555 million, was "firm," "high quality," and "not cancelable." *Id.* ¶¶ 3, 269, 332, 402–03, 425; *see generally* Statements. Defendants publicly assured investors of "complete visibility" and "negligible cancellations," that is, less than one percent of bookings, and said they saw no evidence of "double ordering." ECF 95 ¶¶ 3, 16, 72, 79, 331, 269, 388–487, 510, 621.

### vi.    Additional allegations of scienter

The FEs explained that Defendants directly orchestrated and monitored the manipulative sales tactics on 16 grounds. *Id.* ¶¶ 94–118, 120–23, 129–35, 183–87, 206, 222–48, 274–91, 306–28, 487–562, 572–614. For example, according to the FE-1's contemporaneous note, Defendant Meyercord "chose this path—lesser of the 2 evils" to "blow up" the Company's FIFO backlog allocation system because the Company was "running out of tricks in our bag" to meet quarterly numbers. *Id.* ¶ 115. Several FEs explained that Defendants monitored end-user sales through the Clari and Salesforce databases, knowing that products were being shipped without confirmed end-user orders. *Id.* ¶¶ 229–48, 526–31. FE-3 and FE-1 further revealed that the backlog was not "firm" because Extreme lacked "back-to-back" purchase orders from end users, leading to

8

widespread double-booking and phantom demand. *Id*. ¶¶ 307–13. Despite being warned by FE-3 of this lack of visibility, Defendant Thomas refused to implement commitment-securing clauses to avoid internal restructuring and Defendants Rice and Brown refused to cancel backlog orders to inflate backlog metrics. *Id*. ¶¶ 310, 314. Also, FE-1 directly informed Defendant Thomas of the unethical channel stuffing and suppressed stock rotations during FE-1's exit interview in July 2022. *Id*. ¶¶ 183–87. Similarly, FE-7 warned the Executive Leadership Team in Summer 2022, including Defendants Meyercord, Thomas, and Rice, that the Extreme's reported backlog portrayals conflicted with established industry practice. *Id*. ¶¶ 601–07. FE-1 observed that Defendant Brown repeatedly refused to document "side deals" with TD Synnex, insisting on verbal-only agreements, stating that "auditors will be all over us" if the conversion rates spiked. *Id*. ¶¶ 118, 177, 501, 597. The FE-2, FE-10, and FE-11, who refused to implement the manipulative sales tactics, were subjected to demotions or belligerent pressure from management. *Id*. ¶¶ 222–28, 584–95.

## III.    LEGAL STANDARD

### A.    Rule 12(b)(6)

Under Rule 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To overcome a motion to dismiss, a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009) (citations omitted).

### B.    Rule 9(b) and PSLRA

At the pleading stage, "[s]ecurities fraud class actions must meet the higher, more exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Under the PSLRA, plaintiffs are required to "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), as amended (Feb. 10, 2009) (citations omitted); *see Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc*, No. 24-4909, 2026 WL 292424, at *8 (9th Cir. Feb. 4, 2026).

"A plaintiff asserting a claim under Section 10(b) and Rule 10b-5 must allege "(1) a material misrepresentation or omission by the defendant [("falsity")]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."" *Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc*, 166 F.4th 805, 821 (9th Cir. 2026) (citing *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023). "Section 20(a) imposes liability on a person who is in control of the person who is directly responsible for a securities fraud violation." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701–02 (9th Cir. 2021). Section 20(a) claims are derivative and require an underlying violation of the statute. *Id.* (quoting 15 U.S.C. § 78t(a)).

To properly plead falsity, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). There is "no requirement that Plaintiffs allege actual knowledge of the risk disclosure's falsity to get their claims past dismissal on the falsity element." *Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc*, No. 24-4909, 2026 WL 292424, at *14 (9th Cir. Feb. 4, 2026). "[T]he relevant question is whether the allegations in the complaint allow for the reasonable inference that risk disclosures "created an impression of a state of affairs that differed in a material way from the one that actually existed." *Id.* (quoting *Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023); *Brody v. Transitional*

*Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).

To properly plead scienter, the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Whether the allegations meet the strong inference standard requires a two-step inquiry. *See Funko Inc*, 2026 WL 292424, at *17. The first step asks whether "any of the allegations, alone, are sufficient to give rise to a strong inference of scienter." *Id*. (citing *Glazer*, 63 F.4th at 766; *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009), as amended (Feb. 10, 2009)). If no individual allegations are sufficient, the court proceeds to the next step of a holistic review, in which, when considered together, the allegations give rise to a strong inference of scienter. *Id*. "Ultimately, [the Court is required] to assess allegations of scienter holistically." *Leventhal v. Chegg, Inc.*, 721 F. Supp. 3d 1003, 1017 (N.D. Cal. 2024), reconsideration denied, No. 21-CV-09953-PCP, 2024 WL 3447516 (N.D. Cal. July 17, 2024).

## IV.    DISCUSSION

### A.    Requests for judicial notice or incorporation by reference

Defendants request that the Court take judicial notice of, or incorporate by reference, 21 exhibits that were previously considered and granted under either framework. ECF 92 at 9–12. Defendants assert that "[e]ach of these exhibits [is] quoted from and/or [is] necessarily the source of information Plaintiffs rely upon in support of their claims in this case." ECF 105 at 6. Defendants also contend that "Exhibits 4-11, 13-15, 17-19, and 21 are publicly available SEC filings, press releases, or earnings call transcripts" and must be "incorporated by reference because Plaintiffs quote these documents as sources of the challenged statements and alleged corrective disclosures that are fundamental to Plaintiffs' securities fraud claims." *Id*. at 4. Plaintiffs do not object to these exhibits for the limited purpose of establishing their existence, not for the truth of the matters therein, or as an improper counternarrative to Plaintiffs' allegations. ECF 108. Defendants do not intend to create a counternarrative or factual dispute, but to the extent the Court considers the exhibits in the appropriate context relative to Plaintiffs' allegations. ECF 111.

"The [C]ourt may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately

and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Alternatively, the Court may "consider materials that are submitted with and attached to the Complaint. [The Court] may also consider unattached evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011). The Ninth Circuit has cautioned against the "unscrupulous use of extrinsic documents" under these exceptions, which "risks premature dismissals of plausible claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99 (9th Cir. 2018).

Here, Exhibits 1, 4, 8, 9, 11, and 15 are publicly available transcripts of earnings calls. ECF 105 at 1–2. Exhibits 2, 6, 14, and 20 are Forms 10-K, and Exhibits 3, 5, 7, 10, 12, 13, 16, 18, and 19 are Forms 8-K. *Id.*, at 1–3. Courts routinely take judicial notice of public SEC filings and publicly available transcripts of earnings calls—not to accept the entire contents of the documents as true, but to show what information was available to the market. *See Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 872 (N.D. Cal. 2023) (taking judicial notice of earnings call transcripts, Forms 8-K and Forms 10-K to show representations made to the market only); *Pirani v. Netflix, Inc.*, 710 F. Supp. 3d 756, 767 (N.D. Cal. 2024) ("courts routinely take judicial notice of . . . documents filed with the SEC for the purpose of determining what information was available to the market"); *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 929–30 (N.D. Cal. 2022) (taking judicial notice of transcripts of calls with and presentations to analysts and investors); *Cement Masons & Plasterers Joint Pension Tr. v. Equinix, Inc.*, No. 11-01016 SC, 2012 WL 685344, at *8 n.5 (N.D. Cal. Mar. 2, 2012) (taking judicial notice of the fact that a defendant actually sold more shares during the "six months preceding the class period").

Next, Exhibit 17 is a publicly available CRN article. ECF 105 at 2. And Plaintiffs do not oppose its SAC, which relies on Exhibit 17. ECF 108. To the extent that the press releases form the basis for the Plaintiff's claims, as incorporated by reference in the SAC, the Court takes judicial notice of the three press releases and the report only to the extent of acknowledging their existence in the public domain, the fact that such statements were made, but not for the truth of

United States District Court
Northern District of California

their statements. *See Sanchez-Martinez v. Freitas*, No. 23-CV-02508-HSG, 2024 WL 4309277, at *3 (N.D. Cal. Sept. 26, 2024) ("The Court takes judicial notice of the press release and the article for the limited purposes of acknowledging the existence of these documents. But the Court does not take judicial notice of the truth of the contents of these documents."); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) ("Courts may take judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true."); *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1111–12 (N.D. Cal. 2009) (taking judicial notice of press releases, news articles, and analyst reports referred to in the complaint, but not for the truth of their content).

Accordingly, the Court **GRANTS** judicial notice as to the existence of 21 Exhibits for the purpose of determining what information was available to the market or the existence in the public domain, not for the truth of any of the facts asserted.

**B.    Falsity**

    **i.    The SAC alleges with particularized facts to demonstrate that growth and demand Statements were false.**

Defendants argue that the SAC fails to cure deficiencies identified in the growth and demand statements because Plaintiffs still rely on vague allegations from anonymous FEs. ECF 104 at 7. Specifically, Defendants point out that FE-1's remixed testimony, combined with previously undisclosed contemporaneous notes, to allege illicit channel stuffing is unreliable and puzzling, given that Plaintiffs' lead counsel possessed these notes in the FAC. *Id*. at 8. FE-2's allegation of a transaction with Synergetics lacks information about "when the deal was closed, what incentives were offered, what the final price was, and whether the transaction artificially inflated Extreme's earnings." *Id*. at 10–11. FE-4's allegation is hearsay because he or his source did not attend the dinner where the deal was allegedly discussed. *Id*. at 10. FE-11's allegation is also deficient for lack of transaction details beyond a vague timeline of summer 2022. *Id*. at 11. Defendants also point out that the SAC failed to identify any actual instances of the customer's return or Defendants' return refusals. *Id*. at 9.

The Court previously held that although part of FE-1's accounts were reliable, FE-1

United States District Court
Northern District of California

ultimately failed to provide specific, particularized allegations of channel stuffing because the timeline was not clear and its allegations heavily relied on hearsay. ECF 92 at 17. In this Order, the Court considers whether the SAC clarifies the FE-1's timeline and the reliability of FE-1's personal knowledge on his allegations.

The SAC alleges that, according to FE-1, in March 2022, Defendant Brown launched an initiative that forced distributors waiting for backlogged products to buy large amounts of "low- or no-demand products" to maintain or move their place in the backlog. ECF 95 ¶ 101. FE-1's contemporaneous notes from the meeting on March 16, 2022, capture that Defendant Brown asked, "how do we get into the company # that the street expects . . .", stated that "FIFO would not work" to meet expectations, and noted a plan to "decommit all". *Id*. ¶¶ 106–15. FE-1's note also reflects that Brown stated the plan was the "lesser of many evils for ELT" and that Defendant Meyercord specifically "chooses blowing up FIFO." *Id*. ¶¶ 114–15.

Here, the Court finds that "[r]equiring more detail than those presently alleged [in the SAC] would transform the PSLRA's formidable pleading requirement into an impossible one." *See Glazer*, 63 F.4th at 769. First, the SAC clarifies the timeline of FE-1's account, which is mostly based on his personal knowledge, indicating the particularity of allegations. The SAC cures the unclear timeline by anchoring the commencement of the illicit channel stuffing scheme to the specific March 2022 meetings and contemporaneous notes that FE-1 personally witnessed. ECF 95 ¶¶ 99–123. Moreover, the notes and communications with Defendants Brown, Rice, Meyercord, and Thomas, whom FE-1 directly heard, as well as with Extreme's distributors during his tenure, particularize the SAC sufficiently to allege that illicit channel stuffing was occurring. ECF 95 ¶¶ 99–123, 140, 146–57, 164–87.

These particularized allegations are consistent with two cases Plaintiffs cited in both their previous and current briefs. Similar to *In re Plantronics, Inc. Securities Litigation*, where channel stuffing was identified through internal accounts of manipulative sales tactics, FE-1's notes mention the presence of illegal channel stuffing, with those who complied receiving priority shipments of desired inventory, whereas those who refused receiving reduced shipments of inventory. No. 19-CV-07481-JST, 2022 WL 365333, at *12 (N.D. Cal. Aug. 17, 2022); ECF 95 ¶

152. Mirroring *Murphy v. Precision Castparts Corporation*, where channel stuffing was found through the internal pull-in sales policy, FE-1 describes that Extreme received weekly inventory-demand reports from its distributor and a pipeline report to determine what "true real demand" was but chose to push inventory to distributors that did not need it and did not allow them to cancel or return it. No. 3:16-CV-00521-SB, 2017 WL 3084274, at *3 (D. Or. June 27, 2017); ECF 95 ¶ 170–72. FE-1 further describes that "to maximize revenues and avoid detection," Defendant Brown regularly reneged on the 15% stock rotation agreements, forcing a lower 5% cap or delaying rotations indefinitely to report inflated numbers. *Id*. ¶¶ 168–69.

Second, the SAC cures deficiencies identified in the previous order by providing specific timelines and transactions for other FEs. For instance, the SAC clarifies that FE-4 worked directly with Westcon and his account corroborated the $102 million channel stuffing deal involving "end of sale" products in 4Q2022. *Id*. ¶¶ 131–36. The SAC also details communications and transactions from FE-2, including the coercion of PC Solutions and Synergetics to accept $2.2 million in product without end-user purchase orders to meet the FY2023 revenue target in June 2023. *Id*. ¶¶ 207–21. FE-11 details a suspicious $500,000 deal in Summer 2022, in which a partner was incentivized to purchase without a customer order. *Id*. ¶¶ 226–28.

Third, as to whether the revenue number is misleading, the Court previously held that Plaintiffs' allegation will be sufficient to allege revenue number is misleading "[i]f Plaintiffs are able to provide more particularized allegations regarding manipulative sales practices toward Defendants' largest distributors" including TD Synnex, Jenne, and Westcon. ECF 92 at 19. As stated above, the SAC provides more particularized allegations by describing Extreme's alleged manipulative sales of $40 to $50 million to Jenne at the end of June 2022, the coercive $102 million Westcon deal involving $52 million in unwanted inventory, and the systematic punishment of TD Synnex and ScanSource for refusing to "play ball" while forcing TD Synnex into compliance to meet quarterly targets. ECF 95 ¶¶ 131–38, 152–56.

Accordingly, the Court finds the SAC provides particularized details about the purported illicit channel stuffing scheme to render Defendants' growth and demand statements false to survive the motion at this stage.

United States District Court
Northern District of California

### ii.   The SAC alleges with particularized facts to demonstrate that the backlog Statements were false.

Defendants argue that the SAC still failed to allege backlog statements with particularity, contending that FE-1 lacks personal knowledge of the cancelled order in 2023, as he left before 2023, and FE-2 relies on hearsay statements to support duplicative backlog orders without details. ECF 104 at 15.  For FE-7, Defendants contend that its added timeline of meetings occurred between July and September 2022 only reflects a forward-looking assumption about a 10 percent internal cancellation hedge, rather than a contemporaneous fact contradicting the company's historical reporting of actual cancellations at that time.  *Id*. at 15–16.  Defendants further contend that FE-7's "acid test" is logically defective as it relies on hearsay statements from five executives who were not current customers of Extreme.  *Id*. at 16–17.  FE-7's recollection of three important deals over $5 million fails to identify the actual customers or provide evidence that any named Defendants knew of these deals or that the deals remained in Extreme's backlog.  *Id*. at 17.

Plaintiffs counter that the SAC demonstrates that Defendants had actual knowledge that backlog cancellations would exceed the touted "fraction of 1%" as early as July–September 2022. ECF 109 at 13.  FE-7 attended monthly and quarterly ELT meetings with Defendants Meyercord, Thomas, Rice, and others, where the state of the business towards sales targets and potential bumps are always an element of discussion.  ECF 95 ¶¶ 278–79.  The ELT meeting in Summer 2022 discussed a 10 percent cancellation hedge, a figure FE-7 informed Defendants was already "misleading" based on an "acid test" confirming that industry participants double-order and up to 66 percent of the backlog would vanish once competitors delivered first. ECF 95 ¶¶ 278–90. This is corroborated by FE-5, who noted that double-ordering was "widely known" via the "Return Merchandise Authorization" process, and FE-3, who discussed these cancellations directly with Defendant Thomas.  *Id*. ¶¶ 303–11, 318–19.

In the previous order, the Court found that while FE-1, FE-2, FE-3, FE-5, and FE-7's accounts in FAC were reliable, they lacked the particularity largely because of generalized terms, missing details, and unclear timelines to demonstrate specific examples of customers' double or triple bookings and the timing of when the cancellations occurred.  ECF 92 at 20.

The Court finds that the SAC cures these deficiencies by providing a concrete timeline and

16

corroborating contemporaneous details from multiple FEs who testify to the pervasive "double-ordering" phenomenon that created an imminent risk that Extreme's backlog would evaporate. The FE-7's accounts anchor the falsity to an ELT meeting between July and September 2022 where Defendants Meyercord, Thomas, and Rice openly discussed a 10 percent cancellation hedge, directly contradicting their public assurances of negligible cancellations.  ECF 95 ¶¶ 281–84.  The FE-3 directly warned Defendant Thomas regarding the lack of back-to-back purchase orders.  ECF 95 ¶¶ 307–11.  Given the positions of FEs, such contemporaneous conversations are detailed enough to meet a heightened, severe risk of backlog cancellations known to Defendants at the time of their statements.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (finding the complaint alleged with particularity when a former employee is in a position to reasonably infer the issuance of a stop-work order that creates a heightened risk of cancellation); *Glazer*, 63 F.4th at 771 (crediting allegations of contemporaneous conversations that [FEs] themselves heard).

Accordingly, the Court finds that the SAC provides particularized details sufficient to render Defendants' backlog statements misleading to survive the motion at this stage.

### iii.   The challenged Statements suggest more than mild optimism and are actionable.

Defendants contest that most of the challenged Statements are general statements of optimism and, therefore, constitute non-actionable puffery.  ECF 104 at 12.  Specifically, Defendants argue that terms such as "strong" and "impressive" for Extreme's growth and demand are non-actionable feel-good monikers that do not affect investment decisions.  *Id*.  Additionally, more emphatic terms like "exceptionally strong," "unabated," "record setting," "double-digit revenue growth," and "unprecedented" are also non-actionable under *In Re Cutera Securities Litigation*, 610 F.3d 1103 (9th Cir. 2010).  ECF 125 at 2.

The Court is not persuaded.  While general statements of optimism are typically non-actionable, they still may form a basis for an actionable securities fraud claim when taken in context.  *Glazer*, 63 F.4th at 770 (citing *Cutera*, 610 F.3d at 1111 and *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).  In *Cutera*, the Ninth Circuit observed that mildly optimistic and

subjective terms like "good" and "well-regarded" are non-actionable because investors know "how to devalue" such statements.  610 F.3d at 1111.  For a similar reason, the Ninth Circuit concluded that statements such as "we expect the second half [] to be stronger than the first half," "new products are coming in a wave, not in a trickle," and "old products are doing very well" are vague corporate optimism.  *Id*. (citation omitted).

Here, the challenged Statements suggest more than a mild or vague optimistic nature.  The SAC alleges that during the Class Period, Defendants repeatedly reassured investors of "strong growth" and "impressive double-digit revenues," bolstered by "organic," "exceptionally strong," and "unabated market demand," while allegedly concealing an illicit channel stuffing or manipulative sales practice.  The FEs' accounts, including FE-1's contemporary note of Defendant Brown's statement for the need to "get into the company [the] # the street expects," provide granular details, suggesting that the challenged Statements were not merely non-actionable feel-good monikers when taken in context.  *Cf. In re Solarcity Corp. Securities Litigation*, 274 F. Supp. 3d 972, 994–1009 (N.D. Cal. 2017) (finding that "[d]emand remained as strong as ever," "Q2 was an amazing quarter," "incredibly strong sales," and "we very [sic] optimistic about our growth" are non-actionable while finding no specific allegation that its confidential witness had personal knowledge of officers or their states of minds regarding the operation of the company); *In re SunPower Corp. Sec. Litig.*, 2018 WL 4904904, at *4 (N.D. Cal. Oct. 9, 2018) ("very strong demand" was non-actionable when allegations failed to disclose why the company cannot reasonably stay optimistic).

Accordingly, the Court finds that the challenged Statements are not non-actionable statements of corporate optimism.

### iv.    The PSLRA safe harbor does not shield challenged Statements.

Defendants contend that the PSLRA's safe harbor provision immunizes Defendants from liability for the 22 growth and demand Statements Plaintiffs challenge because they are categorically forward-looking.  ECF 104 at 13–14.  Defendants also contend that, similar to the growth and demand Statements, the 23 backlog Statements Plaintiffs challenge are forward-looking and protected under the PSLRA safe harbor, specifically because they included

meaningful cautionary language that warned that customers could cancel orders, which would impact the accuracy of revenue forecasts, and also warned against other scenarios, such as rescheduling or canceling orders. *Id*. at 17–18. Concurrently, Defendants claim that because Plaintiffs have failed to allege actual knowledge of Defendants' falsity, the PSLRA safe harbor provision protects these Statements. *Id*. at 18–19.

The PSLRA's safe harbor provision generally exempts a forward-looking statement, which is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (citation omitted). The PSLRA shields the forward-looking statement if it is either "accompanied by meaningful cautionary language" or "made without actual knowledge" of falsity. 15 U.S.C. § 78u-5(c)(1); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190 (9th Cir. 2021). To be meaningful, the cautionary language must have "identified important factors that could cause actual results to differ materially from those in the forward-looking statement" and "must have consisted of non-boilerplate warnings that were tailored to the forward-looking statements." *Zaghian v. Farrell*, 675 F. App'x 718, 719–20 (9th Cir. 2017). "[W]here defendants make mixed statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are not protected by the safe harbor of the PSLRA." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017).

Here, Defendants do not appear to contest how each of the challenged growth and demand Statements is specifically forward-looking, other than pointing to boilerplate warnings used in SEC filings or earnings calls, or arguing that Plaintiffs are cherry-picking words to make statements seem present-tense. *See* ECF 104, Exhibit 2 at 4; Exhibit 3 at 8, 10–11, Exhibit 4 at 5; Exhibit 5 at 9, 11; Exhibit 6 at 4; Exhibit 7 at 8, 10; Exhibit 9 at 5; Exhibit 10 at 8, 10–11; Exhibit 11 at 5; Exhibit 12 at 9–11; Exhibit 13 at 9, 11; Exhibit 14 at 4; Exhibit 15 at 5; Exhibit 16 at 8, 10; Exhibit 18 at 6; Exhibit 19 at 8–9, 11; Exhibit 20 at 4; Exhibit 21 at 3; ECF 110 at 6–7. Moreover, the Court is not persuaded that Plaintiffs are merely cherry-picking words. Statements such as Statement 3 ("Our teams continue to see unabated market demand") 6 ("Our results for

19

fiscal '22 highlight unprecedented demand for Extreme's solutions"), 11 ("it's just this very evenly spread, organic growth that we're experiencing at Extreme"), 12 ("primarily due to strong demand for our product") 18 ("We had a record quarter as demand . . . for Extreme Solutions has never been stronger. Again, our share gains are evident by double-digit revenue growth"), 19 ("Our distributors give us the highest rank in the networking industry for delivering on our commit dates, and this is driving demand"), 33 ("[W]e in fact grew from December, reflecting strong demand"), 37 ("[W]e're seeing good demand. We're seeing double-digit growth in our weighted funnel year over year"), 43 ("Extreme has never been in a more robust financial position"), 44 ("End customer orders remain firm and distributor orders have normalized"), 45 ("[I]n EMEA and the rest of the markets, they remain very strong, and the demand in the U.S. market remains very strong"), 48 ("[W]ith the momentum we are building today, we don't see a lot of change for that at this moment") plainly describe existing business conditions and present fact.  Moreover, because the Court finds that with the absence of non-boilerplate warnings and the generalized boilerplate warnings, the growth and demand Statements are not accompanied by meaningful cautionary language.

As to backlog statements, the Court finds that they are primarily non-forward-looking statements of present fact, or at minimum, "mixed statement" that are ineligible for PSLRA safe harbor protection.  *See* ECF 109-2, Statement 7 ("We have complete visibility into our product backlog"), 9 ("the massive backlog that we've built up and the continued strength of bookings"), 10 ("high quality of our order backlog gives us greater visibility into the next several years and increased confidence of the returns"), 15 ("The combination of our continued revenue growth and record backlog gives us even greater confidence in our long-term growth outlook), 17 (""Product Backlog" of $555 million was a key driver of that "Growth""), 19 ("We have complete visibility into our product backlog, the vast majority of which is comprised of orders with current delivery request dates."), 23 ("[W]e built up quite a bit of backlog because of the supply chain scenario, but it's all very high quality and we are very confident in the back log"), 24 ("[W]e're not seeing de-books . . . we're feeling a lot of confidence in the backlog number we have."), 25 ("[W]e've been underreporting our earnings . . . because we've been putting in backlog."), 30 ("The majority of

our backlog consists of the latest generation universal products."), 34 ("[W]e remain confident in the revenue outlook for Q4 as supported by our strong funnel of opportunities, our product log"), 38 ("As far as visibility, we have our backlog . . . between the backlog and the deferred revenue that we will recognize over time, we have really good, probably better than ever visibility into what we're going to achieve through the next fiscal year."), 41 ("we have excellent visibility into our backlog. If I think about the question of double ordering or triple ordering . . . [t]hat is not happening, that's not a phenomenon we see at all. . . . it's not cancelable. These are real projects that we see. And so I would say the vast majority of our backlog is related to this kind of end user demand project-based business and we don't see double ordering."), 44 ("We have the benefit of a healthy backlog of customer orders with request dates that spread fairly evenly through the end of our fiscal year."), 47 ("We feel good about the level of backlog we have. For instance, it's primarily, I'd say, 90-plus percent is all end customer orders at this point. And so the distribution orders that we had in the past have basically worked themselves through the system, especially with supply chain getting better."), 49 ("We continue to have a healthy customer order backlog with clear visibility to order with specific customer request dates through the balance of our fiscal year."), 50 ("We continue to have a healthy customer order backlog with clear visibility to order with specific customer request dates through the balance of our fiscal year."), 52 ("[O]ur backlog as it relates to distribution has normalized, but we still have a fair amount of customer backlog that's out there."), 54 ("And I think the channel is very healthy because the channel is digesting all this backlog that is being release.")   Even if they are arguably forward-looking, backlog represents "a snapshot of how much work the company has under contract right now," and backlog statements describe the present rather than looking ahead. *Berson*, 527 F.3d at 990 (9th Cir. 2008); *see* Statements 5, 6, 8, 10, 13, 16, 18, 20, 21, 27, 28, 29, 31, 32, 35, 36, 37, 39, 40, 43, 46, 47, 48, 49.

Accordingly, the challenged growth and demand Statements and backlog Statements are not protected by the PSLRA safe harbor.

**v.    The Court declines to determine the actionability of SOX certifications.**

Defendants also contend that, because Plaintiffs still fail to allege falsity, these challenges

21

fail as well.  ECF 104 at 19.  Separately, Plaintiffs' addition to certain revenue statements fails because they fail to allege that any revenue reporting was false.  *Id*.

Since the Court finds that SAC adequately alleges the falsity of the challenged Statements, which are also actionable, the Court declines to determine whether SOX Certification itself is actionable.

### C.    Scienter

In the previous order, the Court did not reach analyzing this element because Plaintiffs failed to allege falsity in the FAC.  Now that the Court finds that Plaintiffs have plausibly alleged falsity in the SAC, the Court will assess a strong inference of scienter under the holistic review and core operation doctrines.

### i.    Under holistic review, the SAC creates a strong inference of scienter.

Defendants contend that the "SAC does not state facts particular enough to raise a strong inference of conscious or reckless disregard" and claimed that Defendants' alternative explanations that Defendants altered their strategy in response to an unprecedented supply chain crisis and tried to keep investors informed the entire time are more plausible.  ECF 104 at 19.  Specifically, Defendants claim that the Defendants did not benefit from the alleged fraud and the SAC is still short of identifying "any motive for Defendants to commit fraud" and that FE-1's notes show a general corporate desire to "meet analysis market expectations" in response to a supply-chain crisis and therefore are insufficient to establish a strong inference of scienter.  *Id*. at 19–20.  Further, Defendants claim that because Meyercord's shareholdings increased during the Class Period, this heightens the innocence inference.  *Id*. at 19.

Defendants also contend that Plaintiffs' boilerplate allegations about public statements, internal reports, and meetings fail to establish a strong inference of scienter.  *Id*. at 21.  Defendants add that general claims about Defendants' "visibility into the backlog" are not actionable corporate puffery without evidence that they "closely monitored contracts" or "received specific information about those contracts."  *Id*.  Defendants also assert that management's alleged receipt of unspecified weekly or monthly internal reports is insufficient to infer scienter.  *Id*. at 22.

Defendants also argue to discredit many other FEs by stating that they "are low-level

22

United States District Court
Northern District of California

employees who never interacted with Defendants and thus lack personal knowledge of Defendants' decision-making to show scienter." *Id.* at 20. FE-1 was inconsistent for claiming Defendant Brown avoided written records while elsewhere citing a June 2022 email Brown authored, FE-2 failed to specify when alleged conversations with Meyercord took place or what they specifically discussed, and FE-7's expressions of concern about the internal backlog hedge figure "speaks more to a good-faith difference of opinion than scienter". *Id*. at 20–22. Defendants raise that Extreme's alleged retaliatory culture fails to connect any individual Defendants to support scienter. *Id.* at 22–23.

The Court must credit all of FE's accounts at this stage as any disputes regarding reliability or consistency "must at least await discovery." *Berson*, 527 F.3d at 985. Taking allegations in the SAC true, several FEs reported directly to the individual Defendants or provided first-hand accounts of their involvement. ECF 95 ¶¶45, 47, 206, 278–84. The Court previously found that "FE-7's pre-Class Period allegations are reliable to provide what Defendants knew during the Class Period[.]" Order at 21. The SAC now clarifies that FE-7's allegations concerning the ELT Meeting occurred during the Class Period. ¶282. Because the individual Defendants are "on direct notice" of and "directly informed of the issues" underlying the allegations, this naturally establishes a "strong" inference of scienter. *See SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 742 F. Supp. 3d 1003, 1021 (N.D. Cal. 2024).

The Court also finds that Plaintiffs corroborate their allegations with particularized pecuniary motives. The SAC details that Defendants' motive exists through their access to real-time sales metrics, including Defendant Brown specifically stating that there were "Lots of eyes on this backlog process – it's updated all the way up to Ed [Meyercord]." ECF 95 ¶ 328. The SAC identifies specific reports and databases, such as Clari and Salesforce, which FE-5 confirms senior executives reviewed "as if Meyercord is reading them." *Id*. ¶¶241–43, 516–31. When statements exist regarding reports generated by software that are available to executives who practice continual monitoring of such reports, scienter is supported. *See Quality Sys.*, 865 F.3d at 1145. The SAC identified that Defendants had a pecuniary motive for increasing both the Extreme's stock price and revenues in the short term, and Defendants Meyercord, Thomas, Tate,

23

and Rhodes received significant bonuses through the executive compensation program, where Meyercord alone earned over $1.1 million in cash in FY 2023 and his share acquisitions resulted from derivative conversions rather than open-market purchases. *Id*. ¶¶572–82.  Therefore, the scienter is further supported as defendants "were motivated to inflate [the company]'s "financial results and stock prices because their eligibility for stock options and executive bonuses were based principally on the company's financial performance." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003); *see Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *15 (N.D. Cal. Mar. 31, 2023) (finding that increase in holdings as a result of compensation rather than purchase supports an inference of scienter).

Under holistic review, even if individual allegations may be insufficient, the Court finds that their collective weight creates a strong inference that outweighs the competing innocent inferences.

### ii.    The core-operations doctrine supports a strong inference of scienter.

Defendants argue that Plaintiffs' reliance on the core-operations doctrine also fails because the SAC lacks specific admissions by Defendants of "detailed involvement" or witness accounts demonstrating that "Defendants participated in creating false reports."  ECF 104 at 23.  Moreover, Defendants contend that a large backlog is not a "rare circumstance" that would make it "absurd" to suggest management was unaware of its detailed data, and the decision to stop reporting the backlog is attributable to "many potential reasons" unrelated to fraud."  *Id*. at 23–24.

Plaintiffs counter that the core-operations doctrine reinforces the inference of scienter because it would be "absurd [] to suggest that C-Suite officers responsible for revenue and backlog reporting were unaware of [] the widespread channel stuffing [] that affected Extreme's most important distributors [which] collectively accounted for more than 50% revenues."  ECF 109 at 21.  ¶¶ 62–63, 206.

Here, the Court finds a strong inference of scienter under the core-operations doctrine as well.  The core operations doctrine "relies on the principle that 'corporate officers have knowledge of the critical core operation of their companies.'" *Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2025 WL 556283, at *15 (N.D. Cal. Feb. 18, 2025).  The

individual Defendants must have known about the backlog orders because of their devastating effect on the corporation's revenue. *See Berson*, 527 F.3d at 987. Considering Defendant Brown's description of "lots of eyes on this backlog process" and FE-5's statement that senior executives reviewed real-time databases like Clari and Salesforce, ECF 95 ¶¶242–43, 328, along with the direct warnings to the ELT and the "culture of secrecy and fear", *id*. ¶¶584-600), the core operations doctrine offers a strong inference of scienter. *See State Tchrs. Ret. Sys. of Ohio v. ZoomInfo Techs. Inc.*, No. 3:24-CV-05739-TMC, 2025 WL 3013683, at *23 (W.D. Wash. Oct. 28, 2025) ("[T]he core operations doctrine and the statements by Individual Defendants suggesting they closely monitored company data support an inference of scienter.").

Accordingly, the Court finds that the SAC alleges plausible motives of Defendants and creates a strong inference of scienter under the holistic review and core operation doctrine.

**D.      The SAC plausibly alleges loss causation through sequential disclosures.**

Defendants argue that the SAC fails to establish "a causal connection between the material misrepresentation and the loss" because the five alleged partial disclosures (January 25, 2023, August 24, 2023, November 1, 2023, January 8, 2024, and January 31, 2024) did not reveal any "illicit channel stuffing, manipulative sales and inventory practices, or the true nature of the backlog." ECF 104 at 24. Instead, Defendants contend that the stock drops show the market "reacting to reports of the defendant's poor financial health generally and changing market conditions, changing investor expectations, or other unrelated factors, not any "revelation of fraudulent activity." *Id*. Plaintiffs contend that these five disclosures revealed new facts that rendered Defendants' prior statements false or misleading, causing a total of 60 percent decline in the stock price. ECF 109 at 23.

The SAC alleges that the January 25, 2023 disclosure reported that Defendant Thomas had resigned as CFO and that the backlog had fallen, causing a 15 percent decline in the share price. ECF 95 ¶¶ 353–55. The August 24, 2023 disclosure revealed that the backlog had fallen again, causing a 9 percent decline in the share price. *Id*. ¶¶ 357–59. The November 1, 2023 disclosure revealed that Extreme would discontinue reporting the current backlog figure on a quarterly basis, causing an 18 percent decline in the share price. *Id*. ¶¶ 361–65. The January 8, 2024 disclosure

revealed that Extreme expected to fail to meet the guidance because of channel digestion issues, causing a seven percent decline.  *Id*.  ¶¶ 366–69.  The January 31, 2024 disclosure revealed a decline in revenues attributable to "continued channel digestion and elongated sales cycles."  *Id*. ¶¶ 370–72.  This disclosure further informed that Extreme's distributors had lowered inventory purchases, prompting a reduction in channel inventory by \$40 to 50 million in the third quarter to address the channel digestion issue, causing a 24 percent stock decline.  *Id*.  ¶¶ 373–76.

Loss causation is the "causal connection between the material misrepresentation and the loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  To properly plead loss causation, the complaint "must allege particularity facts plausibly suggesting that a corrective disclosure revealed . . . the truth concealed by the defendant's misstatements and that disclosure "caused the company's stock price to decline.""  *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 540 (9th Cir. 2024) (quotation altered and citation omitted).  "Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (citation omitted).

Here, the Court finds that the SAC plausibly pleads loss causation with particularity facts suggesting that the five disclosures revealed the truth concealed by Defendants' alleged misstatements and caused sequential stock drops.  Defendants rely on *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014), to argue that disappointing earnings results are insufficient.  However, the Court is not persuaded.  Unlike *Loos*, where the disappointing earnings results themselves were solely at issue, 762 F.3d at 887–88, the SAC reveals more than simply disappointing earnings to show the connection of implementation of Defendants' illicit channel stuffing and manipulative business revenue, such that the decline in revenue is evident once Extreme's distributors and partners cannot take more inventories.   Furthermore, changing market conditions or other unrelated factors would not prevent Plaintiffs from proving loss causation with respect to these disclosures.  *See First Solar Inc.*, 881 F.3d at 754 ("A plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss."); *York City. on Behalf of Cty.*

United States District Court
Northern District of California

*of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1216 (N.D. Cal. 2024) (finding that loss causation is sufficiently demonstrated through inventory corrections and revenue decline, along with the subsequent drop in stock price, even though the illicit scheme was not known at the time).

Accordingly, the SAC adequately alleges loss causation.

### E.    The SAC adequately alleges scheme liability and Section 20(a) claims.

Defendants contend that the SAC fails to allege a scheme liability claim under Rule 10b5 because "neither Plaintiffs' channel-stuffing nor their backlog theory involves any deceptive act that Defendants engaged in for the principal purpose and effect of creating a false appearance of fact and Plaintiffs' failure to plead scienter and loss causation is similarly fatal to their scheme liability claim." ECF 104 at 25. Plaintiffs counter that the SAC adequately alleged the deceptive conduct and note that Defendants do not challenge their control in violation of Section 20(a). ECF 109 at 25.

The Court finds that the SAC adequately alleges Defendants engaged in deceptive acts under Rule 10b-5 for the reasons above. *Supra* Section B–D. Taking Plaintiffs' allegations as true at this stage, the SAC supports a scheme liability claim by describing Defendants' effort to inflate revenue and backlog by concealing manipulative sales practices. *See HP Inc.*, 738 F. Supp. 3d at 1207. Because Defendants do not expressly contest their control, Section 20(a) claims also survive.

Accordingly, the SAC adequately alleges scheme liability and Section 20(a) claims.

## V.    CONCLUSION AND RECOMMENDATION

For foregoing reasons, the Court **DENIES** Defendants' Motion to Dismiss Lead Plaintiffs' Second Amended Complaint and **GRANTS-IN-PART** Defendants' Request for Judicial Notice and Incorporation by Reference as to the existence of selected exhibits, not for the truth of any of the facts asserted.

ECF 131 is denied as moot.

The Class Certification Motion is due by 4/17/2026**.** The Class Certification Motion Hearing set for 7/7/2026 at 2:00 PM is maintained.

The Further Case Management Conference set for 9/10/2026 at 2:00 PM in San Francisco - Videoconference Only is maintained.

Joint Case Management Statement due by 9/3/2026.

This Order resolves ECF 104, 105 and 131.

IT IS SO ORDERED.

Dated: March 23, 2026

TRINA L. THOMPSON
United States District Judge