**LABATON KELLER SUCHAROW LLP**
Lauren A. Ormsbee (*pro hac vice*)
Jesse L. Jensen (*pro hac vice*)
David Saldamando (*pro hac vice*)
Danielle S. Lazarus (*pro hac vice*)
Alexandra E. Forgione (*pro hac vice*)
Jacqueline E. Lacovara (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
lormsbee@labaton.com
jjensen@labaton.com
dsaldamando@labaton.com
dlazarus@labaton.com
aforgione@labaton.com
jlacovara@labaton.com

*Counsel for Lead Plaintiffs and
Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (Bar No. 250893)
Reed R. Kathrein (Bar. No. 139304)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

*Liaison Counsel for the Class*

*[Additional Counsel appear on signature page]*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EXTREME NETWORKS, INC., EDWARD B. MEYERCORD III, RÉMI THOMAS, CRISTINA TATE, KEVIN RHODES, NORMAN RICE, JONAS BROWN<br><br>Defendants. | Case No.: 3:24-cv-05102-TLT<br><br>**LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:   July 7, 2026<br>Time:   2:00 p.m.<br>Judge:  Hon. Trina L. Thompson<br>Courtroom:   No. 9, 19th Floor |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................................................................iii

NOTICE OF MOTION AND MOTION ..........................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................................1

STATEMENT OF ISSUES TO BE DECIDED ...............................................................................1

I.     PRELIMINARY STATEMENT........................................................................................2

II.    STATEMENT OF FACTS COMMON TO THE CLASS .................................................4

     A.     Extreme's Business in the Networking Industry...............................................4

     B.     Defendants Launch Their Channel Stuffing and Manipulative Sales Scheme ............5

     C.     Defendants Also Misrepresent the Cancellation Risk of the Orders on Backlog ....................................................................................................6

     D.     The Truth Is Revealed...........................................................................8

III.   PROCEDURAL HISTORY ...............................................................................................9

IV.    ARGUMENT .....................................................................................................................10

     A.     Class Certification Standards ............................................................................10

     B.     The Proposed Class Satisfies Rule 23(a) ..........................................................11

          1.     Numerosity Is Established................................................................11

          2.     Commonality Is Established .............................................................11

          3.     Typicality Is Established...................................................................12

          4.     Adequacy Is Satisfied......................................................................13

     C.     The Proposed Class Satisfies Rule 23(b)(3) .....................................................15

          1.     Common Questions Of Law And Fact Predominate.......................15

               a.     The Claims Are Clearly Susceptible To Classwide Proof .................15

               b.     The Fraud-On-The-Market Presumption Of Reliance Applies..........16

                    (i)     High Weekly Trading Volume (*Cammer* Factor 1) ...............17

                    (ii)     Significant Analyst Coverage (*Cammer* Factor 2)................17

(iii)  Market Maker/Arbitrage Activity (*Cammer* Factor 3)...........18

(iv)  S-3 Regulation Eligibility (*Cammer* Factor 4).......................19

(v)  Cause-And-Effect Relationship (*Cammer* Factor 5)..............19

(vi)  Market Capitalization (*Krogman* Factor 1)...........................20

(vii)  Bid-Ask Spread (*Krogman* Factor 2) ....................................21

(viii)  Public Float (*Krogman* Factor 3) ...........................................21

(ix)  Additional Indicium Of Market Efficiency............................21

c.  The *Affiliated Ute* Presumption Applies ..............................................21

d.  Damages Will Be Calculated Using A Common Methodology That Is Consistent With The Class-Wide Theory Of Liability ..........22

2.  A Class Action Is Superior To Other Methods Of Resolving This Controversy ...............................................................................................24

D.  Labaton Should Be Appointed Class Counsel ............................................................25

V.  CONCLUSION......................................................................................................................25

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF CASE NO.: 3:24-CV-05102-TLT

ii

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ................................................................................................................ 22

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................................................ 15

*Amey v. Cinemark USA Inc.*,
  2018 WL 3956326 (N.D. Cal. Aug. 17, 2018) ....................................................................... 12

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ............................................................................................................ 3, 16

*In re Apple Inc. Sec. Litig.*,
  2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ............................................................................ 16

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) .............................................................................................. 16

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................................................ 16

*Berner v. Lazzaro*,
  730 F.2d 1319 (9th Cir. 1984), *aff'd sub nom. Bateman Eichler, Hill Richards,*
  *Inc. v. Berner*, 472 U.S. 299 (1985) ....................................................................................... 10

*In re BofI Holding, Inc. Sec. Litig.*,
  2021 WL 3742924 (S.D. Cal. Aug. 24, 2021) ........................................................................ 14

*Borteanu v Nikola Corp.*,
  348 F.R.D. 239 (D. Ariz. 2025) .............................................................................................. 21

*In re Bridgepoint Educ., Inc. Sec. Litig.*,
  2015 WL 224631 (S.D. Cal. Jan. 15, 2015) ........................................................................... 16

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989), *appeal dismissed*, 993 F.2d 875 (3d Cir. 1993) .... 17, 18, 19

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
  2018 WL 4931543 (N.D. Cal. Oct. 11, 2018), *denying leave to appeal*, 2019 WL
  2193335 (9th Cir. Jan. 24, 2019) ............................................................................................ 22

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
  2022 WL 1459567 (N.D. Cal. May 9, 2022) ..................................................................... 14, 23

*Crews v. Rivian Auto., Inc.*,
  2024 WL 3447988 (C.D. Cal. July 17, 2024) ........................................................................ 12

*Cullen v. RYVYL Inc.*,
  2025 WL 2836651 (S.D. Cal. Aug. 20, 2025) ........................................................................ 10

*In re Diamond Foods, Inc., Sec. Litig.*,
  295 F.R.D. 240 (N.D. Cal. 2013) ..................................................................... 17, 18, 19, 20

*In re DiDi Glob. Inc. Secs. Litig.*,
  2025 WL 1909295 (S.D.N.Y. July 7, 2025), *adopted* 2025 WL 2345696
  (S.D.N.Y. Aug. 13, 2025) ........................................................................................................ 22

*DZ Rsrv. v. Meta Platforms, Inc.*,
  96 F.4th 1223 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1051 (2025) ............................... 10, 12

*Epstein v. MCA, Inc.*,
  50 F.3d 644 (9th Cir. 1995), *rev'd on other grounds*, *Matsushita Elec. Indus. Co.
  v. Epstein*, 516 U.S. 367 (1996) ............................................................................................ 2

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ............................................................................................................... 16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) .......................................................................................................... 16, 17

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ............................................................................................... 15

*Harris v. Palm Springs Alpine Ests. Inc.*,
  329 F.2d 909 (9th Cir. 1964) ................................................................................................. 15

*Hatamian v. Advanced Micro Devices, Inc.*,
  2016 WL 1042502 (N.D. Cal. Mar. 16, 2016) ........................................................................ 12

*Hayes v. MagnaChip Semiconductor Corp.*,
  2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ........................................................................ 20

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ............................................................................................................... 10

*Homyk v. ChemoCentryx, Inc.*,
  2024 WL 1141699 (N.D. Cal. Mar. 6, 2024), *denying leave to appeal*, 2024 WL
  2745788 (9th Cir. May 23, 2024) .......................................................................................... 11

*James v. Uber Techs. Inc.*,
  338 F.R.D. 123 (N.D. Cal. 2021) ........................................................................................... 10

*Junge v. Geron Corp.*,
  2022 WL 1002446 (N.D. Cal. Apr. 2, 2022) ..................................................................... 20, 23

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO.: 3:24-CV-05102-TLT

iv

*In re Juniper Networks, Inc. Sec. Litig.*,
  264 F.R.D. 584 (N.D. Cal. 2009) ................................................................................................ 18

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ................................................................................. 17, 20, 21

*Lamartina v. VMware, Inc.*,
  2024 WL 3286059 (N.D. Cal. July 2, 2024) ............................................................................ 13, 24

*In re Lendingclub Sec. Litig.*,
  282 F. Supp. 3d 1171 (N.D. Cal. 2017) ................................................................................... 23

*Malriat v. QuantumScape Corp.*,
  2022 WL 17974629 (N.D. Cal. Dec. 19, 2022) ................................................................. 10, 11, 20

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
  2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) .......................................................................... 11

*Mulderrig v. Amyris, Inc.*,
  340 F.R.D. 575 (N.D. Cal. 2021) ............................................................................................. 24

*In re NetSol Techs., Inc. Sec. Litig.*,
  2016 WL 7496724 (C.D. Cal. July 1, 2016) ............................................................................ 10

*Okla. Firefighters Pension & Ret. Sys. v. Musk*,
  779 F. Supp. 3d 396 (S.D.N.Y. 2025) ...................................................................................... 22

*Pampena v. Musk*,
  2024 WL 4331811 (N.D. Cal. Sept. 27, 2024) ......................................................................... 21

*Pardi v. Tricida, Inc.*,
  2024 WL 4336627 (N.D. Cal. Sept. 27, 2024) ................................................................. *passim*

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
  2021 WL 229310 (N.D. Cal. Jan. 21, 2021) ....................................................................... 21, 23

*Purple Mountain Tr. v. Wells Fargo & Co.*,
  2022 WL 3357835 (N.D. Cal. Aug. 15, 2022) ................................................................. 12, 21, 23

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ................................................................................................. 16

*In re Robinhood Ord. Flow Litig.*,
  2022 WL 9765563 (N.D. Cal. Oct. 13, 2022) .......................................................................... 22

*In re SanDisk LLC Sec. Litig.*,
  2018 WL 4293336 (N.D. Cal. Sept. 4, 2018) ....................................................................... 13, 23

*Sayce v. Forescout Techs., Inc.*,
  754 F. Supp. 3d 878 (N.D. Cal. 2024) ..................................................................................... 16

*In re Scorpion Techs., Inc.*,
    1994 WL 774029 (N.D. Cal. Aug. 10, 1994)............................................................................. 10

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
    335 F.R.D. 276 (N.D. Cal. 2020) ........................................................................................ 13

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
    2025 WL 1243818 (N.D. Cal. Apr. 25, 2025) (Thompson, J.), *leave to appeal
    denied*, 2025 WL 2028400 (9th Cir. July 17, 2025) ..........................................................*passim*

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
    742 F. Supp. 3d 1003 (N.D. Cal. 2024) ............................................................................... 11

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
    2023 WL 3569981 (N.D. Cal. May 19, 2023) ...................................................................... 23

*In re SiRF Tech. Holdings, Inc. Sec. Litig.*,
    2008 WL 2220601 (N.D. Cal. May 27, 2008) ...................................................................... 14

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ..................................................................................................... 3, 10

*Todd v. STAAR Surgical Co.*,
    2017 WL 821662 (C.D. Cal. Jan. 5, 2017) .......................................................................... 18

*In re Twitter Inc. Sec. Litig.*,
    326 F.R.D. 619 (N.D. Cal. 2018) ........................................................................................ 14

*In re UTStarcom, Inc. Sec. Litig.*,
    2010 WL 1945737 (N.D. Cal. May 12, 2010) ...................................................................... 15

*In re Vaxart, Inc. Sec. Litig.*,
    759 F. Supp. 3d 1015-1018 (N.D. Cal. 2024) ...................................................................... 11

*Weston v. DocuSign, Inc.*,
    348 F.R.D. 354 (N.D. Cal. 2024) ............................................................... 11, 14, 23, 24, 25

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ........................................................................................ 22

*Yokoyama v. Midland Nat. Life Ins. Co.*,
    594 F.3d 1087 (9th Cir. 2010)............................................................................................. 23

**Court Rules**

Fed. R. Civ. P. 23(a)(1) ....................................................................................................... 11

Fed. R. Civ. P. 23(a)(2) ....................................................................................................... 11

Fed. R. Civ. P. 23(a)(3) ....................................................................................................... 12

Fed. R. Civ. P. 23(a)(4) ................................................................................................................. 13

Fed. R. Civ. P. 23(b)(3) ............................................................................................................ 15, 24

Fed. R. Civ. P. 23(g)(1)(A) .......................................................................................................... 25

**Other Authorities**

H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. (1995), *reprinted in* 1995
    U.S.C.C.A.N. 730 ................................................................................................................ 3, 14

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF CASE NO.: 3:24-CV-05102-TLT

vii

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on July 7, 2026, at 2:00 p.m., in the Courtroom of the Honorable Trina L. Thompson, Lead Plaintiffs Oklahoma Firefighters Pension and Retirement System ("Oklahoma Fire"), Oklahoma Police Pension and Retirement System ("Oklahoma Police"), Oakland County Voluntary Employees' Beneficiary Association ("Oakland County VEBA"), and Oakland County Employees' Retirement System ("Oakland County ERS") (collectively, "Lead Plaintiffs"), will and hereby move this Court for an order: (i) certifying this action against Defendants Extreme Networks, Inc. ("Extreme" or the "Company") and numerous of its key officers and high-level executives: Edward B. Meyercord III, Rémi Thomas, Cristina Tate, Kevin Rhodes, Norman Rice, and Jonas Brown (collectively, the "Individual Defendants," together with Extreme, "Defendants") as a class action pursuant to Federal Rules of Civil Procedure ("Rule") 23; (ii) appointing Lead Plaintiffs as Class Representatives; and (iii) appointing Labaton Keller Sucharow LLP ("Lead Counsel" or "Labaton") as Class Counsel (the "Motion").

Lead Plaintiffs' Motion is based on this Notice of Motion, the Memorandum of Points and Authorities in Support Thereof, the Declaration of Lauren A. Ormsbee (the "Ormsbee Declaration") with accompanying exhibits, the [Proposed] Order, the papers and pleadings filed in this action, and any materials and arguments that Lead Plaintiffs may submit in further support of this Motion.[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether this Court should certify the proposed Class pursuant to Rule 23(a) and (b)(3);

2. Whether to appoint Lead Plaintiffs as Class Representatives; and

3. Whether to appoint Labaton as Class Counsel.

---

[1] Citations to paragraphs ("¶") are to paragraphs in the Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws filed on September 9, 2025. (ECF 95, the "Complaint"). References to "Ex. _" are to the exhibits attached to the accompanying Ormsbee Declaration. Unless otherwise noted: (i) all emphasis is added; (ii) all internal citations, quotations and original emphasis have been omitted; and (iii) all original alterations are incorporated.

## I.    PRELIMINARY STATEMENT

This is a class action for alleged violations of the federal securities laws. As sustained by the Court in its March 23, 2026 Order on Defendants' motion to dismiss, ECF 132 ("MTD Order"), Lead Plaintiffs allege claims under the Securities Exchange Act of 1934 ("Exchange Act"), on behalf of themselves and all other persons or entities who purchased the common stock of Extreme during the period from July 27, 2022 through January 30, 2024, inclusive (the "Class Period"). Defendants are Extreme and the Individual Defendants, each of whom were key officers and high-level executives of Extreme during the Class Period.

Lead Plaintiffs allege, and this Court has sustained, Defendants' false and misleading statements, omissions, and deceptive acts in violation of Section 10(b) of the Exchange Act and Rule 10b-5 (a)-(c) promulgated thereunder. Defendants' fraudulent acts and statements concerned: (i) Extreme's purported "*exceptionally strong*," "*robust*," and "*unabated*" organic demand for networking equipment while Defendants, in reality, coerced distributors into buying hundreds of millions of dollars in unwanted inventory by leveraging distributors' access to in demand backlogged products, and accelerated revenues from partners by "pulling-in" sales from future quarters in order to achieve their revenue targets; and (ii) Extreme's purported "*firm*" and "*not cancelable*" backlog orders that reflected "*end user demand*" and no "*double ordering*," with "*less than 1% cancellations*" while Defendants, in reality, knew the backlog was contractually designed to be cancelled and was riddled with duplicate and triplicate orders that would not convert into revenue.

Lead Plaintiffs respectfully request that the following "Class" be certified in the Action against Defendants:

> All persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Extreme during the period from July 27, 2022 through January 30, 2024, inclusive, and who were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director or control person of Extreme during the Class Period and their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) the subsidiaries and affiliates of Extreme; (vi) Extreme's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vii) the legal representatives, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

Securities cases fit Rule 23 "like a glove." *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir.

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO.: 3:24-cv-05102-TLT

2

1995), *rev'd on other grounds*, *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996). This Action is no different. Indeed, the Supreme Court has repeatedly recognized the importance of class actions in redressing violations of the federal securities laws. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 313 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions[.]"); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455, 478 (2013) (same). This Court has agreed that securities fraud claims are particularly well-suited for class treatment. *See SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 2025 WL 1243818, at \*9 (N.D. Cal. Apr. 25, 2025) (Thompson, J.), *leave to appeal denied*, 2025 WL 2028400 (9th Cir. July 17, 2025).

This case is no exception, and the Class satisfies Rule 23's requirements.

*First*, Rule 23(a)'s prerequisites—numerosity, commonality, typicality, and adequacy—are readily satisfied in this case. As to numerosity, the Class consists of thousands of investors. Commonality is established because all claims invoke the same federal securities laws with the same elements of proof and arise from Defendants' fraudulent conduct, which involves the same set of facts. Typicality is likewise present, as Lead Plaintiffs' claims arise from the same wrongful conduct that injured every other Class member. And adequacy is well established, as Lead Plaintiffs are fully capable of representing the interests of the Class. Indeed, Lead Plaintiffs Oklahoma Fire, Oklahoma Police, Oakland County VEBA, and Oakland County ERS are precisely the types of sophisticated institutional investors that Congress sought to lead securities class actions when it enacted the PSLRA (*see* H.R. Conf. Rep. No. 104-369, at 34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733), and each Lead Plaintiff has demonstrated its commitment to prosecuting this action in the Class's best interests. Moreover, Lead Plaintiffs have selected Labaton as Class Counsel. Labaton is highly experienced and possesses an extensive track record of successfully prosecuting and trying complex class action cases.

*Second*, the Class also satisfies Rule 23(b)(3) because common questions of law and fact predominate over questions affecting individual Class members. Lead Plaintiffs submit the Expert Report of Matthew D. Cain, Ph.D., in which Dr. Cain demonstrates that: (i) the market for Extreme common stock was efficient during the Class Period; and (ii) damages can be calculated on a class-

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO.: 3:24-CV-05102-TLT

3

wide basis pursuant to a well-established damages methodology. *See* Ex. A (Expert Report of Matthew D. Cain, Ph.D. (the "Cain Report" or "Cain Rpt.")). In addition, proceeding as a class action is superior to other available methods for fairly and efficiently adjudicating Class members' claims.

For the reasons below, Lead Plaintiffs respectfully request that the Court grant their motion.

## II.     STATEMENT OF FACTS COMMON TO THE CLASS

### A.     Extreme's Business in the Networking Industry

Extreme is a global provider of cloud-based computer networking equipment and related services, developing, manufacturing, and selling wired and wireless network infrastructure hardware, such as wireless access points. ¶56. Throughout the Class Period, Extreme's product revenues, as opposed to its subscription-based revenues, accounted for approximately 70% of the Company's total revenues. ¶59. Additionally, Extreme primarily sold its products through its distribution channel, which comprised mainly of Extreme's (i) distributors (*i.e.*, third-party entities who sold to resellers) and (ii) partners or resellers (*i.e.*, third-party entities who sold directly to end customers).  ¶60. Extreme's distribution channel accounted for more than 80% of the Company's product revenues during the Class Period (¶61)—with Extreme's three largest distributors accounting for more than 50% of the Company's *total* revenues: (1) TD Synnex, (2) Jenne, and (3) Westcon. ¶62.

Extreme's networking products relied on critical components including merchant silicon, microprocessors, integrated circuits, and power supplies, all of which were part of an expansive global supply chain. ¶66. The COVID-19 pandemic created significant disruptions and bottlenecks in this supply chain, leading to shortages of key components for Extreme's networking products. ¶¶66-67. As a result of these supply constraints, Extreme began accumulating a substantial product backlog— purportedly representing "confirmed" customer orders that could not yet be fulfilled and shipped. ¶¶65; 68-69. Extreme's backlog skyrocketed from approximately $33 million in 1Q2021 to $555 million during the Class Period in 1Q2023. ¶69.[2] Critically, Extreme's revenue recognition policy recognized product revenues at the moment product orders were fulfilled and shipped to distributors or partners—not when such customers placed an order—thus orders placed on the backlog could not

---

[2] As explained in the Complaint, Extreme's fiscal year ends June 30 of each calendar year, and Extreme's first fiscal quarter ends September 30 (corresponding to the following calendar year). Thus, for example, 1Q2024 refers to the quarter ended September 30, 2023. ¶58.

yet be counted as part of Extreme's revenues. ¶64; ¶333 n.36.

### B.    Defendants Launch Their Channel Stuffing and Manipulative Sales Scheme

By mid-March 2022, Extreme found itself materially short of its forecasted revenue targets. ¶¶ 94; 101. On March 16, 2022, Defendant Meyercord and the rest of Extreme's Executive Leadership Team ("ELT"), which included Defendants Thomas and Rice, launched a scheme to "*get into the company [the] # the street expects*." ¶107. Rather than disclose the truth about weakening demand, Defendants chose deception and authorized a scheme to manufacture demand—all while making statements touting their revenue growth as attributable to "*exceptionally strong*" and "*unabated*" organic demand for Extreme's products. ¶¶6-7; 391; 437. Specifically, on March 16, 2022, at the direction of Defendant Meyercord and the ELT (¶¶114-15), Defendant Brown convened a meeting with senior distributor and supply chain account executives to communicate the plan from the ELT. ¶¶106-15. According to contemporaneous notes maintained by FE-1—a former Senior Distribution Account Manager (¶45)—Brown described to the attendees how Meyercord "*chose this path—[the] lesser of the 2 evils*" to "blow up" the Company's historical first-in, first-out ("FIFO") backlog allocation system because Extreme was "*running out of tricks in [its] bag*" to meet quarterly numbers. ¶¶106; 110-12, 115. Defendant Brown announced that—moving forward—all existing FIFO priority would be "decommit[ted]" and replaced with a new system whereby prioritization of backlog inventory would be based on which distributors agreed to purchase unneeded inventory—those who refused would lose their place in the backlog line. ¶¶101-02; 108-11.

The scheme operated through a form of economic extortion: distributors desperate for in-demand backlog products would be forced to purchase massive quantities of unneeded—and at times obsolete—inventory in exchange for priority shipments. ¶9. Those who refused would watch their competitors who "played ball" jump ahead in line. ¶¶9, 122. Meeting attendees predicted the resulting fallout would cause "*hurt feelings*," "*consternation*," and the proverbial "*blood in the streets*." ¶111.

Defendants immediately put their scheme into practice. In March 2022, Defendant Brown proposed that TD Synnex purchase $40 million of unneeded inventory, which FE-1 described as "terrible inventory" including older cables and antennas. ¶¶104; 122. When TD Synnex refused, Defendants turned to Westcon and Jenne, who agreed to "play[] along" and absorb the unneeded

product. ¶¶9; 123. Additionally, in a separate transaction closing in 4Q2022—and following a specific dinner meeting between Defendant Thomas and Westcon senior management (¶129)—Westcon purchased $52 million of "end of sale" junk products (consisting of cables, brackets, and fans that "nobody wanted") in exchange for receiving $50 million in backlogged products. ¶¶10; 131–134. Similarly, Jenne and Westcon each engaged in approximately $40 to $50 million transactions to take unneeded inventory to help Extreme meet its 4Q2022 and FY2022 revenue targets. ¶137.

Defendants sustained the scheme by employing several other manipulative tactics, including with Extreme's partners and resellers. First, Extreme "pulled in" sales from future quarters by shipping products to partners and resellers without firm end-user purchase orders, offering discounts and rebates to induce early purchases. ¶¶142-44; 190-99. FE-2 described this practice as improper and contrary to Extreme's internal shipping policies, which required end customer purchase orders before a product can ship (and therefore be counted as revenue). ¶192. According to FE-2, this practice was a "regular occurrence" that "exhausted demand from the future." ¶¶197; 203. For example, at the end of FY2023, partner PC Solutions was heavily pressured to take $1.5 million of inventory without end customer orders, while partner Synergetics was pushed to take approximately $700,000 of product. ¶¶208-21. Second, Defendants tried to prevent distributors from exercising their contractual stock rotation rights, which would have revealed the extent of the stuffed inventory. ¶¶161-77. Defendant Brown reneged on the 15% stock rotation allowance by often only permitting 5% rotations and delaying even those returns as long as possible. ¶¶168–69. Indeed, in one exchange, Defendant Brown expressed alarm that TD Synnex's rotation submission "may have tanked our quarter," which would have resulted in Extreme's "***auditors [being] all over us***." ¶¶176-77.

### C.    Defendants Also Misrepresent the Cancellation Risk of the Orders on Backlog

While stuffing channels to generate artificially strong revenues, Defendants perpetrated a parallel deception about what this "strong demand" meant for Extreme's assured revenue growth. ¶13. Throughout the Class Period, Defendants portrayed Extreme's ballooning backlog as essentially deferred revenue, repeatedly touting the Company's "complete" and "excellent visibility" into the firmness of backlog orders. ¶¶72-73, 75. Defendants told investors that the "***vast majority***" of backlog orders reflected "***firm***" customer commitments, were "***not cancelable***," and reflected "***end user***

*demand*." ¶72. Indeed, Defendant Meyercord stated that Extreme had received "***negligible cancellations to date of less than 1% of bookings***," and Defendant Tate asserted that the backlog was simply "***not cancelable***" and that "***we don't see double ordering***." ¶¶72; 75-76; 395; 458.

These representations were false. Multiple former employees confirmed that Extreme's backlog—which peaked at $555 million in 1Q2023—was not "firm." ¶¶272-328. According to FE-7, backlog orders placed with Extreme were conditional in nature and readily cancellable by customers. ¶273. The purchase order language contained "first come, first serve" clauses, meaning that if another supplier could provide the product faster, the contracts were "void" and the customer could freely cancel. ¶¶274-75. FE-7 explained that Extreme's customers customarily "double-book[ed]" or "triple-book[ed]" orders with multiple vendors—including Extreme's competitors—and cancelled the orders on backlog once Extreme's competitor fulfilled the order first. ¶¶274; 280-86.

Defendants knew of this practice. According to FE-7, at ELT meetings attended by the Individual Defendants, "everyone [referring to Extreme's ELT] in the room knew" that customers hedged their procurement by placing orders with multiple vendors, *i.e.*, the double- and triple-booking practice. ¶280. Indeed, based upon a specific ELT meeting which occurred between July and September 2022 and attended by FE-7, the ELT had already been factoring a "10% cushion" internally for backlog deals expected to fall through, in sharp contrast to the "less than 1%" cancellation rate publicly represented. ¶¶281-82, 359. FE-7 was so troubled by the disconnect between the 10% hedge and actual cancellation risk that he conducted an "acid test" survey of relevant industry CIOs, which confirmed that customers routinely placed duplicate orders with two or three competitors. ¶¶286-87. This meant that up to 66% of Extreme's backlog consisted of phantom orders that would vanish once competitors delivered first, a risk far greater than even Extreme's internal and undisclosed 10% hedge. ¶¶288-89. FE-7 presented his findings to ELT member and CTO Nabil Bukhari, telling him that the Company's internal 10% hedge was "just not right" and that he was "quite certain this is misleading." ¶¶288-90.

Other former employees, including FE-3, further corroborated that Extreme's cancellation policy was "quite flexible," and that it was "well known internally at Extreme" during the Class Period that distributors were placing an inordinately high number of orders and that these orders were

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF CASE NO.: 3:24-cv-05102-TLT

7

typically cancellable and returnable. ¶¶301–03. Indeed, FE-3 specifically warned Defendant Thomas about high-value cancellations in Latin America and proposed implementing a "back-to-back" purchase order clause to give Extreme better visibility into actual end-user demand. ¶¶306-08. Tellingly, Defendant Thomas declined to implement this solution. ¶¶310-11.

### D.    The Truth Is Revealed

The truth about Defendants' misleading statements, omissions, and deceptive acts emerged through a series of partial disclosures made from January 25, 2023, through January 31, 2024, causing Extreme's stock to collapse from a Class Period high of $32.27 per share to a low of $12.59 per share, a decline of over 60%. ¶¶20; 351-81; 617.

On January 25, 2023, Extreme announced that Defendant Thomas had resigned as CFO and revealed for the first time that the supposedly "firm" backlog had begun to decline—falling from $555 million to $542 million. ¶¶353-54. Extreme's stock price dropped nearly 15% on this news. ¶355. On August 24, 2023, Extreme's Form 10-K disclosed that the backlog had crashed to $267.3 million as of June 30, 2023—a *staggering 48% collapse* from the prior year's $513 million. ¶¶357-58. Extreme's stock price dropped another 9% on this news. ¶359. Thereafter, on November 1, 2023, Extreme reported sequential revenue declines and provided downward revenue guidance, revealing that "[b]ased on changing customer buying patterns…we are tempering our revenue outlook for this quarter and the balance of the year," citing an "air pocket" of demand. ¶¶361-64. Notably, Extreme also announced it would discontinue quarterly disclosure of its backlog figure—further obscuring the extent to which the backlog was failing to convert to revenue. ¶361. Extreme's stock price fell 13%. ¶365. On January 8, 2024, Extreme issued a press release lowering its 2Q2024 revenue guidance from $312–$327 million to just $294–$297 million, citing "industry headwinds of channel digestion and elongated sales cycles" and announcing that Chief Revenue Officer Joe Vitalone had resigned. ¶¶366–68. The stock price dropped another 7%. ¶369.

Finally, on January 31, 2024, Defendants revealed the full extent of the collapse. Extreme disclosed that product revenues had plummeted to just $186.6 million for 2Q2024, down 26% from the prior quarter. ¶¶370-71. Defendants admitted that "distributors and partners have lowered inventory purchases" and needed to digest "$40 to $50 million reduction in channel inventory"—

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF CASE NO.: 3:24-cv-05102-TLT

8

effectively conceding that the channel had been stuffed with unwanted product. ¶¶372-73. Defendants also disclosed that backlog had normalized "earlier than we initially anticipated," revealing that the phantom orders had evaporated. ¶372. Additionally, Extreme gave 3Q2024 guidance of total revenues of only $200–$210 million—a further decline from the $296.4 million achieved in 2Q2024. ¶374.

Extreme's stock price collapsed 24% over the following days. ¶376. In the aftermath, analysts concluded that Extreme's prior double-digit revenue growth in FY2022 and FY2023 "was the result of pandemic-related supply chain delays…followed by double-ordering by customers in FY22/FY23 to protect against the possibility of supply chain issues" and that "it is now apparent that Extreme is not growing at a sustainable double-digit rate." ¶377. Indeed, the significant and sustained declines in revenue—with product revenues for 3Q2024 falling to an abysmal $106.4 million, a 43% decline from the prior quarter and less than half of product revenues reported in any quarter from 2Q2023 to 1Q2024—confirmed that the previously reported backlog had never reflected "firm" customer commitments, and that Extreme's touted revenue growth story was merely a mirage. ¶¶341-44.

## III.    PROCEDURAL HISTORY

On December 30, 2024, the Court appointed Oklahoma Police, Oklahoma Fire, Oakland County VEBA, and Oakland County ERS as Lead Plaintiffs and Labaton as Lead Counsel. ECF 51. On February 14, 2025, Lead Plaintiffs filed an Amended Consolidated Complaint for Violations of the Federal Securities Laws ("Amended Complaint"). ECF 59. On August 15, 2025, the Court granted Defendants' motion to dismiss the Amended Complaint while granting Lead Plaintiffs leave to amend the pleadings by September 9, 2025. ECF 92.

On September 9, 2025, Lead Plaintiffs filed the operative Complaint, which added allegations including new facts and documents provided by certain former employees of Extreme. ECF 95. Defendants moved to dismiss the claims asserted in the Complaint and, on March 23, 2026, following an oral argument held on March 3, 2026, the Court denied Defendants' motion to dismiss in full. ECF 132. In accordance with the Court's MTD Order, discovery is underway, fact discovery is set to conclude by August 31, 2026, and a trial is scheduled to begin on June 21, 2027. A hearing on this Motion is scheduled for July 7, 2026. ECF 101.

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO.: 3:24-cv-05102-TLT

9

## IV.     ARGUMENT

### A.     Class Certification Standards

Lead Plaintiffs "bear[] the burden of demonstrating by a preponderance of the evidence that all four requirements of Rule 23(a) and at least one of the requirements under Rule 23(b) are met." *Pardi v. Tricida, Inc.*, 2024 WL 4336627, at *3 (N.D. Cal. Sept. 27, 2024). While the Court's class certification analysis must be rigorous, "the law in the Ninth Circuit is very well established that the requirements of Rule 23 should be liberally construed in favor of class action cases brought under the federal securities laws." *In re NetSol Techs., Inc. Sec. Litig.*, 2016 WL 7496724, at *3 (C.D. Cal. July 1, 2016); *see also In re Scorpion Techs., Inc.*, 1994 WL 774029, at *3 (N.D. Cal. Aug. 10, 1994) ("[T]he Ninth Circuit favors a liberal use of class actions to enforce federal securities laws"). Moreover, courts in this Circuit have found that, "[i]n the context of securities litigation, class actions are 'particularly well-suited' because 'geographically dispersed shareholders with relatively small holdings' may not otherwise pursue their claims." *Cullen v. RYVYL Inc.*, 2025 WL 2836651, at *5 (S.D. Cal. Aug. 20, 2025) (quoting *In re VeriSign, Inc. Sec. Litig.*, 2005 WL 7877645, at *9 (N.D. Cal. Jan. 13, 2005)).[3]

"The underlying merits of the case, while admittedly relevant at the class certification stage, should not overly cloud the Court's certification analysis—the only question presently before the Court is whether the requirements of Rule 23 are met." *James v. Uber Techs. Inc.*, 338 F.R.D. 123, 129 (N.D. Cal. 2021). So "[w]hile the class-certification analysis 'may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.'" *Malriat v. QuantumScape Corp.*, 2022 WL 17974629, at *2 (N.D. Cal. Dec. 19, 2022) (quoting *Amgen*, 568 U.S. at 465-66). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th

---

[3] Both the Supreme Court and the Ninth Circuit have repeatedly recognized the importance of private class actions in redressing violations of the federal securities laws. *See, e.g., Tellabs*, 551 U.S. at 313-14; *Herman & MacLean v. Huddleston*, 459 U.S. 375, 380 n.10 (1983); *Berner v. Lazzaro*, 730 F.2d 1319, 1322-23 (9th Cir. 1984), *aff'd sub nom. Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299 (1985) ("[P]rivate actions brought by investors have long been viewed as a necessary supplement to SEC enforcement actions").

1223, 1232 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1051 (2025) (quoting *Amgen*, 568 U.S. at 466).

This case mirrors the numerous recent securities cases in this District where classes were certified. *See, e.g., Wells Fargo.*, 2025 WL 1243818; *Pardi*, 2024 WL 4336627, at *13; *Weston v. DocuSign, Inc.*, 348 F.R.D. 354, 372 (N.D. Cal. 2024); *In re Vaxart, Inc. Sec. Litig.*, 759 F. Supp. 3d 1015-1018 (N.D. Cal. 2024); *Homyk v. ChemoCentryx, Inc.*, 2024 WL 1141699, at *7 (N.D. Cal. Mar. 6, 2024), *denying leave to appeal*, 2024 WL 2745788 (9th Cir. May 23, 2024); *SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 742 F. Supp. 3d 1003, 1021 (N.D. Cal. 2024). The Court should grant class certification here.

### B.    The Proposed Class Satisfies Rule 23(a)

#### 1.    Numerosity Is Established

Rule 23(a)(1) requires only that "the class [be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Courts find this standard met "if the class includes forty or more members." *Wells Fargo*, 2025 WL 1243818, at *3. For securities cases involving stocks traded on a national exchange, courts routinely infer numerosity when the stock has "millions of shares trading." *Malriat*, 2022 WL 17974629, at *3. During the Class Period, over 135 million shares of Extreme common stock were available for trading in the public float, and the average weekly trading volume was approximately 6.65%. Cain Rpt. ¶¶40, 93); *see also In re Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *3 (N.D. Cal. Apr. 21, 2016) (courts certify class of investors "in [] securities fraud case[s] in which several million shares of stock were purchased during the class period"). Moreover, at least 575 institutions held Extreme common stock at some point during the Class Period. Cain Rpt. ¶96; *see also Pardi*, 2024 WL 4336627, at *4 ("Numerosity is satisfied given the number of investors that purchased … stock during the Class Period."). Accordingly, numerosity is satisfied.

#### 2.    Commonality Is Established

Rule 23(a)(2) requires only that "questions of law or fact" be common to the class. Fed. R. Civ. P. 23(a)(2). "So long as there is 'even a single common question,' a would be class can satisfy the commonality requirement of Rule 23(a)(2)." *Wells Fargo*, 2025 WL 1243818, at *3 (quoting *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014)). Securities cases consistently meet this

requirement because class members face the common question whether they were "allegedly defrauded over a period of time by similar misrepresentations." *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *4 (N.D. Cal. Mar. 16, 2016); *Crews v. Rivian Auto., Inc.*, 2024 WL 3447988, at *4 (C.D. Cal. July 17, 2024) ("Securities class actions typically satisfy Rule 23(a)(2) because . . . 'the same basic legal claims . . . are based on the same nucleus of operative facts: the alleged misrepresentations and omissions.'"); *see also DZ Rsrv.*, 96 F.4th at 1234 ("Class action fraud claims often involve similar misrepresentations that cause a large number of victims to each suffer a small financial loss"). Numerous questions are common to the proposed Class here: whether Defendants made material misrepresentations or omissions to investors during the Class Period; whether Defendants engaged in deceptive acts in furtherance of a scheme; whether Defendants acted with scienter; whether Defendants' alleged misstatements, omissions, and/or deceptive acts in furtherance of a scheme caused investors to suffer damages; and whether Defendants Meyercord, Thomas, Tate, Rhodes, and Rice controlled Extreme. Courts routinely find such questions sufficient for commonality. *See Wells Fargo*, 2025 WL 1243818, at *3 (finding common questions for securities class); *see also Pardi*, 2024 WL 4336627, at *3-4 (same); *Purple Mountain Tr. v. Wells Fargo & Co.*, 2022 WL 3357835, at *3 (N.D. Cal. Aug. 15, 2022) (same).

### 3. Typicality Is Established

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is assessed by asking "whether other [Class] members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Pardi*, 2024 WL 4336627, at *3. "A plaintiff's claims are considered typical if they are 'reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Id.*; *see also Amey v. Cinemark USA Inc.*, 2018 WL 3956326, at *4 (N.D. Cal. Aug. 17, 2018) ("representative claims are 'typical' if they are *reasonably co-extensive* with those of absent class members" and "need not be substantially identical").

Here, the identical misconduct injured all proposed Class members. Lead Plaintiffs purchased Extreme stock at artificially inflated prices during the Class Period—the same injury every proposed

Class member suffered as a result of Defendants' misrepresentations and deceptive acts. When the truth emerged, each of these purchasers faced the same harm. Because the claims turn on whether Defendants made material misstatements and omissions and engaged in deceptive acts that artificially inflated Extreme's share price, typicality is satisfied. *In re SanDisk LLC Sec. Litig.*, 2018 WL 4293336, at *1 (N.D. Cal. Sept. 4, 2018) (typicality met where class members' claims involved the same "core factual and legal questions").

### 4.      Adequacy Is Satisfied

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To determine adequacy, courts consider: "(1) whether there are conflicts within the class; and (2) whether plaintiffs and counsel will vigorously fulfill their duties to the class." *Wells Fargo*, 2025 WL 1243818, at *4 (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011)); *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 284-85 (N.D. Cal. 2020) (same).

Both prongs are satisfied here. *First*, Lead Plaintiffs have no conflicts with absent Class members. Like all proposed Class members, Lead Plaintiffs purchased Extreme common stock during the Class Period and suffered harm from Defendants' alleged fraudulent statements and deceptive acts. *See* Ex. B (Rankin Decl.) at ¶11; Ex. C (Sigler Decl.) at ¶11; Ex. D (Rozell Decl.) at ¶11. *Second*, Lead Plaintiffs will vigorously prosecute this action and have already demonstrated their commitment to doing so. Lead Plaintiffs have actively supervised this litigation by regularly communicating with counsel regarding all aspects of the case, including the filing of significant pleadings and Court orders and, most recently, the progress of discovery and the instant motion for class certification. *See* Ex. B (Rankin Decl.) at ¶7; Ex. C (Sigler Decl.) at ¶7; Ex. D (Rozell Decl.) at ¶7; *see also Lamartina v. VMware, Inc.*, 2024 WL 3286059, at *4 (N.D. Cal. July 2, 2024) (adequacy satisfied where "Lead Plaintiff has supervised and monitored the progress of Court proceedings, reviewed pleadings and other documents in this case, and participated in discussions with Lead Counsel concerning significant developments in the litigation"). Lead Plaintiffs will continue to supervise and participate in the prosecution of this case all the way through trial and faithfully fulfill their duties as class representatives. *See* Ex. B (Rankin Decl.) at ¶¶6-10; Ex. C (Sigler Decl.) at ¶¶6-10; Ex. D (Rozell

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO.: 3:24-cv-05102-TLT

13

Decl.) at ¶¶6-10.

Third, Lead Plaintiffs—large institutional investors—are precisely the "type of plaintiff typically favored under the PSLRA to be the lead plaintiffs in securities litigation." *In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 3742924, at *3 (S.D. Cal. Aug. 24, 2021); *see also City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2022 WL 1459567, at *5 (N.D. Cal. May 9, 2022) ("[T]he fact that [lead plaintiff] is a large institutional investor and [lead counsel] is experienced with securities class actions provides further support that they will adequately represent the Class."); *In re SiRF Tech. Holdings, Inc. Sec. Litig.*, 2008 WL 2220601, at *3 (N.D. Cal. May 27, 2008) ("[B]y enacting the PSLRA, Congress sought to increase the participation of institutional investors in securities class actions," because "increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions"); H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733 ("Institutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake").

*Finally,* "[t]he [PSLRA's] lead plaintiff provisions were designed to encourage greater institutional investor participation in class action litigation by giving the lead plaintiff the power to control the course of the action, including the selection of lead counsel." *In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 627 (N.D. Cal. 2018). Here, Lead Plaintiffs have selected as Lead Counsel Labaton, a firm that has extensive experience in securities litigation. *See* Ex. E (Firm Résumé); *see also DocuSign*, 348 F.R.D. at 371 (finding Labaton has "experience in the area of securities litigation and class actions."). Lead Counsel has a proven track record of success in complex cases such as this one, and has successfully prosecuted high-profile securities fraud class actions, including in this District, recovering billions of dollars on behalf of injured investors across the country. *See* Ex. E; Ormsbee Decl. ¶¶7-8. Consistent with its track record, Labaton has vigorously prosecuted the Class's claims to date. *See* Ormsbee Decl. ¶9; *see also Twitter,* 326 F.R.D. at 628 (finding class representative adequate and class counsel appropriate where class counsel had "'vigorous[ly] prosecut[ed]' this case by investigating claims, preparing the complaint, defending the complaint against dismissal,

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF CASE NO.: 3:24-cv-05102-TLT

14

conducting discovery, and pursuing class certification").

## C.   The Proposed Class Satisfies Rule 23(b)(3)

In addition to satisfying Rule 23(a), the Proposed Class also satisfies Rule 23(b)(3), which requires that Lead Plaintiffs show that: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members;" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). As the Ninth Circuit has observed, Rule 23 "does not require that all the members of the class be identically situated." *Harris v. Palm Springs Alpine Ests. Inc.*, 329 F.2d 909, 914-15 (9th Cir. 1964). Rather, it is "based on the assumption that the economy of time, effort, and expense which will result from a common trial of substantial common issues exceeds the additional burden which may be imposed upon the court and the parties by the necessity of also determining in the common litigation those issues which may be several." *Id.*

### 1.   Common Questions Of Law And Fact Predominate

The Supreme Court recognizes that "[p]redominance is a test readily met" in securities fraud cases like this one. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *see also In re UTStarcom, Inc. Sec. Litig.*, 2010 WL 1945737, at *9 (N.D. Cal. May 12, 2010) ("[t]he predominance requirement is readily met in securities fraud cases"). When, as here, "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998). As discussed further below, there are numerous common questions of law and fact that predominate over any individual questions.

### a.   The Claims Are Clearly Susceptible To Classwide Proof

"Considering whether 'questions of law or fact common to the class members predominate' begins, of course, with the elements of the underlying cause of action." *Wells Fargo*, 2025 WL 1243818, at *5 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*") (quoting Fed. R. Civ. P. 23(b)(3))). "To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the

defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140-41 (9th Cir. 2017); *see also In re Bridgepoint Educ., Inc. Sec. Litig.*, 2015 WL 224631, at *6 (S.D. Cal. Jan. 15, 2015) ("In the typical securities-fraud case, as in this case, the factual and legal issues related to most of these elements are common to the class, so the requirements for class certification are usually 'readily met.'").[4]

The elements of "falsity," "materiality," "scienter," and "loss causation" all raise common questions of law and fact and, accordingly, support class certification. *Amgen*, 568 U.S. at 461-62, 474-75; *Halliburton I*, 563 U.S. at 811-12. Each of these elements of Lead Plaintiffs' claims "are clearly susceptible to classwide proof" and will be resolved uniformly among all class members. *In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *6 (N.D. Cal. Feb. 4, 2022).

### b.    The Fraud-On-The-Market Presumption Of Reliance Applies

Lead Plaintiffs and the Class are also entitled to the fraud-on-the-market presumption of reliance. *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988). That presumption is based on the well-founded principle that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 283-84 (2014) ("*Halliburton II*"). When the "fraud-on-the-market" presumption applies, investors do not need to demonstrate individual reliance. *Halliburton I,* 563 U.S. at 811; *see also In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 101 (S.D.N.Y. 2016) (presumption "obviate[s] the need to prove reliance on an individual basis").

As summarized below and in the Cain Report, the relevant factors demonstrate that the market for Extreme's securities was efficient during the Class Period. To evaluate market efficiency, courts first consider whether the security at issue trades on a major national exchange. *See, e.g.*, *Sayce v. Forescout Techs., Inc.*, 754 F. Supp. 3d 878, 891 (N.D. Cal. 2024) ("federal courts are unanimous in

---

[4] To plead Section 20(a) claims, Lead Plaintiffs must allege a violation of the Exchange Act and that "the defendant directly or indirectly controls any person liable for the violation." *Wells Fargo*, 2025 WL 1243818, at *5.

their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency"). Here, Extreme common stock traded on the NASDAQ, a presumptively efficient market. Cain Rpt. ¶29; *see also Halliburton II*, 573 U.S. at 268 ("[T]he market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.").

Next, courts consider the nonexclusive five "*Cammer* factors" (*Cammer v. Bloom,* 711 F. Supp. 1264, 1286-87 (D.N.J. 1989), *appeal dismissed*, 993 F.2d 875 (3d Cir. 1993)), as well as the "*Krogman* factors" (*Krogman v. Sterritt,* 202 F.R.D. 467, 477-78 (N.D. Tex. 2001)). As discussed *infra* and in the Cain Report*,* each of the *Cammer* and *Krogman* factors support a finding that Extreme common stock traded in an efficient market throughout the Class Period.

### (i)    High Weekly Trading Volume (*Cammer* Factor 1)

The greater the amount of buying and selling activity in a security, the more likely it is that new information will be quickly incorporated into the price of that security. *See* Cain Rpt. ¶38; *Wells Fargo*, 2025 WL 1243818, at *6 (finding large weekly trading volume supported market efficiency); *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 247 (N.D. Cal. 2013) (same); *Cammer*, 711 F. Supp. at 1293. The relatively high trading volume for Extreme common stock supports efficiency.

"Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security [was] an efficient one." *Cammer*, 711 F. Supp. at 1293. During the Class Period, Extreme had an average weekly trading volume of 6.65% of shares outstanding—**more than 3 times** the "two percent" threshold that *Cammer* held "would justify a strong presumption that the market for the security is an efficient one." Cain Rpt. ¶¶39-41.

### (ii)    Significant Analyst Coverage (*Cammer* Factor 2)

Securities analyst coverage of a company supports efficiency because analysts facilitate the dissemination of information, increasing the likelihood that the price of the security reflected, and investors therefore relied upon, information released by a company. *See* Cain Rpt. ¶¶42-43; *Diamond Foods*, 295 F.R.D. at 247-48; *Cammer*, 711 F. Supp. at 1286.

Here, Dr. Cain found that analysts from 22 firms published a total of 181 reports concerning

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF CASE NO.: 3:24-CV-05102-TLT

17

Extreme during the Class Period, including UBS, Oppenheimer & Co, and Evercore ISI, among others. Cain Rpt. ¶44. In addition, Dr. Cain identified a substantial volume of news coverage—at least 796 unique articles—regarding Extreme during the Class Period, including articles published by leading news outlets such as *Dow Jones Institutional News*, *Barron's*, *Reuters News*, and *Business Wire*, among others. *Id*. ¶46. Further, Extreme produced numerous filings containing Company information that were immediately disseminated to the public through the SEC's online database, EDGAR, during the Class Period. *Id*. ¶47. As Dr. Cain explains, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about Extreme, indicates a greater likelihood that investors relied on information provided about the Company and, therefore, supports a finding that the market for Extreme shares during the Class Period was efficient. *See id*. ¶48; *see also, e.g.*, *Todd v. STAAR Surgical Co*., 2017 WL 821662, at *7 (C.D. Cal. Jan. 5, 2017) (coverage by six analysts supports efficiency); *In re Juniper Networks, Inc. Sec. Litig*., 264 F.R.D. 584, 591 (N.D. Cal. 2009) (coverage by numerous analysts supports efficiency).

### (iii)    Market Maker/Arbitrage Activity (*Cammer* Factor 3)

Courts find that the existence of numerous market makers supports market efficiency. The existence of numerous market makers ensures that investors "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87; *see also Diamond Foods*, 295 F.R.D. at 248 ("The existence of market makers and arbitrageurs would further provide a mechanism through which the market could be expected to receive information and fully incorporate it into the stock price of a security, as these individuals 'would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level.'").

During the Class Period, there were at least 96 market makers and brokers facilitating the buying and selling of Extreme common stock on NASDAQ. Cain Rpt. ¶52; *see also Wells Fargo*, 2025 WL 1243818, at *7 ("the existence of 87 market makers for Wells Fargo common stock supports market efficiency"). In addition, as Dr. Cain explains, 575 institutional investors held Extreme stock during the Class Period, owning an average of 90.96% of Extreme's outstanding common stock. Cain

Rpt. ¶54. This activity supports the conclusion that investors were able to, and did, react swiftly to public information by trading in Extreme stock, driving price changes. *See id.* ¶55; *Cammer*, 711 F. Supp. at 1286-87.

#### (iv)    S-3 Regulation Eligibility (*Cammer* Factor 4)

Courts find that a corporation's eligibility to use SEC Form S-3 "is an important factor weighing in favor of a finding that [the] market is efficient." *Cammer,* 711 F. Supp. at 1285. This factor "is predicated on the [SEC's] belief that the market operates efficiently for [eligible] companies, i.e., [all public information] has already been disseminated and accounted for by the market place." *Id.* at 1284. More specifically, "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." *Id.* at 1287; *see also Diamond Foods*, 295 F.R.D. at 248 ("That a company's public offerings met the threshold requirements for filing a Form S–3 tends to support a finding of efficiency.").

Throughout the Class Period, Extreme met the necessary requirements to file a Form S-3; in fact, Extreme's Class Period public float (calculated by multiplying the number of shares held by investors other than insiders by Extreme's closing stock price on each quarter-end date) averaged $2.56 billion, a figure that far exceeded the SEC's required market capitalization of $75 million. Cain Rpt. ¶58. Extreme's Form S-3 eligibility supports market efficiency.

#### (v)    Cause-And-Effect Relationship (*Cammer* Factor 5)

The fifth and final *Cammer* factor asks whether during the Class Period, Extreme's common stock price quickly responded to the release of new Company-specific "unexpected" news. *Cammer*, 711 F. Supp. at 1287. As the *Cammer* court explained, empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price" would be helpful to the efficiency analysis. *Id.*; *see also Wells Fargo*, 2025 WL 1243818, at *7 (this factor requires a showing that "common stock price reacted to the release of new, Company-specific information, which supports a finding of market efficiency"). While not required to demonstrate market efficiency, the fifth *Cammer* factor supports such a finding.

Dr. Cain has shown through empirical analyses based on the results of an event study that Extreme's stock price reacted in an efficient manner to new information about the Company. *See* Cain

Rpt. ¶¶60-81. "Courts regularly accept experts' event studies to support market efficiency analyses at the class certification stage." *Malriat*, 2022 WL 17974629, at \*12; *Wells Fargo*, 2025 WL 1243818, at \*7 (finding that the lead plaintiffs' event study "supports a finding of market efficiency"); *Diamond Foods*, 295 F.R.D. at 248 (stating that the "most common empirical test for a causal connection is an event study"). Dr. Cain performed empirical analyses based on the generally accepted and commonly utilized event study methodology to determine whether Extreme common stock had a greater frequency of statistically significant price movements on "News Days"—days on which there *was* Extreme-specific information entering the market—than on more typical "No News Days." Cain Rpt. ¶¶64-77. This is a commonly accepted approach to analyzing *Cammer*'s fifth factor. *See, e.g.*, *Diamond Foods*, 295 F.R.D. at 248 (relying on the same event study methodology used here to conclude that a security's reaction to new information supported finding market efficiency); *Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at \*10 (N.D. Cal. Dec. 22, 2016) (same).

Dr. Cain found a statistically significant pattern of more frequent stock price movement on "News Days" than "No News Days," which provides further evidence that the market for Extreme's common stock was informationally efficient during the Class Period. Cain Rpt. ¶¶78-79 (75.00% of News Days disclosures caused a statistically significant price movement versus 3.97% of No News Days). Further, Dr. Cain found that "News Days" had a higher average absolute abnormal return and greater trading volume than "Non News Days," with these differences being statistically significant at a level greater than 95%. *Id.* ¶80. As Dr. Cain explains, the results of these empirical analyses further support a finding of market efficiency. *Id.* ¶81.

### (vi)    Market Capitalization (*Krogman* Factor 1)

Market capitalization "may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. During the Class Period, Extreme's market capitalization averaged $2.51 billion, placing it in the 50th percentile of all companies listed on the NASDAQ and NYSE from 2016-2018. Cain Rpt. ¶84. The size of Extreme's market capitalization easily supports a finding of efficiency. *Id.* ¶85; *see Junge v. Geron Corp.*, 2022 WL 1002446, at \*4-5 (N.D. Cal. Apr. 2, 2022) (market capitalization that averaged $731.69 million sufficient to meet *Krogman* Factor 1).

### (vii)   Bid-Ask Spread (*Krogman* Factor 2)

The bid-ask spread is "the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Krogman*, 202 F.R.D. at 478. If there is a narrow bid-ask spread—a low number—it "indicates greater efficiency," *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2021 WL 229310, at *6 (N.D. Cal. Jan. 21, 2021), because it means there are as many ready buyers as there are ready sellers. Cain Rpt. ¶87. The average bid-ask spread, as a percentage of the bid-ask midpoint, for Extreme common stock for each trading day over the Class Period was 0.07% percent, which supports a finding of efficiency. *Id*. ¶¶88-90; *see also Wells Fargo*, 2025 WL 1243818, at *7 (factor met when "average bid-ask spread . . . during the Class Period was 0.02 percent").

### (viii)   Public Float (*Krogman* Factor 3)

Courts consider the percentage of shares held by the public versus insiders as further evidence of market efficiency. *See Krogman*, 202 F.R.D at 478. Higher percentages of shares held by the public equate to more efficient markets. *See Borteanu v Nikola Corp.*, 348 F.R.D. 239, 258 (D. Ariz. 2025). During the Class Period, Extreme's public float as a percentage of total shares held by non-insiders was over 97.55%, supporting a finding of market efficiency. Cain Rpt. ¶¶93-94; *see also Purple Mountain*, 2022 WL 3357835, at *5 (float of approximately 90% supported efficiency).

### (ix)   Additional Indicium Of Market Efficiency

Dr. Cain also evaluated institutional ownership, which is another factor indicating market efficiency. Cain Rpt. ¶¶95-96. Dr. Cain identified at least 575 institutions that held the stock during the Class Period and owned an average of 90.96% of outstanding common stock, placing it between the 75th and 90th percentiles of NYSE and NASDAQ traded companies. *Id.* ¶96. Extreme's significant institutional ownership indicates an efficient market for Extreme's common stock. *Id.*

### c.   The *Affiliated Ute* Presumption Applies

While "the Court need not reach whether a presumption [of reliance] would also exist under *Affiliated Ute*" because Lead Plaintiffs and the Class are entitled to a presumption of reliance under *Basic* (*see Pampena v. Musk*, 2024 WL 4331811, at *3 n.1 (N.D. Cal. Sept. 27, 2024); *Pardi*, 2024 WL 4336627, at *12 (same)), Lead Plaintiffs and the Class are also entitled to a presumption of

reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Defendants engaged in a sustained undisclosed scheme to deceive investors by leveraging Extreme's backlog to stuff the channel, closing revenue gaps, and reporting "strong" and "unabated" demand. MTD Order, 2026 WL 817221, at *15. Where claims "involv[e] primarily a failure to disclose, [by persons with a duty to disclose,] positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material." *Affiliated Ute*, 406 U.S. at 153-54.

Courts have held that "plaintiffs need not demonstrate affirmative proof of reliance in securities fraud cases 'involving primarily a failure to disclose' if the 'facts withheld [were] material in the sense that a reasonable investor might have considered them important in the making of this decision.'" *Okla. Firefighters Pension & Ret. Sys. v. Musk*, 779 F. Supp. 3d 396, 421 (S.D.N.Y. 2025) (quoting *Affiliated Ute*, 406 U.S. at 153-54); *see also In re Robinhood Ord. Flow Litig.*, 2022 WL 9765563, at *13 (N.D. Cal. Oct. 13, 2022) (applying the *Affiliated Ute* presumption because "this case is primarily about what Robinhood did not say"). Accordingly, this case is in line with other cases alleging scheme liability in which the plaintiffs alleged other deceptive acts in addition to misstatements, and the courts apply the *Affiliated Ute* presumption. *See In re DiDi Glob. Inc. Secs. Litig.*, 2025 WL 1909295, at *16 (S.D.N.Y. July 7, 2025), *adopted* 2025 WL 2345696 (S.D.N.Y. Aug. 13, 2025) (alleged deceptive acts were "distinct from the false or misleading statements themselves"); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 297-98 (S.D.N.Y. 2003) (scheme "to misrepresent WorldCom's financial condition").

### d. Damages Will Be Calculated Using A Common Methodology That Is Consistent With The Class-Wide Theory Of Liability

The "out of pocket" damages model Dr. Cain proposes to use to measure damages in this case (*see* Cain Rpt. ¶¶97-114) is the universally accepted method for "calculating damages in virtually every Section 10(b) class action." *See, e.g.*, *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018), *denying leave to appeal*, 2019 WL 2193335 (9th Cir. Jan. 24, 2019).

As this Court has noted, "the Ninth Circuit has held that to meet the predominance requirement, 'plaintiffs must be able to show that their damages stemmed from the defendant's actions

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF CASE NO.: 3:24-CV-05102-TLT

22

that created the legal liability' using the proposed damages model." *Wells Fargo*, 2025 WL 1243818, at *7 (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) and citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). Courts in this District, including this Court, have found that the methodology using an "out-of-pocket" damages model proposed by Lead Plaintiffs satisfies the predominance requirement with respect to damages. *See, e.g.*, *id.* at *7-8 (finding that out-of-pocket damages methodology satisfies *Comcast*); *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2023 WL 3569981, at *8 (N.D. Cal. May 19, 2023) (same); *Oracle*, 2022 WL 1459567, at *9 (same); *Geron*, 2022 WL 1002446, at *6 (same); *Purple Mountain*, 2022 WL 3357835, at *5–6 (same).

While "damage calculations alone cannot defeat certification." *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010), Lead Plaintiffs' damages methodology fully supports certification because their proposed model calculates class-wide damages by using an event study to measure the amount of artificial inflation in Extreme's stock on each day of the Class Period. Cain Rpt. ¶¶97-114. Here, as Dr. Cain explains, per-share damages for all Class members are readily calculable using the standard "out-of-pocket" methodology. Cain Rpt. ¶¶99-100. Damages will be measured as the difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale, each ultimately determined by the fact-finder. *Id*. ¶¶99, 109-13. The proposed damages model under Section 10(b) relies on the well-established event study methodology, where an expert estimates company-specific price movement relative to price movement caused by other factors such as overall market conditions or dissemination of other material but non-fraudulent information relayed by the subject company. *Id*. ¶¶99-103.

Dr. Cain's methodology has been employed in nearly every securities class action and has been widely endorsed by courts throughout the Ninth Circuit. *See, e.g.*, *Wells Fargo*, 2025 WL 1243818, at *7-8; *DocuSign*, 348 F.R.D. at 368 ("The out-of-pocket method of damages calculation is common for § 10(b) actions like this one."); *Granite Constr*., 2021 WL 229310, at *7 (same); *In re Lendingclub Sec. Litig*., 282 F. Supp. 3d 1171, 1184 (N.D. Cal. 2017) (plaintiffs' "proposed method—using an event study—is widely accepted for calculating damages of a class of stockholders"); *SanDisk*, 2018 WL 4293336, at *2 ("[T]his damages methodology, coupled with its general

acceptance, suffices to show for class certification purposes that classwide 'damages can be determined without excessive difficulty and attributed to [the plaintiffs'] theory of liability.'").

### 2. A Class Action Is Superior To Other Methods Of Resolving This Controversy

Rule 23(b)(3) also requires the Court to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Superiority is satisfied where "it would be challenging for individual class members to litigate these kinds of resource-intensive claims, the federal forum is appropriate, there are no state actions identified by the parties, and there are no known special manageability issues that risk confounding case resolution." *DocuSign*, 348 F.R.D. at 370-71. "Managing this case as a class action presents no unusual difficulties." *Wells Fargo*, 2025 WL 1243818, at *5.

> Courts examine four factors to determine superiority: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action.

*Pardi*, 2024 WL 4336627, at *5. Each factor is met here.

*First*, the prospective Class consists of a large number of investors "dispersed around the country" for whom "the cost of litigating on an individual basis is much higher than any likely individual recovery." *Id. Second*, counsel is unaware of any other litigation against these Defendants asserting these direct claims under the Exchange Act.[5] *Third*, this forum is appropriate because "concentrating the litigation of prospective Class Members . . . [here] removes the risk of inconsistent adjudication and promotes the fair and efficient use of the judicial system." *Lamartina,* 2024 WL 3286059, at *4. *Fourth*, managing this case as a class action presents no unusual difficulties. *See Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 591 (N.D. Cal. 2021) ("Plaintiffs know of no difficulty in the management of this litigation that would preclude its maintenance as a class action.").

---

[5] Lead Plaintiffs note that there are shareholder derivative actions against certain Extreme officers and directors, in which plaintiffs raise Exchange Act claims that are derivative by nature, in addition to breach of fiduciary duty, unjust enrichment, and waste of corporate assets claims. *See In re Extreme Networks, Inc. S'holder Derivative Litig.*, No. 3:25-cv-02101-TLT (N.D. Cal. Dec. 1, 2025), ECF 43 (Amended Verified Shareholder Derivative Complaint); *see also Miller v. Meyercord, et al.,* 25-cv-00161-BO-KS (E.D.N.C.).

Because all four factors are met, superiority is satisfied.

### D.    Labaton Should Be Appointed Class Counsel

Lead Plaintiffs also respectfully request that the Court appoint Labaton as Class Counsel. In appointing Class Counsel, Rule 23(g) provides that the Court must consider: (i) the work counsel has done; (ii) counsel's experience in handling, among other things, class actions and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Labaton amply satisfies the Rule 23(g) criteria. Under Lead Plaintiffs' supervision and direction, Labaton has undertaken a vigorous prosecution of this case, including by, among other things: thoroughly analyzing, researching, and investigating the securities law claims at issue; drafting two detailed complaints; successfully opposing Defendants' motion to dismiss; conducting ongoing fact discovery; consulting with experts; and assembling a dedicated and highly skilled team to prosecute the Action. *See* Ormsbee Decl. ¶9.

Labaton has significant experience prosecuting complex securities class actions, deep knowledge of the securities laws, and an exemplary record of success. *See* Ex. E. Working as lead counsel or co-lead counsel on behalf of lead plaintiffs in other cases, the firm has recovered billions of dollars for investors. *Id*. Labaton has devoted and will continue to devote the resources necessary to represent the Class throughout the course of this litigation. Labaton has thus demonstrated that it is fully qualified for appointment as Class Counsel under Rule 23(g). *See, e.g.*, *DocuSign*, 348 F.R.D. at 371-72 (appointing Labaton as class counsel). Indeed, this Court already made a preliminary (and proper) determination that Labaton will fairly and adequately protect the interests of the putative Class. *See* ECF 51. For the above reasons, Labaton will fairly and adequately represent the Class and should be appointed Class Counsel pursuant to Rule 23(g).

## V.    CONCLUSION

Lead Plaintiffs request entry of an Order certifying this Action as a class action under Rule 23, appointing Oklahoma Fire, Oklahoma Police, Oakland County VEBA, and Oakland County ERS as the Class Representatives, and appointing Labaton as Class Counsel.

DATED: April 17, 2026

Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

/s/ Lauren A. Ormsbee
Lauren A. Ormsbee (*pro hac vice*)
Jesse L. Jensen (*pro hac vice*)
David Saldamando (*pro hac vice*)
Danielle S. Lazarus (*pro hac vice*)
Alexandra E. Forgione (*pro hac vice*)
Jacqueline E. Lacovara (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
lormsbee@labaton.com
jjensen@labaton.com
dsaldamando@labaton.com
dlazarus@labaton.com
aforgione@labaton.com
jlacovara@labaton.com

*Counsel for Lead Plaintiffs and
Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (Bar No. 250893)
Reed R. Kathrein (Bar. No. 139304)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

*Liaison Counsel for the Class*

**VANOVERBEKE MICHAUD & TIMMONY P.C.**
Aaron L. Castle (*pro hac vice*)
79 Alfred Street
Detriot, MI 48201
Tel: (313) 578-1200
Fax: (313) 578-1201
acastle@vmtlaw.com

*Additional Counsel for Oakland County Voluntary
Employees' Beneficiary and Oakland County
Employees' Retirement System*