LATHAM & WATKINS LLP
Melanie M. Blunschi (Bar No. 234264)
  melanie.blunschi@lw.com
Morgan E. Whitworth (Bar No. 304907)
  morgan.whitworth@lw.com
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Daniel R. Gherardi (Bar No. 317771)
  daniel.gherardi@lw.com
801 Jefferson Avenue, Suite 300
Redwood City, CA 94063
Telephone: +1.650.328.4600

*Attorneys for Defendants Extreme Networks, Inc.,
Edward B. Meyercord III, Rémi Thomas,
Cristina Tate, Kevin Rhodes, Norman Rice, and
Jonas Brown*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, on Behalf of Itself and All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>EXTREME NETWORKS, INC., EDWARD B. MEYERCORD III, RÉMI THOMAS, CRISTINA TATE, KEVIN RHODES, NORMAN RICE, JONAS BROWN<br><br>    Defendants. | Case No. 3:24-cv-05102-TLT<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br> Date: July 7, 2026<br> Time: 2:00 p.m.<br> Location: Courtroom 9, 19th Floor<br> Hon. Trina L. Thompson |

REDACTED

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND .................................................................................................. 3

        A.      Extreme Warned About The COVID-Era Global Supply Chain
                Meltdown ................................................................................................. 3

        B.      Extreme Repeatedly Warned That Backlog Was Subject To
                Cancellation Or Rescheduling ................................................................. 4

        C.      Extreme's Management And Market Commentators Attributed
                Extreme's Financial Difficulties to Industry-Wide Factors ................... 5

        D.      Plaintiffs' Allegations ............................................................................. 6

                1.      The Alleged "Two-Pronged Fraud" Scheme ............................... 6

                2.      The Alleged Misstatements ......................................................... 7

                3.      The Alleged Corrective Disclosures ............................................ 8

        E.      Plaintiffs Move For Class Certification .................................................. 8

III.    LEGAL STANDARD .......................................................................................... 10

IV.     ARGUMENT ....................................................................................................... 10

        A.      Plaintiffs Are Not Entitled To A Class-Wide Presumption Of
                Reliance ................................................................................................... 10

                1.      Plaintiffs Cannot Rely On The *Basic* Presumption Because
                        They Cannot Show That Any Alleged Misstatement Had A
                        Price Impact ................................................................................ 11

                2.      Plaintiffs Cannot Rely On The *Affiliated Ute* Presumption
                        Because Their Theory Is Not Omission-Based ............................ 16

        B.      Plaintiffs Have Not Shown That Damages Are Measurable On A
                Class-Wide Basis .................................................................................... 17

                1.      Plaintiffs Have Not Offered A Methodology That Can
                        Calculate Damages Based On Their Scheme Theory .................. 18

                        a.      Dr. Cain Cannot Establish How Scheme-Based
                                Inflation Was Introduced Into Extreme's Stock
                                Price Separate From The Alleged Misstatements Or
                                How It Evolved .................................................................. 19

                        b.      Dr. Cain Cannot Establish How Scheme-Based
                                Inflation Was Removed From Extreme's Stock
                                Price Separate From The Misstatement Claim .................. 22

DEF'S OPPOSITION TO
PLTFS' MOT FOR CLASS CERTIFICATION
3:24-CV-05102-TLT

2.  Plaintiffs Have Not Offered A Methodology That Can Calculate Damages Based On Their Misstatement Theory Of Liability ........................................................................ 23

a.  Dr. Cain's Discussion of Damages Is Untethered From Plaintiffs' Misstatement Theory Of Liability ..................... 23

b.  Plaintiffs Have Not Offered A Methodology For Their Materialization Of The Risk Theory ................................. 24

V.  CONCLUSION ........................................................................................... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972)................................................................................................ 11, 16

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ...................................................................................................... 10

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    77 F.4th 78 (2nd Cir. 2023) ...................................................................................... 13, 15

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)........................................................................................... 2, 9, 11

*Binder v. Gillespie*,
    184 F.3d 1059 (9th Cir. 1999) .................................................................................. 11, 16

*Boeing Co. v. Pub. Emps. Ret. Sys. of Miss.*,
    26-8007 (7th Cir. May 7, 2026) ...................................................................................... 24

*Bozorgi v. Cassava Scis.*,
    No. 25-90021, Dkt. 24 (5th Cir. Oct. 21, 2025)............................................................ 24

*City of Fort Lauderdale Gen. Emps.' Ret. Sys. et al. vs. Holley Inc. et al.*,
    1:23-cv-00148-GNS (W.D. Ky. Jan. 23, 2026) ....................................................... 22

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)................................................................................................... passim

*Crews v. Rivian Auto., Inc.*,
    2024 WL 3447988 (C.D. Cal. 2024)............................................................................. 12

*Desai v. Deutsche Bank Sec. Ltd.*,
    573 F.3d 931 (9th Cir. 2009) .......................................................................................... 16

*Di Donato v. Insys Therapeutics, Inc.*,
    333 F.R.D. 427 (D. Ariz. 2019) ..................................................................................... 16

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) .......................................................................................... 10

*Epstein v. MCA, Inc.*,
    50 F.3d 644 (9th Cir. 1995) .............................................................................................. 1

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011).......................................................................................................... 19

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

iii

DEF'S OPPOSITION TO
PLTFS' MOT FOR CLASS CERTIFICATION
3:24-CV-05102-TLT

*Gambrill v. CS Disco, Inc.*,
    2025 WL 3771433 (W.D. Tex. Dec. 16, 2025) ........................................................................ 15

*Goldman Sachs Grp., Inc. v. Ark. Teachers Ret. Sys.*,
    594 U.S. 113 (2021)................................................................................................... passim

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)................................................................................................... 10, 11

*In re AGS, Inc. Sec. Litig.*,
    2024 WL 581124 (D. Nev. Feb. 12, 2024), *aff'd*, *Okla Police Pension & Ret.
    Sys. v. PlayAGS, Inc.*, 2025 WL 927296 (9th Cir. Mar. 27, 2025)................................... 18, 19

*In re Boeing Co. Sec. Litig.*,
    No. 25-135 (4th Cir. May 2, 2025) ..................................................................................... 23

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ............................................................................................. 19

*In re Concho Res., Inc.*,
    2025 WL 1040379 (S.D. Tex. Apr. 7, 2025) ....................................................................... 12

*In re DiDi Glob. Inc. Sec. Litig.*,
    2025 WL 1909295 (S.D.N.Y. Jul. 7, 2025) ......................................................................... 17

*In re Enovix Corp. Sec. Litig.*,
    2026 WL 1078569 (N.D. Cal. Apr. 21, 2026) ....................................................... 11, 12, 13, 15

*In re Fastly, Inc. Sec. Litig.*,
    801 F. Supp. 3d 880 (N.D. Cal. 2025) ................................................................................ 25

*In re FibroGen Sec. Litig.*,
    2024 WL 1064665 (N.D. Cal. Mar. 11, 2024)...................................................................... 12

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
    2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ..................................................................... 12

*In re NVIDIA Corp. Sec. Litig.*,
    2026 WL 821418 (N.D. Cal. Mar. 25, 2026)....................................................................... 12

*In re The Estée Lauder Co., Inc. Sec. Litig.*,
    1:23-cv-10669-AS (S.D.N.Y. July 25, 2025) ...................................................................... 22

*In re Vaxart Inc. Sec. Litig.*,
    738 F. Supp. 3d 1259 (N.D. Cal. July 2, 2024) ................................................................... 22

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prod. Liab. Litig.*,
    2 F.4th 1199 (9th Cir. 2021) .................................................................................... 11, 16, 17

*In re WorldCom, Inc. Sec. Litig.*,
219 F.R.D. 267 (S.D.N.Y. 2003) ............................................................................................ 17

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023) ...................................................................... 25

*Levya v. Medline Indus., Inc.*,
716 F.3d 510 (9th Cir. 2013) ................................................................................................... 18

*Mulderrig v. Amyris, Inc.*,
340 F.R.D. 575 (N.D. Cal. 2021) ............................................................................................ 25

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) ................................................................................................. 25

*Pampena v. Musk*,
2025 WL 2224423 (N.D. Cal. Aug. 5, 2025) .......................................................................... 18

*Vinole v. Countrywide Home Loans, Inc.*,
571 F.3d 935 (9th Cir. 2009) ................................................................................................... 10

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ................................................................................................................. 10

**RULES**

Fed. R Civ P. 23(f) ................................................................................................................... 23

Fed. R. Civ. P. 23(a) ................................................................................................................ 10

Fed. R. Civ. P. 23(b)(3) ...................................................................................................... passim

SEC Rule 10b-5(a) ............................................................................................................... passim

SEC Rule 10b-5(b) ........................................................................................................... 2, 8, 18

SEC Rule 10b-5(c) ............................................................................................................... passim

## I.   INTRODUCTION

Plaintiffs ask this Court to certify a class because "[s]ecurities cases fit Rule 23 'like a glove.'"  Mot. at 2 (quoting *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir. 1995)).  But this is not a run-of-the-mill securities fraud case.  In the typical case, a company makes an allegedly misleading statement, the truth comes out, the stock price drops, and an expert plugs the price changes into a formulaic out-of-pocket damages calculation that estimates the difference between the stock price's "inflation" at purchase and its value at sale.  This case is not so simple.

Plaintiffs' theory of liability seeks to capitalize on the uncertainty about both supply and demand that plagued companies like Extreme Networks that supported remote working solutions during the COVID-19 pandemic and the country's fitful return to in-person activities.  Putting blinders on to the stockpiling that many businesses engaged in to guard against shortages and the unknowns around whether and to what extent remote work would become permanent, Plaintiffs ignore the obvious explanations and pretend instead that Extreme's record-breaking revenue growth during the COVID-19 pandemic was the result of  a "two-pronged" scheme to deceive investors about the sources and durability of Extreme's business.  First, they ignore the demand (and stockpiling) trends of the time to claim that Extreme's revenue was artificially inflated by "channel stuffing," and second, they ignore the uncertainty around when that demand (and the supply chains to meet it) would return to pre-COVID norms to claim that Extreme misled investors about whether the company's order backlog would suddenly drop in the future.

Plaintiffs claim that Extreme's stock price was artificially inflated by 54 alleged misstatements relating to Defendants' revenue growth and order backlog, as well as by the "scheme" itself.  The problem for Plaintiffs is that the so-called "truth" about Defendants' alleged scheme and misstatements never came out, much less caused the stock price to drop.  Plaintiffs point to five "corrective disclosure" dates on which a wide variety of information was announced, including earnings results, guidance changes, executive resignations and promotions, and information about the networking technology industry writ large.  While it is true that the stock price declined on these days (sometimes modestly, sometimes more), Plaintiffs cannot tie the declines to their posited scheme because none of these alleged disclosures revealed what Plaintiffs

allege to have been concealed by Defendants—that is, none of the alleged corrective disclosures indicated that Extreme had previously been "channel stuffing" (because it had not) or that Extreme knew all along that a substantial portion of its backlog orders would be cancelled (again, because it did not).

While the Court had to accept these allegations as true when ruling on Defendants' motion to dismiss, now Plaintiffs must prove that they have satisfied each of Federal Rule of Civil Procedure 23's requirements for class certification, including Rule 23(b)(3)'s "predominance" requirement. They cannot do so.

First, individual issues of reliance predominate because Plaintiffs are not entitled to a presumption of class-wide reliance. Under *Goldman Sachs Grp., Inc. v. Ark. Teachers Ret. Sys.*, 594 U.S. 113 (2021), there must be a substantive "match" between the alleged misstatements and the corrective disclosures. If there is no "match," then the alleged misstatements did not have an impact on the share price, and the presumption is rebutted. None of the five alleged corrective disclosures revealed the "truth" of the alleged channel stuffing scheme or disclosed that backlog cancellations were the reason for the backlog's decline. Instead, each disclosure attributed Extreme's deteriorating results to the same industry-wide factors—supply-chain normalization, channel digestion, elongated sales cycles, and macroeconomic softness—that market analysts had already identified. The mismatch between the alleged corrective disclosures and the alleged misrepresentations is fatal to Plaintiffs' Motion because it rebuts the presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

Second, Plaintiffs have failed to demonstrate that damages are measurable on a class-wide basis consistent with their theories of liability, as required by *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Plaintiffs' expert, Dr. Matthew Cain, offers nothing more than vague assurances that the "out-of-pocket" approach will work without any attempt to apply it to the unique facts of this case—the same boilerplate opinion he has submitted in over forty prior cases. This is particularly problematic here, where Plaintiffs allege two different theories of liability on two distinct sets of factual allegations: claims for misstatement liability under Rule 10b-5(b) and scheme liability under Rules 10b-5(a) and (c) as to both the "channel-stuffing" and backlog theories of fraud. As

to Plaintiffs' scheme liability claim, Dr. Cain has offered no method to measure how alleged non-public, fraudulent conduct introduced inflation into the stock price independently of any alleged public misstatement, no method to account for how that inflation evolved as the alleged scheme supposedly waxed and waned over time, and no method to determine how or when scheme-based inflation was removed from the stock price. Adding to the difficulty of disentangling the stock price effects of the various claims and theories, the allegations supporting the two claims proceeded on different timelines: the scheme allegedly started in mid-March 2022, while the misstatements started months later, in late July, and the "channel-stuffing" scheme did not begin to dissipate until after the first corrective disclosure was made. As to Plaintiffs' misstatement liability claim, Dr. Cain's discussion of damages is equally untethered from the facts: it cannot differentiate fraud-related stock price declines from those caused by confounding industry-wide developments or account for the mismatch between what was allegedly concealed and what the corrective disclosures actually revealed. Nor has Dr. Cain offered any methodology capable of calculating damages under Plaintiffs' alternative materialization-of-the-risk theory of loss causation.

The Court should deny Plaintiffs' motion for class certification entirely, and at a minimum, as to the scheme liability claim under Rules 10b-5(a) and (c).

## II.    BACKGROUND

### A.    Extreme Warned About The COVID-Era Global Supply Chain Meltdown

Extreme is a leader in cloud-driven networking solutions. It designs, manufactures, and sells wired and wireless network equipment, as well as a cloud-networking platform and applications portfolios. Ex. 2 at 10; Second Amended Complaint (Dkt. 95) ("SAC") ¶ 56. Extreme, like many other companies, suffered supply chain challenges caused by the COVID-19 pandemic. Ex. 2 at 3-4; SAC ¶¶ 66, 302. But while Extreme experienced supply "disruptions and bottlenecks," it received record orders. Ex. 12 at 5; SAC ¶ 66. In six out of the seven quarters in the Proposed Class Period, Extreme's quarterly revenue grew year-over-year—and it met or exceeded its financial forecasts. *See* Exs. 12, 14, 15, 16, 17, 18, 20, 21, 22.

At the same time, Extreme warned investors about the risks posed by the convergence of

supply-chain chaos and record demand.  Among other things, Extreme cautioned that:

- Its required components and semiconductor chips are "currently in high demand with limited supply"; "shortages have been exacerbated by increased energy, raw material, and transportation costs," resulting in "higher [] costs" and "significantly longer than usual lead times for these components" which "could have a material adverse effect on [its] ability to meet customer orders." Ex. 2 at 14; *see also* Ex. 1 at 14.

- If its "forecasts exceed orders" it "may have excess and/or obsolete inventory" and if its "orders exceed forecasts" it "may have inadequate supplies of certain materials and components" either of which "could have a material adverse effect on [its] ability to meet customer delivery requirements and to recognize revenue." Ex. 1 at 14; Ex. 2 at 14; Ex. 3 at 16.

Extreme similarly explained that the "ongoing supply chain constraints" had a "material" "revenue impact." SAC ¶ 68; Ex. 11 at 13.

### B.    Extreme Repeatedly Warned That Backlog Was Subject To Cancellation Or Rescheduling

Because the rising demand and limited supplies created a large order backlog, Extreme began reporting that backlog each quarter.  SAC ¶¶ 66-71.  This backlog represented "confirmed orders with a purchase order for products to be fulfilled and billed to customers." *Id.* ¶¶ 65, 330. Although Extreme's backlog reached "record" highs during this period, *see, e.g.*, Ex. 12 at 5; Ex. 14 at 5, Extreme warned that it did not "believe [the] backlog, as of any particular date is necessarily indicative of actual revenues for any future period," Ex. 1 at 9; Ex. 2 at 9; Ex. 3 at 10. For this reason, Extreme cautioned—both before and during the Proposed Class Period—that backlog orders could be canceled or rescheduled.  For example, Extreme stated:

- The "firm" orders in its backlog were "subject to possible rescheduling" or "cancellations by customers," that it may allow "on an exception basis," and thus Extreme "do[es] not believe [its] backlog . . . is necessarily indicative of actual revenues for any future period." Ex. 2 at 9; *see also* Ex. 1 at 9; Ex. 3 at 10.

- Revenues and results "have varied significantly in the past and may vary significantly in the future" due to "product returns or the cancellation or rescheduling of orders." Ex. 1 at 20; *see also* Ex. 2 at 20; Ex. 3 at 21.

- "Current supply chain constraints" caused Extreme's backlog "to grow," though "orders in our backlog could be cancelled by customers, impacting the accuracy of our revenue forecasting." Ex. 2 at 20; *see also* Ex. 3 at 21.

- When Extreme announces new or enhanced products, "customers may defer or cancel orders for [its] existing products" and "ending sales of existing products may cause customers to cancel or defer orders"; this "could have a material adverse effect on [its] operating results by unexpectedly decreasing sales, increasing inventory levels of older

products and exposing us to greater risk of product obsolescence." Ex. 1 at 17; *see also* Ex. 2 at 17; Ex. 3 at 18.

Extreme also said that it expected backlog to decline as it caught up with orders. For example, in July 2022, CEO Edward Meyercord stated that Extreme "expect[s] backlog will begin to shrink by Q4 of fiscal '23"—and that it would "take more meaningful chunks out of that backlog" in the second half of 2023. Ex. 13 at 5, 15. He added that Extreme released $20 million of backlog based on "reengineering products to improve lead times for customers." *Id.* at 5.

### C.    Extreme's Management And Market Commentators Attributed Extreme's Financial Difficulties To Industry-Wide Factors

As predicted, Extreme's backlog began to shrink during fiscal year 2023 due to "a combination of a resumption in shipment of orders" "after experiencing significant delays due to supply chain constraints in prior years, and a reduction in distributor orders due to shorter lead times." Ex. 3 at 10. In November 2023, Extreme reiterated that there was "a very high level of backlog release into the channel" and that customers were "digest[ing]" "a lot of product [they put] into the channel." Ex. 19 at 8. Extreme explained that this was due to a change in "customer buying patterns and macroeconomic conditions" that was impacting the "whole industry." *Id.* at 7-8. So, Extreme began "tempering [its] revenue outlook." *Id.* at 7. It lowered its guidance for 2Q24 by about 7.5% based on "industry headwinds of channel digestion and elongated sales cycles," including large sales "pushing out to future quarters." Ex. 21 at 5. Extreme then met this adjusted guidance. Ex. 22 at 5.

Market analysts similarly attributed Extreme's lower revenue outlook and shrinking backlog to industry-wide factors. For instance, on November 1, 2023, UBS reported on Extreme's 1Q24 financial results and explained that "our checks across the networking landscape indicate the softening is largely due to the macro with inventory destocking a contributing factor." Ex. 4 at 1. The next day, B. Riley noted that "like some of their peers, [Extreme's] demand was negatively impacted due to customers becoming more cautious with spending, compounded by high channel inventories." Ex. 5 at 1. On January 8, 2024, after Extreme reported lower than expected guidance for 2Q24, UBS again explained that Extreme's financial results "should not have come as a surprise" given "negative public comments" from Extreme's competitors "over the past several

months." Ex. 7 at 1. Other analysts similarly recognized the challenges plaguing the industry, not just Extreme. *See, e.g.*, Ex. 8 at 1 (Oppenheimer report stating: "We think it is a combination of above trend network upgrades the last few years, macro uncertainty and customers waiting for improved products/services . . . . This is not unique to [Extreme]."); Ex. 9 at 1 (UBS report explaining: "Our concern is that Networking industry spend across Campus/WLAN will decline sharper than expected for the balance of calendar 2024.").

### D.    Plaintiffs' Allegations

#### 1.    The Alleged "Two-Pronged Fraud" Scheme

Plaintiffs allege that Defendants engaged in "two-pronged fraud" to "deceive[] investors about both the source and sustainability of Extreme's revenue growth": (1) the so-called channel stuffing scheme, and (2) misrepresenting the durability of backlog orders. SAC ¶¶ 1-3, 650-53.

For prong one, Plaintiffs allege that Extreme experienced financial success at the beginning of the Proposed Class Period by (1) "secretly coerc[ing] distributors into buying hundreds of millions of dollars in unwanted inventory" to secure priority on the backlog list; (2) improperly "pulling in" sales from future quarters by shipping products to Extreme's partners and resellers, even without a firm end-customer purchase order; (3) offering discounts, rebates, and other incentives to persuade customers to buy outdated and unwanted products with a right to return those products in future quarters; and (4) preventing customers from returning products. *See* SAC ¶¶ 2, 94-268, 651.

For prong two, Plaintiffs assert that Defendants publicly assured investors that its backlog comprised "firm" and "not cancelable" orders even though they "knew the backlog was contractually designed to be cancelled and riddled with duplicate and triplicate orders that would assuredly evaporate." *Id.* ¶ 3. In support, Plaintiffs allege that: (1) the backlog did not reflect "firm" customer commitments because those customers double or triple booked orders and then canceled them; (2) the backlog contracts were "designed to be cancelled" because they allowed customers to double order; (3) Extreme internally forecasted that up to 10% of the backlog would be cancelled; (4) the backlog did not reflect true end-user commitment because Extreme did not know whether distributors had a corresponding end-user purchase order; and (5) there was no

incentive for distributors to place large backlog orders once Extreme started "coercing" them to buy unwanted inventory in exchange for priority on the backlog list, rather than using Extreme's historical "first in, first out" (FIFO) order fulfilment method. *See id.* ¶¶ 8, 269-344.

Plaintiffs contend that the scheme part of the alleged fraud began in mid-March 2022—months *before* the start of the Proposed Class Period on July 27, 2022. *Id.* ¶¶ 106-15, 652. Specifically, Plaintiffs allege that Defendants hatched the scheme on March 16, 2022, when Defendant Brown decided to "blow up FIFO" backlog prioritization and force distributors to buy product they did not want or need. *Id.* ¶¶ 147, 652. Defendant Brown allegedly "sold [Jenne and Westcon] $40 million of unneeded product at the end of 3Q2022 that TD Synnex would not take on." *Id.* ¶ 123. A few weeks later, Plaintiffs say, this plan to "blow up FIFO" got "legs" from Extreme's Director of Purchasing, who agreed with Defendant Brown that Extreme should get rid of FIFO when allocating shipments to distributors. *Id.* ¶¶ 148-49, 652. Soon after, Plaintiffs assert that Extreme convinced one of its biggest distributors, Westcon, to buy $52 million worth of unneeded inventory, *id.* ¶¶ 124-32, 652, and then engaged in a similar transaction with another of its distributors, Jenne, at the end of June 2022, *id.* ¶ 137.

## 2.     **The Alleged Misstatements**

Apart from the alleged scheme, Plaintiffs challenge 54 statements that Defendants made over eighteen months, from July 27, 2022, through January 30, 2024. Specifically, Plaintiffs challenge statements about: (1) Extreme's growth and demand, such as statements describing "strong demand" for Extreme's products, *see, e.g.*, Stmts. 2-3, 5-6, 8-9, 12, 17-18, 27, 29, 33, 37, 45, and the Company's "strong" and "impressive" growth, *see, e.g.*, Stmts. 1-2, 4-5, 11, 15-17, 19, 28, 33, 37, 43, 46, 48, 51; and (2) the status of and Extreme's visibility into the backlog, *see, e.g.*, Stmts. 2, 5-10, 15, 17-21, 23-25, 27-28, 30-31, 34-35, 38-41, 44, 46-47, 50, 52. *See* Appendix A to SAC (Dkt. 95-1).

Although the allegations supporting the purported scheme and the misstatements overlap, Plaintiffs bring separate claims for separate conduct—one for scheme liability under Rule 10b-5(a) and (c), and another for misstatement liability under Rule 10b-5(b). Plaintiffs insist the theories are different because Defendants "participated in deceptive acts beyond their

misrepresentations." Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended Complaint (Dkt. 81) at 25. And indeed, Plaintiffs identify alleged "fraudulent" conduct supporting the scheme that, unlike the alleged misstatements, was never publicly revealed to the market. *See, e.g.*, SAC ¶ 650-53. The two claims similarly proceed on different timelines: the scheme allegedly started in mid-March 2022, while the misstatements started months later, in late July. *Id.* ¶¶ 106-115, 652.

### 3.   The Alleged Corrective Disclosures

Plaintiffs allege that the "two-pronged fraud" was revealed through five corrective disclosures:

- **January 25, 2023**: Extreme announced: (1) that Defendant Thomas resigned as CFO, (2) the backlog decreased from $555 million to $542 million, and (3) a shorter timeline for backlog normalization. SAC ¶¶ 353-354.

- **August 24, 2023**: Extreme announced that its backlog had decreased from $513 million to $267 million, which it attributed "to a combination of a resumption in shipment of orders during fiscal 2023, after experiencing significant delays due to supply chain constraints in prior years, and a reduction in distributor orders due to shorter lead times." *Id.* ¶ 358.

- **November 1, 2023**: Extreme reported a quarter-over-quarter revenue decline and projected lower revenue guidance, which Defendant Rhodes explained was "[b]ased on changing customer buying patterns" from an "air pocket" of demand. *Id.* ¶ 364. Extreme also stated that it would stop disclosing the backlog each quarter, *id.* ¶ 361, although this decision was actually disclosed months earlier, *see* Ex. 27 (Smith Rep.) ¶ 68.

- **January 8, 2024**: Extreme lowered its 2Q24 and long-term revenue guidance, which "reflects industry headwinds of channel digestion and elongated sales cycles" and because "[i]n late Q2, we saw multiple large deals pushing out to future quarters." *Id.* ¶¶ 366-67. Extreme also announced that Chief Revenue Officer Joe Vitalone resigned. *Id.* ¶ 368.

- **January 31, 2024**: Extreme revealed that its product revenues had declined from the prior quarter and lowered guidance for 3Q24. *Id.* ¶¶ 371, 374. It explained that "distributors and partners have lowered inventory purchases," and that the Company's product revenue decline was attributable to "continued channel digestion and elongated sales cycles." *Id.* ¶ 372. Extreme similarly reported that its product backlog had normalized "earlier than we initially anticipated." *Id.*

### E.   Plaintiffs Move For Class Certification

Plaintiffs move to certify a class of "all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Extreme during the period from July 27, 2022 through January 30, 2024." Mot. at 2. Plaintiffs also seek to appoint Oklahoma Firefighters Pension and Retirement System, Oklahoma Police Pension and Retirement System, Oakland

County Voluntary Employees' Beneficiary Association, and Oakland County Employees' Retirement System as Lead Plaintiffs, and Labaton Keller Sucharow ("Labaton") as Class Counsel. *Id.* at 1. None of these four Plaintiffs had heard of Extreme before their counsel asked them to serve as a potential lead plaintiff. *See* Ex. 23 at 95:12-19; Ex. 24 at 20:18-21:8, 134:13-23; Ex. 25 at 32:15-18. And three of the four Plaintiffs bought no Extreme stock until after the first alleged corrective disclosure on January 25, 2023, *see* Dkt. 23-2, after Plaintiffs allege that "truth concerning Extreme's channel stuffing and manipulative sales and inventory practices and the true nature of the Company's backlog" began to "emerge[]," SAC ¶ 351.

In support of their motion, Plaintiffs rely on the expert report of Matthew D. Cain. *See* Dkt. 120-2 ("Cain Rep."). Dr. Cain first opines that Extreme's common stock traded in an efficient market during the Proposed Class Period—a prerequisite to the fraud-on-the-market presumption first recognized in *Basic v. Levinson*, 485 U.S. 224 (1988) that Plaintiffs use to show class-wide reliance. Cain Rep. ¶¶ 32-96. For purposes of this motion, Defendants do not dispute that Extreme's common stock traded in an efficient market.

In the last five pages of his 39-page report, Dr. Cain offers a separate opinion—which is virtually identical to the opinion that he has offered in every case where he has served as an expert at the class certification stage—that damages "can be calculated on a class-wide basis subject to a standard, common methodology." *Id.* ¶ 3. Specifically, Dr. Cain says it is possible to calculate class-wide damages for all Plaintiffs' claims using the "out of pocket" approach. *See id.* ¶ 97; Ex. 26 ("Cain Tr.") 22:19-23:1; *see also* 55:10-22. Dr. Cain explains that the out-of-pocket approach "calculates investor damages formulaically as the artificial inflation in the stock price at the time of purchase minus the artificial inflation in the stock price at the time of sale." Cain Rep. ¶ 99. Dr. Cain admits, however, that he has done no work to confirm that he can, in fact, calculate artificial inflation here consistent with Plaintiffs' theories of liability. *See, e.g.*, Cain Tr. 165:21-166:2; 232:4-20; 270:5-271:2. And his discussion of damages is essentially copied and pasted from his prior reports. Cain Tr. 21:12-22; 22:19-22 (identifying the damages section of his report in this case as one that " ███████████████████████ " to his prior reports).

## III.    LEGAL STANDARD

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted).  To certify a class, a party must meet Federal Rule of Civil Procedure 23(a)'s four requirements—numerosity, commonality, typicality, and adequacy—plus at least one of Rule 23(b)'s requirements. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011). Plaintiffs seek to certify a class under Rule 23(b)(3), so they must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (quoting Fed. R. Civ. P. 23(b)(3)).  To meet their burden, Plaintiffs "must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23" which includes "the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) (*Halliburton II*).  The Court thus must conduct a "rigorous analysis" to determine whether Plaintiffs have met that burden. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011).

## IV.    ARGUMENT

Plaintiffs fail to satisfy Rule 23(b)(3)'s predominance requirement for two reasons. *First*, Plaintiffs cannot establish that they are entitled to the presumption of reliance, and thus individual issues of reliance predominate. *Second*, Plaintiffs have failed to show that damages are measurable on a class-wide basis consistent with their theory of liability.

### A.    Plaintiffs Are Not Entitled To A Class-Wide Presumption Of Reliance

To establish predominance, Plaintiffs must show that they can prove all elements of their claims through class-wide evidence. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 462-63 (2013).  This includes the element of reliance. *Halliburton II*, 573 U.S. at 263.  If every investor had to produce individual evidence that they personally relied on each challenged statement, "individual issues" would "overwhelm the common ones," making it impossible to certify a securities class action. *Id.* at 268 (citation modified) (quoting *Basic Inc. v. Levinson*, 485

U.S. 224, 242 (1988)). To address this concern, the Supreme Court established a rebuttable presumption of reliance in *Basic v. Levinson*, 485 U.S. at 246. The *Basic* "presumption" rests on the "theory that investors rely on the market price of a company's security, which in an efficient market incorporates all of the company's public misrepresentations." *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.,* 594 U.S. 113, 117 (2021) ("*Goldman I*").

In *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), the Supreme Court also recognized that plaintiffs bringing section 10(b) claims based primarily on an omission or non-disclosure theory face the "difficulty of proving 'a speculative negative'—that the plaintiff relied on what was *not* said." *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999) (emphasis added). *Affiliated Ute* therefore extended the presumption of reliance to plaintiffs bringing omission-based claims. *See also In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prod. Liab. Litig.*, 2 F.4th 1199, 1204 (9th Cir. 2021). "When the presumption applies," whether under *Basic* or *Affiliated Ute*, "investors do not need to demonstrate individual reliance for class certification purposes." *In re Enovix Corp. Sec. Litig.*, 2026 WL 1078569, at *6 (N.D. Cal. Apr. 21, 2026) (internal quotation and citation omitted).

Plaintiffs invoke both *Basic* and *Affiliated Ute* to establish class-wide reliance here, *see* Mot. at 16-22, but they cannot rely on either presumption. First, Defendants have rebutted the *Basic* presumption because Plaintiffs cannot show that any alleged misstatement had an impact on Extreme's stock price. Second, Plaintiffs cannot show that the *Affiliated Ute* presumption applies here at all because their theory of liability is not based on omissions.

    1.  **Plaintiffs Cannot Rely On The *Basic* Presumption Because They Cannot Show That Any Alleged Misstatement Had A Price Impact**

Defendants rebut the *Basic* presumption if the preponderance of the evidence shows "that the alleged misrepresentation did not actually affect the stock's price—that is, that the misrepresentation had no 'price impact.'" *Halliburton II*, 573 U.S. at 263-64. If the alleged misstatements did not impact the stock price, "the basis for finding that the fraud has been transmitted through market price would be gone," *id.* at 281, and there would be no basis to presume that the plaintiff relied on the misrepresentation, *Goldman I*, 594 U.S. at 119.

Price impact can be shown in one of two ways: "on the 'front-end' (i.e., misstatements causing or maintaining inflation) or on the 'back-end' (i.e., a decline in price caused by the corrective disclosures)." *In re NVIDIA Corp. Sec. Litig.*, 2026 WL 821418, at *10 (N.D. Cal. Mar. 25, 2026). But even if the stock price declines on the date of an alleged corrective disclosure, there can be no "back-end" price impact unless the substance of the alleged "corrective disclosure 'matches' the earlier misrepresentations or omissions." *In re Concho Res., Inc.*, 2025 WL 1040379, at *11 (S.D. Tex. Apr. 7, 2025) (citing *Goldman I*, 594 U.S. at 123). As the Supreme Court explained in *Goldman I*, "when there is a mismatch between the contents of the misrepresentation and the corrective disclosure . . . it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." 594 U.S. at 123. So, "if a defendant disproves back-end price impact," "one can infer a lack of front-end impact as well because the alleged misrepresentations must not have been the cause of an artificially inflated stock price." *Crews v. Rivian Auto., Inc.*, 2024 WL 3447988, at *13 n.8 (C.D. Cal. 2024) (defendants need not analyze front-end price increases to argue no back-end price impact). "If Defendants convince the Court that there was no back-end price impact, it will be strong and persuasive evidence that there was no price impact at all." *Id.*

A "finding of 'back-end' price impact requires proof that the information disclosed on the date of the corrective disclosure was" actually "corrective of one or more prior false statements or omissions." *Enovix*, 2026 WL 1078569, at *8 (quoting *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024)) (citation modified). In other words, "[r]evelations that are not 'corrective' cannot form the basis for a corrective disclosure." *Id.* Determining whether a corrective disclosure "matches" the alleged misstatement "requires a closer fit (even if not precise) between the front- and back-end statements than courts have required when analyzing the loss causation element of securities fraud." *NVIDIA*, 2026 WL 821418 at *14 (quoting *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *6 (S.D.N.Y. Mar. 29, 2024)). And unlike at the motion to dismiss stage, at the class certification stage, the court must consider "all probative evidence" to determine whether a mismatch exists. *Goldman I*, 594 U.S. at 122.

Here, there is no back-end price impact—and thus no presumption of reliance—for any of the alleged misstatements because none of the five alleged corrective disclosures actually "corrected" Plaintiffs' theory of falsity for the growth and demand or backlog statements.

***Growth and Demand Statements.*** Plaintiffs contend that the growth and demand statements were false because Extreme allegedly achieved revenue growth not through strong demand, but on account of the "channel stuffing scheme." *See, e.g.*, SAC ¶¶ 390, 652. To "correct" the growth and demand statements, then, the alleged corrective disclosures must have revealed the "truth" of this alleged scheme that supposedly propped up Extreme's revenue growth. *See Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.,* 77 F.4th 78, 98 (2nd Cir. 2023) ("*Goldman II*") (a corrective disclosure must "expressly and specifically negat[e] the alleged false statement" or "directly render[] [it] false").

*In re Enovix Corp. Securities Litigation* is instructive. 2026 WL 1078569, at *11-*13. In that case, the plaintiffs alleged that the challenged statement had implied that the defendant company's manufacturing equipment had passed a critical quality-control milestone when, in fact, the equipment had failed the test repeatedly. *Id.* at *8-*9. The alleged corrective disclosures discussed the poor performance of the company's manufacturing operations generally, including the company's disappointing output and reduced revenue guidance. *Id.* at *11. But the court still found a "mismatch" between the misstatement and the disclosures, rejecting plaintiffs' argument that the corrective disclosures were sufficiently "corrective" because they revealed the "consequences" of the concealed test failure. *Id.* at *11-*12.

Here, the alleged corrective disclosures are like those in *Enovix*: they did not "[bring] to light" any of the information that was alleged to have made the growth and demand statements misleading. *Id.* at *12. The alleged corrective disclosures discuss Extreme's financial results, forward guidance, announcements of executive transitions, and management commentary attributing negative financial results to industrywide developments. Smith Rep. ¶ 50; *see* SAC ¶¶ 354-74. They do not reveal any aspect of the allegedly concealed channel stuffing scheme or link the revenue declines to the collapse of the alleged scheme. Smith Rep. ¶¶ 50-53. To the contrary, the corrective disclosures (and associated analyst commentary) blame industrywide trends for

demand reductions, not the refusal of Extreme's customers to continue participating in a channel-stuffing scheme. *Id.* ¶ 53, Section VII.B.

The first two alleged corrective disclosures in January and August 2023 only discuss backlog decline and the resignation of Extreme's CFO, neither of which correct any alleged misrepresentation about Extreme's revenue growth and demand. SAC ¶¶ 353-54, 357-58. The next alleged corrective disclosure, on November 1, 2023, was an earnings release that reported a $10 million decrease in revenue in Q1 2024 from the prior quarter and downward revenue guidance for Q2 2024, *id.* ¶¶ 362-64, neither of which sheds light on whether or how Extreme's growth during the prior quarters was inflated through the alleged channel stuffing scheme. The last two alleged corrective disclosures, in January 2024, reported lower Q2 2024 revenues than originally forecast and lower guidance for Q3 2024 and the full year, *id.* ¶¶ 366-68, 370-75; once again, these do not address the reasons for revenue growth or demand in *prior* quarters.

Analysts reporting on Extreme during the Proposed Class Period similarly did not discuss any of the reasons that allegedly made the growth and demand statements false. Smith Rep. ¶ 52; *see also* Cain Tr. 244:21-245:17 ("███████████████████████████ ██████████████████"). Rather, these analysts, like Extreme's management, attributed the decrease in Extreme's demand to industry-wide factors, including channel inventory normalization as the supply crisis began to level out. Smith Rep. ¶¶ 70, 74, 79; *see also, e.g.*, SAC ¶ 356, 369; Ex. 4 at 1 (in reaction to November 1, 2023 disclosure, UBS explaining "softening is largely due to the macro with inventory destocking a contributing factor"); Ex. 6 at 1 (Rosenblatt characterizing the lower revenue guidance as "not overly surprising, given the channel and inventory digestion Cisco (CSCO, Neutral) recently spoke about"); Ex. 8 at 1 (Oppenheimer explaining: "We think it is a combination of above trend network upgrades the last few years, macro uncertainty and customers waiting for improved products/services . . . . This is not unique to [Extreme]."). Indeed, Plaintiffs have not shown that the "channel stuffing" scheme that serves as the basis for Plaintiffs' theory of falsity for the growth and demand statements has *ever* been revealed to the public.

Because the corrective disclosures did not "correct" the truth allegedly concealed by the growth and demand, those statements had no price impact. *See Gambrill v. CS Disco, Inc.*, 2025

WL 3771433, at *11 (W.D. Tex. Dec. 16, 2025) (finding a mismatch because the alleged corrective disclosure did not "contradict" the challenged statements); *see also* Smith Rep. ¶ 48 ("stock price decline following a corrective disclosure may not be a reliable measure of the value implications of the allegedly concealed information if the corrective disclosure does not match the allegedly concealed information").

***Backlog Statements.***     Plaintiffs allege that Defendants "[m]isrepresent[ed] the [c]ancellation [r]isk of the [o]rders on [b]acklog" by stating that the vast majority of backlog orders were "firm" and "not cancelable" when they were allegedly "conditional in nature and readily cancellable by customers." Mot. at 6–7. To correct the backlog statements, the alleged corrective disclosures must have revealed the "truth" that backlog orders were not as firm and noncancellable as Defendants allegedly represented at the time. *See Goldman II*, 77 F.4th at 98. Plaintiffs' backlog theory faces the same mismatch problem as the disclosures in *Enovix* because "the same information that was alleged to have made the initial statements" did not "also c[o]me to light" through the disclosures. *Enovix*, 2026 WL 1078569 at *12. The challenged statements purportedly misrepresented the cancellation risk of Extreme's order backlog at particular moments in time. But the alleged corrective disclosures only revealed a decline in the value of Extreme's reported backlog at a *later* time and a shortened timeline for backlog normalization. The disclosures did not reveal any allegedly concealed cancellation risk or connect the decline in backlog to heightened cancellation risks prior to the challenged statements being made. *See* Smith Rep. ¶¶ 55-56.

The mismatch is all the more apparent because the disclosed backlog decline is entirely consistent with non-fraudulent explanations. *See Goldman I*, 594 U.S. at 122 (court must consider "all probative evidence" to determine whether a mismatch exists). Both before and during the Proposed Class Period, Extreme reported its backlog on an annual basis in its Form 10-Ks and repeatedly disclosed that "all [backlog] orders are subject to possible rescheduling by customers, and cancellations by customers" and that "we do not believe our backlog[] as of any particular date is necessarily indicative of actual revenues for any future period." Smith Rep. ¶ 94; Ex. 1 at 9; Ex. 2 at 9; Ex. 3 at 10. The market therefore already understood that backlog orders carried cancellation risk—a fact Plaintiffs ignore. *Id.* As Plaintiffs themselves acknowledged, the

COVID-19 pandemic created significant, industrywide supply chain constraints that caused Extreme to "accumulat[e] a substantial product backlog."  Mot. at 4.  Extreme reported this substantial backlog throughout most of the Proposed Class Period and also disclosed its expected timeline for normalization (i.e., when the supply chain constraints were expected to be resolved so that backlog would decline to pre-pandemic levels).  Smith Rep. ¶ 22; SAC ¶¶ 69-70, 354; Ex. 13 at 5, 15.  The resultant decline in backlog, which was faster than Extreme (or others in the industry) were expecting, is not indicative of any misrepresented cancellation risk by itself.  *Id.*  The only new information was that the pace of backlog reduction was steeper than Extreme anticipated, but that is not an alleged misstatement.  Because none of Plaintiffs' alleged corrective disclosures matches Plaintiffs' alleged "truth," none are "corrective," meaning the *Basic* presumption has been rebutted.  And because Plaintiffs cannot rely on the *Basic* presumption, individual questions of reliance predominate, dooming their request for class certification.

2.      **Plaintiffs Cannot Rely On The *Affiliated Ute* Presumption Because Their Theory Is Not Omission-Based**

If Plaintiffs attempt to invoke the *Affiliated Ute* presumption, that presumption is unavailable here. *See* Mot. at 21-22.  Under the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), the Ninth Circuit has recognized that the presumption of reliance is "generally available to plaintiffs alleging violations of section 10(b) based on omissions of material fact," not only affirmative misrepresentations.  *Binder*, 184 F.3d at 1063.  But this presumption "is limited to cases that can be characterized as primarily alleging omissions," meaning that the plaintiffs alleged harm "stem[med] from the failure to disclose accurate information relating to the value of a security where one has a duty to disclose it."  *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 445 (D. Ariz. 2019) (citation omitted).  "[T]he mere fact of concealment cannot transform affirmative conduct into omissions."  *Volkswagen*, 2 F.4th at 1205; *see also Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 941 (9th Cir. 2009) ("If such nondisclosure of a defendants' fraud was an actionable omission, then every manipulative conduct case would become an omissions case.").

Plaintiffs' only basis for invoking *Affiliated Ute* is that "Defendants engaged in a sustained

undisclosed scheme to deceive investors by leveraging Extreme's backlog to stuff the channel, closing revenue gaps, and reporting 'strong' and 'unabated' demand." Mot. at 22. In other words, Plaintiffs' theory of "omissions" is merely that Defendants concealed the alleged fraud, which is insufficient. *See Volkswagen*, 2 F.4th at 1208-09 ("the exception would swallow the rule" if concealment of fraud is enough to satisfy *Affiliated Ute*). The cases that Plaintiffs rely on to argue otherwise are inapposite, as they both involved an overt omission. *See In re DiDi Glob. Inc. Sec. Litig.*, 2025 WL 1909295, at *16 (S.D.N.Y. Jul. 7, 2025) (applying *Affiliated Ute* where defendant failed to disclose a government investigation in order to induce the closing of its IPO); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 297-98 (S.D.N.Y. 2003) (applying *Affiliated Ute* where company failed to disclose an illicit quid-pro-quo relationship with a market analyst who encouraged investors to purchase the company's securities). Because Plaintiffs "can prove reliance through ordinary means by demonstrating a connection between the alleged misstatements and its injury," the *Affiliated Ute* presumption does not apply. *Volkswagen*, 2 F.4th at 1209.

**B.    Plaintiffs Have Not Shown That Damages Are Measurable On A Class-Wide Basis**

Plaintiffs fail to meet Rule 23(b)(3)'s predominance requirement for an additional, independent reason: they have failed to establish that "damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. In *Comcast*, the Supreme Court held that courts must conduct a "rigorous analysis" to ensure at the class-certification stage that "any model supporting a plaintiff's damages case" is "consistent with its liability case." *Id.* at 35 (internal quotations omitted). This means that "a model purporting to serve as evidence of damages in [a] class action must measure *only* those damages attributable to that theory." *Id.* (emphasis added). "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* Although "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)" in the Ninth Circuit, a plaintiff's proposed damages model must at least show that the class members' damages "stemmed from the defendant's actions that created the legal liability." *Levya v. Medline Indus., Inc.*, 716 F.3d 510 (9th Cir. 2013).

Here, Plaintiffs allege two legally and economically distinct claims and theories of liability: one under Rule 10b-5(b) based on alleged misstatements, *see* SAC ¶¶ 636-46, and another under Rules 10b-5(a) and (c) for an allegedly fraudulent scheme, *see id.* ¶¶ 647-57. The fundamental distinction between these two theories is that misstatement liability is about what Defendants *said,* while scheme liability is about what Defendants *did. See Pampena v. Musk,* 2025 WL 2224423, at *3 (N.D. Cal. Aug. 5, 2025) ("Courts distinguish between claims brought under Rule 10b-5(b), which concern material misrepresentations or omissions made by the defendant, and claims under Rule 10b-5(a) and (c), which are also known as 'scheme liability claims' and encompass a broader range of fraudulent conduct.") (citation omitted). Although these claims do not "proscribe mutually exclusive types of fraudulent conduct," scheme liability "involves fraudulent conduct made 'in furtherance' of a scheme," while misrepresentation liability "doesn't involve a scheme." *In re AGS, Inc. Sec. Litig.,* 2024 WL 581124, at *5 (D. Nev. Feb. 12, 2024), *aff'd, Okla Police Pension & Ret. Sys. v. PlayAGS, Inc.,* 2025 WL 927296 (9th Cir. Mar. 27, 2025).

Plaintiffs' expert has not offered a viable damages model for either the scheme liability theory or the misrepresentation theory.

### 1. Plaintiffs Have Not Offered A Methodology That Can Calculate Damages Based On Their Scheme Theory

Dr. Cain concedes that Plaintiffs bring two different claims—one for misstatement liability and another for scheme liability. *See* Cain Tr. 179:2-8. But he offers a high-level description of only one damages calculation: the "formulaic[]," "out-of-pocket" approach, under which damages are computed "as the artificial inflation in the stock price at the time of purchase minus the artificial inflation in the stock price at the time of sale." Cain Rep. ¶ 99; Cain Tr. 179:9-17 (admitting that Dr. Cain is " █████████████████████████████ "). To satisfy *Comcast,* then, Dr. Cain's damages calculation must be capable of "measur[ing] only those damages attributable to" the scheme liability claim, separate and apart from the misstatement liability claim. 569 U.S. at 35.

Dr. Cain has failed to show how his proposed calculation is capable of doing so. First, Dr. Cain has not explained how his calculation will measure how the alleged scheme introduced

inflation into the stock price independently of any public statements or how it fluctuated throughout the Proposed Class Period. Second, he has not shown how his calculation will measure how any artificial inflation dissipated from the stock price on account of revelation of the scheme separate from any public statements.

### a. Dr. Cain Cannot Establish How Scheme-Based Inflation Was Introduced Into Extreme's Stock Price Separate From The Alleged Misstatements Or How It Evolved

According to Dr. Cain, the "out-of-pocket" formula that he proffers for both Plaintiffs' scheme and misstatement liability claims measures "stock price reactions to disclosures and materializations of the risks which dissipate the relevant truth that was concealed by the alleged fraudulent misrepresentations." Cain Rep. ¶ 101. This admission highlights a flaw in Dr. Cain's "analysis"—it explains that artificial inflation enters the stock price through *statements*. More specifically, it presumes that inflation enters the stock price on the date of a specific false statement and dissipates from the stock price when the truth about that misstatement is publicly revealed, usually through a corrective disclosure. *See, e.g.*, *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789-90 (9th Cir. 2020) (explaining that corrective disclosures are commonly used to show that the revelation of truth caused the "fraud induced inflation in the stock's price to be reduced or eliminated") (citation omitted). Scheme liability is different. It involves concealed conduct, not just public-facing statements. *See AGS*, 2024 WL 581124, at *5; *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*") (Rule 23(b)(3)'s predominance inquiry requires courts to look at "the elements of the underlying cause of action"). And here, Plaintiffs allege a scheme that depends on conduct distinct from the alleged misstatements. For example, Plaintiffs allege that Defendants forced distributors to buy unwanted product, improperly "pulled in" sales from future quarters, provided discounts, rebates, and other incentives to persuade Extreme's customers to buy unwanted product, and prevented customers from returning product— none of which involves any *statements* made to investors. SAC ¶¶ 2, 94-268, 651. Any scheme-based damages methodology must therefore be able to measure how that conduct introduced inflation into the stock price, independently of any of the alleged misstatements. Smith Rep. ¶¶ 32, 35-40; *see Comcast*, 569 U.S. at 35.

To start, Dr. Cain has not analyzed how (or even if) his damages calculation can differentiate artificial inflation introduced through the alleged scheme as opposed to the alleged misstatements. Smith Rep. ¶ 36. He acknowledged that the two theories require ████████ ████—*i.e.*, inflation-creating events. Cain Tr. 179:18-180:11; *see also id.* 202:17-203:4 (explaining that he has "████████████████████ for the two claims but that the █████ ██████████████████████████████████████████████████"). But he has not identified any "████" for the scheme claim. Indeed, when asked to identify those "████," Dr. Cain pointed only to "████████████████████" and other "█████ ███████"—the same "████" underlying the misstatement theory. *Id.* at 202:3-203:8.

This cannot be enough under *Comcast*, as Plaintiffs' own allegations confirm. Plaintiffs allege that the scheme began in mid-March 2022—over four months *before* the first alleged misstatement—when Extreme purportedly decided to "blow up FIFO" prioritization for the backlog. *See* SAC ¶¶ 131-32, 652. Defendant Brown allegedly "sold [Jenne and Westcon] $40 million of unneeded product at the end of 3Q2022 that TD Synnex would not take on." *Id.* ¶ 123. On April 7, 2022, according to Plaintiffs, Extreme's Director of Purchasing gave "legs" to this plan to "blow up FIFO" and that in March or April 2022 Westcon agreed to buy $52 million worth of unneeded inventory in exchange for receiving $50 million in product off of the backlog. *Id.* ¶¶ 131, 132, 148, 652. Plaintiffs also allege that Extreme engaged in a similar transaction with Jenne at the end of June 2022. *Id.* ¶ 137.

These allegedly fraudulent acts are not tied to any allegedly false or misleading public statements. In fact, the acts were not publicly reported at all. If these acts created artificial inflation in Extreme's stock price, it would not have been through "█████████████████████ ████████████████████████████" Cain Tr. 203:19-204:13. As a result, Dr. Cain proposes no method that even tries to measure inflation from these alleged acts. *See* Smith Rep. ¶ 37-39. Confirming this, Dr. Cain conceded he has not analyzed how to measure inflation without a public-facing statement. Cain Tr. 264:1-14. Worse still, he did not know that Plaintiffs allege that the scheme started long before the alleged misstatements. *See* Cain Tr. 190:14-191:1 (testifying that "██████████████████████████████████████████████████████████

[REDACTED]").

Nor does Dr. Cain's damages approach adequately account for conduct that occurred during the Proposed Class Period. *See* Smith Rep. ¶ 40. He says he can conduct a damages analysis using an event study. *See* Cain Rep. ¶¶ 103, 105-06; Cain Tr. 270:1-22. But he testified that an event study analyzes the effects of public announcements on a company's stock price. Cain Tr. 261:4-262:3. That is unhelpful where the scheme is predicated on acts that are not disclosed in public statements. For example, Plaintiffs allege that on June 29, 2023, Extreme's Sales Director decided to "get creative" and pull in "as much as we can get in today and tomorrow," which allegedly led to distributors buying product without end-customer orders. SAC ¶ 218. But this information was never publicly reported. Dr. Cain has not identified any way to measure how this alleged fraudulent *conduct* impacted Extreme's stock price at the time it occurred in June 2023. *See* Smith Rep. ¶ 40; Cain Tr. 205:25-207:2 (admitting that he has not "[REDACTED]" on whether it is "[REDACTED]").

Dr. Cain's damages model also fails to account for how inflation allegedly evolved over the course of the alleged scheme. Smith Rep. ¶ 42. The conduct underlying the scheme occurred at different times and with different effects. *Id.* For instance, Plaintiffs allege that the scheme began in the spring of 2022, before the start of the Proposed Class Period, when Defendant Brown allegedly first proposed the idea to "blow up FIFO prioritization," SAC ¶¶ 147, 652, and that management regularly directed sales directors "at the end of almost every quarter to ask partners to take early inventory," *id.* ¶ 237. Plaintiffs allege that this behavior "really started picking up after 2022," when "management" requested to "pull in everything." *Id.* ¶¶ 197-98. Under Plaintiffs' theory, inflation likely would have increased to the extent that an increasing portion of Extreme's revenues were allegedly derived from the scheme as it intensified over time. Smith Rep. ¶¶ 43-44. Plaintiffs further allege that the scheme began to deteriorate in early 2023 when distributors began cancelling their backlogs because Extreme was allegedly "playing games with backlog every quarter." SAC ¶ 349. Inflation presumably would have changed as the alleged scheme became less effective. Smith Rep. ¶¶ 45-46. Dr. Cain offers no methodology to measure

how inflation caused by the alleged scheme may have increased and decreased as the underlying scheme conduct evolved, particularly in the absence of any related public statements to measure stock price impact. *Id.* ¶ 47.

### b.     Dr. Cain Cannot Establish How Scheme-Based Inflation Was Removed From Extreme's Stock Price Separate From The Misstatement Claim

Finally, any damages methodology must be able to parse out how and when the inflation was removed from the stock price, thus causing investor losses. *See In re Vaxart Inc. Sec. Litig.*, 738 F. Supp. 3d 1259, 1267 (N.D. Cal. July 2, 2024) (rejecting Dr. Cain's proposed class damages model for failure to adequately measure timing of alleged inflation dissipation). Dr. Cain testified that he did not know "███████████████████████████████████████ ████████████████████████████████████████████████████." Cain Tr. 207:19-208:14. But this case presents that exact scenario. Plaintiffs allege that the fraudulent scheme "start[ed] to unravel" in around August 2023, when "Extreme's customers had had enough" and "began cancelling backlogged orders at a faster clip and refused to order new product from Extreme." SAC ¶ 90; ECF No. 95-2 at 7 (App. B to SAC). But Plaintiffs also allege that the "truth" began to reveal itself with the first corrective disclosure on January 25, 2023—six months earlier. SAC ¶ 351. Dr. Cain does not explain how the January 2023 disclosure could have corrected any scheme-related inflation if the scheme did not begin "to unravel" until months later, and his damages methodology does not provide any way to account for this distinction.

A comparison of Dr. Cain's report in this case to his other publicly filed securities class actions further emphasizes the inadequacy of his methodology. *See* Smith Rep. ¶ 33. Dr. Cain recently submitted reports in *In re The Estée Lauder Co., Inc. Sec. Litig.* ("*Estée Lauder*") and *City of Fort Lauderdale Gen. Emps.' Ret. Sys. et al. vs. Holley Inc. et al.* ("*Holley*"), both of which involved misstatement liability claims only. *See Estée Lauder*, 1:23-cv-10669-AS, Dkt. 84-1 (S.D.N.Y. July 25, 2025) ("*Estée Lauder* Report"); *Holley*, 1:23-cv-00148-GNS, Dkt. 122-2 (W.D. Ky. Jan. 23, 2026) ("*Holley* Report"). The only difference between the damages section in Dr. Cain's present report and reports in *Estée Lauder* and *Holley* is that in the former, Dr. Cain acknowledges that inflation allegedly resulted from "Defendants' materially misleading

statements, omissions, *and deceptive acts*," whereas in the latter, he does not include the "deceptive acts" language. *Compare* Cain Rep. ¶ 98 (emphases added) *with Estée Lauder* Report ¶ 95 (discussing "Defendant's materially misleading statements, omissions, and undisclosed risks"); *compare* Cain Rep. ¶ 98 (emphases added) *with Holley* Rep. ¶ 108 (discussing "Defendant's materially misleading statements and omissions"). The discussion of damages itself however is the exact same. *Compare* Cain Rep. ¶¶ 97-115 *with Estée Lauder* Report ¶¶ 94-112; *compare* Cain Rep. ¶¶ 97-115 *with Holley* Rep. ¶¶ 107-118, 122-27. Dr. Cain has not attempted to explain how this singular formula can be applied to both Plaintiffs' misstatement and scheme liability claims here, much less how it will measure only those damages attributable to the scheme liability theory. *See* Smith Rep. ¶¶ 32-35. This defies *Comcast*. 569 U.S. at 35 ("If the model does not even attempt to" "measure *only* those damages attributable to" plaintiffs' theory, "it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)").

### 2. Plaintiffs Have Not Offered A Methodology That Can Calculate Damages Based On Their Misstatement Theory Of Liability

#### a. Dr. Cain's Discussion of Damages Is Untethered From Plaintiffs' Misstatement Theory Of Liability

Plaintiffs challenge 54 statements by various speakers over 18 months, yet the damages section of Dr. Cain's report does not once reference the SAC's allegations, provide any analysis particular to Extreme, or show that the proffered formula can be reliably applied to the unique facts of this case. Cain Rep. ¶¶ 97-114. This cannot satisfy *Comcast*.

Defendants acknowledge that district courts in the Ninth Circuit have certified classes for misstatement liability claims based on the out-of-pocket formula that Dr. Cain relies on here.[1] But as Dr. Smith shows, the facts here raise specific damages issues that Dr. Cain's generic approach

---

[1] Although courts have traditionally been willing to accept the generic damages discussion that Dr. Cain relies on here, several circuits are now reviewing cases that address this specific issue. On May 7, 2026, the Fourth Circuit heard oral argument on a Rule 23(f) petition, where defendants argued that plaintiffs' expert's proposed out-of-pocket formula is not sufficient under *Comcast*. *See* Order and Brief of Appellants, *In re Boeing Co. Sec. Litig.*, No. 25-135, Dkts. 25, 36 (4th Cir. May 2, 2025). The Fifth and Seventh Circuits also recently granted Rule 23(f) petitions challenging plaintiffs' ability to establish class-wide damages. *See Bozorgi v. Cassava Scis.*, No. 25-90021, Dkt. 24 (5th Cir. Oct. 21, 2025); *Boeing Co. v. Pub. Emps. Ret. Sys. of Miss.*, 26-8007, Dkt. 23 (7th Cir. May 7, 2026).

ignores. *See* Smith Rep. § VII. For example, Dr. Cain acknowledged that any damages methodology must be able to differentiate between inflation introduced into the stock on account of the alleged fraud, rather than inflation caused by "███████████████"—*i.e.*, "███████████████." Cain Tr. 240:3-22; *see also* Cain Rep. ¶ 103. Yet Dr. Cain's proposed formula does not offer a way to isolate the portion of Extreme's stock price drop attributable to Extreme-specific issues rather than industry-wide trends. *See* Smith Rep. § VII.B. This is particularly problematic here, where both Extreme and the analysts attributed its financial results to macroeconomic and industrywide factors, including the effects of uneven normalization of the supply chain on demand for networking technology products as COVID-19 waned. *Id.* ¶ 86; *see also id.* ¶¶ 87-90 (Extreme's competitors were affected by industrywide factors in similar ways).

Another reason that Dr. Cain's proposed formula cannot establish class-wide damages is because it fails to account for the economic differences between the information allegedly concealed by the false statements and the information disclosed by the corrective disclosures. *See supra* § IV.A.1.; Smith Rep. § VII.A. Although Dr. Cain testified that any alleged corrective disclosure must "█████████████████████████████████████" Cain. Tr. 196:15-197:1, his proposed calculation provides no means to address the mismatch between the alleged misstatements and the alleged corrective disclosures here. Smith Rep. ¶ 50.

### b. Plaintiffs Have Not Offered A Methodology For Their Materialization Of The Risk Theory

As an alternative to a corrective disclosure loss causation theory, Plaintiffs allege that "loss causation can be demonstrated by the materialization of various risks related to Defendants' channel stuffing scheme and the true nature of the backlog." SAC ¶ 619. This materialization of the risk approach "recognizes loss causation where a plaintiff shows that misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of a security." *In re Fastly, Inc. Sec. Litig.*, 801 F. Supp. 3d 880, 916 (N.D. Cal. 2025) (quoting *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013)).

Extreme repeatedly disclosed the risk that backlog orders may be canceled or modified years before the dissemination of the alleged corrective disclosures. *See* Smith Rep. ¶ 94. If (as Dr. Cain opines) the market for Extreme's common stock was efficient, *see* Cain Rep. ¶ 3, and the risk of some backlog cancellations was publicly disclosed (as it was), then the market would have already priced in some probability that some cancellations would occur. Any damages methodology must therefore be able to account for this already partially disclosed risk.

Dr. Cain's report acknowledges the materialization of the risk theory and asserts in passing that "[e]vent studies" can "measure stock price reactions to disclosures and materializations of the risks which dissipates the relevant truth that was concealed by the fraudulent misrepresentations." Cain Rep. ¶ 101. But as Dr. Smith explains, "when a disclosure reveals the materialization of a known (but possibly understated) risk," that alone may have triggered a stock price drop even if Extreme had previously provided a "truthful" disclosure about the magnitude of the risk. Smith Rep. ¶¶ 97-100. An event study measuring the stock price decline to such disclosure "overstates the amount of inflation" dissipated because part of the stock price decline would be completely unrelated to the allegedly understated risk. *Id.* Dr. Cain has offered no methodology capable of addressing this distinction and accounting only for the inflation attributable to the allegedly understated backlog cancelation risk consistent with Plaintiffs' theory of liability. *Id.*; *Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at *11 (M.D. Tenn. Feb. 24, 2023) (denying class certification because plaintiff's out-of-pocket model "failed to … comport[] with the materialization-of-the-risk theory of loss causation"); *Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 590-91 (N.D. Cal. 2021) (same).

## V.    CONCLUSION

Defendants respectfully submit that the Court should deny Plaintiffs' motion for class certification or, at a minimum, excise Plaintiffs' scheme liability claims under Rules 10b-5(a) and (c) from any certified class.

Dated: May 15, 2026

Respectfully Submitted,

LATHAM & WATKINS LLP

By */s/ Melanie M. Blunschi*
Melanie M. Blunschi (Bar No. 234264)
 melanie.blunschi@lw.com
Morgan E. Whitworth (Bar No. 304907)
 morgan.whitworth@lw.com
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Daniel R. Gherardi (Bar No. 317771)
 daniel.gherardi@lw.com
801 Jefferson Avenue, Suite 300
Redwood City, CA 94063
Telephone: +1.650.328.4600

*Attorneys for Defendants Extreme Networks, Inc.,
Edward B. Meyercord III, Rémi Thomas, Cristina
Tate, Kevin Rhodes, Norman Rice, and Jonas
Brown*